# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| | ) |
| Plaintiff, | ) Civil Action No.: 3:21-cv-00194-N |
| | ) |
| v. | ) <u>CLASS ACTION</u> |
| | ) |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, NEIL A. CHAPMAN, JACK P. WILLIAMS, NEIL A. HANSEN, DAVID S. ROSENTHAL, LIAM M. MALLON, JEFFREY J. WOODBURY, and SARA N. ORTWEIN, | ) <u>DEMAND FOR JURY TRIAL</u> ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |
| | ) |

# AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
# THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................... 2

II.    JURISDICTION AND VENUE ............................................................ 8

III.   THE PARTIES ........................................................................................ 9

    A.    Lead Plaintiffs ............................................................................ 9

    B.    Defendants .................................................................................. 9

IV.   SUMMARY OF THE FRAUD ............................................................ 12

    A.    Defendant Woods, Installed To "*Turn The Titanic*," Makes High-Profile Acquisitions In The Permian Basin And Places Them At The Center Of Exxon's Turnaround Plans .................................................................. 13

    B.    March 7, 2018 Analyst Meeting: Exxon Announces "Aggressive Growth Strategy" In The Permian, Touting The Value Of Permian Assets And Production Conditions On The Ground ............................................. 15

    C.    In Truth, Exxon's Reported Valuations Were Based On False Drilling Assumptions, Permian Production Was Plagued By Multiple Problems, And Exxon Did Not Lead Competitors In Wells Or Production ......................... 16

        1.    Exxon's Reported Valuations Were Based On False Drilling Assumptions .............................................................................. 16

        2.    Exxon Experienced Longer Than Expected Drilling Times, Poor Well Performance, Problems With Well Quality, And Other Issues ........ 17

            a.    Problems With Drilling And Wells ............................... 17

            b.    Additional Production Problems And Delays ............... 21

        3.    Exxon Did Not Lead Competitors In Drilling, Wells, Or Production ............................................................................... 22

            a.    Exxon's True Position With Respect to Horizontal Wells And Production ........................................................... 23

            b.    Exxon Did Not Lead Competitors In Drilling Times .................. 24

            c.    Exxon Produced Fewer Barrels Of Oil-Equivalent Than Competitors ................................................................. 25

d. Exxon's Well Performance Was Behind Most Of The Top Operators In The Permian Basin.................................................. 26

e. Exxon's Well Quality Was Not "Very, Very High"..................... 27

D. Defendants Continue To Tout Permian Production In The First And Second Quarters Of 2018, And Unveil The Notorious "Green Blob"................. 27

E. Company Insiders Recognize The Need For A Write-Down Of Exxon's Proved Reserve In Summer 2018 ......................................................... 29

1. Exxon Has A Longstanding Policy Of Not Taking Write-downs ........... 29

2. Exxon's Fraudulent Reserve Forecasting Process ..................................... 30

a. The Reservoir Engineering Department ........................................ 30

b. Boosting The Proved Reserve To Avoid A Write-Down ............ 33

c. Never Revising Down The Resource Base .................................... 37

d. Additional Former Employees Confirm Pressure To Change Valuations That Were Not High Enough......................... 38

3. Exxon Internally Recognizes The Need For A Write-Down In The Summer Of 2018 ...................................................................................... 40

F. Instead Of Taking A Write-Down, Defendants *Increase* The Proved Reserve And Continue To Tout Drilling And Production In The Permian Basin ................................................................................................................ 40

G. "Unleash the Hounds": In March 2019, Defendants Announce Impossible Goal Of 1 Million Oil-Equivalent Barrels Per Day In The Permian .................. 41

H. "The Green Blob": Pressure To Achieve Woods's Impossible Goal Permeated The Organization........................................................................ 44

1. Insiders Acknowledged That The Goal Was Not Achievable ................. 44

2. Expert Analysis Confirms That Achieving The "Green Blob" Goal Was Not Feasible ...................................................................................... 48

I. After March 2019, Defendants Continue To Falsely Assure Investors That Exxon Is "On Track" To Meet Its 1 Million Oil-Equivalent Barrel Production Goal And To Misstate Production Conditions ................................... 50

J. "This is A Lie": In The Summer Of 2019, Exxon Determines To Use False Drilling Assumptions Saved In A File Called "This is A Lie" To Overvalue The Delaware Basin By At Least $10 Billion.................................... 50

1.       The Whistleblower Complaint That Launched An SEC
         Investigation ............................................................. 50

2.       Multiple Former Employees Confirmed The Whistleblower's
         Allegations ............................................................... 51

    a.       "This is A Lie" File And Pressure To Use False
             Assumptions In Connection With Year-End 2019 Planning
             Process ............................................................. 51

    b.       Longer Than Expected Drilling Times Made The Permian
             Production Goal Impossible ........................................ 53

    c.       Additional Problems In The Permian That Rendered The
             Production Goal Impossible To Achieve ........................... 56

        i.       Inadequate Equipment And Infrastructure ...................... 56

        ii.      Inadequate Labor ............................................. 59

        iii.     Less Oil Than Expected ...................................... 60

3.       Expert Analysis Confirms That Exxon Continued To Lag Behind
         The Top Operators In The Permian Basin During 2019 And 2020 .......... 61

    a.       Exxon Continued To Lag Behind In Drilling Times ................... 61

    b.       Exxon Continued To Lag Behind In Production ....................... 65

    c.       Exxon Continued To Lag Behind In Well Performance .............. 66

    d.       Exxon Continued To Lag Behind In Well Quality ..................... 66

K.  Exxon Continued To Falsely Assure Investors That Its 1 Million Oil-
    Equivalent Barrels Goal Was "On Track," Overstate The Value Of Its
    Asset, And Tout Misleading Production Conditions ............................ 67

L.  The Truth Is Revealed Through A Series Of Partially Corrective
    Disclosures ..................................................................... 69

    1.       January 31, 2020:  Exxon Discloses That Permian Basin
             Production Has Slowed Down, But Continues To Mislead
             Investors About Exxon's Ability To Achieve The 1 Million Oil-
             Equivalent Barrels Goal ............................................ 69

    2.       May 1, 2020: Exxon Discloses Significant Rig Cuts And A
             Reduction In 2020-2021 Permian Basin Production Volumes, But
             Represents That Impact Will Only Be Short-Term And Continues
             To Tout Production Conditions ...................................... 71

3.  January 15, 2021: The *Wall Street Journal* Reports That Exxon Used False Drilling Assumptions Saved In A File Called "This is A Lie" To Overvalue The Delaware Basin By $10 Billion ...................... 72

V.  POST-CLASS PERIOD EVENTS ................................................................... 73

A.  Exxon Announces A Reduced Goal Of 700,000 Oil-Equivalent Barrels Per Day By 2025 In The Permian ................................. 73

B.  Exxon Reduces Its Proved Reserve By 1.5 Billion Oil-Equivalent Barrels Related To The Permian Basin ................................ 73

VI.  ADDITIONAL SCIENTER ALLEGATIONS ................................................ 74

A.  Senior Exxon Management Directed Employees To Inflate Reserves ................ 74

B.  Senior Exxon Management Directed Employees To Use False Drilling Assumptions In Valuations ................................................ 75

C.  Senior Exxon Management Reviewed And Approved The Inflated Reserve Reports ................................................................ 76

D.  Senior Exxon Management Received Drilling Reports Twice Per Day .............. 77

E.  Senior Exxon Management Had Access To Reserves And Production Data ....... 77

F.  The Executive Defendants Personally Toured Exxon's Permian Basin Operations ................................................................ 79

G.  A Corporate Culture Of Refusing To Take Write-Downs And Inflating Valuations Pervaded Exxon ................................................ 80

H.  Former Employees Of Exxon Confirm That It Was Common Knowledge Throughout The Company That Defendants' "Green Blob" Goal Was Impossible ................................................................ 81

I.  The Executive Defendants Held Themselves Out As Knowledgeable About Exxon's Production In The Permian Basin ............................... 81

J.  In Response To Questions From Analysts About The Permian Basin, Defendants Denied Problems Existed .................................... 82

K.  The Permian Basin Constituted A "Core Operation" of Exxon's ......................... 83

L.  Expert Analysis Confirms That Achieving The "Green Blob" Was Not Feasible ................................................................ 84

M.  Defendants Woods, Chapman, and Williams Were Financially Motivated To Perpetrate The Fraud And Personally Benefitted From It ............................ 84

iv

N.     Defendants Mallon, Hansen, and Rosenthal's Suspicious Sales Of Exxon Stock ................................................................................................. 86

O.     The SEC Launched An Investigation Into Exxon's Valuation Of The Permian Basin .................................................................................... 89

P.     The Executive Defendants Signed Sarbanes-Oxley Certifications ...................... 90

Q.     Defendants Required Employees To Sign Non-Disclosure Agreements ............ 90

R.     Defendants Retaliated Against Dissenting Employees ......................................... 91

VII.    THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES ................................ 91

A.     Standards Governing The Calculation Of Proved Reserves ................................ 91

B.     GAAP Regulations Governing The Reporting Of Proved Reserves ................... 92

C.     GAAP Requires Proved Reserves To Be Estimated With Reasonable Certainty ................................................................................................. 95

D.     Relevant SEC Regulations Governing Oil and Gas Companies .......................... 96

VIII.   EXXON VIOLATED THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES ................................................................................................. 97

A.     Exxon Incorporated False Drilling Assumptions Into Its Proved Reserve Calculation ............................................................................................ 97

B.     Exxon Engaged In A Fraudulent Process For Estimating Its Proved Reserves ................................................................................................. 97

IX.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................... 98

A.     Defendants Misrepresent The Value Of The Permian Basin And Tout Production Conditions In The Permian Throughout 2018, Concealing Drilling Delays And Problems With Well Performance And Well Quality ......... 99

1.     Misstatements And Omissions On March 7, 2018 Analyst Day ............. 99

a.     False Valuation .............................................................. 99

b.     False And Materially Misleading Production Conditions ........... 99

c.     Materially Misleading Data ...................................................... 100

2.      Misstatements And Omissions In 2017 Financial & Operating Review Report ...................................................................... 101

         a.      False Valuation ......................................................... 101

3.      Misstatements And Omissions In First Quarter 2018 ........................... 102

         a.      False And Materially Misleading Production Conditions .......... 102

4.      Misstatements And Omissions In Second Quarter 2018 ....................... 103

         a.      False And Materially Misleading Production Conditions .......... 103

5.      Misstatements And Omissions During October 2, 2018, "Upstream Spotlight: Unlocking Permian Value" Presentation ............................... 103

         a.      False Valuation ......................................................... 103

         b.      Materially Misleading Data ....................................... 104

6.      Misstatements And Omissions In Third Quarter 2018 ......................... 105

         a.      Materially Misleading Production Conditions........................... 105

B.      Defendants Continue To Misrepresent The Value Of The Permian And Production Conditions At The Beginning Of 2019 ........................................ 106

1.      Misstatements And Omissions In Fourth Quarter 2018 ....................... 106

         a.      False And Materially Misleading Production Conditions .......... 106

2.      Misstatements And Omissions At Year-End 2018 ............................... 107

         a.      False Valuation ......................................................... 107

         b.      False And Materially Misleading Production Conditions .......... 107

         c.      False Valuation Process ............................................. 108

         d.      False Valuation In 2018 10-K...................................... 108

         e.      False Valuation Process In 2018 10-K......................... 108

C.      In March 2019, Defendants Announce 1 Million Oil-Equivalent Barrels Per Day By 2024 In Permian, Despite Goal Being Impossible ......................... 109

1.      Misstatements And Omissions On March 6, 2019 Investor Day............ 109

         a.      Impossible Permian Production Goal ......................... 109

b.        False Valuation ........................................................ 111

c.        False And Materially Misleading Production Conditions .......... 111

D.        After March 2019, Defendants Continue To Falsely Assure Investors That
Exxon Is "On Track" To Meet 1 Million Oil-Equivalent Barrel Production
Goal And Misstate The Value Of The Permian And Production Conditions ..... 112

1.        Misstatements And Omissions In First Quarter 2019 ........................... 112

a.        Impossible Permian Production Goal ......................................... 112

b.        False And Materially Misleading Production Conditions .......... 113

2.        Misstatements And Omissions During June 18, 2019 J.P. Morgan
Energy Conference ................................................................................. 113

a.        Impossible Permian Production Goal ......................................... 113

3.        Misstatements And Omissions In Second Quarter 2019 ....................... 114

a.        Impossible Permian Production Goal ......................................... 114

b.        False And Materially Misleading Production Conditions .......... 115

4.        Misstatements And Omissions In Third Quarter 2019 .......................... 117

a.        Impossible Permian Production Goal ......................................... 117

b.        False And Materially Misleading Production Conditions .......... 118

E.        Despite Disclosing Permian Production Slowdown In January 2020,
Defendants Continue To Mislead Investors About The Value Of The
Permian Basin And Production Conditions, Falsely Assuring Investors
That Exxon Is "On Track" To Meet 1 Million Oil-Equivalent Barrel Goal ...... 118

1.        Misstatements And Omissions At Year-End 2019 ............................... 118

a.        False Valuation ........................................................................ 118

b.        False Valuation Process ........................................................... 119

2.        Misstatements And Omissions On March 5, 2020 Analyst Day ........... 119

a.        Impossible Permian Production Goal ......................................... 119

b.        False Valuation ........................................................................ 120

c.        False And Materially Misleading Production Conditions .......... 121

X.      LOSS CAUSATION .................................................................................. 123

XI.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........................ 129

XII.    THE PRESUMPTION OF RELIANCE ....................................................... 129

XIII.   CLASS ACTION ALLEGATIONS ............................................................. 130

XIV.    CAUSES OF ACTION ............................................................................ 132

XV.     PRAYER FOR RELIEF ........................................................................... 138

XVI.    JURY DEMAND ................................................................................... 138

Lead Plaintiffs Amalgamated Bank ("Amalgamated") and State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") (together, "Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following against Exxon Mobil Corporation ("Exxon" or the "Company") and the other Defendants (defined below), upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief as to the allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning the Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by Exxon with the United States Securities and Exchange Commission ("SEC"); (iv) Exxon's corporate website; (v) other publicly available information; (vi) interviews with former Exxon employees; and (vii) analyses by accounting and industry oil and gas experts.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Plaintiffs bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities who purchased, or otherwise acquired, the common stock of Exxon from March 7, 2018 to January 15, 2021, inclusive (the "Class Period"), subject to certain exclusions addressed in ¶461 below (the "Class").  Plaintiffs' and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.  The Defendants in this action are: Exxon; Darren W. Woods, Exxon's

current Chief Executive Officer ("CEO") and Chairman of Exxon's Board of Directors; Neil A. Chapman, current Exxon Senior Vice President ("SVP"); Jack P. Williams, current Exxon SVP; Neil A. Hansen, current Exxon Vice President ("VP") of Europe, Africa, and Middle East Fuels and former VP of Investor Relations and Corporate Secretary; David S. Rosenthal, current Exxon VP and Corporate Controller; Liam M. Mallon, current Exxon VP and President of ExxonMobil Upstream Oil & Gas Company; Jeffrey J. Woodbury, former Exxon VP of Investor Relations and Secretary until his retirement in July 2018; and Sara N. Ortwein, former President of XTO Energy, Inc. ("XTO"), a subsidiary of Exxon that Exxon purchased in 2010, until her retirement in March 2019.

## I.   INTRODUCTION

1.     This case concerns Exxon's and its officers' misstatements and omissions about Exxon's critical oil and gas resource in the Permian Basin, located in Texas and New Mexico.

2.     Once one of the world's most influential and profitable companies, Exxon's business has faltered over the past decade.  On December 14, 2016, Defendant Darren Woods was appointed Exxon's Chief Executive Officer, and he was charged with, as one analyst put it, "turn[ing] the Titanic."

3.     Three weeks into his tenure as CEO, Woods announced a $6.6 billion acquisition of oil and gas assets in the Permian Basin and placed them at the center of Exxon's turnaround plans.  During his first Analyst Meeting as CEO on March 1, 2017, Defendant Woods repeatedly touted Exxon's new Permian assets and strategy.  The market celebrated: one analyst declared, "All of My Love (To The Permian)," and another announced, "We believe the XOM story is turning a corner."

4.     The Class Period begins on March 7, 2018, when, during Exxon's annual Analyst Meeting, Defendants presented valuations of the Permian Basin amounting to over 9.5 billion

barrels of oil-equivalent and touted production conditions on the ground, including that Exxon's wells in the Permian were "very, very high quality" and "underpin[ned]" the Company's growth plans. Defendants also presented data purporting to show that Exxon was better than other operators in the Permian in both wells and production. In fact, none of this was true.

5. To start, the valuations that Exxon presented to investors were based on false drilling assumptions and therefore inflated. As later revealed by the *Wall Street Journal*, the SEC is currently investigating Exxon in response to a whistleblower complaint. The whistleblower described that Exxon overestimated how quickly it could drill in the Delaware Basin, a subsection of the Permian Basin, in 2018.

6. Multiple former employees interviewed by Lead Counsel corroborated the whistleblower's account. Former employees on the ground in the Delaware Basin, including Norris Wingo, among others, confirmed that drilling times took longer than expected in 2018. Former employees, including Jeff Wachsmann, further confirmed that Exxon's Permian production was plagued by poor well performance, problems with well quality, and other issues. As a former Exxon Operations Drilling Supervisor put it, "I've drilled around the world, but drilling in the Permian was ugly, nasty stuff."

7. These former employee accounts are confirmed by Lead Counsel's oil and gas industry expert, who concluded that Exxon was not the leader in the Permian that it purported to be. Not only did Exxon cherry-pick the data that it presented to investors, but it also misleadingly excluded from its presentations all of the Permian operators that were ahead of Exxon in wells and production. What is more, expert analysis shows that, in fact, Exxon's drilling times were longer than other operators, it produced fewer barrels of oil-equivalent than its competitors, its well performance was behind most of the top operators in the Permian, and its well quality was not

"very, very high" at all.

8.    Even worse, Lead Counsel's investigation confirmed that Exxon's valuation process was rife with fraud.  As former Reservoir Engineer Andrew Rhodes described, reservoir engineers would submit their reserves to the reserves team at Exxon and then pressure would come down from the reserves team to look for places to boost the reserves.  The reservoir engineers then made them higher because the reservoir engineers reported to the reserves team.  Consistent with Exxon's longstanding policy against taking write-downs, Rhodes's team would be told that a scenario looked like a big write-down on reserves, and then told to look for places to boost reserves.

9.    Another former reservoir engineer interviewed by Lead Counsel confirmed that reservoir engineers would be told, "Here's the total number we need to hit, so make small adjustments to many decline curves to reach the number for a basin or an asset or an area."  A former Senior Geoscience Associate, Steven Binns, further confirmed that at Exxon, vice presidents or management-level officers would say that they needed a number to be "X," and the employees would have to scramble to make it "X."

10.    Then, Rhodes described how in the summer of 2018, the legacy Exxon U.S. Reserves Manager started looking at the reserves and saying this needs to be written down.  But Exxon decided to "kick the can down the road."  Instead of reducing its proved reserve to reflect the realities of Permian production on the ground or taking a write-down, Exxon *increased* its year-end 2018 reserves by 4.5 billion barrels, of which it attributed 1.2 billion oil-equivalent barrels to unconventional plays (i.e., the Permian).  In its press release announcing the reserve increase, Defendants tied it to the false drilling assumptions described by the whistleblower, stating, "Significant additions in the Permian Basin are supported by ExxonMobil's growth plan

4

including increased drilling activity and infrastructure development."

11.     The false Permian growth story continued.  On March 5, 2019—95 minutes after one of its largest competitors, Chevron, announced its own goal of 900,000 barrels per day in the Permian—Exxon's CEO Defendant Woods announced a new Permian goal of 1 million oil-equivalent barrels per day by 2024, telling investors that Exxon was going to "unleash the hounds." Defendants touted their progress toward this goal in a presentation that insiders referred to as the "green blob," assuring investors that Exxon was "on track" and "on schedule" to achieve that goal.

12.     In reality, however, the goal was not achievable.  The whistleblower, along with former employees, including Rhodes, Wachsmann, and others, described how it was widely acknowledged internally at Exxon that the Permian goal was not achievable.  As the whistleblower explained, and Lead Counsel's investigation corroborated, "No one I knew in the organization thought this was possible[.]  [T]he pressure to deliver on Woods's promise to the market permeated the organization."

13.     Lead Counsel's industry expert confirmed that the Permian goal was, in fact, not achievable.  Lead Counsel's expert's feasibility test determined that the maximum that Exxon could have achieved was 530,000 barrels of oil-equivalent per day by December 31, 2024.  And even if Exxon increased its rigs in 2019 to meet the goal, as it said it would, it still would have been able to achieve only 700,000 barrels of oil-equivalent per day—materially less than the 1 million that it touted to investors.

14.     The production problems that former employees described in 2018 only continued and worsened throughout 2019 and 2020.  For example, former Construction and Commissioning employee in the Delaware Basin, Karl Rydjord, described insufficient drilling progress that was not "living up to what was forecasted."  A former XTO Drilling Consultant, Ryan Wells, similarly

confirmed drilling delays and increased costs.  Former Rig Move Specialist Jeff Biddle described drilling delays with the rigs that he personally put in place in the Delaware Basin.

15.     In addition to the drilling problems and delays, multiple former employees described problems with (i) inadequate equipment and infrastructure; (ii) inadequate labor; and (iii) less oil than expected, all of which made the Permian production goal impossible.

16.     Further, Lead Counsel's industry expert's analysis reveals that during 2019 and 2020, Exxon continued to lag behind the other top operators in the Permian in drilling times, production, well performance, and well quality.

17.     Exxon's production growth plan was also based on false drilling assumptions and the product of fraud.  In addition to the pressure to boost the reserves that Exxon senior management applied at year-end revealed through Lead Counsel's investigation, the whistleblower described how in the summer of 2019, employees raised the fact that Exxon had overestimated the drilling assumptions it used for 2018. Consequently, Exxon had valued the net present value of the Delaware Basin at $60 billion, but in reality it was closer to $40 billion.

18.     Consistent with the accounts of the former employees interviewed by Lead Counsel, the whistleblower reported that, instead of appropriately reducing the valuation to reflect the truth, the Delaware development manager—then senior Exxon executive Melissa Bond—asked employees to "claw back" some of the lost value by using different assumptions, including a more optimistic "learning curve" that estimated the rate at which Exxon would improve drilling times.  Employees objected, and one employee submitted the revised estimates in a file named "***This is a Lie***." [1]

---

[1] Unless indicated otherwise, all emphasis in quotation marks is added.

19.     Nonetheless, Defendants continued to falsely represent that Exxon was "on track" to achieve its Permian production goal, continued to present falsely overstated valuations of the Permian Basin, and continued to tout production conditions that were in stark contrast to the realities on the ground.

20.     The truth was revealed through three partially corrective disclosures beginning in 2020 and culminating on January 15, 2021, when the *Wall Street Journal* reported that the SEC was investigating Exxon for using false drilling assumptions to value the Delaware Basin.

21.     First, on January 31, 2020, Exxon revealed that its oil production in the Permian Basin was flat quarter-to-quarter and fell below estimates made by industry analysts and the Company's own guidance.  In response to this news, Exxon's stock declined by 4.1% on January 31, 2020, continuing to decline by another 2.2% on February 3, 2020 and 1.3% on February 4, 2020 as the market absorbed this information.

22.     Second, on May 1, 2020, Defendants announced that Exxon was cutting rigs by 75% in the Permian, and that decreased capital expenditures, including the rig cuts, would reduce Permian production volumes in 2020 and 2021.  In response to this news, Exxon's stock declined by 7.2%.

23.     Finally, on January 15, 2021, the truth concerning Defendants' fraud was fully revealed when the *Wall Street Journal* reported that the SEC had commenced an investigation in response to a whistleblower complaint describing how (i) Exxon's drilling assumptions for 2018 were false; and (ii) Exxon determined in the summer of 2019 to fraudulently overvalue the Delaware Basin by $10 billion, using assumptions saved in a file called "This is a Lie."  In response to this news, Exxon's stock declined by 4.8%.

24.     After the end of the Class Period, Defendants reduced Exxon's production goal for the Permian and its proved reserve.  On February 2, 2021, Exxon reduced its goal in the Permian Basin to 700,000 barrels of oil-equivalent per day by 2025—300,000 barrels lower and a year later—an acknowledgment that its March 2019 goal was impossible and its related statements were untrue.  Then, on February 24, 2021, Exxon reduced the proved reserve by 1.5 billion barrels of oil-equivalent, acknowledging that this volume was "mainly related to unconventional drilling in the United States," i.e., the Permian Basin.  The SEC investigation is ongoing.

## II.     JURISDICTION AND VENUE

25.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

26.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.

27.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

28.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

### III.    THE PARTIES

#### A.    Lead Plaintiffs

29.    Lead Plaintiff Amalgamated Bank ("Amalgamated") is an investment bank that serves thousands of labor unions, nonprofits, social impact enterprises, political organizations, foundations, and individuals.  Amalgamated has been offering investment management services since 1973, and it has over $57 billion in assets under management and custody. As set forth in the certification previously filed with the Court (ECF No. 22-2), Amalgamated is the trustee for the LongView LargeCap 500 Index VEBA Fund, LongView LargeCap 500 Index Fund, LongView Large Cap 1000 Index Value Fund, and LongView Broad Market 3000 Index Fund, each of which purchased shares of Exxon common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws.

