**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiff*,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, NEIL A. CHAPMAN, JACK WILLIAMS, NEIL A. HANSEN, DAVID ROSENTHAL, LIAM M. MALLON, JEFFREY J. WOODBURY, and SARA N. ORTWEIN,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 3:21-cv-00194-N |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL**
<u>**PLAINTIFFS TO IDENTIFY CONFIDENTIAL WITNESSES**</u>

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, TX 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122

*Attorneys for Defendants Exxon Mobil
Corporation, Darren W. Woods, Neil A.
Chapman, Jack Williams, Neil A. Hansen,
David S. Rosenthal, Liam M. Mallon, Jeffrey
J. Woodbury, and Sara N. Ortwein*

In support of Defendants Exxon Mobil Corporation, Darren W. Woods, Neil A. Chapman, Jack P. Williams, Neil A. Hansen, David S. Rosenthal, Liam M. Mallon, Jeffrey J. Woodbury, and Sara N. Ortwein's Motion to Compel Plaintiffs to Identify Confidential Witnesses, attached are the following documents:

| Exhibit No. | Description | Page(s) |
|---|---|---|
| 1 | Declaration of Noelle M. Reed | A-1 – A-2 |
| A | September 28, 2021 Letter from Noelle M. Reed to Plaintiffs' Counsel | A-3 – A-4 |
| B | October 4, 2021 Letter from Barbara J. Hart to Noelle M. Reed | A-5 |
| C | December 18, 2017 Hearing Transcript in the matter of *Edgar v. Anadarko Petroleum Corp.*, No. 4:17-CV-01372 | A-6 – A-17 |
| D | March 1, 2019 Hearing Transcript in the matter of *Edgar v. Anadarko Petroleum Corp.*, No. 4:17-CV-01372 | A-18 – A-86 |

Dated: November 19, 2021

Respectfully submitted,

*/s/ Noelle M. Reed*

Noelle M. Reed
   State Bar No. 24044211
Wallis M. Hampton
   State Bar No. 00784199
Brent M. Hanson
   State Bar No. 24106051
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122
noelle.reed@skadden.com
wallis.hampton@skadden.com
brent.hanson@skadden.com

Michelle L. Davis
   State Bar No. 24038854
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
308 Bahama Court
Granbury, Texas 76048
Tel.: (713) 655-5197
Fax: (713) 483-9197
michelle.davis@skadden.com

*Attorneys for Defendants Exxon Mobil
Corporation, Darren W. Woods, Neil A.
Chapman, Jack Williams, Neil A. Hansen,
David S. Rosenthal, Liam M. Mallon,
Jeffrey J. Woodbury, and Sara N. Ortwein*

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiff*,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, NEIL A. CHAPMAN, JACK P. WILLIAMS, NEIL A. HANSEN, DAVID S. ROSENTHAL, LIAM M. MALLON, JEFFREY J. WOODBURY, and SARA N. ORTWEIN,<br><br>*Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 3:21-cv-00194-N |

## DECLARATION OF NOELLE M. REED

1.      My name is Noelle M. Reed.  I am over the age of 18, of sound mind, am competent to make this declaration, and every statement herein is based upon my personal knowledge and is true and correct.  I am a partner in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, resident in the firm's Houston office.  I represent Defendants Exxon Mobil Corporation, Darren W. Woods, Neil A. Chapman, Jack P. Williams, Neil A. Hansen, David S. Rosenthal, Liam M. Mallon, Jeffrey J. Woodbury, and Sara N. Ortwein ("Defendants") in the above-captioned matter.

2.      I submit this declaration in support of Defendants' Motion to Compel Plaintiffs to Identify Confidential Witnesses.

3.      Attached as Exhibit A is a true and correct copy of a September 28, 2021 letter from Noelle M. Reed to counsel for Plaintiffs in this matter.

A-1

4.      Attached as Exhibit B is a true and correct copy of an October 4, 2021 letter from Barbara J. Hart to Noelle M. Reed in this matter.

5.      Attached as Exhibit C is a true and correct copy of a December 18, 2017 Hearing Transcript in the matter of *Edgar v. Anadarko Petroleum Corp.*, No. 4:17-CV-01372.

6.      Attached as Exhibit D is a true and correct copy of a March 1, 2019 Hearing Transcript in the matter of *Edgar v. Anadarko Petroleum Corp.*, No. 4:17-CV-01372.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on November 19, 2021.

_____
Noelle M. Reed

2

A-2

# EXHIBIT A

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1000 LOUISIANA, SUITE 6800

HOUSTON, TEXAS 77002-5026

———

TEL: (713) 655-5100

FAX: (713) 655-5200

www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
LOS ANGELES
NEW YORK
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
(713) 655-5122
DIRECT FAX
(713) 483-9122
EMAIL ADDRESS
NOELLE.REED@SKADDEN.COM

September 28, 2021

**BY ELECTRONIC MAIL**

Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
McKool Smith PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

John Rizio-Hamilton (pro hac vice)
johnr@blbglaw.com
Rebecca E. Boon (pro hac vice)
rebecca.boon@blbglaw.com
Kate W. Aufses (pro hac vice)
kate.aufses@blbglaw.com
R. Ryan Dykhouse (pro hac vice)
ryan.dykhouse@blbglaw.com
Matthew Traylor (pro hac vice)
matthew.traylor@blbglaw.com
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

Daniel L. Berger (pro hac vice)
dberger@gelaw.com
Barbara J. Hart (pro hac vice)
bhart@gelaw.com
Caitlin M. Moyna (pro hac vice)
cmoyna@gelaw.com
Rachel A. Berger (pro hac vice)
rberger@gelaw.com
GRANT & EISENHOFER PA
485 Lexington Avenue
New York, New York 10017
Phone: (646)722-8500
Fax: (646) 7222-8501

A-3

September 28, 2021
Page 2

          RE:    Case No. 3:21-cv-00194-N; *Yoshikawa v. Exxon Mobil Corporation et al.* (N.D. Tex.)

Dear Counsel:

      The Amended Class Action Complaint purports to rely on what numerous former employees told Plaintiffs. Plaintiffs did not identify six of these employees, ostensibly because they "requested to proceed anonymously." (Compl. at 17-18 n.2.) As you know, Defendants are entitled to know their identity. *See, e.g.*, *Brody v. Zix Corp.,* 3-04-CV-1931-K, 2007 WL 1544638, at *1 (N.D. Tex. May 25, 2007) (Kaplan, M.J.) ("In this court's view, the better reasoned authority requires plaintiffs to identify the former ZixCorp employees who were interviewed by counsel and provided facts alleged in the complaint."). Accordingly, please identify each of these witnesses by October 4, 2021.

                       Sincerely,

                       Noelle M. Reed

A-4

# EXHIBIT B

# G|E Grant & Eisenhofer P.A.

485 Lexington Avenue, 29th Floor, New York, NY 10017      tel: 646.722.8500   fax: 646.722.8501

222 Delaware Street
7th Floor
Wilmington, DE 19801
tel:  302.622.7000
fax: 302.622.7100

30 N. LaSalle Street
Suite 2350
Chicago, IL 60602
tel:  312.610.5350
fax: 312.214.0001

505 20th Street N
Suite 1450
Birmingham, AL 35203
tel:  205.453.6415
fax: 205.718.7688

One Market Street
Spear Tower, 36th Floor
San Francisco, CA 94105
tel:  415.293.8210
fax: 415.789.4367

www.gelaw.com

Barbara J. Hart
Director
+1 (646) 722 8526
bhart@gelaw.com

October 4, 2021

**VIA ELECTRONIC MAIL**

Noelle M. Reed
Skadden Arps Slate Meagher & Flom LLP
1000 Louisiana, Suite 6800
Houston, Texas 77002-5026

     Re: Case No. 3:21-cv-00194-N; *Yoshikawa v. Exxon Mobil Corporation et al.*
     (N.D. Tex.)

Dear Counsel:

     We write in response to your letter dated September 28, 2021 requesting identification of former employees named in the Amended Complaint.  Contrary to Defendants' representation, Plaintiffs are not required to disclose this information at the pleading stage.  *See Brody v. Zix Corp.*, 2006 WL 2739352, at \*5 (N.D. Tex. Sept. 26, 2006); *see also Rougier v. Applied Optoelectronics, Inc*, 2019 WL 6111516, at \*11 (S.D. Tex. Mar. 27, 2019) ("The Fifth Circuit ... allows a plaintiff to use confidential sources as long as those sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded.'").  Plaintiffs note that the authority cited in Defendants' letter has relevance only in the context of formal discovery requests, and that, pursuant to the Private Securities Litigation Reform Act, discovery in this action is stayed during the pendency of any motion to dismiss. *Brody v. Zix Corp.,* 2007 WL 1544638, at \*2 n. 3 (N.D. Tex. May 25, 2007); 15 U.S.C. § 78u–4(b)(3)(B).

     Very truly yours,

     Barbara J. Hart

cc:    John Rizio Hamilton (Bernstein Litowitz Berger & Grossman LLP)
       Rebecca E. Boon (Bernstein Litowitz Berger & Grossman LLP)
       Kate W. Aufses (Bernstein Litowitz Berger & Grossman LLP)
       R. Ryan Dykhouse (Bernstein Litowitz Berger & Grossman LLP)
       Matthew Traylor (Bernstein Litowitz Berger & Grossman LLP)

A-5

# EXHIBIT C

Case 4:17-cv-01372   Document 42   Filed on 12/21/17 in TXSD   Page 1 of 12
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 13 of 94   PageID 764

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ROBERT EDGAR                           *    4:17-CV-01372
                                       *
VS.                                    *    3:51 p.m. to 4:04 p.m.
                                       *
ANADARKO PETROLEUM                     *
CORPORATION, ET AL                     *    DECEMBER 18, 2017

**DISCOVERY HEARING**
**BEFORE THE HONORABLE CHIEF JUDGE LEE H. ROSENTHAL**
**Day 1 of 1 Day**

**APPEARANCES:**

**FOR THE PLAINTIFFS (appearing by telephone):**
Mr. Laurence M. Rosen
Mr. Jonathan Horne
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, New York 70016
(212) 686-1060

**FOR THE DEFENDANTS (appearing in the courtroom):**
Ms. Noelle M. Reed
Ms. Annalisa L. Cravens
Skadden, Arps, Slate, Meagher & Flom, LLP
1000 Louisiana Street
Suite 6800
Houston, Texas 77002
(713) 655-5122

Court Reporter:
Laura Wells, RPR, RMR, CRR
515 Rusk, Suite 8004
Houston, Texas 77002

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

Case 4:17-cv-01372   Document 42   Filed on 12/21/17 in TXSD   Page 2 of 12
Case 3:21-cv-00194-N   Document 68    Filed 11/19/21    Page 14 of 94    PageID 765

2

**PROCEEDINGS**

THE COURT:  We're ready in Edgar v. Anadarko.
Come on up.

MS. REED:  Yes, Your Honor.  Noelle Reed for the
defendants.

THE COURT:  And who is with you at counsel table?

MS. REED:  Annalisa Cravens, Your Honor.

(Telephonic connection completed.)

THE COURT:  Good afternoon.  Go ahead.  Those in
the courtroom, state your appearances, please.

MS. REED:  Noelle Reed on behalf of Anadarko
Petroleum and the individual defendants, Your Honor.

THE COURT:  All right.  On behalf of the
plaintiffs?

