**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |  |
|  | ) |  |
| Plaintiff, | ) | Civil Action No.: 3:21-cv-00194-N |
|  | ) |  |
| v. | ) | Hon. David C. Godbey |
|  | ) |  |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, DARREN W. WOODS, NEIL A. CHAPMAN, JACK WILLIAMS, NEIL A. HANSEN, DAVID ROSENTHAL, LIAM M. MALLON, JEFFREY J. WOODBURY and SARA N. ORTWEIN, | ) ) ) ) ) ) ) |  |
|  | ) |  |
| Defendants. | ) ) |  |

**LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................... iv

I.    INTRODUCTION ..................................................................................... 1

II.   FACTS ...................................................................................................... 4

      A.   EXXON ACQUIRES BILLIONS IN ASSETS IN THE PERMIAN AND PLACES THEM
           AT THE CENTER OF ITS TURNAROUND ...................................................... 4

      B.   DEFENDANTS TOUT EXXON'S PERMIAN PROWESS AND PRODUCTION GOALS ......... 5

      C.   EXXON'S STATEMENTS WERE FALSE AND MISLEADING ................................. 8

      D.   THE FRAUD UNRAVELS ........................................................................... 10

III.  ARGUMENT ............................................................................................. 10

      A.   THE FALSE STATEMENTS ALLEGED IN THE COMPLAINT ARE ACTIONABLE ........... 10

           1.   Defendants' "On Track" or "On Plan" Statements Are Actionable ......... 10

           2.   Misstatements Concerning Exxon's Proved Reserves Are
                Actionable ...................................................................................... 15

                a.   The Permian Proved Reserve Valuations Were Material ............. 15

                b.   Valuations of Proved Reserves Are Not Opinions ...................... 18

                     i.   Proved Reserves Are Statements of Fact ............................. 18

                     ii.  Even if Opinions, Proved Reserves Statements Satisfy
                          *Omnicare* .................................................................... 19

           3.   The Complaint Alleges That Exxon Inflated Its Resource Base .............. 21

           4.   Misleading Statements Regarding Exxon's Competitive Position in
                the Permian Are Actionable ................................................................ 22

           5.   Statements About Progress in the Permian Are Not Puffery .................... 23

                a.   Drilling Progress Statements ............................................... 24

                b.   "Unique Position" Statements ............................................... 26

                c.   Reports of Increases in Drilling Activity ................................ 26

i

|  |  | d. | Statements Regarding Exxon's Reserve Process | 26 |
|  |  | e. | Well Quality Statements | 27 |
|  | B. | PLAINTIFFS HAVE ADEQUATELY PLED SCIENTER | | 28 |
|  |  | 1. | The Complaint Alleges a Strong Inference of Scienter | 28 |
|  |  | 2. | Defendants' Remaining Scienter Challenges Fail | 41 |
|  | C. | THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY | | 45 |
| IV. | CONCLUSION | | | 45 |

# TABLE OF AUTHORITIES

CASES                                                                              PAGE(S)

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002) ...............................................................................14

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) ...............................................................................39

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020)...........................................................................21, 27

*Alaska Elec. Pension Fund v. Asar,*
   768 F. App'x 175 (5th Cir. 2019) .......................................................................36

*Arkoma Basin Project Ltd. P'ship v. W. Fork Energy Co. LLC,*
   384 F. App'x 375 (5th Cir. 2010) .......................................................................14

*In re ArthroCare Corp. Sec. Litig.*,
   726 F. Supp. 2d 696 (W.D. Tex. 2010)...........................................................28, 40

*Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) .................................................................... *passim*

*Better v. YRC Worldwide Inc.*,
   2012 WL 4433500 (D. Kan. Sept. 25, 2012) .......................................................41

*In re BP P.L.C. Sec. Litig.*,
   843 F. Supp. 2d 712 (S.D. Tex. 2012) ...........................................................35, 36

*Brody v. Zix Corp.*,
   2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)................................................ *passim*

*Callinan v. Lexicon Pharms., Inc.*,
   479 F. Supp. 3d 379 (S.D. Tex. 2020) .................................................................35

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
   2021 WL 1416025 (S.D. Tex. Apr. 14, 2021) ......................................................40

*Carlton v. Cannon,*
   184 F. Supp. 3d 428 (S.D. Tex. 2016) ............................................................ *passim*

*Christine Asia Co. Ltd. v. Ma*,
   2017 WL 6003340 (2d Cir. Dec. 5, 2017) ...........................................................34

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*,
   2016 WL 6075540  (W.D. Tex. Sept. 16, 2016) ..................................................25

*Collmer v. U.S. Liquids, Inc.*,
  268 F. Supp. 2d 718 (S.D. Tex. 2001) ...............................................................37

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
  504 F. Supp. 2d 151 (N.D. Tex. 2007) ..............................................................24

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010)................................................................34

*Courtroom Scis., Inc. v. Andrews*,
  2009 WL 1313274 (N.D. Tex. May 11, 2009) ...................................................41

*Crutchfield v. Match Grp., Inc.*,
  529 F. Supp. 3d 570 (N.D. Tex. 2021) ..........................................................26, 41

*In re Daou Sys. Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ...........................................................................30

*Dorsey v. Portfolio Equities, Inc.*,
  540 F.3d 333 (5th Cir. 2008) .............................................................................37

*Edgar v. Anadarko Petroleum Corp.*,
  2018 WL 3032573 (S.D. Tex. June 19, 2018)....................................................19

*Edwards v. McDermott Int'l, Inc.*,
  2021 WL 1421603 (S.D. Tex. Apr. 13, 2021) ...................................................20

*In re Fleming Cos. Inc. Sec. & Deriv. Litig.*,
  2004 WL 5278716 (E.D. Tex. June 16, 2004)....................................................30

*In re Franklin Bank Corp. Sec. Litig.*,
  728 F. Supp. 2d 364 (S.D. Tex 2011) ................................................................18

*Fresno C'nty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...............................................................34

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)................................................................26

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)................................................................35

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
  514 F. Supp. 3d 942 (S.D. Tex. 2021) ....................................................12, 33, 37

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ...........................................................................13

iv

*Hart v. Bayer Corp.*,
    199 F.3d 239 (5th Cir. 2000) ........................................................................................45

*In re Hertz Glob. Holdings Inc*,
    905 F.3d 106 (3d Cir. 2018)..........................................................................................34

*Hopson v. MetroPCS Commc'ns, Inc.*,
    2011 WL 1119727 (N.D. Tex. Mar. 25, 2011) ...........................................................11

*Ind. Elec. Workers' Pens. Trust Fund IBEW v. Shaw Grp, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ........................................................................................36

*Inst. Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)..........................................................................................36

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
    237 F. Supp. 3d 492 (S.D. Tex. 2017) .........................................................................45

*Kaltman v. Key Energy Servs., Inc.*,
    447 F. Supp. 2d 648 (W.D. Tex. 2006).........................................................................25

*KB Partners I, L.P. v. Barbier*,
    907 F. Supp. 2d 826 (W.D. Tex. 2012).........................................................................34

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015) ...........................................................................33

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) .................................................................................35

*In re Landry's Seafood Restaurant, Inc.*,
    2001 WL 34115784 (S.D. Tex. Feb. 20, 2001) .............................................32, 35, 37

*Lee v. Active Power, Inc.*,
    29 F. Supp. 3d 876 (W.D. Tex. 2014)...........................................................................29

*Litwin v. Blackstone Grp, L.P.*,
    634 F.3d 706 (2d Cir. 2011)....................................................................................15, 16

*Loc. 210 Unity Pens. & Welfare Funds v. McDermott Int'l Inc.*,
    2015 WL 1143081 (S.D. Tex. Mar. 13, 2015)..............................................................11

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
    2011 WL 12855820 (N.D. Ala. June 7, 2011)..............................................................15

*Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
    810 F.3d 951 (5th Cir. 2016) ........................................................................................41

*Lormand v. US Unwired Inc.*,
565 F.3d 228 (5th Cir. 2009) ...................................................................................... *passim*

*Luna v. Marvell Tech. Grp.*,
2017 WL 2171273 (N.D. Cal. May 17, 2017) ..........................................................34

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...................................................................................35

*Marcus v. J.C. Penney Co., Inc.*,
2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ........................................................32

*Markman v. Whole Foods Mkt., Inc.*
2016 WL 10567194 (W.D. Tex. Aug. 19, 2016) ......................................................16

*McNamara v. Bre-X Mins. Ltd.*,
197 F. Supp. 2d 622 (E.D. Tex. 2001)......................................................................33

*In re MGM Mirage Sec. Litig.*,
2013 WL 5435832 (N.D. Nev. Sept. 26, 2013) ...................................................2, 11

*Nardy v. Chioptle Mexican Grill, Inc.*,
2019 WL 3297467 (D. Colo. Mar. 29, 2019) ..........................................................35

*Nathenson v. Zonagen Inc.*,
267 F.3d 400 (5th Cir. 2001) ............................................................................28, 35

*Neiman v. Bulmahn*,
854 F.3d 741 (5th Cir. 2017) ...................................................................................32

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................26

*In re Odyssey Healthcare, Inc. Sec. Litig.*,
424 F. Supp. 2d 880 (N.D. Tex. 2005) ..............................................................11, 31

*Okla. Police Pens. & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) ............................................................................41

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)..........................................................................................2, 19, 21

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018) ...........................................................31, 32, 33

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ...................................................................... *passim*

*Pub. Emps.' Ret. Sys. Of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ........................................................................23

*Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .......................................................................25

*In re Qualcomm Inc. Sec. Litig.*,
2019 WL 1239301 (S.D. Cal. Mar. 8, 2019) ........................................................36

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) .............................................................. *passim*

*In re Regeneron Pharm., Inc. Sec. Litig.*,
2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)..........................................................17

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ....................................................................25, 29

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)....................................................39, 40

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ........................................................................39

*Sakkal v. Anaplan Inc.*,
2021 WL 3885987 (N.D. Cal. Aug. 31, 2021) ......................................................43

*Sanders v. Realreal, Inc.*,
2021 WL 1222625 (N.D. Ca. Mar. 31, 2021)......................................................27

*Schiller v. Physicians Res. Grp.*, Inc.,
2002 WL 318441 (N.D. Tex. Feb. 26, 2002 ........................................................16

*Schulze v. Hallmark Fin. Servs., Inc.*,
2021 WL 3190529 (N.D. Tex. July 28, 2021) ......................................................41

*SEC v. Leslie*,
2012 WL 116562 (N.D. Cal. Jan. 13, 2012)........................................................16

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021)..........................................................................40

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
2018 WL 1587457 (D. Conn. Mar. 31, 2018) ......................................................33

*Shenwick v. Twitter*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) .............................................................38

vii

*In re Silvercorp Metals, Inc. Sec. Litig.*,
26 F. Supp. 3d 266 (S.D.N.Y. 2014)........................................................................41

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) ............................................................... *passim*

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ...............................................................20, 28, 41

*In re St. Jude Med., Inc. Sec. Litig.*,
836 F. Supp. 2d 878 (D. Minn. 2011)......................................................17

*Stone v. Life Partners Hldgs., Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014)..............................................24, 27, 37, 38

*In re SunPower Sec. Litig.*,
2011 WL 7404238 (N.D. Cal. Dec. 19, 2011).......................................30

*Taubenfeld v. Hotels.com*,
385 F. Supp. 2d 587 (N.D. Tex. 2004) .................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................29, 38

*In re Triton Energy Ltd. Sec. Litig.*,
2001 WL 872019 (E.D. Tex. Mar. 30, 2001) .......................................37

*In re Unumprovident Corp. Sec. Litig.*,
396 F. Supp. 2d 858 (E.D. Tenn. 2005)................................................16

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................34

*In re Venator Materials PLC Sec. Litig.*,
2021 WL 2980581 (S.D. Tex. July 7, 2021)............................... *passim*

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ...............................................................30

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................................................44

*Weiner v. Tivity Health, Inc.*,
528 F. Supp. 3d 795 (W.D. Tenn. 2021).........................................15, 16

*White v. Heartland High-Yield Municipal Bond Fund*,
2005 WL 5954971 (E.D. Wis. Nov. 28, 2005)......................................40

*In re WHX Corp.,* Admin. Proc. File No. 3-9634, SEC Exchange Act Release No.
   47980,
   2003 WL 21283081 (June 4, 2003) ........................................................................40

*Wieland v. Stone Energy Corp.*,
   2007 WL 2903178 (W.D. La. Aug. 17, 2007)........................................................38

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
   2009 WL 464934 (S.D.N.Y. Feb. 25, 2009)..........................................................25

**RULES, STATUTE, AND OTHER AUTHORITIES**

15 U.S.C. § 77z-2I ........................................................................................................14

Generally Accepted Accounting Principles .......................................................... *passim*

Fed. R. Civ. P. 15(a) ....................................................................................................45

## I.    INTRODUCTION

Beginning on March 7, 2018, in the face of market concern over Exxon's ability to capitalize on its critical Permian Basin assets, Defendants announced Exxon's "aggressive growth plans to more than double earnings," supported by "very, very high quality" wells and "increased drilling" in the Permian. In its SEC filings, Exxon reported lofty valuations of the Permian assets, including its proved reserves (a GAAP metric). Defendants also presented data purporting to quantify Exxon's "truly unique position in getting value out of the Permian versus anybody else in the industry," portraying it as first among its competitors. On March 5, 2019, Exxon raised the stakes, announcing an even more aggressive Permian goal of 1 million barrels per day by 2024, and thereafter assured investors throughout the Class Period that it was "on track" and "on plan" to achieve that goal. Analysts lauded Exxon's purportedly strong Permian operations, and the Company's stock price increased significantly.

