IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MENDI YOSHIKAWA, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-00194-N |
| | § | |
| EXXON MOBIL CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendants' Motion to Dismiss filed on November 24, 2021 [69]. For the reasons stated below, the Court grants the motion and gives Plaintiffs leave to amend, if it is possible to do so, in a manner consistent with this opinion.

### I. THE ORIGINS OF THE DISPUTE

This is a federal securities putative class action on behalf of all persons and entities who purchased or otherwise acquired Exxon Mobil Corp. ("ExxonMobil") common stock ("XOM") between March 7, 2018 and January 15, 2021 (the "Class Period"). *See* Amended Complaint 1–2 [53] ("Compl."). In January 2017, ExxonMobil purchased additional oil and gas assets in the Permian Basin in January 2017, and it announced an "aggressive growth strategy" for the region in 2018. Compl. ¶¶ 3, 49, 51, 54–56. Throughout 2018 and 2019, ExxonMobil forecast strong progress toward its goal of producing 1 million oil-equivalent-barrels per day in the Permian by 2024. *Id.* ¶¶ 232, 238, 350, 400, 405, 415, 425. But on January 31, 2020, ExxonMobil disclosed that Permian

barrel-per-day production was essentially flat quarter-over-quarter, and in May 2020, it announced infrastructure and expenditure cuts in the region. *Id.* ¶¶ 439, 444. On January 15, 2021, the *Wall Street Journal* reported that the SEC was investigating ExxonMobil's valuation of its Permian Basin assets in response to a fall 2020 whistleblower complaint. *Id.* ¶ 448. The XOM price per share dropped 4.1, 7.2, and 4.8 percent immediately following each respective announcement. *Id.* ¶¶ 440, 445, 449.

Plaintiffs[1] bring suit under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 against ExxonMobil and several of its personnel, Darren Woods, Neil Chapman, Jack Williams, Neil Hansen, David Rosenthal, Liam Mallon, Jeffrey Woodbury, and Sara Ortwein (the "Individual Defendants"). Plaintiffs also bring suit under section 20(a) of the Securities and Exchange Act against Woods, Rosenthal, and Chapman as control persons of Exxon. Plaintiffs allege that Defendants committed securities fraud by both affirmatively misrepresenting the success of its Permian Basin drilling project and omitting material information about the project's obstacles.

### A. Statements that Production Goals Were "On Track"

Over the course of the Class Period, Defendants stated several times that ExxonMobil was "on track," "on plan," or "on schedule" to meet its 2024 1-million-barrel goal. *Id.* ¶¶ 232, 238, 350, 400, 405, 415, 425. Plaintiffs contend that these statements

---

[1] "Plaintiffs" refers to co-lead plaintiffs, The State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") and Amalgamated Bank.

were misleading because there were numerous problems with the Permian project that made ExxonMobil's 2024 goal impossible.  *Id.* ¶¶ 166–70.

### B. Statements Regarding Proved Reserves

ExxonMobil several times attributed increases of its Proved Reserves to its Permian Basin activity.  *Id.* ¶¶ 54, 140, 235.  The Generally Acceptable Accounting Principles ("GAAP") and SEC regulations specify how to determine Proved Reserves; Plaintiffs allege that Defendants intentionally inflated ExxonMobil's Proved Reserve calculations by using overly optimistic assumptions about drilling time.  *Id.* ¶¶ 60–62.

### C. Statements Regarding the Permian Resource Base

Defendants also made several statements about ExxonMobil's Permian Resource Base, which is its proved reserves "plus other discovered resources that are expected to be ultimately recovered."  *Id.* ¶¶ 90, 138, 145.  Plaintiffs contend that Defendants knowingly published misleading Resource Base estimates based on the erroneous drilling time assumptions and never properly revised them down.  *Id.* ¶¶ 124–27, 138–40, 177.

### D. Statements and Omissions Regarding Production Conditions

Defendants often made statements about ExxonMobil's processes and assets in general terms, such as describing its position as "unique," announcing "increased" drilling, or calling its wells "the best."  *Id.* ¶¶ 355, 359, 233.  Plaintiffs allege that these statements, coupled with a failure to disclose the project's obstacles, created a false impression of success in the Permian.  *Id.* ¶¶ 362, 404, 418, 435.

### *E. Failure to Disclose Additional Information Alongside Data Presentations*

During a 2018 Analyst Meeting, Defendants displayed a chart comparing ExxonMobil's U.S. production to that of its competitors and presented that it demonstrated its "unique position in getting value out of the Permian." Plaintiffs argue that the slide was misleading because it included non-Permian data and failed to state that competitors performed better than ExxonMobil in drilling time, production, well performance, and well quality. *Id.* ¶¶ 57, 81–88, 356.

### *F. The Motion to Dismiss*

Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on several grounds, including the following: (1) Plaintiffs have engaged in impermissible group pleading, failing to allege scienter adequately as to each Defendant; (2) the "on track" statements are protected by the Private Securities Litigation Reform Act's ("PSLRA") safe harbor provision, 15 U.S.C. § 78u–5; (3) Plaintiffs have not pleaded with particularity that the Proved Reserves or Resource Base figures were incorrect; and (4) its generic statements about processes and assets were "soft" statements that are immaterial.

### II. PLAINTIFFS HAVE NOT CREATED A STRONG INFERENCE OF SCIENTER

Federal Rule of Civil Procedure 9(b) requires complaints alleging fraud or mistake to state claims with particularity, or set forth "the 'who, what, when, where, and how' of the events constituting fraud or mistake." *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) (internal quotations omitted)). The PSLRA incorporates Rule 9(b)'s

ORDER – PAGE 4

particularity requirement, and courts pay careful attention to allegations made on information and belief, as Plaintiffs have done here, to ensure that they have carried their burden to "state with particularity *all facts on which that belief is formed*." *ABC Arbitrage*, 291 F.3d at 350 (quoting 15 U.S.C. § 78u-4(b)(1)) (emphasis in original).

The PSLRA further specifies that Plaintiffs must plead facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78-u4(b)(2). The state of mind requirement is scienter: an "intent to deceive, manipulate, or defraud or severe recklessness." *Owens v. Jastrow*, 789 F.3d 529, 535–36 (5th Cir. 2015) (quoting *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009) (internal quotation marks omitted)). Severe recklessness is a high bar, "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). The "danger of misleading buyers or sellers" must be "either known . . . or . . . so obvious that the defendant must have been aware of it." *Id.* A strong inference of scienter is one that is more than merely reasonable; it is "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

### A. Plaintiffs Improperly Rely on Group Pleading

Plaintiffs must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (emphasis in original). Allegations

ORDER – PAGE 5

against the Defendants as a group, without more specific connections between an individual Defendant and an allegedly fraudulent statement, should be disregarded. *Owens*, 789 F.3d at 537–38.  Scienter must be shown as to each Defendant, and group allegations "are not properly imputable as to any particular defendant."  *Id.* at 537. Plaintiffs' allegations, while detailed, are largely impermissible group pleading.

