**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) Civil Action No.: 3:21-cv-00194-N ) |
| v. | ) <u>CLASS ACTION</u> ) |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, | ) <u>DEMAND FOR JURY TRIAL</u> ) ) ) |
| Defendants. | ) ) ) ) ) |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................................... 2

II.    JURISDICTION AND VENUE ........................................................................... 12

III.   THE PARTIES...................................................................................................... 12

       A.     Lead Plaintiffs........................................................................................... 12

       B.     Defendants ................................................................................................. 13

IV.    SUMMARY OF THE FRAUD ............................................................................ 15

       A.     Defendant Woods, Installed To "<u>Turn The Titanic</u>," Makes High-Profile
              Acquisitions In The Permian Basin And Places Them At The Center Of
              Exxon's Turnaround Plans.......................................................................... 17

       B.     March 7, 2018 Analyst Meeting: Exxon Announces "Aggressive Growth
              Strategy" In The Permian, Touting The Value Of Permian Assets ..................... 19

       C.     Defendants Continue To Tout Permian Production In 2018, And Unveil
              The Notorious "Green Blob" .................................................................... 19

       D.     In Truth, Exxon's Reported Valuations Were Based On False Drilling
              Assumptions And An Inflated 2018 Development Plan............................. 20

       E.     Company Insiders Recognize The Need For A Write-Down Of Exxon's
              Proved Reserves In Summer 2018 ............................................................. 21

              1.     Exxon's Fraudulent Reserve Forecasting Process ......................... 21

                     a.     The Annual Development Planning Process................................. 21

                     b.     The Global Reserves Group Headed By Defendant Mallon......... 22

                     c.     The Reservoir Engineering Department ...................................... 24

                     d.     Boosting Proved Reserves To Avoid A Write-Down................... 26

                     e.     Never Revising Down The Resource Base.................................... 30

              2.     Exxon Internally Recognizes The Need For A Write-Down In The
                     Summer Of 2018............................................................................. 31

       F.     Instead Of Taking A Write-Down, Defendants <u>Increase</u> Proved Reserves
              And Continue To Tout Production In The Permian Basin ................................. 32

G.      "Unleash the Hounds": In March 2019, Defendants Announce Impossible
        Goal Of 1 Million Oil-Equivalent Barrels Per Day In The Permian, And
        Tout Permian Value Through The End Of The Class Period ............................. 32

H.      Exxon Uses False Drilling Assumptions To Overvalue The Delaware
        Basin By At Least $10 Billion ............................................................................. 35

        1.      Two Exxon Employees Become Whistleblowers .................................... 35

        2.      At Mallon's Direction To Inflate The Plan, Bond Instructs The
                Delaware Planning Team To Fraudulently Inflate Exxon's
                Valuations, Over The Experts' Objections, To Meet Woods'
                Publicly-Stated Goal, And This False Information Is Incorporated
                Into Exxon's SEC Filings ....................................................................... 36

        3.      Dr. Gulden And Dr. Burch Report The Fraud .......................................... 42

        4.      Dr. Gulden And Dr. Burch's Complaints Trigger An Investigation
                That Reached Upper Management, And Exxon Fires Them With
                Woods' Approval ..................................................................................... 43

        5.      The Department Of Labor Investigates And Confirms The Fraud ........... 46

I.      Lead Counsel's Investigation Confirms The Fraud ................................................ 50

        1.      New Reports From Former Employees Further Confirm The Fraud ....... 50

        2.      Former Employees Confirm The "This is A Lie" File And Pressure
                To Use False Assumptions In Connection With Year-End 2019
                Planning Process ....................................................................................... 51

        3.      Former Employees Confirm That Pressure to Achieve Woods'
                Impossible Goal Permeated The Organization ......................................... 52

        4.      Additional Former Employees Confirm Pressure To Change
                Valuations That Were Not High Enough .................................................... 56

        5.      Exxon's Culture And Longstanding Policy Of Not Taking Write-
                downs ....................................................................................................... 58

        6.      Production Conditions On The Ground Were Far Different Than
                Exxon Represented To Investors ............................................................. 60

                a.      Problems With Drilling And Wells In 2018 ................................. 61

                b.      Additional Production Problems And Delays In 2018 ................. 64

                c.      Longer Than Expected Drilling Times Made The Permian
                        Production Goal Impossible ........................................................ 65

d.    Additional Problems In The Permian That Rendered The Production Goal Impossible To Achieve ...................................... 69

      i.    Inadequate Equipment And Infrastructure........................ 69

      ii.    Inadequate Labor ............................................................. 72

      iii.    Less Oil Than Expected .................................................... 72

J.    The Truth Is Revealed Through A Series Of Partially Corrective Disclosures ............................................................................................. 74

    1.    January 31, 2020:  Exxon Discloses That Permian Basin Production Has Slowed Down, But Continues To Mislead Investors About Its 1 Million Barrels Per Day Goal................................ 74

    2.    May 1, 2020: Exxon Discloses Significant Rig Cuts And A Reduction In 2020-2021 Permian Basin Production Volumes ................ 76

    3.    January 15, 2021: The *Wall Street Journal* Reports That Exxon Used False Drilling Assumptions Saved In A File Called "This is A Lie" To Overvalue The Delaware Basin By $10 Billion ...................... 77

V.    POST-CLASS PERIOD EVENTS .................................................. 78

A.    Exxon Announces A Reduced Goal Of 700,000 Oil-Equivalent Barrels Per Day By 2025 In The Permian ............................................... 78

B.    Exxon Reduces Its Proved Reserve By 1.5 Billion Oil-Equivalent Barrels Related To The Permian Basin ............................................................. 78

VI.    ADDITIONAL SCIENTER ALLEGATIONS................................................ 79

VII.    DEFENDANTS MALLON AND BOND WERE KEY PARTICIPANTS IN THE FRAUDULENT SCHEME, AND INTENTIONALLY FURNISHED FALSE INFORMATION FOR INCLUSION IN EXXON'S PUBLIC STATEMENTS ............ 93

A.    Defendants Mallon And Bond Were Key Participants In The Fraudulent Scheme ..................................................................................................... 93

B.    Defendants Mallon And Bond Furnished False Information For Inclusion In Exxon's Public Statements With Intent, And Their Scienter Is Imputed To Exxon..................................................................................................... 97

VIII.    THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES................................ 99

A.    Standards Governing The Calculation Of Proved Reserves ................. 99

B.     GAAP Regulations Governing The Reporting Of Proved Reserves ................. 100

C.     GAAP Requires Proved Reserves To Be Estimated With Reasonable Certainty.................................................................................................... 102

D.     Relevant SEC Regulations Governing Oil And Gas Companies....................... 103

IX.     EXXON VIOLATED THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES.................................................................................................... 104

A.     Exxon Incorporated False Drilling Assumptions Into Its Proved Reserve Calculation ............................................................................... 104

B.     Exxon Engaged In A Fraudulent Process For Estimating Its Proved Reserves ................................................................................................ 105

X.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................................... 105

A.     Defendants Misrepresent The Value Of The Permian Basin Throughout 2018.................................................................................................... 106

1.     Misstatements And Omissions On March 7, 2018 Analyst Day ............ 106

2.     Misstatements And Omissions In Financial & Operating Review Report, Published On April 3, 2018...................................................... 106

3.     Misstatements And Omissions In May 30, 2018 Press Release ............. 106

4.     Defendants Continue To Misrepresent The Value Of The Permian At The Beginning Of 2019 .................................................................... 107

a.     False Valuation ........................................................................... 107

b.     False Valuation Process ............................................................. 108

c.     False Valuation In 2018 10-K..................................................... 108

d.     False Valuation Process In 2018 10-K........................................ 108

B.     In March 2019, Defendants Announce 1 Million Oil-Equivalent Barrels Per Day By 2024 In Permian, And Continue To Misrepresent The Value Of The Permian .................................................................................... 109

1.     Misstatements And Omissions In March 5 And 6, 2019 Press Releases And On March 6, 2019 Investor Day....................................... 109

a.     Impossible Permian Production Goal ......................................... 109

|   |   | b. | False Valuation ........................................................... 112 |
|   | 2. | | Misstatements And Omissions In April 26, 2019 Press Release ........... 113 |
|   | 3. | | Misstatements And Omissions In 2018 Summary Annual Report Published On June 18, 2019 ................................................................... 114 |
|   |   | a. | Impossible Permian Production Goal ......................................... 114 |
|   |   | b. | False Valuation ........................................................... 114 |
|   |   | c. | False Valuation Process .................................................. 114 |
|   | 4. | | Misstatements And Omissions During June 18, 2019 J.P. Morgan Energy Conference ................................................................... 115 |
|   | 5. | | Misstatements And Omissions During September 4, 2019 Barclays CEO Energy-Power Conference ............................................ 116 |
| C. | | | Despite Disclosing Permian Production Slowdown In January 2020, Defendants Continue To Mislead Investors About The Value Of The Permian Basin ..................................................................... 117 |
|   | 1. | | Misstatements And Omissions During Q4 2019 Earnings Call ............. 117 |
|   | 2. | | Misstatements And Omissions In The 2019 10-K ................................. 118 |
|   |   | a. | False Valuation ........................................................... 118 |
|   |   | b. | False Valuation Process ............................................... 119 |
|   | 3. | | Misstatements And Omissions On March 5, 2020 Analyst Day ........... 119 |

| XI. | LOSS CAUSATION ................................................................... 120 |
| XII. | THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ......................... 126 |
| XIII. | THE PRESUMPTION OF RELIANCE ....................................................... 127 |
| XIV. | CLASS ACTION ALLEGATIONS ........................................................ 128 |
| XV. | CAUSES OF ACTION ................................................................... 129 |

COUNT I VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER (AGAINST DEFENDANTS EXXON, WOODS,  MALLON, AND BOND) ........................................................ 129

COUNT II  VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST DEFENDANT WOODS AND DEFENDANT MALLON) ...................... 132

XVI.   PRAYER FOR RELIEF ............................................................................................. 133

XVII.  JURY DEMAND ...................................................................................................... 133

Lead Plaintiffs Amalgamated Bank ("Amalgamated") and State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") (together, "Lead Plaintiffs" or "Plaintiffs") bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities who purchased, or otherwise acquired, the common stock of Exxon from March 7, 2018 to January 15, 2021, inclusive (the "Class Period"), subject to certain exclusions addressed in ¶425 below (the "Class"). Plaintiffs' and the Class's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder. The Defendants in this action are Exxon Mobil Corporation ("Exxon"), Darren W. Woods, Exxon's current Chief Executive Officer ("CEO") and Chairman of Exxon's Board of Directors; Liam M. Mallon, President of ExxonMobil Upstream Oil & Gas Company and Vice President of Exxon; and Melissa Bond, Exxon's former Senior Manager of Delaware Basin Development.

Lead Plaintiffs' information and belief as to the allegations concerning matters other than themselves and their own acts is based upon their investigation. In addition to the steps Lead Counsel took to investigate the facts pled in Plaintiffs' First Amended Complaint, Lead Counsel's investigation encompassed several key developments occurring after the Court issued its September 29, 2022 Order. First, on October 6, 2022, the *Washington Post* published an article titled "ExxonMobil ordered to reinstate fired whistleblowers who alleged fraud." The article explained that two Exxon whistleblowers, Dr. Lindsey Gulden and Dr. Damian Burch, had filed a complaint with U.S. Department of Labor Occupational Safety and Health Administration ("OSHA") alleging that Exxon illegally terminated them in retaliation for divulging Defendants' scheme to defraud the public and investors as to the false statements at issue in this case, including Exxon's proved reserves and resource base reporting. Following an investigation, OSHA ordered

Exxon to reinstate the two Exxon whistleblowers, and pay them hundreds of thousands of dollars in back pay and damages. OSHA issued its findings on October 6, 2022. OSHA found that Exxon violated Sarbanes Oxley's ("SOX") whistleblower protection provision in terminating Dr. Gulden and Dr. Burch. Lead Counsel reviewed Dr. Gulden and Dr. Burch's OSHA complaint and OSHA's findings. Lead Counsel also interviewed Dr. Gulden and Dr. Burch, among multiple other former employees, including employees herein identified as Former Employee ("FE") 1 through 6,[1] Andrew Rhodes, Jeff Wachsmann, Chris Noland, Jeff Biddle, Steven Binns, Karl Rydjord, Ryan Wells, and Norris Wingo. The new facts uncovered by Lead Counsel can be found at paragraphs 5-32, 34, 50, 52, 66-67, 70-73, 109, 112, 114-64, 182-83, 188, 190, 192-93, 260-78, 280, 282-87, 290, 298-314, 317, 319, 340-41, 349, 351, 364, 367-69, 373, 376, 378, 380-82, 386-90, 400, 441.

Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      This case concerns Exxon's and its officers' misstatements and omissions about the value of Exxon's critical oil and gas resources in the Permian Basin, located in Texas and New Mexico.

2.      Darren Woods became Exxon's CEO on January 1, 2017. Weeks later, Defendant Woods announced a $6.6 billion acquisition of oil and gas assets in the Permian Basin (which includes the critical Delaware Basin). Woods touted the Permian acquisition to investors as the

---

[1] The terms "Former Employees" and "FE" refer to the former employees of Exxon and XTO whose reports are discussed in this Complaint. Certain Former Employees who Lead Counsel interviewed consented to be named in this Complaint. Other Former Employees requested to proceed anonymously and, as such, are identified by number. In order to preserve the Former Employees' anonymity while maintaining readability, the Complaint uses the pronouns "he," "his," and "him" in connection with all of the Former Employees, regardless of their gender.

hallmark of Exxon's new growth strategy. As a result, investors placed considerable importance on the metrics Exxon reported about the Permian Basin, a fact which was not lost on Woods.

3.     Two years into his tenure as CEO, on March 5, 2019, Woods announced that Exxon had set an aggressive goal: to extract 1 million oil-equivalent barrels per day by 2024 from the Permian Basin. On the same day, Exxon announced an increase in the Permian's resource base to "approximately 10 billion oil-equivalent barrels" and told investors that this number "is likely to grow further as analysis and development activities continue." These statements, and others detailed below, were false.

4.     As the Court knows, the *Wall Street Journal* reported on January 15, 2021 that (i) Exxon used false drilling assumptions for 2018, which in turn allowed it to report false valuations to investors; and (ii) in 2019, Exxon deliberately overvalued the Delaware Basin by $10 billion using false "learning curve" drilling assumptions saved in a file called "This is a Lie." The *Wall Street Journal* attributed its source to a whistleblower complaint.

5.     The whistleblowers' identities – and other facts supporting their reports that Exxon was lying – were kept anonymous until just over three weeks ago. On October 6, 2022, the *Washington Post* published an article titled "ExxonMobil ordered to reinstate fired whistleblowers who alleged fraud." The article explained that following an investigation, OSHA had ordered Exxon to reinstate the Exxon whistleblowers, and pay them hundreds of thousands of dollars in back pay and damages (the "OSHA Findings"). The article identified the whistleblowers as two PhD scientists and oil reserve valuation experts named Dr. Lindsey Gulden and Dr. Damian Burch, who had each worked at Exxon for over a decade.

6.     As the OSHA Findings explained, Dr. Gulden and Dr. Burch alleged that "[Exxon] retaliated against them in violation of SOX when [Exxon] terminated Dr. Gulden on October 23,

2020 and Dr. Burch on December 10, 2020, because <u>they raised issues about the valuation of oil</u> <u>wells with [Exxon's] management, which they believed overinflated [Exxon's] SEC filings and</u> <u>information [Exxon] disclosed to the public.</u>"

7.     As detailed herein, at the direction of Defendant Liam Mallon (President of ExxonMobil Upstream Oil & Gas Company and President of Exxon), Defendant Melissa Bond (Exxon's former Senior Manager of Delaware Basin Development), instructed her team to artificially inflate the value of the Delaware Basin development plan to make it match Defendant Woods' pledge to investors of 1 million barrels per day by 2024 in the Permian. Defendant Woods, Defendant Mallon, and Defendant Bond knew that Exxon's publicly-reported proved reserves and resource base valuations were based on the development plan.

8.     As alleged in the OSHA Complaint, in 2018, Exxon estimated the net present value ("NPV") of its Delaware Basin holdings to be $60 Billion. The NPV estimate is a metric that describes the value of a development plan using certain assumptions, including drilling assumptions. However, "actual, real-world drilling speeds turned out to be considerably slower than the 2018 estimates" used to support the $60 billion figure in the 2018 plan.

9.     Nevertheless, in the face of this contradictory data, on March 5, 2019, Defendant Woods told investors that Exxon would achieve a material increase in production to 1 million barrels per day by 2024 in the Permian. Defendant Woods' March 5 pledge was based on the overvalued 2018 development plan, which had been proven inaccurate. When specifically asked on March 6 by an analyst about the "Permian production curve," Woods stated, "It goes back to the development plan we have in place," and "what we've done in 2018" and "what we've been doing in 2018." In truth, as noted above, the actual historic drilling times in 2018 were considerably slower than the estimates that the 2018 development plan had relied on.

10. Exxon's valuation and development planning experts, including Dr. Burch, performed a valuation of the Delaware Basin based on how fast Exxon had actually drilled in 2018. This valuation was $40 billion, which was $20 billion less than the valuation used for the 2018 development plan. As alleged in the OSHA Complaint:

> During the 2019 planning and budget season, the Delaware Development Planning Team revised the development plan for the Delaware Basin holdings using refined time-to-drill estimates, generated by company drilling experts and based on actual drilling speeds that had been measured over the past year. Due to the slower-than-anticipated drilling speeds, the NPV estimate of the initial 2019 development plan was $40 Billion, $20 Billion less than the NPV estimate for the 2018 development plan.

11. In March or April of 2019, Defendant Bond presented this initial Delaware Basin valuation to Defendant Mallon at an in-person meeting in Houston. Defendant Mallon directed Defendant Bond to find ways to increase the $40 billion number. Defendant Mallon communicated, in sum and substance, that the development plan that Defendant Bond presented to him did not say 1 million barrels per day and it did not say a valuation of $60 billion, and Defendant Bond needed to bring Defendant Mallon a new plan that did say those things.

12. Defendant Bond then executed Defendant Mallon's instruction to falsify the plan to bring it up toward the desired result and match Defendant Woods' public statements about drilling productivity. As the OSHA Complaint alleged, "After sharing the initial 2019 $40-Billion-NPV plan with upper management, ExxonMobil's Delaware Basin Development Manager, [Defendant Bond], instructed the Delaware Planning Team to change the development plan so that the 2019 NPV estimate would increase and so that production projections would be consistent with the CEO's public pledges" – i.e., Defendant Woods's pledge that Exxon would increase production in the Permian to 1 million barrels by 2024.

13. But "the use of realistic revised assumptions failed to significantly increase the Delaware Basin's NPV estimate and accelerate production projections," so, as alleged in the

OSHA Complaint, Defendant "Bond decided to mandate the use of increasingly aggressive 'drilling learning curve' assumptions, which referred to the assumption that drilling speeds would increase the longer a drilling crew stayed in a certain area."

14.     In May 2019, Defendant Bond re-presented the adjusted results to Defendant Mallon at another in-person meeting in Houston. Defendant Mallon instructed Defendant Bond to revisit the long-term learning curves which meant, in sum and substance, that <u>the Delaware Development Planning Team had not lied hard enough yet to achieve the desired outputs in terms of valuation and drilling speed and productivity</u>.

15.     As alleged in the OSHA Complaint, Defendant "Bond dictated increasingly optimistic learning curve assumptions until the NPV of the Delaware Basin reached an estimated value of $50 billion. However, by that point, the learning curve assumptions were fully inconsistent with ExxonMobil's actual drilling speed data and with the learning assumptions from ExxonMobil's drilling experts. Accordingly, such information was false."

16.     At the same time that the Delaware Planning Team was fraudulently inflating the development plan – at Mallon's direction – on June 18, 2019, Exxon participated in a J.P. Morgan Energy Conference. During the conference, Defendant Mallon falsely stated, "Starting with the Permian, we are on track to deliver on the million barrels a day by 2024. We believe our innovative development plan is key to that and we continue to see and achieve the milestones that we set out for ourselves."

17.     In July 2019, Defendant Bond presented the revised development plan – now valued at $50 billion and reflecting drilling productivity in line with Defendant Woods' public pledges – to Defendant Mallon during an in-person meeting in Houston.

18.     In August 2019, with Defendant Mallon's approval, the adjusted $50 billion NPV plan became the final development plan. Exxon used the fraudulently inflated plan and the fraudulently inflated estimate of oil production and cost and supply in its public filings and its public statements to investors, including its stated 1 million barrels per day Permian production goal, its stated proved reserves, and its stated resource base valuations.

19.     As alleged in the OSHA Complaint, Defendant Bond held a Delaware Basin-wide meeting on October 23, 2019 in which Dr. Burch "was asked to present the Delaware Basin drilling plan based on the learning curve assumptions mandated by Bond. During the presentation, one of the drillers interrupted and stated, 'That is impossible.' Before [Dr.] Burch could respond, [Defendant] Bond told the audience that [Dr.] Burch must have made a mistake and that [Dr.] Burch, a mathematical modeling expert did not understand mathematical modeling."

20.     Nevertheless, the plan was not changed to align with reality. The fraudulently inflated Delaware Development Plan was final and, as the OSHA Complaint alleged, "The true and correct forecast of oil production and cost of supply for ExxonMobil's Delaware Basin holdings was not used by the Company in its public filings, which constitutes a violation of criminal fraud statutes, SEC rules and/or regulations, and Federal law relating to fraud against shareholders."

21.     As Dr. Burch told the *Washington Post* on October 6, 2022, "I had never seen anything like this before. Management said to just override the experts so we can get to the number the CEO has already blasted to the public. We could not find any evidence to support it. The science did not support it. The data did not support it. Nothing supported it."

22.     There was a lot of discussion within Exxon about how it did not matter if Exxon was actually going to produce 1 million barrels per day. The development plan had to say that,

even if it meant they had to lie to get it on the plan. The attitude at Exxon was that it would be Exxon's problem next year to deal with why they were not on track to get to 1 million barrels per day, and this was commonly understood at Exxon.

23.      Throughout the course of the events described above, Defendants continued to issue materially false and misleading statements concerning the fraudulently inflated plan. The OSHA Findings detail how Dr. Gulden and Dr. Burch repeatedly raised their concerns about securities fraud within Exxon, including to their senior managers and Exxon's HR Department—and were fired for it. For instance, on April 26, 2019, Exxon filed a Form 8-K which stated, "ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024. The size of the company's resource base in the Permian is appropriately 10 billion oil-equivalent barrels, and is likely to grow further as analysis and development activities continue." As the OSHA Findings concluded, "Dr. Gulden and Dr. Burch believed this statement was not accurate and they informed management about the misleading SEC filings."

24.      In fact, this public statement was contradicted by then-existing data within Exxon. Dr. Burch, a valuation expert, had, according to the OSHA Findings, conducted his own "analysis [which] revealed a lower NPV than what [Exxon] had disclosed publicly," which he sent to the Delaware Basin Team repeatedly, including on June 18, 2019 and June 19, 2019. Further, Dr. Gulden analyzed "publicly available drilling-time data for more than 10,000 wells in the Delaware Basin" which confirmed that, as OSHA found, "drilling times over the past several years remained essentially unchanged" and "supported Dr. Burch's objections to the 'learning curve assumptions' made by [Defendant] Bond." Dr. Gulden sent her analysis to Dr. Burch and Ozgur Ozen, the supervisor of the Delaware Development Planning Team.

25.     On September 4, 2019, a Barclays analyst specifically asked Defendant Woods about his "target of achieving over 1 million barrels a day" by 2024 in the Permian. In response, Defendant Woods assured investors that the estimate was supported by a legitimate bottoms-up process that was based on "fundamentals":

> We didn't go out and say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that. What we ended up saying is, develop the resource in a way that we think maximizes the recovery is a very grassroots buildup from the beginning of the fundamentals. And then once we've figured out what was the optimal development of that, we stacked at the volume to see what it came out to be, and that was what it came out to be.

26.     In reality, the exact opposite was true:  Woods did "go out and say" that Exxon would "achieve 1 million barrels a day" when the data contradicted him; Exxon's valuation experts strenuously objected because Exxon could not actually "drill that" much that quickly; and Defendants nevertheless continued to report the same false metrics to investors. It was also false for Woods to say that there was "a very grassroots buildup from the beginning of the fundamentals," when, in truth, the expert scientists were instructed to "turn the knob" on the software, as OSHA found and Dr. Burch told the *Washington Post*, using false assumptions until the model produced the 1 million barrels per day that Woods had promised.

27.     The OSHA Findings concluded that both Dr. Gulden and Dr. Burch "raised issues with [Exxon's] analysis of oil production in the Delaware Basin. They believed it was artificially inflated and [Exxon] was misleading the public and the SEC in their filings." For instance, Dr. Gulden lodged a complaint with Exxon's Human Resources Department on October 23, 2019. On November 14, 2019, Dr. Burch wrote to Exxon's Human Resources department saying he was pressured to "turn any knobs we could in our modeling software to get the forecasts NPV up, and (a) [his managers] didn't care whether those new assumptions were realistic (they weren't) and (b) they didn't make any changes that would be required to try to operationalize these new

assumptions." Dr. Burch raised his concerns about the inaccurate forecasted NPV multiple times with management.

28.     As alleged in the OSHA Complaint, "Dr. Gulden and Dr. Burch's complaints triggered an investigation that reached upper management. Upon information and belief, the investigation activities took place throughout 2020." Defendant Woods and Defendant Mallon were made aware of the investigation.

29.     Dr. Burch told the *Washington Post* on October 6, 2022, "We were told by H.R. Yep, this is definitely bad and we will definitely take care of it." But then, nothing happened until the *Wall Street Journal* contacted Exxon about a forthcoming article about the Delaware Basin.

30.     OSHA found that on August 27, 2020, the *Wall Street Journal* contacted Exxon regarding an article that they intended to publish about Exxon's development plans for the Delaware Basin. In response, Beth Casteel, Exxon's Audit Team and Security Director, immediately initiated an investigation into whether Dr. Gulden and Dr. Burch had provided information to the *Wall Street Journal*.

