**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiff*,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, NEIL A. CHAPMAN, JACK WILLIAMS, NEIL A. HANSEN, DAVID ROSENTHAL, LIAM M. MALLON, JEFFREY J. WOODBURY, and SARA N. ORTWEIN,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 3:21-cv-00194-N

**MOTION TO DISMISS SECOND AMENDED CLASS ACTION**
**COMPLAINT AND BRIEF IN SUPPORT**

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, TX 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122

*Attorneys for Defendants Exxon Mobil*
*Corporation, Darren W. Woods, Liam M.*
*Mallon, and Melissa Bond*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................................... iv

GLOSSARY ........................................................................................................................... viii

INTRODUCTION ........................................................................................................................1

STATEMENT OF FACTS .............................................................................................................5

I.      The Delaware Development Planning Team estimates the value of the Delaware
        assets. ..........................................................................................................................5

II.     The Global Reserves and Resources Group oversees the Proved Reserves. ......................6

III.    Plaintiffs file suit, alleging that ExxonMobil misled shareholders regarding the
        Permian assets. .............................................................................................................8

IV.     The Court dismisses Plaintiffs' claims, finding that none alleged scienter and
        numerous challenged statements aren't actionable. ............................................................9

V.      Plaintiffs repeat their same liability theories and build their lawsuit around alleged
        "learning curve" assumptions that were not disclosed and did not affect
        ExxonMobil's public statements. ...................................................................................10

ARGUMENT .............................................................................................................................12

I.      Plaintiffs have not alleged facts supporting a strong inference of any Defendant's
        scienter. .....................................................................................................................12

        A.      The SAC largely recycles scienter allegations that the Court already
                rejected. ...........................................................................................................13

        B.      Plaintiffs have not alleged a strong inference that Woods made any
                actionable public statements with scienter. .........................................................17

        C.      Plaintiffs have not alleged that Bond or Mallon made any actionable
                public statements with scienter. ........................................................................22

        D.      Plaintiffs have not alleged that Mallon and Bond intended to defraud the
                public by furnishing false information for use in public statements. ....................23

                1.      Plaintiffs do not allege that Mallon and Bond furnished any
                        information for use in public statements. .................................................24

2.    Plaintiffs do not allege that Mallon and Bond furnished the internal valuation's learning curve assumptions to anyone, let alone furnished them for use in ExxonMobil's statements about production goals. ............................................................. 25

3.    Plaintiffs do not plead with particularity that Mallon or Bond knew that the GRRG would use the Planning Team's learning curve assumptions when generating the Proved Reserves estimate or the Resource Base. ......................................................... 27

4.    Plaintiffs have not alleged that Bond and Mallon knew of any concerns about Woods's April 26, 2019 statement until October 2019. ................................................................... 29

E.    Plaintiffs have not alleged that Woods or Mallon were involved in the investigation arising out of Gulden and Burch's concerns or their subsequent termination. ...................................................... 29

II.    Plaintiffs fail to allege scienter for the unattributed statements. ........................................ 30

III.    Plaintiffs have not alleged that Defendants made any actionable misstatements or omissions. ................................................................................................................. 31

A.    Statements purportedly related to ExxonMobil's net present value calculation for the Delaware Basin assets are not actionable. .............................. 32

B.    The Court correctly dismissed ExxonMobil's statements regarding its production goals. ............................................................................................... 32

1.    Statements based on "learning curve assumptions" are protected by the PSLRA safe harbor. ............................................................... 32

2.    Production goals are classic forward-looking statements under the PSLRA's safe harbor. ............................................................... 33

3.    Plaintiffs have not alleged with particularity that any of the statements that accompanied the production goals were materially misleading. ................................................................................... 34

C.    Plaintiffs have not alleged with particularity that the Proved Reserves were materially misleading. ......................................................................................... 38

D.    Plaintiffs have not alleged with particularity that ExxonMobil misrepresented the Permian's Resource Base. ...................................................... 40

E.    Statements regarding ExxonMobil's rigorous or disciplined reserves process are immaterial puffery. ................................................................................ 42

IV.    Plaintiffs' omissions claims are meritless on their face. ....................................................43

V.    Plaintiffs have not stated a claim for scheme liability. .........................................................44

VI.    Plaintiffs have not stated a control person claim under Section 20(a)............................44

CONCLUSION.............................................................................................................................44

## TABLE OF AUTHORITIES

Page(s)

## CASES

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
    291 F.3d 336 (5th Cir. 2002) ..............................................................29, 32, 40

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ............................................................13, 16, 17

*Ahern v. Apple Inc.*,
    411 F. Supp. 3d 541 (N.D. Cal. 2019) ...............................................................43

*Alaska Electrical Pension Fund v. Asar*,
    768 F. App'x 175 (5th Cir. 2019)......................................................................19

*In re Australia & New Zealand Banking Group Ltd. Securities Litigation*,
    No. 08 Civ. 11278(DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........................37

*Callinan v. Lexicon Pharmaceuticals, Inc.*,
    479 F. Supp. 3d 379 (S.D. Tex. 2020) ..............................................................15

*Carlton v. Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016) ........................................................34, 37

*Coates v. Heartland Wireless Communications, Inc.*,
    55 F. Supp. 2d 628 (N.D. Tex. 1999) ...............................................................40

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
    504 F. Supp. 2d 151 (N.D. Tex. 2007) ..............................................12, 38, 44

*Crutchfield v. Match Group, Inc.*,
    529 F. Supp. 3d 570 (N.D. Tex. 2021) ...............................................................31

*Dorsey v. Portfolio Equities, Inc.*,
    540 F.3d 333 (5th Cir. 2008) ....................................................................5, 31

*Edgar v. Anadarko Petroleum Corp.*,
    No. H-17-1372, 2019 WL 1167786 (S.D. Tex. Mar. 13, 2019) ....................20, 21, 25, 31

*In re Franklin Bank Corp. Securities Litigation*,
    782 F. Supp. 2d 364 (S.D. Tex. 2011) ...............................................................40

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. 2021) ..............................................................44

iv

*Heinze v. Tesco Corp.*,
    971 F.3d 475 (5th Cir. 2020) ........................................................5

*In re Hertz Global Holdings Inc*,
    905 F.3d 106 (3d Cir. 2018)........................................................14

*Indiana Electrical Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008) ........................................13, 27, 40

*Izadjoo v. Helix Energy Solutions Group, Inc.*,
    237 F. Supp. 3d 492 (S.D. Tex. 2017) .......................................30

*Jacobowitz v. Range Resources Corp.*,
    No. 4:21-CV-0751-P, 2022 WL 976003 (N.D. Tex. Mar. 31, 2022) .............12, 20, 40, 42

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005).................................................15

*Knutson v. Harris*,
    No. 3:17-CV-2618-BK, 2018 WL 4281557 (N.D. Tex. Sept. 6, 2018) ..........................31

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996) ......................................................14

*McNamara v. Bre-X Minerals, Ltd.*,
    197 F. Supp. 2d 622 (E.D. Tex. 2001) ........................................17

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Hold*ings, Inc.,
    No. 20-cv-00054-SPF-JFJ, 2022 WL 377415 (N.D. Okla. Jan. 7, 2022).........................27

*Municipal Employees' Retirement System of Michigan v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) ......................................................20

*Nardy v. Chipotle Mexican Grill, Inc.*,
    No. 17-cv-01760-WYD-STV, 2019 WL 3297467 (D. Colo. Mar. 29, 2019) ..................15

*Parker v. Hyperdynamics Corp.*,
    126 F. Supp. 3d 830 (S.D. Tex. 2015) ........................................34

*People ex rel. James v. Exxon Mobil Corp.*,
    65 Misc.3d 1233(A), 2019 WL 6795771 (N.Y. Sup. Ct. Dec. 10, 2019)..................4, 5, 42

*In re Philip Morris International Inc. Securities Litigation*,
    437 F. Supp. 3d 329 (S.D.N.Y. 2020).........................................42

*In re Plains All American Pipeline, L.P. Securities Litigation*,
    245 F. Supp. 3d 870 (S.D. Tex. 2017) ........................................12

*In re Plains All American Pipeline, L.P. Securities Litigation*,
    307 F. Supp. 3d 583 (S.D. Tex. 2018) .......................................................16, 21, 22, 29, 31

*Police & Fire Retirement System of the City of Detroit v. Plains All American Pipeline, L.P.*,
    777 F. App'x 726 (5th Cir. 2019) ..............................................................................38, 44

*Rains v. Zale Corp.*,
    No. 3:09–CV–2133–B, 2011 WL 3331213 (N.D. Tex. Aug. 1, 2011)............................27

*Sanders v. Realreal, Inc.*,
    No. 19-cv-07737-EJD, 2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ............................43

*SEC v. Narayan*,
    No. 3:16-cv-1417-M, 2017 WL 4652063 (N.D. Tex. Aug. 28, 2017) .............................44

*SEC v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ............................................................................................44

*Southland Securities Corp. v. INSpire Insurance Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) .......................................................................................31

*Taubenfeld v. Hotels.com*,
    385 F. Supp. 2d 587 (N.D. Tex. 2004) ....................................................................32, 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................13, 23, 30

*Truk International Fund LP v. Wehlmann*,
    737 F. Supp. 2d 611 (N.D. Tex. 2009) .........................................................................37

*In re Tupperware Brands Corp. Securities Litigation*,
    No. 6:20-cv-357-GAP-GJK, 2021 WL 6755476 (M.D. Fla. Aug. 9, 2021).....................24

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) .................................................................................32, 33

*Woodward v. Raymond James Financial, Inc.*,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010)...........................................................................30

*Zeiger v. WellPet LLC*,
    304 F. Supp. 3d 837 (N.D. Cal. 2018) ..........................................................................43

## STATUTES

15 U.S.C. § 78u-4(b)(1) ...........................................................................................................32

15 U.S.C. § 78u-5 ............................................................................................................32, 34

## REGULATIONS

17 C.F.R. § 210.4-10..................................................................................................7, 39

17 C.F.R. § 240.10b–5...................................................................................................31

## GLOSSARY

| Term or Abbreviation | Description |
| --- | --- |
| Defendants | ExxonMobil Corporation and the Individual Defendants |
| Delaware Basin | A region within the Permian Basin (SAC ¶ 2) |
| Downstream | An industry term referring to the manufacture, trade, and sale of petroleum products such as fuels and lubricants (App. 50) |
| ExxonMobil | Exxon Mobil Corporation |
| FAC | Plaintiffs' First Amended Class Action Complaint (Dkt. 53) |
| GAAP | Generally Accepted Accounting Principles |
| Individual Defendants | Darren W. Woods, Liam M. Mallon, and Melissa Bond |
| Permian or Permian Basin | A hydrocarbon-rich region in parts of Texas and New Mexico (SAC ¶ 1; App. 47) |
| Plaintiffs | The State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island and Amalgamated Bank |
| Proved Reserves | Quantities of oil and natural gas that, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible under existing economic and operating conditions and government regulations. Proved Reserves are determined using the average of first-of-month oil and natural gas prices during the reporting year (SAC ¶ 46; App. 64) |
| PSLRA | Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 |
| Resource Base | The estimated quantities of oil and gas that are expected to be ultimately recoverable (including, but not limited to, Proved Reserves) (SAC ¶ 51; App. 220) |
| SAC | Second Amended Complaint (Dkt. 92) |
| Upstream | An industry term referring to exploration for and production of crude oil and natural gas (App. 74) |

Defendants move to dismiss Plaintiffs' Second Amended Class Action Complaint (the "SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## INTRODUCTION

Plaintiffs' SAC is déjà vu all over again.[1]  This Court dismissed Plaintiffs' 138-page First Amended Complaint ("FAC") in September because (1) Plaintiffs had failed to plead a strong inference of scienter as to all of the named defendants,[2] and (2) the FAC challenged numerous statements that were not actionable.  In their second bite at the apple, Plaintiffs ignored the Court's reasoning on both issues.  The SAC simply reasserts claims based on statements the Court already found immaterial or otherwise nonactionable.  And it continues to plead scienter based on impermissible group pleading and position pleading, rank speculation, and the deliberate but groundless conflation of the process through which ExxonMobil creates its development plans and internal valuations with the separate process through which it estimates its Proved Reserves in accordance with SEC rules.  Repetition isn't alchemy, and it can't transform Plaintiffs' deficient pleadings into a viable claim.