30.    Lead Plaintiff State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island"), is a public pension fund that provides benefits to public employees of the State of Rhode Island.  Rhode Island manages approximately $10.3 billion in assets on behalf of its active and retired members.  As set forth in the certification previously filed with the Court (ECF No. 22-2), Rhode Island purchased shares of Exxon common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws.

#### B.    Defendants

31.    Defendant Exxon Mobil Corporation ("Exxon" or the "Company"), one of the world's largest oil and gas companies, is a New Jersey corporation with its principal executive offices located at 5959 Las Colinas Boulevard, Irving, Texas 75039.  Exxon common stock trades on the New York Stock Exchange, an efficient market, under the ticker symbol "XOM."  Exxon is engaged in the development, acquisition, and exploration of crude oil and natural gas resources

in the United States and worldwide.  Exxon's energy holdings include substantial acreage in the Permian Basin, a large oil-and-gas producing area in the southwestern United States, which includes the Delaware Basin and the Midland Basin.  Exxon operates through three business segments: (i) Upstream, through which Exxon explores for and produces crude oil and natural gas, including its oil resources in the Permian Basin; (ii) Downstream, through which Exxon manufactures and sells petroleum products; and (iii) Chemical, through which Exxon manufactures and sells petrochemicals.

32.    Defendant Darren W. Woods ("Woods") is, and was throughout the Class Period, the Company's Chief Executive Officer and Chairman.  Defendant Woods joined the Company in 1992 and became its CEO on January 1, 2017.  In 2010, Woods was appointed ExxonMobil Refining and Supply Company's Vice President of supply and transportation.  In 2012, Woods was appointed Vice President of the Company and President of ExxonMobil Refining and Supply Company.  In 2014, Woods was elected Senior Vice President of the Company.  Woods signed all of the Company's annual filings with the SEC during the Class Period.

33.    Defendant Neil A. Chapman ("Chapman") is, and was throughout the Class Period, a Senior Vice President of the Company, a position that he has held since 2018.  Chapman is also a member of the Company's Management Committee.  In 2015, he served as the President of ExxonMobil Chemical Company and in 2011, Chapman served as the Senior Vice President of ExxonMobil Chemical Company.

34.    Defendant Jack P. Williams ("Williams") is, and was throughout the Class Period, a Senior Vice President of the Company.  He joined the Company in 1987 as a Drilling Engineer and then held various technical, supervisory, and planning positions.  In 2010, Williams became President of XTO.  He held this position for three years before returning to the ExxonMobil

Production Company as Executive Vice President.  In 2014, Williams was elected Senior Vice President of the Company.

35.     Defendant Neil A. Hansen ("Hansen") has served as the Company's Vice President of Fuels for Europe, Africa, and the Middle East since February 2020.  From July 2018 until February 2020, Hansen was the Company's Vice President of Investor Relations and Secretary. Prior to July 2018, Hansen was the Company's Downstream Controller.

36.     Defendant David S. Rosenthal ("Rosenthal") served as the Company's Vice President and Controller at all relevant times.  In this role, Rosenthal served as Exxon's principal accounting officer.  Prior to becoming a Vice President and Controller, Rosenthal served as the Company's Vice President of Investor Relations.  Rosenthal signed all of the Company's filings with the SEC during the Class Period.

37.     Defendant Liam M. Mallon ("Mallon") has served as Vice President of the Company and President of ExxonMobil Upstream Oil & Gas Company since April 2019.  Prior to April 2019, Defendant Mallon was President of ExxonMobil Development Company.

38.     Defendant Jeffrey J. Woodbury ("Woodbury") was the Company's Vice President of Investor Relations and Secretary from 2014 until his retirement in July 2018.

39.     Defendant Sara N. Ortwein ("Ortwein") served as President of XTO from October 31, 2016 through March 1, 2019.  Exxon identified Ortwein as an "Executive Officer" of Exxon in its Form 10-K annual report for the year-ended 2018.  Ortwein began her career at Exxon as a Drilling Engineer.

40.     Defendants Woods, Chapman, Williams, Hansen, Rosenthal, Mallon, Woodbury, and Ortwein are referred to herein as the "Executive Defendants."

41.     Defendants Woods, Rosenthal, and Chapman, because of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day business of Exxon, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Exxon, had the power and ability to control the actions of Exxon and its employees throughout the Class Period, as alleged herein.

42.     Exxon and the Executive Defendants are collectively referred to herein as "Defendants."

## IV.     SUMMARY OF THE FRAUD

43.     This case arises from materially false and misleading statements and omissions concerning Exxon's assets and production in the Permian Basin from March 7, 2018 through January 15, 2021 (the "Class Period"), including: (i) statements about the value of Exxon's Permian Basin asset, including its stated proved reserve and resource base; (ii) statements touting production conditions on the ground, and in particular, drilling, drilling times, well performance, and well quality; (iii) data purporting to demonstrate that Exxon led competitors in the Permian Basin in wells and production; and (iv) beginning on March 6, 2019, statements that Defendants were "on plan," "on track," and "on schedule" to achieve a production goal of 1 million oil-equivalent barrels per day by 2024 in the Permian Basin.

44.     A barrel of "oil-equivalent" or "BOE" is a unit of measure to quantify crude oil and natural gas amounts, which is used to summarize the amount of energy that is equivalent to the amount of energy found in a barrel of crude oil.

45.     Proved reserves, a number subject to GAAP (defined below) and SEC regulations described in Section VII below, consist of the number of barrels of oil-equivalent that Exxon told investors could be extracted from the ground and sold with reasonable certainty.  Proved reserves are calculated using assumptions that include, as relevant here, how quickly a company is able to

drill its wells and the productivity of existing producing wells.

46.    The "resource base" is the number of oil-equivalent barrels that Exxon told investors consisted of "proved reserves, plus other discovered resources that are expected to be ultimately recovered."

### A.    Defendant Woods, Installed To "*Turn The Titanic*," Makes High-Profile Acquisitions In The Permian Basin And Places Them At The Center Of Exxon's Turnaround Plans

47.    Over the past several years, Exxon's business has faltered, causing investor concern.  Beginning in late 2009, Exxon built out its position in the Permian Basin, starting with its acquisition of XTO for $31 billion.  Exxon immediately faced criticism that it had paid too much for XTO.  For example, the *Wall Street Journal* wrote on December 14, 2009 that the Company's "deal machine could be rusty."  The pressure was on Exxon to justify the XTO acquisition.

48.    Meanwhile, Exxon was dogged by other blows to its reputation.  For example, in late 2016, amid the crash of oil prices, Standard & Poor's stripped Exxon of the perfect triple-A credit rating that it had held for more than 60 years.  In late 2018, Exxon was sued by multiple regulators for fraud.  As Exxon has weathered these storms, its share price and market capitalization have steadily declined.  Since the peak of Exxon's market capitalization in 2013 and 2014, the Company's stock has lost roughly 60% of its value.

49.    On December 14, 2016, Exxon announced that Defendant Woods would succeed Rex Tillerson as Exxon's CEO.  Woods, who was charged with reversing Exxon's fortunes, faced an uphill battle.  At the helm of Exxon's turnaround plans, Woods led the Company through another series of major acquisitions.  On January 17, 2017—three weeks into Defendant Woods's tenure as CEO—Exxon announced a purchase of $6.6 billion worth of assets in the Permian Basin from the Bass family of Fort Worth, Texas, including 3.4 billion barrels of oil-equivalent in the

Delaware Basin.  Exxon charged its subsidiary, XTO, with managing those assets.

50.     The pressure was on Woods to justify the acquisition as the market closely connected Exxon's development of the Permian Basin to Woods taking control of the Company.  Further, some market-makers again expressed concern that Exxon paid too much.  As the *Wall Street Journal* observed on January 17, 2017, "Some in the industry have voiced concerns that the high prices indicate a bubble is building up in the area," or even "a Ponzi scheme."

51.     Further, Defendant Woods was particularly driven to ensure the success of the Permian acquisitions.  The metrics that Exxon used to calculate Woods's and other top executives' compensation depended on Woods's ability to achieve Exxon's production growth goals in the Permian Basin, as described further in Section VI(M) below.

52.     Prior to the start of the Class Period, Defendants continued to place the Permian and Delaware assets at the center of the Company's turnaround plans.  Analysts celebrated this strategy.  For example, after Woods's first Analyst Meeting as CEO, Deutsche Bank's analyst declared, "All of My Love (To The Permian)," and Cowen noted, "We believe the XOM story is turning a corner."

53.     By the end of 2017, however, investors remained deeply concerned about Exxon's prospects.  Despite Defendant Woods's promises, he did not turn the Company around promptly upon taking the reins, and success in the Permian became ever more pressing.  Thus, at the start of the Class Period, Defendant Woods was under extreme pressure to, as BMO Capital Markets put it on January 26, 2018, "[t]urn the Titanic."

54.     On February 8, 2018, Exxon announced an addition to its proved reserves of 800 million oil-equivalent barrels from "rich unconventional plays in the United States, mainly in the Permian Basin."  Exxon told investors, "Additions in the Permian are supported by ExxonMobil's

growth plan and increased drilling activity, expected to increase daily production to more than 600,000 oil-equivalent barrels by 2025."

**B.     March 7, 2018 Analyst Meeting: Exxon Announces "Aggressive Growth Strategy" In The Permian, Touting The Value Of Permian Assets And Production Conditions On The Ground**

55.     The Class Period begins on March 7, 2018 when Defendants announced, "ExxonMobil Outlines Aggressive Growth Plans to More than Double Earnings," and Exxon held its annual Analyst Meeting call.  In its press release, Exxon touted its increased Permian resource base of 9.5 billion oil-equivalent barrels of recoverable resource.

56.     During Exxon's Analyst Meeting, Defendants reiterated and explained the basis for Exxon's "aggressive growth strategy."   In particular, Defendant Chapman cited Exxon's "9.5 billion barrels in the Permian."  Defendant Williams touted Exxon's well quality in the Permian as "very, very high quality," and "underpinning" the Company's "growth plans."

57.     Defendant Chapman delivered a 30-minute presentation about Exxon's Upstream portfolio, where he presented data that he told investors demonstrated Exxon's "truly unique position in getting value out of the Permian versus anybody else in the industry" in wells and production, set forth on the slide below.



58.     Analysts were positive on Exxon's growth progress in the Permian and its status as a leader in the region.  For example, Wells Fargo reported on March 7, 2018, "[W]e expect growth from U.S. tight oil (Permian, Bakken) will be a key component to mitigating declines elsewhere, particularly in the near-term."  Societe Generale wrote on March 12, 2018, "We still believe XOM is one of the best project managers with unique technical capabilities," and noted with respect to Exxon's "ability to grow the Permian" that "[t]hus far, they have been on plan."

### C.     In Truth, Exxon's Reported Valuations Were Based On False Drilling Assumptions, Permian Production Was Plagued By Multiple Problems, And Exxon Did Not Lead Competitors In Wells Or Production

#### 1.     Exxon's Reported Valuations Were Based On False Drilling Assumptions

59.     Exxon's reported resource base number was materially overstated.  As noted above, the "resource base" is the number of oil-equivalent barrels that Exxon told investors consisted of "proved reserves, plus other discovered resources that are expected to be ultimately recovered."  The proved reserve calculation—of how many barrels of oil-equivalent a company ascertains with reasonable certainty exist and can be exploited and sold—incorporates assumptions about how quickly and effectively the company will be able to drill its wells.  Thus, both the "proved reserve" and the "resource base," which includes the proved reserve, are based on drilling assumptions.

60.     The drilling assumptions that Exxon used to perform these calculations during the Class Period were false.  As the *Wall Street Journal* later reported, Exxon overestimated how quickly it could drill in 2018.  Based on its interviews with six current and former employees, the *Wall Street Journal* reported on September 13, 2020 that the net present value of the Delaware Basin, which Exxon used in its annual planning process for 2018, was overstated by $20 billion because Exxon was overestimating how quickly it could drill.  As the *Wall Street Journal* further revealed on January 15, 2021, a whistleblower complaint lodged with the SEC confirmed that the

lower estimate for the Delaware Basin "reflected, in part, that it took longer than expected to drill wells in 2018." Thus, the drilling assumptions that Exxon used for its Delaware Basin valuations in 2018 were false.

61.     The reports from the *Wall Street Journal* are corroborated by reports from multiple former employees, set forth directly below, describing myriad problems with drilling, drilling delays, well performance, and well quality, among others, that plagued Exxon's Permian operations in 2018. The *Wall Street Journal* report is further corroborated by former employee Andrew Rhodes, whose account, set forth below, describes a policy at Exxon of never revising down the resource base, even if the initial assumptions used in the calculation were wrong.

62.     In addition, Exxon told investors prior to and during the Class Period that its proved reserves from the Permian Basin were "supported by ExxonMobil's growth plan, including increased drilling activity and infrastructure." As described further below, Exxon's growth plan was impossible to achieve due to multiple production problems on the ground, including problems with drilling, infrastructure and equipment, labor, and finding less oil than expected. The growth plan was also based on false drilling assumptions.

## 2.     Exxon Experienced Longer Than Expected Drilling Times, Poor Well Performance, Problems With Well Quality, And Other Issues

### a.     Problems With Drilling And Wells

63.     Multiple former employees interviewed by Lead Counsel confirmed that drilling times were longer than expected in 2018, and they described additional problems with production in the Permian Basin, including poor well performance and well quality. For example, Former Employee ("FE") 1,[2] an Operations Drilling Supervisor at Exxon from June 1998 until December

---

[2] The terms "Former Employees" and "FE" refer to the former employees of Exxon and XTO whose reports are discussed in this Complaint. Certain Former Employees who Lead Counsel

2020, who was one of the first wave of drilling supervisors to be sent to the Permian Basin when Exxon's drilling projects began there, confirmed that there was no way that Exxon was going to be able to produce what it promised with how long it was taking to drill a well in the Permian. According to FE1, it took double, sometimes triple the time to drill a well in the Permian.

64.     FE1 explained that Exxon thought that individual wells would take around 20 days each to drill, but they would instead take 35 days or a month and a half to drill.  Some problems that those performing drilling like FE1 ran into were running into zones that were depleted of oil, water and mud in wells, poisonous gases that would shut down a rig, casing getting stuck, depleted zones, and well controls—all of which are issues that can "mushroom" into a multi-day problems.

65.     FE1 added that the amount of H2S poisonous gas that the drilling teams were experiencing in the Permian was deadly.  FE1 spent over 20 years working for Exxon, but the Permian was the first place in the Company where he saw management acting less stringent about H2S safety, noting that they had eyes on the Permian 100%, and on more production and more wells in less time.  FE1 explained that when poisonous gas was discovered, Exxon used the "Cascade System" in which everyone is wearing breathing masks and hoses to do their work.  This is usually reserved for last resort situations and emergency situations—not normal work environments.

66.     FE2 was a Drilling Consultant on a contract basis for XTO from January 2018 until February 2019 who worked in the Permian Basin at a field office south of Midland, Texas. FE2 was responsible for supervising the drilling operations and tracking related costs, including

---

interviewed consented to be named in this Complaint.  Other Former Employees requested to proceed anonymously and, as such, are identified by number.  In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in connection with all of the Former Employees, regardless of their gender.

assessing estimated drilling costs and comparing them to actual drilling costs.  FE2 reported that there were at least two problems that took more time and money than Exxon had anticipated.  First, there were "hole problems," meaning that the formation took on fluid, which required the drilling activity to be stayed while the team tried to fix the formation.  Second, FE2 explained, Exxon imposed processes that were standard for offshore wells, not onshore wells, and that offshore techniques took longer than those standard for onshore drilling.  This process slowed the operations down by at least four days and sometimes five days for each well.

67.    Norris Wingo was an Engineering Coordinator at XTO from May 2018 until February 2019 who worked out of the Midland, Texas corporate office and reported to Nathan Hartshrone, and later to Gordan Holloway.  As engineering coordinator, Wingo coordinated the equipment being located to the wellsites of a lot of the wells and assets that were being drilled, primarily in the Delaware Basin.

68.    Wingo confirmed that wells were taking longer to drill than anticipated.  Wingo explained that he had a schedule that he coordinated to deliver equipment to sites, and some of the schedules in the Delaware Basin were behind and up to 90 days delayed.  These schedules were for new equipment to come from the manufacturer to the site.  Wingo described how some of the schedules were delayed because they had not gotten started, and others were taking longer to strike oil.  According to Wingo, these delays, including the drilling delays, resulted in increased costs.

69.    Both FE1 and FE2 further confirmed that the assumption that Exxon could improve its drilling times, as it later told investors, was unrealistic.  According to FE1, the Company's assumption that it could improve drilling times at an optimistic rate was unrealistic.  FE1 explained that the Delaware Basin assets that the Company bought for $6.6 billion from the Bass family turned out to be "pretty ugly."  As FE1 put it, "I've drilled around the world, but drilling in the

Permian was ugly, nasty stuff."

70.     FE2 similarly confirmed that reducing drilling times in the near future was an unrealistic assumption at the time, especially considering Exxon knew things were going to take longer by using the offshore processes.   The slower drilling times persisted throughout FE2's contract employment, which included all of 2018.

71.     Jeff Wachsmann, whose career in the oil and gas industry has spanned 40 years, worked for the Bass family, which owned the assets in the Delaware Basin that Exxon purchased in 2017.  Wachsmann stayed on after the acquisition as an Instruments and Electrical Specialist, Project Manager for XTO from March 2017 until May 2019.   He reported to XTO's general manager of the Delaware Basin, Joe Cardenas.

72.     Wachsmann confirmed that there were drilling problems in the Delaware Basin. Wachsmann explained that, as he knew from his experience working in the Delaware Basin, the wells in the Delaware Basin have decline rates of 50% or higher in their first year of operation. This means that they pump out 2,000 barrels a day when they first come online, but by the end of the first year, they are at less than 1,000 barrels per day.  According to Wachsmann, after the wells decline, you have to drill holes to catch up.

73.     Wachsmann added that XTO brought in people from all areas of the Company, but most of those people normally worked in gas fields, and they had no idea how an oil field works. He explained that in gas fields, a well can flow the same way for 30 years, and these people thought oil wells would do this as well.  Wachsmann would explain to them that oil wells require artificial lifts within a year of their coming online.  This was a reality check for those that came from the gas fields.

### b.      Additional Production Problems And Delays

74.      In addition to drilling times and processes, FE2 described problems with infrastructure, costs, and manpower in the Permian Basin.  According to FE2, with respect to infrastructure (i.e., the "start to finish of a well," including fracking, the flow lines, the tank batteries, the flare lines, and a way to fill the well), from when FE2 began working as an XTO contract employee in January 2018 until he left in February 2019, Exxon had not started any new rigs in the Delaware Basin.  There was only a small amount of infrastructure in the Delaware Basin when FE2 started working as a contractor in 2018.  FE2 explained that around February 2019, the Company began moving rigs to the Delaware Basin, but the Company did not have the infrastructure to support the number of rigs that were being moved.

75.      Further, according to FE2, the number of rigs was not sufficient to allow Exxon to achieve its goals.  FE2 confirmed that Exxon "was overreaching" in terms of the plans that the Company had for the region.  According to FE2, based on his experience of having worked in the industry for more than 10 years, the amount of oil that Exxon was purporting it could bring in would have required "at least 100 rigs."

76.      In addition, FE2 explained that Exxon would have needed 10 times the amount of equipment it had to reach the promised oil production levels.  The required equipment included completion rigs, frac units, flowback units and other types of equipment.  According to FE2, Exxon was competing with other companies for the equipment, and the vendors had a limited supply when all drilling companies were considered.

77.      Further, with respect to costs, in FE2's role, he saw the estimated costs for drilling per well and specifically received hard copy Excel spreadsheets with the estimated drilling costs. FE2 used the Excel spreadsheets to assess the estimated drilling costs and then compare them to the actual drilling costs.  According to FE2, the estimated drilling costs for the Permian Basin were

not reliable.  FE2 explained that drilling was consistently more expensive than the estimated costs.  For example, FE2 explained that completion costs exceeded estimates for 16 out of the 20 wells that were completed in the Permian Basin during the time that he worked for XTO (from January 2018 until February 2019) costing around $2 million per well.

78.     Finally, according to FE2, Exxon also lacked the manpower to complete the wells.  FE2 explained that Exxon would have needed everyone in west Texas to be working for the company to complete the wells at the desired pace.  According to FE2, there was not enough manpower to drill quickly enough to reach the production levels Exxon was promising and Exxon would have needed 10 times the manpower it had to achieve the production goals.

79.     Wingo also confirmed that, with respect to infrastructure in the Delaware Basin, most everything was new and being built there.  In addition, Wingo confirmed that there were issues with equipment shortage.  According to Wingo, there were so many oil companies out there that the equipment manufacturers could not keep up with demand.

80.     Wachsmann agreed with this, noting that another big issue was electricity.  Wachsmann explained that Xcel Energy was the vendor that supplies energy in that area, and that the company was "swamped" with projects "from everybody."  A request for power for a single facility could take two years to get done.

### 3.     Exxon Did Not Lead Competitors In Drilling, Wells, Or Production

81.     Expert analysis of historic data on Exxon's actual production in the Permian Basin reveals that Exxon did not lead competitors in drilling, wells, or production.  The data reflected in the charts below is from a service called Enverus that oil and gas experts use to access and obtain oil and gas data from public records.  This data requires a subscription and a significant amount of aggregation and analysis; it is not readily accessible to the general public.  Lead Counsel's oil and gas industry expert's analysis of this data is reflected below.

22

a.     **Exxon's True Position With Respect to Horizontal Wells And Production**

82.     As noted in ¶57 above, Defendants presented data that Defendant Chapman told investors demonstrated Exxon's "truly unique position in getting value out to the Permian versus anybody else in the industry."  The data included non-Permian data and excluded the Permian operators who were ahead of Exxon.  In fact, as of January 31, 2018 (the same date Exxon used for its slide), Exxon did not lead the top Permian operators in total horizontal wells or production, as reflected below.



23

### b.  Exxon Did Not Lead Competitors In Drilling Times

83.    With respect to drilling times, the below chart reflecting historical median drilling time in the Permian Basin in 2018 shows that Exxon's drilling times were longer than 10 of the other top operators in the Permian Basin.



84.    With respect to the Delaware Basin alone, Exxon's position was even worse—Exxon had longer drilling times than any of the other top operators in the Delaware Basin in 2018.



**c.    Exxon Produced Fewer Barrels Of Oil-Equivalent Than Competitors**

85.    With respect to the production of barrels of oil-equivalent (BOE), the below chart reveals that of the top 10 operators in the Permian, Exxon was in ***ninth place*** in total 2018 annual production.



### d.   Exxon's Well Performance Was Behind Most Of The Top Operators In The Permian Basin

86.   Exxon similarly lagged behind the top Permian operators in average well quality, as reflected in the graph below, which shows Exxon's average well performance in 2018 as behind most of the other top operators in the Permian Basin.



### e.    Exxon's Well Quality Was Not "Very, Very High"

87.    Further, with respect to well quality, which Defendants told investors was "very, very high," the below chart reveals that, in fact, Exxon was in **tenth place** in 2018 with respect to first month average normalized production and first twelve months average normalized production.  This metric shows how many barrels of oil-equivalent Permian operators were producing in their first month of well production and their first twelve months of well production, respectively.



88.    Thus, the data shows that in 2018, conditions on the ground were far different than Defendants represented.

### D.    Defendants Continue To Tout Permian Production In The First And Second Quarters Of 2018, And Unveil The Notorious "Green Blob"

89.    In contrast to the reality on the ground, Exxon continued throughout the first and second quarters of 2018 to report false valuations of the Permian Basin and to tout production conditions on the ground.

90.    Specifically, Defendants continued to state that Exxon had a resource base in the Permian of more than 9 billion oil-equivalent barrels.

91.     Defendants also continued to tout "increased drilling" and "strong well performance" in the Permian as supporting Exxon's growth plan.

92.     In a slide deck that Exxon presented during the July 27, 2018 earnings call, Defendants included a slide that Defendant Chapman referred to as the "green wedge" and that Exxon employees referred to internally as the "green blob."  As set forth below, the slide presented by Defendant Chapman purported to show Exxon's current and future production in the Permian Basin as growing in a near-vertical line.



93.     As described in more detail in Section IV(H)(1) below, multiple former employees confirmed that it was widely acknowledged internally at Exxon that the "green blob" goal presented to investors was not achievable.  During the July 27, 2018 call, however, Defendant Chapman specifically referred to the "green wedge" in response to a Wells Fargo analyst's concerns about when the Permian "becomes more of a value-add or a cash-flow provider as opposed to a cash flow consumer."  Defendant Chapman responded, "But I do want to point you back to that volume curve that we showed earlier on.  It's I guess been called the green wedge in

the industry.  You can see where we are on that green wedge.  I think it's just illustrative of [where] we are on the plan, and I indicated that we are optimistic about achieving that plan and frankly some more."