MR. ROSEN:  Good afternoon, Your Honor.  Laurence
Rosen and Jonathan Horne are here.

THE COURT:  Very good.  So I gather the issue is
the extent to which the names and contact information of
the unnamed witnesses, the confidential sources of
information will be revealed to opposing counsel.  I
gather the parties agree at a minimum to revealing it to
attorneys eyes only to include in-house attorneys and the
issue is whether there would be a relaxation of that
limit, correct?

MS. REED:  That's what I understand is the issue,

*Laura Wells, CRR, RDR*

A-7

Case 4:17-cv-01372   Document 42   Filed on 12/21/17 in TXSD   Page 3 of 12
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 15 of 94   PageID 766

3

Your Honor.  We believe that the information was offered in the complaint free of restriction; confidentiality was disclaimed; and frankly, there isn't a basis for holding it attorneys eyes only.

THE COURT:  Is there any current employee in the group?

MS. REED:  Not according to the complaint.  There are six former employees and one contractor.

THE COURT:  Is the contractor still a contractor?

MS. REED:  I don't know the answer to that.

THE COURT:  Does the plaintiffs' counsel?

MR. ROSEN:  I don't believe so, Your Honor; but I can't say for sure.  I would have to check with our investigator.

THE COURT:  To the extent the competently, desired-for, restrictive dissemination was based on a fear of retaliation, none of these individuals seems vulnerable to retaliation.

MR. ROSEN:  Well, Your Honor, if I may just --

THE COURT:  They are not current employees.  They are not contractors.

MR. ROSEN:  Yes, Your Honor.  My experience with this situation is you get a lot of different possibilities.  So it's pretty common for defendants to put pressure on a witness in various ways.

*Laura Wells, CRR, RDR*

A-8

Case 4:17-cv-01372  Document 42  Filed on 12/21/17 in TXSD  Page 4 of 12
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 16 of 94  PageID 767

4

One way is they get a lawyer to call them up and ask them and tell them, oh, you know, your name is in the complaint or you're mentioned in this complaint as having said this.  You know, we think it's untrue.  Do you know you can be liable?  You know, we could sue you if it's not true, if you are not telling -- so they can threaten them with legal action.

We have seen that happen.  I'm not saying these people will, but I'm just saying what we have -- what we have seen in the past.

We have had the human resources department call them, you know, the same human resources department they go to for a reference when they are looking for a new job; and the human resources department says things to them that make them feel uneasy and, you know, sort of avail to them, well, you know, next time you are looking for a job, you know, things are going to be a lot harder for you.

I mean, there is just a -- there is a whole range of things.  They can get family members or friends.

THE COURT:  Are these employees still working in the business?

MR. ROSEN:  I believe they do.  So, well, certainly some are.  I don't know about all of them.  But certainly some of them are in the business, sure.

THE COURT:  All right.  Response?

Case 4:17-cv-01372   Document 42   Filed on 12/21/17 in TXSD   Page 5 of 12
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 17 of 94   PageID 768

5

MS. REED:  Your Honor, we have also seen confidential witnesses cited in complaints who when interviewed by defense counsel either deny ever having provided the information in the complaint or recant the information in the complaint.

The reasons that the plaintiffs give for not sharing this information openly -- and these would be witnesses. They clearly would have to be disclosed on initial disclosures -- are reasons that I'm very confident this Court would promptly address were they to come to this Court's attention.

THE COURT:  Well, that is certainly true.

MS. REED:  The things that Mr. Rosen describes I think would be ethical violations.  I think they would be reasons to come to the Court independent of any confidentiality, and no confidentiality order is required to be added to protect witnesses from intimidation or harassment.

But we are entitled to contact unrepresented witnesses or represented witnesses through counsel to determine whether the information they have to provide is relevant to our case.  And that's what we are being precluded from doing.

MR. ROSEN:  I don't think we're precluding you from any -- we said we would give you the names.  We just

*Laura Wells, CRR, RDR*

Case 4:17-cv-01372  Document 42  Filed on 12/21/17 in TXSD  Page 6 of 12
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 18 of 94  PageID 769

6

don't want you to publish them, and the issue -- you know, so the issue is could you give it to your client on the business side rather than the attorneys or the in-house counsel.  And that's still the issue.  I mean, we're going to give you the names.  We've always said we're going to give you the names.

In fact, you also told me in one of your e-mails that you have a pretty good idea who everybody is.  So it's not like you haven't really had an opportunity to contact -- I mean, you know the job titles of all these people.  You know pretty much who they are.  So this is just sort of confirmation.

And so we don't want to stop you from contacting them. We just want to make sure that if you contact them that there are no veiled threats of any nature.

THE COURT:  Last chance to respond.

MS. REED:  Your Honor, we have heard a sort of shifting of responses as to why this has to be protected. The fact is the representation was made in the complaint that no confidentiality was promised or requested.  They are represented to be former employees.  They are not particularly vulnerable to any harassment or retaliatory conduct.

And in order to do what I need to do to represent my clients, I need to be able to confer with my clients and

*Laura Wells, CRR, RDR*

A-11

tell them who the witnesses are and be able to investigate information about those witnesses and possibly attempt to speak with those witnesses.

I am, frankly, perplexed that we're having the argument, given the express representation made in the complaint.

THE COURT:  How do you get around that representation?

MR. ROSEN:  Well, Your Honor, we didn't -- so we can't guarantee the witnesses confidentiality because we know that the Court can order us to give their names up. So we can't ever promise them confidentiality.

What we can say is we're going to do our best to avoid you being harassed.  We can do our best to avoid your name being published on the internet as having helped a lawsuit against your former employer.

So I don't -- you know, again, we're going to give the names to the defendant.  It's just a question of under -- in what context.

And I think that, you know, if they could assure us that they are not going to be harassed in any way, then if they want to share it with their client and their client can assure them that -- that there is not going to be any veiled threats or pressure placed on current employers, I -- you know, I can assure you, Your Honor, there are

*Laura Wells, CRR, RDR*

Case 4:17-cv-01372   Document 42   Filed on 12/21/17 in TXSD   Page 8 of 12
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 20 of 94   PageID 771

8

situations in which pressure is placed and witnesses get scared.

You know, people have mortgages to pay and families to feed and people are nervous, you know, frankly, in the current economic market.  So, you know, the question of just, you know, doing something that's fair to these people, you know, who have gone out of their way to provide information in aid of a securities case and --

THE COURT:  The only reason I would be worried about it is if any of these individuals were to go to Anadarko for a job reference, and I don't know if any of them are likely to do that.

Do you know, counsel for the plaintiffs?

MR. ROSEN:  I can't say for sure; but if they no longer work at Anadarko, it's very likely that at least one or two of them are looking for jobs.

THE COURT:  Well, I think that's a stretch.  We have no idea what they are doing now.  And how long ago was the complaint filed?

MS. REED:  The complaint was filed November 2nd.

THE COURT:  And the events that gave rise to the complaint were generated and occurred in?

MS. REED:  Spring of 2017, Your Honor.

THE COURT:  Okay.  And they were -- were all of the employees ex-employees at that time?

*Laura Wells, CRR, RDR*

A-13

MS. REED:  I couldn't tell you.  I just know on the date that this was filed they were former employees. I couldn't tell you necessarily what the dates of employment were.  That would be Mr. Rosen.

But I will say, Your Honor, that also would be an improper use of the information.

THE COURT:  It would be.

MS. REED:  I think the Court has known me long enough and I have known the Court long enough to know that that would not be countenanced by this Court.

THE COURT:  I agree.  So I am going to order the release of the information without the restriction to the attorneys eyes only but on the condition that if the -- any of the witnesses do apply to Anadarko for a job reference or a similar kind of recommendation that there be a kind of a Chinese wall erected so that the information about their role in this lawsuit is not shared with anyone who is supplying the requested information about the employee.

MS. REED:  Thank you, Your Honor.

THE COURT:  All right.  So that would mean, counsel for the plaintiffs, that you would have to report to Ms. Reed or people on her team as soon as you know if any of the individuals are seeking any kind of reference, recommendation, or similar action from Anadarko in

*Laura Wells, CRR, RDR*

A-14

advance.

MR. ROSEN:  Yes, Your Honor.  I think that would help address our main concern because that is -- you know, that's certainly something --

THE COURT:  All right.  That would include serving as a vendor, too, or a contractor of Anadarko.  Okay?

MS. REED:  Thank you, Your Honor.  Could we get a date certain since there has been a lengthy back and forth about this?

THE COURT:  When would you reasonably be in a position to comply?

MR. ROSEN:  Well, Your Honor, it sounds like there will be a confidentiality agreement and it will be -- it will just include a promise not to have any retaliation.

THE COURT:  Well, this is on the record.  The order is on the record.  If you want to write up a separate stand-alone order and circulate it, I'm happy to sign it.

MR. ROSEN:  I see.

MS. REED:  I take the Court's word as an order.

THE COURT:  The question is as to the timetable at this point.

MR. ROSEN:  Oh, yes, Your Honor.  I wasn't

*Laura Wells, CRR, RDR*

A-15

Case 4:17-cv-01372 Document 42 Filed on 12/21/17 in TXSD Page 11 of 12
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 23 of 94 PageID 774

11

certain. I didn't know it was on the record.

THE COURT: Oh, yes. Everything is on the record.

MR. ROSEN: Okay. So then I think that's fine what Your Honor has ruled and certainly -- and it resolves the issue for us.

THE COURT: If you would like the clarity of a written order that you can show to HR or whoever it is you need to show it to, Ms. Reed, you know what to do.

But the timetable for the production of the information, that's the question on the table.

MR. ROSEN: We can get the information tonight, you know. I don't think that is an issue, Your Honor.

THE COURT: End of the week?

MS. REED: I think he said tonight.

THE COURT: Tonight. Oh, that's even better. I'll order it by Wednesday and give you some grace. Okay.

MS. REED: Thank you, Your Honor.

THE COURT: Thank you. Have a good holiday, and I look forward to learning more about the case.

MS. REED: Thank you, Your Honor.

THE COURT: I'm sure I will.

MR. ROSEN: Have a good holiday.

*(Proceedings concluded at 4:04 p.m.)*

*Date: December 22, 2017*

*Laura Wells, CRR, RDR*

A-16

### *COURT REPORTER'S CERTIFICATE*

*I, Laura Wells, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

*/s/ Laura Wells*

*Laura Wells, CRR, RMR*

*Laura Wells, CRR, RDR*

A-17

# EXHIBIT D

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

\* \* \* \* \*

ROBERT EDGAR                    \*    CIVIL NO. 4:17-CV-1372
                                \*
Vs.                             \*    Houston, Texas
                                \*
ANADARKO PETROLEUM              \*    3:11 p.m. - 3:50 p.m.
CORPORATION, ET AL              \*    March 1, 2019

\* \* \* \* \*

**MOTION HEARING**

BEFORE CHIEF JUDGE LEE H. ROSENTHAL
UNITED STATES DISTRICT JUDGE

\* \* \* \* \*

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*EDWARD L. REED*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

A-18

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 2 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 27 of 94   PageID 778

2

**APPEARANCES:**

For the Plaintiff:

    MR. LAURENCE M. ROSEN
    **The Rosen Law Firm, P.A.**
    275 Madison Ave., 34th Floor
    New York, NY 10016

For Defendant Anadarko, et al:

    MS. NOELLE M. REED
    MS. SUSAN L. SALTZSTEIN
    MR. WILLIAM S. O'HARE
    **Skadden Arps Law Firm, LLP**
    1000 Louisiana, Suite 6800
    Houston, TX 77002

    MS. JENNIFER GADD EDWARDS
    **Anadarko Petroleum Corporation**
    1201 Lake Robbins Drive
    The Woodlands, TX 77380-1181

For Defendant David J. McBride:

    MR. THOMAS R. GUY
    MS. JENNIFER BROOKS CROZIER
    MS. SHELBY T. PERRY
    **Weil Gotshal & Manges, LLP**
    200 Crescent Court, Suite 300
    Dallas, TX 75201

Case Manager:

    LISA EDDINS

Court Reporter:

    EDWARD L. REED

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 3 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 28 of 94   PageID 779

3

**P R O C E E D I N G S**

**3:11 P.M. - MARCH 1, 2019**

THE COURT:  Go ahead and state your appearances while you are getting set up.