None of this was true. On January 15, 2021, the *Wall Street Journal* revealed a whistleblower's report that Exxon management instructed personnel to "claw back" lost value in the Permian Basin by using false drilling assumptions to overvalue its Permian assets by $10 billion.  The whistleblower (and multiple former employees identified by Lead Counsel) confirmed that the false valuations were housed in a file called "This is a Lie." The *Wall Street Journal* stated that half a dozen employees corroborated its report.

Lead Counsel's investigation has further corroborated the fraud. Specifically, while Defendants were assuring investors that Exxon was "on track" and "on plan" to achieve its Permian goal, in truth, its Permian production was plagued by longer than expected drilling times, inadequate equipment and infrastructure, inadequate labor, and misses on oil production—all of which made its stated goals impossible to achieve. Expert analysis also reveals selective data

presentations that misled the public about Exxon's leadership in the region. Thus, while Exxon held itself out as number one in the Permian, in fact, it lagged behind other operators.

Seeking dismissal before discovery, Defendants rewrite the Complaint, ask for impermissible inferences in their favor, and ignore controlling law. Defendants' arguments that the Complaint fails to allege a single actionable misstatement fail for several reasons. *First*, courts in this Circuit hold that statements assuring investors that a company is currently "on track" to achieve an outcome are statements of present fact, and not mere projections. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 494 (S.D. Tex. 2016); *In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at *7 (N.D. Nev. Sept. 26, 2013).[1]

*Second*, Exxon's proved reserves were supposed to reflect the amount of oil that Exxon was 90% certain it would extract from the ground—but they were based on false assumptions that overstated how quickly Exxon could drill. They were also the product of a fraudulent process: engineers were instructed to manipulate valuations in various ways, which former employees corroborate ("boosting," "scrunching," and "clawing back" lost value). Since GAAP requires an extremely high degree of certainty for proved reserves, they are not, as Defendants contend, opinions. *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 848 (N.D. Tex. 2018) ("alleged accounting violations are sufficient to plead material misstatements"). Moreover, even if opinions, the statements are actionable. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).  Further, Exxon regularly touted the Permian's importance, belying arguments that the statements were immaterial. And while Exxon asserts that the false drilling assumptions used in the annual planning process were not used in the annual reserve

---

[1] References to "¶__" are to the Amended Complaint (ECF No. 53), and "MTD ___" are to the Motion to Dismiss (ECF No. 69). Emphasis is added and internal quotations and citations omitted.

calculation, Exxon's public reports state that the Permian reserves were "supported" by Exxon's "growth plan," including "increased drilling activity." ¶140.

*Third*, Exxon's resource base included its inflated proved reserves and was likewise false. It was also the product of a fraudulent policy to never "revise down" assumptions. ¶¶124-27. Defendants speculate that the inflated reserves may have been appropriately included elsewhere in the resource base calculation, urging an improper factual determination.

*Fourth*, Defendants mischaracterize as immaterial Exxon's many false statements concerning drilling progress, drilling efficiency and capabilities, and well quality. In fact, these statements are concrete, and therefore material, because they were tied to a specific production goal. Further, materiality determinations are typically inappropriate at the pleading stage.

*Fifth*, Exxon's charts depicting its Permian wells and drilling performance as superior to its peers were misleading: by presenting *non-Permian* data and *excluding Permian operators who outperformed Exxon*, Exxon portrayed itself as first when it was actually seventh or eighth. Defendants protest that their deceptive presentations came from public data. But Fifth Circuit law is clear: investors need not independently verify a company's statements. Nor could they: only an expert with access to proprietary data from a subscription service could unravel Defendants' misleading presentations. Defendants also assert that they generically disclosed that the slides "contained data from other regions," but nowhere did the slides disclose that the use of this data— data that Defendants told investors demonstrated Exxon's "truly unique position in getting value out of the Permian"—somehow transformed Exxon from seventh place to first in the region.

Defendants also wrongly assert that the Complaint fails to plead scienter. The Complaint alleges numerous facts supporting an inference of Defendants' actual knowledge that their statements were false, or at minimum their severe recklessness, including but not limited to:

3

- Senior Exxon management directed employees to inflate the Company's proved reserves (¶¶253-55) and to use false assumptions in asset valuations (¶¶256-58).

- Exxon intentionally distorted the data it presented to investors. ¶¶57, 82, 355, 367.

- Senior Exxon management reviewed and approved reserve reports and required them to incorporate inflated valuations (¶¶259-61); received twice daily drilling reports reflecting Exxon's actual drilling speed (¶¶262-64); and had access to reserves and production data showing the hindered progress in the Permian (¶¶265-69).

- The Executive Defendants toured Exxon's Permian operations and touted their knowledge of the assets. ¶¶270-73, 281-83.

- Exxon's corporate culture forbade write-downs but permitted inflated metrics. ¶¶274-77.

- Defendants emphatically denied problems in response to analysts' questions. ¶¶284-88.

- The Executive Defendants were motivated to, and did, benefit from the fraud, both through compensation packages that depended on Exxon's progress toward achieving its Permian goal (¶¶294-98), and through suspicious insider sales of Exxon stock (¶¶299-306).

Finally, Defendants attempt to rewrite the Complaint to blame their woes in the Permian on the COVID pandemic. MTD 8. As detailed herein, this factual argument ignores the Complaint's allegations demonstrating that the statements were false when made for reasons having nothing to do with COVID. Defendants' counter-statement of fact cannot be accepted as a matter of law at the pleading stage. For the reasons below, Defendants' motion should be denied.

## II.    FACTS

### A.    EXXON ACQUIRES BILLIONS IN ASSETS IN THE PERMIAN AND PLACES THEM AT THE CENTER OF ITS TURNAROUND

In December 2016, when Defendant Darren Woods became Exxon's CEO, Exxon had been faltering for a decade. ¶¶47-48. Woods was charged with righting the ship. ¶49. Among his first major acts as CEO, Woods announced the purchase of $6.6 billion of assets in the Permian. *Id.* The market soon connected success in the Permian with Exxon's turnaround. The pressure was on Woods to deliver. ¶50. In his first analyst meeting as CEO, Woods touted Exxon's new Permian assets and strategy. ¶52. In response, analysts declared, "All Of My Love (To The Permian)," and

hoped that XOM was "turning a corner." ¶52. Yet, at the end of 2017, investors remained concerned, and success in the Permian became even more material to Exxon (¶53) and to Woods and other senior executives whose compensation depended on it (¶51). At the start of the Class Period, Woods was under extreme pressure to, as one analyst put it, "Turn the Titanic." ¶53.

### B.   DEFENDANTS TOUT EXXON'S PERMIAN PROWESS AND PRODUCTION GOALS

***Exxon Announces "Aggressive Growth Plans to More than Double Earnings."*** The Class Period begins on March 7, 2018 when Defendants announced Exxon's new "aggressive growth plan" and held their annual Analyst Meeting. ¶55. In the accompanying press release, Exxon touted its increased Permian resource base of 9.5 billion oil-equivalent barrels. ¶55. Defendants explained the basis for the "aggressive growth strategy" on the call: senior VP Defendant Neil Chapman pointed to Exxon's "9.5 billion barrels in the Permian," and senior VP Defendant Jack Williams emphasized "very, very high" Permian well quality that "underpin[ned]" the growth plans. ¶56. Chapman also presented data to show Exxon's "truly unique position in getting value out of the Permian versus anyone else in the industry," which portrayed Exxon as number one compared to competitors. ¶57. Analysts focused on Permian growth. ¶58. As explained below, Defendants continued to make misstatements about Exxon's (a) Permian valuations, (b) position compared to its peers, (c) progress toward achieving its production goal in the Permian, and (d) production conditions on the ground.

***Proved Reserves and Resource Base.*** Defendants told investors that Exxon had a "total Permian resource base" of "more than 9 billion oil-equivalent barrels" ¶357 (April 3, 2018); *see* ¶365 ("~9.5 billion OEB recoverable resource (net)" on October 2, 2018). On March 5, 2019, Defendants updated that valuation to "approximately 10-billion oil-equivalent barrels" and said it "is likely to grow further." ¶393; *see* ¶428 ("~10 Boeb" on March 5, 2020).

Oil companies, like Exxon, are required to disclose "proved reserves" in their SEC filings.

5

¶318. These disclosures are subject to GAAP and SEC regulations. ¶¶325-32. The accounting rules require proved reserves to be estimated with "reasonable certainty"; typically 90%. ¶317. Defendants reported proved reserve valuations of 24.3 billion oil-equivalent barrels for year-end 2018, and 22.4 billion for year-end 2019 (¶¶376, 419), with 1.2 billion barrels attributed to the Permian (¶376). When added to the 800 million barrels of its proved reserves for year-end 2017 that Exxon attributed to "mainly" the Permian, the total Permian proved reserves Exxon reported exceeded 2 billion oil-equivalent barrels. ¶140. Defendants described their proved reserve calculations as "rigorous," "well-established," and "disciplined," touting senior "management accountability" and their review of reserves and changes to them. ¶¶380, 421-23.

*Cherry-Picked Data Misrepresented Exxon's Position in the Permian.* Exxon manipulated data to misrepresent its position in the Permian. On October 2, 2018, Chapman and Defendant Sara Ortwein (President of XTO) presented "Upstream Spotlight: Unlocking Permian Value," which showed data purporting to demonstrate Exxon's leadership—that Exxon was number one—in producing horizontal wells in the Permian. ¶367.

*Statements That Permian Production Was "On Track" and "On Plan."* On March 5, 2019—95 minutes after Chevron announced its own Permian goal of 900,000 barrels per day— Woods announced a new Permian goal of 1 million barrels per day by 2024, telling investors on March 6 that Exxon was going to "unleash the hounds." ¶¶142-47. Woods presented the goal on a "green blob" slide, and throughout the Class Period, Defendants assured investors that Exxon was "on track" to meet that goal. ¶¶389-91, 400-01, 405, 407-08, 415, 425-26.

*Statements About Production Conditions.* Defendants touted production conditions in the Permian, claiming that they supported Exxon's growth plan and, in turn, the proved reserves. On April 27, 2018, Defendant VP Jeffrey Woodbury represented, "We're continuing to progress

growth initiatives as outlined in our Analyst Meeting, including increased drilling in the Permian." ¶359. On the same call, Woodbury touted "strong well performance." ¶361. On July 27, 2018, Defendant VP Neil Hansen told investors that Exxon "ramped up drilling activities" in the Permian which would "continue to see tremendous volumes growth." ¶363. On November 2, 2018, Hansen reiterated, "We continue to ramp up drilling activities in the Permian." ¶370. *See also* ¶378.

After announcing the 1 million barrels per day revised "green blob" goal, on March 6, 2019, Chapman told investors, "We have great competencies in drilling," and "We drill and complete in what I describe as the optimum fashion." ¶¶397-98. The April 26, 2019 "green blob" slide stated, "Extensive well inventory supports production profile," and Williams reiterated, "This volumes ramp is supported by a strong well inventory." ¶403. On August 2, 2019, Chapman told investors that "well performance is extremely strong," and denied that there were problems in the Permian, reassuring, "we're on plan" and "there's nothing really to flag." ¶¶410, 412-13. On November 1, 2019, their "green blob" slide assured, "Continued strong well performance" in the Permian. ¶417. Exxon told investors on March 5, 2020, "Permian well cost and performance continues to improve." Chapman said, "drilling times are reducing," touting drilling "efficiencies" and that Exxon was "drilling the best wells." ¶¶430-36.

***Analysts Believed Defendants and Celebrated the Permian.*** Analysts celebrated the Permian and heavily weighted it when evaluating Exxon stock. For example, on September 15, 2018, Trefis predicted that the "Permian Basin will drive future growth . . . we expect the Permian growth to create value for the Company as well as its shareholders." ¶138. Bank of America Merrill Lynch wrote on November 2, 2018 that "Permian growth kicks in," and "3Q 2018 appears to confirm commentary at [Exxon's] recent set of roundtables that it has turned a corner." *Id*. Notably, Exxon stock increased following Defendants' misrepresentations. ¶¶369, 372, 375, 382.