      *1. Employee Groups. –* The Complaint frequently refers to "senior ExxonMobil management," "corporate officials," "executives," or similar terms when describing who had access to certain records or performed certain review functions.  *See, e.g.*, Compl. ¶¶ 253, 256, 261, 263, 267.  In doing so, Plaintiffs contend that because Defendants belonged to those categories of personnel who had record access or review responsibilities, it is proper to infer that Defendants in fact accessed records or signed off on documents containing information that rendered the disputed statements false and misleading. Plaintiffs argue that, at the very least, the Defendants were severely reckless in not noticing. *Id.* at ¶ 269.  But it is well established that an officer's position on its own is insufficient to support an inference of scienter, *Abrams*, 292 F.3d at 433, barring special circumstances which are inapplicable here.[2] Plaintiffs must go further to explain which specific individuals personally knew or failed to apprehend what information and when in order to allege the necessary state of mind with particularity.

---

[2] This is the core operations theory of scienter, discussed further *infra* Part II.A(4).

   *2. Common Knowledge.* – Plaintiffs contend that the Defendants spoke with intent or severe recklessness when they used the "green blob" slide[3] demonstrating the 2024 1-million-barrel goal because it was "common knowledge throughout the company" that the goal was not achievable.   Compl. ¶ 278.   But allegations that certain practices or information are common knowledge are "too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity." *Callinan v. Lexicon Pharma., Inc.*, 479 F.3d 379, 432 (S.D. Tex. 2020) (quoting *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010)).

   *3. Corporate Culture.* – Plaintiffs also allege that the Individual Defendants operated as a "God Pod" and created pressure downwards through the company not to ever take write-downs of its reserves.   Compl. ¶¶ 96–97.   Courts are mixed on their treatments of culture allegations; some have found that "tone at the top" can support scienter, while others have said that tone is less plausible than other inferences, such as typical mismanagement.  *Compare Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *4–5 (N.D. Cal. 2017) *with In re Hertz Global Holdings Inc.*, 905 F.3d 106, 121 (3d Cir. 2018).   Tone can be circumstantial evidence that supports an inference of scienter, but it cannot replace particularized allegations as to each Defendant as required by the group pleading rule. Plaintiffs still must connect each Defendant to the tone or culture issues, which they have

---

[3] In various presentations, Exxon Mobil used what it referred to internally as "the green blob" to show how it expected to scale its production in the Permian.  The trajectory begins in 2015, grows steadily before trending sharply upward in 2019, and rounds out from 2021 to 2025.  The area under the curve, shown in green, resembles a wedge or blob.

not done with particularity. *See, e.g.*, *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 537 (5th Cir. 2008) (finding that statements that defendants "have got to show more progress" and "need to do something to fix" revenue numbers were insufficient to support an inference of scienter because of lack of identifying details about the source).

  ***4. Core Operations.*** – Typically, plaintiffs may not infer that defendants must have been aware of their misstatements based on their positions within the company. *Crutchfield v. Match Group, Inc.*, 529 F. Supp. 3d 570, 603 (N.D. Tex. 2021).  However, under the core operations doctrine, in special circumstances, plaintiffs may do so.  It is the rare case where core operations doctrine is applicable.  Courts consider: (1) the size of the company; (2) whether the transaction at issue is critical to the company's continued vitality; (3) apparentness of the alleged misrepresentations to the speaker; and (4) internal inconsistencies among the defendants' statements. *Local 731 I.B. v. Diodes, Inc.*, 810 F.3d 951, 958–59 (5th Cir. 2016).  The special circumstances do not guarantee an exception, but "might tip the scales in favor" of scienter.  *Id.* (emphasis added).

  At any rate, none relates to this case.  ExxonMobil is not a small company, and size alone can render the exception inapplicable.  *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 924 (S.D. Tex. 2017) ("*Plains I*") (finding that the defendant having approximately 5,000 employees during the class period and a large and complex business took the case outside the scope of the exception).  Plaintiffs also have not pleaded that any of Defendant's statements were internally inconsistent.  Further, Plaintiffs' allegations that ExxonMobil "centered" the Permian Basin assets in its turnaround plans

ORDER – PAGE 8

lack the particularity necessary to establish that the project was "critical to the company's continued vitality." Compl. ¶ 52. Finally, Plaintiffs cannot use the exception for "readily apparent" information, without more, to bypass its failure to plead exactly that — that Defendants must have been aware of certain information by virtue of their positions within the company. *See Crutchfield*, 529 F. Supp. 3d at 604.

   *5. Miscellaneous Arguments. –* Plaintiffs also allege that ExxonMobil is using nondisclosure agreements and terminating employees to silence opposition, supporting an inference of scienter.   But these allegations are not sufficiently particularized. Nondisclosure agreements are legal and quite common; Plaintiffs must go beyond broad speculation, such as by pointing to specific examples of interference with employees' interactions with regulatory bodies, silencing employees from speaking about the company's true activities, or illegal retaliatory termination, which they have not done. *See, e.g.*, *Diodes*, 810 F.3d at 960 (finding no inference of scienter based on early shipping of orders because it was a "legal practice" "supported by 'any number of legitimate reasons,'" which "usually does not support a strong inference of scienter").

   Moreover, several courts have held that SEC investigations are relevant to scienter, but insufficient to support a strong inference on their own. *See, e.g.*, *Carlton*, 184 F. Supp. 3d at 480–81 (citing *Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009)*, abrogated on other grounds by Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011))*; In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 248–49 (8th Cir. 2008).   The decision to investigate is somewhat relevant, but so is the fact that the investigation has since been closed. Def. Reply App. 3 [77].

ORDER – PAGE 9

**B. Plaintiffs' Allegations as to Each Individual Defendant Do Not Establish Scienter**

With the group allegations addressed, the Court turns to the contentions as to each Defendant, first one by one, then holistically. *See Owens*, 789 F.3d at 537.

*1. Defendant Woods.* – Among the individual Defendants, Plaintiffs set out the most substantial contentions against Darren Woods, ExxonMobil's Chief Executive Officer ("CEO") and Chairman of the Board of Directors. They allege that he signed a public letter, signed several of ExxonMobil's filings with the SEC, and made several public statements about ExxonMobil's success in the Permian with knowledge that drilling times, production rates, and resource estimates were worse than ExxonMobil was indicating. Compl. ¶ 474. To establish Woods' state of mind, Plaintiffs allege that: (1) he and other Defendants spoke about their knowledge of the Permian Basin business; (2) he, other Defendants, and the Public Issues and Contributions Committee ("PICC") visited the Permian site, which would have exposed him to the project's obstacles; (3) he regularly communicated with "executives," and Defendant Melissa Bond was an executive who Plaintiffs allege instructed employees to use false drilling assumptions; (4) he had access to reserves and production data; (5) he was motivated by his compensation package to make ExxonMobil perform; and (6) he signed Sarbanes–Oxley certifications. *Id.* at ¶¶ 122, 130, 257, 267, 270–73, 309–11.