31.     On September 13, 2020, the *Wall Street Journal* published their article titled "Exxon Used to be America's Most Valuable Company. What Happened?" The article noted that it had interviewed over 20 current and former employees, including Dr. Gulden's husband, Enrique Rosero. Following interviews of Exxon's Audit Team, OSHA concluded that the Audit Team had told Michael Deal, Vice President of the Upstream for Research Technology & Digital Development, that the Audit Team believed that since Dr. Gulden's husband was quoted in the article, she was "guilty by association." Exxon then retaliated against Dr. Gulden and Dr. Burch by terminating them because Exxon believed they had provided information about the Company's

securities fraud to the *Wall Street Journal*. Defendant Woods at least approved the decision to terminate Dr. Gulden and Dr. Burch.

32.    OSHA concluded, following its investigation, that Dr. Gulden and Dr. Burch had engaged in protected whistleblower activity under SOX by reporting their concerns that Exxon had defrauded investors, and were fired by Exxon for engaging in that activity. OSHA ordered Exxon to pay Dr. Gulden and Dr. Burch hundreds of thousands of dollars in back pay, back wages, and compensatory damages, and to expunge their terminations from Exxon. OSHA concluded:

> Here, [Dr. Gulden and Dr. Burch] engaged in protected activity several times in 2019 and 2020 when they raised their concerns to [Exxon's] management that the assumptions leading to the estimated NPV of the Permian Basin were inaccurate and how those assumptions were included in misleading statements in SEC filings. These concerns were ultimately the subject of the 2020 WSJ article and a subsequent lawsuit alleging shareholder fraud. [Dr. Gulden and Dr. Burch] had a reasonable belief that [Exxon's] statements in their SEC filings were inaccurate. [Dr. Gulden and Dr. Burch] raised these concerns internally and [Exxon] was aware of this protected activity.

OSHA made these findings after providing Exxon due process, hearing its denials, and rejecting them.

33.    Lead Counsel's investigation further confirmed that Exxon's valuation process was rife with fraud. As detailed below, Lead Counsel spoke with numerous former Exxon employees, who reported that: (i) reserve estimate teams were pressured from their management to boost their reserve numbers; (ii) reserve experts' suggestions to write-down reserve valuations were rejected due to Exxon's long-standing policy never to take write-downs; and (iii) lengthy drilling times and poor well performance – which only worsened throughout 2019 and 2020 – demonstrated that Exxon's stated oil equivalent barrels per day goals were unachievable.

34.    Further, after the Court's Order of September 29, 2022, Lead Counsel re-contacted former employees who confirmed that in September and October of 2019, senior management, including Defendant Woods, reviewed the inflated NPV amount and other metrics that are the

basis for the proved reserve and resource base valuations that Exxon reports to investors. Thus, a close review of these records was within the scope of Defendant Woods' position as CEO, and he was at least severely reckless in not discovering that they were artificially inflated. Indeed, Woods announced the 1 million-barrels goal when it was contradicted by the actual data, and then Company insiders, including Defendant Mallon and Defendant Bond, mobilized to make the impossible appear possible to investors.

## II.   JURISDICTION AND VENUE

35.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

36.     This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1331 and 1337.

37.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District.

38.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## III.   THE PARTIES

### A.   Lead Plaintiffs

39.     Lead Plaintiff Amalgamated Bank ("Amalgamated") is an investment bank that serves thousands of labor unions, nonprofits, social impact enterprises, political organizations,

foundations, and individuals. Amalgamated has been offering investment management services since 1973, and it has over $57 billion in assets under management and custody. As set forth in the certification previously filed with the Court (ECF No. 22-2), Amalgamated is the trustee for the LongView LargeCap 500 Index VEBA Fund, LongView LargeCap 500 Index Fund, LongView Large Cap 1000 Index Value Fund, and LongView Broad Market 3000 Index Fund, each of which purchased shares of Exxon common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws.

40.     Lead Plaintiff State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island"), is a public pension fund that provides benefits to public employees of the State of Rhode Island. Rhode Island manages approximately $10 billion in assets on behalf of its active and retired members. As set forth in the certification previously filed with the Court (ECF No. 22-2), Rhode Island purchased shares of Exxon common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws.

    **B.     Defendants**

41.     Defendant Exxon Mobil Corporation ("Exxon" or the "Company"), one of the world's largest oil and gas companies, is a New Jersey corporation with its principal executive offices located at 5959 Las Colinas Boulevard, Irving, Texas 75039. Exxon common stock trades on the New York Stock Exchange under the ticker symbol "XOM." Exxon is engaged in the development, acquisition, and exploration of crude oil and natural gas resources in the United States and worldwide. Exxon's energy holdings include substantial acreage in the Permian Basin, a large oil-and-gas producing area in the southwestern United States, which includes the Delaware Basin and the Midland Basin. Exxon operates through three business segments: (i) Upstream, through which Exxon explores for and produces crude oil and natural gas, including its oil

resources in the Permian Basin; (ii) Downstream, through which Exxon manufactures and sells petroleum products; and (iii) Chemical, through which Exxon manufactures and sells petrochemicals.

42.     Defendant Darren W. Woods ("Woods") is, and was throughout the Class Period, the Company's Chief Executive Officer and Chairman. Defendant Woods joined the Company in 1992 and became its CEO on January 1, 2017. In 2010, Woods was appointed ExxonMobil Refining and Supply Company's Vice President of Supply and Transportation. In 2012, Woods was appointed Vice President of the Company and President of ExxonMobil Refining and Supply Company. In 2014, Woods was elected Senior Vice President of the Company. Woods signed all of the Company's annual filings with the SEC during the Class Period.

43.     Defendant Liam M. Mallon ("Mallon") has served as Vice President of the Company and President of ExxonMobil Upstream Oil & Gas Company since April 2019. As President of Upstream Oil & Gas, Defendant Mallon was responsible for Exxon's development planning, including the reserves and resource base calculation process, and had to approve any adjustments to Exxon's reserves reporting. The manager of the Global Reserves and Resources Group ("GRG"), which was responsible for generating the annual proved reserves, reported to Defendant Mallon. Defendant Mallon reported directly to the Management Committee and was the sole executive between the Committee and the GRG. Prior to April 2019, Defendant Mallon was President of ExxonMobil Development Company.

44.     Defendant Woods and Defendant Mallon, because of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day business of Exxon, and/or intimate knowledge of the Company's actual performance, and their

power to control public statements about Exxon, had the power and ability to control the actions of Exxon and its employees throughout the Class Period, as alleged herein.

45.     Defendant Melissa Bond ("Bond") was a Exxon's Delaware Basin Development Manager, a Senior Manager in Exxon's Upstream Oil & Gas Division responsible for development planning in the Delaware Basin from May 2018 until March 2021. Shortly after the *Wall Street Journal* article disclosed the fraud at issue in this Action, Bond became Exxon's Lead Country Manager for Angola. In her capacity as the Delaware Development Manager during the Class Period, Bond was responsible for all economic analysis for the Delaware Basin and for providing a forecast for the Company's development plan. Bond had initial responsibility for the development plan for the Delaware, including Exxon's 2019 development plan (also referred to by Exxon as its "growth plan"). Defendant Mallon was Defendant Bond's corporate sponsor, meaning that Defendant Mallon was responsible for fostering her career development. Defendant Mallon had approval and ownership responsibility for Exxon's development plans, including its development plan for the Delaware Basin.

46.     Exxon, Woods, Mallon, and Bond are collectively referred to herein as "Defendants."

## IV.   SUMMARY OF THE FRAUD

47.     This case arises from materially false and misleading statements and omissions concerning the value of Exxon's assets and production in the Permian Basin from March 7, 2018 through January 15, 2021 (the "Class Period"), including Exxon's stated proved reserves and resource base, and, beginning on March 5, 2019, statements touting Defendants' production goal of 1 million barrels per day by 2024 in the Permian that Defendants knew was false.

48.     A barrel of "oil-equivalent" or "BOE" is a unit of measure to quantify crude oil and natural gas amounts, which is used to summarize the amount of energy that is equivalent to the

amount of energy found in a barrel of crude oil.

49.     Proved reserves consist of the number of barrels of oil-equivalent that Exxon told investors could be extracted from the ground and sold with reasonable certainty. Proved reserves are calculated using assumptions that include, as relevant here, how quickly a company is able to drill its wells and the productivity of existing producing wells. As defined in 17 C.F.R. § 210-.4-10(a)(22), "proved reserves" mean "those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible . . . under existing economic conditions, operating methods and government regulations . . . regardless of whether deterministic or probabilistic methods are used for the estimation."

50.     As Exxon explained in its SEC filings, including its year-end 10-Ks, the proved reserve was based on the Company's development plan:

> Proved reserves can be further subdivided into developed and undeveloped reserves. Proved developed reserves include amounts which are expected to be recovered through existing wells with existing equipment and operating methods. Proved undeveloped reserves include amounts expected to be recovered from new wells on undrilled proved acreage or from existing wells where a relatively major expenditure is required for completion. <u>Proved undeveloped reserves are recognized only if a development plan has been adopted indicating that the reserves are scheduled to be drilled within five years, unless specific circumstances support a longer period of time.</u>

51.     The "resource base" is the number of oil-equivalent barrels that Exxon told investors consisted of "proved reserves, plus other discovered resources that are expected to be ultimately recovered."

52.     The proved reserve and resource base numbers that Exon stated during the Class Period were false. As set forth below, these numbers were produced by a fraudulent process, and they relied on an inflated development plan and false drilling assumptions. Indeed, as OSHA found in its investigation, Dr. Gulden and Dr. Burch specifically reported to Exxon management that the Company's April 26, 2019 statement that "[t]he size of the company's resource base in the Permian

is approximately 10 billion oil-equivalent barrels" was inaccurate and misleading. Instead of adjusting those numbers, Exxon employed false "learning curve" assumptions to fraudulently inflate its stated valuations at the direction of Defendant Mallon and Defendant Bond.

> **A.** **Defendant Woods, Installed To "<u>Turn The Titanic</u>," Makes High-Profile Acquisitions In The Permian Basin And Places Them At The Center Of Exxon's Turnaround Plans**

53. Over the past several years, Exxon's business has faltered, causing investor concern. Beginning in late 2009, Exxon built out its position in the Permian Basin, starting with its acquisition of XTO for $31 billion. Exxon immediately faced criticism that it had paid too much for XTO. For example, the *Wall Street Journal* wrote on December 14, 2009 that the Company's "deal machine could be rusty." The pressure was on Exxon to justify the XTO acquisition.

54. Meanwhile, Exxon was dogged by other blows to its reputation. For example, in late 2016, amid the crash of oil prices, Standard & Poor's stripped Exxon of the perfect triple-A credit rating that it had held for more than 60 years. As Exxon has weathered these storms, its share price and market capitalization have steadily declined. Since the peak of Exxon's market capitalization in 2013 and 2014, the Company's stock has lost roughly 60% of its value.

55. On December 14, 2016, Exxon announced that Defendant Woods would succeed Rex Tillerson as Exxon's CEO. Woods, who was charged with reversing Exxon's fortunes, faced an uphill battle. At the helm of Exxon's turnaround plans, Woods led the Company through another series of major acquisitions. On January 17, 2017—three weeks into Defendant Woods' tenure as CEO—Exxon announced a purchase of $6.6 billion worth of assets in the Permian Basin from the Bass family of Fort Worth, Texas, including 3.4 billion barrels of oil-equivalent in the Delaware Basin. Exxon charged its subsidiary, XTO, with managing these assets.

56. The pressure was on Woods to justify the acquisition as the market closely connected Exxon's development of the Permian Basin to Woods taking control of the Company.

Further, some market-makers expressed concern that Exxon paid too much. As the *Wall Street Journal* observed on January 17, 2017, "Some in the industry have voiced concerns that the high prices indicate a bubble is building up in the area," or even "a Ponzi scheme."

57.     Further, Defendant Woods was motivated to ensure the success of the Permian acquisitions. The metrics that Exxon used to calculate Woods' and other top executives' compensation depended on Woods' ability to achieve Exxon's production growth goals in the Permian Basin, as described further in paragraphs 294-97 below.

58.     Prior to the start of the Class Period, Defendants continued to place the Permian and Delaware assets at the center of the Company's turnaround plans. Analysts celebrated this strategy. For example, after Woods' first Analyst Meeting as CEO, Deutsche Bank's analyst declared, "All of My Love (To The Permian)," and Cowen noted, "We believe the XOM story is turning a corner."

59.     As of the end of 2017, however, investors remained deeply concerned about Exxon's prospects. Despite Defendant Woods' promises, he had not turned the Company around promptly upon taking the reins, and success in the Permian had become ever more pressing. Thus, at the start of the Class Period, Defendant Woods was under extreme pressure to, as BMO Capital Markets put it on January 26, 2018, "Turn the Titanic."

60.     On February 8, 2018, Exxon announced an addition to its proved reserves of 800 million oil-equivalent barrels from "rich unconventional plays in the United States, mainly in the Permian Basin." Exxon told investors, "Additions in the Permian are supported by ExxonMobil's growth plan and increased drilling activity, expected to increase daily production to more than 600,000 oil-equivalent barrels by 2025."

B.      **March 7, 2018 Analyst Meeting: Exxon Announces "Aggressive Growth Strategy" In The Permian, Touting The Value Of Permian Assets**

61.      The Class Period begins on March 7, 2018 when Defendants announced, "ExxonMobil Outlines Aggressive Growth Plans to More than Double Earnings." In its press release, Exxon touted its increased Permian resource base of "9.5 billion oil-equivalent barrels" of recoverable resource. As Exxon told investors, the "resource base" consisted of "proved reserves, plus other discovered resources that are expected to be ultimately recovered."

62.      Analysts were positive on Exxon's growth progress in the Permian. For example, Wells Fargo reported on March 7, 2018, "[W]e expect growth from U.S. tight oil (Permian, Bakken) will be a key component to mitigating declines elsewhere, particularly in the near-term." Societe Generale wrote on March 12, 2018, with respect to Exxon's "ability to grow the Permian" that "[t]hus far, they have been on plan."

C.      **Defendants Continue To Tout Permian Production In 2018, And Unveil The Notorious "Green Blob"**

63.      Exxon continued throughout 2018 to report false valuations of the Permian Basin, including that Exxon had a resource base in the Permian of more than 9 billion oil-equivalent barrels. These numbers were based on Exxon's development plan, which Exxon employees referred to internally as the "green blob."

64.      As set forth below, the "green blob" was contained in a slide that Exxon presented during a July 27, 2018 earnings call. It purported to show Exxon's current and future production in the Permian Basin as growing in a near-vertical line.



65.     Analysts remained positive on the Permian. For example, Credit Suisse reported on April 27, 2018, "1Q production above consensus; Permian growth remains robust." Barclays similarly noted on July 27, 2018, "strong Permian and Bakken growth."

**D.     In Truth, Exxon's Reported Valuations Were Based On False Drilling Assumptions And An Inflated 2018 Development Plan**

66.     Exxon's reported resource base number was materially overstated. As noted above, the "resource base" is the number of oil-equivalent barrels that Exxon told investors consisted of "proved reserves, plus other discovered resources that are expected to be ultimately recovered." The proved reserve calculation—of how many barrels of oil-equivalent a company ascertains with reasonable certainty exist and can be exploited and sold—is based on the Exxon's development plan and incorporates assumptions about how quickly and effectively the Company will be able to drill its wells. Thus, both the "proved reserve" and the "resource base," which includes the proved reserve, are calculated using the drilling assumptions in the development plan.

67.     The drilling assumptions that Exxon used to perform these calculations during the Class Period were false. As the *Wall Street Journal* later reported and Dr. Burch and Golden

confirmed in their OSHA Complaint, the actual, real-world drilling speeds in 2018 turned out to be considerably slower than the 2018 estimates that Exxon used to calculate the NPV of the Delaware Basin. Thus, the 2018 development plan was inflated and the 2018 drilling assumptions that Exxon used to calculate the 2018 NPV were false. Exxon's stated proved reserve and resource base valuations were false because they were based on those false assumptions.

### E.   Company Insiders Recognize The Need For A Write-Down Of Exxon's Proved Reserves In Summer 2018

68.   In stark contrast to Defendants' rosy statements to investors, in the summer of 2018, Exxon determined internally that it needed to reduce its stated proved reserves and take a write-down. However, Exxon did not reduce its proved reserves or take a write-down; instead, reservoir engineers were instructed to boost the reserves and never to revise down the resource base.

#### 1.   Exxon's Fraudulent Reserve Forecasting Process

##### a.   The Annual Development Planning Process

69.   Exxon engages in an annual planning process before the end of each year, after which it reports various production goals and metrics, which reflect the value of its assets, including its assets in the Delaware Basin. Development planners, reservoir engineers, geologists, and geoscientists develop the Company's annual development or growth plans and assumptions for those plans, including the Company's production goal for the Permian Basin and the value of the proved reserves and resource base that Exxon reported to investors at year-end.

70.   As discussed above, Exxon's stated proved reserve and resource base valuations that are reported to investors are based on Exxon's development plan or growth plan. As Exxon stated when it reported its proved reserves at year-end on February 8, 2018 and February 26, 2019, Permian Basin proved reserves "are supported by ExxonMobil's growth plan" including "increased drilling activity . . . ." Exxon further explained in its annual filings that proved

undeveloped reserves "are recognized only if a development plan has been adopted indicating that the reserves are scheduled to be drilled within five years . . . ." Defendant Woods, Defendant Mallon, and Defendant Bond knew that Exxon's stated proved reserve and resource base valuations in its SEC filings were based on the development plan.

**b.      The Global Reserves Group Headed By Defendant Mallon**

71.      The Global Reserves and Resources Group (or "GRG") was responsible for generating the annual proved reserves. The GRG reported directly to the Management Committee, and submitted its analysis to Exxon executives for final endorsement prior to publication.

72.      Global Reserves and Resources was managed by Richard Ducharme, who, as of April 1, 2019, reported directly to Defendant Mallon, the President of Upstream Oil & Gas and Vice President of Exxon Mobil Corporation. Mallon reported to the Management Committee, which included Woods, on behalf of all division leads, as reflected in the organization chart below:



73.     Every request to adjust reserves – no matter how small – went to Defendant Mallon.

Further, there were times when employees would go to Mallon and say that they needed to write

down reserves because the underlying production metrics were not supported by the technical

details and Mallon rejected that request because a write down would have adversely impacted his

bonus.

23

c.      **The Reservoir Engineering Department**

74.      Andrew Rhodes was a Reservoir Engineer at XTO from August 2013 until his last day with the Company on July 31, 2020. Rhodes was based in Fort Worth, Texas from 2013 until the Company moved the entire Reservoir Engineering Department, of which Rhodes was a part, to Houston, Texas in the summer of 2018. From the summer of 2018 until July 2020, Rhodes worked at the same location in Houston as did the reservoir engineers from the Delaware and Permian Basins, and the Company's geologists and landmen. In approximately the summer of 2019, Exxon's Accounting Department also moved to Houston, Texas.

75.      According to Rhodes, the reserve forecasting process operated as follows. <u>First</u>, reservoir engineers such as Rhodes would prepare a reserve forecast for their assigned geographical area, approve that forecast, and submit it to their managers. Rhodes' manager was Timothy Isernhagen, the Reservoir Engineering Manager for the MidContinent group prior to April 2019 and for the Central Business Unit after April 2019. For the forecasting process, Rhodes and the other reservoir engineers used the computer programs LAPP, an internal program, and EOPC, an Excel-based program.

76.      Second, the Reservoir Engineering Manager would approve all of the forecasts for each engineer who reported to him/her.

77.      Third, the reserves team or "Global Reserves Group" would review the reserves along with the Senior Vice President of Reservoir Engineering, who in 2018 was F. Terry Perkins ("Perkins"). The production forecast and operating cost data from LAPP and EOPC would get pushed into ARIES, a system that is commonly used for reserves, and the reserves team would run different scenarios, such as different oil and gas pricing. The Global Reserves Group typically would send back to the reservoir engineers PDFs that would show different looks at the reserves. They would run the data in ARIES under different scenarios, and they would get different total

24

reserve numbers based on the different pricing scenarios. There would then be a review period where the reservoir engineers, such as Rhodes, would review what the reserves team had sent.

78.      From approximately 2013 until April 1, 2019, there were 12-13 divisions within the Reservoir Engineering Department, which were organized geographically— including, for example, the Permian division, the Arkoma (Arkansas and Oklahoma) division, the MidContinent division, and the Appalachian division. Each division had a reservoir engineering team, a geology team, and a land team, and each division had one reservoir engineering manager. The 13 reservoir managers all reported to Perkins. Perkins reported to Monte Dobson, the Senior Vice President of the Development Company, who in turn reported to Sara N. Ortwein, the President of XTO.

79.      On approximately April 1, 2019, the 13 divisions of the Reservoir Engineering Department were consolidated into five groups, which included the Permian Basin group and the Delaware Basin group. There were approximately 8-12 reservoir engineers in each group. From approximately the spring of 2018 until July 2020 when Rhodes left the Company, Rhodes reported to Isernhagen. According to Rhodes, nearly all of the reservoir engineers who were working on the Permian and Delaware Basins following the move to Houston are still with the Company.

80.      Rhodes was responsible for forecasting reserves for approximately 2,000 wells at any given time. Rhodes was involved in Exxon's proved reserve forecasting process, familiar with Exxon's policies concerning proved reserve forecasting, and personally experienced pressure from the Senior Vice President of Reservoir Engineering, Perkins, to inflate the proved reserve numbers that the Company reported by making adjustments, described directly below. Rhodes had personal contact with reservoir engineers who did the proved reserve forecasting for the Permian or Delaware Basins, including Andrew Bridwell and Kaylene Tovar. In addition, Rhodes was good friends with Afif Alafifi, who had worked with Rhodes in the Arkoma group in the earlier days,

but then moved to either the Delaware or Permian Basin.

81.     In addition, Rhodes attended monthly reservoir engineering meetings with all the reservoir engineers, including those responsible for the Delaware and Permian basins. These meetings were called the "reservoir engineering monthly meetings." At the meetings, both before and after the move to Houston in the summer of 2018, Senior Vice President Perkins and Senior Vice President Dobson would give a state of the company overview as it related to the reservoir engineering group. Then, the reservoir engineers on Rhodes's level would give presentations on anything of interest. The Vice President of Geology, Andre Griffin, also attended. The geologists also held monthly meetings.

82.     Outside of formal meetings, Rhodes had regular discussions with reservoir engineers, including the reservoir engineers who worked on the Permian and Delaware Basins, such as Bridwell and Tovar.

83.     Rhodes also had access to all the reserves for any group, including the Delaware Basin group, and would periodically personally review the reserves for the Delaware Basin. Rhodes could look at reserves on a well level and see production and reserves forecast for any XTO well anywhere. The group of individuals responsible for reviewing reserves would put a report together at year-end that reflected the reserves in the Permian Basin and any change from the prior year and review that report with the reservoir engineers, including Rhodes.

### d.     Boosting Proved Reserves To Avoid A Write-Down

84.     Rhodes confirmed that he and the other reservoir engineers believed that the reserve forecast numbers they submitted were accurate; despite this, after submission, they were pressured by their supervisors to look for places to boost the reserves. Accordingly, the reservoir engineers inflated the reserve numbers because the reservoir engineers reported to the reserves team. There were times when Rhodes would revise a forecast after he had already approved it and after his boss

had already approved it because of the pressure from superiors to increase the reserves. The reserves group knew they were exerting that pressure.

85.     Specifically, there were times when Rhodes's team was told that this particular scenario looks like a big write-down on reserves. There was pressure to find where Rhodes could increase reserves and Rhodes was told to look for places to boost reserves.

86.     Rhodes explained that even slight adjustments or manipulation of the variables that make up the total could have a significant impact on the total. According to Rhodes, if you were sneakily optimistic with respect to any of the variables that went into the total, including capital expenditures or completion costs, the adjustments compound each other, and your final answer comes out to be significantly different than it should be.

87.     For example, Rhodes explained that Exxon would adjust the numbers by adjusting the operating costs or the final decline rate, which are inputs into the proved reserve calculation. Rhodes explained that the final decline rate is part of the gas forecast. They would look at monthly data points for each month, for example, if a well had made 100 barrels in January 2020, then 90 barrels in February 2020 and 80 barrels in March 2020, they would have actual production data points. To do decline forecasting, you would pretty much draw a line through those data points. As you move into the future and the unknown and the reserves, reservoir engineers would typically do a three-legged exponential decline. That means if you are looking at it as a semi log graph, you will have three straight lines. The first one, the earliest in time, would have to be the steepest decline, perhaps 70% exponential decline. Then there is a middle decline rate for however long, and then a final decline rate.

88.     Rhodes explained that if you are looking at a function, the area under the curve is a meaningful thing in oil and gas terms. If you imagine a declining line on a graph, the area under

that curve is your reserves volume. If you draw three straight lines with the first being steepest and then the others getting shallower and you make it break to the shallower decline earlier, then the result will be more area under the curve. This is an example of something a reservoir engineer would do to get a higher number after experiencing pressure from the reserves team.

89.     According to Rhodes, the newest wells that are still on their initial steepest decline are really the ones you could have the highest impact on. You could increase the reserves the most on these wells because they have the most reserves left to be had. Rhodes explained that if the well is still on that steepest 70% decline, you may have been thinking it would be on that steepest decline for 12 months, and it was only at 4 months at the time. You could change your forecast and have it change to a shallower decline at 8 or 9 months, for instance, instead of at 12 months. You could do the same thing with the middle decline as well. As Rhodes put it, you could "scrunch" up your decline curves in order to increase the proven reserves.

90.     Rhodes explained that the Permian and Delaware Basin wells were new wells, so the engineers working on the reserve forecast for the Permian and Delaware Basin would have used this technique. Rhodes described how if you have a new well that has only been producing for a few months break from that initial decline rate at 8 months versus 12 months, you could increase the reserves on the well by huge amounts. These wells decline so fast and so much. You recover about 50% of the reserves over the first year. Rhodes explained that for the newer wells, like those in the Permian and Delaware, the technique to increase reserves would be the scrunching technique. You make the decline curve shorten sooner than you think it reasonably should, and that then increases the area under the curve substantially.

91.     Rhodes confirmed that the pressure to increase reserves occurred at least yearly in connection with the year-end process, but may have been more frequent for the Delaware Basin

assets.

92.     FE3 served as a Reservoir Engineer at XTO from 2012 to 2016, and served in various other engineering roles at XTO from 2016 to 2021, including a role specific to the Permian as his last role at the Company. FE3 was based in Fort Worth and Spring, Texas. As a Reservoir Engineer, FE3's responsibilities included reserves reporting for North Dakota assets.