Plaintiffs have also replaced the foundation of the FAC – a *Wall Street Journal* article disclosing a now-closed SEC investigation – with a new but equally unsound underpinning.  The SAC now focuses on a *Washington Post* article about an OSHA employment proceeding.  But that article provides even less support for Plaintiffs' claims than the first one.  The OSHA proceeding didn't even purport to examine whether any ExxonMobil internal or external statement was true, and it related only to two employees who could not have relevant knowledge of either the truth or

---

[1]    YOGI BERRA, THE YOGI BOOK: I REALLY DIDN'T SAY EVERYTHING I SAID 45 (2010).

[2]    Plaintiffs dropped their claims against Neil Chapman, Jack Williams, Neil Hansen, David Rosenthal, Jeffrey Woodbury, and Sarah Ortwein.

falsity of any actionable statement or of the scienter of the remaining named defendants.

Specifically, Plaintiffs rely on the report of the OSHA proceeding to allege that a development plan that ExxonMobil used to *internally* value its assets in the Delaware Basin (a subset of the Permian Basin) incorporated as one of its many inputs a "learning curve" assumption about how quickly ExxonMobil would increase the speed at which it drilled wells over time. The problem is, Plaintiffs don't allege ExxonMobil ever made any public statement about "learning curve" assumptions or about the internal plans affected by those assumptions. Plaintiffs cannot build a securities fraud case on an internal planning metric that ExxonMobil never disclosed to investors. To get around this, they speculate that a learning curve assumption that was just one input in the development plan somehow infected the separate process through which ExxonMobil estimates Proved Reserves. From that unsupported premise, Plaintiffs hypothesize that learning curve assumptions must have migrated into a number of ExxonMobil's public statements about other topics. But the SAC's 451 paragraphs cannot bury the lead: Plaintiffs fail to plead any facts supporting a strong inference of scienter and fail to identify any actionable statement linked to their claim that a learning curve assumption input in the planning process was wrong.

Most fundamentally, Plaintiffs have failed to plead a strong inference of scienter against any of the remaining Defendants. Most of Plaintiffs' scienter theories are recycled allegations that this Court rejected when it dismissed the FAC. These generalized allegations rest on the premise that Defendants "should have known" about the fraud based on their positions in the company or because "everyone" in the company knew something to be true. But these propositions cannot support a cogent and compelling inference of scienter.

Plaintiffs attempt to shore up these deficient allegations with claims from two purported whistleblowers – Lindsey Gulden and Damian Burch – about the allegedly overly optimistic

2

learning curve assumptions.  But while Plaintiffs spill much ink describing Burch and Gulden's purported whistleblower activity, they do not allege that any Defendant learned about Gulden's and Burch's concerns before they made any challenged statement or purportedly "furnished" information for use in public statements.  The remainder of Plaintiffs' scienter allegations are baseless conjecture about what might have happened at meetings – but this speculation comes from unnamed witnesses who provide no basis to conclude that they have personal knowledge that the meetings occurred at all, let alone what was actually said or done in such meetings.

Plaintiffs have also failed to plead any actionable misstatements.  *First*, this Court has already held that ExxonMobil's statements about its production goals in the Permian Basin are forward-looking statements protected by the PSLRA's safe harbor disjunctive prongs because (1) they were accompanied by meaningful cautionary language, and (2) separately because Plaintiffs fail to plead actual knowledge that they were false.  Nothing pled in the SAC changes the basis for the Court's prior analysis or ruling.

*Second*, Plaintiffs have failed to plead with particularity that ExxonMobil's statements that accompanied the production goal statements were false at all (*e.g.*, that ExxonMobil had "increased" its production in the Permian).  And many of the challenged statements are the sort of optimistic puffing that investors don't rely on (*e.g.*, that ExxonMobil planned to "unleash the hounds").

*Third*, ExxonMobil's statements about its Proved Reserves are not misleading.  Most fundamentally, Plaintiffs base their arguments on the claims of purported whistleblowers Burch and Gulden regarding ExxonMobil's use of learning curve assumptions.  But Plaintiffs do not allege that either of them believed that the Proved Reserves were misstated.  Nor could they – Plaintiffs do not allege that either of them played any role in estimating Proved Reserves.  And

while Plaintiffs refer to anecdotal complaints from other witnesses about ExxonMobil's reserve estimates in other geographic areas, not a single witness is alleged to have claimed that the Delaware Proved Reserves were actually misstated – much less that ExxonMobil's statements about its global Proved Reserves or unconventional reserves generally were materially misstated.

*Fourth*, ExxonMobil's statements about the "Resource Base" in the Permian are also not misleading. The Resource Base includes all "discovered resources that are expected to be ultimately recovered." (SAC ¶ 51.) Proved Reserves are quantities of oil and gas that ExxonMobil believed with reasonable certainty existed and could be economically produced under existing economic and operating conditions and government regulations. The Resource Base, in contrast, is the total amount of hydrocarbons the company believes will *ultimately* be produced. Changing the estimate of how much of the Resource Base will be recovered in a fixed time period has no impact on the Resource Base itself. Plaintiffs' unreasonable – and counterfactual – inference that if the Proved Reserves were estimated incorrectly, the Resource Base must have been too, cannot sustain their claim. None of their 16 witnesses backed this theory, and Plaintiffs do not explain how their theory is even plausible.

*Fifth*, Plaintiffs challenge ExxonMobil's generic statements about the process of estimating reserves (*e.g.*, a "rigorous" reserves process). But Plaintiffs do not make any particularized allegations that the group that determined Proved Reserves didn't follow a rigorous process – they complain about the process used by an entirely different group. Furthermore, courts do not assess the "rigor" of a process when analyzing claims of falsity; they assess only whether there was a process – and Plaintiffs have failed to plead that ExxonMobil's process was *not* rigorous.[3]

---

3    While not dispositive, a trial court in New York recently found, after a hard-fought trial, that ExxonMobil's process was the definition of rigorous. According to Justice Barry Ostrager,

Plaintiffs have had ample opportunity to plead their securities fraud claims. They haven't come close to meeting their burden. It is time to dismiss Plaintiffs' claims with prejudice.

## STATEMENT OF FACTS

In January 2017, ExxonMobil purchased 3.4 billion barrels of oil-equivalent in the Permian Basin (including assets in the Delaware Basin). (SAC ¶¶ 2, 55; App. 142.) [4] The SAC focuses on the alleged conduct of two separate groups within ExxonMobil.

## I.    The Delaware Development Planning Team estimates the value of the Delaware assets.

According to Plaintiffs, Ozgur Ozen led the Delaware Development Planning Team (the "Planning Team"). (SAC ¶ 24.) Plaintiffs' allegations about the Planning Team's work are sparse; they primarily allege that the Planning Team prepared a development plan for the Delaware Basin and valued the Delaware assets during the annual budgeting and planning cycle. (SAC ¶ 10.) The SAC focuses on the Planning Team's valuation of the Delaware assets and its analysis of near-term production in the Delaware Basin. (*E.g.*, SAC ¶¶ 7, 12.) Melissa Bond was allegedly responsible

---

"executives and employees were uniformly committed to rigorously discharging their duties in the most comprehensive and meticulous manner possible. . . . The testimony of these witnesses demonstrated that ExxonMobil has a culture of disciplined analysis, planning, accounting, and reporting." *People ex rel. James v. Exxon Mobil Corp.*, 65 Misc.3d 1233(A), 2019 WL 6795771, at *20 (N.Y. Sup. Ct., Dec. 10, 2019) (unpublished table opinion).) On the issue of reserves, Justice Ostrager found that "ExxonMobil's public disclosures in its Form 10-K submissions were true and correct with respect to ExxonMobil's proved reserves." *Id.* at *18. Plaintiffs' lengthy recitation of alleged problems in ExxonMobil's reserves process fails to mention this decision.

[4]    While at this stage the Court must "accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff," it should "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (citations omitted). The Court also may "rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation omitted). Defendants recognize that they must take all well-pled factual allegations as true for purposes of this motion but deny that Plaintiffs' allegations are correct.

for the development planning in the Delaware Basin at all relevant times. (SAC ¶ 45.)

In the 2018 planning and budget cycle, the Planning Team estimated the net present value ("NPV") of the Delaware assets at $60 billion. (SAC ¶ 8.) The 2018 estimate was based on a discounted cash flow model that incorporated a variety of assumptions, including drilling, production, costs, number of drilling rigs, drilling crews, and revenue estimates. (SAC ¶¶ 7, 8, 119.) During the 2019 planning and budget cycle, the Planning Team updated its NPV for these assets. (SAC ¶ 10.) In March or April 2019, the Planning Team generated an initial valuation of $40 billion. When it completed its analysis in August 2019, it valued these assets at $50 billion. (*E.g.*, SAC ¶¶ 10-15, 18.)

Plaintiffs unreasonably assume that the initial valuation reflected the Delaware assets' final, actual value, rather than a first draft. Based on that assumption, Plaintiffs spend much of the SAC alleging that the $50 billion NPV of the Delaware Basin was somehow "inflated" because one of the many inputs, the "learning curve" assumption, was allegedly overly-optimistic. (*E.g.*, SAC ¶¶ 6, 18-20, 23, 114-68.) Plaintiffs refer to "NPV" or "net present value" 76 times. But they do not allege that any internal NPV was ever publicly disclosed. Indeed, Plaintiffs' catalogue of allegedly false and misleading statements never mentions NPV, the $50 billion valuation, learning curve assumptions, or the Delaware Basin. (SAC ¶¶ 344-401.)

## II.    The Global Reserves and Resources Group oversees the Proved Reserves.

As Plaintiffs concede, the Global Reserves and Resources Group ("GRRG") is a separate group that is responsible for "generating" ExxonMobil's annual Proved Reserves across the entire company.[5] (SAC ¶ 71.) Broadly speaking, Proved Reserves reflect the estimated amount of

---

[5]    Plaintiffs characterized the GRRG as being responsible for "generating" the Proved Reserves. (SAC ¶ 71.) Although Defendants recognize that they must take Plaintiffs' well-pled allegations as true, Plaintiffs fundamentally misunderstand ExxonMobil's planning, reserves

hydrocarbons that ExxonMobil believed with reasonable certainty existed and could be economically produced under existing economic and operating conditions and government regulations. (SAC ¶ 332.) SEC regulations and GAAP require companies like ExxonMobil to follow a specific process in estimating and disclosing Proved Reserves. (*See generally* SAC ¶¶ 315-32.) Unlike traditional valuation models, which are based on estimates of future prices, SEC Regulation S-X requires ExxonMobil to estimate the value of reserves using average first-day-of-the-month prices for the *prior* 12-month period. *See* 17 C.F.R. § 210.4-10(a)(22)(v), (c)(8). Plaintiffs allege that "reasonable certainty" usually means that a company believes there is a 90 percent chance that it can produce the hydrocarbons.[6] (SAC ¶ 315.) When estimating reserves, a company must "calculat[e] the quantities of oil and gas it expects each of its wells to produce and when." (SAC ¶ 318.)

Richard Ducharme managed the GRRG during the relevant period. (SAC ¶ 72.) Plaintiffs allege that the GRRG generated reserves estimates as follows:

- reservoir engineers prepared reserves forecasts for their assigned areas and submitted them to their managers;

- their managers approved the forecasts;

- the GRRG reviewed and evaluated forecasts prepared by reservoir engineers, including analyses under different scenarios; and

- the GRRG generated the reserves using the SEC's mandated process for reserves.

(*E.g.*, SAC ¶¶ 74-77.)

---

estimating, and reporting processes. But even Plaintiffs' incorrect interpretation of those processes does not show any actionable misstatements.