94.     Analysts remained positive on the Permian.  For example, Credit Suisse reported on April 27, 2018, "1Q production above consensus; Permian growth remains robust."  Barclays similarly noted on July 27, 2018, "strong Permian and Bakken growth" and that U.S. liquids was a "bright spot."

### E.     Company Insiders Recognize The Need For A Write-Down Of Exxon's Proved Reserve In Summer 2018

95.     In stark contrast to Defendants' rosy statements to investors, in the summer of 2018 in connection with its annual planning process, Exxon determined internally that it needed to reduce its stated proved reserve and take a write-down.  As described below, Exxon did not reduce the proved reserve; instead, reservoir engineers were instructed to boost it.

### 1.     Exxon Has A Longstanding Policy Of Not Taking Write-downs

96.     Exxon is notorious for having a longstanding policy against taking write-downs, and for having a senior executive management team that is known internally—and in the media— as the "God Pod."

97.     Former CEO Rex Tillerson explained in a 2015 interview, "***We don't do write-downs***.  If you look at our history, we do not write our investments down. . . . [E]veryone around here understands, once you make that investment, you live with that the rest of your career . . . . We are not going to bail you out by writing it down."  In 2016, Wolfe Research wrote that Exxon's decision not to write down its reserves "raises serious questions of financial stewardship," and noted, "it is impossible to believe that no assets have been impaired."

29

98. Nonetheless, Exxon's policy against write-downs continued throughout the Class Period. For example, on November 30, 2020, *Oil Daily* reported that, rather than write down its investments, Exxon "had a different approach—if prices fall and an asset is struggling, employees must improve its performance and lower costs to improve returns, no matter how hard the task." On December 1, 2020, Raymond James's analyst noted, "Former Exxon CEO Rex Tillerson had famously been opposed to ever writing down assets."

99. Exxon is equally famous for the fact that its senior management is known as the "***God Pod***." As the *New York Times* reported on March 1, 2017 in an article titled, "Darren Woods, Exxon's New Chief, Begins to Make His Mark," "The executive wing of Exxon Mobil's headquarters outside Dallas is nicknamed the God Pod because orders given by executives there can sometimes be as sharp as thunderbolts." According to the *New York Times*, when Defendant Woods became the CEO, he also became "top god."

100. As the *New York Times* reported in a December 10, 2020 article, Exxon's executive suite was known as the "God Pod" throughout the Class Period.

### 2. Exxon's Fraudulent Reserve Forecasting Process

#### a. The Reservoir Engineering Department

101. Exxon engages in an annual planning process before the end of each year and reports various production goals, as well as metrics such as the proved reserve, reflecting the value of its assets, including its assets in the Delaware Basin. Development planners, reservoir engineers, geologists, and geoscientists develop the Company's annual production plans and assumptions for those plans, including the Company's production goal for the Permian Basin and the value of the proved reserve that Exxon reported to investors at year-end.

102. Andrew Rhodes was a Reservoir Engineer at XTO from August 2013 until his last day with the Company on July 31, 2020. Rhodes was based in Fort Worth, Texas from 2013 until

the Company moved the entire Reservoir Engineering Department, of which Rhodes was a part, to Houston, Texas in the summer of 2018.  From the summer of 2018 until July 2020, Rhodes worked at the same location in Houston as the reservoir engineers from the Delaware and Permian Basins, and the Company's geologists and landmen. In approximately the summer of 2019, Exxon's Accounting Department also moved to Houston, Texas.

103.    From approximately 2013 until April 1, 2019, there were 12-13 divisions within the Reservoir Engineering Department, which were organized geographically—including, for example, the Permian division, the Arkoma (Arkansas and Oklahoma) division, the MidContinent division, and the Appalachian division.  Each division had a reservoir engineering team, a geology team, and a land team, and each division had one reservoir engineering manager.  The 13 reservoir managers all reported to the same Senior Vice President of Reservoir Engineering, F. Terry Perkins.  Perkins reported to Monte Dobson, the Senior Vice President of the Development Company, who in turn reported to Defendant Ortwein, the President of XTO.

104.    On approximately April 1, 2019, the 13 divisions of the Reservoir Engineering Department were consolidated into five groups, which included the Permian Basin group and the Delaware Basin group.  There were approximately 8-12 reservoir engineers in each group.  From approximately the spring of 2018 until July 2020 when Rhodes left the Company, Rhodes reported to Timothy Isernhagen, the Reservoir Engineering Manager for the MidContinent group prior to April 2019 and for the Central Business Unit after April 2019.  According to Rhodes, nearly all of the reservoir engineers who were working on the Permian and Delaware Basins following the move to Houston are still with the Company.

105.    Rhodes was responsible for forecasting reserves for approximately 2,000 wells at any given time.  Rhodes was involved in Exxon's proved reserve forecasting process, familiar with

Exxon's policies concerning proved reserve forecasting, and personally experienced pressure from the Senior Vice President of Reservoir Engineering, Perkins, to inflate the proved reserve numbers that the Company reported by making adjustments, described directly below. Rhodes had personal contact with reservoir engineers who did the proved reserve forecasting for the Permian or Delaware Basins, including Andrew Bridwell and Kaylene Tovar. In addition, Rhodes was good friends with Afif Alafifi, who had worked with Rhodes in the Arkoma group in the earlier days, but then moved to either the Delaware or Permian Basin.

106.    In addition, Rhodes attended monthly reservoir engineering meetings with all of the reservoir engineers, including those responsible for the Delaware and Permian basins. These meetings were called the "reservoir engineering monthly meetings." At the meetings, both before and after the move to Houston in the summer of 2018, Senior Vice President Perkins and Senior Vice President Dobson would typically give a state of the company overview as it related to the reservoir engineering group. Then, the reservoir engineers on Rhodes's level would give presentations on anything of interest. The Vice President of Geology, Andre Griffin, also attended. The geologists also held monthly meetings.

107.    Outside of formal meetings, Rhodes had regular discussions with reservoir engineers, including the reservoir engineers who worked on the Permian and Delaware Basins, such as Bridwell and Tovar.

108.    Rhodes also had access to all of the reserves for any group, including the Delaware Basin group, and would periodically personally review the reserves for the Delaware Basin. Rhodes could look at reserves on a well level and see production and reserves forecast for any XTO well anywhere. The group of individuals responsible for reviewing reserves would put a report together at year-end that reflected the reserves in the Permian Basin and any change from

the prior year and review that report with the reservoir engineers, including Rhodes. This group is referred to in Exxon's public filings as the "Global Reserves and Resources" group or the "Global Reserves group."

### b.    Boosting The Proved Reserve To Avoid A Write-Down

109.    According to Rhodes, the reserve forecasting process was as follows. First, reservoir engineers such as Rhodes would prepare a reserve forecast for their assigned geographical area, approve that forecast, and submit it to their managers, whom for Rhodes was Isernhagen, the Reservoir Engineering Manager responsible for MidContinent. Reservoir engineers including Rhodes used the computer programs LAPP, an internal program, and EOPC, an Excel-based program, for this process.

110.    Second, the Reservoir Engineering Manager such as Isernhagen would approve all of the forecasts for every engineer who reported to him/her.

111.    Third, the reserves team or "Global Reserves group" would review the reserves along with the Senior Vice President of Reservoir Engineering, who in 2018 was Perkins. The production forecast and operating cost data from LAPP and EOPC would get pushed into ARIES, a system that is commonly used for reserves, and the reserves team would run different scenarios, such as different oil and gas pricing, on the data. The reserves team would typically send the reservoir engineers back PDFs that would show different looks at it. They would run the data in ARIES under different scenarios, and they would get different total reserve numbers based on the different pricing scenarios that the reserves team ran. There would then be a review period where the reservoir engineers, such as Rhodes, would review what the reserves team had sent.

112.    Rhodes confirmed that he and the other reservoir engineers felt with a degree of certainty that the numbers they were submitting were accurate and then pressure came down from the reserves group to look for places to boost reserves. The reservoir engineers then made them

higher because the reservoir engineers reported to the reserves team.  There were times when Rhodes would revise a forecast after he had already approved it and after his boss had already approved it because of the pressure to increase the reserve.  The reserves group knew they were exerting that pressure.

113.    Specifically, there were times when Rhodes's team was told that this particular scenario looks like a big write-down on reserves.  There was pressure to find where Rhodes could increase reserves and Rhodes was told to look for places to boost reserves.

114.    Rhodes explained that even slight adjustments or manipulation of the variables that make up the total could have a significant impact on the total.  According to Rhodes, if you were sneakily optimistic with respect to any of the variables that went into the total, including capital expenditures or completion costs, the adjustments compound each other, and your final answer comes out to be significantly different than it should be.

115.    For example, Rhodes explained that Exxon would adjust the numbers by adjusting the operating costs or the final decline rate, which are inputs into the proved reserve calculation. Rhodes explained that the final decline rate is part of the gas forecast.  They would look at monthly data points for each month, for example, if a well had made 100 barrels in January 2020, then 90 barrels in February 2020 and 80 barrels in March 2020, they would have actual production data points.  To do decline forecasting, you would pretty much draw a line through those data points. As you move into the future and the unknown and the reserves, reservoir engineers would typically do a three-legged exponential decline.  That means if you are looking at it as a semi log graph, you will have three straight lines.  The first one, the earliest in time, would have to be the steepest decline, perhaps 70% exponential decline.  Then there is a middle decline rate for however long, and then a final decline rate.

116.     Rhodes explained that if you are looking at a function, the area under the curve is a meaningful thing in oil and gas terms.  If you imagine a declining line on a graph, the area under that curve is your reserves volume.  If you draw three straight lines with the first being steepest and then the others getting shallower and you make it break to the shallower decline earlier, then the result will be more area under the curve.  This is an example of something a reservoir engineer would do to get a higher number after experiencing pressure from the reserves team.

117.     According to Rhodes, the newest wells that are still on their initial steepest decline are really the ones you could have the highest impact on.  You could increase the reserves the most on these wells because they have the most reserves left to be had.  Rhodes explained that if the well is still on that steepest 70% decline, you may have been thinking it would be on that steepest decline for 12 months, and it was only at 4 months at the time.  You could change your forecast and have it change to a shallower decline at 8 or 9 months, for instance, instead of at 12 months.  You could do the same thing with the middle decline as well.  As Rhodes put it, you could "scrunch" up your decline curves in order to increase the proven reserves.

118.     Rhodes explained that the Permian and Delaware Basin wells were new wells, so the engineers working on the reserve forecast for the Permian and Delaware Basin would have used this technique.  Rhodes described how if you have a new well that has only been producing for a few months break from that initial decline rate at 8 months versus 12 months, you could increase the reserves on the well by huge amounts.  These wells decline so fast and so much.  You recover about 50% of the reserves over the first year.  Rhodes explained that for the newer wells, like those in the Permian and Delaware, the technique to increase reserves would be the scrunching technique.  You make the decline curve shorten sooner than you think it reasonably should, and that then increases the area under the curve substantially.

35

119.    Rhodes confirmed that the pressure to increase reserves occurred at least yearly in connection with the year-end process, but may have been more frequent for the Delaware Basin assets.

120.    FE3 served as a Reservoir Engineer at XTO from 2012 to 2016, and served in various other engineering roles at XTO from 2016 to 2021, including a role specific to the Permian as his last role at the Company.  FE3 was based in Fort Worth and Spring, Texas.  As a Reservoir Engineer, FE3's responsibilities included reserves reporting for North Dakota assets.

121.    FE3 confirmed that reserves reporting at Exxon consisted of frequently being told what the answer was.  As a Reservoir Engineer, FE3 reported to a manager, Erich Palko, who reported to Senior Vice President Perkins, who reported to Defendant Ortwein, the President of XTO.  According to FE3, reservoir engineers would be told, "Here's the total number we need to hit, so make small adjustments to many decline curves to reach the number for a basin or an asset or an area."  FE3 described how there is an expectation by management for all of the wells that there will be X number of barrels per well, and that number is bigger in the Permian.  There is a 40-year life for exponential curve and reserves reporting, and if wells are not hitting the expected number, you make adjustments.  For example, if a well reaches its potential earlier and declines slower earlier, the total number comes up.  Small adjustments are made to those DCA numbers, but adding, for example, 50,000 barrels here or there adds up quickly when you're dealing with thousands of wells.

122.    FE3 explained that when he submitted a forecast, it would be kicked back to him in the system to be looked at again for improvement.  FE3 further explained that, when his reports made their way back to him the next year, for the purpose of determining the next year's reporting, the wells FE3 reported on would show a curve that was "way off and crazy" from what he had

done, like someone had changed it.  FE3 confirmed that his manager, Palko, Senior Vice President

Perkins, and Defendant Ortwein, President of XTO, all had the ability to change his forecasting

reports.

123.    FE3 further corroborated Rhodes's account of the Company's refusal to write down

its reserves, noting, "ExxonMobil never ever writes down reserves."  FE3 described how there was

always talk of "albatrosses" on Exxon's books.

<strong>c.    Never Revising Down The Resource Base</strong>

124.    In addition to the pressure to boost the proved reserve, Rhodes confirmed that in

general, there was also pressure not to change or reduce assumptions even if they were not

accurate, including with respect to the resource base.

125.    Rhodes was charged with reserve forecasting for an area in Oklahoma.  The

Company had an assumption that 10 wells would be drilled in that section, which was way too

many wells and should have been revised down, and an assumption that each well there would

produce a certain volume, which was also way too high and should have been revised down.  But,

Rhodes explained, the Company never revised it down.  Rhodes was told by his boss, Isernhagen,

never to change the number of wells they could get in each section or the amount of volume that

they could get in each well.  Rhodes was only allowed to change the classification of the well from

resource base to proved; he was not allowed to revise it down.

126.    According to Rhodes, once he started working the Arkoma/Woodford area in

January 2015, the general policy every year was not to revise down the resource base number.

Rhodes knew that it dated back to the initial resource evaluation which occurred around 2013 when

the Company first started drilling wells in the Arkoma region.  That was when they first got these

assumptions, and the field was pretty immature and unknown at the time.  Rhodes explained that

once the field was drilled more, that was an egregious lie for that resource base, and it was basically

37

never changed from the earliest time when there were pretty much no wells there. They just kept pretty much all those assumptions. This policy was in place for the entire time that Rhodes was forecasting in Oklahoma, including 2018 through 2020, and also earlier.

127.   Starting in the summer of 2018 for reserve years 2018 and 2019, Rhodes told Isernhagen that he disagreed with this and raised objections. Rhodes expressed to Isernhagen how ridiculous it was and raised questions. Rhodes said that he did not understand why he was taking time to work on the resource base calculation and change classifications if the whole thing was bogus anyway. In response, Isernhagen diminished the importance of the calculation. Rhodes knew that both Perkins and Isernhagen discussed this and knew that the resource base was not real, but still did not change it.

### d.   Additional Former Employees Confirm Pressure To Change Valuations That Were Not High Enough

128.   Lead Counsel's investigation further confirmed that Exxon's corporate culture included a push to change valuations that were not high enough. For example, with respect to the Delaware Basin in particular, as reported by the *Wall Street Journal* on January 15, 2021, the whistleblower described how employees were instructed by the Delaware development manager in connection with the annual planning process for 2019 to use false drilling assumptions saved in a file called "***This is a Lie***" to overvalue the Delaware Basin by at least $10 billion.

129.   As another example, FE4 worked as a subsurface employee with Exxon and XTO for just under 13 years from 2009 until 2021. FE4 was deployed out to the Delaware Basin to perform research concerning Exxon's drilling and production rates because production in the Delaware Basin was not getting to where Exxon wanted it to be.

130.   FE4 confirmed that Melissa Bond, who served as the manager for all of the Delaware Basin, supervising geoscience and engineering in the region, had access to the data from

the Delaware, which is known as Decline Curve Analysis (DCA).  FE4 explained that conventional reservoirs have veracity and pressure analysis to measure how much oil is in porous rock.  With unconventional reservoirs like in the Delaware, DCA is used to understand how much oil is there.

131.   FE4 explained that DCA employs data matching.  You drill a well and then look at the oil produced quickly and the cumulative oil production over time.  The two sets of data that are matched are Hyperbolic and Exponential Decline.  Hyperbolic is the decline measured when oil is first coming out of the well fast, and exponential is the "smoother" data showing the more gradual decline.  By looking at the production and the DCA for multiple wells, you can make estimates for production of unconventional wells.  This information is put into a system called ARIES.  The DCA curves are then extrapolated over a 20-to-40-year period.  According to FE4, in his area, employees were told that the curve needed to be a certain way per well, but he told the Company that the number of wells he was told was possible in his area was, in fact, impossible.

132.   FE4 further confirmed an overall general pressure at Exxon to make things "rosier" than they were.

133.   Steven Binns was a Senior Geoscience Associate at Exxon from April 2000 until October 2020.  His responsibilities included aggregating all of the data and information that he could about a topic so that the decision-makers could use it for their goals.

134.   Binns confirmed that Johnny Hall, Executive Vice President at Exxon, was an individual whom employees, including geologists and engineers, had trouble with because valuations had to be changed to his liking. Binns reported that he heard about Hall from geologists and engineers who were upset.  He also reported that he heard from geologists and engineers that, at Exxon, vice presidents or management-level officers would say that they needed a number to be "X," and the employees would have to scramble to make it "X."

### 3.  Exxon Internally Recognizes The Need For A Write-Down In The Summer Of 2018

135.    Rhodes confirmed that it was known at the upper management level that the proved reserves needed to be written down, but there was tension about whether to do the right thing and when to do it.  According to Rhodes, in approximately the summer of 2018 with the move to Houston or shortly before that, the legacy Exxon U.S. Reserves Manager started looking at XTO reserves and saying this needs to be written down.  In particular, according to Rhodes, this Exxon reserves manager would express to the reserves team and Perkins that the reserves were not right and needed to be written down.

136.    Even prior to this point in time, Rhodes described the Company's process as "kicking the can down the road."  Rhodes explained that Perkins knew they would have to make a write-down eventually, but the question was when, and they were just kicking the can down the road.  When the Exxon manager took over, he basically said that you cannot just do that and kick the can down the road, you have to do it every year.  But Rhodes explained that there was tension about whether to do the right thing.  The Exxon reserves manager started putting on pressure to take a write-down in the summer of 2018.

### F.  Instead Of Taking A Write-Down, Defendants *Increase* The Proved Reserve And Continue To Tout Drilling And Production In The Permian Basin

137.    Defendants continued to report false resource base valuations and materially misleading production conditions and data to investors through the end of the year.

138.    Analysts remained positive on the Permian.  For example, on September 15, 2018, Trefis wrote that the "Permian Basin will drive future growth," and observed, "With an increased resource base in one of the most profitable oil plays in the country, coupled with strong execution skills, we expect the Permian growth to create value for the company as well as its shareholders in the coming years."  On October 2, 2018, Wolfe Research reported after attending a presentation

40

by Defendants that it "left with a high confidence interval in . . . production targets."  Wells Fargo wrote on November 2, 2018 with respect to the Permian, "[W]e expect rapid production growth will continue as drilling productivity and efficiency improves."  Notably, Bank of America Merrill Lynch wrote on November 2, 2018 that "Permian growth kicks in," and "3Q18 appears to confirm commentary at [Exxon's] recent set of round tables that it has turned the corner."

139.   Then, instead of reducing or writing down the stated proved reserve to reflect the realities of Permian production on the ground, for the year-end 2018, Exxon increased its reserves by 4.5 billion barrels, of which it attributed 1.2 billion new oil-equivalent barrels to unconventional plays, thereby representing to investors that Exxon's Permian assets were more valuable than ever.

140.   In its February 26, 2019 press release titled "ExxonMobil Adds 4.5 Billion Barrels to Reserves," Defendants tied the increase in Permian Basin reserves to the false drilling assumptions, stating, "Significant additions in the Permian Basin are supported by ExxonMobil's growth plan including increased drilling activity and infrastructure development."  Notably, Exxon had attributed 800 million oil-equivalent barrels of its proved reserves for year-end 2017 to "unconventional plays in the United States, mainly in the Permian Basin," bringing the total proved reserves that Exxon explicitly attributed to the Permian to at least 2 billion oil-equivalent barrels.

141.   Analysts reacted positively to the increase.  For example, Credit Suisse noted on February 26, 2019, "Proved reserves up ~15% YoY . . . . Bulk of reserve additions price-related, with unconventionals (Permian) driving organic additions . . . . XOM added 1.2 BBoe from unconventional plays particularly in the Permian driven by its material activity acceleration."

**G.     "Unleash the Hounds": In March 2019, Defendants Announce Impossible Goal Of 1 Million Oil-Equivalent Barrels Per Day In The Permian**

142.   At 7:25 a.m. in the morning of March 5, 2019, Chevron—one of Exxon's largest competitors—issued a press release announcing that it intended to reach unconventional net oil-

41

equivalent production of 900,000 barrels per day in the Permian Basin by 2023.  Chevron held its Analyst Day conference later the same day and elaborated on its plans.

143.     Not to be outdone, Exxon issued its own press release just 95 minutes later, at 9:00 a.m., while Chevron's CEO was speaking to analysts, proclaiming that it had revised its Permian Basin growth plans to "produce more than 1 million oil-equivalent barrels per day by as early as 2024."  As Exxon acknowledged, this represented an increase of nearly 80% from its previous goal of 600,000 oil-equivalent barrels per day by 2025, and "a significant acceleration of value."

144.     The next day, March 6, 2019, Exxon held an Investor Day call, during which Defendant Woods assured investors that "our plans are on track" to achieve the Company's new Permian production goal.  Woods also presented Exxon's new "green blob" slide, setting forth the new goal with an even more vertical curve, and reiterating "Production on plan," reflected below.



145.     Defendants further stated that Exxon's resource base was 10 billion oil-equivalent barrels "and growing" in the Permian.

146.    Defendants also continued to tout production conditions in the Permian, including, for example, Exxon's "great competencies in drilling" and that Exxon drilled in "the optimum fashion."

147.    Multiple analysts asked about the basis for the 1 million oil-equivalent barrels per day Permian goal, and questioned whether the Company could achieve it, particularly given the labor and equipment available.  In response, Defendants offered repeated assurances.  For example, an analyst from Goldman Sachs observed that Exxon's Permian production curve growth looked linear in 2019, but "more hyperbolic" by 2021, and specifically asked, "what you're doing now to ultimately set yourself up for th[e] acceleration that you see in 2020-2021?"   In response, Defendant Woods touted Exxon's understanding of the resource and infrastructure building and assured him that Exxon was going to "***unleash the hounds***."

148.    An analyst from Mizuho Securities also asked about the "hyperbolic Permian curve," stating that there "is known tightness in labor in the Permian and you're adding rigs at an extremely rapid rate.  I would have thought there was a very high risk that your cost[s] start to go hyperbolic as well."  The analyst asked, "[A]re you that convinced that . . . the framework you laid out is actually going to deliver the volumes and you'll be okay on cost?"  In response, Defendant Woods downplayed this risk, "Yeah . . . I think it's all about anticipating and managing that."

149.    The market trusted Defendants.  For example, on March 6, 2019, Credit Suisse noted regarding the Permian goal, "Richest opportunity set has certainly gotten bigger."  RBC Capital Markets observed on March 7, 2019 that Exxon was "[d]oubling down on key growth projects, preparing to 'unleash the hounds' in the Permian." Simmons Energy noted on the same day that while an increase was expected, "The magnitude of the increase, however, is on an impressive scale."   Every single analyst covering Exxon reported on its increased Permian

production goal.

### H.   "The Green Blob": Pressure To Achieve Woods's Impossible Goal Permeated The Organization

#### 1.   Insiders Acknowledged That The Goal Was Not Achievable

150.   The market had high expectations for Exxon's Permian production, and pressure to achieve Woods's goal permeated the organization.  However, it was common knowledge among Company insiders that achieving 1 million barrels of oil-equivalent per day by 2024 in the Permian Basin was not achievable.

151.   For example, as the *Wall Street Journal* reported on September 13, 2020, six current and former Exxon employees assigned to develop estimates for the oil and gas production in the Permian Basin said that Woods's statement that Exxon would increase oil and gas production in the Permian Basin to 1 million barrels per day as early as 2024 was unrealistic.

152.   As reported by the *Wall Street Journal* on January 15, 2021, the whistleblower complaint alleged with respect to Woods's goal that: "No one I knew in the organization thought this was possible[.]  [T]he pressure to deliver on Woods's promise to the market permeated the organization[.]"

153.   Multiple former employees interviewed by Lead Counsel confirmed that employees were under constant pressure to deliver on Woods's promise and that Company insiders knew and discussed among themselves that Woods's goal was not achievable.

154.   For example, Rhodes (Reservoir Engineer for XTO from August 2013 until July 31, 2020) confirmed that by the beginning of 2019, pretty much everyone at Exxon, including executives and management, knew that the volume projections and the big green blob were totally unrealistic, but the Company kept showing the same projection with the green blob on it and did not revise it down.  According to Rhodes, it was definitely pretty obvious internally that the

Permian goal was not achievable.  Rhodes further confirmed that he understood from Bridwell, a Reservoir Engineer who worked on the Permian or Delaware Basins, that there was no way that Exxon could ever meet the 2024 Permian Basin projections.