MR. GUY:  Your Honor, Ray Guy with Weil Gotshal & Manges, along with Jennifer Brooks Crozier and Shelby Perry for the Defendant McBride, who is also in the courtroom.

THE COURT:  And who are you representing?

MR. GUY:  David McBride.

THE COURT:  All right, the individual officer?

MR. GUY:  Yes.

THE COURT:  All right.  Other appearances, please?

MR. ROSEN:  Lawrence Rosen for plaintiff, Your Honor.

MS. REED:  Your Honor, Noelle Reed with Skadden Arps for Anadarko Petroleum Corporation and the individuals other than Mr. McBride.  With me is my partner, Susan Saltzstein, from our New York office, and Jennifer Gadd is with Anadarko.

THE COURT:  All right, and I'm sorry, but last name, please?

MS. REED:  Jennifer Gadd -- Gadd Edwards, sorry.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 4 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 29 of 94   PageID 780

4

THE COURT:  And the other people at counsel table?

MS. REED:  Billy O'Hare, associate in my office, Your Honor; and Aaron Shorr, who is doing our technology.

THE COURT:  All right, we're not going to have a PowerPoint, are we?

MS. REED:  We don't have a PowerPoint.

THE COURT:  Good.

MS. REED:  But we have the ability to pull up evidence as necessary.

THE COURT:  You don't have a PowerPoint, do you?

MR. GUY:  Probably not this morning, Your Honor.

THE COURT:  That would be a good thing.

And Mr. Rosen, PowerPoint?

MR. ROSEN:  No, Your Honor.

THE COURT:  And your company men at counsel table, who is with you, please?

MR. GUY:  Yes, Your Honor.  Jennifer Brooks Crozier and Shelby Perry and defendant David McBride.

THE COURT:  Very good, thank you.

Okay, so I think the best way to go here is defendant by defendant and to look at the

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 5 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 30 of 94   PageID 781

5

allegations and separate holes from the arguments and to see if whether we could add from the arguments to the allegations, if that would make any difference. And if they weren't in the allegations, why not after we've had points made in the argument that are put forward without specifically searching in the factual pleadings themselves.  So we have across-the-board issues, but I think the critical issues is as to the individual defendants; and by extension, then the corporate defendant, whether there is the requisite factual support pleaded to support pleading to support a strong inference of scienter.  I think that's the critical issue or test that we have before us.  The complaint has been previously amended more than one occasion and that, of course, affects the analysis of whether any additional pleading deficiencies or remaining pleading deficiencies should be addressed one more time or if a dismissal should be without leave to amend.

So I think that's where we are.  Anybody disagree on the analysis?

MR. ROSEN:  No, Your Honor.

MS. REED:  No, Your Honor.

THE COURT:  Good start.

Okay, Mr. Christiansen.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 6 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 31 of 94   PageID 782

6

MS. REED:  Yes, Your Honor.

THE COURT:  We have one statement alleged as to Mr. Christiansen.

MS. REED:  Yes, Your Honor.

THE COURT:  And that is the February 26 Factsheet -- February 2016, I'm sorry -- stating that the Operation Center had certain capabilities, including real-time monitoring.  And let's start with what the allegations are as to (A), what Mr. Christiansen's specific position is, and (B), what the allegations are to support the inference that he in fact made, in quotes, if any.

MS. REED:  Yes, Your Honor.  The only allegations as to Mr. Christiansen are that he was in a vice-president position that, quote, approved statements on the website, meaning every statement on the website.

THE COURT:  And how many?

MS. REED:  I do not know the exact number, but I do know there are thousands of pages to that website and they cover the full breadth of Anadarko's operations.  There is no conceivable way that one person in that high level position could know the content, let alone verify the content of all that --

THE COURT:  How many people worked beneath

Case 4:17-cv-01372 Document 86 Filed on 04/15/19 in TXSD Page 7 of 69
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 32 of 94 PageID 783

7

Mr. Christian, or his report, if you will, in fulfilling this obligation, which he was at a very high supervisory level, I gather?

MS. REED: It's not alleged in the petition, but my client advises me of at least five people that covered the territory.

THE COURT: All right. And does the website cover worldwide operations?

MS. REED: Yes, it does.

THE COURT: And his area of departmental responsibility is approving everything in the website that applies to the company's worldwide operations?

MS. REED: I believe that's correct in the way it's alleged in the petition --

THE COURT: All right, I have it. And of course, there is no allegation that he specifically approved the statements or specifically authorized the Factsheet or approved its contents?

MS. REED: That's correct, Your Honor.

THE COURT: So what do they say that he's the speaker as to this statement, other than his title?

MS. REED: Yes, Your Honor. There is nothing to say that. There is nothing specifically linking him to it. And frankly, there is also nothing linking him to contrary information. Their allegations would have

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 8 of 69
Case 3:21-cv-00194-N    Document 68    Filed 11/19/21    Page 33 of 94    PageID 784

8

to go through a couple of hoops to get there for Mr. Christiansen.

First, there's nothing sufficient saying that he actually relied on a document or did anything to verify or had a responsibility to do so.

Second, their argument about it relies on sort of an inferential reading of the statements itself. And so for Mr. Christiansen to believe that they were false, he also would have to read it in that inferential way, which I don't think that's alleged and there is no reason to think that he would have.

Also, Plaintiff's Excel notes is on the face of the IOC Factsheet. There is a disclaimer -- there are two versions. But they plead in Paragraph 216, I believe, of the petition, that there was direction to read the terms and conditions of the website, and the terms and conditions said, as is understandable, in all caps, material on the website shouldn't be relied on, may be out of date, may be inaccurate, we've done our best, but you shouldn't be relying on this information. And we would submit that that is actually one of the contexts the Court should consider as to --

THE COURT: So, is there also a timing issue, that is, evidence showing that at the time the

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 9 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 34 of 94   PageID 785

9

Factsheet was posted, Mr. Christiansen knew what it said and that the real-time monitoring described was in fact not an existing capability?  And if not as to before, is there any evidence that during the time it was on the website -- and I don't know what time frame that covers -- that that information did come to his attention and the statement remained uncorrected?

MS. REED:  Plaintiff alleges that the statement and the Factsheet in two different areas is on the website beginning in February 2016 and continuing in 2017.  That's the time frame that's alleged.  The basis for -- first of all, plaintiff does not allege that the capabilities were not stamped on the wells.  So, again, the business of falsity is probably indicated differently than it's written.

But even if you read it to say "we were monitoring all wells," the basis of the knowledge allegation as to Mr. Christiansen is that he attended "the majority of Biannual Meetings" in which "the fact that only half of the Noble Wells had remote monitoring and control capabilities as described in PowerPoint slides."  That's in Paragraphs 134 and 224.

There are a couple problems with that allegation.  It never specified what meeting the slide represented or what information was presented, and it

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 10 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 35 of 94   PageID 786

10

never specified what meeting Mr. Christiansen attended. If fact, it's alleged as he attended the stuff that he didn't attend. And so we have no way to put someone in the room with the relevant information.

In addition, there is an inherent conflict in the allegation. In Paragraph 222 of the complaint the plaintiff alleges that only half of the Noble Wells could be monitored by the end of 2016. But in Paragraph 224 they allege that before 2016 that fact was presented at a biannual meeting. So there is a temporal problem. If that fact didn't exist from the end of 2016, it couldn't possibly have been presented before 2016.

But putting that aside, there is just a total lack of connection between what the plaintiff claims as relevant information and Mr. Christiansen actually receiving that information.

THE COURT: At any time?

MS. REED: At any time, Your Honor.

THE COURT: During the time the website statement was there?

MS. REED: At any time, Your Honor.

THE COURT: All right.

MS. REED: Yes, Your Honor.

THE COURT: All right, let me hear from the

Case 4:17-cv-01372  Document 86  Filed on 04/15/19 in TXSD  Page 11 of 69
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 36 of 94  PageID 787

11

plaintiff in response.  And if co-defendant has anything you want to add on this point.  Doesn't sound like it.

MR. ROSEN:  First, Your Honor, I'll address the accusation issue.  So Mr. Christiansen is the vice-president of communications, he ultimately started the website.  There's five people in his group, not a big group, in which the allegation is it would require his approval to put the documents on the website, so somebody at Anadarko had to take responsibility and he's the one who's approving it.

THE COURT:  Well, giving specific approval or if he just had an office that in general is tasked with approving content at a high level?  Is there advance approval?  Do you have any allegations on his specific role and responsibility?

MR. ROSEN:  I don't have a specific allegation other than he's responsible for the --

THE COURT:  You just have his job title?

MR. ROSEN:  Well, not title so much as to responsibility, his function.

THE COURT:  Yeah, well, but again, it's a very generic and generalized:  "I have a 30,000 foot description of a 30,000 foot job."

MR. ROSEN:  Yes, Your Honor.  So, as far as

Case 4:17-cv-01372 Document 86 Filed on 04/15/19 in TXSD Page 12 of 69
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 37 of 94 PageID 788

12

his knowledge of the fact that the IOC was not capable of monitoring 6800 wells --

THE COURT: None of the specific statements exactly say. What does the statement in specific say? Does it say every one of these X number of wells can be monitored?

MR. ROSEN: Approximately 10 percent of all the flowlines -- well flowlines could not -- they could not locate the flowlines.

THE COURT: I understand, but what does the statement say about -- precisely, what are the words?

MR. ROSEN: Oh.

THE COURT: Quote to me what the statement says.

MR. ROSEN: The Factsheet?

THE COURT: Yes.

MR. ROSEN: I'm sorry. So the Factsheet says, "provides real-time remote-monitoring capabilities for 6800+ wells." Now, that means that all the wells in the Wattenberg Field, the maximum number of wells, they monitor all the wells remotely. It's there and plainly written what it says. And Mr. Christiansen knew it wasn't true because at the biannual meetings, he attended a majority of. And if he wasn't there, he sent his representative on his behalf to inform him.

Case 4:17-cv-01372  Document 86  Filed on 04/15/19 in TXSD  Page 13 of 69
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 38 of 94  PageID 789

13

And he was at least at one of the meetings, and the witness said he thinks it was two, maybe one of two, but at least one, and they discussed the fact that they couldn't find the flowlines for 10 percent of the wells or 10 percent of the flowlines and it was a serious problem and they wanted to do something about it and nobody ever -- there was never any solution provided or suggested or it was never resolved.  So that puts him in possession of knowledge of that statement.

THE COURT:  All right.  Anything further you wanted to add --

MR. ROSEN:  No, Your Honor.

THE COURT:  -- on Mr. Christiansen?