### C.    EXXON'S STATEMENTS WERE FALSE AND MISLEADING

In truth, the Permian was plagued by problems and did not deliver enough oil to justify Exxon's reported proved reserves, resource base, or production goals. ¶¶60, 63-80.

***Proved Reserves and Resource Base Were Fraudulently Inflated.*** Exxon's proved reserves and resource base calculations were the product of a fraudulent process and based on false drilling assumptions. By the summer of 2018, Exxon recognized internally that it needed to reduce its proved reserves and take a write-down, but it determined to "kick the can down the road." ¶¶135-36. Former employees described multiple ways that engineers were instructed to "boost" the reserves. ¶¶109-19. According to former Exxon reservoir engineer Andrew Rhodes, Permian engineers used a "scrunching" technique in order to "make the decline curve shorten sooner than you think it reasonably should" which would "increase[] the area under the curve substantially." ¶118. Engineers were told to be "sneakily optimistic with respect to any of the variables that went into the total" to make the "final answer . . . significantly different than it should be." ¶114.

FE3, another former reservoir engineer, confirmed that "reserves reporting at Exxon" was "being told what the answer was." ¶121. Reservoir engineers, who reported to Ortwein, were told, "Here's the number we need to hit, so make small adjustments to many decline curves to reach the number for a basin or an asset or an area." *Id.* FE3, who submitted forecasts to the reserve team, confirmed that he was pressured to search for increases, that the forecasts he submitted for the year would come back "way off and crazy," and that Ortwein had the ability to change them. ¶122. This conduct aligns with Exxon's policy against writing down its resource base, where engineers were instructed to retain initial assumptions even once they were proven to be false. ¶¶124-27.

Exxon employees also employed false drilling assumptions. A whistleblower, corroborated by six other employees interviewed by the *Wall Street Journal*, explained that in the summer of 2019, Exxon concluded that the drilling assumptions it used for 2018 were false, but senior

8

management instructed employees to overestimate the drilling "learning curve" and use drilling assumptions saved in a file called "This is a Lie" to "claw back" lost value and over-value the Permian by $10 billion. ¶128. Rhodes and FE4 confirmed the "This is a Lie" file. ¶¶181-82. FE4 was deployed to the Permian to research Exxon's drilling and production rates. ¶129. As production missed its goals, he explained to management that their expectations were impossible. ¶¶129-31. Former employees corroborated pressure at Exxon to make things "rosier" than they were (¶132) and to back into targets pre-set by management (¶134).

*True Data Reveals Exxon Not a Leader in the Permian.* Expert analysis of Exxon's proprietary data reveals that Exxon was not a leader in the Permian: it ranked 7th and 8th. ¶¶356, 367. To inaccurately portray Exxon as number one on its slides, Exxon misleadingly included non-Permian data and excluded all of the peers who were ahead of Exxon in the region. *See id.*

*Production Not "On Track" Due to True State of Production Conditions, Confirmed by Expert.* Differently-situated former employees confirmed that Exxon was experiencing: (i) longer than expected drilling times; (ii) poor well performance; and (iii) severe problems with well quality. ¶¶63-73. Former employees also described issues relating to inadequate equipment, infrastructure, and labor. ¶¶74-80. Norris Wingo and Jeff Wachsmann confirmed drilling delays and equipment and electricity shortages in the Permian. ¶¶67-68, 71-73, 79-80. FE2 stated that Exxon had not started any new rigs in the Delaware Basin (a portion of the Permian) until February 2019, which even then, lacked necessary infrastructure. ¶74. Exxon did not have the equipment or manpower to complete the wells at its desired pace, and drilling was consistently more expensive than estimated. ¶¶75-78. It was openly discussed at meetings that Exxon's stated production goal was unfeasible. ¶¶155, 157, 159, 162-64. This fact was independently confirmed by expert analysis of Exxon's data reflecting its (i) well performance, (ii) drilling time, (iii) the time it took for its

wells to begin producing oil and gas, and (iv) the average lateral lengths it drilled. ¶¶167-70.

### D.   THE FRAUD UNRAVELS

The truth regarding Defendants' fraud was revealed to the market in a series of corrective disclosures on January 31, 2020, May 1, 2020, and January 15, 2021. ¶438. First, on Exxon's Q4 2019 Earnings Call, Woods presented a "green blob" slide showing production that was virtually flat quarter over quarter, falling below industry estimates and Exxon's guidance. ¶439. In response, Exxon's stock dropped 4.1% on January 31, 2020 (Friday), and an additional 2.2% on February 3, 2020 and 1.3% on February 4th. ¶440. Analysts noted the "disappointing" results. ¶¶441-42.

Then, on May 1, 2020, Defendants disclosed significant rig cuts to the Permian, which would significantly reduce production capacity. ¶444. In response, Exxon's stock dropped 7.2% on May 1, 2020 on heavy trading volume, and analysts, once again, took note. ¶445.

Last, on January 15, 2021, the *Wall Street Journal* reported that the SEC was investigating Exxon's valuation of its Permian assets. ¶448. The report described how Exxon determined in the summer of 2019 to overvalue the Delaware Basin by $10 billion, using drilling assumptions saved in a file called "This is a Lie." *Id.* Exxon stock declined 4.8% on January 15, 2021. ¶449.

## III.   ARGUMENT

### A.   THE FALSE STATEMENTS ALLEGED IN THE COMPLAINT ARE ACTIONABLE

#### 1.   Defendants' "On Track" or "On Plan" Statements Are Actionable

***The "On Track" Statements Are Not Forward-Looking.*** On March 5, 2019, Woods announced a new Permian production goal of 1 million oil-equivalent barrels per day by 2024. ¶389. The next day, Woods represented that Exxon was "on track" to meet that goal, and he presented a "green blob" slide reiterating that Exxon was "on plan." ¶391. Defendants continued to tout Exxon's current progress toward the goal, stating that it was "on track" or "on plan." ¶¶400, 401, 405, 407, 408, 415, 425, 426. Defendants misclassify these statements as forward-looking.

MTD 11. This effort fails.

Defendants have argued that an entire category of statements is forward-looking. They do not meet their burden to show that each "statement is specifically and meaningfully protected by the safe harbor." *Ramirez*, 334 F. Supp. 3d at 850. Further, Defendants' argument mischaracterizes the allegations and is contrary to law. Statements that a company is "on track" or "on plan" to meet a goal pertain not only to the future achievement of the goal, but also to the progress achieved toward that goal to date. Thus, they are actionable statements of present fact. *In re Venator Materials PLC Sec. Litig.*, 2021 WL 2980581, at *19 (S.D. Tex. July 7, 2021) (sustaining statements that company was "on track," "on pace," and "on schedule" to complete a rebuilding project); *Cannon*, 184 F. Supp. 3d at 493-95 (sustaining statement that plant "currently producing" additional oil and "well positioned" to achieve goals); *MGM Mirage*, 2013 WL 5435832, at *7 (sustaining statement that a project was "on track for a late 2009 opening"). Exxon's "on track" statements were false statements of present fact. Exxon was not "on track" (and the goal was not achievable) because of the multiple production problems that Exxon was presently experiencing. Defendants' authorities involve mere projections or decline to decide the issue.[2]

*The "On Track" Statements Are Not Accompanied by Meaningful Cautionary Language.* Even if the "on track" statements were forward-looking, they would have to be accompanied by meaningful cautionary language to fall within the safe harbor, and they are not. Exxon's cautionary language was general and conditional. Exxon warned that "'[p]roduction

---

[2] *See Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591 (N.D. Tex. 2004) (projected revenue); *In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d 880, 886 (N.D. Tex. 2005) (projected EPS); *Loc. 210 Unity Pens. & Welfare Funds v. McDermott Int'l Inc.*, 2015 WL 1143081, at *7 n.7 (S.D. Tex. Mar. 13, 2015) (noting "without deciding" that defendants are not liable for forward-looking statements); *Hopson v. MetroPCS Commc'ns, Inc.*, 2011 WL 1119727, at *2, *17 (N.D. Tex. Mar. 25, 2011) (alleging growth still strong at the time the EBITDA projection was made).

11

growth' and 'project plans, timing, costs, and outcomes' *might* vary because of numerous risks."
MTD 13. But "[w]hen risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021) ("*Anadarko*"); *Ramirez*, 334 F. Supp. 3d at 851 (Plaintiff "has pleaded sufficient factual allegations that at [time of misstatement] ExxonMobil had actual knowledge the Kearl Operations would require de-booking, making ExxonMobil's forward-looking statement insufficient to provide meaningful cautionary language."); *see Lormand v. U.S. Unwired Inc.*, 565 F.3d 228, 247 (5th Cir. 2009) (warnings did not "provide sufficiently meaningful caution about *clearly present danger that was materializing*" or "concrete explanations that *clearly identified and quantified* the *clearly present … dangers*").

Here, at all relevant times, Permian production was already plagued by longer than expected drilling times, inadequate equipment, infrastructure, and labor, and less oil than expected, and Exxon's projections were already incorporating false drilling assumptions. ¶¶128-34, 184-227; *see* ¶¶166-70 (confirmed by expert analysis).  Thus, as in *Anadarko*, Defendants knew at the time the statements were made that the potential for oil production in the region was exaggerated. 514 F. Supp. 3d at 953 ("[B]y the time Defendants made 'forward-looking' statements during the Class Period regarding Shenandoah, Defendants already knew that the potential for Shenandoah was being exaggerated and needed 'a significant downward adjustment.'"). The Complaint also alleges that Exxon determined to "kick the can down the road" instead of taking a write-down. ¶¶135-36; *see* ¶¶249-51. Thus, as in *Ramirez*, Defendants knew at the time the statements were made that proved reserves would need to be reduced. 334 F. Supp. 3d at 850-51. The risks had manifested; Exxon cannot avoid liability by pointing to cautionary language about hypotheticals.

Exxon contends that its cautionary language is not "boilerplate" because some of the risks

12

it highlighted ultimately materialized. MTD 13-14. But "meaningful" cautionary statements require "'substantive' company-specific warnings based on a realistic description of the risks," as opposed to a "boilerplate litany" of potential risks. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004). Risks like "reservoir performance and depletion rates," "timely completion of exploration, development and production projects," and "unforeseen technical difficulties" (MTD 13) are precisely the sorts of generic risks an oil and gas company would include in its warnings and are not particular to the circumstances at all. *See Lormand*, 565 F.3d at 247 (safe-harbor argument fails where "misrepresentations and omissions were not accompanied by *specific, concrete explanations* that clearly identified and quantified [risks]").

It is not surprising that some of the factors that materially impacted Exxon's stock price fell under the deliberately broad umbrella of its boilerplate warnings. Nor did the warnings list include all of the factors that Plaintiffs allege caused Defendants' statements to be false. For example, risks associated with false drilling assumptions and the necessity of a write-down appear nowhere in the warnings list. ¶¶59-62, 95-100. Other warnings, like "actions of competitors and customers" and "market conditions" (MTD 13) have nothing to do with Plaintiffs' allegations.

Defendants point to *Harris v. Ivax Corp.*, 182 F.3d 799 (11th Cir. 1999) to suggest that meaningful cautionary language need not address the problems that ultimately cause the statements to be untrue. MTD 13. But this is not the applicable law. *See Cannon*, 184 F. Supp. 3d at 455 ("PSLRA requires a fit between the disclaimer and the challenged forward-looking statement."); *Lormand*, 565 F.3d at 245 (district court erred in neglecting to address how each statement was "specifically and meaningfully protected by the safe harbor.").

***Plaintiffs Have Pled Particularized Facts Demonstrating That Defendants Knew That the Statements Were False When Made.*** Further, as described in Section III(B)(1) below,

13

Plaintiffs have pled particularized facts demonstrating that Defendants knew these statements were false when made, and the statements therefore cannot be protected by the safe harbor. *See Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations."). "'An opinion or prediction is actionable if there is a gross disparity between prediction and fact.'" *Id.* at 248 n.13. *Lormand* likewise makes clear that "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id.* at 248. [3] Thus, the known risks emerging from longer than expected drilling times, inadequate equipment, infrastructure, and labor, and finding less oil all should have been disclosed alongside reassurances that Exxon was "on track."