These contentions are insufficient because they fail to raise an inference that Woods in fact learned of or was severely reckless in failing to discover the allegedly falsified valuations or technical issues with drilling. First, the challenged statements of the

Defendants' knowledge about the Delaware Basin[4] region were vague references to their level of understanding; Defendants said they were learning about the resource "rapidly," "improving" their understanding, and "working very hard to delineate" it. *Id.* at ¶ 281–83. Plaintiff has not alleged any facts suggesting that Defendants did not believe these statements, such as by pointing to internally inconsistent statements.[5] Nor has Plaintiff explained how making these statements was severely reckless. The Court agrees with Defendants that these statements were "innocuous." Def. Mot. to Dismiss Brief 40 [69].

Additionally, Plaintiffs have not set forth any facts detailing the itinerary of the site visit. *Id.* at ¶¶ 270–73. Without knowing more about the duration of the visits, what the Defendants and the PICC saw while there, or with whom they spoke, it is implausible to infer that the site visit necessarily advised Woods of all the issues Plaintiffs allege. *See McNamara v. Bre-X Minerals Ltd.*, 197 F. Supp. 2d 622, 695–97 (E.D. Tex. 2001) (finding that highly detailed site visits involving laboratory tours and sample analysis were insufficient for scienter, showing "at most . . . negligence.").

Similarly, taking as true Plaintiffs' allegations regarding Bond, Plaintiffs still have not pleaded facts connecting Woods to Bond's conduct. Plaintiffs "cannot simply point to the fact that some other person at the corporation knew of facts that make [a] statement

---

[4] The Delaware Basin is an area within the larger Permian Basin.

[5] Plaintiffs are correct that scienter does not have an "inconsistent statement requirement" for scienter, Pls.' Response Brief [75] 36, but without one, Plaintiffs must allege other facts that suggest that a Defendant spoke with intent or severe recklessness. Evidence suggesting that the statements were false and misleading, such as Plaintiffs' Expert's analysis, goes to materiality; it cannot provide insight into Defendants' states of mind, at least without relying on improper "should have known" inferences, discussed *infra*.

misleading and impute that knowledge" to Woods as a speaker.  *Plains I*, 245 F. Supp. 3d at 892.  To support scienter on this basis, Plaintiffs must be able to allege with particularity that Bond actually informed Woods that the reports were being manipulated or that Woods was severely reckless as to their falsity. *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 64 2 (S.D. Tex. 2018) ("*Plains II*").  In either case, Plaintiffs must set forth additional details about Bond's and Woods' communications.  Plaintiffs have asserted only that Bond was an executive and that Woods regularly communicated with executives.  That plausibly includes her, but Plaintiffs fail to do more than speculate that these communications must have covered the alleged falsification of the reserves calculations.  Compl. ¶ 257.  It is true that "significant contact" between the two is not required, Response Br. 41, but even "direct and steady contact" does not give rise to an inference of scienter, and nor does reporting structure, without more.  *Plains II*, 307 F. Supp. 3d at 642.

Because the Complaint lacks details about Bond's and Woods' interactions, Plaintiffs also have not alleged with particularity that Woods departed from the ordinary standard of care in their working relationship, if one existed.  Further, Plaintiffs may rely on confidential witness statements which have an adequate basis, *ABC Arbitrage*, 291 F.3d at 353, but it is unclear from the pleadings how Former Employee 4 ("FE4") would have specific knowledge of Bond's and Woods' communications.  Compl. ¶ 129, 257.

Plaintiffs' record access arguments do not create a strong inference of scienter either; courts in this Circuit have consistently held that "simply pleading that a defendant had access to internal information that contradicted his or her public statements is not enough." *Plains II*, 307 F. Supp. 3d at 616.  *See also, e.g.*, *Jacobowitz v. Range Resources*

*Corp.*, 2022 WL 976003, at *16 (N.D. Tex. 2022), *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 767, 817 (S.D. Tex. 2012), *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 902–903 (W.D. Tex. 2008).  For the same reasons that Bond's purported knowledge cannot be imputed to Woods without facts supporting that link, neither can the knowledge in the records themselves.

Nor can knowledge be presumed based on Woods' position within Exxon, as already discussed.  To establish Woods' state of mind, Plaintiffs must plead facts connecting specific documents containing the allegedly false information with actual notice or recklessness on Woods' part.  *Dell*, 591 F. Supp. 2d at 894.  Plaintiffs allege that Woods had access to vast amounts of ExxonMobil records and perhaps was part of the "senior management" to whom twice-daily drilling reports were sent.  Compl. ¶ 264.  But they have not alleged any specifics about when Woods actually accessed these records or if he discussed their contents with anyone; they have not contended that close review of these records was within the scope of his position and that he was severely reckless to not discover their contents.  Plaintiffs do not distinguish between the Individual Defendants and their respective responsibilities when they describe the report review process.  *Id.* at ¶ 260.

The difficulty with alleging falsified records is that Plaintiffs must explain how Woods would or should have discovered that they were incorrect, and they have not done so here.  *See BP p.l.c*, 843 F. Supp. 2d at 783 (finding scienter for CEO who made numerous specific statements about process safety goals, identified himself as the "key individual" tracking progress, and implemented and attended safety courses), *In re Netsolve, Inc. Sec.*

*Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (finding that top officers "must have been aware" of accurate records of declining sales with the company's primary customer based on specific allegations about their roles in corporate functions); *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (finding that scienter was not established by mere receipt of reports without supporting allegations that the defendant read the relevant information).

Plaintiffs' compensation structure arguments go only to "allegations of motive," which cannot create an inference of scienter alone. *Diodes*, 810 F.3d at 957. Were it true that incentive compensation sufficed, "the executives of virtually every corporation in the United States would be subject to fraud allegations." *Abrams*, 292 F.3d at 434. This type of circumstantial evidence "can enhance the strength of the inference of scienter," *Diodes*, 810 F.3d at 957, but requires further factual basis than Plaintiffs have alleged.

The same is true for the signing of Sarbanes–Oxley certifications. The PSLRA does not create strict liability for any allegedly incorrect statement in an SEC filing; the Plaintiffs must plead facts establishing Woods' severe recklessness or intent to defraud. Inferring scienter from a Sarbanes–Oxley certification is appropriate only "if plaintiff has alleged the defendants had reason to know the financial statements contained material misstatements because of obvious accounting irregularities or other red flags." *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 854 (N.D. Tex. 2018) (citing *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007)). Plaintiffs have not alleged that the certifications contained any issues glaring enough to alert Woods to the potential for the filings to be misleading.