93.     FE3 confirmed that reserves reporting at Exxon consisted of frequently being told what the answer was. As a Reservoir Engineer, FE3 reported to a manager, Erich Palko, who reported to Senior Vice President Perkins, who reported to Ortwein, the President of XTO. According to FE3, reservoir engineers would be told, "Here's the total number we need to hit, so make small adjustments to many decline curves to reach the number for a basin or an asset or an area." FE3 described how there is an expectation by management for all of the wells that there will be X number of barrels per well, and that number is bigger in the Permian. There is a 40-year life for exponential curve and reserves reporting, and if wells are not hitting the expected number, you make adjustments. For example, if a well reaches its potential earlier and declines slower earlier, the total number comes up. Small adjustments are made to those DCA numbers, but adding, for example, 50,000 barrels here or there adds up quickly when you're dealing with thousands of wells.

94.     FE3 explained that when he submitted a forecast, it would be kicked back to him in the system to be looked at again for improvement. FE3 further explained that, when his reports made their way back to him the next year, for the purpose of determining the next year's reporting, the wells FE3 reported on would show a curve that was "way off and crazy" from what he had done, like someone had changed it. FE3 confirmed that his manager, Palko, Senior Vice President Perkins, and Ortwein, President of XTO, all had the ability to change his forecasting reports.

29

### e.       Never Revising Down The Resource Base

95.     In addition to the pressure to boost proved reserves, Rhodes confirmed that in general, there was also pressure not to change or reduce assumptions even if they were not accurate, including with respect to the resource base.

96.     Rhodes was charged with reserve forecasting for an area in Oklahoma. The Company had an assumption that 10 wells would be drilled in that section, which was way too many wells and should have been revised down, and an assumption that each well there would produce a certain volume, which was also way too high and should have been revised down. But, Rhodes explained, the Company never revised it down. Rhodes was told by his boss, Isernhagen, never to change the number of wells they could get in each section or the amount of volume that they could get in each well. Rhodes was only allowed to change the classification of the well from resource base to proved; he was not allowed to revise it down.

97.     According to Rhodes, once he started working the Arkoma/Woodford area in January 2015, the general policy every year was not to revise down the resource base number. Rhodes knew that it dated back to the initial resource evaluation which occurred around 2013 when the Company first started drilling wells in the Arkoma region. That was when they first got these assumptions, and the field was pretty immature and unknown at the time. Rhodes explained that once the field was drilled more, that was an egregious lie for that resource base, and it was basically never changed from the earliest time when there were pretty much no wells there. They just kept pretty much all those assumptions. This policy was in place for the entire time that Rhodes was forecasting in Oklahoma, including 2018 through 2020, and also earlier.

98.     Starting in the summer of 2018 for reserve years 2018 and 2019, Rhodes told Isernhagen that he disagreed with this and raised objections. Rhodes expressed to Isernhagen how ridiculous it was and raised questions. Rhodes said that he did not understand why he was taking

30

time to work on the resource base calculation and change classifications if the whole thing was bogus anyway. In response, Isernhagen diminished the importance of the calculation. Rhodes knew that both Perkins and Isernhagen discussed this and knew that the resource base was not real, but still did not change it.

> ### 2.   Exxon Internally Recognizes The Need For A Write-Down In The Summer Of 2018

99.    Rhodes confirmed that it was known at the upper management level that the proved reserves needed to be written down, but there was tension about whether to do the right thing and when to do it. According to Rhodes, in approximately the summer of 2018 with the move to Houston or shortly before that, the legacy Exxon U.S. Reserves Manager started looking at XTO reserves and saying this needs to be written down. In particular, according to Rhodes, this Exxon reserves manager would express to the reserves team and Perkins that the reserves were not right and needed to be written down.

100.    Even prior to this point in time, Rhodes described the Company's process as "kicking the can down the road." Rhodes explained that Perkins knew they would have to make a write-down eventually, but the question was when, and they were just kicking the can down the road. When the Exxon manager took over, he basically said that you cannot just do that and "kick the can down the road," you have to do it every year. But Rhodes explained that there was tension about whether to do the right thing. The Exxon reserves manager started putting on pressure to take a write-down in the summer of 2018.

101.    FE3 corroborated Rhodes's account of the Company's refusal to write down its reserves, noting, "ExxonMobil never ever writes down reserves." FE3 described how there was always talk of "albatrosses" on Exxon's books.

**F.      Instead Of Taking A Write-Down, Defendants <u>Increase</u> Proved Reserves And Continue To Tout Production In The Permian Basin**

102.    Instead of reducing or writing down the stated proved reserve to reflect the realities of Permian production on the ground described in Section IV(I)(6) below, for the year-end 2018, Exxon increased its reserves by 4.5 billion barrels, of which it attributed 1.2 billion new oil-equivalent barrels to unconventional plays, thereby representing to investors that Exxon's Permian assets were more valuable than ever.

103.    In its February 26, 2019 press release titled "ExxonMobil Adds 4.5 Billion Barrels to Reserves," Defendants tied the increase in Permian Basin reserves to Exxon's growth plan and the underlying false drilling assumptions, stating, "Significant additions in the Permian Basin are supported by ExxonMobil's growth plan including increased drilling activity and infrastructure development." Notably, as stated in Exxon's February 8, 2018 press release, Exxon had attributed 800 million oil-equivalent barrels of its proved reserves for year-end 2017 to "unconventional plays in the United States, mainly in the Permian Basin," bringing the total proved reserves that Exxon explicitly attributed to the Permian to at least 2 billion oil-equivalent barrels.

104.    Analysts reacted positively to the increase. For example, Credit Suisse noted on February 26, 2019, "Proved reserves up ~15% YoY . . . . Bulk of reserve additions price-related, with unconventionals (Permian) driving organic additions . . . . XOM added 1.2 BBoe from unconventional plays particularly in the Permian driven by its material activity acceleration."

**G.      "Unleash the Hounds": In March 2019, Defendants Announce Impossible Goal Of 1 Million Oil-Equivalent Barrels Per Day In The Permian, And Tout Permian Value Through The End Of The Class Period**

105.    At 7:25 a.m. in the morning of March 5, 2019, Chevron—one of Exxon's largest competitors—issued a press release announcing that it intended to reach unconventional net oil-equivalent production of 900,000 barrels per day in the Permian Basin by 2023. Chevron held its

Analyst Day conference later the same day and elaborated on its plans.

106.    Not to be outdone, Exxon issued its own press release just 95 minutes later, at 9:00 a.m., while Chevron's CEO was speaking to analysts, proclaiming that it had revised its Permian Basin growth plans to "produce more than 1 million oil-equivalent barrels per day by as early as 2024." As Exxon acknowledged, this represented an increase of nearly 80% from its previous goal of 600,000 oil-equivalent barrels per day by 2025, and "a significant acceleration of value."

107.    The next day, March 6, 2019, Exxon held an Investor Day call, during which Defendant Woods assured investors that "we have accelerated value capture in the Permian" and presented a "green blob" slide with an even more vertical growth curve. Defendants further stated in press releases on March 5 and 6, 2019 that Exxon's resource base had increased to "10 billion oil-equivalent barrels" and was "likely" and "expected to grow further."

108.    Multiple analysts asked about the basis for the 1 million oil-equivalent barrels per day Permian goal, and questioned whether the Company could achieve it. In response, Defendants offered repeated assurances. For example, an analyst from Goldman Sachs asked about "the shape of the Permian production curve," observing it looked linear in 2019, but "more hyperbolic" by 2021, and specifically asked, "what you're doing now to ultimately set yourself up for th[e] acceleration that you see in 2020-2021?"

109.    In response, Defendant Woods assured that the goal was supported by Exxon's "development plan" and "what we've done in 2018" and what we've been doing in 2018," and told him that Exxon would "unleash the hounds." In reality, Defendants knew that the goal of 1 million oil-equivalent barrels per day by 2024 in the Permian was based on the 2018 development plan, which relied on false drilling assumptions that were faster than the actual historical drilling speeds in 2018. Further, Woods' references to "what we've done in 2018" and "what we've been

33

doing in 2018" were false and at a minimum misleading, because they concealed the fact that the actual historic drilling times in 2018 were considerably slower than the estimates that the 2018 plan had relied on.

110.    The market trusted Defendants. For example, on March 6, 2019, Credit Suisse noted regarding the Permian goal, "Richest opportunity set has certainly gotten bigger." RBC Capital Markets observed on March 7, 2019 that Exxon was "[d]oubling down on key growth projects, preparing to 'unleash the hounds' in the Permian." Simmons Energy noted on the same day that while an increase was expected, "The magnitude of the increase, however, is on an impressive scale." Every single analyst covering Exxon reported on its increased Permian production goal.

111.    Throughout the end of the Class Period, including on April 26, 2019, June 18, 2019, and at year-end 2019, Defendants continued to report false proved reserves and resource base numbers that were a product of the fraudulent reserves process and based on an inflated development plan and false drilling assumptions. Defendants continued to present Exxon's "green blob" slide to investors every quarter and tout Exxon's 1 million barrels per day goal in the Permian.

112.    Defendants also continued to falsely assure investors that Exxon's 1 million barrels per day statements were based on a legitimate process that analyzed the fundamentals of oil production, and the product of historical data. For instance, on September 4, 2019, Defendant Woods told investors, "We didn't go out and say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that. What we ended up saying is, develop the resource in a way that we think maximizes the recovery is a very grassroots buildup from the beginning of the fundamentals."

113.     Analysts remained positive on Permian production and growth. For example, Credit Suisse noted that "XOM's accelerated development plan targets reaching >1 MMBoed by as early as 2024" and that "[t]he company has dramatically ramped up the pace of activity in the Permian[.]" UBS wrote on August 2, 2019, "In the Permian, production growth is very impressive." On February 28, 2020, two days after Exxon reported its total proved reserves in the 2019 10-K, Barclays celebrated, "Major 'mojo' in the Permian[.]"

**H.     Exxon Uses False Drilling Assumptions To Overvalue The Delaware Basin By At Least $10 Billion**

114.     In truth, Exxon's stated proved reserves and resource base were the result of the fraudulent reserves process and based on an inflated development plan and false drilling assumptions set forth in Section IV(E)(1) above. Moreover, after March 2019, those valuations were intentionally artificially inflated in order to make Defendant Woods' impossible "1 million barrels per day goal" appear possible, and to align with his publicly-stated goal. The fraud was made public by two Exxon whistleblowers whose identities were revealed three weeks ago. The information in paragraphs ¶¶115-64 below comes from the OSHA Complaint, the OSHA Findings, and interviews with multiple former employees identified above, including Dr. Gulden and Dr. Burch, and the October 6, 2022 *Washington Post* article.

**1.     Two Exxon Employees Become Whistleblowers**

115.     On February 10, 2021, Dr. Gulden and Dr. Burch filed the OSHA Complaint. In the OSHA Complaint, they detailed how they were wrongfully terminated by Exxon for internally reporting during the Class Period that Defendants' stated valuations at issue in this case were the product of fraud. Specifically, Dr. Gulden and Dr. Burch described how they were directed by Defendant Bond (a Senior Manager in Exxon's Upstream Oil & Gas division) to artificially inflate Exxon's valuations in order "[t]o ensure conformity" with Woods' "public pledge" of 1 million

oil-equivalent barrels per day by 2024 in the Permian. Defendant Mallon instructed Bond to artificially inflate these valuations because his annual performance review was tied to how much these numbers went up, and if the valuation went down, his compensation would suffer.

116.    On October 6, 2022, OSHA issued the OSHA Findings after investigating Dr. Gulden and Dr. Burch's allegations. The OSHA Findings concluded that Dr. Burch and Dr. Gulden "had a reasonable belief that [Exxon's] statements in their SEC filings were inaccurate," and were fired for engaging in protected whistleblower activity under SOX.

117.    Prior to her termination on October 23, 2020, Dr. Gulden worked as a Computational Scientist/Team Lead in Upstream Integrated Solutions at Exxon for over a decade. Her responsibilities included making analytic technical contributions and building, managing, and executing a portfolio of projects in which analytics and optimization capability could assist decision-makers in the Upstream Oil and Gas division.

118.    Prior to his termination on December 10, 2020, Dr. Burch worked for over a decade as a Computational Scientist in Development Planning in Global Projects and assisted as the Development Planner in the Unconventional Development Planning Group, also referred to as the Delaware Planning Team, in the Upstream Development Planning division of ExxonMobil Global Projects. His responsibilities included simulating the long-term development of Exxon's properties, performing economic analyses of different development strategies, and developing new strategies that could improve the economics of a property.

> **2.    At Mallon's Direction To Inflate The Plan, Bond Instructs The Delaware Planning Team To Fraudulently Inflate Exxon's Valuations, Over The Experts' Objections, To Meet Woods' Publicly-Stated Goal, And This False Information Is Incorporated Into Exxon's SEC Filings**

119.    In 2018, Exxon estimated that the NPV of its holdings in the Delaware Basin was $60 billion. The NPV estimate is a metric that describes the value of a particular development plan

or growth plan under certain economic assumptions. The core component of a development plan is the schedule of wells to be drilled and completed. The schedule is built using projected numbers of drilling rigs and fracking crews and assumptions for drilling speed and completion speed. NPV is calculated by discounting cash flow that is estimated by combining the development plan schedule, estimates for oil and gas coming out of planned wells, cost calculations for development activities, and assumed commodity prices.

120.    In 2018, the actual, real-world drilling speeds of Exxon's drilling in the Delaware Basin turned out to be considerably slower than the 2018 estimates.

121.    During the 2019 planning and budget season, the Delaware Planning Team revised the development plan for the Delaware Basin holdings using refined time-to-drill estimates, generated by company drilling experts and based on actual drilling speeds that had been measured over the past year. Due largely to slower-than-anticipated drilling times in 2018, the NPV estimate for the initial 2019 development plan was $40 billion, $20 billion less than the NPV estimate for the 2018 development plan.

122.    In his March 5 and 6, 2019 statements to investors, Woods had pledged that Exxon would increase oil and gas production in the Permian Basin, which includes the Delaware Basin, to one million barrels per day by 2024. However, those statements were based on the assumptions in the 2018 development plan. As Woods stated on March 6 when asked about the "shape of the Permian production curve"; "It goes back to the development plan that we have in place" and "what we've done in 2018" and "what we've been doing in 2018." The 2018 development plan had been proven false by actual events; thus, the revised drilling speeds that factored into the $40 billion NPV original 2019 development plan were well below the level needed to support Woods' statements.

123.    To make the numbers agree with Woods' public pledges for oil and gas production, Exxon senior management pressured the Delaware Planning Team to change the development plan so that the 2019 NPV estimate would increase and so that production projections would be consistent with the CEO's public pledges.

124.    In March or April 2019, Defendant Bond presented the initial 2019 $40 billion NPV development plan to Defendant Mallon at an in-person meeting in Houston. Defendant Mallon directed Defendant Bond to find ways to increase that number. Defendant Mallon communicated, in sum and substance, that the plan did not say 1 million barrels per day and it did not contain a valuation of $60 billion, and Defendant Bond needed to bring him a new plan that did say those things.

125.    Defendant Mallon gave the instruction to artificially inflate the value of the Delaware development plan in order to make the plan consistent with the one million barrels per day goal that Woods had promised investors. It was commonly understood within the development planning group that Woods had said Exxon was going to produce one million barrels a day and therefore, it would not be acceptable for the planners to submit a plan that did not reflect that, even if it meant they had to lie. It did not matter whether Exxon could actually produce one million barrels a day: the attitude at Exxon was that it would be Exxon's problem next year to deal with why they were not on track to get to one million barrels per day.

126.    Defendant Mallon also gave the instruction to increase the value of the plan because his annual performance review was tied to how much these numbers went up, and if the plan numbers went down he would receive significantly less compensation. Similarly, as noted above, there were times when employees would go to Mallon and say that they needed to write down

reserves because the underlying production metrics were not supported by the technical details and Mallon rejected that request because a write down would have adversely impacted his bonus.

127.    After Defendant Bond's meeting with Defendant Mallon, she went back to the Delaware Planning Team and made clear that the numbers she had presented were not going to be acceptable as the company plan. Bond then instructed the Delaware Planning Team to generate higher 2019 NPV estimates by revising the assumptions used to build the development plan in a way that would "claw back" value.

128.    When even the use of revised assumptions failed to significantly increase the Delaware Basin's NPV estimate, Bond figured out that the development plan was highly sensitive to "drilling learning curve" assumptions, which referred to the assumption that drilling speeds would increase the longer a drilling crew stayed in a certain area. Bond mandated the use of increasingly aggressive "drilling learning curve" assumptions in order to increase the NPV of the Delaware Basin.

129.    In May 2019, Defendant Bond re-presented the adjusted results to Defendant Mallon at another in-person meeting in Houston. Defendant Mallon instructed her to revisit the long-term learning curves which meant, in sum and substance, that the Delaware Planning Team had not lied hard enough yet.

130.    Bond therefore dictated increasingly optimistic learning curve assumptions until the NPV of the resulting Delaware development plan reached an estimated value of $50 billion. The learning curve assumptions were inconsistent with Exxon's actual drilling speed data and with the assumptions from Exxon's drilling experts. Simply put, such information was false.

131.    In July 2019, Defendant Bond presented the revised development plan, now valued at $50 billion, to Defendant Mallon during an in-person meeting in Houston. In August 2019, with

Defendant Mallon's approval, the adjusted $50 billion NPV development plan became the final development plan.

132.    Members of the Delaware Planning Team, including Dr. Burch, objected to the $50 billion NPV estimate because it was based on learning curve assumptions that were contradicted by the actual historical drilling speed data from 2018. Further, the learning curve assumptions were specified post hoc by non-expert management, against the advice of the experts, for the sole purpose of inflating the NPV estimate and production projections. Initially, Dr. Burch refused to use the learning curve assumptions that generated the $50 billion estimate because it was purposefully misleading. However, Bond insisted that it be used in the official estimate.

133.    In a *Washington Post* article dated October 6, 2022, Dr. Burch confirmed that "he was so unnerved at being directed to gin up a scientific outlook bolstering the company CEO's misleading public statements that he named the file: 'Please_do_not_turn_this_into_a_lie.xlsx'."

134.    Dr. Gulden conducted a study of whether the learning curve theory was supported by actual data. To perform the study, Dr. Gulden analyzed publicly available drilling-time data for more than 10,000 wells in the Delaware Basin, and observed that, while drilling times had fallen between the late 2000s and early 2010s, drilling times over the several years before 2019 had remained essentially unchanged. In other words, the learning curve theory had no support from recent historical drilling time data for Exxon's Delaware Basin wells. Dr. Gulden forwarded the results of her study to Dr. Burch and Ozen (the supervisor of the Delaware Planning Team), to support Dr. Burch's objections to Bond's chosen learning-curve assumption.

135.    On September 4, 2019, a Barclays analyst specifically asked Defendant Woods about his "target of achieving over 1 million barrels a day" by 2024 in the Permian. In response,

Defendant Woods assured investors that the estimate was supported by a sound and legitimate, bottoms-up, fundamental analysis:

> <u>We didn't go out and say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that</u>. <u>What we ended up saying is, develop the resource in a way that we think maximizes the recovery is a very grassroots buildup from the beginning of the fundamentals</u>. And then once we've figured out what was the optimal development of that, we stacked at the volume to see what it came out to be, and that was what it came out to be.

136.   In reality, the exact opposite was true:  Woods did "go out and say" that Exxon would "achieve 1 million barrels a day"; Exxon's valuation experts strenuously objected because Exxon could not actually "drill that" much that quickly; and Defendants continued to report the same false metrics to investors. It was also false for Woods to represent that the analysis that produced the 1 million barrels per day estimate was sound and based on fundamentals – i.e., that there was "a very grassroots buildup from the beginning of the fundamentals" – when it was anything but. In truth, the expert scientists were instructed to "turn the knob" on the software using false assumptions, which were contradicted by the actual data, until the model produced the 1 million barrels per day that Woods had promised.

137.   On October 23, 2019, Bond held a Delaware Basin-wide meeting attended by approximately 200 people within Exxon. At the meeting, Dr. Burch was asked to present the Delaware Basin drilling plan based on the learning curve assumptions mandated by Bond. During the presentation, when Dr. Burch described the drilling speed and drilling learning curve assumptions that were used to generate the plan, one of the drillers interrupted the presentation and stated, "That is impossible." Before Dr. Burch could respond, Bond told the audience that Dr. Burch must have made a mistake and that Dr. Burch, a mathematical modeling expert, did not understand mathematical modeling. Nevertheless, Bond did not seek any modification to the model.

138.    One of the slides accompanying Dr. Burch's presentation at the October 23, 2019

meeting specifically referred to adjusting learning curves starting in April as the explanation for

how Exxon had reached the Delaware Basin valuation. It was made clear to the Delaware Planning

Team at the October 23, 2019 meeting that Exxon was going to use the adjusted $50 billion forecast

with the learning curve assumptions as the final forecast. Bond referred to this as "clawing back"

$10 billion from the original $40 billion forecast.

139.    The true and correct forecast of oil production and cost of supply for Exxon's

Delaware Basin holdings was not used by the Company in public filings.

140.    Dr. Burch told the *Washington Post* on October 6, 2022, "I had never seen anything

like this before. <u>Management said to just override the experts so we can get to the number the CEO</u>

<u>has already blasted to the public</u>. We could not find any evidence to support it. The science did not

support it. The data did not support it. Nothing supported it."

### 3.    Dr. Gulden And Dr. Burch Report The Fraud

141.    Appalled that Bond was knowingly using false data to exaggerate drilling output at

Mallon's direction, while blaming the person — Dr. Burch — who initially objected to the

exaggerated assumption when other employees made similar objections, Dr. Gulden submitted an

internal complaint on October 23, 2019 with Tanya Miller, a representative in Exxon's Human

Resources Department.

142.    Shortly after Dr. Gulden's October 23, 2019 verbal complaint, Dr. Burch spoke

with Miller and raised similar complaints regarding Bond's insistence on using false data to

exaggerate drilling output. On November 14, 2019, at Miller's suggestion, Dr. Burch forwarded

emails corroborating his assertions to Scott Clingman, Miller's supervisor in the Human Resources

Department.

143.    Dr. Burch told the *Washington Post* on October 6, 2022, "We were told by H.R. Yep, this is definitely bad and we will definitely take care of it." But then, nothing happened until the *Wall Street Journal* contacted Exxon about a forthcoming article about the Delaware Basin.

**4.    Dr. Gulden And Dr. Burch's Complaints Trigger An Investigation That Reached Upper Management, And Exxon Fires Them With Woods' Approval**

144.    Dr. Gulden and Dr. Burch's complaints triggered an investigation that reached upper management. Upon information and belief, the investigation activities took place throughout 2020, and Defendant Woods and Defendant Mallon were made aware of the investigation. Defendant Mallon was Defendant Bond's executive sponsor who was responsible for stewarding her career at Exxon. As such, Defendant Mallon would have been made aware of Dr. Gulden and Dr. Burch's complaints because they involved Defendant Bond.

145.    On August 27, 2020, the *Wall Street Journal* contacted Exxon and informed the Company that there would be an article forthcoming regarding Exxon's development plans for the Permian Basin, and in particular the Delaware Basin. Following this communication, Exxon's Audit Team and Security Director, Beth Casteel, initiated an investigation into whether company information had been improperly disclosed. During the course of this investigation, Dr. Burch and Dr. Gulden were singled out.

146.    On September 13, 2020, an article was published in the *Wall Street Journal* entitled, "Exxon Used to Be America's Most Valuable Company. What Happened?" The article cited unnamed current and former employees for its reporting that Exxon engineered an increase of 2019 NPV for the Delaware Basin from $40 Billion to $50 Billion by overestimating how quickly it could drill. That same assertion was the basis for Dr. Gulden and Dr. Burch's internal complaints in October and November 2019.

147.    In October 2020, Rick McGovern, an investigator in Exxon's Audit Department, notified Dr. Burch that he was under investigation for sending emails from his Exxon email account to his personal email account in July 2020.

148.    During the initial investigative meeting, Dr. Burch explained to McGovern that the emails he sent to his personal email account did not contain any proprietary or other company information. At the end of the initial investigative meeting, McGovern told Dr. Burch that "the case is closed."

149.    Despite telling Dr. Burch that "the case is closed," McGovern subsequently requested additional data from Dr. Burch's computer and conducted a follow-up meeting with Dr. Burch. McGovern also told Dr. Burch that he was prohibited from discussing the investigation with anyone else at or outside of Exxon. That instruction violated Exxon's written personnel policies, which sets forth a formal procedure for employees to discuss any employment-related concerns with Exxon management and Human Resources.

150.    Shortly after the initial investigative meeting with McGovern, Dr. Burch received a notification that his LinkedIn account had been viewed by Casteel, the global head of the Audit Department. The global head of the Audit Department is several levels above McGovern's position and would normally be involved only in investigations of matters far more significant than the issue McGovern claimed was the basis for his investigation of Dr. Burch. Further, at approximately the same time, Dr. Gulden received a similar notification that Casteel had viewed her LinkedIn account as well, which indicated that Dr. Burch and Dr. Gulden were being scrutinized by the Company for a common reason.

151.    On October 23, 2020, just over one month after the publication of the *Wall Street Journal* article, Dr. Gulden was terminated by Exxon despite performing her job in a competent

and professional manner. Exxon told Dr. Gulden that the reason for her termination was that management had lost confidence in her commitment to the Company and believed that her values were not aligned with those of the Company. In truth, as OSHA determined, Dr. Gulden was terminated in retaliation for her protected activity under SOX.

152.    On December 10, 2020, Dr. Burch was terminated by Exxon, although Dr. Burch had also been performing his job in a competent and professional manner. Exxon told Dr. Burch that his termination was based partly on the investigation that commenced in October 2020. Specifically, Exxon stated that Dr. Burch was determined to have forwarded company files to his personal email address, and that he had modified as well as failed to disclose certain company documents during the investigation. Those allegations are false, as Exxon further admitted that they could not determine the nature of the files Dr. Burch allegedly forwarded to his email address. Dr. Burch did not forward any company files to his personal email address, did not modify any company documents except in the normal course of business, and did not withhold any company documents from the Company in the course of its investigation. Accordingly, the alleged reasons for Dr. Burch's termination by Exxon were pretextual.