[6] The 90 percent standard applies when a company uses the "probabilistic" methodology for determining Proved Reserves. 17 C.F.R. § 210.4-10(a)(19), (a)(24). The other alternative methodology permitted by the SEC is the "deterministic" methodology. 17 C.F.R. § 210.4-10(a)(5).

Once complete, the GRRG submitted the estimate of the Proved Reserves it generated to "senior management" for final approval. (SAC ¶¶ 278-79.)

Plaintiffs recognize that the Planning Team and the GRRG are separate groups within ExxonMobil. (SAC ¶¶ 24, 71-73.) The SAC does not allege that the Planning Team had any active role in the process of estimating reserves. Indeed, it does not allege that there was any overlap between the members of the Planning Team and the GRRG.

### III.  Plaintiffs file suit, alleging that ExxonMobil misled shareholders regarding the Permian assets.

On January 15, 2021, the *Wall Street Journal* reported that the SEC was investigating ExxonMobil in response to a whistleblower complaint relating to its valuation of the Permian Basin asset, including how quickly ExxonMobil could drill wells in the Permian Basin. (SAC ¶ 252; App. 230-33.) This lawsuit was filed days later. (Dkt. 1.) On September 10, 2021, Plaintiffs filed the FAC, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 against ExxonMobil and eight individual defendants. (Dkt. 53 at 10.) The FAC generally challenged four categories of ExxonMobil's disclosures.

*Production Goals and Accompanying Statements.* On February 8, 2018, ExxonMobil projected that it "expected to increase daily production to more than 600,000 oil-equivalent barrels by 2025" in the Permian. (FAC ¶ 54.) On March 5, 2019, ExxonMobil "revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024." (FAC ¶ 389.) It made similar oral and written statements over the following year. (FAC ¶¶ 390, 400-01, 405, 407, 425-26.) Whenever ExxonMobil discussed its anticipated production growth, it also cautioned investors that its ability to meet the projections depended on a number of factors, including the timely completion of projects, reservoir performance, market changes, and unforeseen technical difficulties. (*See* App. 9-12, 22, 40-42, 58, 85, 88, 94, 143-44, 146-47, 149,

151, 154-56, 162-63, 166-67, 169, 176, 182, 188, 191, 199, 202, 214, 222, 228.)  The FAC alleged that the production goal statements and some related statements were actionable.  (FAC ¶¶ 389-91, 400-01, 405, 407-08, 415, 425-26.)

*Proved Reserves.*  ExxonMobil disclosed its global Proved Reserves in its 10-Ks.  (FAC ¶¶ 383, 419.)  But ExxonMobil did not separately disclose its estimation of Proved Reserves for the Permian Basin.  (App. 43-44.)  Nonetheless, the FAC alleged that ExxonMobil had misstated its Proved Reserves.  (FAC ¶¶ 347, 377, 379, 384, 420.)

*Resource Base.*  ExxonMobil also periodically provided investors with a separate, non-GAAP measure of the hydrocarbons it owned: the Resource Base.  (FAC ¶¶ 46, 59.)  This metric measured the oil-equivalent barrels "of Proved Reserves, *plus* other discovered resources that are expected to be *ultimately* recovered."  (FAC ¶ 46 (emphasis added).)  Because the Resource Base focused on ultimate recovery, it also included existing hydrocarbons that weren't part of the Proved Reserves estimation.  ExxonMobil stated several times that its Resource Base in the Permian was roughly 9 to 10 billion oil equivalent barrels.  (*See, e.g.*, FAC ¶¶ 351, 357; *see also* App. 91, 142.)  The FAC alleged that the Resource Base was misstated because one of its components – Proved Reserves – was misstated.  (*E.g.*, FAC ¶¶ 253-55.)

## IV.  The Court dismisses Plaintiffs' claims, finding that none alleged scienter and numerous challenged statements aren't actionable.

On September 29, 2022, the Court dismissed the FAC.  (Dkt. 88.)  Among other things, the Court held that:

- Plaintiffs had not pled a strong inference of scienter against any Defendant.  (Dkt. 88 at 4-20.)

- ExxonMobil's statements that production goals were "on track," "on plan," or "on schedule" to meet its one million oil-equivalent barrel per day production goal were protected by the PSLRA safe harbor.  (Dkt. 88 at 25-27.)

- ExxonMobil's subjective qualitative statements about its drilling activities and wells

9

(*e.g.*, that wells had "very high quality" or were the "best") were nonactionable puffery. (Dkt. 88 at 32-33.)

## V.    Plaintiffs repeat their same liability theories and build their lawsuit around alleged "learning curve" assumptions that were not disclosed and did not affect ExxonMobil's public statements.

On October 31, 2022, Plaintiffs filed the SAC, in which they generally assert the same legal and factual theories and rely on many of the original allegations that this Court already found wanting.  (SAC ¶¶ 74-101, 169-243.)  Plaintiffs' principal new allegations relate to concerns that two ExxonMobil employees (Damian Burch and Lindsey Gulden) had allegedly expressed regarding "learning curve" assumptions incorporated in the Planning Team's assessment of the Delaware assets' NPV in 2019.  (SAC ¶¶ 132, 134, 138, 158, 274, 305, 307.)

Plaintiffs do not allege that Burch or Gulden were reservoir engineers.  Rather, according to Plaintiffs, Burch allegedly assisted with Development Planning, including planning for the Delaware Basin.  (SAC ¶ 118.)  Gulden was allegedly responsible for making "analytic technical contributions" to assist "decision-makers in the Upstream Oil and Gas division."  (SAC ¶ 117.) Neither Burch nor Gulden is alleged to have worked in the GRRG.  (SAC ¶ 77.)  And Plaintiffs do not allege that Burch or Gulden raised any concerns about ExxonMobil's Proved Reserves estimates.

ExxonMobil terminated Gulden in late October 2020 and Burch in December 2020, well over a year after the alleged 2019 concerns were purportedly raised.  (SAC ¶¶ 6, 158.)  Plaintiffs make much of a newspaper article that reported that OSHA concluded that Burch and Gulden had been wrongfully terminated in retaliation for raising concerns about learning curve assumptions used by the Planning Team.[7]  (SAC ¶¶ 157-60.)  But OSHA's review was limited to the reason for

---

[7]    Plaintiffs do not plead that the OSHA decision is final.  ExxonMobil plans to challenge the Administrative Law Judge's decision.

Gulden's and Burch's terminations, not whether their alleged concerns were justified.  (SAC ¶¶ 116, 159-60.) In fact, the Securities and Exchange Commission closed its investigation into allegations mentioned in the *Wall Street Journal* article regarding purported issues in the Permian Basin without taking any action against ExxonMobil.  (Dkt. 88 at 9.)

In their SAC, Plaintiffs challenge certain statements regarding ExxonMobil's production goals and accompanying disclosures, its Proved Reserves, and the Permian's Resource Base.  Many of the challenged statements were already determined by this Court to be nonactionable.

*Statements about ExxonMobil's Production Goals in the Permian Basin*.  Plaintiffs once again allege that ExxonMobil's production goals through 2024 were materially misleading.  (*E.g.*, SAC ¶¶ 361-69, 373-74, 383-85, 387-90, 398-99.)  According to Plaintiffs, ExxonMobil could not reach its daily production goal of one million oil-equivalent barrels because (1) "learning curve" assumptions were allegedly inflated, and (2) ExxonMobil had purported production issues in the Permian Basin.  (SAC ¶¶ 361-69, 388-89.)

*Statements Accompanying the Production Goals.*  Plaintiffs challenge ExxonMobil's statements about "accelerated" value and operations in the Permian; increased production volumes; development, delineation, and understanding of resources; and basing its global production goals on the company's "best assessment."  (SAC ¶¶ 361-62, 367-69 376, 386, 398, 400.)  Plaintiffs generally allege these statements were false because ExxonMobil purportedly could not meet its production goals and its goals were aspirational.  (SAC ¶¶ 363, 368-69, 377, 387, 399, 401.)

*Statements about ExxonMobil's Proved Reserves*.  Plaintiffs also reallege their challenges to ExxonMobil's estimates of Proved Reserves and ExxonMobil's description of the rigorous process that it followed to estimate reserves.  (SAC ¶¶ 351-52, 353-54, 355-56, 357-58, 378-79, 380-83, 392-97.)  Plaintiffs assert that these statements were false because the Proved Reserves

11

were allegedly based on "a fraudulent reserves process" that somehow incorporated learning curve assumptions and ExxonMobil purportedly refused to write down its reserves.  (*E.g.*, SAC ¶¶ 84-85, 100-01, 188, 344, 354.)

  ***Statements About ExxonMobil's Resource Base.***  Plaintiffs again allege that ExxonMobil misstated its Resource Base in the Permian because one component of the Resource Base – the Proved Reserves – was incorrect.  (SAC ¶¶ 345-50, 370-74.)

**ARGUMENT**

**I. Plaintiffs have not alleged facts supporting a strong inference of any Defendant's scienter.**

  While the SAC does not allege a single false or misleading statement, Defendants address scienter at the outset because the Court found that issue to be dispositive as to the entire FAC in its September 29, 2022 Order and the SAC fails to remedy the deficiencies that led to that decision. (Dkt. 88 at 4-20.)  The failure to plead scienter is therefore still dispositive.

  Plaintiffs must "plead with particularity facts giving rise to a strong inference that defendants acted with scienter, which is 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 165 (N.D. Tex. 2007) (Godbey, J.).  To do this, Plaintiffs must, for each purportedly false and misleading statement, "explicitly and precisely set out why the statement was false or misleading and why *the speaker* knew (or recklessly disregarded the fact that) the statement was misleading."  *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 890 (S.D. Tex. 2017) (Rosenthal, C.J.) (emphasis added), *aff'd sub nom. Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019) (per curiam).  Courts must also discount allegations from confidential witnesses. *Jacobowitz v. Range Res. Corp.*, No. 4:21-cv-0751-P, 2022 WL 976003, at *16 (N.D. Tex. Mar. 31, 2022).

12

In evaluating scienter allegations, "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.'" *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (citation omitted). A "strong inference" requires that "a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007) (emphasis added).

**A.    The SAC largely recycles scienter allegations that the Court already rejected.**

The majority of Plaintiffs' scienter allegations simply parrot theories that the Court already rejected.

***Group Pleading.*** The SAC is still replete with group pleading allegations that fail to link information to any Individual Defendant.[8] As the Court already held, alleging that individuals must have known information because they held certain positions or were part of a particular group of employees is insufficient to allege a strong inference of scienter. (Dkt. 88 at 6 ("[I]t is well established that an officer's position on its own is insufficient to support an inference of scienter . . . barring special circumstances which are inapplicable here.")); *see Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). For instance, Plaintiffs' allegation that, based on Woods's position as CEO, he "knew or was severely reckless in not knowing that the Permian production goal . . . [was] false" is merely deficient position pleading. (SAC ¶ 268.) Likewise, an alleged

---

[8]    *Compare* SAC ¶¶ 27 (human resources department, management), 28 (upper management), 32 (management), 34 (senior management), 260 (management), 274 (senior management, Management Committee), 275-76 (Management Committee), 278 (Management Committee), 279 (senior management), 280 (Management Committee, senior management), 282 (Management Committee), 289 (Management Committee) *to* FAC ¶¶ 9, 162, 253-65, 267-70, 273, 276-80, 283-84, 288, 312-16.

"mandate not to take write downs" from the "Management Committee" fails to allege with particularity who purportedly instituted the "mandate" or when it was issued. (SAC ¶ 282.)