155.   Rhodes also confirmed that with respect to the 2024 Permian Basin projections, most people at Exxon knew that the timing of what Exxon said could be accomplished was impossible.  Rhodes further confirmed that concerns about the goal were voiced at reservoir engineering meetings, and that he personally raised concerns to his manager that the projections for the Delaware and Permian were ridiculous.

156.   Chris Noland, who was a Geographic Information Analyst at XTO from January 2013 until February 2021, has been in the oil and gas industry since 2007.  Noland worked in Fort Worth, Texas until 2018, at which time he moved to Exxon's main campus in Houston, Texas. Most recently, Noland reported to Tyler Hansen, and prior to that, Noland worked under Dave Kinkel, who retired in 2020.  As a GIS analyst and a cartographer, Noland mapped out a lot of the Permian and Delaware Basin to show what XTO's leaseholds and assets were in that area.

157.   Noland attended yearly presentations run by the seniors in the land division (Noland's division) in which the Company would show what their predictions were and what the production was from the prior year.  Noland confirmed that when the Company showed its production moving forward at the 2019 meeting on the "green blob" graph everyone thought there was just no way those goals could be hit.  Noland understood that the goal was not feasible from talking to employees who had attended the meeting after leaving the meeting, from talking to people in other departments with knowledge of those areas, and from his experience in the industry.

158.    FE4 (a subsurface employee with Exxon and XTO for just under 13 years from 2009 until 2021, who was sent to the Delaware Basin to perform research into Exxon's drilling and production in the area) confirmed that CEO Woods's statement to shareholders regarding the production of 1 million barrels of oil per day by 2024 was a false statement.  FE4 confirmed that Exxon has an annual process for planning and budgeting, and if one was to look at the planned budget for 2019, we would not see these figures because, as those in the tech department suspected, Woods made this number up on the fly.

159.    According to FE4, he was there when the announcement was made, and everyone did not know where this came from, and everyone was scrambling.  At the time the announcement was made, FE4 could not foresee how the Company would reach a million without a miracle.  But, the Company was focused on this number and achieving the "green blob."  FE4 recalled being on the Exxon Campus and watching the CEO's statements live and the entire tech group being "appalled" by what they were hearing.  FE4 recalled that his "jaw fell to the floor" when Woods made the announcement.  FE4 further recalled that he and his fellow team members asked during several team meetings and town hall meetings where Woods's 1 million number came from, and they were told it was a "vision."  FE4 added that tech employees asked how this was supposed to happen, and they were told that it was their job to make it happen.  According to FE4, Woods and other Exxon senior executives "were lying through and through."

160.    As a researcher, FE4 knew that the plan to drill 300 wells in his area of the Delaware Basin alone would not work.  FE4 and his reservoir engineer got to the field they were assigned and were told that 300 wells should be drilled on that acreage.  FE4 and the reservoir engineer came back with 150 wells, but this made Exxon unhappy.  FE4 and the reservoir engineer held their ground because 150 was the scientifically correct number.  FE4 added that he knew this by

looking at three months of data, which confirmed that 300 wells wouldn't work.  FE4 explained, "You're supposed to go with whatever the Company said, and all dissidents have been removed."

161.    Wachsmann (Instruments and Electrical Specialist, Project Manager for XTO in the Delaware Basin from March 2017 until May 2019) agreed that Exxon executives were lying about the rate of oil production, and this was "purely" about needing to impress the investors.  According to Wachsmann, "It's all about the perception of the investors, that's why they were trying to set records."  Wachsmann explained that the issue of trying to hit record flow rates was forced in meetings that he personally attended along with production engineers that "we needed to keep Exxon number one in the world, and our production would help keep them there."  He said that Exxon was only concerned with setting records for flow rates because the records of flow are what the "investor world" saw.

162.    Wachsmann described the "green blob," referenced in ¶144 above, as a presentation featuring a slide that showed volume on the left side and dates at the bottom. The graph showed a line that projected the Company's goal of reaching 1 million barrels by 2024, and it was nearly vertical, with the filled in area under the near-vertical line known as the "green blob," signifying the color of crude oil. According to Wachsmann, the "green blob" was discussed at all-hands employee meetings attended by everyone from the Vice Presidents and management to the janitors. Wachsmann explained that the "green blob" may have laid out the goal 2024, but he knew that physically speaking alone, this was not attainable.

163.    According to Wachsmann, in team meetings attended by Defendant Ortwein (prior to her retirement on March 1, 2019), Tim Mcilwain (current SVP of Operations at XTO), Joe Cardenas (Operations Manager at XTO from 2017 to 2019 and Reliability Integrity and Subsurface Manager at Exxon from April 2019 until December 2020), and others, employees would ask

questions about how the Company intended on meeting the lofty "green blob" goal when there was a lack of basic infrastructure. Wachsmann explained, "The blob was brought up many times; how we get there. People knew we couldn't get there." Wachsmann noted that these meetings were an open forum for employees to ask questions, and one of the questions asked with some frequency was "how do we get there?" The answers, Wachsmann explained, were very vague. Wachsmann explained that those, like himself, with experience knew the Company was not going to be able to achieve the 1 million barrel goal.

164.    Wachsmann further described that production engineers and mid-level engineers would ask questions because they understood what was going on in the field better than anyone. They did not have pipelines out there in the Delaware or the infrastructure built. "We're talking 2024, green blob and the curve on that chart, and these guys (production engineers) are thinking we need power, pipelines, takeaway pipes; how are we going to do this?" This was the general conversation among the engineering group.

165.    In addition, Wachsmann confirmed that the drilling problems he described in Section IV(C)(2)(a) above made the "green blob" goal of 2024 not attainable. Wachsmann explained that the thought that the wells were going to make all this volume without having to worry about decline was "pie in the sky, not achievable."

### 2.    Expert Analysis Confirms That Achieving The "Green Blob" Goal Was Not Feasible

166.    Expert analysis confirms that it was not feasible for Exxon to achieve 1 million barrels of oil-equivalent per day in the Permian Basin by 2024, as Defendants repeatedly assured investors Exxon was "on track" and "on schedule" to do. Specifically, the below analysis conducted by Lead Counsel's oil and gas industry expert confirms that Exxon would not have been able to achieve its 1 million barrels of oil-equivalent per day by 2024 goal using either (i) the actual

number of active rigs that Exxon had by year-end 2018, or (ii) the 55 rigs that Exxon told investors on March 5, 2019 that it would have by the end of 2019.

167.    Lead Counsel's oil and gas industry expert conducted a feasibility test using generally accepted industry methods and the historic data available through Enverus, a subscription service described in ¶81 above.  Defendants' "green blob" volume projection included development in both the Delaware and Midland Basins of the Permian Basin.  To test whether this projection was feasible, Lead Counsel's oil and gas expert used average metrics reflecting Exxon's performance in the Delaware and Midland Basins in 2018 in the following categories: (i) well performance; (ii) drilling time; (iii) the time it took for Exxon's wells to begin producing oil and gas volumes once they had been drilled; and (iv) the average lateral lengths drilled by Exxon.

168.    Based on these estimates and the actual number of active rigs Exxon had in the Delaware Basin in 2018, Exxon would have been able to achieve 530,000 barrels of oil-equivalent per day by December 31, 2024, not the 1 million barrels of oil-equivalent per day "green blob" goal that it represented to investors.

169.    Even with the 55 active rigs that Exxon told investors it would acquire in 2019 in order to meet the goal, achieving 1 million barrels of oil-equivalent per day by 2024 was still not feasible.  In this scenario, the maximum that Exxon would have been able to achieve was 700,000 barrels of oil-equivalent per day by December 31, 2024.

170.    Thus, based on what had happened on the ground with respect to production in the Permian Basin in 2018, and even assuming that Exxon achieved the 55 active rigs in 2019 that it told investors it would, Exxon's goal of 1 million barrels of oil-equivalent per day by 2024 in the Permian Basin was not feasible.

**I.      After March 2019, Defendants Continue To Falsely Assure Investors That Exxon Is "On Track" To Meet Its 1 Million Oil-Equivalent Barrel Production Goal And To Misstate Production Conditions**

171.    In stark contrast to the understanding among Company insiders that Exxon's goal of 1 million oil-equivalent barrels per day in the Permian was not achievable, and Exxon's own historic data, after March 2019, Defendants continued to assure investors that Exxon was "on track" to achieve this goal and presented its "green blob" slide to investors every quarter.

172.    In addition, Defendants continued to make false statements about production conditions on the ground, for example, citing Exxon's "strong well inventory" as supporting the Permian growth plan.

173.    Analysts remained positive on Permian production and growth.  For example, Credit Suisse wrote on April 26, 2019 that "six key areas" including "US tight oil (principally the Permian)" would "help drive XOM's longer-term production and earnings growth and improvement in upstream ROCE."  Credit Suisse noted that "XOM's accelerated development plan targets reaching >1 MMBoed by as early as 2024" and that "[t]he company has dramatically ramped up the pace of activity in the Permian[.]"

**J.      "This is A Lie": In The Summer Of 2019, Exxon Determines To Use False Drilling Assumptions Saved In A File Called "This is A Lie" To Overvalue The Delaware Basin By At Least $10 Billion**

**1.      The Whistleblower Complaint That Launched An SEC Investigation**

174.    As the *Wall Street Journal* first made public on January 15, 2021, some Exxon managers in 2018 had initially pegged the net present value of the Delaware Basin at about $60 billion.  But some employees involved in Exxon's annual development planning estimated during the summer of 2019 that the area's net present value was closer to $40 billion.  According to the whistleblower complaint, the lower estimate reflected, in part, that it took longer than expected to drill wells in 2018.

175.    According to the whistleblower complaint, as reported by the *Wall Street Journal* on January 15, 2021, after employees delivered the new number to the Delaware development manager, she asked them to "claw back" the some of the lost value by using different assumptions, including a more optimistic "learning curve" that estimated the rate at which they would improve drilling times.  The Delaware development manager in the summer of 2019 was Melissa Bond.[3]

176.    As the *Wall Street Journal* reported, some employees objected to using the new learning curve, which they viewed as unrealistic, and one employee submitted the revised estimates in a file named "This is a Lie."  After additional debate and consultation, the value was adjusted to $50 billion.

177.    The analysis that the whistleblower described in the summer of 2019 as part of "Exxon's annual development planning" was being done in connection with setting the Company's production goals and preparing the Company's year-end 2019 annual report.  As explained in Section IV(C)(1) above and Section VIII below, the false drilling assumptions used by Exxon to inflate the value of the Delaware Basin also rendered Exxon's stated proved reserve, resource base, and production plan false.

### 2.    Multiple Former Employees Confirmed The Whistleblower's Allegations

#### a.    "This is A Lie" File And Pressure To Use False Assumptions In Connection With Year-End 2019 Planning Process

178.    Former employees interviewed by Lead Counsel confirmed the existence of the "This is a Lie" file and the pressure to use false assumptions at Exxon.

---

[3] Ms. Bond's LinkedIn profile states that she was the "Development Manager—Delaware Basin" at XTO from May 2018 until March 2021, based in Houston, Texas.  Ms. Bond is currently the Lead Country Manager/Managing Director at Exxon in Angola.
https://www.linkedin.com/in/melissa-bond-a003b651/?originalSubdomain=ao.

179.    As detailed in Section IV(E)(2) above, Rhodes described that he would be pressured by the reserves team to try to find places to boost the reserves in connection with Exxon's year-end process.  Rhodes explained that the reservoir engineers, who reported to the reserves team, would make the numbers higher.  Rhodes confirmed that this pressure occurred for the 2019 reserves process.  In addition, Rhodes described that for the start of the year-end 2019 reserves process they had a kickoff meeting with the members of the reserves team, which was led by the legacy Exxon U.S. Reserves Manager.  At the start of the process, the manager alluded to the fact that Exxon had not historically been doing things right.

180.    Rhodes further confirmed that the whistleblower's description of the net present value of the Delaware Basin as wrong due in part to drilling times made a lot of sense and was consistent with Rhodes's understanding that Exxon was trying to go too fast in that region.  As summarized above, Rhodes understood from Bridwell, a Reservoir Engineer who worked on the Permian or Delaware Basins, that there was no way that Exxon could ever meet the 2024 Permian Basin projections.  Rhodes confirmed that it would be more obvious to the Company how realistic the drilling timing would be and also harder for outsiders to pick up on.

181.    Rhodes also confirmed that he heard about the "This is a Lie" file two or three times, at least once from Alafifi, who worked in either the Delaware or Permian Basin.

182.    FE4 confirmed that he had heard about the "This is a Lie" file.

183.    In addition, as described in Section IV(E)(2)(b) above, former employees interviewed by Lead Counsel confirmed a culture at Exxon of pressure to make valuations higher than they should have been.

### b. Longer Than Expected Drilling Times Made The Permian Production Goal Impossible

184.    Six current and former employees interviewed by the *Wall Street Journal* and the whistleblower confirmed that the $60 billion valuation of the Delaware Basin was wrong because Exxon was overestimating how quickly it could drill, and because drilling took longer than expected in 2018.  Multiple former employees interviewed by Lead Counsel confirmed that there were drilling delays and other problems in 2018, as described in Section IV(C)(2) above.

185.    Further, multiple former employees interviewed by Lead Counsel confirmed that drilling delays and problems with drilling and wells continued through 2019 and 2020.

186.    For example, Karl Rydjord was a Contractor in Construction and Commissioning for XTO from September 2019 until September 2020 in the Delaware Basin.  Rydjord reported to Project Manager Ryan Smith, who oversaw the infrastructure buildout in the Poker Lake unit of the Delaware Basin.  Rydjord also had a "dotted line" reporting responsibility to Josh Loch, another project manager.  Smith and Loch worked in XTO's Midland, Texas office and reported to Brian Klutz, a project manager for XTO, who oversaw project execution for the midstream assets group.

187.    Rydjord confirmed that there were problems with project execution and issues with production in The Big Eddy, including insufficient drilling progress.  Rydjord explained that The Big Eddy was one of the two main production units in the Delaware Basin (along with Poker Lake) that were being drilled and supposed to produce oil at levels that would allow Exxon to reach the goal of 1 million barrels per day. However, Exxon was not getting wells drilled and completed in the timeframe it thought it could, leaving Exxon behind where it wanted to be.

188.    According to Rydjord, the drilling progress was not "living up to what was forecasted."  There were issues with the completion design or the manner via which Exxon

completed wells.  In particular, Rydjord noted, it was taking longer to drill and complete the wells and fracks, and when the wells came on production, the production was not as good as what Exxon was hoping for.

189.    Further, Rydjord explained, the forecasts proved not to be true for The Big Eddy area.  The Big Eddy was the larger area of the basin, where Exxon was expecting more development drilling, but the activity turned out to be more exploratory drilling.  According to Rydjord, the well performance in The Big Eddy was "not what they were hoping for."  The field was not as consistent as Exxon hoped, and the basin was not a homogenous reservoir that would be the same no matter where it was drilled.

190.    Rydjord described that there's a process by which geologists and reservoir engineers create a curve for a well and project it into the future.  However, Exxon thought it would have certain volumes coming out of the wells, but it didn't, and slid these forecasts into the future. For example, if the Company forecasted a certain amount of production by October, but they did not meet that goal, they would slide it to December.

191.    Ryan Wells was a Drilling Consultant at XTO from August 2019 until December 2019 who worked in the Permian Basin, specifically the Delaware Basin, and the Bakken as a directional driller.  As a Drilling Consultant, Wells's job was to drill the wells according to well plans that were designed by the engineers.  Wells had a close connection to the actual drilling engineers in his role, and he spoke to them every day in mandatory safety meetings.  Wells reported to Roger Rutherford, the rig manager at the time.  While Wells's job was to drill the wells, he would get updates on how the wells were doing, including, among others, two wells that Wells personally drilled in the Delaware Basin.

192.     Wells confirmed that the Company's claim that it would produce 1 million barrels of oil per day in the Permian by 2024 was highly inaccurate.  Wells confirmed that the Company did not come close to that.  Wells explained that there were drilling delays and increased costs associated with drilling delays all the time.  For example, on one of his wells in the Delaware Basin, they lost a lot of fluid, and they had to cap it off there and then sidetrack around it.  The cost that resulted from losing too much fluid and having to sidetrack was well over a few hundred thousand dollars.  The problems with drilling wells in the Delaware Basin, including losing fluid, were particularly frequent in the Wolfcamp D section of the Delaware Basin, which was essentially drilling through a canyon.  As another example, Wells described how two of the wells that Wells personally drilled in the Delaware were hardly producing at all.

193.     Jeff Biddle was a Rig Move Specialist at XTO from September 2019 until March 2020, who worked primarily in the Delaware Basin. Biddle's responsibilities included doing site surveys of new locations where they were going to set a rig out, route reconnaissance, on-location safety any time there was a rig move, and accounting for all parts of rigs when they were moved. Biddle reported to a Rig Move Coordinator based out of the XTO Midland, Texas headquarters.

194.     Biddle confirmed that Exxon's claim that it would produce 1 million barrels by 2024 did not seem at the time to be realistic.  According to Biddle, Exxon was having issues drilling in the eastern New Mexico region of the Delaware Basin because the Company was also fracking a quarter of a mile or half a mile away.  The Company could not finish drilling all the wells because of all the fracking that was going on just on the other side of them.  They had to cap those wells and move down the road, maybe a half a mile to a mile.  Biddle explained that when you drill and frack at the same time, it causes gas and other issues in the formation that you cannot see, but that computers determine is a problem, so that you cannot drill effectively.  As a result, Exxon had to

55

move the rigs to another location which caused delay.

195.    As another example of delay, Biddle described how he put a rig in place in September 2019 in Texas that was supposed to drill four wells, but by the time Biddle left in March 2020, they were still in that same location because of issues with formation.  Biddle explained that when that rig has four wells that it has to drill in a location, and it had been on the location for 4.5 to 6 months, you are just not going to hit your goal.

196.    FE5 was a Project Control Specialist who worked on a contract basis for XTO from January 2019 until April 2020, working in the field in Midland, Texas.  FE5 was responsible for creating and presenting reports for XTO's management team, which forecasted manpower needs for construction crews on projects within the Permian.  FE5 attended quarterly safety meetings in the Midland, Texas office, as well as more frequent construction team meetings, where the progress in the Permian Basin and the Delaware Basin was discussed.

197.    FE5 explained that the wells in the Delaware Basin are "harder to drill" and a "worst case scenario" drilling environment because there is "sour gas" that contains an inordinate amount of hydrogen sulfide in Lea County, New Mexico, where the Delaware Basin is located.

### c.    Additional Problems In The Permian That Rendered The Production Goal Impossible To Achieve

198.    Multiple former employees interviewed by Lead Counsel confirmed that in addition to the drilling delays and other drilling and well problems described above, there were additional problems with (i) inadequate equipment and infrastructure; (ii) inadequate labor; and (iii) finding less oil than the Company expected.

### i.    Inadequate Equipment And Infrastructure

199.    Multiple former employees explained that Exxon did not have enough rigs operating in the Delaware Basin to achieve its goal.  For example, Biddle explained that if Exxon

wanted to hit the goal of 1 million barrels, they needed a lot more rigs than they had.  To meet this goal, Biddle confirmed that Exxon would have needed at least 100 rigs drilling nonstop with no issues at all, which Biddle explained, hardly ever happens.  According to Biddle, the goal was incomprehensible.

200.    FE1 (Operations Drilling Supervisor at Exxon from June 1998 until December 2020) was one of the first wave of drilling supervisors to be sent to the Permian Basin in January 2018 when Exxon's drilling projects began there.  Exxon sent FE1 to the Permian to learn from the existing consultants at the site and improve on how things were being done, including how to drill the wells cheaper and faster, and quell the uncontrolled spending going on at that time.

201.    FE1 confirmed that there was no way Exxon was going to be able to produce what it promised with the number of rigs it was running.  FE1 added that the Delaware Basin was difficult to drill, and cost more time and money, due to its isolated location. There were also no support services in the Delaware Basin; support services were located in Midland and another location, but not near the Delaware, so the drilling became more expensive.  FE1 added that because Delaware Basin operations are closed loop, there are no reserve pits, so everything runs directly through a frack tank and then is hauled off by trucks, which is a cost increase.  In addition, because there were no roads in the Delaware Basin, they had to be built in each location to bring out oil due to the closed loop.  The land was also rocky, not sandy, which made it difficult as well.

202.    Multiple former employees also described problems with Exxon's infrastructure that made achieving the Company's Permian goal impossible.  For example, Rhodes confirmed that inadequate infrastructure was the main reason why the Permian Basin goal was not achievable. Rhodes explained that there was a lack of capacity and a lack of pipeline capacity to transport the oil.  Rhodes got this understanding from Bridwell, a Reservoir Engineer at XTO who worked on

the Permian or Delaware Basins.  Rhodes added that the capacity issue would also cause too much "soaking time" for the wells.  Rhodes explained that if you are drilling and producing so many wells, but you cannot complete them, you will not take advantage of the "super charge" of the frack.  To get the super charge, you need to flowback the well and start producing it shortly after the frack of the well, within days of the frack.  If there was nowhere for the oil to go because of lack of capacity and infrastructure, it not only delays the production, but it also likely makes the well not as good of a well because it had so much soaking time.

203.    Rydjord, who was based in the field as an officer in The Big Eddy, was responsible for building infrastructure needed to get the oil and gas to market, and he was the only project engineer working in the field on the infrastructure team.  Rydjord described that the Cowboy Central Delivery Point ("CDP") was the main facility that was being developed and through which all of the oil and gas in the Delaware Basin were supposed to flow.  But, as Rydjord saw first-hand and knew because he was working closely with the Cowboy CDP, progress was not being made on the Cowboy CDP.  Based on Rydjord's discussions with peers, managers, vendors, and from the timing for the infrastructure work that Rydjord was tasked with completing which fed into the Cowboy CDP, Rydjord believed that Exxon likely sought for the Cowboy CDP to be completed by late 2019 or early 2020.  However, the CDP was still not done by the time Rydjord's contract was completed in September 2020.  In fact, according to Rydjord, the Cowboy CDP was "a long way from done."  Rydjord also described instances of delay in receiving necessary equipment and supplies.

204.    Like Rydjord, Wachsmann explained that the Cowboy plant was $1 billion over budget—after the Company over-budgeted for the facility at $800 million—and it is still not in full production to this day.  Wachsmann explained that the construction began in 2018, and it was

not an out of the ordinary facility—it was a cookie-cutter facility.  The rule of thumb when building such a facility is that a 200 million cubic feet-per-month plant takes $350-400 million to build, and another 200 million cubic feet takes another $150-175 million to add on.

205.    Wachsmann additionally explained that Exxon's goal was not achievable by 2024, in part because the infrastructure was being installed "from scratch."  He explained that the infrastructure required to produce that volume was not there in the whole area, and that this included everything necessary: physical power like electricity, pipelines, roads, processing plants and tank batteries.  Wachsmann confirmed that there were no pipelines to bring the product to the gulf, and there was also rough terrain that the Company would have to deal with in building this scope of infrastructure.

### ii.    Inadequate Labor

206.    In addition, former employees interviewed by Lead Counsel explained that inadequate labor contributed to the Company's inability to meet its production goal in the Permian Basin.

207.    For example, Rydjord confirmed that the limits on labor availability negatively impacted the Company's ability to construct all of the infrastructure at the same time.  Rydjord described how Exxon was building the infrastructure with the plan that it would be able to service all of the planned production and allow Exxon to ramp up very fast to 1 million barrels of oil per day.  However, there were downstream partners that also had to build out their facilities to prepare for the planned increase in production from the Delaware Basin, including, for example, Lucid Energy Group, which had to modify and expand its pipeline and other infrastructure to meet Exxon's projected volumes.

208.    Rydjord added that Exxon's focus was oil production, which is associated with gas production, and the Company was not planning enough capacity to move it all. According to

Rydjord, Lucid and Exxon were drawing from the same labor pool, and the competition meant that both companies had to tap into less skilled laborers to meet demand.  Moreover, labor costs increased with competition.

209.    According to Rydjord, everything got very expensive, labor costs exceeded forecasts, and the amount of oil that Exxon was producing from the completed wells did not meet the Company's expectations.

### iii.    Less Oil Than Expected

210.    Multiple former employees interviewed by Lead Counsel also confirmed that Exxon was finding less oil in the Permian Basin than it expected, which contributed to its inability to achieve its goal.

211.    For example, Rydjord explained that the amount of oil that Exxon was producing from the completed wells did not meet expectations.  According to Rydjord, The Big Eddy was not consistent.  There were "sweet spots," but one could not count on the basin being a homogenous reservoir.  According to Rydjord, Exxon's plan was shattered when there was not as much oil as they were hoping to find.

212.    In addition, Wells confirmed that two of the wells that he personally drilled in the Delaware Basin were hardly producing at all.

213.    FE5 also confirmed that he understood from attending quarterly safety meetings and more frequent construction team meetings in XTO's Midland, Texas office, that the Company's Delaware Basin goals were not on schedule, and that the Delaware Basin was producing far fewer barrels of oil per day than the targeted amount.