MR. ROSEN:  Well, only that I think his statement to -- his two statements show his mindset, the way he used his role.

So one is, you know -- or I think it was maybe two -- complaining that there was a lack of skilled staff and there was lot of problems and dangerous conditions.  His response was something like -- his response was pretty much to be quiet and your job is to -- "Keep quiet.  Your job is to shuffle [excrement] and to clean up the messes that our employees make."  So that is a pretty strong indicator of how he feels his role as vice-president of

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 14 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 39 of 94   PageID 790

14

communications to the public is, right, is to bury these problems rather than get them out in the open and resolve them.

The second thing he said publicly was, when he was interviewed by the newspaper, he said, "No one knew that this problem was a potential issue," you know, speaking of the chain of events that led to that explosion, when in fact the chain of events that led to the explosion were well-known. The problems that led to this, the standard operating procedures, the study of pressure tests, turning on the well and shutting the well without pressure testing, not being able to test methane and knowing this dangerous condition and still operating, all of that was well-known. And so he's telling the newspaper that -- it's a false exculpatory statement.

So, one, it's an insight as to how he's used his role; and two, it's a false exculpatory statement, which shows again his mal-intent as far as communicating to the public --

THE COURT:  Well, what's the date of the false exculpatory statement --

MR. ROSEN:  It was sometime --

THE COURT:  -- in relation to the Factsheet?

MR. ROSEN:  I think it was in late 2017 when

Case 4:17-cv-01372  Document 86  Filed on 04/15/19 in TXSD  Page 15 of 69
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 40 of 94  PageID 791

15

he was interviewed by the Denver newspaper.

THE COURT:  And in what paragraph do you allege that as a specific misrepresentation?

MR. ROSEN:  Oh, it's not a -- it's a false exculpatory statement.

THE COURT:  So you're not alleging it for anything but evidence of general --

MR. ROSEN:  State of mind, how he likes to -- his pattern and practice in communicating to the public, to the media.

THE COURT:  But it's not in the complaint for a specific claim?

MR. ROSEN:  Pardon?

THE COURT:  What paragraph do you describe the evidentiary support that this factual allegation provides?

MR. ROSEN:  I think it's Paragraph 215 -- 214. November 13, 2017, Paragraph 214.

THE COURT:  Okay, I just wanted it just for handy reference.  Do you have more that you wanted to raise?

MR. ROSEN:  No, Your Honor.

THE COURT:  All right, your chance to respond.

MS. REED:  I do, Your Honor.  That point in particular, the full quote from the paper, and it's in

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 16 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 41 of 94   PageID 792

16

December 2017, so well after the relevant statement.

THE COURT:  Are you looking at Paragraph 215 again?

MS. REED:  214.

THE COURT:  214, thank you.

MS. REED:  The full quote is, "'No one really foresaw this as a potential issue,' Christiansen said of the chain of events that are suspected to be linked to the blast.  'And I think going forward, there is no question there is a heightened degree of awareness around it and a need to do better.'"

The problem of saying it's a false exculpatory statement is it rather assumes the weight of the entire case.  You have to show that it was false --

THE COURT:  Well, it's not really exculpatory.

MS. REED:  Right, it's not really exculpatory.

THE COURT:  Because "we need to do more than we did."

MS. REED:  Yes.

THE COURT:  Of course, it simply says it wasn't foreseeable at the same time.

MS. REED:  Correct, Your Honor.

The other statement is part of a larger -- a lot of what's been added in the Second Amended

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 17 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 42 of 94   PageID 793

17

Complaint is really just vague, generic, Anadarko-bad-company type allegations. And, you know, while we don't love those, they don't add anything to what's required.

In Paragraph 16, I just want to be very clear, because Mr. Rosen seems to be exaggerating a bit on what he's claiming was said at meetings. It's very alleged that at least at one meeting, one biannual meeting, in some unspecified date between 2014 and 2016 -- this is in Paragraph 16 -- "Anadarko Colorado Production Superintendent raised the issue that Anadarko did not know where all the flowlines were located." It's not alleged Mr. Christiansen was at that meeting, it's not alleged when that meeting was. As this Court acknowledged in *Plains*, and as many cases have acknowledged, if you're going to rely on that sort of information, you really have to place the actual defendant and the speaker in the place at the time that is relevant. And frankly, even saying between 2014 and 2016 means it could have been after the February 2016 statement. It's clearly inadequate.

I do want to go to very briefly, Your Honor, the actual IOC Factsheet because there are a whole slew of assumptions that plaintiff is arguing about that Factsheet. Nowhere does it say we monitor

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 18 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 43 of 94   PageID 794

18

all our wells.  If you look at that bullet list, there is a verb for each one, and I submit to you that having meant to say "monitors all of our wells," it would have said "monitors all of our wells" rather than "provides real-time remote-monitoring capabilities for 6800+ wells."  And remember, it's describing the Center, not the wells.

In addition, the preface says that Anadarko operates more than 6,000 wells in Weld County. The Wattenberg Field covers five counties, not just Weld County.  So there is no map in this petition that lets you conclude that that was meant to be a reference where an investor should read it and let it be a reference to every Anadarko well.  Why would an investor think that we were monitoring an abandoned well.  There is no allegation in the petition about how many wells we own.  There is only how many we operate at various given points.  There is no allegation about the rate at which we actually abandon or shut in wells and the rate at which we drill new wells.

So you have to make a whole slew of unfounded assumptions to get to reading this statement to mean we are in fact monitoring every well we have in the Wattenberg Field.  It just doesn't say that and it's took far of a stretch.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 19 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 44 of 94   PageID 795

19

THE COURT: What is your best case for your argument that the complaint does not allege the necessary facts to support an inference of scienter as to Mr. Christiansen?

MS. REED: I think it's probably the BP case decided by Judge Ellison. I know there are a bunch of BP cases. BP-3 is how it's commonly referred to from 2013, in which the plaintiff alleged that an individual on a KC committee was, quote, responsible for reviewing the voracity of public statements about BP, and that that individual was aware of the falsity of a published statement. And Judge Ellison held that the plaintiff was required to allege specific facts linking a statement to a person with actual knowledge, and they were insufficient.

THE COURT: As I recall, he got affirmed in that case.

MS. REED: Oh, Judge Ellison? Yes.

THE COURT: Yes, and I know the opinion.

Okay. On behalf of the plaintiff, the best case for your position?

MR. ROSEN: As to scienter, Your Honor?

THE COURT: As to this scienter as to this defendant, what's your best case and what else did you want to add in response to the arguments that were just

20

made?

MR. ROSEN:  Well, I would say that paragraph 224 says that at one or two meetings it was mentioned.

THE COURT:  All right, but we don't know which one of two and whether Mr. Christiansen attended either one of those one or two.

MR. ROSEN:  We know he went to the majority.

THE COURT:  All right.

MR. ROSEN:  There was also PowerPoints that included information about the flowlines not being locatable -- 10 percent of the flowlines not being locatable, PowerPoints that were then taken to The Woodlands and presented there, which included Mr. Walker.

THE COURT:  And do you know if he was specifically present there?

MR. ROSEN:  Mr. Christiansen?  No.

THE COURT:  All right.  Okay.  And your best case, Fifth Circuit?

MR. ROSEN:  Well, the *ABC* arbitrage case is a good case in the sense that if he's placed at the meetings or if he's receiving reports and receiving the information, then that's enough to show scienter, he has the knowledge, if he's provided the knowledge.  And we've given enough information about the information

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 21 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 46 of 94   PageID 797

21

given to him to satisfy that case.

THE COURT:  All right, anything further?

MS. REED:  No, Your Honor.

THE COURT:  All right, let's switch to Mr. McBride and Mr. Walker.  Here my focus is a little bit different and I want to hear the arguments starting with counsel for Mr. McBride.  What's the alleged factual basis for a motive and as a matter of case law on what is required, what is missing, and what is present?  Go ahead.

MR. GUY:  I'm unaware of any alleged factual basis for a motive, Your Honor, which is one of our points.  There's nothing said and it is not alleged, for example, that Mr. McBride's job was on the line based on compliance or whatever for the inference.  I'm not aware of anything that would be an allegation with respect to a motive for the man who operates as the head of the Health, Safety & Environment Division, overseeing between 120 and 185 employees during this time span.

So I think that the cases that speak to scienter are strong on this subject, because when you take there's a lack of an inherent reason for him to misstate, and then the standards under Tellabs being that the motive must be not just permissive or

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 22 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 47 of 94   PageID 798

22

possible, but compelling; and then when you try to move into where I think the plaintiff's have gone with their position as to recklessness -- first of all, I don't think it's -- I mean, it's quite unlikely that Mr. McBride or, for that matter, Mr. Walker, who I don't represent, would look at the total listed information and say, "We'll just slip this one sentence into the HSES Report.  If people can find the website, that might motivate someone to buy our stock."

If you go to recklessness, the standards are so strong -- severely reckless -- that the defendant must have been aware of the danger.  From Judge Ellison in the *Anadarko Litigation* and the Fifth Circuit in *Nathenson, "*a slightly lesser species of intentional misconduct."  I do not know of anything that would satisfy the scienter requirement with respect to him.

There is actually one statement in the opposition that helps make our case.  It's when the plaintiffs say that Mr. McBride was informed by field employees that Anadarko was not operating in compliance with Colorado Oil & Gas Commission regulations.  There is no such allegation.  There are multiple allegations vaguely about meetings he attended, problems that may have been discussed or things that he may have not

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 23 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 48 of 94   PageID 799

23

reviewed, but nothing that says, "and we also told Mr. McBride that they were not in compliance with the regulations."

So, if you're taking scienter the rest of the way on recklessness, you have to say, just to pick the most specific of their allegations, that Anadarko failed to check its flowlines.  Mr. McBride -- or Mr. Walker, as the CEO of the company, had to know first of all that Anadarko was not testing its flowlines; secondly, that Rule 1101b.(1) requires annual testing of flowlines, except if they operate at a gauge pressure of less than 15 pounds per square inch; and third, would have to know that the flowlines not being tested were operating at more than 15 pounds per square inch.  I don't believe that's a reasonable inference or plausible inference, Your Honor.

And the cases that I will cite for scienter on that point would be basically the general standards from Judge Ellison and from the *Nathenson* case and perhaps even some of the cases cited by the plaintiff where scienter was inferred.  For example, they cite *Institutional Investors vs. Avaya* where there were repeated questions posed to a chief financial officer, who consistently denied the allegations.

So that where I would go with it, Your

Case 4:17-cv-01372 Document 86 Filed on 04/15/19 in TXSD Page 24 of 69
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 49 of 94 PageID 800

24

Honor.

THE COURT: All right. Did you want to add anything?

MS. REED: So, as to Mr. Walker and Mr. McBride, the allegations of knowledge and scienter are essentially the same, or they are less for Mr. Walker. They rely on a couple of different sources of theoretical information: Biannual meetings, but the biannual meeting allegations have the same problem as to Mr. Walker and Mr. McBride as addressed to Mr. Christiansen, only more exaggerated. We still have a total lack of description of what was discussed at any particular biannual meeting, a total lack of information about the timing where any similar issue was discussed and the time of the statement. We have no specifics. There is a description of -- the three to five most important issues for each supervisor was in the PowerPoint, but there is no place in the complaint in which any one of those three to five issues was actually identified.