**Whether Exxon Guaranteed Future Projections Is Irrelevant to Whether "On Track" Statements Are Actionable.** Defendants' argument that liability cannot be established *solely* on the grounds that projections are missed ignores the alleged facts and has no application here. MTD 14. [4] Defendants' attempt to invoke an overbroad interpretation of the "bespeaks caution" doctrine (MTD 14) also fails; the Fifth Circuit rejected the doctrine in favor of fact-based contextual inquiry. [5] In all events, the principle has no application here because the "on track" statements are

---

[3] Defendants attempt to create a conflict between *Lormand* and *Southland* (MTD 12 n.2), but both cases and the PSLRA are clear that a forward-looking statement is not protected by the safe harbor if the forward-looking statement is unaccompanied by meaningful cautionary language or a plaintiff adequately pleads actual knowledge, as Plaintiffs have done here. *See* 15 U.S.C. § 77z-2(c); *Southland*, 365 F.3d at 371-72; *Lormand*, 565 F.3d at 244-45.

[4] Defendants' cases are inapt. *See Arkoma Basin Project Ltd. P'ship v. W. Fork Energy Co. LLC*, 384 F. App'x 375, 380-81 (5th Cir. 2010) (following trial, "no evidence that Appellees knew that the projections…were false when made"); *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 359-62 (5th Cir. 2002) (discussing forward-looking statements only briefly in dicta).

[5] *See Lormand*, 565 F. 3d at 247 ("Under our precedent, cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law.").

14

not forward looking, or accompanied by meaningful cautionary language.

### 2.    Misstatements Concerning Exxon's Proved Reserves Are Actionable

#### a.    The Permian Proved Reserves Valuations Were Material

The Complaint alleges that Exxon reported false proved reserves ranging from 22.4 to 24.3 billion oil-equivalent barrels. ¶¶376, 383, 419. Exxon's engineers were pressured by their superiors to "boost reserves." ¶¶109-123. Exxon included false drilling assumptions in the proved reserves calculations. ¶¶175-76. Thus, Exxon's statements concerning the rigor of its reserves reporting were also false. ¶¶380, 383, 385, 387, 419, 421, 423. *See Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 WL 12855820, at *6 (N.D. Ala. June 7, 2011) (stated reserves actionably false and misleading based on confidential witness descriptions of manipulating the numbers).

Defendants argue that the Permian proved reserves were immaterial compared to Exxon's total proved reserves and unconventional resources. MTD 15. The materiality analysis "typically presents a mixed question of fact and law and generally a decision for the jury." *See Venator*, 2021 WL 2980581, at *18. Nonetheless, the Complaint amply alleges that the Permian reserves were "quantitative[ly] and qualitative[ly]" material. *See Weiner v. Tivity Health, Inc*., 528 F. Supp. 3d 795, 808 (W.D. Tenn. 2021); *Litwin v. Blackstone Grp, L.P.*, 634 F.3d 706, 717 (2d Cir. 2011).

To start, Exxon reported *increases* in its Permian reserves of 800 million and 1.2 million BOE on Forms 8-K (¶¶139-40, 376-78). The purpose of a Form 8-K is to report material information to investors,[6] and the February 26, 2019 Form 8-K specifically acknowledged that the 1.2 billion barrel addition was "significant" (¶140). Indeed, a Permian increase of 2 billion barrels

---

[6] "Form 8-K is known as a 'current report' and it is the report that companies must file with the SEC to announce major events that shareholders should know about." Form 8-K, Investor.gov, *available at* https://www.investor.gov/introduction-investing/investing-basics/glossary/form-8-k.

is 8-9% of Exxon's total proved reserves (¶¶376, 419), which is higher than the range that courts find quantitatively material. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 (2d Cir. 2000) (1.7% of revenue not immaterial as a matter of law); *SEC v. Leslie*, 2012 WL 116562, at *6 (N.D. Cal. Jan. 13, 2012) ($6.4 million accounting manipulation not immaterial at summary judgment).[7]

To be clear, the 2 billion refers only to the *increase*. The Permian was Exxon's largest resource, and the actual total reserves attributed to the Permian were much larger than 9%. As for the Permian's "impact on unconventional plays" (MTD 15), the Complaint expressly alleges that the Permian was Exxon's "largest asset devoted to unconventional drilling in the U.S." ¶250.[8]

The Permian proved reserves were also qualitatively material. *See Weiner*, 528 F. Supp. at 808 (error to rely exclusively on a single benchmark to determine materiality). Defendants repeatedly stressed the significance of Exxon's Permian operations. As Chapman stated, "[T]he Permian is really important," and "we're putting a lot of focus on the Permian now." ¶290. Woods touted, "continued ramp up in the Permian" and called it a "significant driver" of growth. *Id.* Former senior VP Andrew Swiger referred to the Delaware Basin as "Exxon's largest resource." *Id.* Qualitative materiality attaches to statements concerning operations to which the company itself prescribes importance. *Blackstone*, 634 F.3d at 720. Analyst coverage of the Permian and its proved reserves also demonstrates materiality. ¶¶58, 94, 138, 141, 235, 246, 441-42, 446. *See In*

---

[7] *Markman v. Whole Foods Mkt., Inc.* involved minute amounts, as opposed to the massive overstatements here. 2016 WL 10567194, at *2 (W.D. Tex. Aug. 19, 2016). Unlike in *Schiller v. Physicians Res. Grp., Inc.*, 2002 WL 318441, at *13 (N.D. Tex. Feb. 26, 2002), *aff'd*, 342 F.3d 563 (5th Cir. 2003), the Complaint is replete with detail. *See In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 889 (E.D. Tenn. 2005) (distinguishing *Schiller* as dealing with "a broad general allegation of improper accounting followed up with no details whatsoever").

[8] *See* ¶54 (2017 proved reserve addition from "rich unconventional plays in the United States, mainly in the Permian"); ¶¶140-41 (2018 proved reserves from unconventional plays, consisted of "significant additions in the Permian"); ¶141 ("XOM added 1.2 BBoe from unconventional plays particularly in the Permian"); ¶408 ("green blob" growth consists of "unconventional Permian…volumes"); ¶130 (Delaware contains "unconventional reservoirs").

*re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 888 (D. Minn. 2011) (responses to analyst questions material); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *21 (S.D.N.Y. Feb. 1, 2005) (analyst coverage of "crucial" product and its "prospects" shows materiality).

Next, Defendants argue that the false drilling assumptions were an internal measuring stick, which Plaintiffs cannot prove were used in Exxon's reserves. MTD 16. Plaintiffs need not prove anything at this stage; they must allege enough facts to enable the Court to "draw [] reasonable inferences in [their] favor." *Lormand*, 565 F.3d at 232. The Complaint expressly alleges that: the drilling assumptions were incorporated into the proved reserves (¶¶341-43); "the analysis that the whistleblower described in the summer of 2019 as part of 'Exxon's annual development planning' was being done in connection with setting the Company's production goals and preparing the Company's year-end 2019 report" (¶51); and the annual report contained the false proved reserves (¶383). *See* ¶101 ("annual planning process" where engineers developed assumptions, including "the value of the proved reserve that Exxon reported to investors at year-end"). The February 26, 2019 Form 8-K corroborates the fact that the "learning curve," which overestimated drilling speed, was incorporated into the proved reserves: it stated that Exxon's proved reserves for the Permian were "supported by ExxonMobil's growth plan, including increased drilling activity." ¶62.

Analysts made the connection. Following the disclosure of the SEC investigation, UBS noted that the fraud the whistleblower revealed made the proved reserves false. ¶451. The SEC's requirements governing proved reserve calculations (MTD 16) bolster Plaintiffs' position.

Defendants also wrongly contend that Rhodes and FE3 were not sufficiently connected to the Permian and described different types of reserve fraud than the whistleblower. MTD 17. Rhodes, FE3, and the whistleblower all described being told by management to manipulate or "scrunch" curves—decline curves, "learning curves"—to reach a target number. ¶¶117-18. The

17

Company-wide policy was to manipulate numbers to meet management's targets; multiple former employees' descriptions of how this was done ("scrunching," "boosting," being "more optimistic" and "clawing back" lost value) corroborate Plaintiffs' claims. As Rhodes explained, the direction was to be "sneakily optimistic with respect to *any of the variables that went into the total*." ¶114.

The Complaint also details Rhodes's knowledge of the Permian. *See* ¶¶105, 107 (contact and discussions with reservoir engineers who forecasted Permian proved reserve); ¶180 (Permian engineer telling him Exxon could not meet 2024 projections); ¶106 (attendance at monthly engineer meetings); ¶108 (personal review of Permian reserves).[9] Likewise, FE3 served in a role specific to the Permian (¶120), received directions to fraudulently boost Exxon's reserves (like Rhodes) (¶121), and witnessed fraudulent changes to his own reports (¶122). Defendants' argument that XTO reserves are "not tied to the Permian at all" (MTD 17) ignores the fact that Permian reserves are XTO reserves. ¶¶47, 49.

### b.      Valuations of Proved Reserves Are Not Opinions

### i.      Proved Reserves Are Statements of Fact

Proved reserves are not opinions, and Defendants' out-of-Circuit cases do not address oil and gas reserves. MTD 18-19. Companies reporting estimated proved reserves are required to ensure that their estimates are reported with "reasonable certainty" – usually 90%. ¶317. The high level of certainty required for proved reserves counsels against a finding that they are opinions.

Proved reserve estimates are GAAP figures, subject to rigorous scrutiny. ¶¶317-40. As a GAAP metric, proved reserves are facts. *See Ramirez*, 334 F. Supp. 3d at 848 (holding that failure to take impairment and overstating a GAAP metric was a fact statement); *Barrie v. Intervoice-*

---

[9] *In re Franklin Bank Corp. Sec. Litig.*, 728 F. Supp. 2d 364, 389 (S.D. Tex 2011) (MTD 18) is inapt, rejecting allegations based on "non-specific statements" of a witness who was not present at relevant meetings.

*Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005) (sustaining claims for accounting violations). In

*Ramirez*,[10] the plaintiff alleged that Exxon misled the public about business risks posed by climate

change. *Ramirez*, 334 F. Supp. 3d at 840. By year-end 2015, Exxon's Rocky Mountain Gas

Operations were impaired. *Id*.  The court disagreed with Exxon's contention that its overvaluation

was a non-actionable opinion, taking particular issue with Exxon's disregard for binding law:

> ExxonMobil failed to cite binding case law from the Fifth Circuit, which has held that alleged accounting violations are sufficient to plead material misstatements. *See Barrie*, 397 F.3d at 257-58 (plaintiff pleaded material misstatement by alleging with particularity defendants violated GAAP). Thus, based on Fifth Circuit case law, ExxonMobil's alleged GAAP violation and its failure to recognize the impairment of the Rocky Mountain Dry Gas Operation are not opinion statements but create a fact question.

*Id*. at 847-48. The court also found that Exxon's failure to disclose that its Canadian Bitumen

Operations were operating at a loss violated GAAP and was an actionable omission. *Id*. at 849.

Here, as in *Ramirez*, Exxon ignores the law in miscasting proved reserves as opinions. MTD 18.

### ii.   Even if Opinions, Proved Reserves Statements Satisfy *Omnicare*

Even if the proved-reserve statements were opinions, they are actionable because: (1) "the

opinion expressed was not sincerely held," (2) it "contain[ed] embedded statements of untrue fact,"

*or* (3) it "omit[ted] material facts [that] … conflict with what a reasonable investor, reading the

statement fairly and in context, would take from the statement itself." *Omnicare*, 575 U.S. at 176.[11]

Here, each analysis independently demonstrates that the proved reserve statements are actionable.

---

[10] Defendants relegate *Ramirez* to a footnote, noting that the defendants in that case moved for reconsideration. MTD 18 n.6. This is of no consequence; *Ramirez* remains good law. In any event, that motion is about facts derived from an AG investigation that the New York Supreme Court ultimately did not credit. This issue has no bearing on the legal question at bar.

[11] Contrary to Defendants' assertion (MTD 19), *Edgar v. Anadarko Petroleum Corp.*, 2018 WL 3032573, at *9 (S.D. Tex. June 19, 2018) never once mentions a new "two-prong" test that supersedes *Omnicare*, and Defendants fail to address *Omnicare*'s holding that opinion statements are actionable "if they contain embedded statements of untrue facts." *Omnicare*, 575 U.S. at 176.

*First*, Defendants did not sincerely believe that the proved reserves were accurate. The whistleblower and other former employees demonstrated Defendants' knowledge of falsity, including the directive from senior management to use false drilling assumptions (¶¶256-58) and a Company-wide policy of reporting fraudulent proved reserves. ¶¶96-98. Exxon decided to "kick the can down the road" instead of taking a write-down. ¶¶135-36. Further, expert analysis demonstrates that Exxon's growth plan which supported the proved reserves was not feasible based on data available to Defendants at the time the statements were made, belying any inference that they sincerely believed the accuracy of the reserves. ¶¶81-87, 166-70, 218-26; *see Edwards v. McDermo't Int'l, Inc.*, 2021 WL 1421603, at *7 (S.D. Tex. Apr. 13, 2021) (failure to report additional costs that defendants knew about rendered opinion statements actionable); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, [69]1 (5th Cir. 2014) (confidential-witness testimony that oil had not been found at a particular drilling location contradicted defendants' statements that the wells were "commercially viable," and the statements were actionable as a result).