Taken together, Plaintiffs' allegations against Wood are largely circumstantial and lack facts suggesting that he was informed of the issues that Plaintiffs contend made his statements false.  And while Plaintiffs are correct that actual knowledge is not the only path to scienter, Response at 44, they have also not created an inference that Woods was severely reckless; the Complaint does not set out facts alleging the ordinary standard of care for someone in Woods' position or that he extraordinarily departed from it. Accordingly, the inferences opposing scienter outweigh those in support.

**2. Defendants Chapman and Williams.** – Plaintiffs assert that Defendants Neil Chapman and Jack Williams, Senior Vice Presidents at Exxon, made several statements and omissions regarding ExxonMobil's Permian Basin activities that were fraudulent or misleading.  Compl. ¶ 474.  To establish scienter, Plaintiffs raise some of the same allegations they made against Woods: (1) Chapman's referring to his understanding of the Permian; (2) Williams' reference to well quality and his attendance at the Permian site visit; (3) their role as "senior management" in reviewing reserve reports; and (4) their compensation structure.  *Id.* at ¶ 282, 290, 294.

For the same reasons discussed with respect to Woods, these contentions do not create an inference of scienter.  Plaintiffs have not alleged facts demonstrating that Chapman spoke with intent or severe recklessness about his "understanding" of the Delaware Basin resource, nor Williams about well quality, and their financial incentives for ExxonMobil to perform are weak circumstantial support.  Further, as already discussed, state of mind cannot be presumed from mere position or access to records.  And as with Woods, Plaintiffs have not alleged with sufficient differentiation between Defendants that

ORDER – PAGE 15

either Chapman or Woods actually viewed records rendering their statements false and misleading, that they regularly viewed similar records, or that adequately performing their roles would have required them to do so.

### 3. *Defendants Mallon, Hansen, and Rosenthal.* – Plaintiffs assert that Defendants Liam Mallon, Neil Hansen, and David Rosenthal participated in the alleged scheme to deceive investors, and that their states of mind can be established by suspicious insider stock sales during the Class period. *Id.* at ¶¶ 299–306. Insider trading is "probative of scienter" when done "in suspicious amounts or at suspicious times." *Abrams*, 292 F.3d at 435. The Court looks to whether trades are out of line with prior practice or timed to maximize personal profit as well as the size of the trades. *Id.*

These trades were not suspicious. Mallon traded 16% of his portfolio during the Class Period, Rosenthal traded 8%, and Hansen traded 25%. Compl. ¶¶ 299–306. These amounts are consistent with trades this Court has previously considered insufficient to establish scienter. *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 165 (N.D. Tex. 2007) (finding trades of 17.8% and 12.4% not suspicious) (citing *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 901–902 (S. D. Tex. 2001) (finding 22% trade insufficient)). The trades that took place within a two-month window of the January 2020 corrective disclosure were even smaller portions of the Defendants' portfolios—3% for Rosenthal and 7% for Hansen. Def. Br. [69] 39. Further, Plaintiffs have not alleged that the other individual Defendants made suspicious trades, and typically, the "fact that the other defendants did not sell their shares during the relevant class period undermines" scienter. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 421 (5th Cir. 2001). Indeed, it seems

implausible that some Defendants and not others would profit from the securities fraud scheme in which all Defendants are allegedly acting in concert to artificially inflate share prices. Without more beyond the stock trades, Plaintiffs have not established a strong inference of scienter as to Defendants Mallon, Hansen, or Rosenthal.

Plaintiffs' allegations as to Rosenthal regarding his signature on the Sarbanes–Oxley certifications fail to create scienter for the same reasons explained previously with respect to Woods.

*4. Defendant Woodbury.* – Plaintiffs allege that Defendant Jeffrey Woodbury, former ExxonMobil VP of Investor Relations and Secretary, made fraudulent or misleading statements on an earnings call about progress on Permian objectives. Plaintiffs have not made any allegations as to Woodbury individually; he is named as one of the "Executive Defendants," but that term refers to various groupings of the Defendants throughout the Complaint. *See* Compl. ¶ 281 (naming the Executive Defendants at Part I, but only referring to Woods, Chapman, Hansen, and Williams by name). Without any clear, individual references to how Woodbury spoke with intent or severe recklessness, Plaintiffs have failed to enlighten him as to his particular part in the alleged fraud. *Southland*, 365 F.3d at 365. Plaintiffs have not established scienter as to Woodbury.

*5. Defendant Ortwein.* – Plaintiffs allege that Defendant Sara Ortwein, former President of XTO, made a false and misleading statement about ExxonMobil's ability to drill horizontal wells in the Permian at a presentation in October 2018. Compl. ¶¶ 365–68. To establish her state of mind, Plaintiffs point to the fact that: (1) she was at the top of the reporting structure for the Reservoir Engineers; (2) Reservoir Engineers reported a culture

of being told to make certain numbers; (3) she had access to forecasting reports and the ability to change them; and (4) she attended team meetings where employees questioned the feasibility of the "green blob" presentation slide showing the 2024 barrel-per-day goal. *Id.* at ¶¶ 103, 121–23, 144, 163.

First, it would have been impossible for Ortwein to attend the meeting Plaintiffs allege. The "green blob" slide was presented on March 6, 2019, by which point she had already retired. *Id.* at ¶¶ 144, 162–63. Ortwein made the statement Plaintiffs allege was fraudulent and misleading several months prior on October 2, 2018. *Id.* at ¶ 365–68.

Beyond that, Plaintiffs' other allegations about Ortwein are tenuous. The confidential witness Reservoir Engineer FE3 described a culture of being told to make certain numbers on his reports — but the Complaint contains no allegations that such directions came from Ortwein, that she knew about them, or that adequate performance of her role would require her to know about them. *Id.* at ¶ 121. FE3 says that he often had to revise forecasts and when he would get reports back the next year they would have been drastically changed, but Ortwein was one of at least three people who had access to those documents, and Plaintiffs have not alleged any facts beyond mere access suggesting that Ortwein changed the reports. *Id.* at ¶ 122. Additionally, it does not seem that Ortwein and FE3 overlapped in the Reservoir Engineer reporting structure; FE3 served as a Reservoir Engineer until 2016 when he moved on to other roles, and Ortwein did not begin serving as President of XTO until 2016. It is unclear that the patterns FE3 described had anything to do with Ortwein. *Id.* at ¶¶ 39, 120.

ORDER – PAGE 18

Taken as a whole, because assuming knowledge based on position or access to records is improper as discussed previously and because few facts connect Ortwein directly to manipulation of drilling reports, the inferences opposing scienter outweigh those supporting.

**6. *ExxonMobil.*** – To establish the scienter of a corporation, courts in this Circuit focus "on the state of mind of the corporate officials who make, issue, or approve the statement rather than the 'collective knowledge of all the corporation's officers and employees.'" *Diodes*, 810 F.3d at 957 (citing *Shaw Group, Inc.*, 537 F.3d at 533). Because Plaintiffs have failed to show scienter as to the Individual Defendants, as explained above, ExxonMobil's scienter may only be established by imputing that of Melissa Bond.