153.    Exxon also told Dr. Burch that it was terminating him because "it's become clear that you have some very negative sentiments from the company strategy." However, the only company strategy about which Dr. Burch expressed negative sentiments was the decision to artificially inflate the value of the Delaware Basin by using impossible drilling speed assumptions. As OSHA found, Dr. Burch was terminated in retaliation for his protected activity under SOX.

154.    Defendant Woods was Dr. Gulden and Dr. Burch's only common manager at Exxon. When Dr. Gulden was fired, she was told that her firing had been approved by senior

45

management. On information and belief, Defendant Woods at least approved the decision to terminate Dr. Gulden and Dr. Burch.

### 5.    The Department Of Labor Investigates And Confirms The Fraud

155.    On February 10, 2021, Dr. Gulden and Dr. Burch filed the OSHA Complaint, alleging that, as set forth above, they had been wrongfully terminated from their positions at Exxon in retaliation for reporting that Bond had directed them to artificially inflate the value of the Delaware Basin which, in turn, rendered Exxon's reported valuations to investors false. As the OSHA Findings explained, Dr. Gulden and Dr. Burch's complaint alleged that Exxon "retaliated against them in violation of SOX when [Exxon] terminated Dr. Gulden on October 23, 2020, and Dr. Burch on December 10, 2020, because they raised issues about the valuation of oil wells with [Exxon's] management, which they believed overinflated [Exxon]'s SEC filings and information [Exxon] disclosed to the public."

156.    On October 6, 2022, OSHA issued its findings after investigating Dr. Gulden and Dr. Burch's allegations. Among other things, OSHA's investigation included interviews of Exxon's Audit Team, including the lead Audit Team investigator. Exxon also responded to OSHA with its own submissions and arguments, including rebuttal evidence on July 1, 2022. After reviewing the evidence, OSHA found against Exxon and in favor of Dr. Gulden and Dr. Burch. OSHA addressed and rejected each of Exxon's defenses in issuing the OSHA Findings.

157.    The OSHA Findings concluded that Dr. Burch and Dr. Gulden "had a reasonable belief that [Exxon's] statements in their SEC filings were inaccurate." The OSHA Findings also found that Dr. Burch's and Dr. Gulden's voicing of their concerns, whether internal to Exxon or external to the *Wall Street Journal*, was protected activity. Exxon was then ordered to reinstate both Dr. Burch and Dr. Gulden, and compensate them each over $366,000 and $385,000, respectively, for back pay and damages.

158. Specifically, OSHA issued the following findings of fact that are relevant here:

    a.    ExxonMobil employed Dr. Gulden as a Computational Scientist/Team Lead in Upstream Integrated Solutions. Dr. Gulden's responsibilities included making analytic technical contributions, and building, managing and executing a portfolio of projects in which analytics and optimization capability could assist decision-makers in the Upstream Oil and Gas division.

    b.    ExxonMobil employed Dr. Burch as a Computational Scientist in Development Planning in Global Projects. Additionally, Dr. Burch assisted as the Development Planner in the Unconventional Development Planning Group (i.e., "Delaware Planning Team") in the Upstream Development Planning division of ExxonMobil Global Projects. Dr. Burch's responsibilities included simulating the long-term development of ExxonMobil properties, performing economic analyses of different development strategies, and developing new strategies that could improve the economics of a property.

    c.    On April 26, 2019, Exxon filed an SEC Form 8-K in which it claimed: "ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024. The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue." Dr. Gulden and Dr. Burch believed this statement was not accurate and they informed management about the misleading SEC filings.

    d.    Dr. Gulden and Dr. Burch disagreed with the SEC filing because Dr. Gulden analyzed publicly available drilling-time data for more than 10,000 wells in the Delaware Basin and observed that, while drilling times had fallen between the late 2000s and early 2010, drilling times over the past several years remained essentially unchanged. Dr. Gulden forwarded the results of her study to Dr. Burch and the supervisor of the Delaware Development Planning team, Mr. Ozgur Ozen. Dr. Gulden's study also supported Dr. Burch's objections to "learning curve assumptions" made by Melissa Bond, who was a Senior Manager in Exxon's Upstream Oil & Gas division. The "learning curve" was an assumption that drilling speed would increase substantially over the next five years. Dr. Gulden and Dr. Burch believed that this assumption was not accurate and was used to artificially inflate the production estimates and the Net Present Value (NPV) of the wells. Exxon then used the artificially inflated production estimates in their SEC filings.

e.    On June 18, 2019, Dr. Burch sent an email to the Delaware Basin Team, including Mr. Ozgur Ozen, with his results using assumptions with the learning curve modeling against assumptions without the learning curve modeling. Dr. Burch's analysis revealed a lower NPV than what Exxon had disclosed publicly.

f.    On June 19, 2019, Dr. Burch followed up on his June 18, 2019, email writing "I REALLY regret adding the learning curve to my model. Note that D&C learning is solely responsible for a 45% increase in our 2025 production forecasts in Rojo-Coyanasa. But remember, we're telling investors that no efficiency improvements are needed to reach our 2025 production target (though we're also telling investors that we don't have production targets)." Dr. Burch made it clear to management that he disagreed with the NPV analysis and believed Exxon was artificially inflating its oil production capacity to improve Exxon's public filings.

g.    On October 23, 2019, during an all-hands meeting of the Delaware Basin Development Planning Team, Dr. Burch raised a concern about Exxon's desire to reach projected oil production using assumptions in the learning curve modeling that would double drilling speed in the next five years. Dr. Burch did not believe this was supported by the models. Dr. Burch raised these concerns to Senior Manager Melissa Bond. Shortly after the meeting, Dr. Gulden reported to Exxon's Human Resources what she believed to be potential securities fraud surrounding the learning curve model(s) and what was reported to the public. Both Dr. Gulden and Dr. Burch raised issues with Exxon's analysis of oil production in the Delaware Basin. They believed it was artificially inflated and Exxon was misleading the public and the SEC in their filings. Both Dr. Gulden and Dr. Burch expressed these concerns to management, and in doing so, they engaged in SOX-protected activity.

h.    On November 14, 2019, Dr. Burch sent an email to Exxon's Human Resources, which said, in relevant part: "Basically, they asked us to turn any knobs we could in our modeling software to get the forecasts NPV (Net Present Value) up, and (a) they didn't care whether or not those new assumptions were realistic (they weren't) and (b) they didn't make any changes that would be required to try to operationalize these new assumptions. The biggest offender was the "learning curve", which is an assumption that we'll more than double our drilling speed in the next five years." Dr. Burch's email makes it clear that he was worried about the forecasted NPV and believed it to be inaccurate; he raised these issues multiple times with management, thus engaging in SOX-protected activity.

i.      On August 27, 2020, the *Wall Street Journal* (WSJ) contacted Exxon's Public & Government Affairs department (P&GA) regarding an article they intended to publish regarding the Company's development plans for the Permian Basin, in particular the Delaware Basin. Following WSJ's notice of their forthcoming article, Beth Casteel, Exxon's Audit Team and Security Director immediately initiated an investigation into whether company information had been improperly disclosed to the WSJ. Exxon identified employees who had worked with or had access to data related to the Delaware Basin. Exxon claimed it reviewed the electronic records for approximately 10 employees to determine if any of those employees sent company information outside the company. During the Audit Team's investigation, they singled out Dr. Gulden and Dr. Burch.

j.      On September 9, 2020, Dr. Burch reported, via email, to his manager Charles Tautfest that he had received a text message the day prior from a reporter wanting to talk about the Delaware Basin. The next day, Dr. Burch notified the P&GA of the text message he received from the WSJ reporter.

k.      On September 13, 2020, the WSJ article titled "Exxon Used to Be America's Most Valuable Company. What Happened?" was published. The article identified that it had interviewed over 20 current and former employees. It named former ExxonMobil geoscientist, Enrique Rosero, who said he was punished for asking questions about the company's climate strategy. Mr. Rosero, who left the company on July 21, 2020, is Dr. Gulden's husband.

l.      OSHA's interviews of Exxon's audit team revealed that the audit team told Michael Deal, Vice-President of the Upstream for Research Technology & Digital Development, that the Audit Team believed since Dr. Gulden's husband was quoted in the article she was "guilty" by association and probably assisted in the WSJ article.

m.      On October 23, 2020, Dr. Gulden was terminated, a little over a month after the WSJ article was published.

n.      Exxon reported to OSHA that the audit identified multiple large files that Dr. Burch had sent from his work computer to his personal email which were concerning to Exxon because of their size and subject headings (i.e., plots, figures, update figures, and decision plots). Exxon believed these files contained classified company information. However, during OSHA's interview with the lead audit team investigator, he admitted he was unable to ascertain what specifically was in the files. Dr. Burch denied he had sent any confidential information outside of the office and that, rather, the

49

information Dr. Burch emailed to his personal address was used to prepare a white paper on a model dealing with valuing options for development planning.

o.    On December 10, 2020, Dr. Burch was terminated for allegedly providing company information to the WSJ, not fully cooperating in the internal investigation surrounding the article, and transferring company information to his personal email account. Dr. Burch denied sending any confidential information to his personal email.

159.   Further, as noted above, OSHA concluded, following an investigation, that Dr. Gulden and Dr. Burch had engaged in protected whistleblower activity under SOX and ordered Exxon to pay Dr. Gulden and Dr. Burch hundreds of thousands of dollars in back pay, back wages, and compensatory damages, and to expunge their terminations from Exxon. OSHA concluded:

Here, [Dr. Gulden and Dr. Burch] engaged in protected activity several times in 2019 and 2020 when they raised their concerns to [Exxon's] management that the assumptions leading to the estimated NPV of the Permian Basin were inaccurate and how those assumptions were included in misleading statements in SEC filings. These concerns were ultimately the subject of the 2020 WSJ article and a subsequent lawsuit alleging shareholder fraud. [Dr. Gulden and Dr. Burch] had a reasonable belief that [Exxon's] statements in their SEC filings were inaccurate. [Dr. Gulden and Dr. Burch] raised these concerns internally and [Exxon] was aware of this protected activity.

160.   OSHA further concluded that Dr. Gulden and Dr. Burch "suffered financial hardship and mental anguish because [Exxon] illegally retaliated against them in violation of SOX."

I.    **Lead Counsel's Investigation Confirms The Fraud**

1.    **New Reports From Former Employees Further Confirm The Fraud**

161.   New reports from former employees interviewed by Lead Counsel following this Court's September 29, 2022 Order confirm that Defendants knew or were severely reckless in not knowing that the "learning curve" assumptions that Bond directed were false. Specifically, FE4 (a subsurface employee with Exxon and XTO for just under 13 years from 2009 until 2021, who was sent to the Delaware Basin to perform research into Exxon's drilling and production in the area)

stated that between April and October, the budget for each team and the amount of capital expenditure needed to achieve goals of the reserves would go through many reviews. The numbers would then be reviewed by senior management and approved in September and October.

162.    FE4, who personally participated in the annual development planning process, recounted that Woods would be in these reviews and had to approve "every component." FE4 also said that during the annual planning process, he and his team would present their calculations to Bond, who would then ultimately present the final numbers to her VP, President (who at the time was Mallon), and Woods. He said that for major projects of over $10 billion like the Permian Basin, the person in charge of that project (who, in the case of the Permian Basin in 2019, was Bond) would present to Woods in person.

163.    According to FE4, the information presented to Woods would be in the form of a PowerPoint. FE4 stated that the presentation to Woods would include the curve and final NPV amount that are the basis for the numbers that Exxon reports to investors. Thus, close review of the NPV based on the "learning curve" assumptions was within the scope of Defendant Woods' position as CEO and he was at least severely reckless in not discovering that those numbers were artificially inflated.

164.    In addition, Rhodes confirmed that after the back and forth between the reserves team and reservoir engineers like himself, the numbers would be submitted to senior executives for final sign off in September/October.

### 2.    Former Employees Confirm The "This is A Lie" File And Pressure To Use False Assumptions In Connection With Year-End 2019 Planning Process

165.    Former employees interviewed by Lead Counsel also confirmed the existence of the "This is a Lie" file and the pressure to use false assumptions at Exxon.

166.    As detailed in Section IV(E)(1)(d) above, Rhodes described that he would be

pressured by the reserves team to try to find places to boost the reserves in connection with Exxon's year-end process. Rhodes explained that the reservoir engineers, who reported to the reserves team, would make the numbers higher. Rhodes confirmed that this pressure occurred for the 2019 reserves process. In addition, Rhodes described that for the start of the year-end 2019 reserves process they had a kickoff meeting with the members of the reserves team, which was led by the legacy Exxon U.S. Reserves Manager. At the start of the process, the manager alluded to the fact that Exxon had not historically been doing things right.

167.    Rhodes further confirmed that the whistleblowers' description of the net present value of the Delaware Basin as wrong due in part to drilling times made a lot of sense and was consistent with Rhodes's understanding that Exxon was trying to go too fast in that region. As summarized above, Rhodes understood from Bridwell, a Reservoir Engineer who worked on the Permian or Delaware Basins, that there was no way that Exxon could ever meet the 2024 Permian Basin projections. Rhodes confirmed that it would be more obvious to the Company how realistic the drilling timing would be and also harder for outsiders to pick up on.

168.    Rhodes also confirmed that he heard about the "This is a Lie" file two or three times, at least once from Alafifi, who worked in either the Delaware or Permian Basin.

### 3.    Former Employees Confirm That Pressure to Achieve Woods' Impossible Goal Permeated The Organization

169.    Multiple former employees interviewed by Lead Counsel confirmed that employees were under constant pressure to deliver on Woods' promise and that Company insiders knew and discussed among themselves that Woods' goal was not achievable.

170.    For example, Rhodes (Reservoir Engineer for XTO from August 2013 until July 31, 2020) confirmed that by the beginning of 2019, pretty much everyone at Exxon, including executives and management, knew that the volume projections and the big green blob were totally

unrealistic, but the Company kept showing the same projection with the green blob on it and did not revise it down. According to Rhodes, it was definitely pretty obvious internally that the Permian goal was not achievable. Rhodes further confirmed that he understood from Bridwell, a Reservoir Engineer who worked on the Permian or Delaware Basins, that there was no way that Exxon could ever meet the 2024 Permian Basin projections.

171.    Rhodes also confirmed that with respect to the 2024 Permian Basin projections, most people at Exxon knew that the timing of what Exxon said could be accomplished was impossible. Rhodes further confirmed that concerns about the goal were voiced at reservoir engineering meetings, and that he personally raised concerns to his manager that the projections for the Delaware and Permian were ridiculous.

172.    Chris Noland, who was a Geographic Information Analyst at XTO from January 2013 until February 2021, has been in the oil and gas industry since 2007. Noland worked in Fort Worth, Texas until 2018, at which time he moved to Exxon's main campus in Houston, Texas. Most recently, Noland reported to Tyler Hansen, and prior to that, Noland worked under Dave Kinkel, who retired in 2020. As a GIS analyst and a cartographer, Noland mapped out a lot of the Permian and Delaware Basin to show what XTO's leaseholds and assets were in that area.

173.    Noland attended yearly presentations run by the seniors in the land division (Noland's division) in which the Company would show what their predictions were and what the production was from the prior year. Noland confirmed that when the Company showed its production moving forward at the 2019 meeting on the "green blob" graph everyone thought there was just no way those goals could be hit. Noland understood that the goal was not feasible from talking to employees who had attended the meeting after leaving the meeting, from talking to

53

people in other departments with knowledge of those areas, and from his experience in the industry.

174.    FE4 (a subsurface employee with Exxon and XTO for just under 13 years from 2009 until 2021, who was sent to the Delaware Basin to perform research into Exxon's drilling and production in the area) confirmed that CEO Woods' statement to shareholders regarding the production of 1 million barrels of oil per day by 2024 was a false statement. FE4 confirmed that Exxon has an annual process for planning and budgeting, and if one was to look at the planned budget for 2019, we would not see these figures because, as those in the tech department suspected, Woods made this number up on the fly.

175.    According to FE4, he was there when the announcement was made, and everyone did not know where this came from, and everyone was scrambling. At the time the announcement was made, FE4 could not foresee how the Company would reach a million without a miracle. But, the Company was focused on this number and achieving the "green blob." FE4 recalled being on the Exxon Campus and watching the CEO's statements live and the entire tech group being "appalled" by what they were hearing. FE4 recalled that his "jaw fell to the floor" when Woods made the announcement. FE4 further recalled that he and his fellow team members asked during several team meetings and town hall meetings where Woods' 1 million number came from, and they were told it was a "vision." FE4 added that tech employees asked how this was supposed to happen, and they were told that it was their job to make it happen. According to FE4, Woods and other Exxon senior executives "were lying through and through."

176.    As a researcher, FE4 knew that the plan to drill 300 wells in his area of the Delaware Basin alone would not work. FE4 and his reservoir engineer got to the field they were assigned and were told that 300 wells should be drilled on that acreage. FE4 and the reservoir engineer came

back with 150 wells, but this made Exxon unhappy. FE4 and the reservoir engineer held their ground because 150 was the scientifically correct number. FE4 added that he knew this by looking at three months of data, which confirmed that 300 wells wouldn't work. FE4 explained, "You're supposed to go with whatever the Company said, and all dissidents have been removed."

177.   Jeff Wachsmann (Instruments and Electrical Specialist, Project Manager for XTO in the Delaware Basin from March 2017 until May 2019) agreed that Exxon executives were lying about the rate of oil production, and this was "purely" about needing to impress the investors. According to Wachsmann, "It's all about the perception of the investors, that's why they were trying to set records." Wachsmann explained that the issue of trying to hit record flow rates was forced in meetings that he personally attended along with production engineers that "we needed to keep Exxon number one in the world, and our production would help keep them there." He said that Exxon was only concerned with setting records for flow rates because the records of flow are what the "investor world" saw.

178.   Wachsmann described the "green blob" as a presentation featuring a slide that showed volume on the left side and dates at the bottom. The graph showed a line that projected the Company's goal of reaching 1 million barrels by 2024, and it was nearly vertical, with the filled in area under the near-vertical line known as the "green blob," signifying the color of crude oil. According to Wachsmann, the "green blob" was discussed at all-hands employee meetings attended by everyone from the Vice Presidents and management to the janitors. Wachsmann explained that the "green blob" may have laid out the goal 2024, but he knew that physically speaking alone, this was not attainable.

179.   According to Wachsmann, in team meetings attended by Sara N. Ortwein (prior to her retirement on March 1, 2019 as President of XTO), Tim Mcilwain (current SVP of Operations

at XTO), Joe Cardenas (Operations Manager at XTO from 2017 to 2019 and Reliability Integrity and Subsurface Manager at Exxon from April 2019 until December 2020), and others, employees would ask questions about how the Company intended on meeting the lofty "green blob" goal when there was a lack of basic infrastructure. Wachsmann explained, "The blob was brought up many times; how we get there. People knew we couldn't get there." Wachsmann noted that these meetings were an open forum for employees to ask questions, and one of the questions asked with some frequency was "how do we get there?" The answers, Wachsmann explained, were very vague. Wachsmann explained that those, like himself, with experience knew the Company was not going to be able to achieve the 1 million barrel goal.

180.    Wachsmann further described that production engineers and mid-level engineers would ask questions because they understood what was going on in the field better than anyone. They did not have pipelines out there in the Delaware or the infrastructure built. "We're talking 2024, green blob and the curve on that chart, and these guys (production engineers) are thinking we need power, pipelines, takeaway pipes; how are we going to do this?" This was the general conversation among the engineering group.

181.    In addition, Wachsmann confirmed that drilling problems made the "green blob" goal of 2024 not attainable. Wachsmann explained that the thought that the wells were going to make all this volume without having to worry about decline was "pie in the sky, not achievable."

### 4.    Additional Former Employees Confirm Pressure To Change Valuations That Were Not High Enough

182.    In addition, former employees interviewed by Lead Counsel confirmed that Exxon's corporate culture included a push to change valuations that were not high enough. For example, FE4 worked as a subsurface employee with Exxon and XTO for just under 13 years from 2009 until 2021. FE4 was deployed out to the Delaware Basin to perform research concerning

Exxon's drilling and production rates because production in the Delaware Basin was not getting to where Exxon wanted it to be. FE4 had first-hand knowledge of the year-end development planning process, as his team would have presented the PowerPoint presentation to Bond reflecting the production data generated through that process before Bond presented it to executives including Defendant Woods, and he was aware of Woods' involvement based on his personal experience participating in the Planning & Budget review process.

183.    While FE4 worked at Exxon for just under 13 years, he explained that anyone who had been at the Company for five years would understand the seniority structure of the Company, and how executives like Bond and Woods would have access to the same data concerning the Delaware Basin valuations. Furthermore, FE4 recounted having been on the same jet to the Permian as Bond, and that Bond travelled to the Permian by jet at least once a month from 2018 to 2020. FE4 mentioned that there were so many flights going to the Permian that the airline could not keep up with them. FE4 also mentioned that while about 1,000 employees had executive career level status, only about 50 employees at that level travelled to the Permian.

184.    FE4 confirmed that Bond had access to the data from the Delaware, which is known as Decline Curve Analysis (DCA). FE4 explained that conventional reservoirs have veracity and pressure analysis to measure how much oil is in porous rock. With unconventional reservoirs like in the Delaware, DCA is used to understand how much oil is there.

185.    FE4 explained that DCA employs data matching. You drill a well and then look at the oil produced quickly and the cumulative oil production over time. The two sets of data that are matched are Hyperbolic and Exponential Decline. Hyperbolic is the decline measured when oil is first coming out of the well fast, and exponential is the "smoother" data showing the more gradual decline. By looking at the production and the DCA for multiple wells, you can make estimates for

production of unconventional wells. This information is put into a system called ARIES. The DCA curves are then extrapolated over a 20-to-40-year period. According to FE4, in his area, employees were told that the curve needed to be a certain way per well, but he told the Company that the number of wells he was told was possible in his area was, in fact, impossible.

186.   FE4 confirmed that he had heard about the "This is a Lie" file. FE4 further confirmed an overall general pressure at Exxon to make things "rosier" than they were.

187.   Steven Binns was a Senior Geoscience Associate at Exxon from April 2000 until October 2020. His responsibilities included aggregating all of the data and information that he could about a topic so that the decision-makers could use it for their goals. Binns confirmed that he heard from geologists and engineers that, at Exxon, vice presidents or management-level officers would say that they needed a number to be "X," and the employees would have to scramble to make it "X."

### 5.      Exxon's Culture And Longstanding Policy Of Not Taking Write-downs

188.   Exxon is notorious for having a longstanding policy against taking write-downs, and for having a senior executive management team that is known internally—and in the media—as the "God Pod." For example, David Rosenthal, former Vice President, Controller, and Principal Accounting Officer, wrote to his colleagues concerning a footnote addressing impairments in a draft report on climate risks in an email dated March 25, 2014. In the email, made public through an investigation by the New York Attorney General into Exxon's climate change-related statements to investors, Rosenberg wrote, "That word [impairment] gives folks on the third floor [i.e., Exxon executives] heartburn."

189.   Former CEO Rex Tillerson similarly explained in a 2015 interview, "We don't do write-downs. If you look at our history, we do not write our investments down. . . . [E]veryone

around here understands, once you make that investment, you live with that the rest of your career . . . . We are not going to bail you out by writing it down." In 2016, Wolfe Research wrote that Exxon's decision not to write down its reserves "raises serious questions of financial stewardship," and noted, "it is impossible to believe that no assets have been impaired."

190.     Exxon's policy against write-downs continued throughout the Class Period. For example, on November 30, 2020, *Oil Daily* reported that, rather than write down its investments, Exxon "had a different approach—if prices fall and an asset is struggling, employees must improve its performance and lower costs to improve returns, no matter how hard the task." On December 1, 2020, Raymond James's analyst noted, "Former Exxon CEO Rex Tillerson had famously been opposed to ever writing down assets." Additionally, Bloomberg reported on October 13, 2022 that Rosero (an Exxon geoscientist that had worked at Exxon for almost 11 years and was married to Dr. Gulden) was demoted repeatedly, eventually resulting in his resignation, because he had "questioned whether Exxon would have to write down some of its oil and gas assets."

191.     Exxon is equally famous for the fact that its senior management is known as the "God Pod." As the *New York Times* reported on March 1, 2017 in an article titled, "Darren Woods, Exxon's New Chief, Begins to Make His Mark," "The executive wing of Exxon Mobil's headquarters outside Dallas is nicknamed the God Pod because orders given by executives there can sometimes be as sharp as thunderbolts." According to the *New York Times*, when Defendant Woods became the CEO, he also became "top god." The *New York Times* reported in a December 10, 2020 article that Exxon's executive suite was known as the "God Pod" throughout the Class Period.

192.     An October 13, 2022 article from *Bloomberg* titled, "Exxon's Exodus: Employees Have Finally Had Enough of Its Toxic Culture," further confirmed that Exxon is "famous for its

top-down, buttoned-up, authoritarian culture, where employees rarely challenge their superiors[.]" *Bloomberg* interviewed more than 40 current and former Exxon employees, and reviewed "dozens of internal documents," to determine why top talent was "fleeing" Exxon. The investigation revealed an "organization trapped in amber, whose insular and fear-based culture–once a beacon of corporate America–has become a drag on innovation, risk taking, and career satisfaction." Indeed, Exxon employs a performance ranking system which "pits its employees against each other" and discourages subordinates from voicing opinions contrary to their bosses.

193.    The Exxon culture, which *Bloomberg* describes as "toxic," is propagated by senior management, which includes the Company's CEO Defendant Woods. One former employee explained that "Upper management doesn't like to hear bad news, so to stay at Exxon long term,  you have to drink the Kool-Aid." The culture did not just negatively affect the moods of employees or drive them away. It incentivized employees to misrepresent the numbers or inputs in their various projects. For example, career advancement was often the reward for proposing a project that was greenlighted. This led employees to "intentionally underestimate" the costs associated with their proposals. The problem was rampant enough that Exxon conducted a study in 2020 called "runaway projects," focusing on projects which exceeded cost estimates by 70%.