   ***Corporate Culture.*** Plaintiffs continue to generally allege that ExxonMobil had a corporate culture of refusing to take write-downs and that individuals were pressured to inflate reserves in the reserves process. (*Compare* SAC ¶¶ 165-67, 186, 188-90, 281-84 *to* FAC ¶¶ 253-55, 274-77.)[9] But this argument is a non sequitur. Plaintiffs' claims regarding the estimation of Proved Reserves relate to the company's annual process for estimating those reserves under the SEC's standards (including using historical prices rather than projected prices). (App. 64.) That is entirely different from asset impairment testing, which applies to all of ExxonMobil's assets (e.g., refineries, equipment, and Proved Reserves), follows a different set of accounting rules, and uses projected prices when assessing whether to write down Proved Reserves. (*E.g.*, App. 26-27, 64-66.) Accordingly, allegations about the culture surrounding impairment decisions are irrelevant. Of course, if Plaintiffs are alleging that ExxonMobil had a culture against lowering its estimated reserves during the annual booking process, that is demonstrably wrong. During the class period, ExxonMobil disclosed a "downward revision to proved reserves estimates" of approximately 1 billion oil-equivalent barrels in the first quarter of 2020. (App. 82.) *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (holding that courts may consider statements in SEC filings on a motion to dismiss).

   In any event, allegations based on "culture" do not support an inference of scienter. *See In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 117 (3d Cir. 2018) (holding that creating "an environment in which improper accounting practices flourished" is insufficient to allege scienter).

---

[9]   Plaintiffs' allegations regarding management's revisions of reservoir engineers' reserves estimates don't even support an allegation of "pressure." (SAC ¶¶ 77-85.) They support the opposite inference – an iterative process that well-run companies follow.

But this Court already recognized that Plaintiffs "still must connect each Defendant to the tone or culture issues." (Dkt. 88 at 7.) Plaintiffs have not connected Woods's statements about production goals to any pressure on employees to meet those goals. And Woods's purported statement in 2015 that "leaders influence culture" does not come close to pleading with particularity that Woods pressed employees to meet production goals or avoid write-downs. (SAC ¶¶ 281-84.)

*Common Knowledge.* Plaintiffs continue to assert that it was "common knowledge" or that "everyone thought" that the Permian production goal was purportedly not achievable. (*Compare* SAC ¶¶ 173, 243 *to* FAC ¶¶ 150, 215, 278-80.) But the Court already concluded that generic allegations of "common knowledge" that a goal was not achievable are "too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity." (Dkt. 88 at 7 (quoting *Callinan v. Lexicon Pharm., Inc.*, 479 F. Supp. 3d 379, 432 (S.D. Tex. 2020), *aff'd*, 858 F. App'x 162 (5th Cir. 2021)); *see also Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 681-82 (9th Cir. 2005) (holding allegation that information was "common knowledge" was insufficient); *Nardy v. Chipotle Mexican Grill, Inc.*, No. 17-cv-01760-WYD-STV, 2019 WL 3297467, at *16 (D. Colo. Mar. 29, 2019) (holding allegation that information was "widely known" was insufficient).

*Access to Information or Reserve Reports.* Plaintiffs continue to allege that Woods engaged in a year-end review, that he had "access" to data, and that Proved Reserves would be submitted for final signoff to senior managers. (*Compare, e.g.*, SAC ¶¶ 164, 183, 268, 271, 273, 280 *to* FAC ¶¶ 259-61, 262-66, 268-69.) Plaintiffs also now allege that Bond had "access" to data. (SAC ¶¶ 183-84.) Again, the Court already rejected these types of scienter allegations, recognizing that generic claims that Woods and Bond would have had access to data or that Woods or Mallon would have received or reviewed reports are insufficient to allege scienter as a matter of law. (Dkt.

88 at 12 (citing *In re Plains All Am. Pipeline, L.P.*, 307 F. Supp. 3d 583, 616 (S.D. Tex. 2018) (Rosenthal, C.J.)).)  In *Plains*, the plaintiff attempted to plead scienter by alleging that a regulation required specific executive officers, who were identified by name in the complaint, to review and verify specific data.  307 F. Supp. 3d at 640.  Nonetheless, the court concluded that "[a]lthough the plaintiffs have alleged specific reports and notices of regulatory violations, the allegations that the individual defendants received and reviewed these reports and notices are group allegations based on the defendants' positions.  These allegations fall short of the plaintiffs' burden under Rule 9(b) and the PSLRA."  *Id.*  Similarly, *Plains* rejected the argument that plaintiffs could allege scienter merely by claiming that defendants had access to information that contradicted public statements.  *Id.* at 616.

   ***Compensation or Stock Trades.***  Plaintiffs repeat the same deficient motive allegations regarding stock sales and compensation that the Court already rejected.  (*Compare* SAC ¶¶ 57, 115, 126, 262, 265-66, 285, 294 *to* FAC ¶¶ 294-98, 300-01); (Dkt. 88 at 14, 16-17).  The Court held that if incentive compensation sufficed, "the executives of virtually every corporation in the United States would be subject to fraud allegations."  (Dkt. 88 at 14 (quoting *Abrams*, 292 F.3d at 957.)  The Court also held that Mallon's stock trades were "not suspicious" because they were only 16% of his holdings and because other executives did not make trades.  (Dkt. 88 at 16.)  Plaintiffs' motive allegations against Woods have not changed.  As to Mallon, Plaintiffs now curiously allege that Mallon actually traded a lower percentage of his common stock than previously alleged – making any inference of motive even weaker.  (Dkt. 88 at 16.)  Plaintiffs also assert that Mallon was one of three insiders who disposed of the highest number of ExxonMobil shares from November 23, 2018, through November 22, 2019 (SAC ¶ 285), but they do not explain why that time range is relevant.

Plaintiffs' incentive compensation allegations fare no better.  Plaintiffs now allege that Mallon was incentivized to increase the NPV of the Delaware Basin to improve his annual performance review.  (SAC ¶¶ 265-66.)  But their generic allegation that Mallon's compensation was tied to "how much these numbers went up" fails to allege with particularity any actual metric that influenced his compensation.  (SAC ¶ 126.)  The Court already rejected similar allegations as a basis for scienter.  (Dkt. 88 at 14 (quoting *Abrams*, 292 F.3d at 434).)  Nor do Plaintiffs explain how Mallon's supposed incentive to inflate an undisclosed internal metric would translate into an incentive to mislead investors.

*Site Visits*.  Plaintiffs again plead that Woods's single visit to Carlsbad, New Mexico is somehow relevant to scienter.  (*Compare* SAC ¶¶ 286-87 *to* FAC ¶¶ 270-73.)  The Court already concluded that it is "implausible to infer that the site visit necessarily advised Woods of all the issues Plaintiffs allege."  (Dkt. 88 at 11 (citing *McNamara v. Bre-X Minerals, Ltd.*, 197 F. Supp. 2d 622, 695-97 (E.D. Tex. 2001)).)  In an effort to fix this, Plaintiffs now assert that Woods "tour[ed] a well site where directional drilling and hydraulic fracturing technologies [were] being employed, as well as a production site where oil and gas [were] separated and stabilized prior to transport and use."  (SAC ¶ 286.)  Those new allegations do not add anything of substance.  Plaintiffs do not allege that anyone expressed concerns to Woods about relevant issues on this visit or explain how he would have identified problems with drilling speeds, learning curve assumptions, or anything else while visiting this single site.  Similarly, Plaintiffs' new allegations that Bond traveled frequently to the Permian do not plead anything about what Bond might have seen or learned there.  (SAC ¶ 183; Dkt. 88 at 11.)

## B.    Plaintiffs have not alleged a strong inference that Woods made any actionable public statements with scienter.

Plaintiffs' allegations against Woods boil down to the theory that because an overly

17

optimistic learning curve assumption was purportedly used as one of many inputs in the Delaware Basin NPV calculation, Woods should have known that his statements about production goals, Proved Reserves, and the Resource Base must have been false and misleading. But Plaintiffs cannot connect the dots. They do not allege that anyone told Woods that any learning curve assumptions were incorrect. Plaintiffs try to bootstrap their way around that pleading failure with a variety of generalized scienter theories that the Court already rejected.[10] *See* Section I(A), *supra.*

Plaintiffs also theorize that Woods's statements about ExxonMobil's "understanding" of the Permian Basin or purported denials of problems in the Permian somehow demonstrate his scienter. (*Compare* SAC ¶¶ 289-91 *to* FAC ¶¶ 281-83.) The Court has already held that these "innocuous" statements do not support scienter. (Dkt. 88 at 11.) Plaintiffs now try to reframe these same statements as showing Woods's knowledge of production conditions in the Permian or the intricate details of the NPV calculation in the Delaware Basin. (SAC ¶¶ 288-89, 290, 292-93, 367.) But Woods was not referencing his own specific knowledge – he was speaking on behalf of the company generally. *ExxonMobil's* supposed knowledge about the Permian does not support an inference that *Woods* learned information that was inconsistent with his statements.

Plaintiffs' assertions that Woods purportedly "denied" there were problems in the Permian also fail to allege scienter. (*Compare* SAC ¶ 291 *to* FAC ¶¶ 284-88.) First, Plaintiffs' cited statements can barely be considered "denials." For instance, Plaintiffs cite Woods's response to analyst questions that ExxonMobil's "focus is on maximizing NPV for those developments and recovering the most resources in the most competitive way." (SAC ¶ 291.) Of course, every

---

[10] Plaintiffs allege "common knowledge" (SAC ¶¶ 267-68); position or group pleading allegations related to the investigation and termination of Burch and Gulden, the proved reserves estimate, and a "mandate" not to take write-downs (SAC ¶¶ 274, 275-76, 277, 280, 282); tone at the top or corporate culture allegations (SAC ¶¶ 282-84); a Permian site tour (SAC ¶¶ 286-87); and Woods's compensation structure (SAC ¶¶ 294-97).

company presumably tries to maximize the benefits of its assets.  If Plaintiffs could convert this generalized statement into scienter, then the strong inference requirement would be illusory.  At its core, this is a heads-I-win, tails-you-lose argument.  If Woods had stated that there were problems in the Permian Basin, Plaintiffs surely would have argued that this demonstrated scienter.  Instead, under Plaintiffs' theory, Woods's denial of problems also supports scienter.  Plaintiffs cannot have it both ways.[11]   If anything, Woods's statements were consistent with the Company's other statements, suggesting that he believed what he said.  *See Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 188 (5th Cir. 2019); *see also* Dkt. 88 at 11 (recognizing that failure to plead inconsistent statements fails to plead scienter).

Plaintiffs' timeline also undercuts any inference of scienter for Woods's March and April 2019 statements regarding the Resource Base estimate of 10 billion barrels and the daily production goal of one million oil-equivalent barrels.  (SAC ¶¶ 9, 107-09, 373-74.)  Plaintiffs allege that Woods stated the production goals were based in part on the 2018 development plan, which Plaintiffs assert was overly-optimistic.  (*E.g.*, SAC ¶ 299.)  But Plaintiffs never allege that anyone ever told Woods before he made these statements that the 2018 development plan or its assumptions had turned out to be inaccurate.

This leaves Plaintiffs' conjecture that Bond supposedly told Woods something – Plaintiffs do not say what – about the Delaware Basin's development plan in September or October 2019 during an alleged meeting between Bond, Woods, and Mallon.  (SAC ¶¶ 271-72.)  But, again, the Court already held that generic references to meetings are insufficient to establish scienter.  Rather, "Plaintiffs must be able to allege with particularity that Bond actually informed Woods that the

---

[11]   Plaintiffs also mischaracterize Woods's statement, alleging that Woods was describing "his" focus when he actually was speaking generally on behalf of the Company.  (App. 194.)

reports were being manipulated or that Woods was severely reckless as to their falsity." (Dkt. 88 at 12.) Unable to do so, Plaintiffs double down on new speculation from FE4 – a subsurface employee who was "deployed out to the Delaware Basin." But the best FE4 can do, even after pressure from Plaintiffs to supplement his or her statements from the FAC, is to guess that Bond *would have* made a PowerPoint presentation to Woods and Mallon, Bond *would have* presented information on the Permian to Woods, and Bond *would have* presented the Delaware assets' "curve" and NPV to Woods. (SAC ¶¶ 163, 182, 271-72.) But Plaintiffs do not allege that any such PowerPoint was actually prepared or presented, much less that FE4 ever saw it.