214.    FE6 worked at Exxon and XTO from 2013 until February 2021, serving as an Instrument, Controls & Electrical Equipment Lead Commissioning Engineer at XTO from 2020 until 2021, and a Senior Staff Instrument Engineer at Exxon from 2018 until 2020.  From May

2020 until February 2021, FE6 was working in the Delaware Basin out of Carlsbad, New Mexico, and reported to Gordan Holloway.

215.    FE6 confirmed it seemed to be a recurring theme of disappointment that "we weren't making our oil marks."  FE6 explained that it was common knowledge with the boots on the ground employees in the Delaware Basin that they were pumping saltwater and that individuals on the ground were in frequent contact with the people at the Midland office.  According to FE6, it was a running joke that the Company should start selling saltwater because they were getting so much saltwater and not oil.

### 3.    Expert Analysis Confirms That Exxon Continued To Lag Behind The Top Operators In The Permian Basin During 2019 And 2020

216.    The problems that Exxon experienced in 2018 continued and worsened throughout 2019 and 2020.  Lead Counsel's oil and gas industry expert's analysis of historic data obtained through the subscription service, Enverus, described in ¶81 above, reveals that Exxon continued to lag behind the other top operators in the Permian in (i) drilling times; (ii) production; (iii) well performance; and (iv) well quality.

### a.    Exxon Continued To Lag Behind In Drilling Times

217.    Throughout 2019, Defendants touted their drilling efficiency to investors.  For instance, on Exxon's March 6, 2019 Investor Day call, Defendant Chapman stated, "We drill and complete in what I describe as the optimum fashion."  Expert analysis confirms that these statements were false, and in fact, Exxon's drilling time consistently ranked far below the other top operators in both the Delaware and Permian Basins in 2019.

218.    The below chart reflecting historical median drilling time in the Delaware Basin in 2019 shows that Exxon had the highest drilling time of the ten top operators in the Delaware Basin.



219.    In the Permian Basin, Exxon's drilling time ranked *twelfth* highest out of the Permian Basin's top operators in 2019.



220.    Defendants continued to falsely tout their drilling efficiency and drilling time to investors throughout 2020.  For example, on Exxon's March 5, 2020 Investor Day call with investors, Defendant Chapman stated, "Drilling times are reducing and we are very pleased with what we see in the rocks and with our well performance."  These statements were again false, as expert analysis confirms.

221.    In 2020, Exxon ranked *ninth* out of the ten top operators in the Delaware Basin for highest drilling times.



222.    And in the Permian Basin in 2020, Exxon again ranked the ***twelfth highest*** among the top operators in the Permian for drilling times.



**b.      Exxon Continued To Lag Behind In Production**

223.    In addition, as reflected in the charts below, Exxon was in the middle of the pack in total annual production of barrels of oil-equivalent, not a leader, ranking *sixth* and *fifth* in 2019 and 2020, respectively.





### c.    Exxon Continued To Lag Behind In Well Performance

224.    Exxon's well performance also lagged behind the Permian top operators throughout 2019 and 2020, as reflected in the charts below.



### d.    Exxon Continued To Lag Behind In Well Quality

225.    Exxon also continued to lag behind the other Permian operators in well quality in 2019, as reflected in the charts below.



226.    And Exxon continued to lag behind the other Permian operators in well quality in 2020, as reflected in the charts below.



227.    Thus, expert analysis confirms that Exxon's production problems continued and worsened throughout 2019 and 2020, in stark contrast to Defendants' statements to investors.

### K.    Exxon Continued To Falsely Assure Investors That Its 1 Million Oil-Equivalent Barrels Goal Was "On Track," Overstate The Value Of Its Asset, And Tout Misleading Production Conditions

228.    Throughout the end of the Class Period, Defendants continued to repeatedly represent to investors that Exxon was "on track" to achieve its goal of 1 million barrels of oil-equivalent per day in the Permian, presenting its false "green blob" slide to investors.

229.    In addition, Defendants reported proved reserve and resource base numbers that were a product of the fraudulent reserves process and based on false drilling assumptions.

230.    Defendants also touted production conditions as supporting Exxon's growth plan, including, for example, "continued strong well performance" and that "drilling times are reducing."

231.    In addition, Defendants provided false denials in response to analyst questions.  For example, on Exxon's August 2, 2019 earnings call, an analyst from Scotiabank asked Exxon to confirm point blank that there was "***no material information that you have seen either***

*improvement or deterioration compared to your current plan*."  In response, Defendant Chapman acknowledged that Exxon was focused on getting "that drilling time down," but reiterated, "*[T]here's nothing to flag because it's within the range of our planning basis*."

232.   During the same call, an analyst from UBS asked about Exxon's drilling activity in the Permian. In response, Defendant Chapman falsely stated, "*Overall, we're on plan* . . . . Of course, I want us to go faster, but we're making decent progress.  So there's nothing really to flag outside of what we're already said.  *It's within the range of what we have expected*, and today our Permian production is accretive to earnings."

233.   As yet another example, during Exxon's March 5, 2020 Investor Day call, in response to a question from a Wells Fargo analyst about Exxon's production performance in the Delaware Basin, noting that Exxon's "lack of performance improvement over the years is in contrast to some of your competitors," Defendant Chapman stated:

> I mean *we've been drilling best wells*, best ventures, we're looking for those opportunities.  And the point I was making when I rolled over and showed you what the advantages had been, what the *performance improvement had been in the Delaware*, that's because we've been in *development drilling*.  So, we can model very, very clearly where we will get to in the Delaware.

234.   During the same March 5, 2020 call, former Exxon senior vice president Andrew Swiger told a Barclays analyst that in the Delaware Basin, Exxon was "only just about to unleash the hounds."

235.   Analysts remained positive on the Permian and Defendants' growth progress and plan.  For example, UBS wrote on August 2, 2019, "In the Permian, production growth is very impressive."  Bank of America Merrill Lynch wrote on November 1, 2019, "Permian production is performing well," and "Output in the Permian continues to track well above plan[.]" On February 28, 2020, two days after Exxon reported its total proved reserves in the 2019 10-K,

Barclays celebrated, "Major 'mojo' in the Permian[.]"

### L.    The Truth Is Revealed Through A Series Of Partially Corrective Disclosures

#### 1.    January 31, 2020:  Exxon Discloses That Permian Basin Production Has Slowed Down, But Continues To Mislead Investors About Exxon's Ability To Achieve The 1 Million Oil-Equivalent Barrels Goal

236.    On January 31, 2020, Exxon held its Q4 2019 earnings call at 8:30 a.m. CT.  During the call, Defendant Woods presented a "green blob" slide, set forth below, stating that fourth quarter 2019 production was "294 Koebd" or 294,000 barrels of oil-equivalent per day, which was virtually flat quarter to quarter compared to 293,000 barrels of oil-equivalent per day for the third quarter of 2019.  This fell below estimates made by industry analysts as well as the Company's own guidance.  In response to this news, Exxon's stock declined 4.1% on January 31, 2020, and continued to decline 2.2% on February 3, 2020 and 1.3% on February 4, 2020 as the market absorbed this news over the weekend.



237.    However, during the January 31, 2020 call, Defendant Woods continued to reassure investors that "we are making very good progress" on Permian production.  Defendant Woods

presented the same "green blob" slide referenced in ¶236 above, which reiterated, "Permian volume growth on schedule."

238.     In response to analyst questions, Defendants assured investors that Exxon was "on track" to achieve its goal of 1 million oil-equivalent barrels per day in the Permian.  For example, a Goldman Sachs analyst asked about Permian production looking flat from Q3 to Q4 2019 and Exxon's progress in achieving its production curve in the Permian.  In response, Defendant Woods said to expect "lumpy progress with respect to volumes growth" and to not "draw a whole lot" from it.  Further, Defendant Woods reiterated that Exxon's production goal for the Permian was "***clearly on track***," stating, "I think a really important point, if you look at the volumes that we delivered in the Permian, we're above what we said we were going to do last year at the Analyst Day by about 20,000 barrels a day, so that's clearly on track."

239.     Defendants also touted production conditions in the Permian Basin in response to analyst questions.  For example, in response to an analyst from Barclays, Defendant Woods stated, "We like what we see around some of the ***well performance***, particularly in the Delaware." Defendant Woods concluded, "[B]ottom line[:] the potential of that and the value propositions that we've talked about ***haven't changed, if anything, we like it better***."

240.     Analysts were discouraged by Exxon's flat Permian production growth for the quarter, but they were reassured by Defendants' representations that Exxon was still on schedule to meet its 1 million oil-equivalent barrels by 2024 goal in the Permian.  For example, Barclays wrote on January 31, 2020, "Permian production was ~flat QoQ at 294 MBoe/d vs. our estimate of 324 MBoe/d.  However, management reiterated prior commentary that Permian growth can be lumpy given infrastructure buildout and that FY production is generally a little above expectations."  Credit Suisse similarly noted on January 31, 2020, "Permian production averaged

70

a disappointing 294 MBoed in 4Q19, flat with the 293 MBoed in 3Q19 but is expected to increase by ~200 MBoed YoY through 4Q20." But Credit Suisse further noted that "XOM's Permian (and Bakken) growth had been ahead of its long-term trajectory, and management attributed the 4Q Permian results to the lumpiness in wells to sales as seen in historical patterns, with volume growth on track for long-term target. For reference, XOM expects its net production from the Permian (Midland and Delaware Basins) to grow at a >30% CAGR during 2019-25 *with a target of reaching ~1 MMBoed 2024, which we expect it to reach in late 2024*."

**2.     May 1, 2020: Exxon Discloses Significant Rig Cuts And A Reduction In 2020-2021 Permian Basin Production Volumes, But Represents That Impact Will Only Be Short-Term And Continues To Tout Production Conditions**

241.     On May 1, 2020, Exxon held its Q1 2020 earnings call at 8:30 a.m. CT. During the call, Defendants disclosed that Exxon was cutting rigs by 75% in the Permian, and that decreased capital expenditures would reduce Permian volumes in 2020 and 2021. Defendant Woods stated, "[R]eduction in capital spend will primarily affect 2021 where we expect volumes will be down 100,000 to 150,000 oil equivalent barrels per day from our previous estimates. In 2020, the impact of the reduced CapEx will be much lower, at about 15,000 oil equivalent barrels per day." In addition, Defendant Woods disclosed, "Over the course of the year, we expect to ramp rigs down by about 75% in the Permian, ending the year at approximately 15 rigs." In response to this news, Exxon stock declined 7.2%.

242.     However, Defendant Woods also represented during the call that Exxon had the "flexibility" to reduce spend now, while still maintaining its progress in the region. In addition, Defendant Woods touted the "high productivity wells" in Poker Lake in the Delaware Basin.

243.     Analysts were generally negative on the impact of the capital investment reduction on the Permian Basin. For example, on May 1, 2020, Raymond James noted, "This was the final

quarter with Permian uplift on a sequential basis, in view of the rig count having been slashed as part of the overall 30% spending cut unveiled on April 7." On the same day, Credit Suisse stated, "While not detailing capex reductions by area, it noted that the largest share of the cuts is from the Permian." Also, on May 1, 2020, Evercore ISI further commented, "Capital reductions are expected to decrease Permian production volumes by approximately 15 MBOEPD in 2020 and 100-150 MBOEPD in 2021 . . . . Management anticipates this will impact volumes in the Permian by approximately 100 MBOEPD in 2Q."

244.    However, multiple analysts credited Exxon's "flexibility" and noted that the impact was not material in the near-term. For example, Wolfe Research wrote on May 1, 2020, "2020 production guidance is not materially impacted." Cowen wrote on May 1, 2020, "Production should return back to 4MM bped in 2022." UBS similarly wrote on May 4, 2020, "In the Permian, capex reductions are expected to have only a minor impact on volumes this year[.]"

### 3.    January 15, 2021: The *Wall Street Journal* Reports That Exxon Used False Drilling Assumptions Saved In A File Called "This is A Lie" To Overvalue The Delaware Basin By $10 Billion

245.    On January 15, 2021, the truth concerning Defendants' fraud was finally revealed when the *Wall Street Journal* reported that the SEC had commenced an investigation in response to the whistleblower complaint, which described how Exxon's 2018 drilling assumptions were false and that Exxon had determined in the summer of 2019 to fraudulently overvalue the Delaware Basin by $10 billion, using false drilling assumptions saved in a file called "***This is a Lie***." In response to this news, Exxon's stock declined 4.8%.

246.    News outlets and analysts reported on the SEC investigation and attributed Exxon's stock drop to the disclosed investigation and whistleblower allegations. For example, *Bloomberg* reported on January 15, 2021 in an article titled, "Exxon Falls After Report of SEC Probe into Permian Valuation," that "Exxon Mobil Corp. slumped after a newspaper report said the company is being

investigated by the U.S. Securities and Exchange Commission for allegedly overvaluing a key asset in the Permian Basin." UBS reported on the *Wall Street Journal* article on January 17, 2021, noting that the net value assessments described in the article would impact Exxon's assessment of its "proved reserves and resources, underpin balance sheet historic cost (which are audited), and guide strategy and investment."

## V.    POST-CLASS PERIOD EVENTS

### A.    Exxon Announces A Reduced Goal Of 700,000 Oil-Equivalent Barrels Per Day By 2025 In The Permian

247.    On February 2, 2021, Exxon held its Q4 2020 earnings call and acknowledged that it would not meet its 1 million oil-equivalent barrels per day by 2024 production goal. Announcing a new reduced goal, Defendant Woods stated, "[O]ur plans result in Permian volumes of approximately 700,000 oil equivalent barrels per day by 2025."

248.    Analysts noted Exxon's new guidance on Permian production as negative news, but with little surprise. On February 2, 2021, Bank of America Securities reported, "Permian . . . production set at a range of 500-700kboed by 2025 (from >1mm boed previously)" and further commented, "[N]oting that expectations were already for a lower growth wedge following 2020's collapse, management now indicates an overall production estimate for 2025 at 500-700kboed with bands of $50-60 Brent, a 40% cut at the midpoint from prior expectations of >1mm boepd." CFRA also stated that same day, "Whereas guidance from '19 suggested Permian production of 1.0 mmboe/d by '24, today's revised guidance is 0.7 mmboe/d by '25."

### B.    Exxon Reduces Its Proved Reserve By 1.5 Billion Oil-Equivalent Barrels Related To The Permian Basin

249.    The Company did not reduce its proved reserve to more accurately reflect the reduced value of the Delaware Basin until after the end of the Class Period. On February 24, 2021, when Exxon released its 10-K for the year ended December 31, 2020, Defendants revealed, "a net

reduction to estimates of proved reserves of approximately 1.5 billion oil equivalent barrels, mainly related to unconventional drilling in the United States."

250.     By identifying the reduction as "mainly related to unconventional drilling in the United States," the Company acknowledged that this reduction stemmed primarily from its operations in the Permian Basin—its largest asset devoted to unconventional drilling in the U.S.

251.     Analysts were not particularly surprised by Defendants' announcement.   For example, Credit Suisse's February 26, 2021 analyst report noted that "XOM has scaled back on its plans to grow Permian volumes over 1MMboe/d by 2024."

## VI.     ADDITIONAL SCIENTER ALLEGATIONS

252.     As set forth above and further below, numerous facts demonstrate that the Executive Defendants and Exxon knew or were severely reckless in not knowing that Defendants' statements identified in Section IX were materially false and misleading when made.  The scienter of Exxon as a corporate entity is derived from the scienter of its executives, including but not limited to the Executive Defendants and senior executive Melissa Bond.

### A.     Senior Exxon Management Directed Employees To Inflate Reserves

253.     Lead Counsel's investigation confirms that senior Exxon management directed employees in the reservoir engineering group to inflate the Company's stated proved reserves and resource base to create the appearance that Exxon's reserves were larger than they really were.

254.     As described in more detail in ¶¶109-119 above, Rhodes confirmed that he and the other reservoir engineers felt with a degree of certainty that the numbers they were submitting were accurate, but that pressure came down from the reserves group to look for places to boost reserves, and that the reserves group knew they were exerting that pressure.   Rhodes also specifically described the "scrunching" technique that the reservoir engineers working on the Permian and Delaware Basins would have used to make wells break to a different, shallower

decline rate sooner than they reasonably should, which, in turn, would increase the reserves by huge amounts. The report from the whistleblower and multiple former employees interviewed by Lead Counsel confirmed pressure at Exxon to make valuations, including the reserves and Delaware Basin valuations, higher than they actually were.

255.    The fact that senior Exxon management instructed Company employees to inflate the Company's proved reserves figures supports a strong inference of their scienter with respect to the falsely inflated proved reserves that Exxon reported in its annual filings with the SEC, and the "resource base" number that Exxon represented to investors, which included the false proved reserve. The whistleblower report and accounts from multiple former employees lend further support to the inference.

**B.     Senior Exxon Management Directed Employees To Use False Drilling Assumptions In Valuations**

256.    Lead Counsel's investigation confirms that senior Exxon management directed employees in the development planning group to use false drilling assumptions to overvalue the Delaware Basin by billions of dollars.

257.    The whistleblower alleged that, at a minimum, Exxon's development planning manager for the Delaware Basin, who at the time was Melissa Bond, knew that the net present value of the Delaware assets was lower than the $60 billion originally estimated because drilling wells in 2018 took longer than expected, and she nevertheless pressured her team to use false drilling assumptions saved in a file named "This is a Lie." The *Wall Street Journal* further reported that "some Exxon managers" were involved in calculating the initial, inflated $60 billion net present value for the Delaware assets that was based on false drilling assumptions. FE4 explained that Melissa Bond was an executive, and executives and the CEO speak to each other all the time. Further, Rhodes and multiple former employees interviewed by Lead Counsel confirmed pressure

at Exxon to make valuations higher than they actually were.

258.    The fact that senior Exxon management instructed Company employees to use false drilling assumptions saved in a file called "This is a Lie" supports a strong inference of their scienter with respect to the false drilling assumptions that Exxon used to calculate its proved reserve and resource base valuations, and that supported its Permian production plan.  The accounts from multiple former employees, including Rhodes, lend further support to the inference.

## C.    Senior Exxon Management Reviewed And Approved The Inflated Reserve Reports

259.    Exxon's own disclosures confirm that senior Exxon management reviewed and approved the reserve reports that contained false inflated reserve numbers.

260.    As stated in the 2019 10-K, the Global Reserves and Resources group's responsibilities "include oversight of the reserves estimation process for compliance with Securities and Exchange Commission (SEC) rules and regulations, review of annual changes in reserves estimates, and the reporting of ExxonMobil's proved reserves."  Critically, "After all changes are made, *reviews are held with senior management for final endorsement*."  Further, "Reserve changes are made within a well-established, disciplined process driven by senior level geoscience and engineering professionals, assisted by the Global Reserves group which has significant technical experience, *culminating in reviews with and approval by senior management*."  Finally, Exxon explicitly stated in its February 26, 2019 press release that its "long-standing, rigorous" process for estimating its proved reserve is structured to ensure "consistency and *management accountability* in all reserves bookings."

261.    The fact that senior Exxon management is personally responsible for the final endorsement of the Company's proved reserve figures, and responsible for reviewing and approving any changes to those figures, supports a strong inference of their scienter with respect

to the falsely inflated proved reserve and resource base.

**D.    Senior Exxon Management Received Drilling Reports Twice Per Day**

262.    Lead Counsel's investigation confirms that senior Exxon management received drilling reports on the Permian Basin twice per day.

263.    Wells explained that Exxon and XTO corporate officials received morning and evening drilling reports that were sent out twice a day, every day.  The reports sent out twice a day to corporate would include the projected well path, their PDFs, PMGs, VFD files, and all the surveys and logs that they were taking while drilling.  Wells stated that the reports sent out could not possibly be more detailed, and in fact, Exxon was "anal" about how it wanted the reports to look.  Defendant Chapman corroborated this fact on March 5, 2020, when he stated in response to an analyst's question about Exxon's pace of development in the Permian, "We're micromanaging every single rig."

264.    The fact that senior Exxon management received drilling reports twice per day supports a strong inference of their scienter with respect to drilling delays in the Permian Basin and false drilling assumptions that Exxon used in its valuations and Permian production plan.

**E.    Senior Exxon Management Had Access To Reserves And Production Data**

265.    Lead Counsel's investigation confirms that senior Exxon management had access to reserves and production data reflecting Exxon's production and progress in the Permian Basin.

266.    Rhodes explained that he had access to data concerning all of the reserves for any group, including the Delaware Basin group, and would periodically personally review the reserves for the Delaware Basin.  Rhodes could look at reserves on a well level and see production and reserves forecast for any of the wells in any of the Company's XTO assets.

267.    FE4 confirmed that Melissa Bond, the Delaware development manager, had access to the data from the Delaware Basin known as a Decline Curve Analysis (DCA), as described in

more detail in ¶¶130-131.  FE4 explained further that Bond was in charge of executing the plan in the Delaware Basin and had access to everything.  FE4 confirmed that the information from Bond to Defendant Woods would be "very transparent."  Specifically, according to FE4, at Exxon the employees are divided into Career Level 29 or below or Career Level 30 or higher.  Those below Career Level 29 were regular employees, those above were executives.  FE4 explained that Melissa Bond was an executive, and executives and the CEO speak to each other all the time.  The information Bond had was not information a supervisor would have had.  She was an executive and immersed in the data, and she has to approve the data and present it to those above her.  According to FE4, there is a system of delegation of authority at Exxon which dictates everything down to the amount of money someone can approve for expenditure.  It's militaristic, and there is no room for "oh, I didn't know" scenarios.  As such, according to FE4, Defendant Woods could access data "perfectly well."

268.    Indeed, Exxon's own disclosures confirm that management-level executives had access to the central database of the Company's reserves data in order to approve changes.  The 2019 10-K states that "changes to reserves estimates that exceed certain thresholds require further review and approval by the appropriate level of management . . . before the changes may be made in the central database."

269.    The fact that senior Exxon management had access to data about the Company's reserves and production in the Permian Basin supports a strong inference of scienter with respect to their statements to investors concerning production in the Permian Basin and the falsely inflated proved reserve and resource base.

**F.      The Executive Defendants Personally Toured Exxon's Permian Basin Operations**

270.     The Executive Defendants touted their hands-on knowledge and understanding of the Permian Basin specifically through personal visits to the Company's operations in the Permian.

271.     On November 2, 2018, Defendant Williams announced that he and other Defendants—including the management committee and Exxon's Board of Directors—had visited the Company's operations in the Permian Basin.  Defendant Williams stated, "I was out there about a month ago.  *And in fact, the entire management committee and the board went out there.*  We even let Neil go out there with us."

272.     In Exxon's February 4, 2019 Energy & Carbon Summary presentation, the Company touted that the Public Issues and Contributions Committee ("PICC") of Exxon's Board of Directors—which reports to the full Board, of which Defendant Woods is the Chairman— visited Exxon's Permian Basin operations in Carlsbad, New Mexico.  The presentation stated, "The visit included a tour of a well site where directional drilling and hydraulic fracturing technologies are being employed, as well as a production site where oil and gas are separated and stabilized prior to transport and use.  Through these field visits, the PICC is able to *see first-hand and validate* that the risk management process and operations integrity management system (OIMS) are effective at protecting the Corporation's employees, the community and the environment.  The PICC utilizes this information, along with reports on the safety and environmental activities of the operating functions throughout the year, *to provide recommendations to the full Board*."

273.     The fact that the Executive Defendants and other senior management personally toured and observed production in the Permian Basin supports a strong inference of their scienter with respect to the true conditions on the ground.

### G.    A Corporate Culture Of Refusing To Take Write-Downs And Inflating Valuations Pervaded Exxon

274.    Lead Counsel's investigation confirms that a culture pervaded Exxon—imposed from the top down—of refusing to take necessary write-downs and falsely inflating valuations.

275.    It is well-known within the oil industry that Exxon refuses to take write-downs, with former CEO Tillerson famously declaring, "We don't do write downs."  It has also been well-documented that senior management at Exxon, including Defendant Woods and Defendant Williams, was known as the "God Pod," particularly because they impose decrees that the rest of the Company has no choice but to follow.

276.    Further, Rhodes described that beginning in the summer of 2018, the legacy Exxon U.S. Reserves Manager started looking at XTO reserves and saying that the reserves were not right and needed to be written down.  Rhodes described the Company's process as "kicking the can down the road."  Moreover, Rhodes also described receiving the instruction not to revise down the resource base calculation, including for reserve years 2018 and 2019.  FE3 corroborated Rhodes's account, noting, "ExxonMobil never ever writes down reserves."  Further, the whistleblower and multiple former employees interviewed by Lead Counsel, including Binns, confirmed pressure at Exxon to make valuations higher than they actually were.

277.    The facts that the Company had a well-known and well-documented policy of refusing to write-down its assets, an executive management team that is known for ruling by decree, and a corporate culture of falsely inflating valuations, support a strong inference of the Executive Defendants' scienter with respect to the falsely inflated proved reserve and resource base, and the false drilling assumptions that Exxon used to value the Delaware Basin.