Mr. Walker is only alleged to have attended "approximately 25 percent" of those meetings, with no specificity as to time. And that's by, I believe, FE 7, who worked until March 2018 for the company, so there is no placement of this in relation

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 25 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 50 of 94   PageID 801

25

to the statement.  The PowerPoints are never described in any detail.  Similarly, the reports that supposedly went to Mr. McBride and Mr. Walker are never described.

It's very interesting, we pointed out that *ABC Arbitrage* and *Abrams* in the Fifth Circuit requires that when you rely on documentary evidence, you have to identify the preparer of the document, the contents of the document, the time in which it was prepared, that it was actually delivered to a relevant person, and the information that was included in it. In fact, in *Plains* you very specifically stated, to avoid dismissal, the plaintiffs have to make specific allegations about which corporate officers learned what facts, from what source, on what date.  It's just entirely absent.

In a footnote from the opposition, the plaintiff said those details are provided by the documents in the PowerPoint in Paragraph 170-175.  But if you actually look at those paragraphs, no such detail is provided.  They say that at best the weekly reports included the number of wells that had been plugged and abandoned and that remained on the list. They even have a statement from FE 9 who says that he or she prepared those weekly reports, but he or she does not describe what's in the weekly reports.  That

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 26 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 51 of 94   PageID 802

26

person also delivered the weekly reports, but never says they were delivered to Walker or McBride or to Christiansen.  It says sometimes they went to FE 1 and FE 1 was sometimes a participant on these weekly calls, the contents of which is also not described.

So it is a total lack of connection of any specific content and particularly any content advising someone that there was a concern of any kind about a compliance or a regulatory violation tied to any of these people in the relevant time frame.  And again, in *ABC Arbitrage and Abrams* we specifically lay out what has to be included in the types of statements and it's utterly absent.

THE COURT:  All right.  Is there anything in the argument that's not in the complaint that, if imported into the complaint, would make a difference? So it's really a two-part question.

MS. REED:  I have to assume that at this point, with three rounds and nearly a dozen confidential witnesses, it alleged as much as they can alleged.  I haven't heard anything about anyone able to tie the relevant information to the relevant people at the relevant time.

I want to point something out about FE 7 that's alleged in the complaint which goes to this

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 27 of 69
Case 3:21-cv-00194-N    Document 68    Filed 11/19/21    Page 52 of 94    PageID 803

27

issue.  Every other confidential witness is given an alleged start month and year, and end month and year for their relevant role, except FE 7.  FE 7 is described as having been responsible for plugging and abandoning wells from 2016 until March 2018.  That start month is important because we have statements in February and August of 2016, and FE 7 is the source of virtually all of the information.  Without it, it is not pled and I submit to you that that's not an accident, that that's the only month missing from the confidential witness's time frame in a relevant role, because that witness isn't starting that role until after the February 2016 statement.  But anyway, it's absent.  So it fails to plead that person into the relevant knowledge as well.

THE COURT:  All right, response?

MR. ROSEN:  Well, first, FE 7, in Paragraph 50 it says, from 2014 to 2016, FE 7 was Anadarko's Colorado Superintendent for Gas Gathering, one of five Superintendents responsible for the entirety of Anadarko's Colorado operations, and he was responsible for getting gas to the plants, compressing gas, managing 120 employees and 120 contractors.  And then from 2016 to March 2018, FE 7 served as Superintendent of well servicing.  In this position he was responsible

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 28 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 53 of 94   PageID 804

28

for all vertical well prep, including the maintenance, plugging and abandonment of wells.  So I don't know -- in both positions he's very well placed in all the information on all the information in that area.  I just want to get that out of the way, Your Honor.

And so I think I'll address the biannual meetings first.  So we have biannual meetings where Mr. McBride is going to 50 percent of the meetings and Mr. Walker is at 25 percent of the meetings.  However, in Paragraph 153 -- I'm sorry, 152 of the complaint, FE 7 says that Mr. McBride was definitely present at least at one meeting when they discussed the flowlines, that 10 percent of the flowlines could not be located, and that that was a major problem.  So he was definitely placed at that meeting.

Now, Mr. Walker, who was not definitely at the meeting, but came to 25 percent of the meetings, nonetheless, the witness states clearly in Paragraphs 170 to 175, he discusses the PowerPoint presentation that he and the other superintendents created.  And it was crystal clear that these PowerPoint presentations would be taken to The Woodlands and a presentation would then be given to the Executive Committee, including Mr. Walker, using the PowerPoint presentations that included the information (1) about

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 29 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 54 of 94   PageID 805

29

the flowlines, 10 percent of the flowlines not being able to be located, and (2), about the problems with plugging and abandonment and the inability to find three to five percent of the wells. So, even if he wasn't at the biannual meeting, Mr. Walker received the PowerPoint and Mr. McBride was definitely at the meeting. That was crystal clear from FE 7. He was definitely at the meeting.

So, as far as the specificity of the PowerPoints, I think we meet the *ABC Arbitrage* requirement. And specifically in *ABC*, the Fifth Circuit did not adopt the Ninth Circuit's less requirement, and what that requires is, in specifying internal reports, it says who prepared them, when, how firm the numbers were, or which company's officers reviewed them. So here he specifically says that he and he and others who were in attendance prepared them, it was for the biannual meetings, and it specifically said the numbers on the plug and abandonment, what wells have been plugged and abandoned, what wells still remain on the list, he specifically described the inability to find the 10 percent of the flowlines. And he said it was then given to the Executive Committee, which included Walker. So we met it then, the requirement for showing the reliability of that

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 30 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 55 of 94   PageID 806

30

information being given to the defendant.

Now, as far as scienter, so having received the information, the complaint adequately alleges, demonstrated that they are in possession of this information that shows violations of law.  And at Anadarko they clearly should have -- people at Anadarko are aware that when they speak about a subject, they have to speak -- they have to have -- they can't just say something off the cuff.

THE COURT:  Well, it's not a negligence standard.  So what's their kind of ongoing obligation to monitor the statement that they make with the responsibilities that they hold?

MR. ROSEN:  Well, Your Honor, also to that, the standard operating procedures that they had for pressure testing violated Colorado law.  So Colorado law, Rule 1103 --

THE COURT:  Did Mr. McBride have international responsibilities?

MR. ROSEN:  I assume he had some.  But remember, this Wattenberg Field generated probably a third of their -- it was the most profitable field they had because it had the lowest cost, and they were paying less, paying the least, and they had the best operating margins.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 31 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 56 of 94   PageID 807

31

So Rule 1101 e. requires pressure testing annually.

THE COURT:  Well, you're assuming he knew specifically what Colorado law was.  You're assuming that as to these particular locations, he knew of the non-compliance before the statements were made and that he had a motive to make a false statement beyond simply helping the company make money.

MR. ROSEN:  Well, first, let's look at the various laws that are being violated.

First, Rule 1102 a.(2) says, if the operator is aware of a condition that could adversely affect a safe operation, he must correct it.

And number 2, Rule 1101 a.(1)C. says they must know where the flowlines are, they must be locatable.

Rule 1102 b. says they have to register all of their flowlines, all of them.  That's the statute.  Cross-reference of the statute.

All right.  1101 a. says they must pressure test annually.

So, first, they can't find the flowlines and they are told in reports and they are told at meetings, which Mr. McBride is at, that they can't find the flowlines, and he knows that.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 32 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 57 of 94   PageID 808

32

Now, also, as the head of Health & Safety, he should be aware that flowlines should be pressure tested on a regular basis, right?  But their Standard Operating Procedures, which his division drafted and someone under his supervision approved and were subject to his review --

THE COURT:  Do we know if he actually reviewed these?

MR. ROSEN:  The witness said they were subject to his review.

THE COURT:  That's not the question.  So that's all we know?

MR. ROSEN:  Definitely, we know that these were provided to Mr. Walker for his review.  They were given to him to review and also summarize, list it and summarize, right?  Now, remember, Mr. Walker isn't just a person that's been in this business for a long time. He's also on the Board of Directors of the American Petroleum Institute.  The American Petroleum Institute is responsible for setting the industry standards for safety, for safe operations.  And for him to suggest that he wouldn't know that flowlines should be pressure tested on a regular basis to ensure safe operations is just far from a reasonable inference.  Far, far from it.  He knows the rules.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 33 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 58 of 94   PageID 809

33

So we have a situation where they are clearly given the knowledge, right?  Their standard operating procedure is to never pressure test 80 percent of their wells -- never -- and to only pressure test the other 20 percent every other year, which is still a violation if it's not annually.  And so that is a condition that is unsafe, it also violates the specific rule as far as pressure testing.  And even if assuming they wanted to pressure test these flowlines, they didn't even know where they were.

So they're violating all of those rules. And for them to say, "Well, we didn't know the fact that we were constantly in violation of the law" is an unreasonable inference because of his position and his experience.  This is a very simple issue, pressure testing flowlines.  Very simple issue.  And it's exactly what caused this explosion in Colorado.  If the Firestone well had been shut in, the rules are, for this well to shut in, they would have turned on -- and this was in the initial complaint -- on a regular basis, the wells that were shut in, they turn them on at least on an annual basis.  But it's required to pressure test before you turn the well back on.  Here, they clearly didn't pressure test it.  They turned on the well and they couldn't find out where the gas was

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 34 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 59 of 94   PageID 810

34

going because they couldn't find the methane.  But in violation of the law, they kept the well on.  They kept the well on knowing that they had no idea where the gas leaks are.

So this is exactly what caused -- the failure to follow this rule is exactly what caused the explosion, and this is information that they had in their possession.  And for them to simply say, "Yes, we knew the facts, but we didn't know it constituted a violation of the law" is, I think -- you know, first of all, it violates the concept that before you speak, you should make some reasonable inquiry as to whether the facts you are aware of are inconsistent with the statement you are making.  And here they had reams of reports, the weekly operating report.  They had the PowerPoint presentations.  The had the standard operating procedures.  The had the biannual meetings. And they were aware of the remediation budget.  They were aware of the plug and abandonment.  I mean, they can't suggest that they didn't know that they cut a third of the work force in Colorado, and they knew that the necessary work had to be done.  So they are aware of the information.

And for them to simply say, "Well, that doesn't mean we knew it constituted a violation," I

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 35 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 60 of 94   PageID 811

35

think, is contrary to the law.  If you look at the case we cited, the *Mylan* case, where the court found that they were aware of the underlying actions, the conduct that constituted the violation.  They didn't need to know that that contact -- the plaintiffs didn't have to show that they knew it was a violation.  They only had to show they were aware of the conduct that constituted the violation.  Because how could we ever possibly allege which laws Mr. Walker was aware of and which laws he was not.  That's impossible.  That's a standard we could never possibly meet.

So what's a reasonable inference here?  That a man who's been in the business for many, many years, who's on the Board of Directors of the American Petroleum Institute, the Texas Standards for Safe Operations of the oil business and gas business, he knows that you should pressure test your flowlines at least once in a while, if not annually.  And his standard operating procedures which he received and reviewed said that they would never pressure test, and that's what caused it.

THE COURT:  I'd like to hear from the other side and then we will hear any response.