*Second*, the total proved reserve estimates contained "embedded statements of untrue fact." In *Ramirez*, the court held that Exxon's failure to include the proxy cost of carbon in its impairment analysis resulted in its impairment determination containing an embedded statement of untrue fact, namely, the missing proxy cost. 334 F. Supp. 3d at 848. Similarly, the proved reserve estimates in Exxon's SEC filings included the Permian proved reserve estimates which were calculated based on false drilling assumptions and were the product of a fraudulent process. ¶¶59-60.

*Third*, Defendants omitted material facts relevant to their estimates of proved reserves which conflicted with what a reasonable investor would have understood the statements to mean. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) ("[W]hen a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably

should know of different material facts that were omitted, liability under Rule 10b-5 may follow."). In *Ramirez*, the defendants' opinion that Exxon's assets were not impaired "necessarily" omitted particular facts that were part of the basis for the opinion. *Ramirez*, 334 F. Supp. 3d at 848.  Here, Defendants omitted that the drilling assumptions used to calculate the reserves were false, and that the estimates were the product of a fraudulent process. ¶¶59-80; *Omnicare*, 575 U.S. at 176.

### 3.      The Complaint Alleges That Exxon Inflated Its Resource Base

The Complaint alleges that Exxon's resource base was materially overstated during the Class Period. ¶¶357, 365, 394. Defendants stated that the Permian resource base was "more than" 9 billion, approximately 9.5, and then 10 billion oil-equivalent barrels "and growing." ¶¶357, 365, 394. These statements were false for two reasons. *First*, the resource base included the proved reserves, which were false, as described in Section III(A)(2)) above. *Second*, the resource base numbers were the product of a fraudulent process whereby Exxon never revised down its resource base, even when it knew that the underlying assumptions were wrong. ¶¶124-27, 131-32.

Defendants argue that it is "more plausible to assume" that even if the proved reserves were overstated, the overstatement was properly accounted for elsewhere in the "resource base" calculation. MTD 2, 19-20. But the comparative plausibility of inferences is not relevant to evaluating falsity. Plaintiffs need only have alleged a "reasonable" inference. *Lormand*, 565 F.3d at 232. Defendants are not now entitled to favorable inferences. *Id.*; *see Barrie*, 397 F.3d at 254-55. Even if it were acceptable to weigh competing inferences, Defendants' interpretation is not plausible given the Complaint's allegations that the resource base calculations were themselves the product of a fraudulent process. ¶¶124-27. Defendants argue that the resource base fraud was limited exclusively to "Arkoma shale play" (MTD 20), but this is not plausible either given the allegations of a Company-wide policy of manipulating the numbers. *See* ¶¶96-134.

Defendants contend that Plaintiffs "merely challenge Exxon's assumptions about how

quickly it could produce" oil. MTD 20. This argument ignores Plaintiffs' extensive allegations that Exxon was finding less oil in the Permian than it stated. ¶¶64, 129-32, 189-90, 192, 210-15.

Defendants also argue that statements regarding Exxon's resource base are forward-looking and opinions. These arguments fail for the same reasons as their arguments concerning proved reserves. *Supra* III(A)(2). The resource base number is a measure of the Company's oil-equivalent assets, that is, "proved reserves, plus other *discovered* resources that are expected to be ultimately recovered." ¶46. Warnings regarding "future . . . resource recoveries," MTD 21, do not insulate this valuation of current assets. Proved reserves is a GAAP-metric and therefore not an opinion or forward looking. *See supra* III(A)(2)(b)(1). Likewise, "discovered resources" is a quantified metric that does not speak to how fast but rather how much. The cautionary language accompanying the resource-base statements was itself misleading because it omitted that the risks had already materialized. *Supra* III(A)(1). Plaintiffs allege with particularity that Defendants knew the statements were false when made. *Infra* III(B)(1).

### 4. Misleading Statements Regarding Exxon's Competitive Position in the Permian Are Actionable

The Complaint alleges that Defendants made materially misleading statements about Exxon's competitive position in the Permian by generating slides with bar graphs depicting Exxon as the leader, when, in fact, it lagged behind other Permian operators. ¶¶355-56, 367-68. Defendants ignore the significance of their hand-picked data points as reflecting a cover-up and a consciousness of the fraud. Instead, they point to a disclosure that the slides included data from other regions and contend that competitor data was publicly available information. MTD 24-25.

Neither argument is availing. While Defendants assert that they disclosed the use of data from other regions, nowhere did they disclose that the "use" of this data dramatically distorted the results by somehow vaulting Exxon from seventh place to first place. Plus, the slides simply

22

excluded all of the Permian operators who were ahead of Exxon. ¶¶356, 368. In presenting the first of the relevant slides on March 7, 2018, Chapman told investors that Exxon had a "truly unique position in getting value out to the Permian versus anybody else in the industry." ¶355. But Exxon was not even a top-five competitor in the area as measured by either total horizontal wells or production, let alone number one. ¶356. Some modest disclosure about out-of-region data does not negate the inference that these graphs were intended to and did mislead; at most, it raises a fact issue as to whether a reasonable investor could have understood that half-disclosure to reveal the actual truth about Exxon's competitive position (they could not). If Defendants had used just Permian data and included the operators who were ahead of Exxon, investors would have seen that Exxon trailed many competitors in the Permian – a graph not consistent with the Green Blob goals.

Defendants also argue that because the data in the slide was compiled from public sources, investors could "decide for themselves how Exxon stacked up against its competitors." MTD 25. But investors are entitled to take corporations and their officers at their word and are not expected to research the basis for public statements. Plaintiffs uncovered Defendants' chicanery only after consulting with an oil and gas expert with access to proprietary data (¶81). Ordinary investors are entitled to rely on Defendants' statements. *See Pub. Emps.' Ret. Sys. Of Miss. V. Amedisys, Inc.*, 769 F.3d 313, [32]3 (5th Cir. 2014) ("complex economic data understandable only through expert analysis may not be readily digestible by the marketplace"). By Defendants' logic, companies would be able to say anything at all, so long as investors could theoretically uncover contradictory facts by retaining experts with proprietary data.

### 5.     Statements About Progress in the Permian Are Not Puffery

The Complaint alleges misstatements about Exxon's growth and progress in the Permian. Defendants isolate these misstatements, taking them out of context, and contend they are

"puffery." MTD 22. To start, puffery is a materiality determination,[12] which is inappropriate now. Further, Defendants' statements and the market's reactions demonstrate the materiality of the Permian. ¶¶55-58, 149, 441-42, 445-46, 450-51.

Defendants distort and isolate the statements as just "adjectives and adverbs" creating a "generalized, positive" impression.  MTD 22. That is wrong here, as it was in *Lormand*. As explained below, Defendants' statements convey concrete information and are actionable. *See infra, III(A)(5)(a); Lormand*, 565 F.3d at 249 n.14; *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698⁻99 (5th Cir. 2005) (finding "statement of fact" where, taken in context, it created a false impression); *Brody v. Zix Corp.*, 2006 WL 2739352, at *3 (N.D. Tex. Sept. 26, 2006) (statements containing "concrete factual information" not "mere puffery") (citing *Southland*, 365 F.3d 353 at 372).

### a.       Drilling Progress Statements

The Complaint alleges that Defendants falsely touted Exxon's drilling progress. ¶¶350, 391, 400, 401, 405, 407, 408, 412, 415, 425. Exxon argues that these statements are puffery because many of them contain words like "on track," "decent," "continuing," and "optimized," and "within the range of what we have expected." MTD 22, 23. "On track" statements are actionable statements of fact. *Supra* III(A)(1). Further, by decontextualizing them, Defendants conceal that these statements related to Exxon's current progress toward achieving its concrete goal of 1 million barrels per day by 2024, further showing they are actionable.  MTD 22; ¶¶228-32, 359, 412, 415; *Plotkin*, 407 F.3d at 698-99 ("designed to create an impression that a substantial payoff would soon flow").

Defendants' authority, including *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F.

---

[12] *See Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 599 (W.D. Tex. 2014) (misrepresentations about strength of company and its product material and thus, not puffery).

24

Supp. 2d 151, 162 (N.D. Tex. 2007) (cited at MTD 22), establishes that referencing current facts to assert, or even imply, that a goal is achievable carries those statements outside the puffery realm. In that case, this Court held that statements tethered to specific future goals are concrete, actionable fact statements. *Id.*; *see also Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 660 (W.D. Tex. 2006) (projection based on "current activity levels, as well as our expectations for increased drilling and workover activity later this year" not puffery); *Brody*, 2006 WL 2739352, at *4 ("goal of 10,000 deployed physicians by end of 2004" not puffery).[13]

Moreover, Defendants' reliance on the holding of *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003), that "making steady progress" is a "generalized positive categorization" is misguided. MTD 22. Courts applying *Rosenzweig* have clarified that its holding does not pertain to statements that reference, or even imply, concrete targets. In *Cannon*, for example, the court held that progress statements "tethered" to current production levels are actionable, explaining:

> Some of Cannon's promises of progress, however, were tethered to statements that the Columbus plant was "currently producing additional oil" and "turning the corner toward steady-state operations." These factual statements about current operations were a basis for projecting that the Columbus plant would produce 1 to 2 million gallons in 2013. Cannon did not simply state that KiOR was generally "well positioned" or ready to "turn the corner." Rather, Cannon's specific and concrete statements about KiOR's progress toward million-gallon yields described objectively verifiable, current facts.

*Cannon*, 184 F. Supp. 3d at 493. Similarly, in *City of Pontiac General Employees' Retirement System v. Dell Inc.*, "generalized, positive statements" that, by implication, induced analysts to expect certain quarterly revenue were not puffery. 2016 WL 6075540, at *3 (W.D. Tex. Sept. 16, 2016). Here, too, Defendants' statements about drilling times supported their production, and "lacked a reasonable basis" as Exxon was experiencing longer than expected drilling times, drilling

---

[13] Defendants' authority is inapt. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("pretty good position"); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("strong," "experienced," and "capable" team).

25

delays, and quality problems. *Id.* at \*3 (no reasonable basis where "growth was stagnant, shipments were stalling, and inventories were stockpiling"); ¶¶63-73, 81-88. The statements are actionable.

### b.    "Unique Position" Statements

In context, Defendants' statement that Exxon was in a "truly unique position" is not puffery. MTD 22; *Plotkin*, 407 F.3d at 698. This statement was accompanied by a graph intentionally generated to depict Exxon, falsely, as superior to its peers in the Permian. ¶355. Because the statement of Exxon's "unique position" was supported by cherry-picked data and quantified metrics, it is factualized. *Brody*, 2006 WL 2739352, at \*4.

### c.    Reports of Increases in Drilling Activity

Defendants' statements regarding "increased" and "ramped up" drilling activity are actionable. MTD 23; ¶¶363-64, 378-79. Like the "on track" statements, statements about activity increases are linked to the concrete benchmark of past performance, and are therefore factual. Moreover, increased drilling in the Permian was material to investors, and Exxon's overall growth depended on its Permian drilling. Exxon also expressly tied its increases in Permian proved reserves to "increased drilling activity." ¶140. These statements were both factual and material.[14]

### d.    Statements Regarding Exxon's Reserve Process

Statements that the reserve process was "well-established," "disciplined," and "rigorous" are actionable. MTD 23. Confidential sources are sufficient to support the falsity of alleged misstatements in the context of a puffery analysis. *Brody*, 2006 WL 2739352, at \*4-5. Moreover, these statements are not just "rosy predictions;" they are "statements of existing fact" that Defendants knew to be untrue at the time they were made. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir.

---

[14] *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570 (N.D. Tex. 2021) had no allegation that the statements were untrue and the omitted facts were immaterial.

2000)) ("[M]isstatements regarding risk management, discipline, monitoring and credit quality are not 'puffery' where … they were 'misrepresentations of existing facts'"). Plaintiffs have pled detailed facts demonstrating that these statements were false and that Exxon's reserve process was fraudulent based on statements from former engineers directly involved in that process. ¶¶101-34. Further, statements regarding the "rigorous" reserve process are not puffery because the reserves process was "a cognizable process that delivers an outcome," namely, the "objectively measurable standard" of the stated proved reserves. *See Sanders v. Realreal, Inc.*, 2021 WL 1222625, at \*10 (N.D. Ca. Mar. 31, 2021) (statements of "rigorous" process not puffery).