Plaintiffs allege that Bond, the manager for the Delaware Basin region, knew that the Delaware assets' true value was lower than ExxonMobil's original estimates. Compl. ¶ 18. Based on the SEC whistleblower's account, Plaintiffs say that Bond asked employees to "claw back" lost value by calculating drilling time with overly optimistic assumptions about how quickly Exxon would improve. Compl. ¶¶ 18, 130, 257, 448. Allegedly, at least one employee submitted a manipulated report in a file named "This is a Lie." Compl. ¶¶ 18, 130, 257. Taking these facts as true, Plaintiffs still must set forth facts demonstrating that Bond furnished information or language for inclusion in the allegedly false and misleading statements in ExxonMobil's press releases, investor presentations, and SEC filings, "consistent with the general common law rule that . . . the required state of mind must actually exist in the individual making (*or being a cause of the making of*) the

ORDER – PAGE 19

misrepresentation." *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 883 (W.D. Tex. 2014) (quoting *Southland*, 365 F.3d at 366) (emphasis in original).

The Court agrees with Defendants that Plaintiffs have failed to plead facts demonstrating Bond's intent to defraud the public. She is not an executive and is several levels removed from the employees at the top of the reporting structure who interact with investors. For example, this Court has declined to find scienter as to an employee who falsified records to make her department "appear to be efficient, organized, and well-managed" because she lacked the intent to "initiate company-wide fraud." *Rains v. Zale Corp.*, 2011 WL 3331213, at *5 (N.D. Tex. 2011). The Court holds that Bond's role in the production of allegedly false records does not constitute furnishing information so as to make her a speaker of the disputed statements, and thus her scienter could not be imputed to ExxonMobil if established. Accordingly, Plaintiffs have not adequately pleaded scienter as to ExxonMobil.

Because Plaintiffs have not created a strong inference of scienter as to any Individual Defendant or Exxon, their claims fail.[6] But to provide guidance if Plaintiffs choose to amend, the Court turns to the remainder of Defendant's arguments.

### III. THE PSLRA SAFE HARBOR

SEC Rule 10b–5, implementing section 10(b) of the Securities Exchange Act, prohibits the making of any "untrue statement of a material fact" or the omission of any

---

[6] Plaintiffs must be able to connect unattributed statements to at least one Defendant with the requisite scienter, of which there is none here. *Southland*, 365 F.3d at 365. Similarly, control person liability is not available without a viable primary liability claim. *Id.* at 383 (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)).

material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5. However, there is a safe harbor for some forward-looking statements. Defendants argue that their statements in press releases and investor presentations that the Permian drilling objectives were "on track" or "on schedule" qualify for the safe harbor. Compl. ¶¶ 144, 166, 238, 287, 350.

The safe harbor provision has two independent prongs. First, defendants will not be held liable for immaterial statements nor forward-looking statements that are identified as such and are accompanied by cautionary language. 15 U.S.C. § 78u-5(c)(1)(A). Second, to evade the safe harbor, plaintiffs must properly plead that the forward-looking statement was made with actual knowledge that it was false and misleading. 15 U.S.C. § 78u-5(c)(1)(B). Unlike with the scienter requirement, severe recklessness does not suffice. The safe harbor provision is "disjunctive;" it may apply even when a plaintiff adequately alleges that the speaker had such knowledge if meaningful cautionary language was provided, and it also may apply even without that language if the plaintiff fails to allege facts sufficient to satisfy the second prong. *Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016).

### A. Whether the Statements Were Accompanied by Cautionary Language

Courts must determine how each statement is "specifically and meaningfully" protected. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009). Courts typically analyze each statement on its own, but Plaintiffs have challenged them in a single allegation, and Defendants' cautionary statements for each were largely identical. The use of the same disclaimer or one with only slight variations is often evidence that the warning

is "generic and formulaic . . . boilerplate and not meaningful cautionary language. *Id.* at 245. But in this case, the statements used the same language regarding the same projects, so warning of the same risks would be appropriate. Accordingly, the Court addresses cautionary language first, and addresses the statements together.

To qualify for the safe harbor provision, forward-looking statements must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those described. 15 U.S.C. § 78u-5(c)(1)(A). Boilerplate cautionary language does not suffice. *Lormand*, 565 F.3d at 248. If "reasonable minds could disagree as to whether the mix of information in the allegedly actionable document is misleading," dismissal based on the safe harbor is not appropriate. *Id.* (cleaned up).

Oral statements may also be covered so long as they refer to a readily available written document or portion thereof that explains how actual results could materially differ from those described. 15 U.S.C. § 78u-5(c)(2).

ExxonMobil began its calls and presentations by referring the audience to its cautionary statement and supplementary information. *See, e.g.*, Def. App. 171 [70]. The cautionary statement informs readers that several types of information are forward-looking statements, including "projections, estimates, goals, discussions of potential," and "descriptions of business plans." *Id.* at 169. It also explains that actual future results, including future earnings, proved and other reserve, project plans, completion dates, timing, and production rates and capacities may vary due to numerous factors, including change in market conditions, reservoir performance and demand, and unforeseen technical

difficulties. *Id.* Further, the cautionary statement directs readers to ExxonMobil's SEC website, filings, and a supplemental information section that explains definitions, assumptions, and other details about how ExxonMobil arrived at the forward-looking statements presented. *Id.*

Plaintiffs argue that these warnings were inadequate because the listed risks had already begun to materialize. Response Br. at 12. But liability on that basis turns on Defendants' knowledge of that, which Plaintiffs have failed to establish, as discussed in Part I. *See Lormand*, 565 F.3d at 249 (finding cautionary language inadequate because defendants "*recognized* signs that those risks had already materialized") (emphasis added); *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021). Imposing liability for inadequate warnings when Defendants did not in fact apprehend the problems would render the PSLRA's requirement that Plaintiffs plead actual knowledge meaningless. Legislative records reflect that "[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true" was not intended to foreclose application of the safe harbor. *Id.* (quoting H.R. Conf. Rep. 104–369, at 44 (1995), reprinted at 1995 U.S.C.C.A.N. 730, 743).

ExxonMobil's warnings do not recite "merely a boilerplate litany of generally applicable risk factors." *Carlton*, 184 F. Supp. 3d at 454 (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)). The risks described are those that Plaintiffs allege actually materialized, demonstrating the "fit between the disclaimer and the challenged forward-looking statement" that the PSLRA requires. *Carlton*, 184 F. Supp. 3d at 455. Cautionary language satisfies the safe harbor provision

when it warns investors "of risks of a significance similar to that actually realized." *Harris*, 182 F.3d at 807.  If this lengthy statement outlining risks specifically tailored to oil and gas drilling projects is not sufficiently cautionary, it is difficult to imagine what would be.