### 6.    Production Conditions On The Ground Were Far Different Than Exxon Represented To Investors

194.    The accounts from Rhodes, the whistleblowers, and others set forth in Sections IV(I)(1) – (5) above are corroborated by reports from multiple former employees, set forth directly below, describing myriad problems with drilling, drilling delays, well performance, and well quality, among others, that plagued Exxon's Permian operations throughout the Class Period. Exxon told investors prior to and during the Class Period that its proved reserves from the Permian Basin were "supported by ExxonMobil's growth plan, including increased drilling activity and

infrastructure" and based on Exxon's "development plan." As described further below, Exxon's development plan was impossible to achieve due to multiple production problems on the ground, including problems with drilling, infrastructure and equipment, labor, and finding less oil than expected.

### a.   Problems With Drilling And Wells In 2018

195.   Multiple former employees interviewed by Lead Counsel confirmed that drilling times were longer than expected in 2018, and they described additional problems with production in the Permian Basin, including poor well performance and well quality. For example, FE1, an Operations Drilling Supervisor at Exxon from June 1998 until December 2020, who was one of the first wave of drilling supervisors to be sent to the Permian Basin when Exxon's drilling projects began there, confirmed that there was no way that Exxon was going to be able to produce what it promised with how long it was taking to drill a well in the Permian. According to FE1, it took double, sometimes triple the time to drill a well in the Permian.

196.   FE1 explained that Exxon thought that individual wells would take around 20 days each to drill, but they would instead take 35 days or a month and a half to drill. Some problems that those performing drilling like FE1 ran into were running into zones that were depleted of oil, water and mud in wells, poisonous gases that would shut down a rig, casing getting stuck, depleted zones, and well controls—all of which are issues that can "mushroom" into multi-day problems.

197.   FE1 added that the amount of H2S poisonous gas that the drilling teams were experiencing in the Permian was deadly. FE1 spent over 20 years working for Exxon, but the Permian was the first place in the Company where he saw management acting less stringent about H2S safety, noting that they had eyes on the Permian 100%, and on more production and more wells in less time. FE1 explained that when poisonous gas was discovered, Exxon used the "Cascade System" in which everyone is wearing breathing masks and hoses to do their work. This

61

is usually reserved for last resort situations and emergency situations—not normal work environments.

198.    FE2 was a Drilling Consultant on a contract basis for XTO from January 2018 until February 2019 who worked in the Permian Basin at a field office south of Midland, Texas. FE2 was responsible for supervising the drilling operations and tracking related costs, including assessing estimated drilling costs and comparing them to actual drilling costs. FE2 reported that there were at least two problems that took more time and money than Exxon had anticipated. First, there were "hole problems," meaning that the formation took on fluid, which required the drilling activity to be stayed while the team tried to fix the formation. Second, FE2 explained, Exxon imposed processes that were standard for offshore wells, not onshore wells, and offshore techniques took longer than those standard for onshore drilling. This process slowed the operations down by at least four days and sometimes five days for each well.

199.    Norris Wingo was an Engineering Coordinator at XTO from May 2018 until February 2019 who worked out of the Midland, Texas corporate office and reported to Nathan Hartshrone, and later to Gordan Holloway. As engineering coordinator, Wingo coordinated the equipment being located to the wellsites of a lot of the wells and assets that were being drilled, primarily in the Delaware Basin.

200.    Wingo confirmed that wells were taking longer to drill than anticipated. Wingo explained that he had a schedule that he coordinated to deliver equipment to sites, and some of the schedules in the Delaware Basin were behind and up to 90 days delayed. These schedules were for new equipment to come from the manufacturer to the site. Wingo described how some of the schedules were delayed because they had not gotten started, and others were taking longer to strike oil. According to Wingo, these delays, including the drilling delays, resulted in increased costs.

201.    Both FE1 and FE2 further confirmed that the assumption that Exxon could improve its drilling times, as it later told investors, was unrealistic. According to FE1, the Company's assumption that it could improve drilling times at an optimistic rate was unrealistic. FE1 explained that the Delaware Basin assets that the Company bought for $6.6 billion from the Bass family turned out to be "pretty ugly." As FE1 put it, "I've drilled around the world, but drilling in the Permian was ugly, nasty stuff."

202.    FE2 similarly confirmed that reducing drilling times in the near future was an unrealistic assumption at the time, especially considering Exxon knew things were going to take longer by using the offshore processes. The slower drilling times persisted throughout FE2's contract employment, which included all of 2018.

203.    Wachsmann, whose career in the oil and gas industry has spanned 40 years, worked for the Bass family, which owned the assets in the Delaware Basin that Exxon purchased in 2017. Wachsmann stayed on after the acquisition as an Instruments and Electrical Specialist, Project Manager for XTO from March 2017 until May 2019. He reported to XTO's general manager of the Delaware Basin, Joe Cardenas.

204.    Wachsmann confirmed that there were drilling problems in the Delaware Basin. Wachsmann explained that, as he knew from his experience working in the Delaware Basin, the wells in the Delaware Basin have decline rates of 50% or higher in their first year of operation. This means that they pump out 2,000 barrels a day when they first come online, but by the end of the first year, they are at less than 1,000 barrels per day. According to Wachsmann, after the wells decline, you have to drill holes to catch up.

205.    Wachsmann added that XTO brought in people from all areas of the Company, but most of those people normally worked in gas fields, and they had no idea how an oil field works.

He explained that in gas fields, a well can flow the same way for 30 years, and these people thought oil wells would do this as well. Wachsmann would explain to them that oil wells require artificial lifts within a year of their coming online. This was a reality check for those that came from the gas fields.

### b.    Additional Production Problems And Delays In 2018

206.    In addition to drilling times and processes, FE2 described problems with infrastructure, costs, and manpower in the Permian Basin. According to FE2, with respect to infrastructure (i.e., the "start to finish of a well," including fracking, the flow lines, the tank batteries, the flare lines, and a way to fill the well), from when FE2 began working as an XTO contract employee in January 2018 until he left in February 2019, Exxon had not started any new rigs in the Delaware Basin. There was only a small amount of infrastructure in the Delaware Basin when FE2 started working as a contractor in 2018. FE2 explained that around February 2019, the Company began moving rigs to the Delaware Basin, but the Company did not have the infrastructure to support the number of rigs that were being moved.

207.    Further, according to FE2, the number of rigs was not sufficient to allow Exxon to achieve its goals. FE2 confirmed that Exxon "was overreaching" in terms of the plans that the Company had for the region. According to FE2, based on his experience of having worked in the industry for more than 10 years, the amount of oil that Exxon was purporting it could bring in would have required "at least 100 rigs."

208.    In addition, FE2 explained that Exxon would have needed 10 times the amount of equipment it had to reach the promised oil production levels. The required equipment included completion rigs, frac units, flowback units and other types of equipment. According to FE2, Exxon was competing with other companies for the equipment, and the vendors had a limited supply when all drilling companies were considered.

209.     Further, with respect to costs, in FE2's role, he saw the estimated costs for drilling per well and specifically received hard copy Excel spreadsheets with the estimated drilling costs. FE2 used the Excel spreadsheets to assess the estimated drilling costs and then compare them to the actual drilling costs. According to FE2, the estimated drilling costs for the Permian Basin were not reliable. FE2 explained that drilling was consistently more expensive than the estimated costs. For example, FE2 explained that completion costs exceeded estimates for 16 out of the 20 wells that were completed in the Permian Basin during the time that he worked for XTO (from January 2018 until February 2019) costing around $2 million per well.

210.     Finally, according to FE2, Exxon also lacked the manpower to complete the wells. FE2 explained that Exxon would have needed everyone in west Texas to be working for the company to complete the wells at the desired pace. According to FE2, there was not enough manpower to drill quickly enough to reach the production levels Exxon was promising and Exxon would have needed 10 times the manpower it had to achieve the production goals.

211.     Wingo also confirmed that, with respect to infrastructure in the Delaware Basin, most everything was new and being built there. In addition, Wingo confirmed that there were issues with equipment shortage. According to Wingo, there were so many oil companies out there that the equipment manufacturers could not keep up with demand.

212.     Wachsmann agreed with this, noting that another big issue was electricity. Wachsmann explained that Xcel Energy was the vendor that supplies energy in that area, and that the company was "swamped" with projects "from everybody." A request for power for a single facility could take two years to get done.

      **c.     Longer Than Expected Drilling Times Made The Permian Production Goal Impossible**

213.     Multiple former employees interviewed by Lead Counsel confirmed that drilling

delays and problems with drilling and wells continued through 2019 and 2020.

214.    For example, Karl Rydjord was a Contractor in Construction and Commissioning for XTO from September 2019 until September 2020 in the Delaware Basin. Rydjord reported to Project Manager Ryan Smith, who oversaw the infrastructure buildout in the Poker Lake unit of the Delaware Basin. Rydjord also had a "dotted line" reporting responsibility to Josh Loch, another project manager. Smith and Loch worked in XTO's Midland, Texas office and reported to Brian Klutz, a project manager for XTO, who oversaw project execution for the midstream assets group.

215.    Rydjord confirmed that there were problems with project execution and issues with production in The Big Eddy, including insufficient drilling progress. Rydjord explained that The Big Eddy was one of the two main production units in the Delaware Basin (along with Poker Lake) that were being drilled and supposed to produce oil at levels that would allow Exxon to reach the goal of 1 million barrels per day. However, Exxon was not getting wells drilled and completed in the timeframe it thought it could, leaving Exxon behind where it wanted to be.

216.    According to Rydjord, the drilling progress was not "living up to what was forecasted." There were issues with the completion design or the manner via which Exxon completed wells. In particular, Rydjord noted, it was taking longer to drill and complete the wells and fracks, and when the wells came on production, the production was not as good as what Exxon was hoping for.

217.    Further, Rydjord explained, the forecasts proved not to be true for The Big Eddy area. The Big Eddy was the larger area of the basin, where Exxon was expecting more development drilling, but the activity turned out to be more exploratory drilling. According to Rydjord, the well performance in The Big Eddy was "not what they were hoping for." The field was not as consistent as Exxon hoped, and the basin was not a homogenous reservoir that would be the same no matter

where it was drilled.

218.    Rydjord described that there is a process by which geologists and reservoir engineers create a curve for a well and project it into the future. However, Exxon thought it would have certain volumes coming out of the wells, but it did not, and slid these forecasts into the future. For example, if the Company forecasted a certain amount of production by October, but they did not meet that goal, they would slide it to December.

219.    Ryan Wells was a Drilling Consultant at XTO from August 2019 until December 2019 who worked in the Permian Basin, specifically the Delaware Basin, and the Bakken as a directional driller. As a Drilling Consultant, Wells's job was to drill the wells according to well plans that were designed by the engineers. Wells had a close connection to the actual drilling engineers in his role, and he spoke to them every day in mandatory safety meetings. Wells reported to Roger Rutherford, the rig manager at the time. While Wells's job was to drill the wells, he would get updates on how the wells were doing, including, among others, two wells that Wells personally drilled in the Delaware Basin.

220.    Wells confirmed that the Company's claim that it would produce 1 million barrels of oil per day in the Permian by 2024 was highly inaccurate, and that the Company did not come close to that. Wells explained that there were drilling delays and increased costs associated with drilling delays all the time. For example, on one of his wells in the Delaware Basin, they lost a lot of fluid, and they had to cap it off there and then sidetrack around it. The cost that resulted from losing too much fluid and having to sidetrack was well over a few hundred thousand dollars. The problems with drilling wells in the Delaware Basin, including losing fluid, were particularly frequent in the Wolfcamp D section of the Delaware Basin, which was essentially drilling through

a canyon. As another example, Wells described how two of the wells that Wells personally drilled in the Delaware were hardly producing at all.

221.    Jeff Biddle was a Rig Move Specialist at XTO from September 2019 until March 2020, who worked primarily in the Delaware Basin. Biddle's responsibilities included doing site surveys of new locations where they were going to set a rig out, route reconnaissance, on-location safety any time there was a rig move, and accounting for all parts of rigs when they were moved. Biddle reported to a Rig Move Coordinator based out of the XTO Midland, Texas headquarters.

222.    Biddle confirmed that Exxon's claim that it would produce 1 million barrels by 2024 did not seem at the time to be realistic. According to Biddle, Exxon was having issues drilling in the eastern New Mexico region of the Delaware Basin because the Company was also fracking a quarter of a mile or half a mile away. The Company could not finish drilling all the wells because of all the fracking that was going on just on the other side of them. They had to cap those wells and move down the road, maybe a half a mile to a mile. Biddle explained that when you drill and frack at the same time, it causes gas and other issues in the formation that you cannot see, but that computers determine is a problem, so that you cannot drill effectively. As a result, Exxon had to move the rigs to another location which caused delay.

223.    As another example of delay, Biddle described how he put a rig in place in September 2019 in Texas that was supposed to drill four wells, but by the time Biddle left in March 2020, they were still in that same location because of issues with formation. Biddle explained that when that rig has four wells that it has to drill in a location, and it had been on the location for 4.5 to 6 months, you are just not going to hit your goal.

224.    FE5 was a Project Control Specialist who worked on a contract basis for XTO from January 2019 until April 2020, working in the field in Midland, Texas. FE5 was responsible for

creating and presenting reports for XTO's management team, which forecasted manpower needs for construction crews on projects within the Permian. FE5 attended quarterly safety meetings in the Midland, Texas office, as well as more frequent construction team meetings, where the progress in the Permian Basin and the Delaware Basin was discussed.

225.    FE5 explained that the wells in the Delaware Basin are "harder to drill" and a "worst case scenario" drilling environment because there is "sour gas" that contains an inordinate amount of hydrogen sulfide in Lea County, New Mexico, where the Delaware Basin is located.

### d.    Additional Problems In The Permian That Rendered The Production Goal Impossible To Achieve

226.    Multiple former employees interviewed by Lead Counsel confirmed that in addition to the drilling delays and other drilling and well problems described above, there were additional problems with (i) inadequate equipment and infrastructure; (ii) inadequate labor; and (iii) finding less oil than the Company expected.

### i.    Inadequate Equipment And Infrastructure

227.    Multiple former employees explained that Exxon did not have enough rigs operating in the Delaware Basin to achieve its goal. For example, Biddle confirmed that if Exxon wanted to hit the goal of 1 million barrels, they needed a lot more rigs than they had. To meet this goal, Biddle confirmed that Exxon would have needed at least 100 rigs drilling nonstop with no issues at all, which Biddle explained, hardly ever happens. According to Biddle, the goal was incomprehensible.

228.    FE1 (Operations Drilling Supervisor at Exxon from June 1998 until December 2020) was one of the first wave of drilling supervisors to be sent to the Permian Basin in January 2018 when Exxon's drilling projects began there. Exxon sent FE1 to the Permian to learn from the existing consultants at the site and improve on how things were being done, including how to drill

the wells cheaper and faster, and quell the uncontrolled spending going on at that time.

229.    FE1 confirmed that there was no way Exxon was going to be able to produce what it promised with the number of rigs it was running. FE1 added that the Delaware Basin was difficult to drill, and cost more time and money, due to its isolated location. There were also no support services in the Delaware Basin; support services were located in Midland and another location, but not near the Delaware, so the drilling became more expensive. FE1 added that because Delaware Basin operations are closed loop, there are no reserve pits, so everything runs directly through a frack tank and then is hauled off by trucks, which is a cost increase. In addition, because there were no roads in the Delaware Basin, they had to be built in each location to bring out oil due to the closed loop. The land was also rocky, not sandy, which made it difficult as well.

230.    Multiple former employees also described problems with Exxon's infrastructure that made achieving the Company's Permian goal impossible. For example, Rhodes confirmed that inadequate infrastructure was the main reason why the Permian Basin goal was not achievable. Rhodes explained that there was a lack of capacity and a lack of pipeline capacity to transport the oil. Rhodes got this understanding from Bridwell, a Reservoir Engineer at XTO who worked on the Permian or Delaware Basins. Rhodes added that the capacity issue would also cause too much "soaking time" for the wells. Rhodes explained that if you are drilling and producing so many wells, but you cannot complete them, you will not take advantage of the "super charge" of the frack. To get the super charge, you need to flowback the well and start producing it shortly after the frack of the well, within days of the frack. If there was nowhere for the oil to go because of lack of capacity and infrastructure, it not only delays the production, but it also likely makes the well not as good of a well because it had so much soaking time.

231.    Rydjord, who was based in the field as an officer in The Big Eddy, was responsible

for building infrastructure needed to get the oil and gas to market, and he was the only project engineer working in the field on the infrastructure team. Rydjord described that the Cowboy Central Delivery Point ("CDP") was the main facility that was being developed and through which all of the oil and gas in the Delaware Basin were supposed to flow. But, as Rydjord saw first-hand and knew because he was working closely with the Cowboy CDP, progress was not being made on the Cowboy CDP. Based on Rydjord's discussions with peers, managers, vendors, and from the timing for the infrastructure work that Rydjord was tasked with completing which fed into the Cowboy CDP, Rydjord believed that Exxon likely sought for the Cowboy CDP to be completed by late 2019 or early 2020. However, the CDP was still not done by the time Rydjord's contract was completed in September 2020. In fact, according to Rydjord, the Cowboy CDP was "a long way from done." Rydjord also described instances of delay in receiving necessary equipment and supplies.

232.    Like Rydjord, Wachsmann explained that the Cowboy plant was $1 billion over budget—after the Company over-budgeted for the facility at $800 million—and it is still not in full production to this day. Wachsmann explained that the construction began in 2018, and it was not an out of the ordinary facility—it was a cookie-cutter facility. The rule of thumb when building such a facility is that a 200 million cubic feet-per-month plant takes $350-400 million to build, and another 200 million cubic feet takes another $150-175 million to add on.

233.    Wachsmann additionally confirmed that Exxon's goal was not achievable by 2024, in part because the infrastructure was being installed "from scratch." He explained that the infrastructure required to produce that volume was not there in the whole area, and that this included everything necessary: physical power like electricity, pipelines, roads, processing plants and tank batteries. Wachsmann confirmed that there were no pipelines to bring the product to the

71

gulf, and there was also rough terrain that the Company would have to deal with in building this scope of infrastructure.

### ii.      Inadequate Labor

234.    In addition, former employees interviewed by Lead Counsel explained that inadequate labor contributed to the Company's inability to meet its production goal in the Permian Basin.

235.    For example, Rydjord confirmed that the limits on labor availability negatively impacted the Company's ability to construct all of the infrastructure at the same time. Rydjord described how Exxon was building the infrastructure with the plan that it would be able to service all of the planned production and allow Exxon to ramp up very fast to 1 million barrels of oil per day. However, there were downstream partners that also had to build out their facilities to prepare for the planned increase in production from the Delaware Basin, including, for example, Lucid Energy Group, which had to modify and expand its pipeline and other infrastructure to meet Exxon's projected volumes.

236.    Rydjord added that Exxon's focus was oil production, which is associated with gas production, and the Company was not planning enough capacity to move it all. According to Rydjord, Lucid and Exxon were drawing from the same labor pool, and the competition meant that both companies had to tap into less skilled laborers to meet demand. Moreover, labor costs increased with competition.

237.    According to Rydjord, everything got very expensive, labor costs exceeded forecasts, and the amount of oil that Exxon was producing from the completed wells did not meet the Company's expectations.

### iii.      Less Oil Than Expected

238.    Multiple former employees interviewed by Lead Counsel also confirmed that

Exxon was finding less oil in the Permian Basin than it expected, which contributed to its inability to achieve its goal.

239.    For example, Rydjord explained that the amount of oil that Exxon was producing from the completed wells did not meet expectations. According to Rydjord, The Big Eddy was not consistent. There were "sweet spots," but one could not count on the basin being a homogenous reservoir. According to Rydjord, Exxon's plan was shattered when there was not as much oil as they were hoping to find.

240.    In addition, Wells confirmed that two of the wells that he personally drilled in the Delaware Basin were hardly producing at all.

241.    FE5 also confirmed that he understood from attending quarterly safety meetings and more frequent construction team meetings in XTO's Midland, Texas office, that the Company's Delaware Basin goals were not on schedule, and that the Delaware Basin was producing far fewer barrels of oil per day than the targeted amount.

242.    FE6 worked at Exxon and XTO from 2013 until February 2021, serving as an Instrument, Controls & Electrical Equipment Lead Commissioning Engineer at XTO from 2020 until 2021, and a Senior Staff Instrument Engineer at Exxon from 2018 until 2020. From May 2020 until February 2021, FE6 was working in the Delaware Basin out of Carlsbad, New Mexico, and reported to Gordan Holloway.

243.    FE6 confirmed it seemed to be a recurring theme of disappointment that "we weren't making our oil marks." FE6 explained that it was common knowledge with the boots on the ground employees in the Delaware Basin that they were pumping saltwater and that individuals on the ground were in frequent contact with the people at the Midland office. According to FE6, it was a running joke that the Company should start selling saltwater because they were getting so

much saltwater and not oil.

**J.     The Truth Is Revealed Through A Series Of Partially Corrective Disclosures**

**1.     January 31, 2020:  Exxon Discloses That Permian Basin Production Has Slowed Down, But Continues To Mislead Investors About Its 1 Million Barrels Per Day Goal**

244.     On January 31, 2020, Exxon held its Q4 2019 earnings call at 8:30 a.m. CT. During the call, Defendant Woods presented a "green blob" slide, set forth below, stating that fourth quarter 2019 production was "294 Koebd" or 294,000 barrels of oil-equivalent per day, which was virtually flat quarter to quarter compared to 293,000 barrels of oil-equivalent per day for the third quarter of 2019. This fell below estimates made by industry analysts as well as the Company's own guidance. In response to this news, Exxon's stock declined 4.1% on January 31, 2020, and continued to decline 2.2% on February 3, 2020 and 1.3% on February 4, 2020 as the market absorbed this news over the weekend.



245.     However, during the January 31, 2020 call, Defendant Woods continued to reassure investors that "we are making very good progress" on Permian production. Defendant Woods

presented the same "green blob" slide referenced in ¶244 above, which reiterated, "Permian volume growth on schedule."

246.    In response to analyst questions, Defendants assured investors that Exxon was "on track" to achieve its goal of 1 million oil-equivalent barrels per day in the Permian. For example, a Goldman Sachs analyst asked about Permian production looking flat from Q3 to Q4 2019 and Exxon's progress in achieving its production curve in the Permian. In response, Defendant Woods said to expect "lumpy progress with respect to volumes growth" and to not "draw a whole lot" from it. Further, Defendant Woods reiterated that Exxon's production goal for the Permian was "clearly on track."

247.    Defendants also touted production conditions in the Permian Basin in response to analyst questions. For example, in response to a question from analyst Jeanine Wai from Barclays about "how operations [in the Permian] are going," Defendant Woods stated, "[B]ottom line[:] the potential of that and the value propositions that we've talked about haven't changed, if anything, we like it better."

248.    Analysts were discouraged by Exxon's flat Permian production growth for the quarter, but they were reassured by Defendants' representations that Exxon was still on schedule to meet its 1 million oil-equivalent barrels by 2024 goal in the Permian. For example, Barclays wrote on January 31, 2020, "Permian production was ~flat QoQ at 294 MBoe/d vs. our estimate of 324 MBoe/d. However, management reiterated prior commentary that Permian growth can be lumpy given infrastructure buildout and that FY production is generally a little above expectations." Credit Suisse similarly noted on January 31, 2020, "Permian production averaged a disappointing 294 MBoed in 4Q19, flat with the 293 MBoed in 3Q19 but is expected to increase by ~200 MBoed YoY through 4Q20." But Credit Suisse further noted that "XOM's Permian (and

Bakken) growth had been ahead of its long-term trajectory, and management attributed the 4Q Permian results to the lumpiness in wells to sales as seen in historical patterns, with volume growth on track for long-term target. For reference, XOM expects its net production from the Permian (Midland and Delaware Basins) to grow at a >30% CAGR during 2019-25 with a target of reaching ~1 MMBoed 2024, which we expect it to reach in late 2024."

### 2.   May 1, 2020: Exxon Discloses Significant Rig Cuts And A Reduction In 2020-2021 Permian Basin Production Volumes

249.   On May 1, 2020, Exxon held its Q1 2020 earnings call at 8:30 a.m. CT. During the call, Defendants disclosed that Exxon was cutting rigs by 75% in the Permian, and that decreased capital expenditures would reduce Permian volumes in 2020 and 2021. Defendant Woods stated, "[R]eduction in capital spend will primarily affect 2021 where we expect volumes will be down 100,000 to 150,000 oil equivalent barrels per day from our previous estimates. In 2020, the impact of the reduced CapEx will be much lower, at about 15,000 oil equivalent barrels per day." In addition, Defendant Woods disclosed, "Over the course of the year, we expect to ramp rigs down by about 75% in the Permian, ending the year at approximately 15 rigs." In response to this news, Exxon stock declined 7.2%.

250.   Analysts were generally negative on the impact of the capital investment reduction on the Permian Basin. For example, on May 1, 2020, Raymond James noted, "This was the final quarter with Permian uplift on a sequential basis, in view of the rig count having been slashed as part of the overall 30% spending cut unveiled on April 7." On the same day, Credit Suisse stated, "While not detailing capex reductions by area, it noted that the largest share of the cuts is from the Permian." Also, on May 1, 2020, Evercore ISI further commented, "Capital reductions are expected to decrease Permian production volumes by approximately 15 MBOEPD in 2020 and 100-150 MBOEPD in 2021 . . . . Management anticipates this will impact volumes in the Permian

by approximately 100 MBOEPD in 2Q."

251.    However, multiple analysts credited Exxon's "flexibility" and noted that the impact was not material in the near-term. For example, Wolfe Research wrote on May 1, 2020, "2020 production guidance is not materially impacted." Cowen wrote on May 1, 2020, "Production should return back to 4MM bped in 2022." UBS similarly wrote on May 4, 2020, "In the Permian, capex reductions are expected to have only a minor impact on volumes this year[.]"

> **3.    January 15, 2021: The *Wall Street Journal* Reports That Exxon Used False Drilling Assumptions Saved In A File Called "This is A Lie" To Overvalue The Delaware Basin By $10 Billion**

252.    On January 15, 2021, the truth concerning Defendants' fraud was finally revealed when the *Wall Street Journal* reported that a whistleblower complaint described how Exxon's 2018 drilling assumptions were false and that Exxon had determined in 2019 to fraudulently overvalue the Delaware Basin by $10 billion, using inflated drilling assumptions saved in a file called "This is a Lie." In response to this news, Exxon's stock declined 4.8%.