In fact, the Court already recognized that Plaintiffs had not explained in the FAC how FE4 would have specific knowledge of Bond's, Woods's, and Mallon's communications. (Dkt. 88 at 12 ("it is unclear from the pleadings how [FE4] would have specific knowledge of Bond's and Woods's communications").) The SAC doesn't explain this either. Accordingly, the Court should reject FE4's conjecture. *See Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 434 (5th Cir. 2019) (discounting allegations from confidential witness who did not have direct interaction with defendant); *Jacobowitz*, 2022 WL 976003, at *16 (discounting confidential witness allegations).

FE4 also does not, and cannot, explain how Woods or Mallon would have interpreted a purported $10 billion reduction in the NPV to mean that the production goals statements were false or misleading. Even if the Court credits FE4's statements, they do not support any inference of scienter. *See Edgar v. Anadarko Petroleum Corp.*, No. H-17-1372, 2019 WL 1167786, at *15 (S.D. Tex. Mar. 13, 2019)*, aff'd sub nom. Iron Workers Benefit & Pension Fund – Iron Workers Dist. Council Phila. & Vicinity v. Anadarko Petroleum Corp.*, 788 F. App'x 268 (5th Cir. 2019) (holding that plaintiffs cannot allege scienter by asserting that defendant attended some meetings

20

that discussed pressing issues, without alleging that the alleged contradictory facts to public statements were discussed).

Even if the Court credited FE4's speculation, the timeline does not support a strong inference of scienter for any of Woods's statements about the production goals. According to Plaintiffs, Bond was not on notice of any concerns with the learning curve assumptions until Burch raised them on October 23, 2019. (SAC ¶¶ 137-38, 158, 274.) But the purported meeting between Bond, Mallon, and Woods allegedly happened sometime "in either September or October." (SAC ¶ 271.) Plaintiffs do not provide a plausible reason to assume that the meeting FE4 assumes "would have" happened must have taken place only in the last seven days of this two-month window. Accordingly, they have failed to plead a strong inference that Woods learned of the purportedly inflated Delaware NPV or allegedly overly optimistic learning curve assumptions during the alleged meeting with Bond. *See Plains*, 307 F. Supp. 3d at 642 (noting that plaintiffs' scienter allegations failed because they did not adequately plead "that the individual defendants knew about the [purportedly contrary facts] *before* speaking" (emphasis added)).

Finally, Plaintiffs have not pled any particularized facts supporting a strong inference that Woods had reason to believe the Proved Reserves, Resource Base, or other generalized statements about the Permian were false or misleading. Plaintiffs do not allege that anyone raised concerns about these issues to Woods. Nor do they claim that someone (incorrectly) told Woods that the Planning Team's learning curve assumptions would somehow impact Proved Reserves reported by the GRRG. Plaintiffs don't even allege that those assumptions were used in the Proved Reserves or Resource Base. *See* Section III(C), (D), *infra*. Nor do Plaintiffs explain why Woods would believe that any of his statements about ExxonMobil's "reserves process," progress, and understanding of the Permian were purportedly false and misleading. (SAC ¶¶ 353, 362, 364, 373,

376, 388, 390.)  And Plaintiffs otherwise fail to connect any of these purported issues (*e.g.*, the alleged production problems in the Permian Basin or the "scrunching technique" to purportedly inflate the Proved Reserves through decline curves) to Woods other than through scienter theories this Court already rejected.  (*See, e.g.*, SAC ¶¶ 286, 280-81); Section I(D)(3), *infra*.

### C.     Plaintiffs have not alleged that Bond or Mallon made any actionable public statements with scienter.

Plaintiffs do not allege that Bond made any of the alleged public misstatements.  As to Mallon, Plaintiffs challenge only his June 18, 2019 statement that "[s]tarting with the Permian, we are on track to deliver on the million barrels a day by 2024.  We believe our innovative development plan is key to that and we continue to see and achieve the milestones that we set out for ourselves."  (SAC ¶ 384.)  But as with Woods, Plaintiffs' allegations about Mallon don't support a strong inference of scienter.[12]  Plaintiffs' remaining allegations do not allege a strong inference that Mallon knew any part of his June 2019 statement was false.

***Production Goals.***  Plaintiffs fail to allege that Mallon knew that the production goal was not achievable on June 18, 2019.  They don't allege that anyone ever told Mallon that Gulden, Burch, or anyone else believed the production goal was not feasible.  (SAC ¶¶ 24, 158.)  *See Plains*, 307 F. Supp. 3d at 642.  And Plaintiffs' allegations that Mallon told Bond in a March or April 2019 meeting to find ways to increase the $40 billion Delaware Basin valuation does not support any inference that in June 2019 he did not believe that ExxonMobil was "on track" to deliver one million oil-equivalent barrels a day by 2024 or that he did not believe ExxonMobil's innovative development plan was key to hitting that goal.  Plaintiffs do not provide any basis for their assertion

---

[12]  As discussed above, the recycled allegations regarding Mallon's compensation do not support a strong inference of scienter.  *See generally* Section I(A).  And Plaintiffs also fail to plead Mallon's scienter through the alleged meetings with Bond and Woods for the reason already discussed.  *See* Section I(B), *supra*.

about this alleged meeting. They neither attribute these allegations about this purported meeting to any witness nor plead how any of their witnesses would have been in a position to know whether Bond and Mallon met or what they may have discussed. Plaintiffs therefore fail to state with particularity the facts on which their allegation is formed. (Dkt. 88 at 4-5.) Furthermore, they don't explain how a reduced initial NPV would have alerted Mallon that the near-term production goals were not attainable.[13] Indeed, the more reasonable inference is that Mallon believed that ExxonMobil could have deployed additional rigs or employed more people to increase its production in the development plan. (SAC ¶ 119); *Tellabs*, 551 U.S. at 323-24.[14]

**ExxonMobil's Innovative Development Plan and Milestones.** Plaintiffs do not plead that ExxonMobil did not have an innovative development plan that it believed in or that ExxonMobil had not achieved its own set milestones, and thus don't plead any reason Mallon should not have believed his statement. To the contrary, Plaintiffs' allegations show that ExxonMobil was meeting, if not exceeding, its production estimates in June 2019. (SAC ¶ 365.) And Plaintiffs never assert that ExxonMobil failed to disclose accurate historical production figures.

### D. Plaintiffs have not alleged that Mallon and Bond intended to defraud the public by furnishing false information for use in public statements.

Unable to point to any misleading public statements by Mallon or Bond, Plaintiffs assert that Mallon and Bond knowingly furnished false information for use in public filings. Their allegations fail on multiple levels.

---

[13]  Plaintiffs' allegations that Mallon reviewed reserves and rejected write-downs to them have nothing to do with his statement about ExxonMobil's production goals. (SAC ¶ 126.)

[14]  To the extent Plaintiffs may now claim ExxonMobil did not have sufficient rigs, manpower, or infrastructure to meet its goals, they fail to allege a basis for that speculation. (SAC ¶¶ 206-12.)

### 1. Plaintiffs do not allege that Mallon and Bond furnished any information for use in public statements.

The Court previously rejected Plaintiffs' theory that Bond acted with the requisite scienter to "furnish" information to ExxonMobil for use in public statements, emphasizing that Bond "is not an executive and is several levels removed from the employees at the top of the reporting structure who interact with investors." (Dkt. 88 at 19-20.) The Court concluded that "Bond's role in the production of allegedly false records does not constitute furnishing information so as to make her a speaker of the disputed statements, and thus her scienter could not be imputed to ExxonMobil if established." (Dkt. 88 at 20.) None of Plaintiffs' new allegations fixes these deficiencies. Plaintiffs still allege that Bond was allegedly responsible for learning curve assumptions, and Plaintiffs still do not allege that Bond is an executive or otherwise a "speaker." (*E.g.*, SAC ¶¶ 45, 310.)

Plaintiffs also fail to allege with particularity that Mallon "furnished" any information for use in a public statement. The closest Plaintiffs come are their unsupported assertions that Mallon "approved" the Delaware development plan NPV and that he had to approve changes to reserves. (SAC ¶¶ 278, 280, 313.) But if Bond did not furnish information through her involvement with the Delaware development plan, then Mallon's approval is even more tenuous. There's not a single allegation in the SAC that Mallon sent or provided information related to learning curve assumptions to anyone at ExxonMobil. Indeed, allegations of "approval" without allegations that he was involved in the actual production or delivery of the figures are not sufficient. *See In re Tupperware Brands Corp. Sec. Litig.*, No. 6:20-cv-357-GAP-GJK, 2021 WL 6755476, at *4 (M.D. Fla. Aug. 9, 2021) (rejecting allegation that "approv[ing]" sales figures was sufficient to allege furnishing because plaintiffs "do not detail [employee's] role in preparing the financial statements and whether he had any hand in supplying those figures for inclusion in the public statements").

Likewise, Plaintiffs' conclusory allegations that Mallon "had to approve any adjustments to Exxon's reserves reporting" and that "there were times" when Mallon rejected requests to adjust the reserves are wholly inadequate to infer that he intentionally or recklessly furnished inaccurate information for the Proved Reserves. (SAC ¶¶ 43, 73.) Plaintiffs fail to identify a single individual who went to Mallon, the size of any alleged requested write-down, the date any such request was made, the contents of the discussion, why any write-down was actually justified, or whether any allegedly requested write-down was even related to the Permian Basin. There's no basis to infer that one of these "times" occurred during the Class Period, that Mallon's alleged decisions were improper at all, let alone knowingly so, that the GRRG even disagreed with Mallon, or that the Proved Reserves were materially misstated as a result. These conclusory allegations do not allege scienter. *See Edgar*, 2019 WL 1167786, at *10 (dismissing scienter allegations that defendant knew of information when plaintiffs failed to allege when meeting took place, what was discussed, and whether specific concerns were relayed to the speaker).

Plaintiffs try to mask these pleading failures by conflating the Delaware NPV valuation, production goals, Proved Reserves, and Resource Base. (SAC ¶¶ 298, 299, 303, 309, 312-13.) But as explained in the following sections, nowhere do Plaintiffs allege any particularized facts indicating that Mallon or Bond specifically had reason to believe, based on information that they received, that the Planning Team's learning curve assumptions would have been disclosed or even embedded in a public filing.

> **2.     Plaintiffs do not allege that Mallon and Bond furnished the internal valuation's learning curve assumptions to anyone, let alone furnished them for use in ExxonMobil's statements about production goals.**

As a matter of logic, Bond and Mallon could not have furnished information for use in particular public statements if they provided the information after those statements were made. Woods's March 6 and April 26, 2019 statements about ExxonMobil's one million oil-equivalent

barrel production goal and increase in the Resource Base were purportedly based on the 2018 development plan. (SAC ¶¶ 23, 52, 122-24, 310-11.) But Plaintiffs allege the purportedly overly optimistic learning curve assumptions were in the *2019* plan. (SAC ¶¶ 300-04.) Plaintiffs then allege that Bond and Mallon finalized learning curve assumptions for the 2019 development plan in August 2019. (SAC ¶¶ 131, 263.) Mallon and Bond could not have furnished the August 2019 learning curve assumptions for Woods's use in the earlier March and April 2019 statements.

Plaintiffs' theory also reverses the causal relationship. The SAC alleges that *after* ExxonMobil disclosed its production goals in the Permian, Mallon and Bond adjusted the internal Delaware NPV to match those goals. (*E.g.*, SAC ¶ 12.) But that allegation doesn't show that Mallon or Bond provided any information that was used for the public production estimates. To the contrary, it suggests that any alleged adjustment of internal figures happened *after* the challenged statements about production goals. Furthermore, Plaintiffs have never explained how someone would have interpreted a lowered valuation to mean that a near-term production goal was unattainable.