**H.** **Former Employees Of Exxon Confirm That It Was Common Knowledge Throughout The Company That Defendants' "Green Blob" Goal Was Impossible**

278.    Lead Counsel's investigation confirms that it was common knowledge throughout the Company that Defendants' "green blob" was not achievable.

279.    As the *Wall Street Journal* reported on January 15, 2021, the whistleblower complaint alleged with respect to Woods's goal: "No one I knew in the organization thought this was possible.  The pressure to deliver on Woods's promise to the market permeated the organization."  Former employees of Exxon, including Rhodes and Wachsmann, corroborated the whistleblower's account.

280.    The fact that it was common knowledge at Exxon that the "green blob" goal was impossible supports a strong inference of the Executive Defendants' scienter with respect to this fact.

**I.** **The Executive Defendants Held Themselves Out As Knowledgeable About Exxon's Production In The Permian Basin**

281.    Defendant Woods, Chapman, Hansen, and Williams regularly spoke to investors and securities analysts regarding the importance of the Permian Basin and Delaware Basin assets to Exxon's business and production in the Permian and Delaware basins, professing to know what they were speaking about.

282.    Throughout the Class Period, the Executive Defendants referenced their "understanding" or "delineation" of the Permian Basin at least 25 times.  For example, on March 5, 2019, Chapman stated, "We're increasingly confident about our Permian growth strategy due to our unique development plans.  We will leverage our large, contiguous acreage position, ***our improved understanding of the resource***[.]"  On April 26, 2019, Williams stated, "We've been ***working very hard to delineate this new acreage we have in the Delaware Basin***, which we've

81

made some good progress on[.]"  On March 5, 2020, Chapman stated, "Our focus in the Delaware has been on *rapidly understanding the resource*[.]"

283.    The fact that the Executive Defendants held themselves out as knowledgeable about Exxon's production and progress in the Permian Basin and discussed these subjects in detail with investors and securities analysts, supports a strong inference of their scienter with respect to these subjects.

**J.    In Response To Questions From Analysts About The Permian Basin, Defendants Denied Problems Existed**

284.    In response to questions by investors and securities analysts, Defendants specifically denied that Exxon was facing problems in the Permian Basin.

285.    For instance, on August 2, 2019, a Wells Fargo analyst asked Defendants, "[W]e don't have a lot of clarity on a lot of what you're doing out there or at least not contemporaneously. So I was just curious how you think about the performance in the Permian and maybe where that shakes out."  Chapman responded, "[W]e're very confident that we can meet what's in green, famously called the green blob, but the green growth profile . . . . I'm very confident that we're going to meet the overall growth rate that we represented in that famous green production profile." On this same call, an analyst from Scotiabank asked for confirmation that there was "no material information that you have seen either improvement or deterioration compared to your current plan."  In response, Chapman again acknowledged that Exxon was focused on getting "that drilling time down," but reiterated, "there's nothing to flag because it's within the range of our planning basis."

286.    Similarly, on a January 31, 2020 call, an analyst from Barclays asked "if there's any change in the number of rigs you see required to make the 1 million barrels a day that you laid out earlier?"  Defendant Woods assuaged the analyst's concerns: "[W]e feel really good about the

82

progress that we're making and seeing significant improvements in the initial production across 365 days and longer . . . . *We like what we see around some of the well performance, particularly in the Delaware.*"

287.    On this same earnings call, a Goldman Sachs analyst asked for "any color" on the issue of "Delaware . . . not performing as well as you would like on the drilling side."  Woods responded, "[I]f you look at the volumes that we delivered in the Permian, we're above what we said we were going to do last year at the Investor Day by about 20,000 barrels a day, so that's *clearly on track*."  Woods stated further, "*[W]e like what we're seeing in the Delaware*."

288.    The Executive Defendants' reassurances in response to analysts' questions and concerns about the Company's production progress in the Permian Basin support a strong inference of their scienter with respect to that subject.

### K.    The Permian Basin Constituted A "Core Operation" of Exxon's

289.    The fraud concerned Exxon's core business operation.  As of mid-2019, the Permian Basin was the largest oil field in the United States, and Defendants continually touted the importance of the Permian to Exxon's business and financial health.

290.    For example, on Exxon's earnings call for the second quarter of 2018, Chapman stated, "Let me just talk about the Permian for a second because *the Permian is really important*."  On Exxon's earnings call for the first quarter of 2019, Williams stated, "[O]bviously, *we're putting a lot of focus in the Permian right now*."  Similarly, on Exxon's earnings call for the fourth quarter of 2019, Woods touted the importance of the Permian Basin to Exxon's business: "Continued ramp up in the Permian Basin was a significant driver of this growth. . . ."  On March 5, 2020, Chapman explained that Exxon's Delaware Basin assets were "three times the size" of Exxon's Midland Basin assets, and Exxon's former senior vice president Andrew Swiger specified that the Delaware Basin—part of the Permian Basin—was Exxon's "*largest resource*."

291.   The fact that the Permian Basin was a core operation of Exxon's—and the Executive Defendants touted its importance and the Company's focus on it—supports a strong inference of the Executive Defendants' scienter with respect to their statements about the value of the Permian, production conditions in the Permian, and Exxon's progress toward achieving its Permian production goal.

### L.   Expert Analysis Confirms That Achieving The "Green Blob" Was Not Feasible

292.   Expert analysis of Exxon's own data confirmed that achieving the "green blob" was not feasible.  As described in Section IV(H)(2) above, Lead Counsel's oil and gas industry expert confirmed that using either (i) the actual number of active rigs that Exxon had by year-end 2018; or (ii) the 55 rigs that Exxon told investors on March 5, 2019 that it would have by the end of 2019, Exxon would not have been able to achieve its 1 million barrels of oil-equivalent by 2024 goal.

293.   The fact that a feasibility analysis—based entirely on Exxon's own data and metrics—revealed that achievement of the "green blob" would not have been feasible supports a strong inference of Defendants' scienter with respect to their statements assuring investors that the Company's progress in the Permian and Delaware Basins was on track to succeed.

### M.   Defendants Woods, Chapman, and Williams Were Financially Motivated To Perpetrate The Fraud And Personally Benefitted From It

294.   Defendants Woods, Chapman, and Williams were financially motivated to perpetrate fraud on Exxon's investors in order to achieve their compensation and bonus targets.

295.   The portion of Exxon executives' compensation comprised of performance shares—the most financially significant component of Exxon's executive compensation model—is calculated based on Exxon's "progress towards strategic objectives" and its "financial and operating performance" over the prior year.  The metrics included within the "financial and operating performance" category are: safety and operations integrity, return on average capital

employed (ROCE), cash flow from operations and asset sales, and total shareholder return.  The executives' annual bonus calculation considers the inputs of estimated earnings and earnings per share.  And the executives' base salary is based on "performance, experience, and pay grade," including "significant accomplishments" in the prior year.

296.    The Company tied several of these metrics specifically to its performance in the Permian Basin.  In particular, the Company touted that its investments in the Permian would enhance its earnings, cash flow, and ROCE, and that its performance in the Permian was evidence of its "progress towards strategic objectives."  For instance, in Exxon's 2018 Summary Annual Report, published in April 2019, the Company specifically stated that it was "GROWING EARNINGS, CASH FLOW, AND ROCE BY . . . PROFITABLY GROWING PERMIAN PRODUCTION TO MORE THAN 1 MILLION OIL-EQUIVALENT BARRELS PER DAY NET BY 2024." Similarly, Exxon's 2018 Proxy Statement stated, "COMPENSATION COMMITTEE NOTED SIGNIFICANT PROGRESS IN 2018 IN ADVANCING STRATEGIC OBJECTIVES . . . STRENGTHENING THE UPSTREAM PORTFOLIO . . . Accelerated pace of development in the Permian, capturing benefits across the full value chain from integration with world-class U.S. Gulf Coast manufacturing."  And in Exxon's 2019 Proxy Statement, the Company stated in a slide titled, "PROGRESS TOWARDS STRATEGIC OBJECTIVES: 2019 KEY HIGHLIGHTS" that these highlights included "STRENGTHENING THE UPSTREAM PORTFOLIO: Value driven by attractive growth opportunities, including Permian[.]"

297.    Defendants Woods, Chapman, and Williams achieved their target compensation— including base salary, bonus, and performance shares—for 2018 and 2019.  In 2020, however, Exxon suspended its bonus program for executive officers due to the COVID-19 pandemic. Defendants Woods, Chapman, and Williams otherwise achieved their target compensation—

including base salary and performance shares—for 2020.  Exxon's Compensation Committee ascertained each year that Defendants Woods, Chapman, and Williams met each of the benchmarks set forth by the Company to calculate executive officers' compensation, including those that it specifically tied to production in the Permian Basin—earnings, cash flow, ROCE, and progress towards strategic objectives.

298.    The fact that certain of the Executive Defendants' compensation depended on their success in the Permian Basin, including progress toward achieving the goal of 1 million barrels of oil-equivalent per day by 2024 in the Permian, supports a strong inference of their scienter because they were financially motivated to commit fraud and would personally financially benefit from it.

### N.    Defendants Mallon, Hansen, and Rosenthal's Suspicious Sales Of Exxon Stock

299.    Defendants Mallon, Hansen, and Rosenthal engaged in suspicious insider stock sales during the Class Period.  Defendants' insider sales were suspiciously timed: they each sold shares just two months before Exxon disclosed disappointing news about its production in the Permian Basin.  Defendants Mallon and Hansen's insider sales were not comparable to their prior trading: neither Defendant sold Exxon shares in the three years prior to the Class Period.  Neither Mallon, Hansen, nor Rosenthal's sales were made pursuant to Rule 10b5-1 plans.  And Defendants' insider sales were suspicious in amount: the Defendants sold between 8% and 25% of their holdings of Exxon common stock for collective profits of close to *$4 million*.

300.    Defendant Mallon sold over $2.2 million worth of shares of Exxon common stock during the Class Period.  In particular, Defendant Mallon sold 32,278 shares on November 20, 2019, two months before Exxon's January 31, 2020 disclosure that its oil production in the Permian Basin was flat quarter-over-quarter, falling below industry estimates and the Company's own guidance.  This sale comprised *16%* of Defendant Mallon's total holdings of Exxon stock and

garnered $2,203,920.31 in proceeds.  Notably, Defendant Mallon made no sales of Exxon stock in the three years prior to the Class Period.  Defendant Mallon's November 20, 2019 sale was not made pursuant to a Rule 10b5-1 trading plan.

301.    Lead Counsel calculated the percentage of Defendant Mallon's total holdings of Exxon stock sold during the Class Period using Defendant Mallon's Form 3 filed with the SEC on January 5, 2017, as well as Defendant Mallon's Forms 4 filed with the SEC on November 28, 2017, December 1, 2017, November 27, 2018, November 30, 2018, December 4, 2018, December 14, 2018, November 22, 2019, November 29, 2019, December 3, 2019, November 27, 2020, and December 1, 2020.  Defendant Mallon's Form 3 reflects that he received 170,814 shares of Exxon common stock directly on January 5, 2017, and his Forms 4 reflect that he obtained additional shares of Exxon common stock totaling 33,066 through transactions dated between November 24, 2017 and November 29, 2017.  As a result, Lead Counsel estimated that Defendant Mallon began the Class Period with a balance of 203,880 shares of Exxon common stock (170,814 shares reflected in Mallon's Form 3 plus 33,066 shares reflected in Mallon's Forms 4), of which he sold 32,287, or 16%, directly during the Class Period.

302.    Defendant Hansen sold over $469,000 worth of shares of Exxon common stock during the Class Period.  In particular, Defendant Hansen sold 2,798 shares on December 14, 2018 and 3,630 shares on December 10, 2019, just weeks before Exxon's January 31, 2020 disclosure that its oil production in the Permian Basin was flat quarter-over-quarter, falling below industry estimates and the Company's own guidance.  Defendant Hansen's sales during the Class Period comprised *25%* of his total holdings of Exxon stock and garnered $469,014.38 in proceeds. Notably, Defendant Hansen made no sales of Exxon common stock in the three years prior to the Class Period.  Defendant Hansen's December 14, 2018 and December 10, 2019 sales were not

made pursuant to a Rule 10b5-1 trading plan.

303.    Lead Counsel calculated the percentage of Defendant Hansen's total holdings of Exxon stock sold during the Class Period using Defendant Hansen's Form 3 filed with the SEC on July 5, 2018, as well as Defendant Hansen's Forms 4 filed with the SEC on November 27, 2018, November 30, 2018, December 4, 2018, December 14, 2018, November 29, 2019, December 3, 2019, December 10, 2019, and March 17, 2020. Defendant Mallon's Form 3 reflects that he received shares of Exxon common stock totaling 25,500 directly on July 5, 2018 (after the Class Period began), of which he sold 6,428, or 25%, directly during the Class Period.

304.    Defendant Rosenthal sold over $1.2 million worth of shares of Exxon common stock during the Class Period.  In particular, Defendant Rosenthal sold 7,562 shares of Exxon stock on December 4, 2018 and 9,615 shares of Exxon stock on December 4, 2019, just weeks before Exxon's January 31, 2020 disclosure that its oil production in the Permian Basin was flat quarter-over-quarter, falling below industry estimates and the Company's own guidance.  Defendant Rosenthal's sales during the Class Period comprised *8%* of his total holdings of Exxon stock and garnered $1,269,887.58 in proceeds.  Defendant Rosenthal's December 4, 2018 and December 5, 2019 sales were not made pursuant to a Rule 10b5-1 trading plan.

305.    Lead Counsel calculated the percentage of Defendant Rosenthal's total holdings of Exxon stock sold during the Class Period using Defendant Rosenthal's Form 3 filed with the SEC on October 1, 2008, as well as Defendant Rosenthal's Forms 4 filed with the SEC on May 21, 2012, August 24, 2012, September 10, 2012, September 17, 2012, November 13, 2012, November 19, 2012, November 30, 2012, December 5, 2012, December 12, 2012, December 18, 2012, February 8, 2013, May 3, 2013, August 15, 2013, November 29, 2013, December 4, 2013, December 11, 2013, December 19, 2013, February 10, 2014, May 9, 2014, September 12, 2014,

November 5, 2014, November 28, 2014, December 1, 2014, December 3, 2014, December 8, 2014, December 19, 2014, February 4, 2015, March 19, 2015, May 4, 2015, November 11, 2015, November 27, 2015, December 1, 2015, May 31, 2016, December 2, 2016, December 8, 2016, December 16, 2016, May 19, 2017, November 16, 2017, December 1, 2017, December 6, 2017, March 13, 2018, November 12, 2018, November 16, 2018, November 28, 2018, November 30, 2018, December 6, 2018, November 29, 2019, December 5, 2019, November 27, 2020, and March 2, 2021.  Defendant Rosenthal's Form 3 reflects that he received 88,237 shares of Exxon common stock directly on October 1, 2008, and his Forms 4 reflect that he obtained additional shares of Exxon common stock through transactions dated between May 12, 2012 and December 6, 2017. Specifically, Defendant Rosenthal's Form 4 dated December 6, 2017 lists his "Amount of Securities Beneficially Owned Following Reported Transaction" as 215,650 shares.  As a result, Lead Counsel estimated that Defendant Rosenthal began the Class Period with a balance of 215,650 shares of direct holdings of Exxon common stock, of which he sold 17,177, or 8%, directly during the Class Period.

306.    The fact that Defendants Mallon, Hansen, and Rosenthal sold significant amounts of their personally held shares of Exxon common stock in the weeks and months prior to Exxon's disclosure of bad news, while they were in possession of this material non-public information, supports a strong inference that their sales were suspiciously timed, which further supports a strong inference of their scienter.

O.      **The SEC Launched An Investigation Into Exxon's Valuation Of The Permian Basin**

307.    As the *Wall Street Journal* reported on January 15, 2021, the SEC launched an investigation into Exxon after the whistleblower complaint filed in the fall of 2020 alleged that Defendants had used false drilling assumptions to overvalue the Company's Delaware Basin assets

in 2018 and 2019.

308.    The existence of an investigation by the SEC into Exxon's false valuation of the Delaware Basin supports a strong inference of Defendants' scienter.

**P.    The Executive Defendants Signed Sarbanes-Oxley Certifications**

309.    In Exxon's 2018 10-K and 2019 10-K, Defendant Woods and Defendant Rosenthal signed Sarbanes-Oxley Certifications attesting to the fact that, "to [their] knowledge," the SEC filing at issue "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and . . . the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

310.    However, the proved reserve figures that Exxon reported in the 2018 10-K and 2019 10-K were the product of fraud and were based on false drilling assumptions.  Those proved reserve figures should have been written down—as Exxon's reserves manager concluded was necessary—but Defendants decided to kick the can down the road.

311.    The Executive Defendants' signing Sarbanes-Oxley Certifications in the 2018 10-K and the 2019 10-K supports a strong inference of their scienter with respect to their statements in those SEC filings—including Exxon's stated proved reserve and its process for estimating its proved reserve.

**Q.    Defendants Required Employees To Sign Non-Disclosure Agreements**

312.    Defendants concealed their misconduct by requiring employees to sign non-disclosure agreements.  Moreover, while Lead Counsel spoke with numerous former employees who corroborated the fraud alleged in this Complaint, Lead Counsel also contacted nearly a dozen former employees of Exxon who declined to provide information based on their fear that either they would be prosecuted by Exxon for violating the terms of non-disclosure agreements with the Company, or they would be subject to retaliation from the Company in seeking employment, or

both.

313.    Defendants' policy requiring departing employees to sign non-disclosure agreements—and former employees' fear of retaliation by the Company—supports a strong inference of Defendants' scienter with respect to their false statements alleged herein.

### R.    Defendants Retaliated Against Dissenting Employees

314.    Exxon retaliated against at least one employee who complained that the Company was overvaluing its Permian Basin assets, which supports an inference of Defendants' scienter.

315.    As the *Wall Street Journal* reported on January 15, 2021, several people involved in valuing the Delaware Basin asset "complained during an internal assessment in 2019 that employees were being forced to use unrealistic assumptions about how quickly the company could drill wells there to arrive at a higher value[.]"  The *Wall Street Journal* reported that, according to a person familiar with the matter, at least one of the employees who complained was fired last year.   Lead Counsel's investigation corroborates this report as, according to FE4, "You're supposed to go with whatever the Company said, and all dissidents have been removed."

316.    Defendants' policy of retaliation against dissenting employees—and Exxon's actual retaliation against employees who disagreed with the Company's valuation of the Delaware Basin—supports a strong inference of Defendants' scienter with respect to their false statements alleged herein.

## VII.    THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES

### A.    Standards Governing The Calculation Of Proved Reserves

317.    Oil reserves are quantities of crude oil that a company estimates with reasonable certainty—usually 90%—exist in a particular location and can be extracted from the ground for commercial purposes and sold.

318.     A quantity of oil reserves that a company ascertains with reasonable certainty exists and can be exploited is called "proved reserves."   Oil companies are required to disclose the quantities of and other information pertaining to their proved reserves in supplemental schedules to their financial statements filed with the SEC.

319.     Proved reserves are typically broken down into two categories—developed and undeveloped.   Developed reserves are reserves that are typically part of existing production and can be reasonably expected to be recovered from a company's existing wells.   Undeveloped reserves typically include reserves that are expected to be found in new wells on land owned by the company or to be found by expanding and/or deepening existing wells.

320.     An oil and gas company calculates its proved reserves, a volumetric quantity reported as a number of barrels of oil-equivalent, by calculating the quantities of oil and gas it expects each of its wells to produce and when.   The calculation of expected production volume incorporates assumptions about how quickly and effectively the company will be able to drill its wells and the productivity of its existing wells, among other inputs.

321.     As a result, if a company overstates its assumptions about its drilling activity—or any other input incorporated into its calculation of its proved reserve—the resulting proved reserve quantity will be false.

**B.      GAAP Regulations Governing The Reporting Of Proved Reserves**

322.     Oil companies such as Exxon are required by the SEC and bound by the generally accepted accounting principles in the United States ("GAAP") to report information relating to their oil reserves to investors through supplemental information to their financial statements.

323.     Financial statements (including the Supplemental Information on Oil and Gas Exploration and Production Activities, which oil and gas companies are required to disclose) are a central feature of financial reporting and are a principal means of communicating financial

information to external parties, such as investors.  The accounting profession (and the SEC) recognize GAAP as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time.

324.    GAAP are primarily promulgated by the Financial Accounting Standards Board ("FASB") and are codified into a system that has been accepted by the SEC as the framework by which public companies must report their financial position and the results of their operations— i.e., SEC regulations require that public company financial statements be prepared in conformity with GAAP.  Beginning with the year 2009, the FASB's codified standards are referenced by the acronym ASC ("Accounting Standards Codification"), which represents the source of authoritative GAAP for nongovernmental entities. (ASC 105, Generally Accepted Accounting Principles, section 10-05-1).

325.    The accounting framework for GAAP, which is set out in, among other places, the Statement of Financial Accounting Concepts ("FASCON") 8 also states:

> Financial reports represent economic phenomena in words and numbers.  To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena it purports to represent.  To be a perfectly faithful representation, a depiction would have three characteristics.  It would be complete, neutral, and free from error.

FASCON 8, ¶QC12.

326.    Publicly traded oil and gas companies are subject to specific requirements governed by the SEC and/or GAAP that require those companies to disclose properly various types of information and measures concerning their proved reserves.

327.    Most relevant here, under ASC 932-235-50-2, "Publicly traded companies that have significant oil- and gas-producing activities shall disclose with complete sets of annual financial statements . . . (a) Proved oil and gas reserve quantities . . . ."

328.     ASC 932-235-50-3 through 50-11B set forth specific disclosure requirements relating to an oil and gas company's proved reserves quantities.

329.     ASC 932-235-50-4 requires an oil and gas company to disclose "as of the beginning and the end of the year," "[n]et quantities of an entity's interests in proved oil and gas reserves, proved developed oil and gas reserves, and proved undeveloped oil and gas reserves" for its holdings of crude oil, including condensate and natural gas liquids, natural gas, synthetic oil, synthetic gas, and "other nonrenewable natural resources that are intended to be upgraded into synthetic oil and gas."

330.     ASC 932-235-50-5 requires an oil and gas company to disclose "[c]hanges in the net quantities of an entity's proved reserves of oil and of gas during the year."  Specifically, a company must disclose "changes resulting from": either upward or downward revisions of previous reserves estimates; application of improved recovery techniques; purchases of minerals in place; extensions of proved acreage of previously discovered reservoirs or the discovery of new fields with proved reserves or new reservoirs of proved reserves in old fields; production; or sale of minerals in place.

331.     ASC 932-235-50-10 provides that an oil and gas company must explain "[i]f important economic factors or significant uncertainties affect particular components of an entity's proved reserves . . . ."  The rule provides examples of these possible factors, including: "unusually high expected development or lifting costs, the necessity to build a major pipeline or other major facilities before production of the reserves can begin, and contractual obligations to produce and sell a significant portion of reserves at prices that are substantially below those at which the oil or gas could otherwise be sold in the absence of the contractual obligation."

94

332.    ASC 932-235-50-11 provides only two instances in which an oil and gas company need not disclose its proved reserves: if those reserves are in a country in which "[t]he government . . . prohibits disclosing reserves in that country, or "[t]he government . . . prohibits disclosing a particular field, and disclosing reserves in that country would have the effect of disclosing reserves in particular fields."

### C.    GAAP Requires Proved Reserves To Be Estimated With Reasonable Certainty

333.    GAAP requires that oil and gas companies estimate their proved reserves "with reasonable certainty."

334.    Specifically, ASC 932-10-S99-1 (a) (22) provides, "Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with ***reasonable certainty*** to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation."

335.    Exxon states in its filings with the SEC that it complies with the "reasonable certainty requirement."  For instance, the 2019 10-K stated, "Proved oil and natural gas reserves are determined in accordance with Securities and Exchange Commission (SEC) requirements. Proved reserves are those quantities of oil and natural gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible under existing economic and operating conditions and government regulations."

336.    Elsewhere in the same filing, the Company stated, "The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based

on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures."

### D.     Relevant SEC Regulations Governing Oil and Gas Companies

337.    Companies engaged in oil and gas exploration and/or the production of crude oil or natural gas in the United States must also adhere to specific financial accounting and reporting standards pursuant to the federal securities laws, which largely overlap with the requirements set forth in the above GAAP framework.

338.    Specifically, SEC Regulation S-X Rule 4-10 outlines certain definitions, guidelines, and requirements for companies that file reports with the SEC.  Applicable definitions in S-X Rule 4-10 mirror those reflected in GAAP, including with respect to "proved reserves," "undeveloped oil and gas reserves," "proved properties," and "unproved properties," as well as "reasonable certainty."

339.    The SEC also identifies two particular methods by which an entity may account for the costs associated with its oil and gas exploration, including the capitalization of certain costs associated with such exploration and extraction, as well as for arriving at its required disclosures surrounding proved reserves: the "successful efforts method" and the "full cost method."  And while a company that elects to employ the "full cost method" must make certain disclosures outlined directly within S-X Rule 4-10, S-X Rule 4-10 similarly states, that "[a] reporting entity that follows the successful efforts method shall comply with the accounting and financial reporting disclosure requirements of FASB ASC Topic 932" (as described in ¶¶322-334 above).