MR. GUY:  First of all, Mr. McBride's division did not draft the standard operating procedures.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 36 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 61 of 94   PageID 812

36

Mr. McBride, as I think was made clear in our papers, was the head of the Health, Safety & Environment.  He was not in the operations division, he was not in the field in Colorado.  The plaintiff's own pleadings make it clear that he was not in control of the operations in Colorado.  The allegations with respect to the standard operating procedures is in paragraph 17, I believe, that they were prepared and they were reviewed by -- they were approved, rather, by the HSES Division. More specifically, in paragraph 166 they say the standard operating procedures were approved by a representative from the HSES Division and subject to review by Mr. McBride.  No indication that they were reviewed or that there was any reason for him to do so. Plus, you just heard him say they were drafted by his division, but they were reviewed by Mr. McBride.  There is no pleading to support that.

In addition, the allegation with respect to paragraph 152 actually is another thing that supports what I was saying a few moments ago.  You were told that there was information given to them.  And by the way, there's reference to "them, they, those," whatever, in the pleadings.  But the allegation you were told is the information was given to show the violations of the law.  The actual statement in

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 37 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 62 of 94   PageID 813

37

paragraph 152 is that "Mr. McBride was present for at least one of the Biannual Meetings," at which "the Unknown Flowline Wells problem was raised and discussed."  Again, nothing that would support the notions that were put in terms of compliance.

I think that's the key here, Your Honor, is that for Mr. McBride, if you're going strictly based on knowledge, the Fifth Circuit cases say it's not enough to say he must have known.  There has to be more than that.  And the allegation is very specific.  The allegation is not they didn't do that if they weren't in compliance with the law, and that's the big gap. You asked a moment ago what allegations in the complaint would be problematic for us.  That would be problematic if a field person were alleged to have told Mr. McBride, "We are not operating in compliance with Colorado Oil & Gas Conservation Commission regulations."  There is just no such thing.

So, Your Honor, I believe that's all I would have to respond to that.

THE COURT:  All right, thank you.  Let me hear the response, please.

MS. REED:  Yes, Your Honor.  Not only does Mr. Guy correctly state the content of paragraph 152, that it does not specify what exactly was discussed at

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 38 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 63 of 94   PageID 814

38

this meeting, but it also doesn't place that meeting in time.  It doesn't say when Mr. McBride attended at least one meeting at which a problem about unknown flowlines was discussed.  In addition, having unknown flowlines does not mean it's a regulatory violation, it's not identified as one, it's not alleged to be one.

On the standard operating procedures, I would submit to the Court that they actually support the opposite of an inference of scienter.  Why wouldn't we write a policy, why wouldn't we put that in writing if we knew it was a violation?  I submit that's what's probably going on here -- and this goes back to the underlying alleged violations we detailed in our brief, and I won't go through all of it -- coincidentally, the 20 percent that the plaintiffs say we were testing -- 20 percent of, as they say, wells, even though it's flowlines, it should be flowlines -- probably matches the number that we were not continuously monitoring. And we pointed out that in a case where you have a continuous monitoring program, you don't have to annually pressure test because you are effectively always pressure testing.

I would submit, too, Your Honor, you don't even know that, but it might be a very reasonable inference that a company who was supposed to have an

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 39 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 64 of 94   PageID 815

39

annual pressure testing obligation would say, "We are satisfying that obligation by constantly monitoring the pressure in the ones that we are able to remotely monitor."  So the numbers actually match an allegation of total compliance with that rule.

While we're touching on that, let me touch on *Mylan*, the case that Mr. Rosen referenced. There is nothing in *Mylan* that says that as long as you know underlying facts, but have no reason to believe that they are a violation, that's sufficient.  In that case the allegation was that one of the misleading statements was antitrust compliance.  The fact that there was sufficient evidence to show that the main defendants might be participating in price fixing was fairly clearly linked to the idea of their making statements saying, "We are operating in a competitive market, our prices are competitive with other people." The language Mr. Rosen quoted and that the plaintiff says in it's opposition just isn't in there.

Similarly, with the *Cosmas* case, in which the allegation there that the defendant made a particular statement about revenues expected from China was inconsistent with the knowledge of regulations that would restrict income from China.  Same thing, though. It's not a question of whether there was a specific

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 40 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 65 of 94   PageID 816

40

regulation, it's whether you had reason to believe that there was some regulation that dealt with these things.

THE COURT:  What about motive, strength of the allegations as to motive?

MS. REED:  There is no allegation in this complaint about motive.

THE COURT:  Other than "I want my company to make money."

MS. REED:  That's not even in this case.  The opposition tries to create a motive and it is touched on in the complaint.  There was a prior settlement, although it's presented in the complaint more as an attempt to paint Anadarko as a bad company because of the settlement in *Macondo* and *Tronox* cases.  But it's not tied and there is no ties to the notion that these supposed representations would somehow have led to income that would then go to the bottom line and somehow fill this nine million dollar hole the plaintiffs allege.  The linkage just isn't there.

And frankly, even the case -- I believe it's *Abrams* -- that the defendant relies on for the notion that that can be relevant, this concern about credit, etcetera, *Abrams* in the Fifth Circuit talks about that as an exception rarely used.  And I think what they are pointing to is where there's a very

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 41 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 66 of 94   PageID 817

41

specific credit crunch that the company was alleged to be trying to fix.  There is nothing like that here. It's far from --

THE COURT:  Is there exquisite timing? There's no exquisite timing or acute timing that needs to be --

MS. REED:  There is just not even a link. There is not a suggestion of how any of those would have led to somehow more income for Anadarko that would have mattered in the context of these prior settlements.

You know, I want to point out again some internal contradictions about even the alleged regulatory violation.  As to Rule 1103, the rule actually says, "Each pipeline abandoned in place shall be disconnected from all sources."  The plaintiff begins with the wrong definition of "abandonment".  He gives the definition of "inactive".  Inactive is not abandonment.  Inactive implies that you can just turn it back on and it will be active again.  Abandonment and dealing with cutting flowlines, that's a different thing and they don't explain why those definitions should be the same.  And in fact, in the Governor's notice after the Firestone incident, operators were required to inspect abandoned or inactive lines, making it clear they are different.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 42 of 69
Case 3:21-cv-00194-N      Document 68     Filed 11/19/21     Page 67 of 94     PageID 818

42

Interestingly, too, they seem to be trying to imply that because there's a list of wells to be plugged and abandoned in the future, that they were already abandoned.  I don't think we have any mention about what was on the list, number of wells, or what descriptions were given about why they were being abandoned.  And in fairness, in 129, as he said himself, he would have also gone to a well and couldn't believe it was producing.  So wells on the list that were producing, they weren't abandoned even though they were the plaintiff's "inactive" definition, which is again a lot of noise, but it doesn't connect to an actual violation.  We never have an allegation about how many wells had actually been abandoned and weren't under seal.

Regarding their correction of a dangerous condition, which I believe is 1102(a)(2), it requires that when an operator discovers a condition, it correct it in a reasonable time.  There is not a single specific condition actually described as to an actual well, nor is there any description of the time in which Anadarko addressed these matters.  "Within a reasonable time" necessarily means it's going to be conditioned on what's the nature of the problem, what's required to remediate it.  So all these allegations about 200 wells

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 43 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 68 of 94   PageID 819

43

on a list really don't prove anything about whether we're in violation.

THE COURT:  Two questions on case law, and then I'll ask the same questions to counsel for the plaintiff and co-defendant's counsel.  There is a lot of allegations that the material would be provided, sort of suggesting in the ordinary course of events, whether it was PowerPoint slides or information at annual meetings, discussions at annual meetings -- or biannual meetings, excuse me -- or weekly reports that some or all of the information would be seen by a group that could include Mr. Walker or Mr. McBride.

What is the case law, the best case law, that would in the ordinary course be seen by a group that could include "X" or would likely be seen in the course by "X"?  What's your case for saying that's not enough under similar allegations of facts?  And then I'm going to ask the plaintiff what his best case is that it is enough, at least here.  The most recent highest authority.

MS. REED:  *ABC Arbitrage* and *Abrams* are quite clear you have to show that a thing was actually delivered in terms of having knowledge.  And frankly, Your Honor, your case, the *Plains* case, you acknowledge that principle.  And speculation that it must have gone

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 44 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 69 of 94   PageID 820

44

to him is effectively just position pleading, which is not allowed in the Fifth Circuit.

THE COURT:  Okay.

All right, did you want to add a different case on behalf of your client?

MR. GUY:  I don't think so, except to say that the few cases where there has been scienter found were ones that involved some particular reason why the person in that particular capacity would have had reason to have known of things that were clearly within like the Chief Financial Officer's purview or in the Anadarko Petroleum class action litigation, the notoriety of the Macondo blowout and statements that were made following that.  I don't think there is anything that says that this group idea of things that would have been given in the ordinary course of things creates the inference of scienter.

THE COURT:  All right, what's your best case?

MR. ROSEN:  Well, I believe one of the cases I read clearly said "would be seen."  But I don't think that the use of the word "would" means that it was a question mark.

THE COURT:  I'm not saying that.

MR. ROSEN:  I think that what a production superintendent said was that these PowerPoints were

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 45 of 69
Case 3:21-cv-00194-N    Document 68    Filed 11/19/21    Page 70 of 94    PageID 821

45

taken out, that the protocol was following by these PowerPoints taken to The Woodlands and presented at these meetings.  There is no question mark there, there is no "if".  The use of the word "would" was not meant imply "maybe".  It should be the next step after, meaning they would then go to The Woodlands.

THE COURT:  So what's the factual allegations as to how many pages were in these PowerPoint slides?

MR. ROSEN:  Well, what's important is the factual allegations about the information apprising the defendant of --

THE COURT:  I asked a prior question.  Can I have a answer to that question?  How many pages do these cover --

MR. ROSEN:  Well, it says specifically the information, it states plus plug and abandonment, it gave the number of wells on the list that had recently been abandoned, plugged and abandoned, how many remains to be plugged and abandoned.

THE COURT:  Within how many pages was that particular page included?

MR. ROSEN:  How many pages?

THE COURT:  Yes.  What is the size of the "haystack" according to the defendants' perspective?

MR. ROSEN:  Three to five critical facts in

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 46 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 71 of 94   PageID 822

46

the PowerPoint.

THE COURT:  That is not my question.  In how many slides was this slide included?  Because you're talking about a single side; correct?

MR. ROSEN:  Let me see, "each time the Unknown Flowline Well problem was identified as one of the 3-5 facts in the Biannual Meetings, it was included in a PowerPoint slide for that meeting."

THE COURT:  Okay.  So how big was the information packaged --

MR. ROSEN:  In other words, there's three to five facts that are at issue.  It's one of those three to five facts.

THE COURT:  I understand, but in what volume was it included?

MR. ROSEN:  Pardon?

THE COURT:  In what volume of other information was it included?

MR. ROSEN:  It just says those PowerPoints.  There were three to five facts or three to five PowerPoints.  That's a level of detail that didn't occur to me.

THE COURT:  Well, we just don't know, first question.

Second question:  The PowerPoints, were

Case 4:17-cv-01372 Document 86 Filed on 04/15/19 in TXSD Page 47 of 69
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 72 of 94 PageID 823

47

the subject areas at the meetings at which they were provided, were the PowerPoints -- (a) did they include potentially a worldwide array of subjects in terms of both --

MR. ROSEN: No, this was just a Colorado operation.

THE COURT: No, not your PowerPoints. The PowerPoints that were presented or provided at these meetings, was it limited to Colorado, the entire deck, or did it potentially cover --

MR. ROSEN: Limited to Colorado. They took these Colorado PowerPoints that were discussed at all these biannual meetings concerning the Colorado operations.

THE COURT: All right, this is the only PowerPoint that you're talking about?

MR. ROSEN: Yes, it's a report about the Colorado operations.