In addition, the statements themselves establish that Defendants were aware they were false at the time they were made. *Abramson*, 965 F.3d at 174 (puffery actionable where speakers knew statements were untrue). As stated in the 2019 10-K, "After all changes are made [to the reserves estimates], *reviews are held with senior management for final endorsement . . . Reserve changes are made within a well-established, disciplined process … culminating in reviews with and approval by senior management*." ¶260. Likewise, Exxon stated that its "long-standing, rigorous process" for estimating proved reserves ensured "*management accountability*." *Id.*

### e.    Well Quality Statements

Defendants argue that their statements about Permian well quality are puffery. But it is hard to imagine a more germane and crucial assessment that Exxon might make about its assets than the quality of its wells. The wells were the driver of oil production. That is why Defendants said Exxon's Permian wells were "extensive" and supported Exxon's "production profile" and "volumes ramp." ¶¶401-04. And why Exxon stated that "the well quality that's underpinning those growth plans is very, very high quality is kind of the heart of the Permian . . . and it results in some very good financial metrics." ¶353. *See also* ¶¶432-34 (drilling the "best wells" and "drilling times [were] reducing"). Well quality purportedly underpinned the Permian growth plan. ¶¶289-91, 353.

27

This is not puffery. *Stone*, 26 F. Supp. 3d at 599 (materiality defeats puffery).

Moreover, former employee reports confirm the wells' poor quality, demonstrating that Defendants' statements were unmoored from reality. *Brody*, 2006 WL 2739352, at *5. Exxon's Permian wells were plagued by performance issues, and drilling times were longer than expected. ¶¶63-73 (engineering coordinator Wingo referencing long drilling times; project manager Wachsmann pointing to drilling problems). According to Contractor Karl Ryjord, Drilling Consultant Ryan Wells, Rig Move Specialist Jeff Biddle, and others, longer than expected drilling times made the production goal impossible. ¶¶186-97. Permian drilling supervisor FE1 and drilling consultant FE2 confirmed that Exxon's Permian drilling assumptions were unrealistic because of the quality of Exxon's wells, with FE1 stating that drilling there was "ugly, nasty stuff." ¶¶69-70. Multiple sources reported additional problems including zones depleted of oil, water and mud in wells, poisonous gas, rig shutdowns, and casings getting stuck. ¶¶63-64. FE2 described "hole problems," where formations were taking on fluid. ¶66. FE4 performed a Decline Curve Analysis, and he told Exxon the number of wells he was told was possible in the area was not. ¶¶130-31.

### B.   PLAINTIFFS HAVE ADEQUATELY PLED SCIENTER

#### 1.   The Complaint Alleges a Strong Inference of Scienter

Plaintiffs may plead scienter by alleging an "intent to deceive" or "severe recklessness." *Spitzberg*, 758 F.3d at 684; *Plotkin*, 407 F.3d at 697. Factual allegations are taken as true. *Cannon*, 184 F. Supp. 3d at 458; *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 405 (5th Cir. 2001). Courts must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Ramirez*, 334 F. Supp. 3d at 845. A scienter inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324; *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 711 (W.D. Tex. 2010). "[A] tie favors the

plaintiff." *Spitzberg*, 758 F.3d at 686.

An individual's scienter is imputed to the company if he made or "participated" in making the statements. *See Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 879, 884-85 (W.D. Tex. 2014). Participation includes: "ordering or approving [] statements or furnishing information or language for inclusion therein or omission therefrom, or the like," "or being a cause of the making of" the statement. *Southland*, 365 F.3d at 366-67; *Lee*, 29 F. Supp. 3d at 881-85.

Here, in addition to the scienter of each Executive Defendant, discussed below, the scienter of Melissa Bond, the Delaware development manager who directed employees to use false drilling assumptions (¶¶175-77), is imputed to Exxon (¶252). *See Lee*, 29 F. Supp. 3d at 882 (corporate scienter from operations manager, who "furnished information for inclusion in the false statements with scienter, and . . . was a cause of the making of the misrepresentations").[15]

***Senior Exxon management directed employees to inflate the Company's reserves and to use false drilling assumptions in their valuations.*** Pressure came down from the reserves group to Exxon's reservoir engineers to boost the reserves. ¶¶109-19, 254. As Rhodes described, one way to boost the Permian reserves was to use the "scrunching technique" that made decline curves smaller and the area under the decline bigger. ¶114. FE3 confirmed that reserves reporting at Exxon consisted of being told what the number was, and then told to "make small adjustments to many decline curves to reach the number for a basin or an asset or an area." ¶121. Binns confirmed that "vice presidents or management-level officers would say that they needed a number to be 'X,'" and the employees would have to scramble to make it 'X.'" ¶134; *see* ¶¶128-33. According to the whistleblower, Bond pressured her team to use a false drilling "learning curve" to overvalue the

---

[15] Defendants question Bond's "executive" status (MTD 41), but corporate scienter is not confined to "executives," and Defendants do not argue that Bond's scienter may not be imputed to Exxon. Bond was a "Career Level 30" or higher executive who communicated with the CEO. ¶267.

Delaware by $10 billion saved in a file called "This is a Lie," (¶¶175, 257), which was confirmed by Rhodes and FE4 (¶¶181-82). These allegations support a strong inference of scienter. *See In re Fleming Cos. Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *28-29 (E.D. Tex. June 16, 2004) (scienter supported where defendant directed manipulations); *In re Daou Sys. Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (scienter where "top executives actually directed the improper" practices); *In re VeriFone Hldgs., Inc. Sec. Litig.*, 704 F.3d 694, 709 (9th Cir. 2012) (same).

***Exxon used cherry-picked data to falsely portray itself as the leader in the Permian.*** Exxon intentionally skewed data to show that it was number one in the Permian, when the reality looked much different:



¶82. Exxon's decision to exclude all of the Permian operators that were ahead of Exxon, and use non-Permian data to skew the results supports a strong inference of scienter. *In re SunPower Sec. Litig.*, 2011 WL 7404238, at *4 (N.D. Cal. Dec. 19, 2011) ("pattern" of manipulating data supports scienter). To discover the truth, Plaintiffs needed an expert with access to proprietary data. ¶81.

***Senior Exxon management's review, approval, and access to reports and data.***

Reserves. Senior management was responsible for "oversight of the reserves estimation process" and "final endorsement" of the reserves, "culminating in reviews with and approval by senior management." ¶¶259-60. Exxon touted "management accountability in all reserves

bookings." *Id*. Management's review and oversight of the reserves process, and approval of reserves supports scienter, because that process was rife with manipulation and employed false assumptions. *Venator*, 2021 WL 2980581, at \*26-27 ("substantial indication" that defendants "had access to regular information" about relevant issues shows scienter).

Defendants contend that their own disclosures about "senior management" review are not specific enough to be credited, and that the Complaint fails to allege that management "had access to earlier drafts or were otherwise able to tease out how assumptions had changed." MTD 29. But the Complaint alleges the "active" involvement of Ortwein in reserve reports (¶122). It also details how reservoir engineers were directed to manipulate the numbers in reserve reports, by whom, and the reporting structure (¶¶108-22), and that engineers submitted accurate reserves but then pressure came down to boost them (¶112), or the reserves were changed to be "way off and crazy" from what they submitted (¶122). At a minimum, Woods, Ortwein, and Bond had access to the reserves and production data (¶¶122, 130). Ortwein had the ability to change the yearly reserves forecasts, which were, in fact, fraudulently changed (¶122). Indeed, Exxon's disclosures say that senior management "review[ed] annual changes." ¶260.[16]

Drilling and Production. As noted above, Exxon's drilling data showed that it was impossible to achieve the production goal. Twice per day, every day, senior management received reports on drilling in the Permian. ¶¶262-64. Wells explained that the reports could not possibly be more detailed, and in fact, Exxon was "anal" about how it wanted the reports to look. ¶263. Chapman corroborated this, "We're micromanaging every single rig." *Id*. Senior management had

---

[16] Defendants' authority is inapt. *See In re Odyssey Healthcare, Inc. Sec. Litig.*, 424 F. Supp. 2d at 889-90 (double assumptions that program would have detected fraud and defendants would have been aware of it due to positions); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 640 (S.D. Tex. 2018) (regulation requiring review of reports).

access to data—including reserves and production data—reflecting the Company's drilling progress in the Permian. ¶265. Bond gave the direction to use false drilling assumptions. ¶257. FE4 specifically confirmed that Bond and Woods spoke to each other all the time; that information from Bond to Woods would have been "very transparent," and  given Exxon's "militaristic" system of delegation of authority, Woods could access data "perfectly well." ¶267. Reports and access to data are "classic" facts demonstrating scienter. *See Venator*, 2021 WL 2980581, at \*26-27; *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at \*6 (E.D. Tex. Sept. 29, 2015); *Brody*, 2006 WL 2739352, at \*7 (tracking reports); *In re Landry's Seafood Restaurant, Inc.*, 2001 WL 34115784, at \*9 (S.D. Tex. Feb. 20, 2001) (daily reports); *see Ramirez*, 334 F. Supp. 3d at 852-53 (review and discussion of publications).[17]

Defendants contend that the drilling reports would have shown that Exxon's "learning curve"—i.e., the assumptions saved in a file called "This is a Lie"—was correct because Exxon reduced its drilling time overall. MTD 30. But Plaintiff's expert specifically confirmed that the production goal was not achievable, even with the reduction in drilling times, which Exxon knew or was severely reckless in not knowing based on its own data. ¶169. Expert analysis further shows that Exxon decreased its drilling time in 2018 and 2019 by a mere few days (¶¶83-84, 218-19), which is consistent with the whistleblower's account that the 2018 and 2019 drilling assumptions were false and too aggressive. The same expert analysis shows that Exxon's drilling times were far longer than many other Permian operators' (*id.*), rendering their statements to investors touting drilling efficiencies at least severely reckless when made, and corroborating that the goal was not achievable. In all events, a decrease in drilling times does not somehow negate Exxon's intentional

---

[17] Consistent issues pervading the entire Permian operation are different than "specific safety issues on particular lines." *See Plains*, 307 F. Supp. 3d at 642. Likewise, in *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017), "internal corporate reports alone" were insufficient.

decision to use false assumptions that were a "Lie."

Defendants are also not entitled to an inference that they did not read the reports, particularly given their "focus" on and the "importance" of the Permian and drilling times. *See Anadarko*, 514 F. Supp. 3d at 956 (inference of scienter "at least as strong" as inference that defendants did not read reports).

**The Executive Defendants personally toured Exxon's Permian Basin operations.** The Executive Defendants touted their hands-on knowledge and understanding of the Permian Basin operations through personal visits to the area. ¶¶270-73. These facts support a strong inference of scienter. *See Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *14 (D. Conn. Mar. 31, 2018) ("personal trips" support scienter); *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 608 (E.D. Va. 2015) (tour of operations supported scienter); *McNamara v. Bre-X Minerals. Ltd.*, 197 F. Supp. 2d 622, 681, 693 (E.D. Tex. 2001) (that "[Defendant] had been to [the facility]" raised "strong inference" of scienter).

Defendants' arguments that their visits are not "sufficient" fail (MTD 40-41), where they touted their hands-on knowledge from the visits. *Plains*, 307 F. Supp. 3d at 642, in contrast, did not involve personal field visits by executives.

**A corporate culture of refusing to take necessary write-downs and inflating valuations pervaded Exxon.** Exxon's culture—imposed from the top down—refused to take write-downs and inflated figures that investors rely on. ¶¶274-77. Former CEO, Rex Tillerson, famously stated, "We don't do write downs." ¶275. Senior management, including Woods and Williams, was known as the "God Pod," because they impose decrees that employees must follow. *Id*. Rhodes detailed the Company's "kick the can down the road" policy of refusing to write down reserves, or revise down the resource base. ¶276. FE3 corroborated this, "ExxonMobil never ever writes

33

down reserves," as did the whistleblower report. *Id.* Exxon's well-documented policy of refusing to write down and falsely inflate its valuations—and an executive management team known to rule by decree—supports a strong inference of scienter, as courts credit scienter allegations based on a company's "tone at the top." *See Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *4-5 (N.D. Cal. May 17, 2017); *Fresno C'nty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551-53 (S.D.N.Y. 2017). In response, Defendants cite out-of-circuit authority to contend that the allegations regarding Exxon's corporate culture are not relevant as a matter of law. MTD 31. But *In re Hertz Global Holdings Inc*, 905 F.3d 106, 119-122 (3d Cir. 2018) is inapposite. Here, the allegations are ample, numerous, and further bolstered by the specific fact that Exxon employees repeatedly received direct instructions from management to manipulate reserve numbers. ¶128.

*Former Exxon employees confirm that it was common knowledge internally that Defendants' "Green Blob" goal was impossible, and expert analysis corroborates this fact.* According to the whistleblower, "no one [he] knew" thought Woods's "green blob" goal was possible. ¶279. Rhodes, Wachsmann, and Noland corroborated this, describing meetings where employees discussed the implausibility of the "Green Blob." *Id.*; ¶157. These facts support a strong inference of scienter. *KB Partners I, L.P. v. Barbier*, 907 F. Supp. 2d 826, 831 (W.D. Tex. 2012) (crediting meetings); *Christine Asia Co. Ltd. v. Ma*, 2017 WL 6003340, at *2-3 (2d Cir. Dec. 5, 2017) (crediting meetings where threat discussed); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (crediting "widespread knowledge" of problems); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009) (same).