Because Plaintiffs have not pleaded facts showing that Defendants knew the warned-of risks were already coming to fruition, as discussed in Part II, *supra*,[7] ExxonMobil's cautionary language is adequate.

### B. Whether the "On Track" Statements Were Forward-Looking

Saying that a project is "on track" "merely declar[es] or reaffirm[s] the objective itself" and is thus forward-looking.  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021).   Statements  about  "assumptions  intrinsic  to  those  forward-looking statements . . . are also immunized."  *In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *1 (N.D. Cal. 2021) (citing *Wochos*, 985 F.3d at 1192).  But "on track" statements are often accompanied by assertions of specific past or present circumstances that make the objective possible, the truth or falsity of which is discernable at the time the statement is made.  *See Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591 (N.D. Tex. 2004) (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999)).  Such mixed statements are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014).

---

[7] The safe harbor provision requires a higher state of mind than does pleading scienter.  As Plaintiffs' allegations did not satisfy the severe recklessness standard, they also have not adequately alleged the actual knowledge required to evade the safe harbor.

For example, in *Carlton*, the Court evaluated a statement that a plant was "currently producing" additional oil, making the company "well positioned" to make progress on its targets. The court held that this statement was not protected because it "justified the projection in terms of a particular aspect of the company's situation." 184 F. Supp. 3d at 495 (quoting *Inst. Investors Grp. v. Avaya*, 564 F.3d 242, 255 (3d Cir. 2009)) (cleaned up). However, the goal of full-year production exceeding 1 million gallons was "clearly forward looking." *Carlton*, 184 F. Supp. 3d at 495. In other words, even if the "on track" portion of a statement satisfies the safe harbor requirements, other factual assertions in the statement cannot be saved merely by proximity to forward-looking language. Present statements alongside forward-looking statements are actionable.

With that, the Court turns to examine ExxonMobil's contested statements.

*1. March 6, 2019 Investor Day.* – During the March 6, 2019 Investor Day presentation, Defendants stated that ExxonMobil was "on track" and "on schedule" to achieve its 2024 production goal. Compl. ¶ 350. These statements do not reference specific factual circumstances beyond the possibility of achieving the goal in the future; accordingly, they are within the scope of the safe harbor provision.[8]

During the Investor Day call, Defendant Woods made various representations about ExxonMobil's accomplishments. He stated that the "Upstream" business[9] had "made very

---

[8] Plaintiffs' expert evidence demonstrating the feasibility of this goal is irrelevant to whether the safe harbor applies.

[9] "Exxon operates through three business segments: (i) Upstream, through which Exxon explores for and produces crude oil and natural gas, including its oil resources in the Permian Basin; (ii) Downstream, through which Exxon manufactures and sells petroleum

good progress" on four key focus areas, including "accelerated value capture in the Permian." The accompanying slide also said that production was on plan for the 2024 goal. Compl. ¶ 391. While "on plan" is forward-looking, "accelerated value capture" suggests that Exxon is extracting resources in the Permian a faster rate than before, which would be measurable in the present. To the extent that this statement was false or misleading, it is actionable.

Accordingly, the March 6, 2019 "on track" statements are not actionable.

*2. April 26, 2019 Call.* – On ExxonMobil's Q1 2019 earnings call, Defendant Hansen said that ExxonMobil remained "on track with plans to increase production" to its 1-million-barrels-per-day goal by 2024. Compl. ¶ 400. This statement by itself is forward-looking.

However, Defendant Williams presented the accompanying slide, which stated that "extensive well inventory supports [the] production profile" and that ExxonMobil had 46 operational rigs in the Permian at that time. Compl. ¶ 401. Saying that the current well inventory supports future production expectations is distinct from ExxonMobil saying that it expects to be able to scale its drilling capacity in the future; "current well inventory" is much more akin to the "currently producing additional oil" statement found to be actionable in *Carlton*. Additionally, quantity of currently operational rigs is easily measured at the time of the statement. To the extent that either of these statements were false or misleading, they are actionable.

---

products; and (iii) Chemical, through which Exxon manufactures and sells petrochemicals." Compl. ¶ 31.

ORDER – PAGE 26

*3. November 1, 2019 Call.* – On ExxonMobil's Q3 2019 earnings call, Defendant Hansen presented the "green blob" slide. He represented that "Permian growth remains on track," and the accompanying slide stated, "continued strong well performance." Compl. ¶ 415. This is a mixed statement. The "on track" statement is forward-looking; the well performance is immediately measurable and therefore actionable, assuming it is material, discussed *infra* Part III.C(1).

*4. January 31, 2020 Call.* – On ExxonMobil's Q4 2019 earnings call, Defendant Woods told investors "we are making very good progress," that ExxonMobil was "on track" to achieve its 1-million-barrel-per-day goal, and that ExxonMobil was above what it said it would do the previous year by "about 20,000 barrels a day, so that's clearly on track." Compl. ¶¶ 237, 238. The only statement discernable immediately without reference to a future goal is Woods' reference to ExxonMobil's current production being above target by a margin of 20,000. If that statement was false or misleading, it is actionable; the rest is protected by the safe harbor.

*5. March 5, 2020 Press Release.* – On March 5, 2020, ExxonMobil released a press release that stated Permian Basin production volumes had increased and remain on track to exceed the 2024 goal. Compl. ¶ 425. This is a mixed statement; "on track" is forward-looking, but whether production volumes had increased would be easily discerned at the time of the statement, making it actionable if false and misleading.

## IV. MATERIALITY AND FALSITY

Rule 10b-5 makes unlawful "any untrue statement of a material fact" or omission of a material fact when otherwise the statement is misleading. 17 C.F.R. § 240.10b-5. A

fact is material if there is a substantial likelihood that a reasonable investor would have placed significance on the withheld or misrepresented information. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). To satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standards, Plaintiffs must set forth why a statement is false or misleading. *See id.* at 362. While materiality "typically presents a mixed question of fact and law," making it ultimately "a decision for the jury," *In re Venator Materials PLC Sec. Litig.*, 2021 WL 2980581, at *18 (S.D. Tex. 2021), Plaintiffs cannot survive a motion to dismiss without setting forth facts that make materiality at least plausible *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) ("Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed].") (emphasis and brackets in original). Defendants argue that Plaintiffs have not carried their burden to set forth facts demonstrating that some statements and omissions they challenge were both false and material.

### A. Allegedly Inaccurate Proved Reserves Figures Are Actionable

"Proved Reserves" is a term of art meaning "those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible . . . under existing economic conditions, operating methods, and government regulations . . . regardless of whether deterministic or probabilistic methods are used for the estimation." 17 C.F.R. § 210.4–10(a)(22). Defendants included

their Proved Reserves estimates in several public statements, including their Form 8-Ks and 10-Ks filed with the SEC.  Compl. ¶¶ 376, 383, 419.  Defendants argue that Plaintiffs' claims as to these statements should be dismissed because they have not pleaded falsity with particularity and because the Permian reserves are immaterial to the larger Proved Reserves calculation.