253.    News outlets and analysts reported on the whistleblower allegations and attributed Exxon's stock drop to it. For example, *Bloomberg* reported on January 15, 2021 in an article titled, "Exxon Falls After Report of SEC Probe into Permian Valuation," that "Exxon Mobil Corp. slumped after a newspaper report said the company is being investigated by the U.S. Securities and Exchange Commission for allegedly overvaluing a key asset in the Permian Basin." UBS reported on the *Wall Street Journal* article on January 17, 2021, noting that the net value assessments described in the article would impact Exxon's assessment of its "proved reserves and resources, underpin balance sheet historic cost (which are audited), and guide strategy and investment."

## V.     POST-CLASS PERIOD EVENTS

### A.     Exxon Announces A Reduced Goal Of 700,000 Oil-Equivalent Barrels Per Day By 2025 In The Permian

254.    On February 2, 2021, Exxon held its Q4 2020 earnings call and acknowledged that it would not meet its 1 million oil-equivalent barrels per day by 2024 production goal. Announcing a new reduced goal, Defendant Woods stated, "[O]ur plans result in Permian volumes of approximately 700,000 oil equivalent barrels per day by 2025."

255.    Analysts noted Exxon's new guidance on Permian production as negative news, but with little surprise. On February 2, 2021, Bank of America Securities reported, "Permian . . . production set at a range of 500-700kboed by 2025 (from >1mm boed previously)" and further commented, "[N]oting that expectations were already for a lower growth wedge following 2020's collapse, management now indicates an overall production estimate for 2025 at 500-700kboed with bands of $50-60 Brent, a 40% cut at the midpoint from prior expectations of >1mm boepd." CFRA also stated that same day, "Whereas guidance from '19 suggested Permian production of 1.0 mmboe/d by '24, today's revised guidance is 0.7 mmboe/d by '25."

### B.     Exxon Reduces Its Proved Reserve By 1.5 Billion Oil-Equivalent Barrels Related To The Permian Basin

256.    The Company did not reduce its proved reserve to accurately reflect the reduced value of the Delaware Basin until after the end of the Class Period. On February 24, 2021, when Exxon released its 10-K for the year ended December 31, 2020, Defendants revealed "a net reduction to estimates of proved reserves of approximately 1.5 billion oil equivalent barrels, mainly related to unconventional drilling in the United States."

257.    By identifying the reduction as "mainly related to unconventional drilling in the United States," the Company acknowledged that this reduction stemmed primarily from its operations in the Permian Basin—its largest asset devoted to unconventional drilling in the U.S.

258.    Analysts were not particularly surprised by Defendants' announcement. For example, Credit Suisse's February 26, 2021 analyst report noted that "XOM has scaled back on its plans to grow Permian volumes over 1MMboe/d by 2024."

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

259.    As set forth above and further below, numerous facts demonstrate that Defendants knew or were severely reckless in not knowing that Defendants' statements identified in Section X below, were materially false and misleading when made. The scienter of Exxon as a corporate entity is derived from the scienter of its executives, including Defendant Woods, Defendant Mallon, and Defendant Bond. Woods, Mallon, and Bond's scienter is imputed to Exxon.

260.    First, OSHA found, after an investigation, that Dr. Gulden and Dr. Burch had a "reasonable belief" that the statements at issue in this Action were false, that Exxon "was aware" that Dr. Gulden and Dr. Burch raised those concerns internally, and that Exxon fired them for engaging in protected whistleblower activity with respect to reporting the fraud. Specifically, OSHA concluded:

> Here, [Dr. Gulden and Dr. Burch] engaged in protected activity several times in 2019 and 2020 when they raised their concerns to [Exxon's] management that the assumptions leading to the estimated NPV of the Permian Basin were inaccurate and how those assumptions were included in misleading statements in SEC filings. These concerns were ultimately the subject of the 2020 WSJ article and a subsequent lawsuit alleging shareholder fraud. [Dr. Gulden and Dr. Burch] had a reasonable belief that [Exxon's] statements in their SEC filings were inaccurate. [Dr. Gulden and Dr. Burch] raised these concerns internally and [Exxon] was aware of this protected activity.

261.    OSHA further concluded that Exxon retaliated against Dr. Gulden and Dr. Burch because Exxon believed that Dr. Gulden and Dr. Burch had provided information to the *Wall Street Journal*. The fact that OSHA concluded following an investigation that Exxon "was aware" that Dr. Gulden and Dr. Burch raised concerns that Exxon's "statements in their SEC filings were inaccurate" — and that Exxon fired them for this protected activity — supports scienter.

262.    Second, Defendant Mallon instructed Defendant Bond to artificially inflate the value of the Delaware Basin so that it would be consistent with Defendant Woods' one-million barrel per day goal in the Permian, and to avoid a reduction in Mallon's compensation. As set forth above, during an in-person meeting in Houston in March or April 2019, Defendant Bond presented Defendant Mallon with the initial 2019 NPV estimate for the Delaware Basin of $40 billion. Defendant Mallon directed Defendant Bond to find ways to increase that number. Defendant Mallon communicated, in sum and substance, that the plan did not say 1 million barrels per day and it did not reflect a valuation of $60 billion, and Defendant Bond needed to bring him a new plan that did say those things. Defendant Bond then worked with the Delaware Planning Team to employ "learning curve" assumptions that would artificially increase the NPV of the Delaware Basin.

263.    In May 2019, Defendant Bond presented Defendant Mallon with adjusted results (i.e., a new plan) at an in-person meeting in Houston. Defendant Mallon instructed her to revisit the long-term learning curves and told her, in sum and substance, that the Delaware Planning Team had not lied hard enough yet. Defendant Bond went back and employed increasingly optimistic learning curve assumptions until the NPV of the Delaware development plan reached $50 billion. In July 2019, Defendant Bond presented the revised $50 billion plan to Defendant Mallon, the plan was finalized in August 2019, with Mallon's approval, and the artificially inflated plan was used by Exxon in its public filings to investors.

264.    The fact that Defendant Mallon directed Defendant Bond to artificially inflate the Delaware Basin valuations in order to make the value of the plan consistent with Defendant Woods' statements to investors, and knew that Defendant Bond in fact did so, supports a strong inference of Defendant Mallon's scienter.

265.    Third, Defendant Mallon was motivated to artificially inflate the value of the Delaware development plan because his annual performance review was tied to how much these numbers went up. If the NPV of the Delaware Basin decreased from the $60 billion the development planners estimated in 2018 to the $40 billion the development planners estimated in 2019 based on actual, historical drilling speeds, then Defendant Mallon would receive significantly less compensation.

266.    The fact that Defendant Mallon was motivated to and did direct Defendant Bond to artificially inflate the value of the Delaware development plan in order to avoid adverse impact on his compensation supports a strong inference of Defendant Mallon's scienter.

267.    Fourth, Defendant Woods' one-million barrel per day goal in the Permian was impossible and contradicted by the data from 2018. Exxon's announcement came just 95 minutes after one of Exxon's largest competitors, Chevron, announced its goal of 900,000 barrels per day in the Permian. Exxon made this statement to respond to and overshadow Chevron's announcement. As numerous former employees, including Dr. Burch, Dr. Gulden, Rhodes, Noland, FE4 and Wachsmann confirmed, no one within Exxon believed that the 1 million barrel per day goal was possible. Indeed, as Dr. Burch and Dr. Gulden alleged in their OSHA Complaint, Defendant Woods' stated goal to reach one-million barrels per day by 2024 was contradicted by the "actual historical drilling speed data" from 2018, and ultimately relied on "learning curve assumptions" that were arrived at post-hoc by non-expert management and designed to back-into the number Woods used publicly. The number was contrary to the advice of experts on the Delaware Planning Team, including Dr. Burch.

268.    The ordinary standard of care for a CEO in Woods' position is to confirm that his statements to investors are not only possible, but not contradicted by the data. The fact that Woods

81

publicly projected 1 million barrels per day despite the lack of any supporting data, and in the face of substantially contradictory data, constitutes an extraordinary departure from the ordinary standard of care for someone in Woods' position and gives rise to the strong inference that Defendant Woods knew or was severely reckless in not knowing that the Permian production goal and the valuations it supported, including the proved reserve and resource base, were false.

269.   Fifth, after Woods made his completely baseless statement, Exxon mobilized its senior executives to make the lie appear true. For example, Defendant Mallon and Defendant Bond acted with intent to deceive and defraud investors when they directed former Exxon employees (including Dr. Burch) to artificially inflate the Company's production estimates and NPV calculations for Delaware Basin development plan by using "learning curve assumptions" about Exxon's drilling speed which they knew were false. At Mallon's direction to inflate the plan, Bond knowingly used false data to exaggerate drilling output to artificially inflate the Permian estimates and NPV of the wells "so that [the] production projections would be consistent with the CEO's public pledges."

270.   Mallon and Bond used those false assumptions in the Delaware Basin development plan to generate false data and drilling output to back into the 1 million barrel of oil equivalents from the Permian Basin per day goal that Woods had promised investors. Mallon and Bond knew that the output of this falsified work would be used by Woods to support his statements about the 1 million barrels per day goal, the resource base valuations and the proved reserve calculations that he was publicly presenting to analysts and in SEC filings. As discussed in ¶103 above, Exxon specifically told investors that Exxon's stated proved reserve and resource base valuations that are reported to investors are based on Exxon's development plan. At Mallon's direction to inflate the plan, Bond provided the false assumptions to her superiors and Woods to fraudulently inflate the

development plan. Accordingly, Mallon and Bond furnished false information for use in Exxon's public statements to investors, and Mallon and Bond acted with intent to deceive investors, as described further in Section VII below. Defendant Mallon and Defendant Bond's scienter is imputed to Exxon.

271.   Sixth, the manipulated development planning data was subjected to a development planning process that culminated in a year-end review by Woods. Specifically, FE4 explained that such data would be put into a PowerPoint presentation, which was reviewed in either September or October of each year. Defendant Woods was not only a part of this review, he had to approve every component. FE4 confirmed that the PowerPoint included the final NPV number. FE4 explained that for major projects of over $10 billion like the Permian Basin, the person in charge of that project would present to Woods in person. Thus, Defendant Bond would have presented the presentation to Defendant Woods in person, as well as to Defendant Mallon.

272.   Further, FE4 noted that senior executives could separately view the data presented on the PowerPoint; that the data could not pass through the system without everyone being in agreement; that all the information is "rolled up to management" in the first instance; and, that if management did not like the information it received, they would change the assumptions to say there will be more wells. FE4 was personally involved in this process, and he knew all of this because his team presented the presentation to Defendant Bond before Bond presented it to management. In addition, Rhodes confirmed that after the back and forth between the reserves team and reservoir engineers like himself, the numbers would be submitted to senior executives for final sign off in September/October.

273.   The fact that Defendant Woods was personally presented with the manipulated data, and reviewed and approved the manipulated data, supports a strong inference that Woods

knew or was severely reckless in not knowing that the data was artificially inflated. A close review of the NPV based on the "learning curve" assumptions and the reserves was within the scope of Defendant Woods' position as CEO, particularly because Woods was making statements to investors that depended on these calculations, and he was at least severely reckless in disregarding that those numbers were artificially inflated. Woods was presented with an NPV for the Delaware Basin that was $10 billion less than the year before; yet he had promised investors a significant increase in Permian production to 1 million barrels per day by 2024. It was within the scope of Woods' responsibility to discuss this disparity with Defendant Bond and Defendant Mallon. Defendant Woods knew or was at least severely reckless in not discovering that even the $50 billion NPV was artificially inflated and did not support his stated goal.

274.    <u>Seventh</u>, that both Dr. Gulden and Dr. Burch separately reported the fraud to Exxon's Human Resources Department supports scienter. Specifically, on October 23, 2019, Dr. Gulden reported to Exxon's Human Resources department what she believed to be a potential securities fraud surrounding the learning curve model shortly after an October 23, 2019 meeting when Dr. Burch raised the same concerns to Defendant Bond. Then, on November 14, 2019, Dr. Burch sent an email to Human Resources stating that in 2019, "they asked us to turn any knobs we could in our modeling software to get the forecasts NPV (Net Present Value) up, and (a) they didn't care whether or not those new assumptions were realistic (they weren't) and (b) they didn't make any changes that would be required to try to operationalize these new assumptions. The biggest offender was the 'learning curve', which is an assumption that we'll more than double our drilling speed in the next five years." As stated in the OSHA Complaint, "Dr. Gulden and Dr. Burch's complaints triggered an investigation that reached senior management." The Human Resources department reported to the Management Committee, which included Defendant Woods.

275.  Eighth, after a September 13, 2020 *Wall Street Journal* article was published that cited anonymous Exxon sources for the proposition that the 2019 NPV for the Delaware Basin was artificially increased, Exxon elevated Dr. Burch and Dr. Gulden's fraud complaints to Exxon's Audit Department. But rather than investigating the truth behind Dr. Burch and Dr. Gulden's claims, the Audit Department investigated Dr. Burch and Dr. Gulden themselves. Both Dr. Burch and Dr. Gulden received notifications that Casteel, the global head of the Audit Department, had viewed their respective LinkedIn profiles. Casteel is a senior executive of Exxon, as Defendant Woods appointed her to act as power of attorney for the Board (of which Defendant Woods is Chairman) to sign and file any Form 10-K amendments on his behalf. The Audit Department also informed Deal (the VP of the Upstream for Research Technology & Digital Development, and more recently describing himself as the "upstream advisor to the Management Committee") of the investigations into Dr. Burch and Dr. Gulden. On information and belief, Defendant Woods and Defendant Mallon knew about this investigation.

276.  The fact that Exxon elevated Dr. Burch and Dr. Gulden's fraud complaints to the Audit Department, the highest available investigative body within Exxon, and to Deal, "upstream advisor to the Management Committee," supports a strong inference of Defendant Woods', Defendant Mallon's, and Exxon's scienter.

277.  Ninth, Defendants retaliated against Dr. Burch and Dr. Gulden for speaking out about the Company's true activities by illegally terminating them without cause. Shortly after the publication of the September 13, 2020 *Wall Street Journal* article, both Dr. Burch and Dr. Gulden discovered that they were being investigated (as explained directly above), and then were subsequently terminated for pretextual reasons. OSHA determined that Exxon violated SOX by terminating Dr. Burch and Dr. Gulden. On information and belief, Defendant Woods at least

approved the terminations of Dr. Burch and Dr. Gulden. As the OSHA Findings concluded, after reviewing arguments and submissions from Exxon, neither Dr. Gulden nor Dr. Burch "was in danger of any disciplinary action, much less losing their job, until [Exxon] suspected them of providing information to the WSJ." This is a specific example of illegal retaliation and silencing of employees from speaking about the Company's true activities, which supports a strong inference of scienter.

278.   Tenth, the Global Reserves and Resources Group (GRG), which was responsible for generating the annual proved reserves, reported directly to the Management Committee, and submitted its analysis to Exxon executives for final endorsement prior to publication. The GRG was managed by Ducharme, who, as of April 1, 2019, reported directly to Defendant Mallon. Mallon in turn reported to the Management Committee, which included Woods, on behalf of all division leads. Every request to adjust reserves – no matter how small – went to Defendant Mallon. Further, there were times when employees would go to Mallon and say that they needed to write down reserves because the underlying production metrics were not supported by the technical details and Mallon rejected that request because a write down would have adversely impacted his bonus.

279.   Exxon's public filings confirm that the reserves were reviewed by senior management at the Company. As stated in the 2019 10-K, the GRG group's responsibilities "include oversight of the reserves estimation process for compliance with Securities and Exchange Commission (SEC) rules and regulations, review of annual changes in reserves estimates, and the reporting of ExxonMobil's proved reserves." Critically, "After all changes are made, reviews are held with senior management for final endorsement." Further, "Reserve changes are made within a well-established, disciplined process driven by senior level geoscience and engineering

professionals, assisted by the Global Reserves and Resources Group which has significant technical experience, culminating in reviews with and approval by senior management." Finally, Exxon explicitly stated in its February 26, 2019 press release that its "long-standing, rigorous" process for estimating its proved reserve is structured to ensure "consistency and management accountability in all reserves bookings."

280.    The fact that Defendant Mallon reviewed requests to adjust reserves supports a strong inference of his scienter with respect to the fact that Exxon's stated reserves were inflated. Further, the facts that (i) there was so little separation between the Management Committee (of which Defendant Woods was one of only four members) and the GRG, and (ii) that Exxon disclosed that senior management had to "endorse" the proved reserves calculations, support an inference of Defendant Woods' scienter because Woods would have reviewed and approved the falsified calculations, and thus knew or was severely reckless in not knowing that they were false.

281.    Eleventh, Exxon had a corporate culture of inflating valuations and refusing to take write-downs. As Rhodes described, reservoir engineers would submit their reserves estimates to the reserves team at Exxon and then pressure would come down from the reserves team to look for places to boost the reserves. The reservoir engineers then made them higher because the reservoir engineers reported to the reserves team. Consistent with Exxon's longstanding policy against taking write-downs, Rhodes's team would be told that a scenario looked like a big write-down on reserves, and then told to look for places to boost reserves. Rhodes further described how in 2018-19, Rhodes told his supervisor that he disagreed with the policy of not revising down their estimates and raised objections. FE3 corroborated Rhodes's account of the Company's refusal to write down its reserves, noting, "ExxonMobil never ever writes down reserves." FE3 described how there was always talk of "albatrosses" on Exxon's books.

282.    The mandate not to take write-downs came from the Management Committee, which included Defendant Woods. Additionally, *Bloomberg* reported that Rosero was demoted repeatedly, eventually leading to his resignation, because he had "questioned whether Exxon would have to write down some of its oil and gas assets."

283.    With respect to Permian, as several former employees explained, including FE4, Rhodes, and Wachsmann, pressure permeated Exxon to make Defendant Woods' Permian goal of one million barrels per-day sound possible. Employees were under constant pressure to support Woods' claim, even though it was contradicted by the drilling data and was generally understood within Exxon to be impossible. FE4 explained that Exxon simply did not have the acreage to produce the volume Woods announced, and that they assumed Woods was going "off-script" when announcing the goal. FE4 also recounted the overall general pressure to make things "rosier" than they were, and that once Woods became CEO it became "Napoleon's March." The pressure campaign ingrained in the culture of Exxon to inflate estimates to match Woods' unsupported production goal and to avoid write-downs (even when they were necessary) supports a strong inference that Woods knew or was severely reckless in not knowing that the data was manipulated to support these corporate goals.

284.    Thus, Defendant Woods is directly connected to the tone and culture issues at Exxon. Indeed, as Woods himself stated in an April 9, 2015 speech, "Leaders influence culture by setting expectations, building structure, teaching others, and driving accountability." As the CEO of Exxon, Defendant Woods sets the tone at the top of the Company.

285.    <u>Twelfth</u>, Defendant Mallon engaged in suspicious insider stock sales during the Class Period. Mallon's insider sales were suspiciously timed because he sold $2.2 million in stock on November 20, 2019 – one month after Mallon's decision to use artificially inflated data in the

88

Exxon's public statements was presented to the Delaware Planning Team, and two months before Exxon's January 31, 2020 disclosure that its oil production in the Permian was flat quarter over quarter. This insider sale – of over $2.2 million – is also suspicious because it was not made pursuant to a Rule 10b5-1 plan and it constituted about 13% of his total holdings. A financial publication called *Chartexe* observed that Mallon was one of three Exxon insiders that disposed of the highest number of Exxon shares in the open market in the 52-week period from November 23, 2018 until November 22, 2019.

286.    <u>Thirteenth</u>, Defendant Woods, whose mandate to "turn the Titanic" relied heavily on his predecessor's investment in the Permian Basin, was intimately familiar with day-to-day Permian operations. For example, Defendant Woods travelled with the Public Issues and Contributions Committee (PICC) to Exxon's Permian operations near Carlsbad, New Mexico. The purpose of the visit was to "observe and provide input on current operating practices and external engagement." Woods "tour[ed] a well site where directional drilling and hydraulic fracturing technologies [were] being employed, as well as a production site where oil and gas [were] separated and stabilized prior to transport and use." Defendant Woods can be seen pictured at the Permian site below.



The Board of Directors, Chairman and senior executives toured XTO operations near Carlsbad, N.M., in September 2018 as part of the annual PICC trip.

287.     That Defendant Woods arranged for this a visit, and also had the above picture included in Exxon's press materials, demonstrates that Woods held himself out to be, and indeed, was, intimately familiar with Exxon's Permian operations, including the drilling technologies that he personally observed when he was there. Therefore, Woods knew or was severely reckless in not knowing that the Permian growth plan and conditions on the ground, including drilling speeds, were not as they were represented to be.

288.     Fourteenth, Defendant Woods regularly spoke to investors and securities analysts regarding the importance of the Permian Basin and Delaware Basin assets to Exxon's business and production in the Permian and Delaware basins, professing to know what he was speaking about.

289.     Throughout the Class Period, Defendant Woods referenced his "understanding" or

"delineation" of the Permian Basin at least 25 times. The fact that Woods held himself out as knowledgeable about Exxon's production and progress in the Permian Basin and discussed these subjects in detail with investors and securities analysts, supports a strong inference of his scienter with respect to these subjects.

290.     Fifteenth, in response to questions by investors and securities analysts, Defendant Woods touted his personal knowledge of the basis for the Permian goal of 1 million barrels per day and his familiarity with how the goal was generated. For example, when asked by a Barclays analyst on a September 4, 2019 call about his "target of achieving over 1 million barrels a day in the Permian," Woods assured:  We didn't go out and say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that. What we ended up saying is, develop the resource in a way that we think maximizes the recovery is a very grassroots buildup from the beginning of the fundamentals." Woods's statement supports a strong inference of his scienter because either he knew that the goal was fabricated or he was at least reckless.

291.     Woods also specifically denied that Exxon was facing problems in the Permian Basin during the same call. In response to a question from same Barclays analyst about Permian production, Woods stated that his "focus is on maximizing NPV for those developments and recovering the most resources in the most competitive way—cost competitive way . . . . In fact, what I would tell you is we don't start off with any volume targets."

292.     On a January 31, 2020 call, Woods falsely assured that even though production had been flat that quarter, "we're making very good progress" in Permian production, "Permian volume growth on schedule," and that nothing had changed and "if anything, we like it better."

293.     Woods' reassurances in response to analysts' questions and concerns about the Company's production progress in the Permian Basin support a strong inference of his scienter

with respect to that subject.

294.    Last, Defendant Woods was financially motivated to perpetrate fraud on Exxon's investors in order to achieve his compensation and bonus targets. The portion of Exxon executives' compensation comprised of performance shares—the most financially significant component of Exxon's executive compensation model—is calculated based on Exxon's "progress towards strategic objectives" and its "financial and operating performance" over the prior year. The metrics included within the "financial and operating performance" category are: safety and operations integrity, return on average capital employed ("ROCE"), cash flow from operations and asset sales, and total shareholder return. The executives' annual bonus calculation considers the inputs of estimated earnings and earnings per share. And the executives' base salary is based on "performance, experience, and pay grade," including "significant accomplishments" in the prior year.

295.    The Company tied several of these metrics specifically to its performance in the Permian Basin. In particular, the Company touted that its investments in the Permian would enhance its earnings, cash flow, and ROCE, and that its performance in the Permian was evidence of its "progress towards strategic objectives." For instance, in Exxon's 2018 Summary Annual Report, published in April 2019, the Company specifically stated that it was "GROWING EARNINGS, CASH FLOW, AND ROCE BY . . . PROFITABLY GROWING PERMIAN PRODUCTION TO MORE THAN 1 MILLION OIL-EQUIVALENT BARRELS PER DAY NET BY 2024." Similarly, Exxon's 2018 Proxy Statement stated, "COMPENSATION COMMITTEE NOTED SIGNIFICANT PROGRESS IN 2018 IN ADVANCING STRATEGIC OBJECTIVES . . . STRENGTHENING THE UPSTREAM PORTFOLIO . . . Accelerated pace of development in the Permian, capturing benefits across the full value chain from integration with world-class U.S.

Gulf Coast manufacturing." And in Exxon's 2019 Proxy Statement, the Company stated in a slide titled, "PROGRESS TOWARDS STRATEGIC OBJECTIVES: 2019 KEY HIGHLIGHTS" that these highlights included "STRENGTHENING THE UPSTREAM PORTFOLIO: Value driven by attractive growth opportunities, including Permian[.]"

296.    Defendant Woods achieved his target compensation—including base salary, bonus, and performance shares—for 2018 and 2019. In 2020, however, Exxon suspended its bonus program for executive officers due to the COVID-19 pandemic. Defendant Woods otherwise achieved his target compensation—including base salary and performance shares—for 2020. Exxon's Compensation Committee ascertained each year that Defendant Woods met each of the benchmarks set forth by the Company to calculate executive officers' compensation, including those that it specifically tied to production in the Permian Basin—earnings, cash flow, ROCE, and progress towards strategic objectives.

297.    The fact that Woods' compensation in part depended on the Company's success in the Permian Basin, including progress toward achieving the goal of 1 million barrels of oil-equivalent per day by 2024, supports a strong inference of his scienter because he was financially motivated to commit fraud and would personally financially benefit from it.

## VII.    DEFENDANTS MALLON AND BOND WERE KEY PARTICIPANTS IN THE FRAUDULENT SCHEME, AND INTENTIONALLY FURNISHED FALSE INFORMATION FOR INCLUSION IN EXXON'S PUBLIC STATEMENTS

### A.    Defendants Mallon And Bond Were Key Participants In The Fraudulent Scheme

298.    On April 1, 2019, Defendant Mallon became the President of ExxonMobil Upstream Oil & Gas Company and the Vice President of Exxon Mobil Corporation. As such, Defendant Mallon reported directly to the Management Committee, including Defendant Woods. Defendant Bond was Exxon's Delaware Basin Development Manager, a Senior Manager in

Exxon's Upstream Oil & Gas division, during the Class Period. As detailed above, at Defendant Mallon's direction to inflate the plan, Defendant Bond employed false "learning curve" drilling assumptions in the Delaware Basin development plan. Defendant Mallon and Defendant Bond artificially inflated the value of that development plan to support Defendant Woods' false statement to investors that Exxon would increase Permian production to one million barrels per day by 2024, and to support Exxon's falsely inflated proved reserve and resource base valuations, which were based on the development plan.