Plaintiffs' attempt to assert the August 2019 valuation was furnished to support Woods's references on March 5, 2020, to a "development plan" also fails. (SAC ¶ 310.) Plaintiffs assert that Woods was talking about the Permian Basin production goal when he said that "it is an outcome of the plans that we've put together." (App. 225.) But Woods was discussing global production plans, not plans specific to the Permian Basin. (App. 225.) And he did not state that his assessment was based on the 2019 valuation of the Delaware assets. (App. 225.) This circumstantial evidence is insufficient to plead with particularity that Bond and Mallon actually provided any information that Woods used or purportedly relied upon in making his statement.

Finally, even if Plaintiffs had sufficiently alleged that Mallon had furnished information

26

for use in a public statement, they have not alleged that he did so with intent to defraud investors. (SAC ¶ 265.)  They contend that Mallon acted to maximize his bonus – but this Court has already rejected a similar claim that scienter was pled by allegations that an employee falsified records to make her department appear well managed and efficient.  (Dkt. 88 at 20 (citing *Rains v. Zale Corp.*, No. 3:09–CV–2133–B, 2011 WL 3331213, at *5 (N.D. Tex. Aug. 1, 2011)).)  Another court recently rejected a similar claim based on allegations that an employee's scienter could be imputed to the company where the employee had allegedly provided information about a cancelled contract that "rolled up" to speakers who then supposedly misrepresented the contract's status.  *See Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, No. 20-CV-00054-SPF-JFJ, 2022 WL 377415, at *26 (N.D. Okla. Jan. 7, 2022) (applying Fifth Circuit law).  The court rejected this theory, holding that the plaintiffs' allegation that the employee was trying to make himself look better by showing better numbers to the company's executive team did not suggest he was trying to defraud investors.

> **3.    Plaintiffs do not plead with particularity that Mallon or Bond knew that the GRRG would use the Planning Team's learning curve assumptions when generating the Proved Reserves estimate or the Resource Base.**

Plaintiffs generally assert that Mallon and Bond knew that ExxonMobil's public statements about the Proved Reserves and Resource Base were based on the Planning Team's development plan. (SAC ¶ 70.)  But conclusory assertions of knowledge do not allege scienter as a matter of law.  *See Shaw Grp., Inc.*, 537 F.3d at 539 (holding that merely stating defendants knew is insufficient to allege scienter).

In fact, Plaintiffs' allegations show that the most compelling inference is the opposite: the NPV and the internal-planning learning curve assumptions are developed on a completely separate track from the Proved Reserves and Resource Base.  Plaintiffs allege that ExxonMobil's Proved

Reserves are generated by the GRRG, not the Planning Team. (SAC ¶¶ 43, 71, 74-83, 278.) They do not allege that Bond, Mallon, or anyone in the Planning Team sent any learning curve assumptions to the GRRG for use in generating Proved Reserves estimates. Nor do they allege that Mallon, while directly supervising Ducharme as head of the GRRG, ever ordered the GRRG to use the allegedly inflated NPV of the Delaware Basin assets or any particular learning curve assumptions. (SAC ¶¶ 278-280.)

Plaintiffs' witness Andrew Rhodes also underscores their leap in logic. When he described the alleged process for estimating Proved Reserves, he stated that the "group of individuals responsible for reviewing reserves would put a report together at year-end that reflected the reserves in the Permian Basin and any change from the prior year and review that report with the reservoir engineers." (SAC ¶¶ 75-77, 83.) Rhodes knew reservoir engineers in the Delaware and the Permian Basins. (SAC ¶¶ 81-82.) Yet Rhodes's explanation of the reserves process does not mention Bond, Mallon, or any alleged use of the Planning Team's learning curve assumptions in the Proved Reserves estimates. He claims only that there was unidentified pressure to "scrunch" *decline* curves. (SAC ¶¶ 84-94.) Decline curves predict the production for a well once it has been drilled and completed. (SAC ¶¶ 184-85.) They are unrelated to learning curve assumptions. (*See, e.g.*, SAC ¶ 128.)

Plaintiffs' theory that Mallon and Bond furnished information for the estimation of the Resource Base is even more tenuous. They allege that the Resource Base was inflated because the Proved Reserves were inflated. (SAC ¶ 66.) But because Plaintiffs have not alleged with particularity that Mallon or Bond furnished learning curve assumptions to the GRRG for use in generating Proved Reserves estimates, it also follows that they also have not alleged with particularity that Mallon or Bond furnished learning curve assumptions for use in estimating the

28

Resource Base.  And more fundamentally, Plaintiffs do not explain why Mallon or Bond – or anyone familiar with reserves – would believe that an assumption about how quickly ExxonMobil would increase its drilling speed would affect an estimate of the volume of hydrocarbons that might ultimately be recovered.

### 4.   Plaintiffs have not alleged that Bond and Mallon knew of any concerns about Woods's April 26, 2019 statement until October 2019.

Plaintiffs' core theory rests on the allegations from Gulden and Burch regarding learning curve assumptions and their impact on the NPV.  Plaintiffs do not allege that Gulden, Burch, or anyone else raised concerns to Bond about the Delaware NPV until October 23, 2019 – two months after the 2019 NPV was finalized.  (SAC ¶ 158.)  In the absence of particularized allegations that Bond was aware of specific concerns *before* the valuation was finalized or before she purportedly met with Woods and Mallon in September or October 2019, Plaintiffs cannot carry their burden to plead the requisite "strong inference of scienter."  *Plains*, 307 F. Supp. 3d at 642.

### E.   Plaintiffs have not alleged that Woods or Mallon were involved in the investigation arising out of Gulden and Burch's concerns or their subsequent termination.

Plaintiffs do not plead that Woods or Mallon were actually aware of Gulden and Burch's internal HR complaints, ExxonMobil's internal investigation, and the later termination of Gulden and Burch.  Instead, they merely allege "on information and belief" that Mallon and Woods were aware of the investigation and Woods approved their terminations.  (SAC ¶¶ 144, 154, 275, 277.) "[C]ourts pay careful attention to allegations made on information and belief, as Plaintiffs have done here, to ensure that they have carried their burden to 'state with particularity *all facts on which that belief is formed*.'"  (Dkt. 88 at 5 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).)  Here, there are no such facts.  Plaintiffs' "information and belief" allegations are nothing more than repackaged group pleading and position pleading, which fail to

29

allege scienter as a matter of law.  (Dkt. 88 at 5-6.)

**F.    A holistic review of Plaintiffs' scienter allegations does not support a strong inference of scienter.**

Combining Plaintiffs' disparate insufficient scienter allegations does not plead a cogent and compelling inference that Defendants acted with the intent to defraud investors.  "The question is whether 'all of the facts alleged, taken collectively, give rise to a strong inference of scienter.'" *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) (quoting *Tellabs*, 551 U.S. at 323); Dkt. 88 at 10-12.  "'[T]he court must take into account plausible opposing inferences,' including 'plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'"  *Izadjoo*, 237 F. Supp. 3d at 518 (quoting *Tellabs*, 551 U.S. at 323-34)

As explained above, Plaintiffs largely rely on generic, non-particularized allegations about what the Individual Defendants "must have" known.  The handful of specific allegations they purported to rely on actually underscore the gaps in their factual allegations.  Taken together, Plaintiffs' scienter allegations amount to nothing more than citations to unrelated and disparate internal ExxonMobil planning metrics to cobble together a nonexistent conspiracy.  *See, e.g.*, *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 436 (S.D.N.Y. 2010) (holding that failure to provide information such as "connection between [internal] reports and the misstatements at issue" is "fatal" to scienter allegation).  These allegations do not support a strong inference of scienter.

**II.    Plaintiffs fail to allege scienter for the unattributed statements.**

Plaintiffs cite various press releases and Summary Annual Reports without attributing the statements in those documents to any Individual Defendant – or to any speaker whatsoever.  (SAC ¶¶ 345, 349, 370-71, 378, 380, 382.)  Instead, Plaintiffs generically plead that a "Summary Annual

Report stated" or that "Exxon stated." (*E.g.*, SAC ¶¶ 345, 370-71, 378, 380.) But to impute liability to a corporate defendant under Section 10(b), the individual corporate officer making the statement must have had the requisite scienter. *See Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 365-66 (5th Cir. 2004); *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 595-96 (N.D. Tex. 2021); Dkt. 88 at 20 n.6. As a corollary, Plaintiffs cannot impute scienter to ExxonMobil by pleading that the Company was generally aware that the information was false. *Southland*, 365 F.3d at 366. Plaintiffs must tie unattributed statements to a particular officer. *See id.* at 364-65. Because they fail to do so, the claims based on these statements must be dismissed. *See Plains*, 307 F. Supp. 3d at 627-28; *see also Edgar*, 2019 WL 1167786, at *9-11.

## III.    Plaintiffs have not alleged that Defendants made any actionable misstatements or omissions.

"SEC Rule 10b–5, implementing section 10(b) of the Securities Exchange Act, prohibits the making of any 'untrue statement of a material fact' or the omission of any 'material fact "necessary in order to make the statements made . . . not misleading.'" (Dkt. 88 at 20-21 (quoting 17 C.F.R. § 240.10b–5).) To state a claim under Section 10(b), and Rule 10b–5, Plaintiffs "must plead (1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries." *Southland*, 365 F.3d at 362. The PSLRA requires Plaintiffs to plead these claims with particularity. *Knutson v. Harris*, No. 3:17-CV-2618-BK, 2018 WL 4281557, at *3 (N.D. Tex. Sept. 6, 2018). The PSLRA incorporates the particularity requirements of Federal Rule of Civil Procedure 9(b), which "requires complaints alleging fraud or mistake to state claims with particularity, or set forth 'the "who, what, when, where, and how" of the events constituting fraud or mistake.'" (Dkt. 88 at 4 (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008)).) And "courts pay careful attention to allegations made on information and belief, as Plaintiffs have done here, to

ensure that they have carried their burden to 'state with particularity *all facts on which that belief is formed*.'"  (Dkt. 88 at 4-5 (quoting *ABC Arbitrage*, 291 F.3d at 350 (quoting 15 U.S.C. § 78u-4(b)(1)) (emphasis in original)).)

### A. Statements purportedly related to ExxonMobil's net present value calculation for the Delaware Basin assets are not actionable.

According to Plaintiffs, ExxonMobil's 2019 estimate that the Delaware assets were worth $50 billion was inflated because it allegedly incorporated unrealistic learning curve assumptions. (*E.g.*, SAC ¶ 341.)  But Plaintiffs do not identify a single instance in which ExxonMobil publicly disclosed the NPV calculation.[15]

### B. The Court correctly dismissed ExxonMobil's statements regarding its production goals.

#### 1. Statements based on "learning curve assumptions" are protected by the PSLRA safe harbor.

All but one (SAC ¶¶ 390-91) of Plaintiffs' allegations rely on their contention that ExxonMobil's "'learning curve' drilling assumption[]" was "inflated" or "false."  (SAC ¶¶ 346, 348, 350, 352, 354, 356, 358, 360, 363, 366, 368, 372, 374, 375, 377, 379, 381, 383, 385, 387, 389, 393, 395, 397, 399, 401.)  But "'statement[s] of the assumptions underlying or relating' to a declared objective are also deemed to be forward-looking statements."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (alteration in original) (quoting 15 U.S.C. § 78u-5(i)(1)(D)) (cited by Dkt. 88 at 24); *see also Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591 (N.D. Tex. 2004) (Godbey, J.) (holding that "statements of the plans and objectives of management for future operations" are forward-looking statements).  Because this assumption concerned ExxonMobil's

---

[15]  Plaintiffs allege in passing that "Burch's analysis revealed a lower NPV than what Exxon had disclosed publicly."  (SAC ¶ 158(e); *see also* SAC ¶ 24.)  But the SAC does not actually allege that ExxonMobil ever disclosed the Delaware Basin's NPV.  (*See* SAC ¶¶ 344-401.)

ability to improve its operations in the future, any statements that were allegedly false or misleading because of that assumption are also forward-looking statements. *See Wochos*, 985 F.3d at 1192. As the Court has already recognized, every statement Plaintiffs identify was accompanied by meaningful cautionary language. (Dkt. 88 at 22-24; App. 9-12, 22, 40-42, 58, 85, 88, 94, 143-44, 146-47, 149, 151, 154-56, 162-63, 166-67, 169, 176, 182, 188, 191, 199, 202, 214, 222, 228.) Plaintiffs also failed to plead any Defendant's actual knowledge of falsity. *See generally* Section I, *supra*. Accordingly, all of the statements that Plaintiffs allege were false because of learning curve assumptions fall within the PSLRA safe harbor.