340.    Exxon stated in its public filings that it utilizes the "successful efforts method," which therefore bound it to ASC 932 and the SEC's requirement that ASC 932 be applied in financial statements filed therewith.

## VIII.   EXXON VIOLATED THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES

### A.   Exxon Incorporated False Drilling Assumptions Into Its Proved Reserve Calculation

341.   As described in ¶¶317-321 above, an oil and gas company calculates the volumetric quantity of its proved reserves based on assumptions about how quickly and effectively it can drill its wells, among other assumptions.

342.   Indeed, Exxon represented that its calculation of its proved reserve incorporates assumptions about "drilling activity" and other factors.  For instance, when Exxon announced that it had added 4.5 billion barrels to its proved reserve for the year-end 2018, it disclosed, "Significant additions in the Permian Basin are supported by ExxonMobil's growth plan including ***increased drilling activity*** and infrastructure development."

343.   As described in Section IV(C)(1) above, the drilling assumptions that Exxon used to calculate its proved reserve were false.  Because Exxon's assumptions about its drilling activity were falsely overstated, its calculated proved reserve, which Exxon reported in the 2018 10-K and the 2019 10-K, was falsely overstated as well.

### B.   Exxon Engaged In A Fraudulent Process For Estimating Its Proved Reserves

344.   As described in Section IV(E)(2) above, Exxon engaged in a fraudulent forecasting process to estimate its proved reserves.  By engaging in a fraudulent process to "boost" the Company's proved reserves higher and by using falsely inflated assumptions saved in a file called "This is a Lie" in its proved reserve calculations, Exxon violated its obligation to disclose in a representationally faithful manner the proved reserves that it believed, with reasonable certainty, existed and could be exploited.

345.   Thus, the proved reserve figures that Exxon reported in its year-end financial statements filed with the SEC were materially false and misleading.

## IX.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

346.   Throughout the Class Period, Defendants made a series of materially false statements, and omitted to state material facts that rendered statements materially misleading, which were disseminated to investors during investor calls and presentations, in Exxon's SEC filings and press releases, and through other news and media outlets.

347.   First, Defendants misstated the value of the Permian Basin by reporting proved reserve and resource base numbers to investors that were the product of a fraudulent reserves process and based on false drilling assumptions.

348.   Second, Defendants touted production conditions in the Permian Basin, including drilling, drilling times, well performance, and well quality when, in fact, Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality.  Further, Defendants represented that these production conditions concerning drilling and wells supported Exxon's Permian production growth plan when, in fact, Exxon's Permian production growth plan was based on false drilling assumptions.

349.   Third, Defendants presented data purporting to demonstrate that Exxon led competitors in the Permian in wells and production that was materially misleading because it included non-Permian data and omitted to state that multiple Permian operators were ahead of Exxon in (i) drilling times; (ii) production; (iii) well performance; and (iv) well quality.

350.   Finally, beginning on March 6, 2019, Defendants represented that Exxon was "on track" and "on schedule" to achieve a production goal of 1 million oil-equivalent barrels per day by 2024 in the Permian Basin when, in fact, this goal was impossible to achieve, as confirmed by Lead Counsel's oil and gas expert's feasibility test, due to production problems on the ground in the Permian, including: (i) longer than expected drilling times; (ii) inadequate equipment and

infrastructure; (iii) inadequate labor; and (iv) less oil than expected.  In addition, Exxon's Permian production growth plan was based on false drilling assumptions.

### A. Defendants Misrepresent The Value Of The Permian Basin And Tout Production Conditions In The Permian Throughout 2018, Concealing Drilling Delays And Problems With Well Performance And Well Quality

#### 1. Misstatements And Omissions On March 7, 2018 Analyst Day

##### a. False Valuation

351.    At the beginning of the Class Period, on March 7, 2018, Exxon published a press release which stated that "in the Permian," Exxon had "increased the size of its resource to 9.5 billion oil-equivalent barrels."  On the same day, Exxon held an Analyst Meeting, during which Defendant Chapman reiterated that Exxon's resource base in the Permian was "9.5 billion barrels."

352.    Defendants' statements identified in ¶351 above were false because the resource base calculation was the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62 and ¶¶101-134 above.

##### b. False And Materially Misleading Production Conditions

353.    During the March 7, 2018 Analyst Meeting, Defendant Williams represented with respect to the Permian, "So the plans, the ***well quality that's underpinning those growth plans is very, very high quality*** is kind of the heart of the Permian . . . and it results in some very good financial metrics."

354.    Defendants' statement identified in ¶353 above that Exxon's "well quality" was "very, very high quality" was false because in fact, Exxon's production was plagued by problems with well quality, as described in ¶¶63-73, ¶82, and ¶¶85-87 above.  Defendants' statement that its "well quality" was "underpinning [its] growth plans" was also false because Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 above.  At a minimum, Defendants' statements were materially misleading because they omitted to state

99

that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶63-73 and ¶¶81-88 above.

### c.   Materially Misleading Data

355.   During the March 7, 2018 Analyst Meeting, Defendant Chapman presented data that he told investors demonstrated Exxon's "truly unique position in getting value out to the Permian versus anybody else in the industry," set forth on the slide below.



356.     The data set forth in ¶355 above was materially misleading because it included non-Permian data and omitted to state that multiple Permian operators were ahead of Exxon in (i) drilling times; (ii) production; (iii) well performance; and (iv) well quality, as described in ¶¶81-88 above.  In fact, as of January 31, 2018 (the same date that Exxon used for its slide), Exxon did not lead the top Permian operators in total horizontal wells or production, as reflected below.



2.     **Misstatements And Omissions In 2017 Financial & Operating Review Report**

a.     **False Valuation**

357.     On April 3, 2018, Exxon published its 2017 Financial & Operating Review Report, with an opening letter to shareholders signed by Defendant Woods.  The Financial & Operating Review Report stated that Exxon had a "total Permian resource base" of "more than 9 billion oil-equivalent barrels."

358.    Defendants' statement identified in ¶357 above was false because the resource base calculation was the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62 and ¶¶101-134 above.

### 3.    Misstatements And Omissions In First Quarter 2018

#### a.    False And Materially Misleading Production Conditions

359.    On April 27, 2018, Exxon released its Q1 2018 earnings and held an earnings call. During the call, Defendant Woodbury represented, "*We're continuing to progress growth initiatives as outlined in our Analyst Meeting, including increased drilling in the Permian*, advancing attractive new projects, and completing maintenance activities to enhance performance of our existing assets."

360.    Defendants' statement identified in ¶359 above that "increased drilling in the Permian" contributed to Exxon "continuing to progress growth initiatives" was false because Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 above.  Defendants' statement that Exxon had "increased drilling in the Permian" was also materially misleading because it omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶63-73 and ¶¶81-88 above.

361.    During the April 27, 2018 call, Defendant Woodbury further represented, "Total unconventional production in the Permian and Bakken has increased by 18% versus the first quarter of 2017, with *strong well performance supported by optimized completions*."

362.    Defendants' statement identified in ¶361 above that Exxon had "strong well performance supported by optimized completions" in the Permian was false because, in fact, Exxon's Permian production was plagued by poor well performance, as described in ¶¶63-73, ¶82, and ¶¶85-87 above.  At a minimum, Defendants' statement was materially misleading because it

omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶63-73 and ¶¶81-88 above.

### 4.    Misstatements And Omissions In Second Quarter 2018

#### a.    False And Materially Misleading Production Conditions

363.    On July 27, 2018, Exxon announced its Q2 2018 earnings and held an earnings call. During the call, Defendant Hansen stated, "A 25% growth in tight oil production in the Permian and Bakken relative to the first quarter provided an uplift to volumes, as *we ramped up drilling activities* and secured logistics capabilities *in an area that will continue to see tremendous volumes growth*."

364.    Defendants' statement identified in ¶363 above that "ramped up drilling activities" supported "volumes growth" was false because Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 above.  Defendants' statement that Exxon had "ramped up drilling activities" in the Permian was also materially misleading because it omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶63-73 and ¶¶81-88 above.

### 5.    Misstatements And Omissions During October 2, 2018, "Upstream Spotlight: Unlocking Permian Value" Presentation

#### a.    False Valuation

365.    On October 2, 2018, Exxon gave a presentation entitled, "Upstream Spotlight: Unlocking Permian Value."  Defendants Chapman and Ortwein were listed as presenters in the presentation agenda.  The presentation included a slide that represented that the Permian had "~9.5 billion OEB recoverable resource (net)."

366.    Defendants' statement identified in ¶365 above was false because the resource base calculation was the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62 and ¶¶101-134 above.

**b.    Materially Misleading Data**

367.    The October 2, 2018 presentation, presented by Defendants Chapman and Ortwein, included slides showing data that purported to demonstrate that Exxon led its competitors in producing horizontal wells in the Permian Basin, set forth below.



368.    The data presented on the slide set forth in ¶367 above was materially misleading because it included non-Permian data and omitted to state that multiple Permian operators were ahead of Exxon in well performance, as described in ¶¶81-88 above.  In fact, as of October 2, 2018, Exxon did not lead the top Permian operators in total horizontal wells, as reflected on the slide below.



369.    Exxon's common stock increased 0.8% after Exxon's presentation to investors, increasing from the October 1, 2018 close of $85.81 to $86.46 on volume of over 8.4 million shares.

### 6.    Misstatements And Omissions In Third Quarter 2018

#### a.    Materially Misleading Production Conditions

370.    On November 2, 2018, Exxon announced its Q3 2018 earnings and held an earnings call.  During the call, Defendant Hansen represented, "*We continue to ramp up drilling activities in the Permian*, while also maximizing the value from our integrated midstream and manufacturing operations."

371.   Defendants' statement identified in ¶370 above was materially misleading because it omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶63-73 and ¶¶81-88 above.

372.   Exxon's common stock increased 1.6% after Exxon's Q3 2018 earnings call, increasing from the November 1, 2018 close of $80.67 to $81.95 on volume of over 10.9 million shares.

**B.     Defendants Continue To Misrepresent The Value Of The Permian And Production Conditions At The Beginning Of 2019**

**1.     Misstatements And Omissions In Fourth Quarter 2018**

**a.     False And Materially Misleading Production Conditions**

373.   On February 1, 2019, Exxon announced its Q4 2018 earnings and held an earnings call. During the call, Defendant Woods represented with respect to the Permian, "As *we have optimized our development with further drilling* and delineation, we see additional upside *well beyond the growth trajectory that we shared previously.*"

374.   Defendants' statement identified in ¶373 above that Exxon's "optimized [] development with further drilling" supported Exxon's "growth trajectory" was false because Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 above.  Defendants' statement that Exxon had "optimized our development with further drilling" was also materially misleading because it omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶63-73 and ¶¶81-88 above.

375.   Exxon's common stock increased 3.6% after Exxon's Q4 2018 earnings call, increasing from the January 31, 2019 close of $73.28 to $75.92 on volume of over 22.9 million

shares.

### 2. Misstatements And Omissions At Year-End 2018

#### a. False Valuation

376.   On February 26, 2019, Exxon published a press release on Form 8-K with the SEC, titled "ExxonMobil Adds 4.5 Billion Barrels to Reserves," signed by Defendant Rosenthal. The press release stated that Exxon's "proved reserves totaled 24.3 billion oil-equivalent barrels at year-end 2018." The press release further stated, "During 2018, proved additions from unconventional plays totaled approximately 1.2 billion oil-equivalent barrels."

377.   Defendants' statements identified in ¶376 above were false because Exxon's stated proved reserves were the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62 and ¶¶101-134 above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in ¶¶135-136 above.

#### b. False And Materially Misleading Production Conditions

378.   The February 26, 2019 press release further stated with respect to Exxon's proved reserves, "***Significant additions in the Permian Basin are supported by ExxonMobil's growth plan including increased drilling activity*** and infrastructure development."

379.   Defendants' statement identified in ¶378 above that Exxon's "increased drilling activity" supported its "growth plan" was false because Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 above. Defendants' statement that Exxon had "increased drilling activity" in the Permian Basin was also materially misleading because it omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶63-73 and ¶¶81-88 above.

### c.      False Valuation Process

380.    The February 26, 2019 press release further described Exxon's reserves process, stating, "The annual reporting of proved reserves is the product of the corporation's long-standing, rigorous process that ensures consistency and management accountability in all reserves bookings."

381.    Defendants' statement identified in ¶380 above was false because, in fact, Exxon's reserves process was fraudulent, as described in ¶¶101-134 above.

382.    Exxon's common stock increased 0.2% after Exxon's February 26, 2019 Form 8-K, increasing from the February 25, 2019 close of $78.50 to a February 26, 2019 close of $78.66 on volume of over 10.9 million shares.

### d.      False Valuation In 2018 10-K

383.    On February 27, 2019, Exxon filed its Form 10-K for fiscal year 2018 with the SEC (the "2018 Form 10-K"), signed by Defendants Woods and Rosenthal.  The 2018 Form 10-K stated that Exxon's "total proved reserves" for year-end 2018 were 24,293 million barrels of oil-equivalent.

384.    Defendants' statement identified in ¶383 above was false because Exxon's stated proved reserves were the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62 and ¶¶101-134 above.   In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in ¶¶135-136 above.

### e.      False Valuation Process In 2018 10-K

385.    The 2018 10-K further stated, "The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir

information such as flow rates and reservoir pressures."

386.     Defendants' statement identified in ¶385 above was false because Exxon's stated proved reserves were the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62 and ¶¶101-134 above.

387.     The 2018 10-K further stated that any changes to the reserve figures are "made within *a well-established, disciplined process* driven by senior level geoscience and engineering professionals, assisted by the Global Reserves group which has significant technical experience, culminating in reviews with and approval by senior management."

388.     Defendants' statement identified in ¶387 above was false because, in fact, Exxon's reserves process was fraudulent, as described in ¶¶101-134 above.

**C.     In March 2019, Defendants Announce 1 Million Oil-Equivalent Barrels Per Day By 2024 In Permian, Despite Goal Being Impossible**

**1.     Misstatements And Omissions On March 6, 2019 Investor Day**

**a.     Impossible Permian Production Goal**

389.     On March 5 and 6, 2019, Exxon published press releases and on March 6, 2019 held an Investor Day call.  In the March 6, 2019 press release, Exxon stated that it had "revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024—an increase of nearly 80 percent and a significant acceleration of value."

390.     In the March 6, 2019 press release, Exxon stated, "ExxonMobil's production in the Permian is expected to exceed 1 million oil-equivalent barrels per day by 2024."

391.     During the March 6, 2019 Investor Day call, Defendant Woods stated, "Bottom line, *our plans are on track* across all three business sectors, and in each business sector, we have identified upsides.  In the Upstream, we made very good progress on our five (sic) [four] key focus areas: significant growth in Guyana, more attractive acreage captured in the Permian and Brazil,

*accelerated value capture in the Permian*, and then we have made advances in our strategic LNG portfolio." Woods also presented Exxon's new "green blob" slide, set forth below, which reflected the new goal of 1 million oil-equivalent barrels per day by 2024 in the Permian and reiterated "Production on plan."



392. Defendants' statements identified in ¶¶389-391 above were false because Exxon's goal to produce more than 1 million oil-equivalent barrels per day by 2024 in the Permian was impossible to achieve, as confirmed by Lead Counsel's oil and gas expert's feasibility test (described in ¶¶166-170 above), due to production problems on the ground in the Permian, including: (i) longer than expected drilling times; (ii) inadequate equipment and infrastructure; (iii) inadequate labor; and (iv) less oil than expected, described in ¶¶184-227 above. In addition, Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 above.

**b.      False Valuation**

393.    In the March 5, 2019 press release, Exxon stated, "The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue."

394.    In the March 6, 2019 press release, Exxon stated, "In the Permian, the size of the company's net resource is 10 billion oil-equivalent barrels and is expected to grow further."

395.    During the March 6, 2019 Investor Day call, Defendant Chapman presented a slide stating that Exxon had "*10 Boeb [net] resource* . . . and growing" in the Permian.  On the call, Defendant Chapman reiterated, "*We currently estimate still about 10 billion oil equivalent barrels of resource*, but I would tell you we haven't done an—and we haven't relooked at that estimate in the last six months.  We know there's considerable upside."

396.    Defendants' statements identified in ¶¶393-395 above that Exxon's resource base in the Permian was 10 billion oil-equivalent barrels were false because the resource base calculation was the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62, ¶¶101-134, and ¶¶174-183 above.

**c.      False And Materially Misleading Production Conditions**

397.    During the March 6, 2019 Investor Day call, Defendant Chapman represented, "We have great competencies in drilling."

398.    During the March 6, 2019 Investor Day call, Defendant Chapman represented, "We drill and complete in what I describe as the optimum fashion."

399.    Defendants' statements identified in ¶¶397-398 above were false because in fact, Exxon's Permian production was plagued by longer than expected drilling times, as described in ¶¶184-197 and ¶¶217-219 above.  At a minimum, Defendants' statements were materially misleading because they omitted to state that Exxon's Permian production was plagued by (i)

longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-219, and ¶¶223-225 above.

### D. After March 2019, Defendants Continue To Falsely Assure Investors That Exxon Is "On Track" To Meet 1 Million Oil-Equivalent Barrel Production Goal And Misstate The Value Of The Permian And Production Conditions

#### 1. Misstatements And Omissions In First Quarter 2019

##### a. Impossible Permian Production Goal

400. On April 26, 2019, Exxon announced its Q1 2019 earnings and held an earnings call. During the call, Defendant Hansen represented, "We also remain on track with plans to increase production in the Permian Basin to 1 million oil-equivalent barrels per day by 2024."

401. During the April 26, 2019 earnings call, Defendant Williams presented a "green blob" slide, set forth below, which stated that Exxon was "on plan to reach 1 Moebd by 2024."



402. Defendants' statements identified in ¶¶400-401 above were false because Exxon's goal to produce more than 1 million oil-equivalent barrels per day by 2024 in the Permian was impossible to achieve, as confirmed by Lead Counsel's oil and gas expert's feasibility test

(described in ¶¶166-170 above), due to production problems on the ground in the Permian, including: (i) longer than expected drilling times; (ii) inadequate equipment and infrastructure; (iii) inadequate labor; and (iv) less oil than expected, described in ¶¶184-227 above.  In addition, Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 and ¶¶174-183 above.

### b.  False And Materially Misleading Production Conditions

403.    The same "green blob" slide in ¶401 above stated, "Extensive well inventory supports production profile."   During the April 26, 2019 earnings call, Defendant Williams reiterated, "This volumes ramp is supported by a strong well inventory."

404.    Defendants' statements identified in ¶403 above that Exxon had "extensive well inventory" and "a strong well inventory" were false because, in fact, Exxon's Permian production was plagued by poor well performance and problems with well quality, as described in ¶¶184-197, 210-215, and ¶¶223-225 above.  Defendants' statements that Exxon's "extensive well inventory" and "strong well inventory" supported its "production profile" and "volumes ramp," respectively, were also false because Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 and ¶¶174-183 above.   At a minimum, Defendants' statements were materially misleading because they omitted to disclose that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-219, and ¶¶223-225 above.

### 2.  Misstatements And Omissions During June 18, 2019 J.P. Morgan Energy Conference

### a.  Impossible Permian Production Goal

405.    On June 18, 2019, Exxon participated in a J.P. Morgan Energy Conference.  During the conference, Defendant Mallon stated, "Starting with the Permian, we are on track to deliver on

the million barrels a day by 2024."

406.    Defendants' statement identified in ¶405 above was false because Exxon's goal to produce more than 1 million oil-equivalent barrels per day by 2024 in the Permian was impossible to achieve, as confirmed by Lead Counsel's oil and gas expert's feasibility test (described in ¶166-170 above), due to production problems on the ground in the Permian, including: (i) longer than expected drilling times; (ii) inadequate equipment and infrastructure; (iii) inadequate labor; and (iv) less oil than expected, described in ¶¶184-227 above.  In addition, Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 and ¶¶174-183 above.

### 3.    Misstatements And Omissions In Second Quarter 2019

#### a.    Impossible Permian Production Goal

407.    On August 2, 2019, Exxon announced its Q2 2019 earnings and held an earnings call.  During the call, Defendant Hansen stated, "We remain on schedule with plans to increase production in the Permian to 1 million oil equivalent barrels per day by 2024."

408.     During the August 2, 2019 call, Defendant Chapman presented a "green blob" slide, set forth below, which stated, "On plan Permian production growth," and he reiterated, "On slide 15, you can see that our unconventional Permian and Bakken volumes are growing in line with plan."



409.     Defendants' statements identified in ¶407 and ¶408 above were false because Exxon's goal to produce more than 1 million oil-equivalent barrels per day by 2024 in the Permian was impossible to achieve, as confirmed by Lead Counsel's oil and gas expert's feasibility test (described in ¶¶166-170 above), due to production problems on the ground in the Permian, including: (i) longer than expected drilling times; (ii) inadequate equipment and infrastructure; (iii) inadequate labor; and (iv) less oil than expected, described in ¶¶184-227 above.  In addition, Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 and ¶¶174-183 above.

**b.      False And Materially Misleading Production Conditions**

410.     During the August 2, 2019 call, Defendant Chapman stated with respect to the Permian, "The rocks and ***well performance is extremely strong***."

411.    Defendants' statement identified in ¶410 above was false because in fact, Exxon's Permian production was plagued by poor well performance, as described in ¶¶184-197, ¶¶210-215, and ¶¶223-225 above.  At a minimum, Defendants' statement was materially misleading because it omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-219, and ¶¶223-225 above.

412.    During the August 2, 2019 call, an analyst from UBS asked about Exxon's drilling activity in the Permian.  In response, Defendant Chapman stated, "***Overall, we're on plan*** . . . . Of course, I want us to go faster, but we're making decent progress.  So ***there's nothing really to flag*** outside of what we're already said.  ***It's within the range of what we have expected***, and today our Permian production is accretive to earnings."

413.    During the same August 2, 2019 call, an analyst from Scotiabank asked Exxon to confirm point blank that there was "no material information that you have seen either improvement or deterioration compared to your current plan."   In response, Defendant Chapman again acknowledged that Exxon was focused on getting "that drilling time down," but reiterated, "***there's nothing to flag because it's within the range of our planning basis***."

414.    Defendants' statements identified in ¶412 and ¶413 above were false because Exxon's Permian production was plagued by longer than expected drilling times, as described in ¶¶184-197 and ¶¶217-219 above.  In addition, Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 and ¶¶174-183 above.  At a minimum, Defendants' statements were materially misleading because they omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-219, and

¶¶223-225 above.

### 4.   Misstatements And Omissions In Third Quarter 2019

#### a.   Impossible Permian Production Goal

415.   On November 1, 2019, Exxon held its earnings call for the third quarter of 2019. During the call, Defendant Hansen presented Exxon's "green blob" slide, set forth below, which stated, "Permian growth on track," and he reiterated, "***Permian growth remains on track***, with production averaging 293,000 oil equivalent barrels per day in the third quarter."



416.   Defendants' statements identified in ¶415 above were false because Exxon's goal to produce more than 1 million oil-equivalent barrels per day by 2024 in the Permian was impossible to achieve, as confirmed by Lead Counsel's oil and gas expert's feasibility test (described in ¶¶166-170 above), due to production problems on the ground in the Permian, including: (i) longer than expected drilling times; (ii) inadequate equipment and infrastructure; (iii) inadequate labor; and (iv) less oil than expected, described in ¶¶184-219 and ¶¶223-225 above. In addition, Exxon's Permian production growth plan was based on false drilling assumptions, as

described in ¶¶59-62 and ¶¶174-183 above.

**b.      False And Materially Misleading Production Conditions**

417.    The same "green blob" slide in ¶415 above stated with respect to the Permian, "Continued strong well performance."

418.    Defendants' statement identified in ¶417 above was false because in fact, Exxon's Permian production was plagued by poor well performance and problems with well quality, as described in ¶¶184-197, ¶¶210-215, and ¶¶223-225 above.  At a minimum, Defendants' statement was materially misleading because it omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-219, and ¶¶223-225 above.

**E.      Despite Disclosing Permian Production Slowdown In January 2020, Defendants Continue To Mislead Investors About The Value Of The Permian Basin And Production Conditions, Falsely Assuring Investors That Exxon Is "On Track" To Meet 1 Million Oil-Equivalent Barrel Goal**

**1.      Misstatements And Omissions At Year-End 2019**

**a.      False Valuation**

419.    On February 26, 2020, Exxon filed its Form 10-K for fiscal year 2019 with the SEC (the "2019 Form 10-K"), signed by Defendant Woods and Rosenthal. The 2019 Form 10-K stated that Exxon's "total proved reserves" for year-end 2019 were 22,445 million barrels of oil-equivalent.

420.    Defendants' statement identified in ¶419 above was false because Exxon's stated proved reserves were the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62, ¶¶101-134, and ¶¶174-183 above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in ¶¶135-136

above.

### b.     False Valuation Process

421.     The 2019 Form 10-K further stated, "The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures."

422.     Defendants' statement identified in ¶421 above was false because Exxon's stated proved reserves were the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62, ¶¶101-134, and ¶¶174-183 above.