THE COURT: And this was at how many of the meetings?

MR. ROSEN: One to two. Definitely one in which Mr. McBride was at. He was at one or two, I can't be sure.

THE COURT: All right.

MR. ROSEN: So I just want to respond to a

Case 4:17-cv-01372 Document 86 Filed on 04/15/19 in TXSD Page 48 of 69
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 73 of 94 PageID 824

48

couple things.

First, the possibility that they were pressure testing the 20 percent of the wells that they couldn't monitor remotely as an exculpatory inference, Your Honor, there is absolutely no -- I mean, that's sort of a mythical request. The Colorado law, which we cite, which is in the documents submitted with the motion, specifically says that -- the guide specifically says, if you are not going to pressure test and you are going to monitor remotely, you have to file an exemption with the state. That's a requirement. So you cannot not pressure test and not file an exemption, because to file an exemption would require identifying exactly what's being remotely monitored.

Now, we show their inference is false because they never filed any exemption at all. It comes up with a zero. So there is no exemption. They were required to pressure test, they never pressure tested, they violated the law. All of the flowlines were in violation of the law.

You know, if you look at what they said after the explosion, they said they cut and sealed 2400 abandoned flowlines. The words came in that order. They cut and sealed 2400 abandoned flowlines. Plus,

49

they cut and sealed 3600 abandoned return lines within 60 days after that explosion, or 60 days after the governor issued the directive.  So add them together. That's 6,000 violations.

Now, interestingly, they didn't want to put the money and the time to finding those abandoned flowlines and cutting and sealing them prior to that explosion.  But once they knew how much trouble they were going to get into --

THE COURT:  What paragraph is this alleged in? It could be helpful for reference.

MR. ROSEN:  Paragraph 213.

THE COURT:  Thank you.  And Mr. McBride was alleged to be responsible for oversight of the remediation budget?

MR. ROSEN:  Yes.  As I understood it, he prepared it and was responsible for overseeing it, and that meant getting the reports --

THE COURT:  As to the specific line items of the remediation budget, is the allegation that he prepared all of them or that he had general review responsibility or oversight?

MR. ROSEN:  It says in paragraph 105, "According to FE 1 and FE 7, Defendant McBride prepared a budget to repair, or plug and abandon, the Noble

Case 4:17-cv-01372  Document 86  Filed on 04/15/19 in TXSD  Page 50 of 69
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 75 of 94  PageID 826

50

wells."

THE COURT:  So it doesn't say what his specific involvement was in the preparation --

MR. ROSEN:  He prepared it.

THE COURT:  -- whether he drafted it, whether he reviewed it after the fact --

MR. ROSEN:  It says he prepared it.

THE COURT:  But we don't know what that means.  Prepared, does that mean drafting?

MR. ROSEN:  Yes.

THE COURT:  All right, let me hear from both lawyers on these points.

MR. ROSEN:  Can I have one more point?

THE COURT:  One more point.

MR. ROSEN:  Now, Your Honor asked about motive, so --

THE COURT:  Yes, sir.

MR. ROSEN:  Now, we're not alleging scienter through motive.  We're alleging scienter through actual knowledge of the facts that demonstrate fault.  What's happened is defendants are suggesting that a lack of motive negates their sin, that their lack of motive means that they didn't intend to mislead when they made their statement, that their lack of motive negates their -- they are making a representation while in

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 51 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 76 of 94   PageID 827

51

possession of information contrary to --

THE COURT:  So, in essence, for the purposes of the analysis, you are not relying on any contention as to motive to support scienter?

MR. ROSEN:  No, Your Honor, but I would suggest that there is some motive.  It's not necessarily financial, but it certainly shows that they had a -- well, a motive at least -- well, it shows not enough motive for scienter, but it does show a motive, and that is they were desperate to raise 2.2 billion in the largest ever offering following these three to four years of terrible lawsuits that turned profit into a loss, the Macondo well and the Kerr-McGee fiasco.  They had to raise that money.  And as you recall, Your Honor, the underwriters required that they make a similar representation that they were in compliance with the laws and regulations governing the operation. And without that representation, they wouldn't be able to do their offering.  So it's not that there is no motive, but it certainly doesn't -- there is some motive.  We're not relying on it for scienter, but it certainly doesn't negate their record in any respect.

THE COURT:  All right.  Response from both sides, please.

MR. GUY:  Very briefly, Your Honor, for

Case 4:17-cv-01372  Document 86  Filed on 04/15/19 in TXSD  Page 52 of 69
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 77 of 94  PageID 828

52

Mr. McBride. Paragraph 106, following the one that counsel just referenced, basically that Mr. McBride does not have the authority to authorize a budget, he has to get approval. Further, it alleges a remediation budget. I don't know that this gets at the motion that it's hearsay for the fact Mr. McBride was not responsible for the budget of plugging and abandoning, he was responsible for environmental remediation. There is an allegation that seems in paragraph 105 to be to the contrary. So, whether that helps, I don't know, but that's as far as I would go with it, Your Honor.

THE COURT: I don't think so.

Ms. Reed?

MS. REED: Just a couple things, Your Honor.

First, with respect to the exemption. We've cited the guidance from COGCC that says it's the Commission's view that that would be required. We don't know if Anadarko ever saw that guidance. So, first of all, Anadarko might well have believed it was in compliance whether it filed the variance or not. But frankly, the evidence that they have attached is not evidence that they did not file a variance request. It's some unknown, undescribed website. I can't tell why they'd make a search for flowlines. There is no

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 53 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 78 of 94   PageID 829

53

description of how that search was done or why that would be the source to go through to file a variance request.  Most importantly raising opposition not pled in the complaint.  There is an exception for continued monitoring.  They didn't plead an exception.  And so had they done so, we might then have in our motion responded to that question we could do that in a reply. They knew the details.  I know it must be agonizing for you to work through the arcane details of the Colorado Oil and Gas Conservation Commission statute.  It sort of makes the point that it would never expect the CEO and the high-up vice-presidents of the company to rely on people on the ground in Colorado to tell them necessarily what the details were --

THE COURT:  And the best case on that is the cases that say, generally, high position in the company is not enough?

MS. REED:  Yes, Your Honor.  I do want to point further to the question about the circumstantial evidence what I think you should also look at *Goldstein* and *Owens,* both from the Fifth Circuit, that similarly adopt that principle.

THE COURT:  All right.

MS. REED:  I need to correct something that Mr. Rosen said that's simply absolutely inaccurate.

54

Anadarko announced not that it had sealed abandoned flowlines, but that it had 2,400 plus inactive flowlines that had been disconnected and cement them as required for abandonment.  Recall that the notice from the governor right after Firestone explosion required operators to do a new inspection of a particular type of lines.  There is a clear inference that Anadarko did that inspection and decided to abandon flowlines that had not previously been abandoned.  Mr. Rosen claims that the language of that announcement was that we sealed abandoned flowlines.  It was not.  It was that we inspected and sealed and abandoned inactive flowlines.  They are two different things.  So I want to make that clear.

With respect to Mr. Rosen's claim that there was all this knowledge presented, it's all inferential, it's all presented passively, and what's missing is a person in the room.  What's missing is a person who says, "I told Mr. Walker" or "I handed him the PowerPoint" or "I sent him the PowerPoint."  And they have those people.  They have the people to say they presented him with the report and handed him the PowerPoint and handed him the slides at the meeting, and they don't put it in anyone's hand.  Mr. Rosen now is describing the PowerPoint, but it is not described.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 55 of 69
Case 3:21-cv-00194-N     Document 68     Filed 11/19/21     Page 80 of 94     PageID 831

55

And here's something that also is another internal contradiction.  At some point FE 7 says unknown flowlines were presented at least at one biannual meeting and I never heard that it had been corrected.  But they also say the PowerPoint was to contain the production supervisors three to five most pressing problems.  If that wasn't on every PowerPoint, which clearly is an implication, it would be very reasonable for someone who didn't see the PowerPoint to assume that having fallen off of the three to five most pressing problems, it was no longer a pressing problem. It would just point again to this enormous gap in information.

THE COURT:  Well, interestingly, it's both an enormous potential amount of information, which in turn gives rise to what you've identified as the gap -- meaning, I think, an absence of connection with these defendants, and that's your argument.  Plaintiff's argument is that there is circumstantial evidence that would show that given the role of these wells and the field in the overall economics and the scope of the problems, it would have been -- "would" have been is the key word again -- within their range of attention and obligation prior to the time they made statements that were challenged.  That's the argument as I

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 56 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 81 of 94   PageID 832

56

appreciate it.

Anything further on behalf of the other defendant?

MR. GUY:  Nothing, Your Honor.

THE COURT:  Anything further on behalf of plaintiff that we haven't already heard?

MR. ROSEN:  Well, for this exemption from knowing where the flowlines are, Anadarko claims that the guidance allowed them this exemption.  To be clear, if you look at the statute, the statute has no exemption.  But, for the lack of knowledge, the guidance says you have to file this exemption with the state and they acknowledge that they didn't file the exemption.  So, to suggest that they don't have to file the exemption, that it's just the guidance, the guidance doesn't really help them because the statute itself doesn't have an exemption.  So, if you go to the guidance, they have no knowledge.  So that's a violation.  That's a violation.  They were obligated to pressure test and they didn't pressure test.

Number 2, defendant suggests that these flowlines that were cut and sealed were not abandoned until they decided to cut and seal them.  So they were all on a well-and-good, not in violation of the law.  But the moment they cut and sealed them, they became

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 57 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 82 of 94   PageID 833

57

abandoned, so they are not abandoned until they are cut and sealed and I don't think that's how it works.  For example, like the Firestone flowline that caused the explosion, that was a flowline that was not in use because the facility had been moved and so this flowline went to nowhere but underneath their own well. It actually was clearly abandoned at the same time because it's not been used nor anything connected to the proper operation of the well.  So I think that's a question of semantics on their part when they cut and sealed 2400 flowlines and 3600 return lines within that 60-day period.  I think these are actions that should have been taken before the explosion, not waiting until after the explosion to be fixed.

THE COURT:  Well, I guess the question is knowledge or access to knowledge about the need to do that before a statement was made about the absence of any need to do that, and I think there is a difference between that and it should have been done earlier.

MR. ROSEN:  To address the knowledge, to address the knowledge.  They were told that --

THE COURT:  "They?"

MR. ROSEN:  Mr. --

THE COURT:  -- "McBride, Mr. Walker?

MR. ROSEN:  Mr. McBride was aware of the plug

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 58 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 83 of 94   PageID 834

58

and abandonment, aware of the dangerous well list because Mr. McBride created the remediation budget. He created and prepared that budget. He got the authorization for it. He received regular status reports about the budget -- about the remediation plan and that the budget had been slashed. He was aware of all that. He's also aware and he was told they can't find 10 percent of the flowlines. So he's aware that things aren't being -- the flowlines are being pressure tested. He's aware of the facts.