Moreover, Plaintiffs' expert's feasibility test based on Exxon's data confirmed that the "green blob" goal was not achievable. ¶¶292-93. Expert analysis bolsters scienter. *Ramirez*, 334 F. Supp. 3d at 841 (crediting facts in expert opinion). Defendants' argument that the expert analysis

34

was performed ex post facto (MTD 36-37) fails because the data was Defendants' own and was known to them when they spoke. ¶¶81, 167; *see id.* Defendants' argument that experts may not opine on state of mind is irrelevant (MTD 36-37) because the analysis shows that the stated goal was not achievable. Further, the facts revealed by the expert's analysis, and not the expert, speak to Defendants' state of mind.

Defendants also contend that Exxon's "boots on the ground" employees' "common knowledge" cannot be credited. MTD 28. But common knowledge supports scienter particularly where the Complaint alleges that: the truth was communicated to Woods and Ortwein in meetings they attended (¶¶159, 163); it is supported by expert analysis (¶¶292-93); and Defendants overrode what they heard to generate different results (¶¶57, 82, 355, 367).[18] Indeed, the fact that multiple former employees with boots on the ground corroborate the same allegation bolsters scienter. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 301 (S.D.N.Y. 2018).

***The Executive Defendants held themselves out as knowledgeable about Exxon's production in the Permian.*** Woods, Chapman, Hansen, and Williams regularly spoke to the market about the importance of the Permian to Exxon, referencing their "understanding" or "delineation" of the Permian at least 25 times. ¶282. *See Ramirez*, 334 F. Supp. 3d at 856 ("in-depth discussions" with analysts support scienter); *Southland*, 365 F.3d at 380 ("touting increased revenues and earnings" supports scienter); *Nathenson*, 267 F.3d at 425 (CEO's scienter pled where statements related to "obviously important" part of the company); *In re BP P.L.C. Sec. Litig.*, 843

---

[18] Defendants' cases are inapposite. *See Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, at 432 (S.D. Tex. 2020) (no information "to or about any Individual Defendant"); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 681 (9th Cir. 2005) (no allegation that sources "were in a position to know what management knew"); *Nardy v. Chioptle Mexican Grill, Inc.*, 2019 WL 3297467, at *16 (D. Colo. Mar. 29, 2019) (what was "widely known" was not the fraud).

F. Supp. 2d 712, 782-83 (S.D. Tex. 2012) (repeated statements weighed "strongly in favor of the inference that [he] paid special attention to" it or was reckless); *Landry's*, 2001 WL 34115784, at *9 ("Defendants have admitted that they closely monitored . . . trends on a daily, weekly, and monthly bases and that they focused on detecting negative trends and efforts to cure them."). Defendants contend that the statements "reflect ExxonMobil's belief that it was learning more about the properties it acquired in 2017." MTD 40. Plaintiffs agree; and what Defendants were learning conflicted with their statements.[19]

*Defendants denied problems in response to analysts' questions.* Defendants repeatedly denied problems in the Permian. ¶¶231, 285 (Chapman: "nothing to flag" and "confident that we can meet what's in green"); ¶¶286-87 (Woods: "clearly on track" and "we like what we see around [] well performance"). Such denials support scienter. *See Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009); *In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 8, 2019). Defendants contend that they believed what they said and that only inconsistent statements support scienter. MTD 42-43. But they are not entitled to this inference now, given the contemporaneous facts that contradicted their statements. *Alaska Elec. Pension Fund v. Asar*, does not impose an "inconsistent statement" requirement. 768 F. App'x, 175, 188 (5th Cir. 2019).

*The Permian constituted one of Exxon's "core operations."* The importance of the Permian to the Company's business and financial success bolsters scienter particularly because it is coupled with the numerous other scienter allegations. As of mid-2019, the Permian was the largest oil field in the U.S., and Defendants continually touted its importance. ¶290 (Chapman:

---

[19] Exxon's authority is inapt. *See Ind. Elec. Workers' Pens. Tr. Fund IBEW v. Shaw Grp, Inc.*, 537 F.3d 527, 539 (5th Cir. 2008) (general statement that CEO knew everything); *Alaska Elec.*, 768 Fed. Appx. at 188-89 ("we are monitoring" statement insufficient, but similar statements contributed to scienter).

"really important"); *id.* (Williams: "obviously, we're putting a lot of focus in the Permian right now"); *id.* (Woods: "[c]ontinued ramp up in the Permian" "a significant driver of [] growth"); *id.* (Swiger: Exxon's "largest resource."). *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (importance of misrepresented information supports scienter); *Plotkin*, 407 F.3d 690, 700 (same); *Venator*, 2021 WL 2980581, at *27 (touting facility and frequent reference to it supported core operations); *Stone*, 26 F. Supp. 3d at 600 (statements about important product show scienter); *In re Triton Energy Ltd. Sec. Litig.*, 2001 WL 872019, at *10-12 (E.D. Tex. Mar. 30, 2001) ("most important assets" support scienter).

Defendants cite cases for the proposition that scienter may not rest on a defendant's mere position unless "special circumstances" are met, and then argue that the Complaint does not allege those circumstances. MTD 34; *Cannon*, 184 F. Supp. 3d at 459-60. This is a straw man because the Complaint does not rely on Defendants' positions for scienter. In any event, the argument fails. *First*, courts have applied the core operations doctrine to very large companies like Exxon. *See Venator*, 2021 WL 2980581, at *27; *Anadarko*, 514 F. Supp. 3d at 956 ("one of the world's largest independent oil and natural gas exploration and production companies"). *Second*, the Complaint alleges that the Permian was critical to Exxon's turnaround (¶¶49-52) or "continued vitality." *See Plotkin*, 407 F.3d at 599, 600. Further, where, as here, a sub-business is particularly important to an overall enterprise, the company need not be a "one product company" to support a finding of scienter. *See Venator*, 2021 WL 2980581, at *27. *Third*, Plaintiffs have alleged a host of facts demonstrating scienter, which include the factors cited in Defendants' cases, such as exposure to documents, conversations, and meetings. *See Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 754 (S.D. Tex. 2001); *Landry's*, 2001 WL 34115784, at *9 (documents, conversations, and meetings support scienter). *Fourth*, internal inconsistency is not required to show scienter. *See*

37

*Venator*, 2021 WL 2980581, at *27. Indeed, consistency could just as plausibly indicate Defendants' commitment to and the importance of the false Permian growth story.

**Defendants' motive, opportunity, and financial benefit from the fraud support scienter.**

Executive Compensation. Woods, Chapman, and Williams had economic motives to mislead investors: their executive compensation depended in part on Exxon's progress toward its Permian goal, and they each purportedly achieved those benchmarks and obtained their compensation during the Class Period. ¶¶294-98. Exxon tied a portion of executives' compensation directly to "progress towards strategic objectives" and "financial and operating performance," which included return on average capital employed (ROCE) and cash flow. ¶295. Exxon described "accelerated pace of development in the Permian" as a key "strategic objective." ¶296. Exxon also stated that it was "GROWING EARNINGS, CASH FLOW, AND ROCE BY . . . PROFITABLY GROWING PERMIAN PRODUCTION TO MORE THAN 1 MILLION OIL-EQUIVALENT BARRELS." *Id.* (emphasis in original).

Personal financial gain—while not required to plead scienter—can weigh in favor of scienter. *Tellabs*, 551 U.S. at 325; *Stone*, 26 F. Supp. 3d at 607 ("A motive to defraud based on compensation incentives such as bonuses and dividends also may strengthen an inference of scienter."); *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *7 (W.D. La. Aug. 17, 2007) (defendants "benefitted financially from the bonus system" tied to fraud). Plaintiffs do not merely allege that Defendants generally stood to fare better if Exxon did (MTD 37); rather, Defendants' compensation was specifically tied to progress in the Permian. This differentiates them from "the executives of virtually every corporation in the United States" (*id.*).

Further, Woods had a personal motive to commit fraud, as he was expected to turn Exxon around. *See Shenwick v. Twitter*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) ("pressure to live

38

up to the targets announced" supported strong inference of scienter). This external pressure also extended to other Defendants as the Permian was at the center of Exxon's growth plans. ¶¶56-58.

Suspicious Stock Sales. The Complaint details Defendants Liam Mallon (VP & President), Hansen, and David Rosenthal (VP & Controller)'s insider sales of Exxon stock, which were "in suspicious amounts or at suspicious times," and thus, "presumptively probative of bad faith and scienter." ¶¶299-306; *Rubinstein v. Collins*, 20. F.3d 160, 169 (5th Cir. 1994); *Brody*, 2006 WL 2739352, at *6-7 (same); *Rougier v. Applied Optoelectronics*, *Inc*, 2019 WL 6111516 (S.D. Tex. Mar. 27, 2019) (same). The sales occurred in suspicious amounts (8%-25% of total holdings), were out of line with prior trading, were not pursuant to 10b5-1 plans, and occurred shortly before the corrective disclosures.  ¶¶299-306.

Defendants' arguments (MTD 38) are unavailing.  *First*, Defendants argue that "where only a few of the insider defendants sell stock during the class period, even unusual sales do not give rise to an inference of motive." But the authority Defendants cite involves sales by a single defendant, which were not probative for other reasons. *Abrams v. Baker Hughes Inc*., 292 F.3d 424, 435 (5th Cir. 2002). *Second*, Defendants' argument that the relevant Defendants increased their holdings as if on a buying spree fails because the purchases were part of compensation and bonus plans, and do not reflect open market purchases. ¶¶301, 303, 305.[20] *Third*, Defendants argue that the size and timing of the sales were not suspicious. But Defendants have not identified a single case where stock sales occurring a mere two months or less before a corrective disclosure were considered remote. The earnings numbers and percentages sold, which courts in this Circuit hold to be based on total Class Period sales, far exceeds the thresholds for suspicious sales.  *See*

---

[20] *Cannon*, 184 F. Supp. 3d at 481, is inapt, as the defendant sold only 1.84% of his ownership interest and did not sell the largest portions at peak prices. *Id.*

*Rougier*, 2019 WL 6111516, at *13 ($729,000 gain and $630,468 gain equal to 18% of holdings held to be suspicious); ¶¶300-06 (Mallon sold $2.2 million, or 16%; Hansen sold over $469,000, or 25%; and Rosenthal sold $1.2 million, or 8%). Both the stock sales within the two-month window and the total Class Period sales are substantial enough in size to support scienter. *Rougier*, 2019 WL 6111516, at *13; ¶¶300-05 (Mallon sold 32,278 shares, equal to 16% of holdings, two months before disclosure; Hansen sold 6,426; Rosenthal sold 17,177 weeks before disclosure).

*The SEC launched an investigation into Exxon's valuation of its assets in the Permian.* The SEC investigation also supports scienter. *See Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 WL 1416025, at *12 (S.D. Tex. Apr. 14, 2021); *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79 n. 58 (2d Cir. 2021). Defendants speculate about the outcome, and argue that the "SEC often closes investigations" (MTD 33). That has not happened. Further, courts hold, consistent with the SEC's own guidance, that the SEC's failure to act is not relevant to liability. *See In re WHX Corp.,* Admin. Proc. File No. 3-9634, SEC Exchange Act Release No. 47980, 2003 WL 21283081, at *8 (June 4, 2003) ("Commission's decision not to prosecute cannot be construed as a determination that the [defendants' action] was legal"); *White v. Heartland High-Yield Mun. Bond Fund*, 2005 WL 5954971, at *3 (E.D. Wis. Nov. 28, 2005) ("SEC inaction does not support any inference as to a defendant's culpability.").

*SOX Certifications.* Woods and Rosenthal's SOX certifications support scienter. ¶¶309-11. *See Ramirez*, 334 F. Supp. 3d at 854; *ArthroCare*, 726 F. Supp. 2d at 724. Defendants' argument about the meaning of SOX certifications "by themselves" (MTD 42) is irrelevant to the facts here, where they corroborate a mosaic of allegations that demonstrate scienter.

*Defendants required employees to sign non-disclosure agreements (NDAs) and retaliated against dissenters.* Defendants concealed their misconduct by requiring employees to

40

sign NDAs and by retaliating against employees who voiced dissent, including at least one who complained that Exxon was overvaluing the Permian. ¶¶312, 314-15. *See In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y. 2014) (crediting retaliation); *Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *10 (D. Kan. Sept. 25, 2012) (requiring NDAs "to keep secret the company's true adverse condition and the problems with and ultimate failure of the integration" supports scienter). Defendants cite inapposite authority[21] to contend that NDAs can be legitimate (MTD 35-36), but they are not entitled to this inference now.