*1. Falsity.* — Plaintiffs have alleged, based on testimony from several employees, that ExxonMobil's Permian Basin management instructed engineers to manipulate calculations to increase the apparent value of the company's assets in the region.  Response at 17.  They also allege that those assumptions and figures were incorporated into the Proved Reserves estimates.  Compl. ¶¶ 317–21, 341–43.

Defendants reject Plaintiffs' interpretation, differentiating the drilling assumptions from the "learning curve"[10] and asserting that the alleged false drilling assumptions were not incorporated into the Proved Reserves calculations.  Def. Br. at 16.  Further, Defendants say that Plaintiffs' information supporting its allegations are inadequate to satisfy the particularity requirement because, in their view, its supporting witnesses lack sufficient knowledge.  *Id.* at 16–17.

Defendants' arguments demand too much of Plaintiffs at this early stage of litigation.  The parties dispute the facts surrounding how the Proved Reserves were calculated and whether allegedly false information was included; in resolving a motion to dismiss, the Court takes all of Plaintiffs' alleged facts as true, so long as there is a

---

[10] The learning curve is a calculation Exxon Mobil uses to predict the rate at which it will be able to scale its drilling.  Compl. ¶ 18.

ORDER – PAGE 29

sufficiently particularized basis for their contentions.  *See ABC Arbitrage*, 291 F.3d at 342, 350.  Plaintiffs need not set forth facts disproving Defendants' theories nor even creating an inference that is the most likely; all that is required is that Plaintiffs' allegations work together to create a plausible narrative of fraud.  *Carlton*, 184 F. Supp. 3d at 456 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009) (interpreting Federal Rule of Civil Procedure 9(b)'s requirements following *Twombly*, 550 U.S. 544).

Plaintiffs have supported their allegations about the Proved Reserves calculations with testimony from two Reservoir Engineers, Rhodes and FE3, who worked on forecasting well performance, including in the Permian.  Compl. ¶¶ 102–27.  Rhodes and FE3's statements specifically address how manipulation of data was allegedly being used "to increase the proven reserves."  *Id.* at ¶ 117.  Defendants may dispute their credibility, but such determinations are improper on motion to dismiss.  *See, e.g.*, *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *11 (W.D. La. 2007) (finding that a determination of credibility was a "fact-specific inquiry" "not appropriately disposed of on a motion to dismiss").  Plaintiffs have pleaded sufficient facts to set forth a theory that is at least plausible of how the Proven Reserves allegedly were fraudulently formulated, when, by whom, and why.  *See Dorsey*, 540 F.3d at 339 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

Now, the Court turns to materiality.

***2. Materiality.*** — Defendants argue that regardless of whether the Proved Reserves estimates were inaccurate, any errors were immaterial.  Def. Br. at 15.  But in the Fifth Circuit, "alleged accounting violations are sufficient to plead material misstatements."

ORDER – PAGE 30

*Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 848 (N.D. Tex. 2018) (citing *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257–58 (5th Cir. 2005) (holding that plaintiff pleaded a material misstatement by alleging with particularity that defendants violated GAAP)).  It does not matter that Plaintiffs have not honed in on the precise impact of the alleged Permian miscalculations on the larger Proved Reserves figures; they have sufficiently alleged a plausible theory connecting the two, and the total Reserves would be relevant to investor decision-making as well as the figures for the Permian Basin.

Accordingly, these statements are actionable.

### B. Allegedly Inaccurate Resource Base Figures Are Actionable

The Resource Base is a less stringent term that refers to all estimated quantities of oil and gas that are expected to be ultimately recoverable, including but not limited to ExxonMobil's Proved Reserves.  Def. Br. at xi.  The parties raise arguments similar to those addressed regarding the Proved Reserve Figures.

As with the Proved Reserves, Defendants argue that Plaintiffs have not shown that inflated Proved Reserves necessarily inflated the Resource Base, rather than simply reallocating the resources from one component of the Resource Base to another without affecting its overall total quantity.  *Id.* at 20.  But again, Plaintiffs' theory need not disprove Defendants' argument; it is enough for Plaintiffs to allege with particularity how and why their theory occurred, so long as, taken as true, the facts make their narrative plausible. Despite Defendants' factual disputes about the methods of calculation, which are "insufficient to support a motion to dismiss," *Barrie*, 397 F.3d at 257, Plaintiffs have set

ORDER – PAGE 31

forth enough facts supporting their theory of fraud to "raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555.

### C. Puffery

Defendants contend that several of the statements Plaintiffs have challenged are mere puffery, the kind of "generalized positive statements about a company's progress" that are not actionable as misrepresentations. *Venator*, 547 F. Supp. 3d at 649–50. Such comments are immaterial as a matter of law because "no reasonable investor would rely" on such "vague assertions of the condition of the company." *Taubenfeld*, 385 F. Supp. 2d at 593 (citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869–70 (5th Cir. 2003)). Because "analysts 'rely on facts in determining the value of a security,'" rather than "generalized, positive statements about the company's competitive strengths . . . and future prospects," statements of corporate optimism do not "perpetrate a fraud on the market." *Southland*, 365 F.3d at 372 (collecting cases). One simple distinction between misstatements and puffery "is that the latter is incapable of objective verification." *Sanders v. Realreal, Inc.*, 2021 WL 1222525, at *9 (N.D. Cal. 2021) (citation omitted).

*1. Drilling and Well Success.* — Defendants made various statements throughout the Class Period about ExxonMobil's drilling progress, including descriptions that it was "on track," "decent," "continuing," "optimized," and "within the range of what [ExxonMobil] expected." Response at 24. Defendants also stated that ExxonMobil "increased" and "ramped up" its drilling activity, *id.* at 26, and described its wells as "very, very high quality" — the "best wells." *Id.* at 27.

Attempting to "objectively verify" these statements would prove difficult, as either there would be no clear standard or verification would yield few or no additional details. *See Sanders*, 2021 WL 1222525, at *9.  These are all the type of "vague expressions of corporate optimism" that "investors and analysts are too sophisticated to rely on" over the more specific factual information that was available.  *In re Blockbuster Inc. Sec. Litig.*, 2004 WL 884308, at *7 (N.D. Tex. 2004).  Plaintiffs cannot characterize them as more specific than they are by connecting them to ExxonMobil's goal of 1 million barrels per day by 2024;[11] goal statements can nevertheless be puffery when they lack connections to specific facts and instead are broad "corporate cheerleading" statements.  *See, e.g.*, *Police and Fire Retirement Sys. of City of Detroit v. Plains All American Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) (holding that several statements made at Investors' Day events were nonactionable "aspirational statements" about goals the defendant was seeking to reach); *Ezra Sholom*, 504 F. Supp. 2d at 162 (finding that broad statements regarding Blockbuster's plans for the business' future direction were nonactionable puffery).