299.    At the time Defendant Woods made his statement in 2019, it was not only baseless, but totally contradicted by the data. Woods' 1 million barrels per day statement to investors was based on the 2018 development plan for the Delaware Basin, which had an estimated NPV of $60 million. The NPV was calculated using assumptions about drilling speeds and other metrics. The actual historical drilling speeds for 2018 were considerably lower than the estimates used to calculate the 2018 NPV, and the actual NPV that Dr. Burch and other experts estimated for the Delaware Basin in 2019 was $40 billion.

300.    As set forth above, during an in-person meeting in Houston in March or April 2019, Defendant Bond presented Defendant Mallon with the initial 2019 NPV estimate for the Delaware Basin of $40 billion. Defendant Mallon directed Defendant Bond to find ways to increase that number. Defendant Mallon communicated, in sum and substance, that the plan did not say 1 million barrels per day, and it did not contain a valuation of $60 billion, and Defendant Bond needed to bring him a new plan that did say those things.

301.    In order "[t]o ensure conformity" with Defendant Woods' "public pledge" of 1 million barrels per day by 2024 in the Permian, and at Defendant Mallon's direction to inflate the plan, Defendant Bond "instructed the Delaware Planning Team to generate higher 2019 NPV

estimates by revising the assumptions used to build the development plan in a way that would 'claw back' value."

302.    Defendant Bond then worked with the Delaware Development Planning Team to employ "learning curve" assumptions that would artificially increase the NPV of the Delaware Basin. In May 2019, Defendant Bond presented Defendant Mallon with adjusted results (i.e., a new plan) at an in-person meeting in Houston. Defendant Mallon instructed her to revisit the long-term learning curves and communicated, in sum and substance, that the Delaware Development Planning Team had not lied hard enough yet.

303.    Indeed, when Bond's initial efforts "failed to significantly increase the Delaware Basin's NPV estimate and accelerate production projections, Bond decided to mandate the use of increasingly aggressive 'drilling learning curve' assumptions." As the OSHA Complaint alleged, "Bond dictated increasingly optimistic learning curve assumptions until the NPV of the resulting Delaware development plan reached an estimated value of $50 Billion." The OSHA Findings specifically concluded that Bond made these "learning curve assumptions."

304.    Defendant Bond went back and employed increasingly optimistic learning curve assumptions until the NPV of the Delaware development plan reached $50 billion. In July 2019, Defendant Bond presented the revised $50 billion plan to Defendant Mallon, and the artificially inflated plan was used by Exxon in its public filings to investors.

305.    Dr. Burch and other members of the Delaware Planning Team objected to the $50 billion NPV estimate because it was based on learning curve assumptions that were contradicted by the actual historical drilling speed data from 2018. Further, the learning curve assumptions were made by Bond "for the sole purpose of inflating the NPV estimate and production projections." However, "Bond insisted that [the learning curve assumption] be used in the official estimate."

306.     On October 23, 2019, Bond held a Delaware Basin-wide meeting where Dr. Burch presented the drilling speed and drilling learning curve assumptions mandated by Bond. One of the drillers interrupted Dr. Burch's presentation to say, "That is impossible," but Bond told the audience that Dr. Burch must have made a mistake and that Dr. Burch, a mathematical modeling expert, did not understand mathematical modeling. Bond did not seek any modification to the model.

307.     The OSHA Findings specifically concluded with respect to the October 23, 2019 meeting:

> On October 23, 2019, during an all-hands meeting of the Delaware Basin Development Planning Team, Dr. Burch raised a concern about [Exxon's] desire to reach projected oil production using assumptions in the learning curve modeling that would double drilling speed in the next five years. Dr. Burch did not believe this was supported by the models. Dr. Burch raised these concerns to Senior Manager Melissa Bond. Shortly after the meeting, Dr. Gulden reported to [Exxon's] Human Resources what she believed to be potential securities fraud surrounding the learning curve model(s) and what was reported to the public. [Dr. Gulden and Dr. Burch] raised issues with [Exxon's] analysis of oil production in the Delaware Basin. They believed it was artificially inflated and Exxon was misleading the public and the SEC in their filings. [Dr. Gulden and Dr. Burch] expressed these concerns to management, and in doing so, they engaged in SOX-protected activity.

308.     In 2019, Exxon's five-year development or growth plan for the Permian Basin was one million barrels per day by 2024. Defendant Mallon and Defendant Bond knew that the falsely inflated development plan supported Woods' "1 million barrels per day" pledge, and they knew that, as Exxon told investors in its annual filings, Exxon's stated proved reserves and resource base valuations were based on the development plan.

309.     Thus, Defendant Mallon and Defendant Bond knowingly used false data to exaggerate drilling output and artificially inflate the Delaware Basin development plan in order to "ensure conformity" with Defendant Woods' statement to investors that Exxon would achieve 1 million barrels per day by 2024 in the Permian. They did so knowing that the false information

was being reported to investors in Woods' statements about the 1 million barrels Permian goal, as well as Exxon's stated proved reserve and resource base valuations. In so doing, Defendant Mallon and Defendant Bond were key participants in a scheme to defraud investors.

### B. Defendants Mallon And Bond Furnished False Information For Inclusion In Exxon's Public Statements With Intent, And Their Scienter Is Imputed To Exxon

310.    Defendant Mallon and Defendant Bond also intentionally furnished false information for inclusion in Exxon's public statements to investors, which makes their scienter attributable to Exxon. <u>First</u>, at Mallon's direction to inflate the plan, Bond furnished "learning curve" drilling assumptions that were included in Exxon's statements to investors. Specifically, the false "learning curve" drilling assumptions that Bond directed supported Exxon's growth plan of 1 million barrels per day by 2024 in the Permian that Defendant Woods and Exxon touted to investors during the Class Period. When analysts asked about the Permian production goal on March 6, 2019 and on March 5, 2020, Woods specifically referred to Exxon's "development plan" and said, "it is an outcome of the plans we put together."

311.    The same false "learning curve" drilling assumptions in Exxon's development plan supported Exxon's stated proved reserve and resource base valuations that Defendants reported to investors throughout the Class Period. Exxon specifically told investors during the Class Period that Exxon's stated proved reserves "in the Permian Basin are supported by ExxonMobil's growth plan including increased drilling activity," and that its stated proved undeveloped reserves "are recognized only if a development plan has been adopted indicating that the reserves are scheduled to be drilled within five years . . . ." Further, the false drilling assumptions rendered Exxon's stated resource base valuation, which included the falsely inflated proved reserves, false. As the OSHA Findings concluded:

On April 26, 2019, [Exxon] filed an SEC Form 8-K in which it claimed: "ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024. The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue." Dr. Gulden and Dr. Burch believed this statement was not accurate and they informed management about the misleading SEC filings.

312.    Thus, Mallon and Bond furnished information that was included in Defendants' false statements to investors.

313.    Second, Mallon and Bond acted with intent because at Mallon's direction to inflate the plan, Bond directed the Delaware Planning Team to change the assumptions that they used to calculate the NPV for the purpose of artificially inflating the production estimates and the NPV of the wells that Exxon used in its SEC filings. Mallon directed Bond to increase the value of the Delaware Basin development plan during in-person meetings in March or April 2019, and in May 2019, and Mallon approved the fraudulent increase during an in-person meeting with Bond in July 2019, and in August 2019 when the fraudulently inflated development plan became final. When Bond executed Mallon's instruction by directing Dr. Burch and other members of the Delaware Planning Team to "claw back" lost value and to use "learning curve assumptions" in calculating the NPV, Bond acted with the intent to artificially inflate the Delaware Basin development plan. As alleged in the OSHA Complaint, Bond instructed the Delaware Planning Team to use these inflated metrics, over the objections of modeling experts such as Dr. Burch, "so that the 2019 NPV estimate would increase and so that production projections would be consistent with the CEO's public pledges" to investors.

314.    Thus, Mallon and Bond acted with intent in furnishing information for inclusion in false statements, including Woods' public pledge of 1 million barrels per day in the Permian by 2024, and Exxon's stated proved reserves and resource base valuations which Mallon and Bond knew were based on the development plan.

## VIII.   THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES

### A.   Standards Governing The Calculation Of Proved Reserves

315.   Oil reserves are quantities of crude oil that a company estimates with reasonable certainty—usually 90%—exist in a particular location and can be extracted from the ground for commercial purposes and sold.

316.   A quantity of oil reserves that a company ascertains with reasonable certainty exists and can be exploited is called "proved reserves." Oil companies are required to disclose the quantities of and other information pertaining to their proved reserves in supplemental schedules to their financial statements filed with the SEC.

317.   Proved reserves are typically broken down into two categories—developed and undeveloped. Developed reserves are reserves that are typically part of existing production and can be reasonably expected to be recovered from a company's existing wells. Undeveloped reserves typically include reserves that are expected to be found in new wells on land owned by the company or to be found by expanding and/or deepening existing wells. As Exxon explained in its annual filings, including the 2018 10-K and the 2019 10-K:

> Proved reserves can be further subdivided into developed and undeveloped reserves. Proved developed reserves include amounts which are expected to be recovered through existing wells with existing equipment and operating methods. Proved undeveloped reserves include amounts expected to be recovered from new wells on undrilled proved acreage or from existing wells where a relatively major expenditure is required for completion. Proved undeveloped reserves are recognized only if a development plan has been adopted indicating that the reserves are scheduled to be drilled within five years, unless specific circumstances support a longer period of time.

318.   An oil and gas company calculates its proved reserves, a volumetric quantity reported as a number of barrels of oil-equivalent, by calculating the quantities of oil and gas it expects each of its wells to produce and when. The calculation of expected production volume in

the development plan incorporates assumptions about how quickly and effectively the company will be able to drill its wells and the productivity of its existing wells, among other inputs.

319.    As a result, if a company inflates its development plan or overstates its assumptions about its drilling activity—or any other input incorporated into its calculation of its proved reserve—the resulting proved reserve quantity will be false.

### B.    GAAP Regulations Governing The Reporting Of Proved Reserves

320.    Oil companies such as Exxon are required by the SEC and bound by the generally accepted accounting principles in the United States ("GAAP") to report information relating to their oil reserves to investors through supplemental information to their financial statements.

321.    Financial statements (including the Supplemental Information on Oil and Gas Exploration and Production Activities, which oil and gas companies are required to disclose) are a central feature of financial reporting and are a principal means of communicating financial information to external parties, such as investors. The accounting profession (and the SEC) recognize GAAP as the uniform rules, conventions, and procedures necessary to define and reflect accepted accounting practices at a particular time.

322.    GAAP are primarily promulgated by the Financial Accounting Standards Board ("FASB") and are codified into a system that has been accepted by the SEC as the framework by which public companies must report their financial position and the results of their operations— i.e., SEC regulations require that public company financial statements be prepared in conformity with GAAP. Beginning with the year 2009, the FASB's codified standards are referenced by the acronym ASC ("Accounting Standards Codification"), which represents the source of authoritative GAAP for nongovernmental entities. (ASC 105, Generally Accepted Accounting Principles, section 10-05-1).

323.    The accounting framework for GAAP, which is set out in, among other places, the

Statement of Financial Accounting Concepts ("FASCON") 8 also states:

> Financial reports represent economic phenomena in words and numbers. To be useful, financial information not only must represent relevant phenomena, but it also must faithfully represent the phenomena it purports to represent. To be a perfectly faithful representation, a depiction would have three characteristics. It would be complete, neutral, and free from error.

FASCON 8, ¶QC12.

324.    Publicly traded oil and gas companies are subject to specific requirements governed by the SEC and/or GAAP that require those companies to disclose properly various types of information and measures concerning their proved reserves.

325.    Most relevant here, under ASC 932-235-50-2, "Publicly traded companies that have significant oil- and gas-producing activities shall disclose with complete sets of annual financial statements . . . (a) Proved oil and gas reserve quantities . . . ."

326.    ASC 932-235-50-3 through 50-11B set forth specific disclosure requirements relating to an oil and gas company's proved reserves quantities.

327.    ASC 932-235-50-4 requires an oil and gas company to disclose "as of the beginning and the end of the year," "[n]et quantities of an entity's interests in proved oil and gas reserves, proved developed oil and gas reserves, and proved undeveloped oil and gas reserves" for its holdings of crude oil, including condensate and natural gas liquids, natural gas, synthetic oil, synthetic gas, and "other nonrenewable natural resources that are intended to be upgraded into synthetic oil and gas."

328.    ASC 932-235-50-5 requires an oil and gas company to disclose "[c]hanges in the net quantities of an entity's proved reserves of oil and of gas during the year." Specifically, a company must disclose "changes resulting from": either upward or downward revisions of previous reserves estimates; application of improved recovery techniques; purchases of minerals in place; extensions of proved acreage of previously discovered reservoirs or the discovery of new

fields with proved reserves or new reservoirs of proved reserves in old fields; production; or sale of minerals in place.

329.    ASC 932-235-50-10 provides that an oil and gas company must explain "[i]f important economic factors or significant uncertainties affect particular components of an entity's proved reserves . . . ." The rule provides examples of these possible factors, including: "unusually high expected development or lifting costs, the necessity to build a major pipeline or other major facilities before production of the reserves can begin, and contractual obligations to produce and sell a significant portion of reserves at prices that are substantially below those at which the oil or gas could otherwise be sold in the absence of the contractual obligation."

330.    ASC 932-235-50-11 provides only two instances in which an oil and gas company need not disclose its proved reserves: if those reserves are in a country in which "[t]he government . . . prohibits disclosing reserves in that country, or "[t]he government . . . prohibits disclosing a particular field, and disclosing reserves in that country would have the effect of disclosing reserves in particular fields."

### C.    GAAP Requires Proved Reserves To Be Estimated With Reasonable Certainty

331.    GAAP requires that oil and gas companies estimate their proved reserves "with reasonable certainty."

332.    Specifically, ASC 932-10-S99-1 (a) (22) provides, "Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with <u>reasonable certainty</u> to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic

or probabilistic methods are used for the estimation."

333.    Exxon states in its filings with the SEC that it complies with the "reasonable certainty requirement." For instance, the 2019 10-K stated, "Proved oil and natural gas reserves are determined in accordance with Securities and Exchange Commission (SEC) requirements. Proved reserves are those quantities of oil and natural gas which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible under existing economic and operating conditions and government regulations."

334.    Elsewhere in the same filing, the Company stated, "The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures."

**D.    Relevant SEC Regulations Governing Oil And Gas Companies**

335.    Companies engaged in oil and gas exploration and/or the production of crude oil or natural gas in the United States must also adhere to specific financial accounting and reporting standards pursuant to the federal securities laws, which largely overlap with the requirements set forth in the above GAAP framework.

336.    Specifically, SEC Regulation S-X Rule 4-10 outlines certain definitions, guidelines, and requirements for companies that file reports with the SEC. Applicable definitions in S-X Rule 4-10 mirror those reflected in GAAP, including with respect to "proved reserves," "undeveloped oil and gas reserves," "proved properties," and "unproved properties," as well as "reasonable certainty."

337.    The SEC also identifies two particular methods by which an entity may account for the costs associated with its oil and gas exploration, including the capitalization of certain costs associated with such exploration and extraction, as well as for arriving at its required disclosures

103

surrounding proved reserves: the "successful efforts method" and the "full cost method." And while a company that elects to employ the "full cost method" must make certain disclosures outlined directly within S-X Rule 4-10, S-X Rule 4-10 similarly states, that "[a] reporting entity that follows the successful efforts method shall comply with the accounting and financial reporting disclosure requirements of FASB ASC Topic 932" (as described in ¶¶322-34 above).

338.    Exxon stated in its public filings that it utilizes the "successful efforts method," which therefore bound it to ASC 932 and the SEC's requirement that ASC 932 be applied in financial statements filed therewith.

## IX.   EXXON VIOLATED THE STANDARDS AND REGULATIONS GOVERNING THE CALCULATION AND REPORTING OF PROVED RESERVES

### A.   Exxon Incorporated False Drilling Assumptions Into Its Proved Reserve Calculation

339.    As described in ¶318 above, an oil and gas company calculates the volumetric quantity of its proved reserves based on assumptions about how quickly and effectively it can drill its wells, among other assumptions. Proved reserves are based on an oil and gas company's development plan and the underlying metrics that comprise that plan, including drilling assumptions.

340.    Exxon explained in its annual SEC filings that proved undeveloped reserves "are recognized only if a development plan has been adopted indicating that the reserves are scheduled to be drilled within five years . . . ." Exxon also stated at year-end 2018 and year-end 2019 that its stated proved reserves for the Permian Basin were "supported by ExxonMobil's growth plan, including increased drilling activity . . . ."

341.    As described in Section IV(H) above, Exxon's development plan and the drilling assumptions that Exxon used to calculate its proved reserve were false. The NPV of the Delaware Basin which supported Exxon's development plan was artificially inflated due to the use of false

"learning curve" drilling assumptions. Because Exxon's assumptions about its drilling activity and its development plan were falsely overstated, its calculated proved reserves, which Exxon reported in the 2018 10-K and the 2019 10-K, were falsely overstated as well.

**B.    Exxon Engaged In A Fraudulent Process For Estimating Its Proved Reserves**

342.    As described in Section IV(E)(1) above, Exxon engaged in a fraudulent forecasting process to estimate its proved reserves. By engaging in a fraudulent process to "boost" the Company's proved reserves higher and by using falsely inflated assumptions saved in a file called "This is a Lie" in its proved reserve calculations, Exxon violated its obligation to disclose in a representationally faithful manner the proved reserves that it believed, with reasonable certainty, existed and could be exploited.

343.    Thus, the proved reserve figures that Exxon reported in its year-end financial statements filed with the SEC were materially false and misleading.

**X.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

344.    Throughout the Class Period, Defendants made a series of materially false statements, and omitted to state material facts that rendered statements materially misleading. These statements were disseminated to investors during investor calls and presentations, in Exxon's SEC filings and press releases, and through other news and media outlets. Specifically, Defendants misstated the value of the Permian Basin by publicly reporting proved reserve and resource base numbers that were false, overstated and the product of a fraudulent reserves process. In addition, beginning on March 5, 2019, Defendants touted a production goal of 1 million oil-equivalent barrels per day by 2024 in the Permian Basin when, in fact, they knew the goal was contradicted by the actual drilling data and ultimately based on "learning curve" assumptions that were false and fraudulently inflated the development plan.

A.   **Defendants Misrepresent The Value Of The Permian Basin Throughout 2018**

  1.   **Misstatements And Omissions On March 7, 2018 Analyst Day**

345.   At the beginning of the Class Period, on March 7, 2018, Exxon published a press release which stated that "in the Permian," Exxon had "increased the size of its resource to 9.5 billion oil-equivalent barrels."

346.   Defendants' statements identified in ¶345 above were false because the resource base calculation was (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions, and thus, the resource base was falsely overstated, as described in Sections IV(D) – (E) above.

  2.   **Misstatements And Omissions In Financial & Operating Review Report, Published On April 3, 2018**

347.   On April 3, 2018, Exxon published its Financial & Operating Review Report, with an opening letter to shareholders signed by Defendant Woods. The Financial & Operating Review Report stated that Exxon had a "total Permian resource base" of "more than 9 billion oil-equivalent barrels."

348.   Defendants' statements identified in ¶347 above were false because the resource base calculation was (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions, and thus, the resource base was falsely overstated, as described in Sections IV(D) – (E) above.

  3.   **Misstatements And Omissions In May 30, 2018 Press Release**

349.   On May 30, 2018, Exxon published a press release titled "ExxonMobil CEO Darren Woods highlights growth plans and advances in lower-carbon solutions." Highlighting Defendant Woods' comments to shareholders during the Company's annual meeting, the press release stated that Exxon "added 10 billion oil-equivalent barrels to its resources base in locations including the

Permian, Guyana, Mozambique, Papua New Guinea and Brazil."

350.     Defendants' statements identified in ¶349 above were false because the resource base calculation was (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions, and thus, the resource base was falsely overstated, as described in Sections IV(D) – (E) above.

### 4.     Defendants Continue To Misrepresent The Value Of The Permian At The Beginning Of 2019

#### a.     False Valuation

351.     On February 26, 2019, Exxon published a press release quoting Defendant Woods on Form 8-K with the SEC, titled "ExxonMobil Adds 4.5 Billion Barrels to Reserves." The press release stated that Exxon's "proved reserves totaled 24.3 billion oil-equivalent barrels at year-end 2018." The press release further stated, "During 2018, proved additions from unconventional plays totaled approximately 1.2 billion oil-equivalent barrels. Significant additions in the Permian Basin are supported by ExxonMobil's growth plan including increased drilling activity and infrastructure development." The press release quoted Defendant Woods as crediting "continued growth in the Permian Basin" as "greatly enhanc[ing] our already strong portfolio of high-quality, low-cost-of-supply opportunities."

352.     Defendants' statements identified in ¶351 above were false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions and thus, the proved reserves were falsely overstated, as described in Sections IV(D) – (E)  above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in Section IV(E)(2) above.

**b.      False Valuation Process**

353.    The February 26, 2019 press release quoting Defendant Woods further described Exxon's reserves process, stating, "The annual reporting of proved reserves is the product of the corporation's long-standing, rigorous process that ensures consistency and management accountability in all reserves bookings."

354.    Defendants' statement identified in ¶353 above was false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions and thus, the proved reserves were falsely overstated, as described in Sections IV(D) – (E) above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in Section IV(E)(2) above.

**c.      False Valuation In 2018 10-K**

355.    On February 27, 2019, Exxon filed its Form 10-K for fiscal year 2018 with the SEC (the "2018 Form 10-K"), signed by Defendant Woods. The 2018 Form 10-K stated that Exxon's "total proved reserves" for year-end 2018 were 24,293 million barrels of oil-equivalent.

356.    Defendants' statements identified in ¶355 above were false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions and thus, the proved reserves were falsely overstated, as described in Sections IV(D) – (E) above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in Section IV(E)(2) above.

**d.      False Valuation Process In 2018 10-K**

357.    The 2018 10-K further stated, "The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical

evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures."

358.    Defendants' statement identified in ¶357 above was false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions and thus, the proved reserves were falsely overstated, as described in Sections IV(D) – (E) above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in Section IV(E)(2)  above.

359.    The 2018 10-K further stated that any changes to the reserve figures are "made within a well-established, disciplined process driven by senior level geoscience and engineering professionals, assisted by the Global Reserves group which has significant technical experience, culminating in reviews with and approval by senior management."

360.    Defendants' statement identified in ¶359 above was false because, in fact, Exxon's reserves process was fraudulent and its reserves were based on an inflated development plan that contained inflated drilling assumptions, as described in Sections IV(D) – (E)  above.

**B.    In March 2019, Defendants Announce 1 Million Oil-Equivalent Barrels Per Day By 2024 In Permian, And Continue To Misrepresent The Value Of The Permian**

      **1.    Misstatements And Omissions In March 5 And 6, 2019 Press Releases And On March 6, 2019 Investor Day**

            **a.    Impossible Permian Production Goal**

361.    On March 5, 2019, Exxon published a press release, and on March 6, 2019, it published an additional press release quoting Defendant Woods and held an Investor Day call. In the March 5, 2019 press release, Exxon stated that it had "revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024—an increase of

nearly 80 percent and <u>a significant acceleration of value</u>."

362.    During the March 6, 2019 Investor Day call, Defendant Woods stated, "In the Upstream, we made very good progress on our five (sic) [four] key focus areas: significant growth in Guyana, more attractive acreage captured in the Permian and Brazil, <u>accelerated value capture in the Permian</u>, and then we have made advances in our strategic LNG portfolio."

363.    Defendants' statements identified in ¶¶361-62 above that the 1 million oil-equivalent barrels per day goal represented a "significant acceleration of value" and that Exxon had "accelerated value capture in the Permian" were false and misleading, omitted to disclose material facts, and were contradicted by the actual drilling times observed in 2018. In truth, (i) Exxon's drilling times were far slower than expected, rendering the goal unachievable; and (ii) Exxon's 1 million barrels per day goal in the Permian was based on the 2018 development plan, which relied on inflated drilling assumptions that were materially faster than the actual historical drilling speeds in 2018, as described in Section IV(D) and (I)(6)(c) above.

364.    The March 6, 2019 press release quoted Defendant Woods, and stated that "ExxonMobil's production in the Permian is expected to exceed 1 million oil-equivalent barrels per day by 2024." The press release also quoted Defendant Woods as stating that Exxon was "exceeding the pace of our expected progress on the aggressive growth strategy we laid out last year."

365.    Woods also presented Exxon's new "green blob" slide, set forth below, which reflected the new goal of 1 million barrels per day by 2024 in the Permian and reiterated "Production on plan."



366.   Defendants' statements identified in ¶¶364-65 above were false and misleading, omitted to disclose material facts, and were contradicted by the actual drilling times observed in 2018. In truth, (i) Exxon's drilling times were far slower than expected, rendering the goal unachievable; and (ii) Exxon's 1 million barrels per day goal in the Permian was based on the 2018 development plan, which relied on inflated drilling assumptions that were materially faster than the actual historical drilling speeds in 2018, as described in Section IV(D) and (I)(6)(c) above.

367.   Also during the March 6, 2019 Investor Day call, after announcing the 1 million barrels per day goal, analyst Neil Mehta from Goldman Sachs asked Defendant Woods about the "shape of the Permian production curve" between 2019 and 2021. Defendant Woods stated "It goes back to the development plan that we have in place. You may remember I talked about these development corridors. I talked about putting the infrastructure in place. It's about putting all of that machine on so what we've done in 2018 and we will continue to do in 2019 is an element of delineation, of understanding the resource, a lot of building the infrastructure such that when we bring those wells on, we have evacuation and we have separation facilities in place. That's what

we've been doing in 2018. We'll do more of that in 2019. Once this all in place, then we can unleash the hounds. I mean, that's really what it is and that's why you get that inflection on the curve."

368.     Defendants' statements identified in ¶367 above were false and misleading, and omitted to disclose material facts. In truth, (i) Exxon's drilling times were far slower than expected, rendering the goal unachievable; and (ii) Exxon's 1 million barrels per day goal in the Permian was based on the 2018 development plan, which relied on inflated drilling assumptions that were materially faster than the actual historical drilling speeds in 2018, as described in Sections IV(D) and (I)(6)(c) above.

369.     Further, Defendant Woods's statement that "That's what we've been doing in 2018" was false, and at a minimum misleading, because it concealed the fact that the actual historic drilling times in 2018 were considerably slower than the estimates that the 2018 development plan had relied on, as described in Section (I)(6)(c) above.