### 2. Production goals are classic forward-looking statements under the PSLRA's safe harbor.

The Court already dismissed the following statements, holding that ExxonMobil's statements that Permian production was "on plan" or "on track" to produce one million oil-equivalent barrels per day by 2024 are protected forward-looking statements:

- The "green blob" slide reflecting the 1 million barrels per day production goal and stating "Production on plan." (SAC ¶ 365.)

- That ExxonMobil was "clearly on track" to achieve its production goal. (SAC ¶ 388.)[16]

- Statement that production volumes "remain on track to exceed 1 million oil-equivalent barrels per day by 2024." (SAC ¶ 398.)

(Dkt. 88 at 25-27.) Despite the Court's order, Plaintiffs reallege these statements. The SAC also challenges the following nearly identical statements:

- Statements that ExxonMobil was "on track to deliver on the million barrels" and making "very good" and "strong" progress, was "exceeding" its "expected progress," believed that its Resource Base was "likely to grow further," and its production outlook "ha[sn't] changed." (SAC ¶¶ 362, 364, 373, 384, 390.) These are also forward-looking statements because they "merely . . . declare[] or reaffirm[] the objective itself." (Dkt. 88 at 24 (citing *Wochos*, 985 F.3d at 1192).)

---

[16]    "On track" statements in Paragraph 388 are also nonactionable puffery. (Dkt. 88 at 32-33.)

- Statements that ExxonMobil "expected" to achieve its production goals and "growth plans," had "revised its Permian Basin growth plans," and "continue[d] to see and achieve the milestones that we set out." (SAC ¶¶ 361, 364, 373, 384.) ExxonMobil's statements that it planned to hit a new goal in the future are the very definition of forward-looking statements. *See id.*; *see also Parker v. Hyperdynamics Corp.*, 126 F. Supp. 3d 830, 853 (S.D. Tex. 2015) (noting that statement that company had goal to begin drilling a well before the end of the year was a forward-looking statement).

The safe harbor contains two disjunctive prongs, each of which independently protects these forward-looking statements. (Dkt. 88 at 21 (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B).)  As to the first prong, ExxonMobil accompanied its statements about production goals and progress toward those goals with meaningful cautionary language by referring the audience to its "cautionary statement" and "additional information on factors that may affect future results." (App. 222, 228; *see also* App. 9-12, 22, 40-42, 58, 85, 88, 94, 143-44, 146-47, 149, 151, 154-56, 162-63, 166-67, 169, 176, 182, 188, 191, 199, 202, 214.)  Here, the warnings describe the risks that Plaintiffs allege actually materialized, "demonstrating the 'fit between the disclaimer and the challenged forward-looking statement' that the PSLRA requires." (Dkt. 88 at 23 (citing *Carlton v. Cannon*, 184 F. Supp. 3d 428, 455 (S.D. Tex. 2016)).)  As to the second prong (actual knowledge), Plaintiffs have not alleged with particularity that any speaker actually knew that the statements were false. *See generally* Section I(B)-(C), *supra.*  Instead, Plaintiffs have failed to plead a strong inference of scienter as to any Individual Defendant.  Accordingly, these statements are protected for the same reasons as the other forward-looking statements. (*See generally* Dkt. 88 at 22-23.)

### 3. Plaintiffs have not alleged with particularity that any of the statements that accompanied the production goals were materially misleading.

The Court already held that certain other statements that ExxonMobil made in conjunction with the production goals were statements of present fact that could potentially be actionable if they were false or misleading. (Dkt. 88 at 26-27.)  Plaintiffs generally allege that these statements were false because they were based on unrealistic learning curve assumptions.  If that's their theory,

it is an improper attempt to circumvent the safe harbor protections.  *See generally* Section III(B)(1), *supra*.  Plaintiffs cannot fix this problem by alleging that the statements are actually false or misleading either.  As explained below, they have not alleged falsity with particularity either.

*Statements about "accelerating" value or operations.*  (SAC ¶¶ 361-62, 376.)  Plaintiffs allege the following statements are actionable:

- "[W]e made very good progress on . . . . key focus areas," including "accelerated value capture in the Permian."  (SAC ¶ 362.)

- ExxonMobil "revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024—an increase of nearly 80 percent and a significant acceleration of value."  (SAC ¶ 361.)

- ExxonMobil "accelerated operations in the Permian Basin in Texas and New Mexico." (SAC ¶ 376.)

The Court previously held that the first statement suggested that ExxonMobil was extracting resources in the Permian faster than it had been before.  (Dkt. 88 at 26.)  Plaintiffs now allege that all three statements were misleading because they were not supported by the actual drilling times.  But Plaintiffs have not alleged any facts suggesting that as of the time these statements were made, ExxonMobil was not producing more hydrocarbons than it previously had.

Moreover, Plaintiffs never allege that ExxonMobil failed to "accelerate[] operations" in the Permian in 2017 or 2018.  They allege only that "Exxon's drilling times were *slower than expected*."  (SAC ¶¶ 376-77) (emphasis added.)  But whether drilling times were slower than expected is different from whether they were slower than historical rates.

*"Increased" production volumes.*  Plaintiffs also failed to allege any facts suggesting that ExxonMobil's March 5, 2020 statement that production volumes "increased" over some

unspecified period of time was false and misleading.[17]  (SAC ¶ 398.)  They do not, and cannot, allege that production had not increased: the SAC includes a slide from the Q4 2019 earnings call which shows that production was increasing.  (SAC ¶ 388.)

*ExxonMobil's development of resources to maximize recovery.*  Plaintiffs challenge Woods's statement that ExxonMobil:

> didn't go out [and] say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that.  What we ended up saying is, develop the resource in a way that we think maximizes the recovery is a very grassroots buildup from the beginning of the fundamentals.  And then once we've figured out what was the optimal development of that, we stacked at the volume to see what it came out to be, and that was what it came out to be.

(SAC ¶ 386.)

First, ExxonMobil's generalized description of how it was developing the Permian is too vague to be material.  (*See* Dkt. 88 at 32 (statement that ExxonMobil drills in an "optimized" way is unactionable puffery).)  Plaintiffs attempt to avoid that result by alleging that this statement was misleading because the production *goal* was based on learning curve assumptions.  (SAC ¶ 387.) But that theory merely critiques ExxonMobil's plans and objectives for future operations, which are protected by the safe harbor.  *Taubenfeld*, 385 F. Supp. 2d at 591 (Godbey, J.).

Second, Plaintiffs leave out essential context surrounding this statement.  Immediately after the snippet that Plaintiffs cite, Woods continued: "We're trying to sustain an economic return.  And so . . . . if that means sustaining the million barrels, we'll do that.  If that means coming off a million barrels, we'll do that as well."  (App. 196.)  So investors understood that the production goal was less important than maximizing the recovery.  This context undercuts any suggestion of

---

[17]  The press release stated that Woods had "outlined progress on key projects that support[ed] ExxonMobil's growth plans, including: . . . .  In the Permian Basin, production volumes increased and remain on track to exceed 1 million oil-equivalent barrels per day by 2024."  (SAC ¶ 398.)

36

materiality.  *See generally Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611, 620 (N.D. Tex. 2009) (noting that to determine whether a statement is materially false or misleading, it must be read in context), *aff'd*, 389 F. App'x 354 (5th Cir. 2010).

**ExxonMobil's characterization of its global production goals as based on "our best assessment."**  Plaintiffs allege that this statement was false because the goals were aspirational based on learning curve assumptions.  (SAC ¶ 400.)  Of course, aspirational goals are by definition forward-looking statements.  (*See* Dkt. 88 at 25 (holding that "the goal of full-year production exceeding 1 million gallons was 'clearly forward looking'" (quoting *Carlton*, 184 F. Supp. 3d at 495)).)  Moreover, Woods was describing ExxonMobil's overall production goal across all its investments worldwide – not the Permian in particular.  (App. 225.)  Plaintiffs do not explain how an allegedly improper use of one assumption in one area made a general statement about the global production goals false or misleading.

In any event, investors do not rely on generalized puffing statements like this.  *See In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ. 11278(DLC), 2009 WL 4823923, at *11 (S.D.N.Y. Dec. 14, 2009) (holding that statement that company was "committed to best practice in preparing its financial statements" was puffery); (Dkt. 88 at 32-33 (statement that ExxonMobil has the "best wells" is unactionable puffery)).

**Woods's March 2019 statements about delineating and understanding the resource as it had done in 2018 so it could "unleash the hounds."**  (SAC ¶¶ 367-69.)  Plaintiffs generally allege that the following statement was false or misleading because ExxonMobil could not meet its production goals:

> what we've done in 2018 and we will continue to do in 2019 is an element of delineation, of understanding the resource, a lot of building the infrastructure such that when we bring those wells on, we have evacuation and we have separation facilities in place.  That's what we've been doing in 2018.  We'll do more of that in

2019.  Once this all [sic] in place, then we can unleash the hounds.

(SAC ¶¶ 367-69.)

But Woods was merely describing the steps that ExxonMobil was taking to develop the

Permian – and Plaintiffs don't allege that ExxonMobil wasn't taking these steps.  To the extent

Plaintiffs are alleging that ExxonMobil should have stated that its preparations would fail,

Defendants had "no duty to cast [their] business in a pejorative, rather than a positive, light." *Ezra

Sholom*, 504 F. Supp. 2d at 162 (Godbey, J.) (citation omitted).  And Woods's conclusion – that

ExxonMobil planned to "unleash the hounds" after "this is all in place" – is a general statement of

corporate cheerleading that no reasonable investor would rely on.  (Dkt. 88 at 33 (citing *Police &

Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019)).)

### C.    Plaintiffs have not alleged with particularity that the Proved Reserves were materially misleading.

The Court previously dismissed Plaintiffs' claims based on Proved Reserves for failure to

allege scienter but concluded that Plaintiffs had sufficiently alleged that the Proved Reserves were

materially misstated.  (Dkt. 88 at 29-31.)  The FAC's allegations largely stitched together a variety

of disparate allegations without providing the context for their central claim regarding the learning

curve assumptions.  But the SAC's additional allegations regarding Burch and Gulden now make

clear that Plaintiffs have not alleged with particularity that the Proved Reserves were actually

misstated.  The backbone of Plaintiffs' case is ExxonMobil's alleged use of certain learning curve

assumptions to estimate the Proved Reserves – but none of their sixteen witnesses states that this

actually happened.  Instead, Plaintiffs rely on a daisy chain of unreasonable inferences.  They

allege that proved undeveloped reserves are recognized only if "a development plan has been

adopted indicating that the reserves are scheduled to be drilled within five years."  (SAC ¶ 50; *see

also* SAC ¶ 339.)  Then they allege that ExxonMobil stated at the end of 2019 that its Proved

38

Reserves in the Permian were "supported by ExxonMobil's growth plan, including increased drilling activity." (SAC ¶ 340.) But ExxonMobil actually made those statements in *February 2018 and February 2019* – long before the alleged internal debate over learning curve assumptions associated with the 2019 valuation. (SAC ¶ 70.)