423.     The 2019 10-K further stated that any changes to the reserve figures are "made within *a well-established, disciplined process* driven by senior level geoscience and engineering professionals, assisted by the Global Reserves and Resources group which has significant technical experience, culminating in reviews with and approval by senior management."

424.     Defendants' statement identified in ¶423 above was false because in fact, Exxon's reserves process was fraudulent, as described in ¶¶101-134 above.

### 2.     Misstatements And Omissions On March 5, 2020 Analyst Day

### a.     Impossible Permian Production Goal

425.     On March 5, 2020, Exxon held an Analyst Meeting and issued a press release, titled "ExxonMobil Outlines Progress on Long-Term Growth Strategy."  The press release stated, "In the Permian Basin, production volumes increased and remain on track to exceed 1 million oil-equivalent barrels per day by 2024."

426.    During the March 5, 2020 call, Defendant Chapman presented a Permian production growth slide which stated that Exxon's 2024 production outlook was ">1,000 Koebd," and he reiterated, "there's no change to our 2024 outlook of 1 million barrels a day."



427.    Defendants' statements identified in ¶425 and ¶426 above were false because Exxon's goal to produce more than 1 million oil-equivalent barrels per day by 2024 in the Permian was impossible to achieve, as confirmed by Lead Counsel's oil and gas expert's feasibility test (described in ¶¶166-170 above), due to production problems on the ground in the Permian, including: (i) longer than expected drilling times; (ii) inadequate equipment and infrastructure; (iii) inadequate labor; and (iv) less oil than expected, described in ¶¶184-216, ¶¶220-224, and ¶226 above.   In addition, Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 and ¶¶174-183 above.

**b.    False Valuation**

428.    During the March 5, 2020 Analyst Meeting call, Defendant Chapman presented a slide stating that Exxon had a net resource base of "~10 Boeb" in the Permian, and he reiterated that the Permian "contains a combined recoverable resource of about 10 billion oil-equivalent

barrels."

429.     Defendants' statements identified in ¶428 above were false because the resource base calculation was the product of a fraudulent reserves process and based on false drilling assumptions, as described in ¶¶59-62, ¶¶101-134, and ¶¶174-183 above.

### c.     False And Materially Misleading Production Conditions

430.     The March 5, 2020 press release further stated, "***Permian well cost and performance continues to improve*** and future growth will be supported by integrated infrastructure capacity expansions at the company's Gulf Coast refineries and petrochemical operations."

431.     Defendants' statement identified in ¶430 above that "Permian well cost and performance continues to improve" was false because in fact, Exxon's Permian production was plagued by poor well performance, as described in ¶¶184-197, ¶¶210-215, ¶¶223-224, and ¶226 above.  At a minimum, Defendants' statements were materially misleading because they omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-216, ¶¶220-224, and ¶226 above.

432.     During the March 5, 2020 call, Defendant Chapman represented with respect to the Delaware Basin, "***Drilling times are reducing*** and we are very pleased with what we see in the rocks and with ***our well performance***."

433.     Defendants' statements identified in ¶432 above were false because Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in in ¶¶184-197, ¶¶210-216, ¶¶220-224, and ¶226 above.  At a minimum, Defendants' statements were materially misleading because they omitted to state that Exxon's Permian production was plagued by (i) longer than expected

drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-216, ¶¶220-224, and ¶226.

434. During the March 5, 2020 call, in response to an analyst question about Exxon's production performance in the Delaware Basin, noting that Exxon's "lack of performance improvement over the years is in contrast to some of your competitors," Defendant Chapman stated:

> I mean **we've been drilling best wells**, best ventures, we're looking for those opportunities. And the point I was making when I rolled over and showed you what the advantages had been, what the **performance improvement had been in the Delaware**, that's because we've been in **development drilling**. So, we can model very, very clearly where we will get to in the Delaware.

435. Defendants' statement identified in ¶434 above that Exxon was "drilling the best wells" in the Delaware Basin was false because in fact, Exxon's production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-216, ¶¶220-224, and ¶226 above. Defendants' statement that its "drilling" enabled it to "model very, very clearly where we will get to in the Delaware" was also false because Exxon's Permian production growth plan was based on false drilling assumptions, as described in ¶¶59-62 and ¶¶174-183 above. At a minimum, Defendants' statements were materially misleading because they omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-216, ¶¶220-224, and ¶226 above.

436. During the March 5, 2020 call, in response to an analyst question about Exxon's activity level, Defendant Chapman represented, "What we're **drilling is more efficiently every year** and we're **drilling more efficiently every month**."

437.    Defendants' statements identified in ¶436 above were false because in fact, Exxon's production was plagued by longer than expected drilling times, as described in ¶¶184-197 and ¶¶220-222 above. At a minimum, Defendants' statements were materially misleading because they omitted to state that Exxon's Permian production was plagued by (i) longer than expected drilling times; (ii) poor well performance; and (iii) problems with well quality, as described in ¶¶184-197, ¶¶210-216, ¶¶220-224, and ¶226.

## X.    LOSS CAUSATION

438.    Defendants' materially false and misleading statements and omissions, including statements regarding the value of Exxon's Permian Basin assets, oil production in the Permian Basin, and Exxon's progress towards achieving its goal of 1 million barrels of oil-equivalent per day by 2024 in the Permian Basin, artificially inflated and/or maintained the price of Exxon's stock.  The artificial inflation in Exxon's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market and/or materialized.   The information was disclosed to the market through disclosures on January 31, 2020, May 1, 2020, and January 15, 2021.  These disclosures reduced the amount of inflation in the price of Exxon's publicly traded stock, causing economic injury to Plaintiffs and other members of the Class.

439.    Specifically, on January 31, 2020, Exxon held its Q4 2019 earnings call starting at 8:30 a.m. C.T.  During the call, Defendant Woods presented a "green blob" slide stating that fourth quarter 2019 production was "294 Koebd" or 294,000 barrels of oil-equivalent per day, compared to 293,000 barrels of oil-equivalent per day for the third quarter of 2019.  Production was virtually flat quarter-over-quarter and fell below industry estimates, as well as the Company's own guidance.

440.    In response, the price of Exxon's common stock dropped 4.1% on January 31, 2020, from $64.79 to $62.12 on heavy trading volume of more than 34.2 million shares. This decline

caused Plaintiffs and Class members to suffer loss as the artificial inflation in Exxon's stock price was partially removed.  As the market continued to absorb these disclosures over the weekend, Exxon shares dropped again by 2.2% on February 3, 2020 and 1.3% on February 4, 2020 on heavy trading of more than 27.3 million shares and 31.9 million shares respectively.

441.    Analysts reacted negatively to Exxon's disclosures on January 31, 2020.  For example, Barclays reported on Permian production as "~flat." Bank of America stated, "Permian production flat lined sequentially."  Credit Suisse reported that "Permian production averaged a disappointing 294 MBoed in 4Q19, flat with the 293 MBoed in 3Q19" and stated, "For an area expected to account for roughly half of XOM's growth over 2019-2025, the absence of QoQ growth despite continued completions activities into 4Q19 (~29 horizontal wells in October according to Drilling info) came as a disappointing surprise."  J.P. Morgan stated that "Permian growth did level off q/q in 4Q (flattish), which was a disappointment for investors."  Scotiabank highlighted as a "Negative Surprise[]" that "Permian production came in at 294 mboe/d below our estimate of 314 mboe/d and fell below the company's outlined guidance.  Q/Q Permian production was up only 1mboe/d."

442.    Negative analyst reaction continued after the February 1-2, 2020 weekend, with Morgan Stanley reporting on February 3, 2020 that "Permian production was roughly flat at 294 Mboe/d vs 293 Mboe/d in 3Q."  Scotiabank published another report on February 3, 2020, noting that "we think investors will be surprised by the poor Permian results[.] . . . Due to the timing of their well completion, we think 1Q20 Permian production will remain unimpressive as the company will launch their first cube development in the first quarter."  Scotiabank further stated, "Similar to the past, management reiterated that Permian production is performing well and from time to time may exhibit fluctuations. We believe investors will continue to scrutinize the results

given the lackluster results over the past two quarters . . . While XOM has outpaced CVX in adding rigs in the Permian, XOM's production growth has lagged behind."

443.    Defendants' January 31, 2020 disclosures partially corrected Defendants' prior materially false and misleading statements and omissions about production in the Permian Basin. However, the full truth about the misstated value of the Permian Basin, production conditions in the Permian Basin and supporting data, and Exxon's progress toward achieving its Permian production goal were not disclosed, and Exxon's stock price remained artificially inflated.

444.    On May 1, 2020, Exxon held its Q1 2019 earnings call starting at 8:30 a.m. C.T., during which Defendants disclosed significant rig cuts of 75% of current rigs in the Permian and that lower capital expenditures, including the rig cuts, would reduce 2020 Permian volumes by ~15 KBoed (to ~345 KBoed total production excluding shut-ins) in 2020 and by 100-150 KBoed (to 450-500 KBoed total production) in 2021.

445.    In response, Exxon's stock dropped 7.2% on May 1, 2020, from $46.47 to $43.14 on heavy trading volume of more than 35.3 million shares.  This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Exxon's stock price was partially removed.

446.    Analysts reacted negatively to Exxon's May 1, 2020 disclosures.  Raymond James noted, "This was the final quarter with Permian uplift on a sequential basis, in view of the rig count having been slashed as part of the overall 30% spending cut unveiled on April 7."  Credit Suisse stated, "While not detailing capex reductions by area, it noted that the largest share of the cuts is from the Permian."  Evercore ISI further commented, "Capital reductions are expected to decrease Permian production volumes by approximately 15 MBOEPD in 2020 and 100-150 MBOEPD in 2021. . . . Management anticipates this will impact volumes in the Permian by approximately 100 MBOEPD in 2Q."

447.     Defendants' May 1, 2020 disclosures partially corrected Defendants' prior materially false and misleading statements and omissions about production in the Permian Basin. However, the full truth about the misstated value of the Permian Basin, production conditions in the Permian Basin and supporting data, and Exxon's progress toward achieving its Permian production goal were not disclosed, and Exxon's stock price remained artificially inflated.

448.     On January 15, 2021, before the market opened, the *Wall Street Journal* reported that the SEC had opened an investigation into Exxon relating to its valuation of the Permian Basin asset.  The SEC investigation was a result of a whistleblower complaint filed in the fall of 2020 alleging that several individuals involved with the valuation were instructed by management to use false data in the assumptions that the Company used to value the Delaware Basin.  The pressure to deliver on Defendant Woods's March 2019 promise that the Permian Basin would exceed 1 million oil-equivalent barrels per day by 2024 "permeated the organization," even though, according to the whistleblower, "no one I knew in the organization thought this was possible." As described in the whistleblower complaint, after employees delivered the lower internal valuation of $40 billion for the Delaware Basin in the summer of 2019 in connection with Exxon's annual planning process, they were pressured by the Delaware development manager, who at the time was Melissa Bond, to "claw back" some of reduction in the valuation by "using different assumptions, including a more optimistic 'learning curve' that estimated the rate at which they would improve drilling times."  Despite this, some employees continued to view the faster drilling time assumptions as unrealistic.  One employee submitted the revised estimates in a file entitled "This is a Lie."  After further debate and consultation, the value was adjusted to $50 billion.

449.     In response to the January 15, 2021 *Wall Street Journal* article, Exxon common stock declined 4.8% on January 15, 2021, from a close of $50.31 per share on January 14, 2021,

to close at $47.89 per share on January 15, 2021.  This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Exxon's stock price was further removed, and quantified the full extent of Exxon's materially false and misleading valuation of its Permian assets, true production conditions in the Permian and supporting data, and Exxon's progress toward achieving its Permian production goal.

450.    Other news outlets reported on the SEC investigation and attributed Exxon's stock drop to the disclosed investigation and whistleblower allegations.  For example, *Bloomberg* reported on January 15, 2021, in an article titled, "Exxon Falls After Report of SEC Probe into Permian Valuation," that "Exxon Mobil Corp. slumped after a newspaper report said the company is being investigated by the U.S. Securities and Exchange Commission for allegedly overvaluing a key asset in the Permian Basin."  Similarly, *CNBC* stated, "Shares of Exxon slipped more than 5% on Friday after The Wall Street Journal reported that the SEC opened an investigation into the oil giant" and that "[t]he complaint, filed by an employee, allegedly centered on how Exxon valued a key asset in the oil-rich Permian Basin."  *Business Insider* also discussed the SEC investigation, writing, "Shares of Exxon Mobil tumbled as much as 6% during intraday trading on Friday following a report from the Wall Street Journal that the SEC launched an investigation into the oil giant concerning [its] asset valuations.  Exxon is being investigated by the SEC after a whistleblower complaint from an employee who alleges that the oil giant overvalued a key oil and gas property in Texas' Permian Basin."  On January 16, 2021, *Forbes* reported that "The U.S. Securities and Exchange Commission opened an investigation into Exxon Mobil for possibly overvaluing one of its key oil and gas properties in the Permian Basin, the highest-producing oil field in the U.S., after an employee filed a whistleblower complaint last fall, according to a report in the Wall Street Journal on Friday that sent the oil major's market value down 5%."

451.    On January 17, 2021, UBS reported on the disclosure of the SEC investigation and tied the whistleblower reports to Exxon's accounting for oil and gas assets.  UBS stated, "On Friday the Wall St Journal reported that the SEC had launched an investigation of XOM.  This followed a whistleblower complaint alleging that XOM overvalued its Permian Basin assets and employees were pressured to use unrealistic assumptions on company drilling performance to drive a higher value.  The WSJ reports internal disputes over the valuation of these assets."  UBS further noted that the net value assessments described in the article would impact Exxon's assessment of its "proved reserves and resources, underpin balance sheet historic cost (which are audited), and guide strategy and investment."

452.    No other Exxon-specific news was announced on January 15, 2021.

453.    The lack of a decline in Exxon's stock price in response to the Company's post-Class Period announcements on February 2, 2021 of a reduced production goal in the Permian of 700,000 oil-equivalent barrels by 2025, and on February 24, 2021 of a net reduction to estimates of proved reserves of approximately 1.5 billion oil-equivalent barrels, mainly related to unconventional drilling in the United States, demonstrates that the market incorporated the information about the whistleblower complaint and its impact on Exxon's production goal in the Permian and stated proved reserve into Exxon's stock price in response to the January 15, 2021 disclosure.

454.    The declines in Exxon's stock price were a direct and proximate result of Defendants' scheme being revealed to investors and to the market.  The timing and magnitude of Exxon's stock-price declines negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or Exxon-specific facts unrelated to Defendants' fraudulent conduct.

## XI.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

455.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

456.     Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was materially false or misleading, or the statement was authorized and/or approved by an executive officer of Exxon who knew that the statement was materially false or misleading when made.

## XII.    THE PRESUMPTION OF RELIANCE

457.     Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material facts that there was a duty to disclose.

458.     Plaintiffs are also entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period, among other things:

   a)       Defendants made public misstatements or failed to disclose material facts;

   b)       The omissions and misstatements were material;

   c)       The Company's stock traded in an efficient market;

      d)      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

      e)      Lead Plaintiff and other members of the Class purchased Exxon common stock between the time Defendants made material misstatements or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misstatements or omitted facts.

459.    At all relevant times, the market for Exxon common stock was efficient for the following reasons, among others:

      a)      Exxon stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

      b)      As a regulated issuer, Exxon filed periodic public reports with the SEC; and

      c)      Exxon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

460.    Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Exxon's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## XIII.   CLASS ACTION ALLEGATIONS

461.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Exxon common stock during the period from March 7, 2018 through January 15, 2021, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants; Exxon's affiliates and subsidiaries; the officers and directors of Exxon and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which

any excluded person has or had a controlling interest.

462.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Exxon common shares were actively traded on the New York Stock Exchange.  Exxon has approximately 4.276 billion shares of common stock issued and outstanding, as reported in Exxon's Form 10-Q for the second quarter of 2021. Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class.  Members of the Class can be identified from records maintained by Exxon or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

463.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

464.    Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of fact and law common to the Class are:

      a)     whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

      b)     whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

      c)     whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

      d)     whether the members of the Class have sustained damages, and the proper measure of damages.

465.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with the interests of the Class.

466.     A class action is superior to all other available methods for the fair and efficient adjudication of this action.  Joinder of all Class members is impracticable.  Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIV.  CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
### (Against Exxon and the Executive Defendants)

467.     Plaintiffs repeat and re-allege each and every allegation set forth in ¶¶1-466 above as if fully set forth herein.

468.     This cause of action is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

469.     During the Class Period, Exxon and the Executive Defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Exxon stock at artificially inflated prices.

470.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market prices for Exxon common stock in

violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

471.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations, and financial results of Exxon as specified herein.

472.    Defendant Exxon is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including materially false and misleading statements and omissions in:

- Exxon's Form 8-K, filed with the SEC on February 26, 2019 (¶¶376, 378, 380);
- Exxon's Form 10-K, filed with the SEC on February 27, 2019 (¶¶383, 385, 387);
- Exxon's Form 10-K, filed with the SEC on February 26, 2020 (¶¶419, 421, 423);
- Exxon's March 7, 2018 press release (¶351);
- Exxon's March 5, 2019 press release (¶393);
- Exxon's March 6, 2019 press release (¶¶389, 390, 394); and
- Exxon's March 5, 2020 press release (¶¶425, 430).

473.    Defendant Exxon is further liable for the materially false and misleading statements and omissions made by Exxon officers in press releases, during conference calls, and at conferences with investors and analysts, as alleged above, as the makers of such statements under the principle of respondeat superior.  These materially false and misleading statements and omissions are set forth in ¶¶353, 355, 357, 359, 361, 363, 365, 367, 370, 373, 391, 395, 397, 398, 400, 401, 403, 405, 407, 408, 410, 412, 413, 415, 417, 426, 428, 432, 434, 436 above.

474.    Defendants Woods, Chapman, Williams, Hansen, Rosenthal, Mallon, Woodbury, and Ortwein, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein.  Defendants Woods, Chapman,

Williams, Hansen, Rosenthal, Mallon, Woodbury, and Ortwein are liable for the materially false and misleading statements and omissions they personally made and/or signed as follows:

- <u>Defendant Woods:</u>

  Defendant Woods signed Exxon's letter to shareholders included in its 2017 Financial & Operating Review Report on April 3, 2018 (¶357); Exxon's Form 10-K, filed with the SEC on February 27, 2019 (¶¶383, 385, 387); and Exxon's Form 10-K, filed with the SEC on February 26, 2020 (¶¶419, 421, 423), which contained materially false and misleading statements and omissions.

  Defendant Woods made additional materially false and misleading statements and omissions during Exxon's Q4 2018 earnings call on February 1, 2019 (¶373); and Exxon's Investor Day call on March 6, 2019 (¶391).

- <u>Defendant Chapman:</u>

  Defendant Chapman made materially false and misleading statements and omissions during Exxon's Analyst Meeting on March 7, 2018 (¶¶351, 355); Exxon's "Upstream Spotlight: Unlocking Permian Value" presentation on October 2, 2018 (¶¶365, 367); Exxon's Investor Day call on March 6, 2019 (¶¶395, 397, 398); Exxon's Q2 2019 earnings call on August 2, 2019 (¶¶408, 410, 412, 413); and Exxon's Analyst Meeting on March 5, 2020 (¶¶426, 428, 432, 434, 436).

- <u>Defendant Williams:</u>

  Defendant Williams made materially false and misleading statements and omissions during Exxon's Analyst Meeting on March 7, 2018 (¶353); and Exxon's Q1 2019 earnings call on April 26, 2019 (¶¶401, 403).

- <u>Defendant Hansen:</u>

  Defendant Hansen made materially false and misleading statements and omissions during Exxon's Q2 2018 earnings call on July 27, 2018 (¶363); Exxon's Q3 2018 earnings call on November 2, 2018 (¶370); Exxon's Q1 2019 earnings call on April 26, 2019 (¶400); Exxon's Q2 2019 earnings call on August 2, 2019 (¶407); and Exxon's Q3 2019 earnings call on November 1, 2019 (¶415).

- Defendant Rosenthal:

  Defendant Rosenthal signed Exxon's Form 8-K, filed with the SEC on February 26, 2019 (¶¶376, 378, 380); Exxon's Form 10-K, filed with the SEC on February 27, 2019 (¶¶383, 385, 387); and Exxon's Form 10-K, filed with the SEC on February 26, 2020 (¶¶419, 421, 423), which contained materially false and misleading statements and omissions.

- Defendant Mallon:

  Defendant Mallon made materially false and misleading statements and omissions during Exxon's appearance at the J.P. Morgan Energy Conference on June 18, 2019 (¶405).

- Defendant Woodbury:

  Defendant Woodbury made materially false and misleading statements and omissions during Exxon's Q1 2018 earnings call on April 27, 2018 (¶¶359, 361).

- Defendant Ortwein:

  Defendant Ortwein made materially false and misleading statements and omissions during Exxon's "Upstream Spotlight: Unlocking Permian Value" presentation on October 2, 2018 (¶¶365, 367).

475.    During the Class Period, Defendants made or were responsible for the materially false and misleading statements and omissions specified above, which they knew or severely recklessly disregarded to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

476.    Defendants had actual knowledge of the materially false and misleading statements and omissions specified above, or severely recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Exxon's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

477.    The allegations above establish a strong inference that Exxon, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the materially false and misleading statements and omissions specified above, or acted with severely reckless disregard for the truth.

478.    Plaintiffs, and the Class, have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Exxon's common stock.  Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Exxon's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

479.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

480.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

## COUNT II
## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Woods, Rosenthal, and Chapman)

481.    Plaintiffs repeat and re-allege each and every allegation set forth in ¶¶1-480 above as if fully set forth herein.

482.    This cause of action is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

483.    As detailed above, Exxon and the Executive Defendants, including Defendants Woods, Rosenthal, and Chapman each violated §10(b) and Rule 10b-5, and Plaintiffs and other members of the Class suffered damages in connection with their purchases of Exxon common

stock as a direct and proximate result of Defendants' wrongful conduct.

484.    Defendants Woods, Rosenthal, and Chapman acted as controlling persons of Exxon within the meaning of Section 20(a) of the Exchange Act, as alleged herein, for the entirety of their tenures at Exxon, which includes the entire Class Period.

485.    By virtue of their high-level positions, participation in, and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Exxon, Defendants Woods, Rosenthal, and Chapman had the power and ability to control the actions of Exxon and its employees, and to cause the Company to engage in the wrongful conduct alleged herein.  Defendants Woods and Rosenthal signed materially false and misleading Exxon SEC filings during the Class Period, and Defendants Woods, Rosenthal, and Chapman were directly involved in certifying and/or approving the materially false and misleading statements disseminated by Exxon during the Class Period.  Each of these Defendants was able to and did control, directly and indirectly, the content of the public statements made by Exxon during the Class Period, which include Exxon's materially false and misleading financial statements contained therein, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

486.    By reason of such conduct, Defendants Woods, Rosenthal, and Chapman are liable for all of the materially false and misleading statements and omissions of material facts made during the Class Period, alleged in Section IX above (¶¶346-437), pursuant to Section 20(a) of the Exchange Act.

487.    As a direct and proximate result of Defendants Woods's, Rosenthal's, and Chapman's wrongful conduct, Plaintiffs and other members of the Class suffered damages in

connection with their purchases of Exxon common stock during the Class Period.

## XV.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a)   Declaring that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

b)   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)   Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)   Awarding such other and further relief as the Court may deem just and proper.

## XVI.   JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: September 10, 2021                    Respectfully submitted,

                                             */s/ Lewis T. LeClair*
                                             Lewis T. LeClair
                                             Texas Bar No. 12072500
                                             lleclair@mckoolsmith.com
                                             **McKOOL SMITH PC**
                                             300 Crescent Court, Suite 1500
                                             Dallas, Texas 75201
                                             Phone: (214) 978-4000
                                             Fax: (214) 978-4044

                                             *Liaison Counsel for the Class*

                                             John Rizio-Hamilton *(pro hac vice)*
                                             johnr@blbglaw.com
                                             Rebecca E. Boon *(pro hac vice)*
                                             rebecca.boon@blbglaw.com
                                             Kate W. Aufses *(pro hac vice)*
                                             kate.aufses@blbglaw.com
                                             R. Ryan Dykhouse *(pro hac vice)*
                                             ryan.dykhouse@blbglaw.com
                                             Matthew Traylor *(pro hac vice)*
                                             matthew.traylor@blbglaw.com

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for Co-Lead Plaintiff State of
Rhode Island, Office of the General Treasurer, on
behalf of the Employees' Retirement System of Rhode
Island*

Daniel L. Berger (*pro hac vice*)
dberger@gelaw.com
Barbara J. Hart (*pro hac vice*)
bhart@gelaw.com
Caitlin M. Moyna (*pro hac vice*)
cmoyna@gelaw.com
Rachel A. Berger (*pro hac vice*)
rberger@gelaw.com
**GRANT & EISENHOFER PA**
485 Lexington Avenue
New York, New York 10017
Phone: (646)722-8500
Fax: (646) 7222-8501

*Co-Lead   Counsel   for   Co-Lead   Plaintiff
Amalgamated Bank*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 10, 2021, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Lewis T. LeClair*
Lewis T. LeClair