And Mr. Walker, if he's not at the meeting where all this is being said, he's receiving the PowerPoint because they took the PowerPoints, they went to The Woodlands and discussed, made a presentation to the Executive Committee, which included Mr. Walker, and in that Executive Committee presentation they showed them the PowerPoint that said: 10 percent of our flowlines, we have no idea where they are. 3 to 5 percent of our wells, we have no idea where they are. We have a plug and abandonment list that we're not making any progress on because we don't have a budget, because we don't have the resources and they didn't give them the resources. So Anadarko's suggestion that we have to say who handed -- which particular individual handed the documents to the defendant is not the law.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 59 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 84 of 94   PageID 835

59

The law in the Fifth Circuit, as I mentioned before, is simply specify the reports, who prepared them, when, how firm the numbers were, and which company officers review them. And we do that. We do that. So we satisfied our obligations under the case law in the Fifth Circuit. We've demonstrated that they were given the knowledge and the information, and before the explosion, before 2016, before the class period. And then the fact that they cut and sealed the flowlines and return lines, 6000, after the class period --

THE COURT: I think you're repeating yourself. I understand. I think that's the same point you made earlier, that they fixed them later and they could have done it earlier and they had the information. Your allegations are -- your argument is that the allegations show that they had access to the information that would have told them that the statements they were making otherwise were not true.

MR. ROSEN: Not the facts necessarily, but had heard the information, had possessed the information.

THE COURT: All right, that's the question. So, is there anything further that the parties wanted to offer with respect to the legal status or implication of the words "prepared" in connection with this remediation budget and what the allegations, viewed as

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 60 of 69
Case 3:21-cv-00194-N      Document 68      Filed 11/19/21      Page 85 of 94      PageID 836

60

a whole, say.  I've heard the plaintiff's approach and I'd like to hear --

MR. GUY:  Only to say that Mr. McBride did not prepare a budget for plug and abandonment.  I'm afraid I may be captive to the allegation which has been made.  To the contrary, most of it's hearsay.  That's all I have to say this morning.

THE COURT:  All right.  Anything further on that?

MS. REED:  A couple things based on what Mr. Rosen said on the remediation budget, Your Honor.  The allegations about the remediation budget are largely the same as they were in the last version of the complaint.  Virtually nothing has been added.  It is also entirely vague and non-specific.  Approximately 10 million, according to the government relations witness, was approved at some point in 2014 and it was later "slashed" or dramatically reduced.  We are never told by how much, we are never told what 10 million was going to cover, we are never told which production was correspondingly slashed when there was a reduction in force.  This Court is actually aware that there were people looking working in Colorado who were not working in the Wattenberg Field, and so we're not tied to any reduction in personnel or budget.  It's not tied in any

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 61 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 86 of 94   PageID 837

61

way to the operations in this field and in this region. It's way too nonspecific to support any kind of claim or inference.

I want to conclude by saying we did not ever concede that we did not file for the exemption, the 502 Variance.  What we're saying is we weren't able to provide you evidence in a reply brief --

THE COURT:  Well, evidence --

MS. REED:  And we're on a motion to dismiss.

THE COURT:  Right, so I have to assume it to be true.

MS. REED:  Exactly.

THE COURT:  All right, that's for later.

MS. REED:  Mr. Rosen said something very important when he described what we did after the Firestone accident.  He said we sealed flowlines and return lines.  Again, it's not pled, but I would lay my own markers here that the line that was at issue and is public information in the Firestone well incident was a return line and I don't believe subject to pressure testing.  Again, not in the pleading, but it's not pled in and there are exceptions of various types, not just in monitoring the pressure testing requirement.  I think that's what would come out.

And I wanted to just touch very briefly on

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 62 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 87 of 94   PageID 838

62

The Woodlands allegation to be very fair about what the allegation actually was.  "FE 7's superiors also were regularly unavailable following the Biannual Meetings, telling him when he asked that it was because they would go to The Woodlands to present the matters discussed at the Biannual Meetings (specifically the information in the PowerPoint presentations) to Anadarko senior executives, including Defendant Walker."  So someone told FE 7 that they would usually go to The Woodlands and that they would present non-specified information from the PowerPoints.  It is clearly not sufficient to place any particular piece of information in the hands of Mr. McBride or Mr. Walker.

THE COURT:  All right.

MR. ROSEN:  Just --

THE COURT:  Yes, sir.

MR. ROSEN:  I just have to say.

THE COURT:  That's fine.

MR. ROSEN:  In Exhibit A of our Declaration of Jonathan Horne, we have a press release from Frederick-Firestone Fire Protection District dated on May 2nd, and it says:  "ORIGIN AND CAUSE OF APRIL 17TH HOME EXPLOSION."  And it specifically says that, "Investigators have reached the conclusion that the origin and cause of the explosion and subsequent fire

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 63 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 88 of 94   PageID 839

63

that destroyed the Martinez home and damaged the neighboring home resulting in the deaths of Mark Martinez and Joey Irwin and the severe injury to Erin Martinez was unrefined, non-odorized gas that entered the home through a French Drain and Sump Pit due to a cut, abandoned gas flow line attached to an oil and gas well in the vicinity that, while abandoned, had not been disconnected from the wellhead and capped." That's an official cause of the explosion.

THE COURT:  All right, does that make any difference to your argument, Ms. Reed?

MS. REED:  It does, Your Honor.  It's a press release, it's not the actual report, and I know that it isn't the public information that it was a return line and not a flowline.  Again, really, the bigger picture is that it points to this tremendous complexity of these regulations, the failure of the plaintiffs to plead conclusively any violation and certainly to plead knowledge on the part of the individuals who are implicated by the claims.

THE COURT:  All right, I have one last question for each of you.  One minute each -- and I mean this -- without repeating anything you've already said, also from the heart.  Two questions.  One is a 30-second answer total.  Is anybody going to order a

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 64 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 89 of 94   PageID 840

64

transcript of this hearing?

MS. REED: Yes, I'm sure we will, Your Honor.

THE COURT: Very good, thank you.

Number 2, one minute tops each, starting with you, Mr. Rosen. Well, actually, it's the defendants' burden. Let me start with them. Move to amend again? What's your best argument in favor of futility?

MS. REED: Your Honor, this is the third attempt to plead a cause of action.

THE COURT: So the next would be the fourth?

MS. REED: The next would be the fourth. At each go-round the plaintiff has added more and more confidential witnesses. It's pretty clear that what's happening here is an attempt to reverse engineer from an explosion and find regulations. I think it is remarkable that while Mr. Rosen claims these regulations are so clear, he did not identify them until his third attempt at pleading a claim here. They've got a slew of confidential witnesses who have provided presumably as much information as they can and who frankly weren't able to shore up the holes that existed in the last complaint, and there is no reason to allow them yet another opportunity to do that.

I would just say respectfully, Your Honor,

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 65 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 90 of 94   PageID 841

65

that the Firestone accident is a terrible event, but this isn't the right claim or the right cause of action to flow from it.  It's a terrible event looking for a security claim rather than the other way around.

MR. GUY:  Same point, Your Honor.  This is my first time in front of you.  Mr. McBride's as well. But the plaintiff has been informed by you and this is as good as it gets.  I would echo what Ms. Reed said. The Second Amended Complaint is actually a pretty good complaint for a wrongful death suit or property damage suit based on negligence per se.  And therefore, I believe it should be dismissed and finally dismissed with prejudice.

THE COURT:  All right.  On behalf of your clients, Mr. Rosen?

MR. ROSEN:  In the Health and Safety overview, on the first page, on the very bottom it says, "Increasing Transparency:  In 2015, we increased our focus and commitment toward sharing useful information through an expanded Corporate Responsibility section on our website, which resulted in improved rankings amongst our peers in third-party reports often used by the socially responsible investment community." So they are targeting the investment community with this document because they know it's important to investors.

Case 4:17-cv-01372   Document 86   Filed on 04/15/19 in TXSD   Page 66 of 69
Case 3:21-cv-00194-N   Document 68   Filed 11/19/21   Page 91 of 94   PageID 842

66

Number 2, Your Honor, this complaint demonstrates that they had knowledge of all the facts constituting violations of law in the Colorado operations.  If there is some small issue about where we said "prepared" and what we mean by "prepared," what it means, exactly who did it, if there is a small detail in the report, we're happy to provide it if they would just tell us what specifically these details are, we could get a chance to just tidy up whatever small issues might remain.  We appreciate it.

THE COURT:  All right, thank you, sir.

Last question, and I know I said there was only one more, but I hope this can be briefly answered.  And that is, is there anything new in particular about any of the confidential informants that the parties wanted to address that they haven't already done, the new allegations as to the confidential informants?  You have addressed some of them.  Are there any others that you think should be specifically noted that you haven't adequately addressed?  Going, going, gone.

MS. REED:  Just one thing, Your Honor.  I pointed out the time issue with FE 7 when they're plugging and abandoning wells.  I don't think I pointed out a contradiction in FE 7's information about

Case 4:17-cv-01372 Document 86 Filed on 04/15/19 in TXSD Page 67 of 69
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 92 of 94 PageID 843

67

inspections. I don't really talk about inspections in the general complaints, about the rates of inspections. If you look at paragraph 130, previous to paragraph 130, FE 7 is reported as saying: We were woefully inaccurate on inspections, we didn't have enough people, we couldn't possibly inspect the wells and our rate of inspection was woeful. If you look at the math in paragraph 130, FE 7 refers to contractors called pumpers who check on the wells, inspect the wells, says they're poorly paid and unskilled. FE 7 says, "Each pumper," so there must have been at least two, "had 120 wells per week to inspect." If you do the math on that, that's roughly 250 -- I'm rounding up a little bit -- wells per week inspected. That's a thousand wells a month. That would allow us to inspect all the 6000 -- roughly 6000 wells that we're operating twice in every year. That's inconsistent entirely with FE 7's claim.

Now, FE 7 claims the inspections were too quick and weren't thorough inspections, but doesn't tie those to any regulatory violation, and I think it's worth pointing out the contradiction.

And important as well, we had two crews to inspect Firestone wells after it was turned on in January, and there is an allegation that the data from

Case 4:17-cv-01372  Document 86  Filed on 04/15/19 in TXSD  Page 68 of 69
Case 3:21-cv-00194-N  Document 68  Filed 11/19/21  Page 93 of 94  PageID 844

68

that well was inconsistent, this is why we sent crews. The implication from that was that we were in some form or fashion monitoring data from that well.

THE COURT: All right, you want to add anything?

MR. GUY: Not from us, Your Honor. This is all what we've already addressed.

THE COURT: All right, very good. Go ahead.

MR. ROSEN: Nothing further, Your Honor.

THE COURT: All right, very good. I think I have exhausted the subject. I'm sure I have exhausted you guys. Thank you for traveling to make the arguments and for the large amount of material that you presented, and it was very helpful.

Anything else that we could do, should do today?

MS. REED: No, Your Honor.

MR. GUY: No, Your Honor.

MR. ROSEN: No, Your Honor.

THE COURT: That's a relief.

All right, have a very good weekend, safe travels back to where you came from. And I do not promise a fast decision. There is a lot to go through. Any additional case law that comes out in the next week or so that comes to your attention, just send an e-mail

Case 4:17-cv-01372 Document 86 Filed on 04/15/19 in TXSD Page 69 of 69
Case 3:21-cv-00194-N Document 68 Filed 11/19/21 Page 94 of 94 PageID 845

69

to Ms. Eddins and with the case attached.  I do not want additional argument, analysis, etcetera.  I am awashed in argument and analysis.

MS. REED:  The Court did receive our notice of the *Flotek* decision?

THE COURT:  Yes.

MS. REED:  Thank you.

THE COURT:  You are all excused.  Thank you. Interesting issues.

**[3:50 p.m. - Proceedings adjourned]**

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled cause.

/s/ Ed Reed                                    4-14-19
Edward L. Reed                                 Date
Court Reporter