## 2.     Defendants' Remaining Scienter Challenges Fail

*"Significant Contact" Is Not Required.* Defendants rely on an out-of-Circuit case to argue that the Complaint fails to allege scienter because the former employees did not have "significant contact" with the Executive Defendants. MTD 26. This is not the law in the Fifth Circuit. Each of the former employees is properly described by position, tenure, and geographical location. ¶¶8, 9, 14, 63, 66, 120, 129, 196, 214; *see Barrie*, 397 F.3d at 259 (confidential sources credited where complaint described positions and basis for knowledge); *Schulze v. Hallmark Fin. Servs., Inc.*, 2021 WL 3190529, at *3 (N.D. Tex. July 28, 2021) (complaint "adequately described" witnesses). Indeed, courts in this District credit confidential sources who have no "significant contact" with defendants. *See Spitzberg*, 758 F.3d at 691 (reversing dismissal on scienter grounds where witness description of test well contradicted defendants' statements); *Brody*, 2006 WL 2739352, at *7 (scienter pled based on witness statement that defendants regularly received reports "which would

---

[21] *See Loc. 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 & n.3 (5th Cir. 2016) (shipping practices, not alleged to violate GAAP, could be supported by "legitimate reasons"); *Courtroom Scis., Inc. v. Andrews*, 2009 WL 1313274, at *14, *17 (N.D. Tex. May 11, 2009) (preliminary injunction case about confidential client data); *Crutchfield v. Match Group, Inc.*, 529 F. Supp. 3d 570, 599 (N.D. Tex. 2021) (no knowledge or approval of fraud where statements did not "speak to or otherwise misrepresent anything" about fraud).

have alerted them . . . that their statements . . . were materially misleading").[22]

*The Complaint Does Not Rely on Group Pleading.* Defendants wrongly contend that the Complaint uses "group pleading," relies solely on positions to allege scienter and fails to "distinguish among those they sue." MTD 27. The Complaint fulfills *Southland*'s requirement that "specific factual allegations link the individual to the statement at issue," 365 F.3d at 365, by outlining how each scienter fact supports the inference to each individual. For example:

- *Woods* was the "top god" at Exxon (¶99), and success in the Permian was critical to him personally, both because the market relied on Woods to "turn the Titanic" (¶¶49-50, 53), and because it was a factor in his compensation (¶¶51, 294-98). Further, Woods himself announced the "green blob" production goal of 1 million barrels, touting Exxon's understanding of the Permian and telling investors that Exxon was going to "unleash the hounds" (¶147). Indeed, the whistleblower and others understood the goal as "*Woods's promise to the market*" (¶152). FE4 confirmed that Woods concocted this number (¶158), which is corroborated by the fact that Woods announced the goal a mere 95 minutes after Chevron announced its goal of 900,000 (¶143). FE4 personally and his team asked during town hall meetings where Woods's 1 million number came from, and they were told it was a "vision." ¶159. Throughout the Class Period, Woods continued:  to present Exxon's "green blob" slide (¶¶144, 236, 237, 391, 439), assure that Exxon's "plans are on track" (¶144, 238), stress the importance of the Permian to Exxon's business (¶290), and deny Permian risk and tout production conditions in response to analyst questions (¶¶148, 238, 239, 242, 287).  In addition, Bond gave the direction to submit false drilling assumptions (¶¶175-76), had access to the data reflecting the true condition in the Delaware (¶¶257, 267), spoke to Woods all the time, and the information from Bond to Woods was "very transparent." (¶267). Exxon's notorious "God Pod" (¶275) and "militaristic" culture (¶267) where senior management was "micromanaging every single rig" (¶263) further supports a strong inference of Woods's scienter. Woods is also, without question, a member of "senior management" which, according to Exxon's own SEC disclosures, reviewed reserve reports and changes to them (¶260). In addition, Woods is the chairman of the board, whose subcommittee visited the Permian to "see first-hand and validate" its processes, and report back to the full board (¶272). Woods also personally toured the Permian (¶271).

- *Chapman* touted his understanding of the Permian, including when he presented misleading data to show Exxon's "unique position" there (¶57). He also touted Permian conditions and goals in response to questions. *See* ¶92 ("green blob"); ¶93 ("green wedge"); ¶217 (Permian drilling); ¶220 (reduced drilling times, "pleased with what we see"); ¶232 ("on plan" and "nothing to flag"); ¶233 ("we can model very, very clearly

---

[22] *Sakkal v. Anaplan Inc.*, 2021 WL 3885987, at *7 (N.D. Cal. Aug. 31, 2021) is inapt. *See id.* (reports not "tethered to any particular" false statements). *See Okla. Police Pens. & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019) (no "significant contact" required).

where we will get to in the Delaware"); ¶285 ("very confident that we can meet what's in green"). Chapman was a member of "senior management" who reviewed reserve reports (¶260), and acknowledged, "we're micromanaging every single rig" (¶263); touted "our improved" and "rapid[]" "understanding" of the Permian (¶282); underscored, "the Permian is really important" (¶290); and visited the Permian (¶271). His compensation also depended on progress toward the Permian goal (¶¶294-98).

- *Williams*, a member of the "God Pod" (¶275), was a "senior executive" who reviewed reserve reports (¶260) and whose compensation depended on Exxon achieving its Permian goal (¶¶294-98). Williams also personally touted well quality and Exxon's growth plans (¶56). Williams explained that he and other Defendants, including the management committee and Exxon's Board, personally toured Exxon's Permian operations during the Class Period. ¶270 ("I was out there about a month ago"); and touted his "delineat[ion]" (¶282) and "focus" (¶290) on the Permian.

- *Ortwein*, former President of XTO, began her Exxon career as a Drilling Engineer (¶39). The engineers who were instructed to manipulate the numbers reported through a chain that ended with Ortwein (¶121). Consistent with Exxon's own disclosures about senior management review of reserves (¶260), FE3 confirmed that Ortwein had the ability to change his reserve reports, which were, in fact, fraudulently changed. ¶122. Ortwein also attended team meetings where employees would ask questions about how Exxon intended to meet the "green blob" goal when there was a lack of basic infrastructure (¶163).[23]

- *Bond*, the manager of the Delaware Basin, told her team to "claw back" value by submitting false drilling estimates to overvalue the asset by $10 billion (¶257). She was a "Career Level 30" or higher executive with access to data about the Delaware (¶267), who frequently interacted and shared information with Woods (*id.*). Notably, two months after the whistleblower made the fraud public, Bond was transferred to Angola. ¶175 & n.3.

- *Mallon, Hansen, Rosenthal, and Woodbury* were also "senior executives" of Exxon who, reviewed reserve reports (¶260). Mallon, Hansen, and Rosenthal engaged in suspicious insider stock sales during the Class Period, reaping millions of dollars in profits that constituted material percentages of their holdings, and were not made pursuant to Rule 10b5-1 plans (¶¶299-306). Mallon, Hansen, and Woodbury assured investors of Exxon's progress in the Permian and touted production conditions (¶¶359, 361, 363, 370, 400, 405, 415), and Rosenthal signed Exxon's filings which contained false statements (¶¶376, 378, 380, 383, 385, 387, 419, 421, 423).

Even the allegations that refer to "senior Exxon management" or "corporate officials" do not simply presume that Defendants must have known what was happening because of their positions.

---

[23] Defendants argue that meetings discussing the "green blob" did not occur until after October 2, 2018 (MTD 43), but in fact, the green blob was presented to the public by July 27, 2018. ¶92. Moreover, "later emerging facts," like a more unachievable "green blob" goal announced on March 6, 2019, can support "inferences about an earlier situation." *See Plotkin*, 407 F.3d at 698.

The Complaint details: the reporting structure (¶¶103-06); how individuals and groups at each level participated in preparing the reserves reports (¶¶109-13); that the reservoir engineers reported through Ortwein (¶¶121-22); and that senior management received Permian drilling reports twice per day (¶¶262-64). These allegations support scienter. Defendants' cited authority is inapt. *See Abrams*, 292 F.3d at 432 (no allegation that Defendants knew about problems).

Defendants contend that the Complaint does not allege that "[any] single Individual Defendant knew" that the "green blob" was unachievable. MTD 28. But actual knowledge is not required for scienter, and the meetings, access to data, personal incentives, that Woods "made it up on the fly," touting personal knowledge, and other facts confirm that this is simply not true.

***Exxon Is Liable for Its Press Releases.*** Defendants wrongly argue that five statements in press releases are not tied to specific speakers and therefore cannot have been made with scienter. MTD 44. That press releases are often unsigned "certainly does not mean that nobody made the [challenged] statement, and cannot preclude Section 10(b) liability against the corporation." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 544-45 (S.D.N.Y. 2011), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016). Woods, Rosenthal, and Chapman controlled the contents of the statements made by Exxon and were all directly involved in certifying and/or approving its press releases. ¶485. Thus, Plaintiffs have tied the misstatements to specific officers, and scienter can be imputed to Exxon. *Vivendi*, 765 F. Supp. 2d at 545.

Defendants ignore that the Complaint "links" each of the five challenged statements to an Executive Defendant. ¶474; *Southland*, 365 F.3d at 365. Each of the statements in a press release was repeated by an individual defendant later that day or in an accompanying analyst meeting. *See* ¶351 (Chapman reiterated statement in analyst meeting "that same day"); ¶¶389-91 (Woods reiterated statements in Investor Day call); ¶¶393-95 (Chapman reiterated statements in Investor

44

Day call); ¶¶425-26 (Chapman reiterated statement in Analyst Meeting); ¶¶430, 432 (same).

*COVID Does Not Exculpate Exxon.* Defendants blame Exxon's failure to achieve its stated goal on COVID (MTD 8), but this effort fails. First, the argument ignores several facts demonstrating contemporaneous falsity, including that Plaintiff's expert determined that it was impossible to meet the Permian goal regardless of Exxon's increased drilling times (¶¶81-88, 166-70, 216-27, 292-93); it was widely known internally that the goal was impossible (¶¶278-80); conditions in the Permian further demonstrated that the goal was impossible (¶¶87-88, 184-215); Exxon used false drilling times to value the asset (¶¶175, 257); and Exxon manipulated data to misrepresent its standing in the Permian (¶¶57, 82, 355, 367). Defendants ask the Court to disregard all of these facts and replace them with Defendants' own alternative factual narrative. Exxon can attempt to establish in discovery that COVID caused all this, but the Court cannot accept that assertion as a matter of law at the pleading stage. *See Barrie*, 397 F.3d at 254-55.

## C.   THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY

The Complaint alleges, and Defendants do not dispute, that Woods, Rosenthal, and Chapman are control persons. ¶484; MTD 44. Plaintiffs stated a primary liability claim against Exxon, thus, their control person claims should be sustained. *See Ramirez*, 334 F. Supp. 3d at 857.

## IV.   CONCLUSION

For the foregoing reasons, the Motion should be DENIED. Should the Court grant the Motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Venator*, 2021 WL 2980581, at *33 (granting leave to amend when claims "ha[dn]'t been subject to a prior motion to dismiss"); *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 519 (S.D. Tex. 2017) (Courts "should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice"); *Hart v. Bayer Corp.,* 199 F.3d 239, 248 n. 6 (5th Cir. 2000) (same).

Dated: January 10, 2022

Respectfully submitted,

/s/ Lewis T. LeClair
Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
**McKOOL SMITH PC**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

John Rizio-Hamilton (*pro hac vice*)
johnr@blbglaw.com
Rebecca E. Boon (*pro hac vice*)
rebecca.boon@blbglaw.com
Kate W. Aufses (*pro hac vice*)
kate.aufses@blbglaw.com
R. Ryan Dykhouse (*pro hac vice*)
ryan.dykhouse@blbglaw.com
Matthew Traylor (*pro hac vice*)
matthew.traylor@blbglaw.com
**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for the Class and Counsel for Co-
Lead Plaintiff State of Rhode Island, Office of the
General Treasurer, on behalf of the Employees'
Retirement System of Rhode Island*

Daniel L. Berger (*pro hac vice)*
dberger@gelaw.com
Barbara J. Hart (*pro hac vice)*
bhart@gelaw.com
Caitlin M. Moyna (*pro hac vice)*
cmoyna@gelaw.com
Rachel A. Berger (*pro hac vice)*
rberger@gelaw.com
**GRANT & EISENHOFER PA**
485 Lexington Avenue

46

New York, New York 10017
Phone: (646) 722-8500
Fax: (646) 722-8501

*Co-Lead Counsel for the Class and Counsel for Co-Lead Plaintiff Amalgamated Bank*

47

## CERTIFICATE OF
## SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on January 10, 2022.

*/s/ Lewis T. LeClair*
Lewis T. LeClair

48