Because no reasonable investor would rely on or be misled by Defendants' generic qualitative statements about ExxonMobil's drilling activities and its wells over the extensive quantitative information available in its numerous public presentations and disclosures, such statements are not actionable.

---

[11] Plaintiffs conflate the requirements of the safe harbor provision with the definition of puffery.  Statements outside the safe harbor may nevertheless be nonactionable as immaterial puffery.  *See* Response at 25 (pointing to discussion of forward-looking statements in *Carlton* for interpretation of *Rosenzweig*'s puffery language).

ORDER – PAGE 33

*2. ExxonMobil's "Unique Position" Relative to Its Competitors.* — During the Analyst Meeting on March 7, 2018, Defendant Chapman presented a slide demonstrating ExxonMobil's "truly unique position in getting value" from the Permian "versus anybody else in the industry." Compl. ¶ 355. The slide showed Exxon outperforming select competitors in "total horizontal wells: operated, oil and gas" and "2017 production (KOEBD net): key unconventional liquids plays." *Id.*

The slide itself contained specific data and is accordingly not puffery; further discussion of the slide is reserved for the section below on Plaintiffs' omissions arguments. As for Chapman's statement, "unique" is not the synonym for "first place" that Plaintiffs make it out to be. *See id.* at ¶ 356. "Unique" may refer to numerous factors not captured in a quantitative ranking of production rates amongst several oil and gas businesses, which savvy investors and analysts would surely recognize. Objective verification of ExxonMobil's position's uniqueness would be impossible. *Sanders*, 2021 WL 1222525, at *9. The statement that ExxonMobil's position was "unique" as compared to the select competitors shown is too vague to mislead the market and accordingly is nonactionable puffery.

*3. Statements Regarding the Reserve Process.* — Defendants stated that ExxonMobil's process for estimating its Proved Reserves was "well-established," "disciplined," and "rigorous." Response at 26. Though general, these terms carry meaning with investors. Courts have held in the past that use of the word "rigorous" "can be actionable when used as a qualifier or basis of comparison," such as describing testing methods and safety processes. *Sanders*, 2021 WL 1222525, at *10 (holding that a fashion

reseller describing authentication process as "rigorous" was not puffery) (citing *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 557 (N.D. Cal. 2019) (holding that describing testing methods as rigorous was not puffery) and *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 851 (N.D. Cal. 2018) (holding that claiming "rigorous standards and practices are put in place to protect the nutritional integrity of our food" was not puffery)).

"Proved Reserves" is a term of art with a specific meaning as defined by GAAP. As in *Ahern*, the calculation methods could be tested, and the rigor of the processes objectively verified. Accordingly, Defendants' statements about ExxonMobil's Proved Reserves calculations are not mere "rosy affirmations," but directly encourage confidence in the published figures. *Carlton*, 184 F. Supp. 3d at 455 (quoting *Ind. State Dist. Council & Hod Carriers Pension & Welfare Fund*, 583 F.3d 935, 944 (6th Cir. 2009). Because these statements could affect a reasonable investor's decision-making, they are not puffery and are therefore actionable.

### D. Omissions

To state a claim based on an omission, Plaintiffs "must sufficiently allege 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Carlton,* 184 F. Supp. 3d at 457 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38) (quotation marks omitted)). "Corporate officials need not present an overly gloomy or cautious picture of the company's current performance," so "long as public statements are reasonably consistent with reasonably available data." *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 433 (5th Cir. 2002). For an omission to be

ORDER – PAGE 35

actionable, Plaintiffs must show that "the defendants created 'an impression of a state of affairs that differ[ed] in a material way from [the] one that actually existed.'" *Carlton*, 184 F. Supp. 3d at 468 (citing *Shaw*, 537 F.3d at 541 (quoting *Brody v. Transitional Hosps. Corp.,* 280 F.3d 997, 1006 (9th Cir.2002))).

Defendants have moved to dismiss Plaintiffs' claims that ExxonMobil's March 7, 2018 presentation was misleading because it failed to disclose several pieces of information affecting the way ExxonMobil appeared in relation to competitors. Response at 26. Defendants argue that the underlying statement was immaterial, meaning it had no duty to disclose beyond the disclosures it did include, which informed the audience that the slide included non-Permian data and that the competitor data was publicly available. Def. Br. at 24.

The standard is summarized well in *Carlton*. 184 F. Supp. 3d at 457. Some information is "of such dubious significance that insistence on its disclosure may accomplish more harm than good." *Id.* (quoting *TCS Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) (cleaned up)). Unnecessarily low standards of materiality may subject the corporation and its management to liability for insignificant omissions or misstatements; "management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information," which is "hardly conducive to informed decisionmaking." *Id.* (quoting *TCS Indus.*, 426 U.S. at 448–49 (internal quotation marks omitted)). "To balance these concerns, 'the plaintiff must plead not only why the statement at issue is incomplete but why that incompleteness makes the statement misleading or untrue.'" *Id.* (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642

(5th Cir. 2005)).   Importantly, section 10(b) and Rule 10b–5(b) "do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary 'to make . . . statements made . . . not misleading.'" *Id.* (quoting *Matrixx*, 563 U.S. at 44, 131 S. Ct. 1309 (quoting 17 C.F.R. § 240.10b–5)).

Plaintiffs argue that the statement was incomplete because it did not notify the audience that other operators in the region outperformed ExxonMobil on the metrics on the slide.  However, Plaintiffs have not alleged why this slide was misleading.  The language did not purport to label ExxonMobil as the number one performer in any category, and it directed viewers to additional information.  There may be legitimate business reasons that ExxonMobil felt it more relevant for its investors to compare itself to those operators than the ones to whom Plaintiffs refer.  To find an omission claim actionable under these circumstances would render it virtually impossible for corporations to present data to investors without inundating every slide and document with likely irrelevant and unhelpful information for the sake of avoiding liability.  For this reason, courts have consistently held that businesses have "no duty to cast its business in a pejorative, rather than a positive, light." *Rosenzweig*, 332 F.3d at 869.  *See also Blockbuster*, 2004 WL 884308, at \*13 (finding that an omission was not actionable when Blockbuster did not disclose a specific source of competition, instead discussing its plan for combating competition generally).

Accordingly, the March 7, 2018 presentation slide is not actionable.

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' Motion to Dismiss.  The Court also grants Plaintiffs' request in the alternative for leave to amend.  Provided

that they can do so in a manner consistent with this opinion, Plaintiffs may file a Second Amended Complaint within thirty (30) days of the date of this Order.  The Court is unlikely to grant any motions, agreed or otherwise, to extend pleading or response deadlines.

Signed September 29, 2022.

David C. Godbey
Chief United States District Judge

ORDER – PAGE 38