### b.      False Valuation

370.     In the March 5, 2019 press release, Exxon stated, "The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue."

371.     In the March 6, 2019 press release, Exxon stated, "In the Permian, the size of the company's net resource is 10 billion oil-equivalent barrels and is expected to grow further."

372.     Defendants' statements identified in ¶¶370-71 above that Exxon's "resource base" in the Permian was "10 billion oil-equivalent barrels" were false because the resource base calculation was (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions, and thus, the resource base was falsely overstated, as described in Sections IV(D) – (E) above.

## 2.    Misstatements And Omissions In April 26, 2019 Press Release

373.    On April 26, 2019, Exxon published a press release quoting Defendant Woods on Form 8-K with the SEC, titled "ExxonMobil Earns $2.4 Billion in First Quarter 2019." The press release stated that "ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024. The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue." The press release quoted Defendant Woods as adding that Exxon was "making strong progress on [its] growth plans."

374.    Defendants' statement identified in ¶373 above that Exxon had "revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024" was false because Defendants knew that the goal of 1 million-oil equivalent barrels per day by 2024 in the Permian was based on the 2018 development plan, which relied on inflated drilling assumptions that were faster than the actual historical drilling speeds in 2018, as described in Sections IV(D) and (I)(6)(c)  above.

375.    Defendants' statement identified ¶373 above that Exxon's "resource base in the Permian is approximately 10 billion oil-equivalent barrels" was false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on an inflated development plan that contained inflated drilling assumptions, and thus, the resource base was falsely overstated, as described in Sections IV(D) – (E) above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserves was necessary, but Exxon determined to "kick the can down the road," as described in Section IV(E)(2) above.

3.      **Misstatements And Omissions In 2018 Summary Annual Report Published On June 18, 2019**

a.      **Impossible Permian Production Goal**

376.   On June 18, 2019, Exxon published its 2018 Summary Annual Report, with an opening letter to shareholders signed by Defendant Woods, stating that "<u>we accelerated operations in the Permian Basin in Texas and New Mexico</u>, building on our 2017 acquisition of high-quality, contiguous acreage that will enable significant low-cost production growth."

377.   Defendants' statement identified in ¶376 above was misleading and omitted to disclose material facts because Exxon's drilling times were slower than expected, and Exxon's 1 million barrels per day goal in the Permian was (i) based on "learning curve" assumptions that were false and directed by Defendant Mallon, (ii) fraudulently inflated, and (iii) contradicted by the actual drilling data, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

b.      **False Valuation**

378.   The 2018 Summary Annual Report stated that Exxon's "total proved reserves" for year-end 2018 were 24,293 million barrels of oil-equivalent.

379.   Defendants' statement identified in ¶378 above was false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on false "learning curve" drilling assumptions and a fraudulently inflated development plan and thus, falsely overstated, as described in Sections IV(D) – (E) and Section IV(H)(2) above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in Section IV(E)(2) above.

c.      **False Valuation Process**

380.   The 2018 Summary Annual Report further stated, "The estimation of proved

reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures."

381.    Defendants' statement identified in ¶380 above was false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on false "learning curve" drilling assumptions and a fraudulently inflated development plan and thus, falsely overstated, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

382.    The 2018 Summary Annual Report further stated that any changes to the reserve figures are "made within a well-established, disciplined process driven by senior level geoscience and engineering professionals, assisted by the Global Reserves and Resources group which has significant technical experience, culminating in reviews with and approval by senior management."

383.    Defendants' statement identified in ¶382 above was false because in fact, Exxon's reserves process was fraudulent and its reserves were based on false "learning curve" drilling assumptions and a fraudulently inflated development plan, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

**4.    Misstatements And Omissions During June 18, 2019 J.P. Morgan Energy Conference**

384.    On June 18, 2019, Exxon participated in a J.P. Morgan Energy Conference. During the conference, Defendant Mallon stated, "Starting with the Permian, we are on track to deliver on the million barrels a day by 2024. We believe our innovative development plan is key to that and we continue to see and achieve the milestones that we set out for ourselves."

385.    Defendants' statement identified in ¶384 above was false because Defendants knew that the goal of 1 million-oil equivalent barrels per day by 2024 in the Permian, as well as the

"milestones" Defendants set to reach that goal, were (i) based on "learning curve" assumptions that were false and directed by Defendant Mallon, (ii) fraudulently inflated, and (iii) contradicted by the actual drilling data, as described in Sections IV(D) – (E) and Section IV(H)(2) above. Further, Defendant Mallon's statement that "our innovative development plan is key to that" was false and misleading because Defendant Mallon directed Exxon employees to fraudulently inflate the value of the development plan, as described in ¶298.

### 5. Misstatements And Omissions During September 4, 2019 Barclays CEO Energy-Power Conference

386. During the September 4, 2019 Barclays CEO Energy-Power Conference, Barclays analyst Jeanine Wai asked Defendant Woods about his "target of achieving over 1 million barrels a day by 202[4]" in the Permian. Defendant Woods stated "We didn't go out say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that. What we ended up saying is, develop the resource in a way that we think maximizes the recovery is a very grassroots buildup from the beginning of the fundamentals. And then once we've figured out what was the optimal development of that, we stacked at the volume to see what it came out to be, and that was what it came out to be."

387. Defendants' statements identified in ¶386 above were false because Defendants knew that the goal of 1 million-oil equivalent barrels per day by 2024 in the Permian was based on "learning curve" assumptions that were false, was fraudulently inflated, and was contradicted by the actual drilling data, as described in Sections IV(D) – (E) and Section IV(H)(2) above. Further, Defendant Woods' representation that the process to determine the 1 million-oil equivalent barrels per day goal was a "grassroots buildup" based on a legitimate "fundamental" analysis of oil production, was false. In truth, the analysis was (i) based on "learning curve" assumptions that were false and directed by Defendant Mallon, (ii) fraudulently inflated, and (iii)

contradicted by the actual drilling data, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

      **C.**      **Despite Disclosing Permian Production Slowdown In January 2020, Defendants Continue To Mislead Investors About The Value Of The Permian Basin**

              **1.**      **Misstatements And Omissions During Q4 2019 Earnings Call**

388.    On January 31, 2020, Exxon held its Q4 2019 earnings call at 8:30 a.m. CT. During the call, Defendant Woods presented a "green blob" slide, set forth below, stating that "Permian volume growth on schedule." Defendant Woods also stated that "we are making very good progress" on Permian production." In response to a question from Goldman Sachs analyst Neil Mehta, Defendant Woods stated that Exxon's production goal for the Permian was "clearly on track."



389.    Defendants' statements identified in ¶388 above were false because Defendants knew that the goal of 1 million-oil equivalent barrels per day by 2024 in the Permian was (i) based on "learning curve" assumptions that were false and directed by Defendant Mallon, (ii)

fraudulently inflated, and (iii) contradicted by the actual drilling data, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

390.    Defendant Woods also answered analyst questions relating to conditions in the Permian Basin. For example, in response to a question from analyst Jeanine Wai from Barclays about "how operations [in the Permian] are going," Defendant Woods stated, "[B]ottom line[:] the potential of that and the value propositions that we've talked about haven't changed, if anything, we like it better."

391.    Defendants' statements identified in ¶390 above were false because the value proposition of the Permian and the operations in the Permian had changed materially for the worse, as Defendants knew. The drilling data demonstrated that drilling times were materially slower than expected, as described in Section IV(I)(6)(c) above.

### 2.    Misstatements And Omissions In The 2019 10-K

#### a.    False Valuation

392.    On February 26, 2020, Exxon filed its Form 10-K for fiscal year 2019 with the SEC (the "2019 Form 10-K"), signed by Defendant Woods. The 2019 Form 10-K stated that Exxon's "total proved reserves" for year-end 2019 were 22,445 million barrels of oil-equivalent.

393.    Defendants' statement identified in ¶392 above was false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on false "learning curve" drilling assumptions and a fraudulently inflated development plan and thus, falsely overstated, as described in Sections IV(D) – (E) and Section IV(H)(2) above. In addition, Exxon's reserves manager determined in the summer of 2018 that a write-down of the proved reserve was necessary, but Exxon determined to "kick the can down the road," as described in Section IV(E)(2) above.

### b.   False Valuation Process

394.    The 2019 Form 10-K further stated, "The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures."

395.    Defendants' statement identified in ¶394 above was false because Exxon's stated proved reserves were (i) the product of a fraudulent reserves process and (ii) based on false "learning curve" drilling assumptions and a fraudulently inflated development plan and thus, falsely overstated, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

396.    The 2019 10-K further stated that any changes to the reserve figures are "made within a well-established, disciplined process driven by senior level geoscience and engineering professionals, assisted by the Global Reserves and Resources group which has significant technical experience, culminating in reviews with and approval by senior management."

397.    Defendants' statement identified in ¶396 above was false because in fact, Exxon's reserves process was fraudulent and its reserves were based on false "learning curve" drilling assumptions and a fraudulently inflated development plan, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

### 3.   Misstatements And Omissions On March 5, 2020 Analyst Day

398.    On March 5, 2020, Exxon held its annual Investor Day and issued a press release quoting Defendant Woods titled "ExxonMobil Outlines Progress on Long-Term Growth Strategy." The press release stated that Defendant Woods "outlined progress on key projects that support[ed] ExxonMobil's growth plans, including: … In the Permian Basin, production volumes increased and remain on track to exceed 1 million oil-equivalent barrels per day by 2024."

399. Defendants' statement identified in ¶398 above was false because Defendants knew that the goal of 1 million-oil equivalent barrels per day by 2024 in the Permian was based on "learning curve" assumptions that were false, was fraudulently inflated, and was contradicted by the actual drilling data, as described in Sections IV(D) – (E) and Section IV(H)(2) above.

400. During the Investor Day analyst question and answer portion, analyst Roger Read from Wells Fargo asked about Exxon's goal to get to 5 million barrels per day by 2025, which included the 1 million oil-equivalent barrels per day in the Permian goal. Woods responded that the barrel per day goal "is not aspirational. It is an outcome of the plans that we put together and our best assessment of how we risked divestments and how that all fits together."

401. Defendants' statement in ¶400 was false because the one million barrels per day goal in the Permian was, at best, purely "aspirational" when Woods announced it. The goal was based on "learning curve" assumptions that were false, was fraudulently inflated, and was contradicted by the actual drilling data and the original (and true) 2019 Delaware development plan that the development planners "put together" based on that data, as described in Sections IV(D) – (E) and Section IV(H)(2) above. It was further false and misleading for Woods to say that the goal "is an outcome of the plans that we put together and our best assessment of how we risked divestments and how that all fits together," when in reality the goal was not the actual outcome of a legitimate planning process. In truth, the plans were manipulated with false assumptions to produce Woods's stated goal.

## XI.    LOSS CAUSATION

402. Defendants' materially false and misleading statements and omissions, including statements regarding the value of Exxon's Permian Basin assets artificially inflated and/or maintained the price of Exxon's stock. The artificial inflation in Exxon's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market

and/or materialized. The information was disclosed to the market through disclosures on January 31, 2020, May 1, 2020, and January 15, 2021. These disclosures reduced the amount of inflation in the price of Exxon's publicly traded stock, causing economic injury to Plaintiffs and other members of the Class.

403.     Specifically, on January 31, 2020, Exxon held its Q4 2019 earnings call starting at 8:30 a.m. C.T. During the call, Defendant Woods presented a "green blob" slide stating that fourth quarter 2019 production was "294 Koebd" or 294,000 barrels of oil-equivalent per day, compared to 293,000 barrels of oil-equivalent per day for the third quarter of 2019. Production was virtually flat quarter-over-quarter and fell below industry estimates, as well as the Company's own guidance.

404.     In response, the price of Exxon's common stock dropped 4.1% on January 31, 2020, from $64.79 to $62.12 on heavy trading volume of more than 34.2 million shares. This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Exxon's stock price was partially removed. As the market continued to absorb these disclosures over the weekend, Exxon shares dropped again by 2.2% on February 3, 2020 and 1.3% on February 4, 2020 on heavy trading of more than 27.3 million shares and 31.9 million shares respectively.

405.     Analysts reacted negatively to Exxon's disclosures on January 31, 2020. For example, Barclays reported on Permian production as "~flat." Bank of America stated, "Permian production flat lined sequentially." Credit Suisse reported that "Permian production averaged a disappointing 294 MBoed in 4Q19, flat with the 293 MBoed in 3Q19" and stated, "For an area expected to account for roughly half of XOM's growth over 2019-2025, the absence of QoQ growth despite continued completions activities into 4Q19 (~29 horizontal wells in October according to Drilling info) came as a disappointing surprise." J.P. Morgan stated that "Permian

growth did level off q/q in 4Q (flattish), which was a disappointment for investors." Scotiabank highlighted as a "Negative Surprise[]" that "Permian production came in at 294 mboe/d below our estimate of 314 mboe/d and fell below the company's outlined guidance. Q/Q Permian production was up only 1mboe/d."

406.    Negative analyst reaction continued after the February 1-2, 2020 weekend, with Morgan Stanley reporting on February 3, 2020 that "Permian production was roughly flat at 294 Mboe/d vs 293 Mboe/d in 3Q." Scotiabank published another report on February 3, 2020, noting that "we think investors will be surprised by the poor Permian results[.] . . . Due to the timing of their well completion, we think 1Q20 Permian production will remain unimpressive as the company will launch their first cube development in the first quarter." Scotiabank further stated, "Similar to the past, management reiterated that Permian production is performing well and from time to time may exhibit fluctuations. We believe investors will continue to scrutinize the results given the lackluster results over the past two quarters . . . While XOM has outpaced CVX in adding rigs in the Permian, XOM's production growth has lagged behind."

407.    Defendants' January 31, 2020 disclosures partially corrected Defendants' prior materially false and misleading statements and omissions about production in the Permian Basin and Exxon's stated valuations based on the Delaware development plan. However, the full truth about the misstated value of the Permian Basin was not disclosed, and Exxon's stock price remained artificially inflated.

408.    On May 1, 2020, Exxon held its Q1 2019 earnings call starting at 8:30 a.m. C.T., during which Defendants disclosed significant rig cuts of 75% of current rigs in the Permian and that lower capital expenditures, including the rig cuts, would reduce 2020 Permian volumes by ~15 KBoed (to ~345 KBoed total production excluding shut-ins) in 2020 and by 100-150 KBoed

(to 450-500 KBoed total production) in 2021.

409.    In response, Exxon's stock dropped 7.2% on May 1, 2020, from $46.47 to $43.14 on heavy trading volume of more than 35.3 million shares. This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Exxon's stock price was partially removed.

410.    Analysts reacted negatively to Exxon's May 1, 2020 disclosures. Raymond James noted, "This was the final quarter with Permian uplift on a sequential basis, in view of the rig count having been slashed as part of the overall 30% spending cut unveiled on April 7." Credit Suisse stated, "While not detailing capex reductions by area, it noted that the largest share of the cuts is from the Permian." Evercore ISI further commented, "Capital reductions are expected to decrease Permian production volumes by approximately 15 MBOEPD in 2020 and 100-150 MBOEPD in 2021. . . . Management anticipates this will impact volumes in the Permian by approximately 100 MBOEPD in 2Q."

411.    Defendants' May 1, 2020 disclosures partially corrected Defendants' prior materially false and misleading statements and omissions about production in the Permian Basin and Exxon's stated valuations based on the Delaware development plan. However, the full truth about the misstated value of the Permian Basin was not disclosed, and Exxon's stock price remained artificially inflated.

412.    On January 15, 2021, before the market opened, the *Wall Street Journal* reported that whistleblowers had filed a complaint in the fall of 2020 regarding the fraudulently inflated valuation of the Permian Basin asset. The whistleblower complaint alleged that several individuals involved with the valuation were instructed by management to use false data in the assumptions that the Company used to value the Delaware Basin. The pressure to deliver on Defendant Woods' March 2019 promise that the Permian Basin would achieve 1 million oil-equivalent barrels per

day by 2024 "permeated the organization," even though, according to the whistleblower, "no one I knew in the organization thought this was possible." As described in the whistleblower complaint, after employees delivered the lower internal valuation of $40 billion for the Delaware Basin in connection with Exxon's annual planning process for 2019, they were pressured by the Delaware development manager, who at the time was Defendant Bond, to "claw back" some of the reduction in the valuation by "using different assumptions, including a more optimistic 'learning curve' that estimated the rate at which they would improve drilling times." Despite this, employees continued to view the faster drilling time assumptions as unrealistic. One employee submitted the revised estimates in a file entitled "This is a Lie." After further debate and consultation, the value was adjusted to $50 billion.

413.   In response to the January 15, 2021 *Wall Street Journal* article, Exxon common stock declined 4.8% on January 15, 2021, from a close of $50.31 per share on January 14, 2021, to close at $47.89 per share on January 15, 2021. This decline caused Plaintiffs and Class members to suffer loss as the artificial inflation in Exxon's stock price was further removed, and quantified the full extent of Exxon's materially false and misleading valuation of its Permian assets.

414.   Other news outlets reported on the whistleblower complaint attributed Exxon's stock drop to the disclosed whistleblower allegations. For example, Bloomberg reported on January 15, 2021, in an article titled, "Exxon Falls After Report of SEC Probe into Permian Valuation," that "Exxon Mobil Corp. slumped after a newspaper report said the company is being investigated by the U.S. Securities and Exchange Commission for allegedly overvaluing a key asset in the Permian Basin." Similarly, CNBC stated, "Shares of Exxon slipped more than 5% on Friday after *The Wall Street Journal* reported that the SEC opened an investigation into the oil giant" and that "[t]he complaint, filed by an employee, allegedly centered on how Exxon valued a

key asset in the oil-rich Permian Basin." Business Insider also discussed the SEC investigation, writing, "Shares of Exxon Mobil tumbled as much as 6% during intraday trading on Friday following a report from the *Wall Street Journal* that the SEC launched an investigation into the oil giant concerning [its] asset valuations. Exxon is being investigated by the SEC after a whistleblower complaint from an employee who alleges that the oil giant overvalued a key oil and gas property in Texas' Permian Basin." On January 16, 2021, Forbes reported that "The U.S. Securities and Exchange Commission opened an investigation into Exxon Mobil for possibly overvaluing one of its key oil and gas properties in the Permian Basin, the highest-producing oil field in the U.S., after an employee filed a whistleblower complaint last fall, according to a report in the *Wall Street Journal* on Friday that sent the oil major's market value down 5%."

415. On January 17, 2021, UBS reported on the whistleblower allegations and tied the whistleblower reports to Exxon's accounting for oil and gas assets. UBS stated, "On Friday the *Wall St Journal* reported that the SEC had launched an investigation of XOM. This followed a whistleblower complaint alleging that XOM overvalued its Permian Basin assets and employees were pressured to use unrealistic assumptions on company drilling performance to drive a higher value. The WSJ reports internal disputes over the valuation of these assets." UBS further noted that the net value assessments described in the article would impact Exxon's assessment of its "proved reserves and resources, underpin balance sheet historic cost (which are audited), and guide strategy and investment."

416. No other Exxon-specific news was announced on January 15, 2021.

417. The lack of a decline in Exxon's stock price in response to the Company's post-Class Period announcements on February 2, 2021 of a reduced production goal in the Permian of 700,000 oil-equivalent barrels by 2025, and on February 24, 2021 of a net reduction to estimates

of proved reserves of approximately 1.5 billion oil-equivalent barrels, mainly related to unconventional drilling in the United States, demonstrates that the market incorporated the information about the whistleblower complaint and its impact on Exxon's production goal in the Permian and stated proved reserve into Exxon's stock price in response to the January 15, 2021 disclosure.

418.   The declines in Exxon's stock price were a direct and proximate result of Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Exxon's stock-price declines negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or Exxon-specific facts unrelated to Defendants' fraudulent conduct.

## XII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

419.   The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the materially false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

420.   Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was materially false or misleading, or the statement was authorized and/or approved by an executive officer of Exxon who knew that the statement was materially false or misleading when made.

### XIII.   THE PRESUMPTION OF RELIANCE

421.   Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material facts that there was a duty to disclose.

422.   Plaintiffs are also entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions pursuant to the fraud-on-the-market doctrine because, during the Class Period, among other things:

    a)    Defendants made public misstatements or failed to disclose material facts;

    b)    The omissions and misstatements were material;

    c)    The Company's stock traded in an efficient market;

    d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

    e)    Lead Plaintiff and other members of the Class purchased Exxon common stock between the time Defendants made material misstatements or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misstatements or omitted facts.

423.   At all relevant times, the market for Exxon common stock was efficient for the following reasons, among others:

    a)    Exxon stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b)    As a regulated issuer, Exxon filed periodic public reports with the SEC; and

    c)    Exxon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

424.   Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Exxon's common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and

omissions during the Class Period.

## XIV.   CLASS ACTION ALLEGATIONS

425.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Exxon common stock during the period from March 7, 2018 through January 15, 2021, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; Exxon's affiliates and subsidiaries; the officers and directors of Exxon and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest.

426.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Exxon common shares were actively traded on the New York Stock Exchange. Exxon has approximately 4.118 billion shares of common stock issued and outstanding, as reported in Exxon's third quarter of 2022 earnings release. Although the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least thousands of members of the proposed Class. Members of the Class can be identified from records maintained by Exxon or its transfer agent(s), and may be notified of the pendency of this action by publication using a form of notice similar to that customarily used in securities class actions.

427.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendants' conduct as complained of herein.

428.    Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of fact and law common to the Class are:

128

a) whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

b) whether Defendants are personally liable for the alleged misrepresentations and omissions described herein;

c) whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

d) whether the members of the Class have sustained damages, and the proper measure of damages.

429. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interest that conflicts with the interests of the Class.

430. A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XV.   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendants Exxon, Woods,  Mallon, And Bond)

431. Plaintiffs repeat and re-allege each and every allegation set forth in ¶¶1-430 above as if fully set forth herein.

432. This cause of action is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

433.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Exxon stock at artificially inflated prices.

434.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period in an effort to maintain artificially high market prices for Exxon common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

435.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations, and financial results of Exxon as specified herein.

436.    Defendant Exxon is liable under Section 10(b) and SEC Rule 10b-5(b) for all materially false and misleading statements and omissions made during the Class Period, as alleged herein.

437.    Defendant Woods and Defendant Mallon, as top executives of the Company, are liable under Section 10(b) and SEC Rule 10b-5(b) as direct participants in the wrongs complained of herein. Defendant Woods is liable for all of the materially false and misleading statements and omissions made during the Class Period, as alleged herein. Defendant Mallon is liable for the materially false and misleading statements and omissions that he made on June 18, 2019, as alleged herein.

438.    During the Class Period, Defendant Woods, Defendant Mallon, and Exxon made or were responsible for the materially false and misleading statements and omissions alleged herein, which they knew or severely recklessly disregarded to be materially false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

439.    Defendants had actual knowledge of the materially false and misleading statements and omissions alleged herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Exxon's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

440.    The allegations above establish a strong inference that Exxon, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents, including Defendants Mallon and Bond, had actual knowledge of the materially false and misleading statements and omissions specified above, or acted with severely reckless disregard for the truth.

441.    Defendant Mallon, Defendant Bond and Exxon are also liable under SEC Rule 10b-5(a) and SEC Rule 10b-5(c) for engaging in deceptive and manipulative acts in a scheme to defraud investors. As part of their scheme to defraud investors in violation of SEC Rule 10b-5(a) and (c), Defendant Mallon, Defendant Bond and Exxon directed that Exxon artificially inflate its development plan and use false "learning curve" drilling assumptions in its statements to investors and Exxon retaliated against employees who tried to make Defendants acknowledge the truth.

442.    Plaintiffs, and the Class, have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Exxon's common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all,

had they been aware that the market prices for Exxon's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

443.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

444.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

**COUNT II**
**VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendant Woods and Defendant Mallon)**

445.    Plaintiffs repeat and re-allege each and every allegation set forth in ¶¶1-430 above as if fully set forth herein.

446.    This cause of action is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

447.    As detailed above, Exxon, Woods, and Mallon each violated §10(b) and SEC Rule 10b-5, and Plaintiffs and other members of the Class suffered damages in connection with their purchases of Exxon common stock as a direct and proximate result of Defendants' wrongful conduct.

448.    Defendant Woods and Defendant Mallon acted as a controlling persons of Exxon within the meaning of Section 20(a) of the Exchange Act, as alleged herein, for the entirety of their tenure at Exxon, which includes the entire Class Period.

449.    By virtue of their high-level position, participation in, and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Exxon, Defendant Woods and Defendant Mallon had the power and ability to

control the actions of Exxon and its employees, and to cause the Company to engage in the wrongful conduct alleged herein. Woods and Mallon were able to and did control, directly and indirectly, the content of the public statements made by Exxon during the Class Period, which include Exxon's materially false and misleading financial statements contained therein, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

450.    By reason of such conduct, Defendant Woods and Defendant Mallon are liable for the materially false and misleading statements and omissions of material facts made during the Class Period, alleged in Section X above (¶¶344-401), pursuant to Section 20(a) of the Exchange Act.

451.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Exxon common stock during the Class Period.

## XVI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a)    Declaring that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c)    Awarding Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)    Awarding such other and further relief as the Court may deem just and proper.

## XVII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 31, 2022

Respectfully submitted,

/s/ John Rizio-Hamilton
John Rizio-Hamilton (*pro hac vice*)
johnr@blbglaw.com
Rebecca E. Boon (*pro hac vice*)
rebecca.boon@blbglaw.com
Thomas Z. Sperber (*pro hac vice* pending)
thomas.sperber@blbglaw.com
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for Co-Lead Plaintiff State
of Rhode Island, Office of the General
Treasurer, on behalf of the Employees'
Retirement System of Rhode Island*

Daniel L. Berger (*pro hac vice*)
dberger@gelaw.com
Barbara J. Hart (*pro hac vice*)
bhart@gelaw.com
Caitlin M. Moyna (*pro hac vice*)
cmoyna@gelaw.com
**GRANT & EISENHOFER PA**
485 Lexington Avenue
New York, New York 10017
Phone: (646)722-8500
Fax: (646) 7222-8501

*Co-Lead Counsel for Co-Lead Plaintiff
Amalgamated Bank*

Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
**McKOOL SMITH PC**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

134

## **CERTIFICATE OF SERVICE**

I certify that on October 31, 2022, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ John Rizio-Hamilton*
John Rizio-Hamilton