Plaintiffs also failed to plead with particularity that learning curve assumptions in the Planning Team's "development plan" were used to generate the Proved Reserves estimate. Nor can they – the GRRG did not follow all of the same assumptions contained in the Planning Group's development plan, but rather modified the assumptions to conform to the SEC's mandates on estimating Proved Reserves. Most importantly, the Proved Reserves are estimated using *existing* operating methods and a 12-month average price during the period *preceding* the date of the annual report. *See* 17 C.F.R. § 210.4-10(a)(22). But learning curve assumptions are an attempt to predict *future* operating conditions; they could not be used in the Proved Reserves estimate, which is based on *existing* operating conditions. (SAC ¶¶ 49-50, 128, 158.) Plaintiffs do not cite any facts suggesting that ExxonMobil incorporated any particular learning curve assumptions regarding drilling speed when estimating Proved Reserves. Similarly, Plaintiffs assert that the Planning Team's development plan uses "assumed commodity prices" (SAC ¶ 119) while Proved Reserves are required to be based on historical pricing. *See* 17 C.F.R. § 210.4-10(a)(22)(v). Accordingly, Plaintiffs have failed to plead with particularity that learning curve assumptions were actually used in the Proved Reserves estimate.

Plaintiffs' reliance on witnesses to assert other, unrelated alleged problems with the reserves estimate can't fill the gap – particularly when the alleged problems are anecdotal. By that logic, a plaintiff could argue that a multinational company's periodic customer complaints in one country meant that customers worldwide were dissatisfied. None of these witnesses is alleged to

have actually helped prepare reserves estimates for the Permian.  (SAC ¶¶ 165-68.)  Andrew Rhodes allegedly worked in the Arkoma Shale.  (SAC ¶¶ 80, 97.)  FE3 worked on "North Dakota assets" and stopped working as a reservoir engineer more than a year before the class period started.  (SAC ¶¶ 92-94.)  The PSLRA does not permit securities plaintiffs to bring claims based on the loose speculation of persons who were not in a position to know the actual facts.  *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 389 (S.D. Tex. 2011) (citing *Shaw Grp.*, 537 F.3d at 535 & *ABC Arbitrage*, 291 F.3d at 353), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012).

Finally, Plaintiffs' inability to link any purported learning curve assumptions to the Proved Reserves estimate also underscores why they have not pled that ExxonMobil materially misstated its global or unconventional Proved Reserves.  (SAC ¶¶ 351-52, 355-56, 378, 392-93.)  Without quantifying how any alleged improper estimation of Proved Reserves in the Permian would materially affect the overall reserves statements, Plaintiffs have not alleged, and cannot allege, that any misrepresentations were material.  *See Jacobowitz*, 2022 WL 976003, at *11-12 (holding that plaintiff's failure to estimate how much the figures he alleged were false were inflated and to provide a "standard of comparison to what the correct numbers would have been" did not satisfy the PSLRA's heightened pleading requirements for materiality (quoting *Shaw Grp., Inc.*, 537 F.3d at 536)); *see also Coates v. Heartland Wireless Commc'ns, Inc.*, 55 F. Supp. 2d 628, 639 (N.D. Tex. 1999) (holding that securities fraud claim was defeated by failure to allege "specific financial information that would allow the inference" that a $5.2 million write-down of receivables was actually material to the company's total financial picture).

### D.   Plaintiffs have not alleged with particularity that ExxonMobil misrepresented the Permian's Resource Base.

ExxonMobil's Resource Base consists of "proved reserves, *plus* other discovered resources

that are expected to be *ultimately* recovered." (SAC ¶ 51 (emphasis added).) It does not depend on when ExxonMobil will produce the hydrocarbons. In other words, Proved Reserves are like a piece of pie and the Resource Base is the whole pie. Plaintiffs do not argue otherwise. Instead, they illogically allege that ExxonMobil's Resource Base figures were "materially overstated" because they included overstated Proved Reserves. (SAC ¶¶ 7, 60, 66.) This makes no sense. Changing the size of a single piece of pie cannot affect the size of the entire pie. Similarly, while the speed at which hydrocarbons are extracted may affect which part of the Resource Base is attributed to Proved Reserves, Plaintiffs do not explain how it could possibly affect the total Resource Base. And as with the Proved Reserves, Gulden and Burch apparently did not tell Plaintiffs' counsel in their interview that the Resource Base was inflated. Instead, Plaintiffs rely on a statement from OSHA's report:

> On April 26, 2019, Exxon filed an SEC Form 8-K in which it claimed: "ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024. The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue." Dr. Gulden and Dr. Burch *believed* this statement was not accurate and they informed management about the misleading SEC filings.

(SAC ¶ 158(c) (emphasis added); *see also id.* ¶¶ 23, 311.)

In fact, in this statement, OSHA identifies two statements in the 8-K – one about production goals and one about the Resource Base – and states that Burch and Gulden "believed" that "this statement" was not accurate. There is no basis to infer that their "belief" related to the Resource Base. To the contrary, the SAC's specific allegations make clear that they were focused on production goals. (*E.g.*, SAC ¶¶ 132, 134, 140, 141, 158(d)-(g).) And Plaintiffs do not explain why Burch and Gulden would have believed that learning curve timing assumptions could affect the size of the Resource Base as a whole. This threadbare allegation is not enough to satisfy the requirements of the PSLRA because Plaintiffs do not explain how or why this resource base figure

41

was false or misleading.  *See Jacobowitz*, 2022 WL 976003, at *11-12.[18]

### E.    Statements regarding ExxonMobil's rigorous or disciplined reserves process are immaterial puffery.

Plaintiffs have likewise failed to plead that any statement related to ExxonMobil's rigorous or disciplined reserves process was actionably misleading.  (SAC ¶¶ 353, 357, 359, 380, 382, 394, 396.)[19]  But Plaintiffs do not assert that any of ExxonMobil's auditors found its reserves process to be flawed.  (App. 68-69.)  And while Plaintiffs embrace OSHA's findings, they ignore that Justice Ostrager, after a 12-day trial about accounting and reserves issues, concluded that ExxonMobil's "public disclosures in its Form 10-K submissions were true and correct with respect to ExxonMobil's proved reserves."  *People ex rel. James v. Exxon Mobil Corp.*, 2019 WL 6795771, at *18.  In any event, words like "rigorous" or "disciplined" describing a process or standard are nonactionable puffery.  *See, e.g.*, *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 350 (S.D.N.Y. 2020) (holding that statements that company conducted "rigorous scientific studies" and "rigorous scientific assessment[s]" are nonactionable puffery (alteration in original)), *reconsideration denied*, No. 18-CV-08049 (RA), 2020 WL 5632901 (S.D.N.Y. Sept. 21, 2020).

Although the Court concluded in its prior Order that these statements could be actionable,

---

[18]    Apparently aware of this ambiguity, Plaintiffs elsewhere omit the statement about production goals altogether, representing to the Court that Burch and Gulden specifically challenged the Resource Base estimate.  (SAC ¶ 52.)  But their recharacterization of OSHA's findings cannot trump what OSHA actually stated.  And Plaintiffs could not rely on the OSHA statement to provide a basis for their conclusions either: OSHA's statement does not provide the basis for Burch and Gulden's "belief" about what was allegedly inaccurate.  Merely reciting OSHA's conclusory and ambiguous statement does not satisfy the particularity standard.

[19]    The SAC identifies four statements that Plaintiffs allege are from ExxonMobil's "2018 Summary Annual Report Published On June 18, 2019."  (SAC ¶¶ 376, 378, 380, 382)  But only one of these four statements (SAC ¶ 376) actually appears in the 2018 Summary Annual Report – which was published on February 27, 2019.  (App. 96.)  The remaining three statements appear to be from ExxonMobil's 2019 Form 10-K.  (*Compare* SAC ¶ 378 *to* App. 76, 78; *compare* SAC ¶ 380 *to* SAC ¶ 394; *compare* SAC ¶ 382 *to* SAC ¶ 396).

(Dkt. 88 at 34-35), Plaintiffs have alleged nothing to support that inference. Their allegations are about the process used by the Planning Team – not the GRRG. Plaintiffs have not pled any facts suggesting that the GRRG's process for generating reserves estimates was not rigorous or disciplined. To the contrary, their own allegations describe a detailed and methodical process. (SAC ¶¶ 71-77.)

Furthermore, the cases cited by the Court in its prior Order focused not on whether the process, testing, or authentication described in the public statement measured up to a vague standard of rigor, but rather whether there was in fact a process, testing, or analysis. (Dkt. No. 88 at 34-35); *see, e.g.*, *Sanders v. Realreal, Inc.*, No. 19-cv-07737-EJD, 2021 WL 1222625, at *10 (N.D. Cal. Mar. 31, 2021) (noting that "whether items on the Company's online marketplace underwent any authentication is testable and, ultimately, verifiable"); *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 851 (N.D. Cal. 2018) (statement was not actionable simply because it characterized something as "rigorous"); *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 557 (N.D. Cal. 2019) (same). Accordingly, the only actionable portion of these statements would be the statement that there *is* a reserves process – and there unquestionably was. Whether that process was "rigorous" or "disciplined" cannot be determined through an objectively verifiable standard, so the adjectives ExxonMobil used to describe it are not actionable.

## IV.    Plaintiffs' omissions claims are meritless on their face.

The Court can quickly dispose of Plaintiffs' omission claims. Plaintiffs allege that many of the forward-looking or corporate cheerleading statements about the production goals and processes were materially misleading because they failed to disclose material issues in the Permian Basin, such as actual drilling times. (*See, e.g.*, SAC ¶¶ 361-68, 376-77.) But the preliminary question is whether a statement is material to begin with. As a matter of common sense, a company does not have a duty to disclose additional information to supplement a statement that is inherently

immaterial, as puffing or corporate cheerleading statements are.  (Dkt. 88 at 33 (citing *Plains All American Pipeline, L.P.*, 777 F. App'x at 731 & *Ezra Sholom*, 504 F. Supp. 2d at 162).)

## V.    Plaintiffs have not stated a claim for scheme liability.

Plaintiffs seek to plead Rule 10b-5 scheme liability by alleging that Mallon and Bond formed a scheme to "defraud investors" by "us[ing] false data to exaggerate drilling output and artificially inflate the Delaware Basin development plan" in order to align them with Woods's prior public statements.  (SAC ¶ 309.)  Their theory of scheme liability derives entirely from the alleged misrepresentations and omissions.  (*E.g.*, SAC ¶¶ 1, 308.)  But "a proper pleading of scheme liability requires that the complaint allege conduct beyond misrepresentations or omissions."  *SEC v. Narayan*, No. 3:16-cv-1417-M, 2017 WL 4652063, at *7 (N.D. Tex. Aug. 28, 2017); *see also Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 951 (S.D. Tex. 2021) (applying *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)); *see also SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (affirming dismissal of complaint alleging scheme liability based solely on misstatements and omissions).  Accordingly, Plaintiffs failed to state a claim for scheme liability.

## VI.    Plaintiffs have not stated a control person claim under Section 20(a).

Because Plaintiffs have not stated a primary liability claim, their control person claims against Woods and Mallon must also be dismissed.  (Dkt. 88 at 20 n.6.)

### CONCLUSION

Plaintiffs have now had three opportunities to allege a securities fraud claim, but they have been unable to do so.   It is now time to dismiss the lawsuit with prejudice.

Dated: November 14, 2022                    Respectfully submitted,

                                            */s/ Noelle M. Reed*
                                            Noelle M. Reed
                                                State Bar No. 24044211
                                            Wallis M. Hampton
                                                State Bar No. 00784199
                                            Brent M. Hanson
                                                State Bar No. 24106051
                                            SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                            1000 Louisiana Street, Suite 6800
                                            Houston, Texas 77002
                                            Tel.: (713) 655-5122
                                            Fax: (713) 483-9122
                                            noelle.reed@skadden.com
                                            wallis.hampton@skadden.com
                                            brent.hanson@skadden.com

                                            Michelle L. Davis
                                                State Bar No. 24038854
                                            SKADDEN, ARPS, SLATE,
                                                MEAGHER & FLOM LLP
                                            308 Bahama Court
                                            Granbury, Texas 76048
                                            Tel.: (713) 655-5197
                                            Fax: (713) 483-9197
                                            michelle.davis@skadden.com

                                            *Attorneys for Defendants Exxon Mobil
                                            Corporation, Darren W. Woods, Liam M.
                                            Mallon, and Melissa Bond*

45