**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>    v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND,<br><br>                  Defendants. | Civil Action No.: 3:21-cv-00194-N<br><br>Hon. David C. Godbey |

**LEAD PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ iii

I.   INTRODUCTION  ................................................................................................. 1

II.  FACTS  .................................................................................................................. 5

    A.   DEFENDANTS' REPORTED PROVED RESERVES AND RESOURCE BASE
        FIGURES WERE PRODUCED BY A FRAUDULENT PROCESS ...................................... 5

    B.   IN MARCH 2019, WOODS ANNOUNCED THE IMPOSSIBLE PERMIAN
        PRODUCTION GOAL, AND FALSELY CLAIMED IT WAS GROUNDED IN
        HISTORICAL DATA  .............................................................................................. 8

    C.   MALLON AND BOND DIRECTED EXXON'S VALUATION EXPERTS TO BACK
        INTO THE PERMIAN PRODUCTION GOAL BY INFLATING INPUTS IN THE
        DELAWARE DEVELOPMENT PLAN  ....................................................................... 9

    D.   THE DEPARTMENT OF LABOR FINDS THAT EXXON ILLEGALLY RETALIATED
        AGAINST THE WHISTLEBLOWERS FOR REPORTING THE FRAUD, AND
        DEFENDANTS KNEW IT  ...................................................................................... 12

    E.   THE SAC CURES DEFICIENCIES IDENTIFIED IN THE COURT'S PRIOR ORDER ......... 13

III. ARGUMENT .......................................................................................................... 15

    A.   THE FALSE STATEMENTS ALLEGED IN THE COMPLAINT ARE ACTIONABLE .......... 15

        1.   False Statements Previously Sustained by the Court ............................... 16

        2.   Misstatements Concerning the Goal ........................................................ 21

        3.   Woods's Misstatement During the March 6, 2019 Investor
            Day Call  ................................................................................................. 23

        4.   Mallon's Misstatements During the June 18, 2019 Conference
            Call  ........................................................................................................ 24

        5.   Woods's Misstatements During the September 4, 2019
            Conference .............................................................................................. 25

        6.   Misstatements Concerning the Then-Current Pace of Exxon's
            Drilling That Accompanied Misstatements About the Goal .................... 26

    B.   THE COMPLAINT PLEADS SCIENTER .................................................................. 27

        1.   Woods Made the Goal Statements With Scienter .................................... 28

i

2.    Woods Made False Statements About Exxon's Proved Reserves and Resource Base With Scienter ............................. 32

3.    Mallon Personally Directed Employees to Falsify Key Information Concerning Exxon's Publicly-Reported Metrics ................. 35

4.    The Complaint Alleges Exxon's Corporate Scienter 36

    a.    Mallon and Bond Generated False Data Which They Knew Would Be Incorporated Into Exxon's Public Statements ..................................................... 37

    b.    Defendants' Remaining Arguments Fail ..................................... 39

5.    Plaintiffs Sufficiently Plead Scienter for All Alleged Misstatements ................................................................ 42

C.    THE COMPLAINT ALLEGES SCHEME LIABILITY AGAINST DEFENDANTS MALLON, BOND, AND EXXON ............................... 42

IV.    CONCLUSION ...................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
  2021 WL 2448223 (9th Cir. June 16, 2021) ...............................................................43

*In re Apache Corp.*,
  2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) ...............................................22, 30, 33

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir. 2005) ......................................................................................39

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
  2021 WL 3675180 (D. Conn. Aug. 19, 2021) ..............................................................43

*In re BP p.l.c. Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) .........................................................................33

*Brown v. Bridges*,
  2016 WL 3660666 (N.D. Tex. Jan. 26, 2016) ..............................................................20

*Coates v. Heartland Wireless Commc'ns, Inc..*,
  55 F. Supp. 2d 628 (N.D. Tex. 1999) ..........................................................................17

*In re Cobalt Int'l Energy, Inc.*,
  2016 WL 215476 (S.D. Tex. Jan. 19, 2016) .................................................................15

*In re Cognizant Tech. Sol. Corp. Sec. Litig.*,
  2020 WL 3026564 (D.N.J. June 5, 2020) ....................................................36, 38, 39, 43, 45

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
  504 F. Supp. 2d 151 (N.D. Tex. 2007) ........................................................................24

*Cuvillier v. Taylor*,
  503 F. 3d 397 (5th Cir. 2007) ......................................................................................15

*Edgar v. Anadarko Petroleum Corp.*,
  2019 WL 1167786 (S.D. Tex. Mar. 13, 2019)..............................................................37

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
  2010 WL 9077875 (S.D. Tex. Jan. 19, 2010)...............................................................33

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
  514 F. Supp. 3d (S.D. Tex. 2021) ....................................................................22, 43, 44

*In re Hertz Global Holdings Inc.*,
   905 F.3d 107, 117 (3d Cir. 2018)....................................................................................34

*Jacobowitz v. Range Res. Corp.*,
   2022 WL 976003 (N.D. Tex. March. 31, 2022) .............................................................17, 31

*Kerr v. Exobox Techs. Corp.*,
   2012 WL 201872 (S.D. Tex. Jan. 23, 2012)...................................................................36

*Klein v. Altria Grp., Inc.*,
   525 F. Supp. 3d 638 (E.D. Va. 2021) ............................................................................44

*Knurr v. Orbital ATK Inc.*,
   294 F. Supp. 3d 498 (E.D. Va. 2018) ........................................................................38, 40

*Lee v. Active Power, Inc.*,
   29 F. Supp. 3d 876 (W.D. Tex. 2014).......................................................................36, 37

*Loc. 703 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
   810 F.3d 951 (5th Cir. 2016) ...............................................................................27, 28, 33

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019)...............................................................................42, 43, 44, 45

*Lormand v. US Unwired, Inc.*,
   565 F. 3d 228 (5th Cir. 2009) ...............................................................................15, 22, 32

*Luna v. Marvell Tech, Grp.*,
   2017 WL 2171273 (N.D. Cal. May 17, 2017) ................................................................34

*Miller v. Stroman*,
   2020 WL 2494576 (W.D. Tex. May 14, 2020) ..............................................................34

*Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*,
   935 F.3d 424 (5th Cir. 2019) .........................................................................................31

*In re New Oriental Educ. & Technology Grp. Sec. Litig.*,
   988 F. Supp. 2d 406 (S.D.N.Y. 2013)............................................................................20

*North Port Firefighters Pension-Local Option Plan v. Temple Island, Inc.*,
   936 F. Supp. 2d 722 (N.D. Tex. Mar. 28, 2013)............................................................42

*Nykredit Portefølje Admin. A/S v. ProPetro Holding Corp.*,
   2021 WL 9037758 (W.D. Tex. Sept. 13, 2021)..............................................................33

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) .........................................................................................40

*People ex rel. James v. Exxon Mobil Corp.*,
65 Misc. 3d 1233(A), 2019 WL 6795771 (N.Y. Sup. Ct. Dec. 10, 2019)...............................20

*In re Philip Morris Int'l Inc. Sec. Litig.*,
437 F. Supp. 3d 329 (S.D.N.Y. 2020).....................................................................................21

*Police & Fire Retirement Sys. of City of Detroit v. Plains All American Pipeline,
L.P.*,
777 Fed. Appx. 726 (5th Cir. 2019).......................................................................................24

*Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*,
564 F. Supp. 3d 1272 (N.D. Ga. 2021)...................................................................................38

*Puddu v. 6D Glob. Techs., Inc.*,
2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) .......................................................................43

*SEC v. City of Miami*,
988 F. Supp. 2d 1343 (S.D. Fla. 2013) ..................................................................................40

*SEC v. Narayan*,
2017 WL 4652063 (N.D. Tex. Aug. 28, 2017)......................................................................43

*SEC v. Rio Tinto Plc*,
41 F.4th 47 (2d Cir. 2022) .....................................................................................................43

*SEC v. Sequential Brands Grp., Inc.*,
2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021).......................................................................43

*SEC v. Winemaster*,
2021 WL 1172773 (N.D. Ill. Mar. 29, 2021).........................................................................43

*In re SolarWinds Corp. Sec. Litig.*,
2022 WL 958385 (W.D. Tex. 2022)......................................................................................18

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
365 F. 3d 353 (5th Cir. 2004) .................................................................15, 36, 38, 40, 42

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .................................................................................................28

*Stone v. Life P'ers Holdings, Inc.*,
26 F. Supp. 3d 575 (W.D. Tex. 2014).....................................................................................38

*Taylor v. Charter Med. Corp.*,
162 F.3d 827 (5th Cir. 1998) .................................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...............................................................................................................28

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)..................................................................................................15

*In re Tupperware Brands Corp. Sec. Litig.*,
  2021 WL 6755476 (M.D. Fla. Aug. 9, 2021) .........................................................37

*In re UnumProvident Corp. Sec. Litig.*,
  396 F. Supp. 2d 858 (E.D. Tenn. 2005)...................................................................17

*Walker v. Rent-A-Center*,
  2005 WL 8161388 (E.D. Tex. July 25, 2005) .........................................................42

*Wieland v. Stone Energy Corp.*,
  2007 WL 2903178 (W.D. La. Aug. 17, 2017).........................................................39

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)............................................................44

**Other Authorities**

17 C.F.R. § 240.10b-5.................................................................................................42, 43

Fed. R. Civ. P. 15(a)(2)....................................................................................................45

*"**Management said to just override the experts so we can get to the number the CEO has already blasted to the public. We could not find any evidence to support it. The science did not support it. The data did not support it. Nothing supported it.**"*

Dr. Damian Burch, one of the whistleblowers, referring to Exxon's promise to deliver one million oil-equivalent barrels per day from its assets in the Permian Basin by 2024.

## I.    INTRODUCTION

In 2019, Dr. Damian Burch and Dr. Lindsay Gulden, two computational scientists at Exxon who worked in development planning for the Delaware Basin, became aware of the lack of integrity of their long-time employer. They had been directed to falsify their assumptions regarding Exxon's drilling speeds in the Delaware Basin, which is in the Permian. This directive came from their superiors, Defendant Liam Mallon, the President of ExxonMobil Upstream Oil & Gas Company (who reported to Exxon's CEO, Defendant Darren Woods), and Defendant Melissa Bond, the Delaware Basin Development Manager in Exxon's Upstream Oil & Gas Division.[1]

Exxon decided to falsify drilling assumptions because on March 5, 2019, its main competitor, Chevron, announced that it planned to produce 900,000 barrels of oil per day from its Permian assets by 2023. ¶105. Not to be outdone, *a mere 95 minutes later*, Exxon told investors that it would produce *one million* barrels of oil per day from *its* Permian assets by 2024 (the "Goal"). ¶106. Investors and analysts were astonished. ¶¶106, 108, 110. This goal represented an 80% increase over Exxon's prior stated goals. ¶106. Speaking the next day, Woods stated that the Goal was based on valuations Exxon had performed in 2018, and on what Exxon had actually achieved in 2018 in the Permian. ¶109, ¶¶367-368. In other words, Woods told investors that the Goal was grounded in Exxon's historical experience. *Id.* This was false.

---

[1] Capitalized terms not defined herein have the meanings ascribed in the Second Amended Complaint ("SAC"). Dkt. 92. "¶" refers to Paragraphs in the SAC. "MTD" refers to Defendants' brief in support of their motion to dismiss. Dkt. 99. Unless otherwise noted, all emphases in quotations are added and internal citations and quotations are omitted.

1

In fact, Woods created the Goal out of thin air. *See* ¶140. Exxon and Woods had "blasted" the Goal to the public minutes after Chevron's announcement, and then had to scramble to back it up. ¶136. Thus, in the months after the March statements, Defendants instructed Exxon's scientists, including Drs. Gulden and Burch, to fabricate data until Exxon's asset valuation models supported the Goal. *See* ¶¶119-140.

Each year, Exxon's scientists generated a development plan setting forth the amount of oil and gas expected to be derived from a particular region ("Development Plan"). ¶69. In this process, Drs. Gulden and Burch had analyzed drilling times underlying the 2018 Development Plan for the Delaware Basin. ¶¶121, 132-134. Drilling times are one of the most impactful inputs in the Development Plan. ¶¶8, 119. The scientists determined that the assumptions were overly aggressive when compared to actual drilling time data. ¶132. If actual drilling times had been used, the 2018 net present value ("NPV") of the Delaware assets would have been $20 billion less than the NPV calculated for the 2018 Development Plan. ¶121. But instead of adjusting the numerous metrics that flowed from the false NPV, Defendants orchestrated a scheme to perpetrate the fictitious Goal and artificially inflate the publicly-reported value of the Permian assets for nearly two years. *See, e.g.*, ¶¶119-140. Mallon and Bond were the architects of this fabricated valuation model used to support Woods's Goal. *Id.*

These false assumptions permeated a host of statements and metrics that Exxon disclosed publicly to investors. Not only was the Goal itself false, but so too were Woods's and Mallon's accompanying statements that the Goal was based on true, existing facts. *See infra* Sections III.A.2-6. Further, the false NPV (including the false drilling time assumptions) was used as a basis for Exxon's publicly reported proved reserves and resource base metrics, statements which the Court previously found were actionable. Dkt. 88 at 28-32 ("Opinion"). *See infra* Section III.A.1.

2

Finally, Woods and others at Exxon made statements regarding the "rigor" of Exxon's reserve estimation processes that were false because that process was actually rigged to achieve a predetermined result. *See infra* Section III.A.2.

The Court previously held that Plaintiffs adequately alleged that several categories of Exxon's statements were materially false and misleading; Plaintiffs again plead those statements in the SAC. But the Court determined that the First Amended Complaint's (Dkt. 53, "FAC") allegations of scienter did not satisfy the PSLRA because the FAC "did not allege with particularity that Bond actually informed Woods that the reports were being manipulated or that Woods was severely reckless as to their falsity." Opinion at 12.

The SAC cures this defect as to scienter by pleading many new facts. Among them are allegations that the false Development Plan was created specifically to make Woods's false statements appear true. *See* ¶¶124-132. Mallon (who reported to Woods) instructed Bond to fraudulently inflate the 2019 Development Plan to support Woods's publicly-stated Goal. *Id.* Bond then personally presented the rigged 2019 Development Plan to Woods during an in-person meeting in September or October 2019. ¶¶161-164. The (falsified) 2019 Development Plan generated an NPV for the Delaware Basin of $50 billion, which was $10 billion less than the 2018 Development Plan. ¶121. This 17% reduction from 2018's NPV was significant, particularly because Exxon had *raised* its output goal by 80% to one million barrels per day – a glaring discrepancy. ¶106. At this meeting, Woods either learned that falsified assumptions were used to generate the NPV, or was at least severely reckless in not knowing that the Development Plan figures (and thereby, Exxon's reported proved reserves and resource base) were false. *See infra* Section III.B.2. These facts demonstrate that "Woods would or should have discovered" that data had been falsified. *See* Opinion at 13.

But these are not all the new facts that Plaintiffs discovered. Drs. Gulden and Burch state that Bond and Mallon demanded that they use false assumptions to calculate drilling speeds in the Permian, which were being used to manufacture an NPV that would support the Goal. ¶¶123-132. Drs. Gulden and Burch realized that investors were being misled because the false drilling speeds were used to support not only the Goal, but other important metrics reported in Exxon's SEC filings, including its proved reserves and resource base. ¶158g. In the Fall of 2019, they each reported to Exxon's Human Resources Department ("HR") that Exxon was committing securities fraud. HR reported those complaints to Exxon's Management Committee, which included Woods. ¶¶141-142, 144, 274-277. However, rather than address their allegations, Exxon fired Drs. Burch and Gulden in the fourth quarter of 2020 after the *Wall Street Journal* published a negative article about Exxon, citing anonymous employees. ¶¶145-154. Woods knew that Gulden and Burch had made reports of securities fraud, and he approved their terminations. ¶¶274-277.

These new facts are sufficient to support direct, corporate and scheme liability against Defendants as follows:

*First*, the SAC alleges that Woods knew of, or was severely reckless as to, the falsity of the drilling assumptions used in the Development Plan. The new facts establish that Woods knew that it would be impossible for Exxon to meet the Goal and that it was not grounded in historical data or sound valuation processes. These facts support scienter for all the statements the Court previously upheld as actionable and render forward-looking statements concerning the Goal outside the protection of the PSLRA's safe harbor. *See infra* Sections III.B.1-2.

*Second*, the SAC asserts that Mallon was the chief architect of the plan to gin up phony data to support the Goal. He directed Bond to falsify drilling speed assumptions to fraudulently inflate the Development Plan, while publicly stating that the Goal was achievable and backed by

4

sound data and processes. *See infra* Section III.B.3.

*Third*, the SAC alleges new facts concerning Bond and Mallon to support corporate scienter. Their instructions to employees to falsify drilling time assumptions were made with the intent to mislead investors by providing phantom support for the Goal and by inflating Exxon's reported proved reserves and resource base figures. *See infra* Section III.B.4.

*Fourth*, the SAC alleges a claim for scheme liability, also based on the concerted actions of Bond, Mallon, and Exxon. *See infra* Section III.C.

In response, Defendants quote Yogi Berra's "déjà vu all over again". But a well-worn cliché cannot obscure the new information Plaintiffs allege in the SAC, ¶¶114-164, including facts provided by Drs. Gulden and Burch through their OSHA Complaint filed under oath; OSHA's findings after a thorough investigation, including that Exxon illegally terminated Drs. Gulden and Burch for reporting securities fraud; interviews with Drs. Gulden and Burch; and new interviews of Andrew Rhodes and FE4 to obtain new corroborating facts. These new, well-pled facts cure the infirmities the Court found with the FAC, and thus Plaintiffs have now stated claims of securities fraud.

## II.    FACTS

### A.    DEFENDANTS' REPORTED PROVED RESERVES AND RESOURCE BASE FIGURES WERE PRODUCED BY A FRAUDULENT PROCESS

The Class Period begins on March 7, 2018 when Exxon announced an increased Permian resource base of "9.5 billion oil-equivalent barrels." ¶¶61-62. Through the end of the Class Period, Exxon continued to report Permian valuations to investors, including Exxon's resource base and proved reserves. ¶¶63-65, 345, 347, 349, 351, 355, 370-371, 373, 378, 392.

One component of the Development Plans generated during Exxon's annual planning process was the NPV. Exxon scientists calculated NPVs to value Development Plans using drilling

time assumptions, which are the "core component" of the plan. ¶¶8, 119. Development Plans feed directly into Exxon's reported proved reserves and resource base figures. ¶¶63, 308-311.

The drilling assumptions that Exxon used to calculate the value of the Delaware Development Plan directly affected Exxon's public statements, including its stated proved reserves, resource base, and the Goal. ¶¶63, 308-311. Exxon told investors that its proved reserve valuations are based on Development Plans, which rely on drilling times. *See, e.g.*, ¶50 ("Proved undeveloped reserves are recognized ***only if a development plan has been adopted*** indicating that the reserves are scheduled to be drilled within five years . . . ."). When Exxon announced increases in the Permian proved reserves at the end of 2018, it attributed those increases to "ExxonMobil's ***growth plan***," including "***increased drilling activity*** . . . ." ¶70. Proved reserves are included in Exxon's resource base valuations, ¶51, and the inputs regarding Exxon's drilling activity therefore affect both the proved reserves and resource base figures. The Goal was also based on the (false) Development Plan. ¶¶308-310.

Exxon experts who calculated the value of Development Plans, such as Dr. Burch, and reservoir engineers, such as Rhodes and FE3, worked together as part of the year-end planning process to establish Development Plans, production goals, and reported proved reserve and resource base metrics. ¶¶69-70. The production forecast was a critical input in these reserve calculations. ¶¶77, 83, 89-90; *see* ¶93 (describing how engineers were instructed to adjust how many barrels of oil wells would produce to fraudulently increase the reserve).

The proved reserve and resource base amounts that Exxon stated during the Class Period were false for two reasons. ¶52. *First*, these metrics resulted from a manipulated process designed to generate numbers to justify Exxon's already-made public disclosures. ¶¶123-131, 162-164. During the annual planning process, engineers were instructed to "boost" the reserves and "never

write down" the resource base, even if such write-down was warranted. ¶¶84-85, 93-95, 100-101. Every request to adjust reserves, no matter how small, was presented to – and then ignored by – Mallon, whose bonus was tied to reserves figures. ¶¶71-73. Woods set the tone of Exxon's corporate culture of inflating valuations and refusing to take write-downs. ¶¶281-284. Additionally, the annual development planning process culminated in a review by Woods of the Development Plan and the final NPV amount that was the basis for Defendants' alleged false statements. ¶¶163-164. The Global Reserves and Resource Group ("GRG") was responsible for generating the annual proved reserves, and the Delaware Planning Team calculated the value of the Development Plan for the Delaware Basin. Both groups reported to Mallon, and the GRG also reported to the Management Committee, which included Woods. ¶¶71-73, 45, 121, 162.

*Second*, the reported metrics were based on a fraudulently inflated Development Plan that relied on false drilling assumptions that were directed by Mallon, executed by Bond, and presented to, reviewed by, and approved by Woods. ¶¶67, 115, 123-131, 162-164. Drs. Burch and Gulden stated that in 2018 Exxon estimated the NPV of its Delaware Basin holdings to be $60 billion. ¶114, 119. The 2018 NPV was based on assumptions regarding drilling speeds that Exxon's scientists input into Exxon's model by early in 2018. ¶119. In Spring 2019, Drs. Burch and Gulden compared actual drilling speeds in 2018 to the assumptions that had been used. ¶134. Actual, real-world drilling speeds were in fact considerably slower than the 2018 estimates used to support the $60 billion figure in the 2018 Development Plan. ¶120. If the correct drilling speeds had been used, the 2018 Development Plan would have yielded a $40 billion NPV. ¶121. Thus, the 2018 drilling assumptions that Exxon used to calculate the 2018 NPV of the Delaware Basin were false, and the entirety of the figures generated by the 2018 Development Plan were likewise false, including Exxon's stated proved reserve and resource base valuations. ¶¶339-343.

7

Additionally, in keeping with its culture of never writing down reserves, Exxon ignored evidence in the summer of 2018 that it needed to reduce its stated proved reserves and take a write-down, and instead *increased* its reserves by 4.5 billion barrels, including 1.2 billion from the Permian. ¶¶68, 99-102. Exxon specifically attributed the increase in Permian reserves to Exxon's growth plan and the underlying drilling assumptions. ¶103.

### B.    IN MARCH 2019, WOODS ANNOUNCED THE IMPOSSIBLE PERMIAN PRODUCTION GOAL, AND FALSELY CLAIMED IT WAS GROUNDED IN HISTORICAL DATA

On March 5, 2019, Chevron, Exxon's chief competitor, announced that it planned to extract 900,000 barrels of oil from the Permian by 2023. ¶105. 95 minutes later, Exxon responded that it would extract 1 million oil-equivalent barrels per day by 2024 from the Permian. ¶106. The next day, Woods stated that "we have accelerated value capture in the Permian." ¶107. On March 5 and 6, 2019, Exxon also announced that its resource base had increased to "10 billion oil-equivalent barrels" and was "likely" and "expected to grow further." ¶107.

Analysts questioned Woods about whether Exxon could achieve the Goal. ¶108. Woods responded that the Goal was supported by Exxon's "development plan" and "*what we've done in 2018*" and "*what we've been doing in 2018*[.]" ¶109. But Woods had no basis to make these statements, and they were false. *Id.* In fact, the 2018 Development Plan had been based on overly aggressive drilling assumptions which were inflated by 50%, when compared to historical data (*i.e.*, what Exxon had done and was doing in 2018). *Id.*; *see* ¶121. Thus, Woods's citations to "what we've done in 2018" and "what we've been doing in 2018" as support for the Goal were themselves false statements; in fact, the actual drilling times in 2018 were considerably slower than the estimates that the 2018 Development Plan had projected. ¶120.

**C.      MALLON AND BOND DIRECTED EXXON'S VALUATION EXPERTS TO BACK INTO THE PERMIAN PRODUCTION GOAL BY INFLATING INPUTS IN THE DELAWARE DEVELOPMENT PLAN**

With investors informed of the Goal, Exxon needed a Development Plan for the Permian that would support this Goal. Because the Goal was pulled from thin air and was not, in fact, achievable, Exxon used phony drilling assumptions to concoct the figures required to back up the Goal that Woods had "blasted" to the investing public.

To produce a Development Plan for 2019, Exxon's valuation and development planning experts, including Dr. Burch, examined how quickly Exxon was able to drill in the Delaware Basin in 2018 using refined time-to-drill estimates, generated by company drilling experts and based on actual drilling speeds that had been measured over the past year. "***Due to the slower-than-anticipated drilling speeds, the NPV estimate of the initial 2019 development plan was $40 Billion, $20 Billion less than the NPV estimate for the 2018 development plan***." ¶10 (quoting the OSHA Complaint). In other words, the valuation used to calculate the proved reserve and to support the Goal, was off by $20 billion, or inflated by 50%. *See* ¶121. In March or April of 2019, Bond told Mallon at an in-person meeting in Houston that the correct value of the Delaware Basin was $40 billion. ¶124. But Mallon rejected this figure because it did not match Woods's public statements, and he directed Bond to find ways to increase the $40 billion NPV. *Id.*

With these marching orders, Bond then "instructed the Delaware Planning Team to change the development plan so that the 2019 NPV estimate would increase and so that production projections would be consistent with the CEO's public pledges" – *i.e.*, Woods's Goal. ¶12; *see* ¶¶125-127. The Delaware Planning Team revised its assumptions, but "the use of realistic revised assumptions failed to significantly increase the Delaware Basin's NPV estimate and accelerate production projections." ¶¶13, 127-128. Bond then went all-in on the drilling assumptions, which had an outsized effect on the NPV estimate, and "mandated the use of increasingly aggressive

'drilling learning curve' assumptions, which referred to the assumption that drilling speeds would increase the longer a drilling crew stayed in a certain area." ¶128.

During this time, Exxon filed a Form 8-K on April 26, 2019, which repeated the Goal and reported a resource base of approximately 10 billion oil-equivalent barrels. ¶158c. OSHA concluded that "Dr. Gulden and Dr. Burch believed this statement was not accurate and they informed management about the misleading SEC filings." *Id.*

In May 2019, Bond again presented the adjusted "learning curve" results to Mallon at an in-person meeting in Houston. ¶129. As before, the output generated by the model was too low to support the Goal, and Mallon again instructed Bond to revisit the long-term learning curves. *Id.* Mallon's message was that ***the Delaware Planning Team had not lied hard enough yet to achieve the desired outputs in terms of valuation and drilling speed and productivity***. *Id.* Bond subsequently dictated increasingly optimistic assumptions until the NPV of the Delaware Basin reached an estimated value of $50 billion. ¶130. By that point, the learning curve assumptions were fully inconsistent with Exxon's actual drilling speed data and with the assumptions from Exxon's valuation experts. Accordingly, such information was false. *Id.* Based on their independent analyses, Drs. Burch and Gulden separately concluded that the true value of the Permian was lower than what had been publicly disclosed. ¶¶158d-158f. Dr. Burch sent emails on June 18, 2019 and June 19, 2019 which "made it clear to management that he disagreed with the NPV analysis and believed ***Exxon was artificially inflating its oil production capacity to improve Exxon's public filings***." ¶158f. Dr. Gulden likewise sent her analysis to Dr. Burch and their supervisor. ¶158d.

While the Delaware Planning Team was implementing Mallon's orders to inflate the Development Plan, on June 18, 2019, Exxon participated in a J.P. Morgan Energy Conference.

¶16. There, Mallon falsely stated, "Starting with the Permian, we are on track to deliver on the million barrels a day by 2024. We believe our innovative ***development plan is key to that*** and we continue to see and achieve the milestones that we set out for ourselves." ¶¶384-385.

In July 2019, Bond presented the revised Development Plan – now valued at $50 billion and reflecting fabricated drilling productivity assumptions that could support Woods's public pledges – to Mallon during an in-person meeting in Houston. ¶131. In August 2019, despite knowing that it was fraudulent and based on false drilling assumptions, Mallon approved the $50 billion NPV plan, and it became the final Development Plan for 2019. *Id.* Exxon used the fraudulent plan to support its public filings and statements, including the Goal, its stated proved reserves, and its stated resource base valuations. ¶¶18, 20.

On September 4, 2019, Woods was specifically asked about his "target of achieving over 1 million barrels a day" in the Permian. ¶25. Woods assured investors that the Goal was supported by a legitimate process that was based on "fundamentals". He further stated, "***We didn't go out and say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that***." *Id.* But in fact, the opposite was true. ¶26. And when the data contradicted the Goal, Exxon instructed its scientists to "turn the knob" on assumptions, including drilling times, until their models produced results that supported the Goal. *Id.*

On October 23, 2019, Bond held a Delaware Basin-wide meeting in which Dr. Burch presented the Delaware Development Plan based on the learning curve assumptions mandated by Bond. When one of the drillers interrupted and stated, "That is impossible," Bond told the audience that Dr. Burch must have made a mistake. ¶19. Dr. Burch concluded: "I had never seen anything like this before. ***Management said to just override the experts so we can get to the number the CEO has already blasted to the public. We could not find any evidence to support it. The science***

*did not support it. The data did not support it. Nothing supported it.*" ¶21.

    **D.    THE DEPARTMENT OF LABOR FINDS THAT EXXON ILLEGALLY RETALIATED AGAINST THE WHISTLEBLOWERS FOR REPORTING THE FRAUD, AND DEFENDANTS KNEW IT**

Both Dr. Gulden and Dr. Burch "***raised issues with Exxon's analysis of oil production in the Delaware Basin. They believed it was artificially inflated and Exxon was misleading the public and the SEC in their filings***." ¶158g (quoting the OSHA Findings). Dr. Gulden lodged a complaint with Exxon's HR Department on October 23, 2019, ¶27, followed by Dr. Burch, who wrote to HR on November 14, 2019, saying he was pressured to "***turn any knobs we could in our modeling software to get the forecasts NPV . . . up***, and (a) [his managers] didn't care whether those new assumptions were realistic (they weren't) and (b) they didn't make any changes that would be required to try to operationalize these new assumptions[,]" ¶158h. Dr. Burch raised his concerns about the inaccurate NPV multiple times with management. ¶27. Dr. Gulden and Dr. Burch's complaints triggered an investigation, which Woods and Mallon knew about. ¶28. That is, they knew that Exxon scientists believed that Exxon was committing securities fraud.

Although HR assured Drs. Gulden and Burch that their concerns would be addressed, nothing happened until August 27, 2020, when the *Wall Street Journal* contacted Exxon regarding an article that they intended to publish about Exxon's development plans for the Delaware Basin. ¶¶143, 145. In response, Beth Casteel, Exxon's Audit Team and Security Director, initiated an investigation into whether company information had been improperly disclosed and zeroed in on Drs. Gulden and Burch. *Id.*

On September 13, 2020, the *Wall Street Journal* published its article titled "Exxon Used to be America's Most Valuable Company. What Happened?" ¶146. Over 20 current and former employees were interviewed for the article, including Dr. Gulden's husband. ¶158k. Following interviews of Exxon's Audit Team, OSHA concluded that the Audit Team had told Michael Deal,

Vice President of Upstream for Research Technology & Digital Development, that the Audit Team believed that Dr. Gulden was "guilty by association." ¶158*l*. Exxon then retaliated against Drs. Gulden and Burch by terminating them because Exxon believed they had provided information about its securities fraud to the *Wall Street Journal*. ¶31. Woods approved this decision. ¶277.

OSHA concluded that Drs. Gulden and Burch had engaged in protected whistleblower activity under SOX by reporting their concerns that Exxon had defrauded investors and were fired by Exxon for engaging in that activity. ¶32. Critical to that decision was OSHA's finding that "*[Drs. Gulden and Burch] had a <u>reasonable belief</u> that [Exxon's] statements in their SEC filings were inaccurate. [Drs. Gulden and Burch] raised these concerns internally and [Exxon] was aware of this protected activity.*" *Id.* In other words, contrary to Defendants' factual argument, MTA at 11, OSHA found that Drs. Burch and Gulden's "alleged concerns [were] justified." Exxon was afforded due process, as OSHA heard, and rejected, its arguments and defenses. ¶32.

### E.    THE SAC CURES DEFICIENCIES IDENTIFIED IN THE COURT'S PRIOR ORDER

On September 29, 2022, the Court issued its Opinion on Defendants' first motion to dismiss. The Court held that several of the alleged false and misleading statements were actionable, but that Plaintiffs had not adequately pled Defendants' scienter.

Regarding Woods, the Court found that the FAC had not alleged actual knowledge or "facts alleging the ordinary standard of care for someone in Woods's position or that he extraordinarily departed from it." Opinion at 15. The following new facts in the SAC cure this defect:

- A mere 95 minutes after Chevron announced a new revised goal for its own Permian production, Exxon and Woods blasted out the phony "1 million barrels per day" Goal to investors that was not supported by the Development Plan or any other data. ¶¶105-106, 114.

- After Woods announced the Goal, Exxon put its machine in motion to make the "production projections . . . consistent with the CEO's public pledges." ¶123.

- In September or October of 2019, Bond presented Woods with the false NPV, that

13

was premised on false drilling assumptions, for the Delaware Basin during an in-person meeting. ¶¶271-272.

- The *false* 2019 NPV for the Delaware Basin that Woods reviewed was $50 billion, which was *$10 billion less* than the 2018 NPV. Yet the Goal (which was *80% greater* than Exxon's prior goal) was based on 2018 figures, which Woods now knew were inflated by at least 25% (and were actually inflated by 50%). ¶273. Woods would have or should have discovered that these valuations were incorrect when Bond presented him with a 2019 NPV that was significantly lower than the 2018 NPV that was supposed to support the aggressively increased Goal.

- In Fall 2019, Woods learned about Drs. Burch and Gulden's complaints to HR, including that they believed that Exxon was lying to investors. ¶¶274-277. OSHA found "specific examples of . . . silencing employees from speaking about the company's true activities, [and] illegal retaliatory termination." Opinion at 9.

With respect to Exxon's corporate scienter, the Court held that Plaintiffs had "failed to plead facts demonstrating Bond's intent to defraud the public" or that she "furnish[ed] information so as to make her a speaker of the disputed statements." Opinion at 20. In addition to Woods's scienter, which is imputed to Exxon, the SAC further cures this defect with the following facts which demonstrate that both Bond and Mallon intended for their falsified data to mislead investors:

- In March or April 2019, Bond presented Mallon with a NPV for the Delaware of $40 billion. ¶124. This was too low to support Woods's public one-million-barrels-per-day Goal, and so Mallon directed her to increase the model's inputs so that the model would produce a NPV that would support that Goal. ¶¶124-125.

- When Bond presented revised NPV figures for the Delaware in May 2019 to Mallon, he told her to revisit the long-term learning curves, which would have the effect of increasing drilling speeds, thereby increasing the NPV even higher, to achieve the Goal. ¶14. Mallon's takeaway message to Bond was that the Delaware Planning Team "had not lied hard enough yet." ¶14.

- In July 2019, Bond presented a third set of figures to Mallon, which had incorporated false learning curves as he had instructed. This Development Plan showed an NPV of $50 million. ¶17.

- In August 2019, Mallon approved the $50 billion NPV Development Plan for the Delaware Basin. ¶18.

- The false drilling times that Mallon directed and Bond orchestrated ultimately led to a false NPV of $50 billion for the Delaware Basin, as well as false proved reserves and resource base figures. ¶¶130, 155. Thus, Mallon and Bond furnished false information – the learning curve assumptions – that was included in

14

> Defendants' false statements to investors, including the Goal statements, the stated proved reserves, and the resource base. ¶157.

- Mallon and Bond generated these figures with the specific intent to defraud the public into believing Woods's and Mallon's statements. ¶¶310-314. Bond instructed her team to artificially inflate the Development Plan at Mallon's direction "so that the 2019 NPV would increase and so that production projections would be consistent with the CEO's public pledges to investors." ¶313.

The SAC also pleads facts demonstrating Mallon's scienter for a false statement he made on June 18, 2019, where he reiterated the Goal, which he knew was impossible to achieve, and stated that it was based on the Development Plan, which he knew was fraudulently inflated. ¶¶384-385.

## III.  ARGUMENT

### A.  THE FALSE STATEMENTS ALLEGED IN THE COMPLAINT ARE ACTIONABLE

To allege a false or misleading statement or omission, a plaintiff need not plead "detailed factual allegations," but merely plead allegations that "when assumed . . . true[,] raise a right to relief above the speculative level." *Cuvillier v. Taylor*, 503 F. 3d 397, 401 (5th Cir. 2007); *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *2-3 (S.D. Tex. Jan. 19, 2016). On this motion, a court "must . . . accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand v. US Unwired, Inc.*, 565 F. 3d 228, 232 (5th Cir. 2009). The "disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Id.* at 248. Materiality determinations are "peculiarly" suited "for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976); *accord Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F. 3d 353, 362 (5th Cir. 2004). "A fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Southland*, 365 F. 3d at 362.

### 1.    False Statements Previously Sustained by the Court

This Court has already held that three categories of false statements are actionable: (1) false proved reserves, Opinion at 28-31; (2) false resource base figures, *id.* at 31-32; and (3) false statements that Exxon's processes for estimating proved reserves were "disciplined and rigorous," *id.* at 34-35. The SAC alleges identical statements, and other closely related statements, as false, and they should be sustained here for the same reasons.

***Proved Reserves.*** The Court previously held that inaccurate proved reserves are actionable. Opinion at 28-31. The Court pointed to three specific instances in the FAC of actionable false proved reserves. *Id.* at 29. These are also alleged as false in the SAC. *Compare* ¶¶351-352 to FAC ¶¶376-377; ¶¶355-356 to FAC ¶¶383-384; ¶¶392-393 to FAC ¶¶419-420. The SAC also alleges additional instances where Exxon reported false proved reserves, and these are actionable for the same reasons the Court discussed in its Opinion. *See* ¶¶378-379.

In finding the proved reserves actionable, the Court credited "testimony from two Reservoir Engineers, Rhodes and FE3." Opinion at 30; *see* ¶¶74, 92-94.[2] In addition to Rhodes's and FE3's allegations, the SAC also explains that proved reserves were based on the fraudulent Development Plan. ¶¶114-140, 194, 351. Defendants inflated the Development Plan by integrating overly aggressive drilling assumptions, including supposed "increased drilling activity," and unrealistic learning curve assumptions. ¶¶115-140; *see* ¶¶194, 351. These drilling times were integral to the NPV and Development Plan; as a result, Exxon's stated proved reserves – derived from those times – were false. ¶¶49-50, 52, 66-67, 77, 103, 155.

---

[2] Defendants' efforts to discredit these witnesses should once again be rejected. *See* MTD at 40. As the Court already held "Defendants may dispute their credibility, but such determinations are improper on a motion to dismiss." Opinion, at 30. *See also* ¶¶80-83, 90-93 (detailing Rhodes's and FE3's basis for knowledge about Permian reserves).

Defendants' only new argument is that the SAC does not plead "that learning curve assumptions in the Planning Team's 'development plan' were used to generate the Proved Reserves estimate[,]" or that "the GRRG . . . follow[ed] all of the same assumptions contained in the Planning Group's development plan." MTD at 39.[3] But they ignore statements from Rhodes and FE3 that the Court credited which describe the fraudulent reserves process that generated the proved reserves, ¶¶84-94, as well as key facts that tie the false drilling times and the Development Plan to the calculation of the proved reserves even before the "learning curve assumptions" were finalized: (i) GRG engineers work closely with the Delaware Planning Team in calculating proved reserves and often pressured planning teams to tweak inputs, ¶¶77, 85-91; (ii) the Development Plan, which was falsely inflated throughout the entire Class Period, is a critical input into proved reserves, ¶¶49-50; (iii) Drs. Burch and Gulden were specifically concerned that Exxon's stated valuations, which included the proved reserves, were false because they were based on false drilling assumptions, ¶155; and (iv) Exxon itself stated that the Permian proved reserves were "supported by Exxon's growth plan including increased drilling activity[,]" ¶103.

Moreover, the false proved reserves that Exxon reported on April 26, 2019, ¶¶373, 375, June 18, 2019, ¶¶378-379, and February 26, 2020, ¶¶392-393, squarely post-date the application

---

[3] The Court has already rejected Defendants' argument that Plaintiffs have not quantified the amount by which proved reserves were inflated and that the Court therefore cannot conclude that they were material. Opinion at 30-31; MTD at 40; *see also In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 888-90 (E.D. Tenn. 2005). Defendants' new citations are likewise inapt. In *Jacobowitz v. Range Resources Corp.*, plaintiff's allegations were "weak, almost incoherent," and plaintiff did not attempt to link the misclassification of wells to conclusory allegations of artificial decreases in reported estimates. 2022 WL 976003, at *11-12 (N.D. Tex. Mar. 31, 2022). Here, Plaintiffs allege that Defendants explicitly touted the increase in Permian reserves as "significant," and that the reserves were directly linked to Defendants' inflated Development Plan. Similarly, the plaintiff in *Coates v. Heartland Wireless Communications, Inc.* failed entirely to allege facts indicating that $5.2 million of write downs was not "miniscule." 55 F. Supp. 2d 628, 639 (N.D. Tex. 1999). Here, the SAC explicitly alleges the importance of Exxon's Permian assets, and that investors and analysts alike looked to the Permian acquisition as a game-changer for Exxon.

of learning curve assumptions. Indeed, Drs. Burch and Gulden specifically alleged that Exxon's April 26, 2019 stated resource base valuation "was not accurate and they informed management about the misleading SEC filings." ¶158c (quoting the OSHA Findings).

***Resource Base.*** The Court also determined that statements regarding Exxon's inflated resource base are actionable. Opinion at 32. Once again, Plaintiffs allege as false identical statements concerning Exxon's resource base that were previously sustained. *Compare* ¶¶345-346 to FAC ¶¶351-352; ¶¶347-348 to FAC ¶¶357-358; ¶¶370-372 to FAC ¶¶393-396. Further, the SAC alleges additional instances where Exxon reported a false resource base, and these are actionable for the same reasons the Court discussed in its Opinion. *See* ¶¶349-350; ¶¶373, 375. Because the false resource base figures incorporate false proved reserves, ¶51, which are based on an inflated Development Plan, ¶¶49-50, the same facts from Rhodes, FE3, and Drs. Burch and Gulden, demonstrate that the resource base figures are false. *See supra*; *see also* ¶¶95-98. Indeed, Drs. Burch and Gulden raised concerns that Exxon's stated resource base was fraudulently inflated. ¶23.

Defendants assert that OSHA's conclusion that "Dr. Gulden and Dr. Burch believed [the Goal and stated resource base valuation] was not accurate and informed management about the misleading SEC filings," is too "conclusory and ambiguous" and is not what Burch and Gulden really believed. MTD at 41-42 & n.18. These factual contentions, which contradict the SAC and the OSHA Findings, must be rejected at this stage. *See In re SolarWinds Corp. Sec. Litig.*, 2022 WL 958385, at *3 (W.D. Tex. 2022) ("[B]ecause the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint.").[4]

---

[4] Defendants also repeat their previously rejected argument that inflated proved reserves could not have increased the size of the resource base. *See* Opinion at 31; MTD at 41.

*Rigorous Estimation Processes.* The Court also held that statements concerning Exxon's reserve calculation process were actionable. Opinion at 34-35. Specifically, the Court noted that terms such as "well-established," "disciplined," and "rigorous" "carry meaning with investors" and "directly encourage confidence in the published figures." *Id.* The SAC alleges as actionable identical statements concerning Exxon's reserve process. *Compare* ¶¶353-354 to FAC ¶¶380-382; ¶¶357-358 to FAC ¶¶385-383; ¶¶394-397 to FAC ¶¶421-424. The SAC also alleges as false similar statements that were not alleged in the FAC. Specifically, in the 2018 Form 10-K published on February 27, 2019, Exxon stated that any changes to its reserve figures are "made within a ***well-established***, ***disciplined*** process . . . ." ¶¶359-360. Further, in its 2018 Summary Annual Report, published on June 18, 2019, Exxon reported that "The estimation of proved reserves . . . is an ongoing process based on ***rigorous*** technical evaluations . . . ." ¶¶380-381; *see* ¶¶382-383 ("disciplined process" for reserve estimates). These statements are also actionable for the same reasons. *See* Opinion, at 34-35.[5]

The statements concerning Exxon's reserves process are false because the process was fraudulent, as described by Rhodes and FE3, and corroborated by Drs. Burch and Gulden, the OSHA Complaint, and the OSHA Findings, which detail how the Development Plan, which supports the proved reserves, was intentionally artificially inflated. ¶¶97-101, 119-140.

Defendants challenge these statements as "immaterial puffery." MTD at 42-43. But the Court has already concluded otherwise. *See* Opinion at 34-35 (citing cases). Defendants next

---

[5] Defendants make the factual assertion that the Summary Annual Report was not published on June 18, 2019, MTD at 42 n.19, but this is the date listed at www.alpha-sense.com, and historical records indicate that the Report was republished on April 11, 2019. *See* "Digital Annual Reports," ExxonMobil                                    (May                                    19, 2019), https://web.archive.org/web/20190519112522/https://corporate.exxonmobil.com/Investor s/Annual-Report (accessed by searching for https://corporate.exxonmobil.com/Investors/Annual-Report in the Internet Archive index).

contend that the SAC does not assert that Exxon's "auditors found the reserves process to be flawed." MTD at 42. But good-faith reliance on auditors is a premature affirmative defense that raises fact issues that cannot be decided now. Auditor findings of fraud are not a pleading requirement. *See, e.g.*, *In re New Oriental Educ. & Technology Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (rejecting the same argument).

Defendants also argue that the Court should adhere to factual findings concerning reserves found in *People ex rel. James v. Exxon Mobil Corp.*, a case filed in New York state court alleging that Exxon's disclosures about future proxy costs related to climate change violated the Martin Act. 65 Misc. 3d 1233(A), 2019 WL 6795771 (N.Y. Sup. Ct. Dec. 10, 2019); MTD at 42. But "courts generally cannot take judicial notice of the findings of fact from other proceedings for the truth of the matter asserted because those facts are usually disputed and almost always are disputable." *Brown v. Bridges*, 2016 WL 3660666, at *2 (N.D. Tex. Jan. 26, 2016), aff'd, 692 F. App'x 215 (5th Cir. 2017); *see also Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998). Further, the *James* case involved inapposite facts and claims, and the holding cited by Defendants was expressly premised on the fact that, unlike here, "***there is no claim in this case that any disclosure on ExxonMobil's Form 10-K is misleading***." 2019 WL 6795771, at *19; *see also id.* at *20 ("there is no allegation in this case, . . . that anything ExxonMobil is alleged to have done or failed to have done affected . . . [any] financial disclosure.").

Defendants further argue that Plaintiffs' allegations fail to focus on the processes used by the GRG or suggest that this process was not rigorous. MTD at 43. But the SAC details how the GRG used information from the Delaware Planning Team, including the falsely inflated Development Plan and production forecast, to calculate reserves. *See* ¶¶69-70. Rhodes's and FE3's allegations also demonstrate that the GRG's process was fraudulent. *See* ¶¶77, 84-85, 93-94. The

20

OSHA Complaint allegations, which similarly describe how the development planners backed into a number announced by Woods by artificially inflating their valuations, supports the inference that, as alleged, the GRG's process was fraudulent in the same way.

Finally, Defendants contend that the Court misapplied the law and that cases the Court cited do not support the conclusion that characterizing something as "rigorous" is actionable. MTD at 43. This is a blatant mischaracterization of the Court's analysis. *See* Opinion at 34-35.[6]

### 2.    Misstatements Concerning the Goal

Between March 5, 2019 and March 5, 2020, Woods and Mallon made several statements asserting that Exxon would produce or was on track to produce 1 million oil-equivalent barrels per day in the Permian by 2024. ¶¶361, 364-365, 373, 384, 388, 398.[7] These statements were false because Defendants knew that the Goal was unachievable and based on a falsely inflated Development Plan.

The Goal was based on the 2018 Development Plan, which was based on inflated drilling assumptions that were materially faster than actual, observed drilling speeds. ¶¶363, 366. Defendants knew that these slower drilling speeds did not support the Goal. *See* Section III.B, *infra*. In fact, when the experts input the historical 2018 data into the valuation model, they determined that the Delaware Basin's NPV was actually $40 billion. Thus, the 2018 development plan which, according to Defendants, supported the Goal, was inflated by 50%. ¶¶120-121.

---

[6] Defendants also rely on *In re Philip Morris International Inc. Securities Litigation*, where the court found that a company's statements that it was "conducting extensive and rigorous scientific studies" were not actionable because there was no way to measure or verify the quality of the studies. 437 F. Supp. 3d 329, 350 (S.D.N.Y. 2020). But here, as this Court found, "the calculation methods could be tested and the rigor of the processes objectively verified." Opinion at 35.

[7] Defendants' argument regarding Woods's statements on March 5, 2020 mischaracterizes Plaintiffs' allegations. MTD at 35-36; ¶¶398, 400. These statements are false because they continued Defendants' fiction that Exxon would achieve the Goal and that the Goal was based on a legitimate Development Plan, as discussed in this Section.

The Court previously found that statements like these were forward-looking and accompanied by adequate cautionary language because the FAC "ha[d] not pleaded facts showing that Defendants knew the warned-of risks were already coming to fruition[.]" Opinion at 24. Thus, these statements were protected by the PSLRA safe harbor. *Id.* at 20-27. As detailed below, Plaintiffs have alleged new facts in the SAC that establish: (1) the warned-of risks were no longer merely theoretical and had in fact already materialized, and (2) Woods and Mallon knew their statements were false at the time they made them (as did Bond, who furnished false information for those statements with intent). *Lormand*, 565 F.3d at 249 ("The defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized.").

Defendants' cautionary statements that "production rates[,] . . . [and] project plans . . . could differ materially due to . . . reservoir performance; the outcome and timing of exploration and development projects; [and] timely completion of construction projects" were describing risks that had already materialized. *See, e.g.*, Dkt. 70, A-171. Further, Defendants knew that the risk that Exxon's "production rates" and "project plans" would materially differ had materialized because the assumptions used in the 2018 Development Plan had been proven false by Exxon's own historical drilling experience in 2018, and again later by Drs. Burch and Mallon in or about March or April 2019. "When risks have begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future. When cautionary language is glossed over as a future risk rather than the certain dangers that had already begun to materialize then the warnings are no longer meaningful." *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2021) ("*Anadarko*"); *see In re Apache Corp.*, 2022 WL 4277350, at *5 (S.D. Tex. Sept. 15, 2022) *memorandum and recommendation adopted* No. 4:21-cv-00575 (S.D.

22

Tex. Nov. 29, 2022) (ECF No. 81) (rejecting cautionary language by oil company warning of "risk that [company] will not encounter commercially productive oil and gas reservoirs" because plaintiffs alleged that at the time the statements were made, defendants had "data indicating that [company] would not encounter commercially productive oil and gas reservoirs.").[8]

### 3.    Woods's Misstatement During the March 6, 2019 Investor Day Call

During a March 6, 2019 Investor Day call, an analyst questioned Woods about the shape of the "Permian Production Curve," as it showed a very steep increase in production. ¶¶9, 367. Woods stated, "*It goes back to the development plan we have in place* . . . . It's about putting all of that machine on *so what we've done in 2018* and we will continue to do in 2019 is an element of delineation, *of understanding the resource*, a lot of building the infrastructure such that when we bring those wells on, we have evacuation and we have separation facilities in place. *That's what we've been doing in 2018*." *Id.*

This statement was false. *First*, Exxon announced the Goal in response to Chevron's goals, and not based on any analyses. *Second*, even if the Goal *were* based on the 2018 Development Plan, it was falsely inflated by 50% because it had incorporated overly aggressive assumptions about drilling speeds. ¶120. Thus, other metrics, including production goals, would have been similarly inflated. ¶121. *Third*, Woods's statements about "what we've done in 2018" and "what we've been doing in 2018" were false because the actual drilling speeds in the Permian were far slower than those underlying the 2018 Development Plan. Thus, even if the 2018 Development

---

[8] Defendants also argue that some of these statements and additional statements related to the Goal were non-material omissions. MTD at 43-44. But all the statements contained materially misleading information regarding the Goal, as discussed in this Section. Because all these statements falsely led investors to believe that Exxon would be able to produce 1 million barrels in the Permian by 2024, they "created an impression of a state of affairs that differed in a material way from the one that actually existed[,]" and are actionable. Opinion, at 36.

Plan did support the Goal on paper, in fact, what Exxon had "done in 2018" did not. ¶¶120-121.

Defendants do not dispute that this statement not forward-looking. Instead, they argue only that the March 6, 2019 statement is not false because it "merely describ[es] the steps that ExxonMobil was taking to develop the Permian . . . ." MTD at 38. Defendants mischaracterize Plaintiffs' allegations, which are that the statement was false not because of what Woods said regarding steps that Exxon was taking (including Exxon's plan to "unleash the hounds"), but rather because none of the historical facts concerning Exxon's 2018 Development Plan and actual production that Woods said were true. Woods's statement, which both "contained historical facts" and "discuss[ed] specific goals or benchmarks for the future," was therefore verifiably false. *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 2d 151, 162-63 (N.D. Tex. 2007); *cf. Police & Fire Retirement Sys. of City of Detroit v. Plains All American Pipeline, L.P.*, 777 Fed. Appx. 726, 731 (5th Cir. 2019) (rejecting "aspirational statements" about commitment to safety in code of conduct). Defendants' argument that the SAC alleges that Exxon "should have stated its preparations would fail" and that Woods's statement is mere "corporate cheerleading" fail for the same reasons. MTD at 38.

### 4.    Mallon's Misstatements During the June 18, 2019 Conference Call

On June 18, 2019, during the JP Morgan Energy Conference, in connection with the Goal, Mallon stated that "Starting with the Permian, we are on track to deliver on the million barrels a day by 2024. We believe our innovative ***development plan is key*** to that and we continue to see and achieve the milestones that we set for ourselves." ¶384. This statement was false because, in addition to falsely claiming that Exxon was "on track" to meet the Goal when he knew that was not true, *see* Section III.B.3, *infra*, Mallon did not "believe" that the "development plan" could enable Exxon to achieve the Goal. He knew that the Development Plan did not support the Goal and that, at his direction, the plan was being fraudulently inflated through the use of false drilling

24

assumptions so that the plan would falsely appear to support the Goal. ¶¶124-126, 129-131. Further, Exxon did not "continue to see and achieve" its "milestones." ¶¶120, 213-243. As Mallon knew, Exxon had not achieved its milestones because the 2018 drilling times were slower than expected and the 2018 Development Plan was falsely overstated. ¶¶120-121.

### 5.    Woods's Misstatements During the September 4, 2019 Conference

On September 4, 2019, in response to an analyst question about the Goal, Woods proclaimed, "*We didn't go out say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that*. What we ended up saying is, develop the resource in a way that we think maximizes the recovery *is a very grassroots buildup from the beginning of the fundamentals*. And then once we've figured out what was the optimal development of that, *we stacked at the volume to see what it came out to be, and that was where it came out to be*." ¶386.

This statement was false. Woods was proclaiming that Exxon did not fabricate data or back into the Goal, when in fact that is exactly what it did. When Mallon and Bond realized that actual data did not support the Goal, they doctored the inputs to the valuation model until it generated figures that could support the Goal. ¶¶124-131. The Delaware Planning Team was told to "turn the knob" on the software using false assumptions that were contradicted by actual data, until the model spat out the 1 million barrel per day figure. ¶¶13-15, 17-20, 132-137.

Defendants again mischaracterize Plaintiffs' allegations to argue that Exxon's "generalized description of how it was developing the Permian is too vague to be material." MTD at 36. Woods's statement was false because it falsely described not how Exxon was developing the Permian, but how Exxon employed data to calculate the Goal. There is nothing vague or forward-looking about claiming that Defendants did not fabricate data to support the Goal, when in fact, they did. Defendants also argue that Plaintiffs left "essential context" out of this statement because Woods commented that Exxon would "com[e] off a million barrels" if necessary to "sustain an

25

economic return." MTD at 36. But this does not provide any useful context as to how Exxon calculated the Goal in the first place.

### 6. Misstatements Concerning the Then-Current Pace of Exxon's Drilling That Accompanied Misstatements About the Goal

Previously, the Court held that portions of Defendants' statements pertaining to the Goal were not forward-looking, and thus did not qualify for the PSLRA's safe harbor. Opinion at 26-27. The Court concluded that these statements could be actionable if adequately alleged to be false. *Id.* For example, the Court held that Woods's reference to "accelerated value capture" on March 6, 2019 was not forward-looking. *Id.* at 26 (citing to FAC Paragraph 191). The SAC alleges again that this statement is actionable, *compare* ¶362 with FAC ¶191, and alleges additional facts that support the statement's falsity. Specifically, the SAC alleges that that Woods's statement was false because, contrary to the 2018 Development Plan, which calculated the Delaware Basin's NPV at $60 billion based on the rate at which Exxon was able to extract resources from the basin (*i.e.*, the "value capture," *see* Opinion at 26), ¶119, the 2019 Development Plan only estimated the Delaware Basin's NPV to be $50 billion, even after pressuring experts like Dr. Burch to "turn any knobs we could in our modeling software to get the forecasts NPV up[,]" ¶27. In other words, Exxon's 2019 drilling speeds and oil production (*i.e.*, its extraction rates) were slower than the drilling speeds and oil production that factored into the 2018 Development Plan. ¶121.

The SAC alleges as false several additional statements that Woods made in connection with his statements regarding the Goal that are not forward-looking. Specifically, the SAC alleges that the following statements are false:

- In a March 5, 2019 press release concerning the Goal, Exxon stated that its projection was based on a significant "acceleration of value." ¶361. For the same reasons highlighted above, this was false.

- In a March 6, 2019 press release, Defendant Woods stated that Exxon was "exceeding the pace of our expected progress on the aggressive growth strategy we

laid out last year." ¶364. But this was blatantly false because in fact, drilling times were far slower in 2018 than expected. ¶121.

- In the Summary Annual Report published on June 18, 2019, Woods wrote in an open letter to Exxon's shareholders that Exxon had "accelerated operations in the Permian Basin [.]" ¶376. This statement was false because in fact, as of June 2019, Exxon had not accelerated its operations in the Permian Basin, as its drilling times were far slower than hoped. ¶121; *see supra*.

- In response to an analyst question about operations in the Permian during Exxon's Q4 2019 earnings call on January 31, 2020, Woods stated that "the potential of that and the value propositions that we've talked about haven't changed, if anything, we like it better." ¶390. This was false because the NPV, or "value proposition," of the Delaware Basin had changed for the worse: it decreased by at least $10 billion between 2018 and 2019. ¶¶121, 138.

In response, Defendants contend that even though the SAC alleges that these statements were not supported by the actual drilling times, the statements are not false because "whether drilling times were slower than expected is different from whether they were slower than historical rates." MTD at 35. But the fact that drilling times were slower than expected *does* mean that Exxon had not experienced "acceleration of value" or "accelerated operations"; rather, due to the slower than expected drilling times, the true "value" of the Delaware Basin declined by $20 billion and "operations" were not accelerating as Exxon had hoped. Exxon was also not "exceeding the pace of our expected progress"; the pace of its progress was slower than expected.

### B.    THE COMPLAINT PLEADS SCIENTER

"Scienter in a securities fraud case connotes 'an intent to deceive, manipulate, defraud, or severe recklessness.'" *Loc. 703 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) ("*Diodes*"). Severe recklessness means there is "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id*. Courts must "assess all the [scienter] allegations holistically." *Id.* at 956. In the Fifth Circuit, this is done using a three-step framework. *Id.* "First, the factual allegations in the pleadings must be accepted as true. Second, the court must consider

27

the entire complaint[.] . . . Third, the court must consider plausible inferences supporting as well as opposing a strong inference of scienter." *Id.* at 956-57.

Allegations of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences'"; they need only be "as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). On a motion to dismiss, "where there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).

The SAC alleges that Defendants possessed the requisite scienter for two principal reasons. *First*, Woods and Mallon made false and misleading statements knowingly or with severe recklessness. *Second*, Mallon and Bond knowingly furnished false information for inclusion in Exxon's public statements.

### 1.    Woods Made the Goal Statements With Scienter

**March and April 2019 Announcements of the Goal and That It Was Grounded in the 2018 Development Plan and Data.** Woods knew, or was at a minimum reckless in disregarding, that the Goal was unachievable and that his accompanying statements of then-current fact – including on March 6, 2019 that the Goal was based on the "development plan we have in place" – were false:

*First*, although Woods stated on March 6, 2019, that the Goal was based on the "development plan we have in place," ¶367, no such development plan was in place. If the Goal had been based on a "development plan" that "was in place," Exxon's scientists would not have had to reverse engineer the NPV model to create a development plan that could sustain the false Goal. ¶¶122-136.

*Second*, Drs. Burch and Gulden documented in March or April of 2019 that the drilling

28

assumptions underlying the 2018 Development Plan were overly aggressive, resulting in the Development Plan being inflated by 50% compared to the value of the plan if the correct drilling times were used. ¶121. Thus, even if the Goal had been based on the 2018 Development Plan, it could not possibly have been based on what Exxon "was doing in 2018," because Exxon was drilling much more slowly than the Plan had assumed.

*Third*, Exxon and Woods announced the Goal just 95 minutes after Chevron announced its goal. ¶106. Based on the new facts alleged in the SAC, a compelling inference can be drawn that, when the announcement was first made, and when Woods spoke the next day, Woods had not, in fact, determined that the Goal was based on what Exxon "was doing in 2018."

**September 4, 2019 Statement that Exxon Did Not Back Into the Goal.** On September 4, 2019, in response to an analyst question about the Goal, Woods falsely stated that Exxon "didn't go out and say how do we achieve 1 million barrels a day and then figure out if we got inventory to do that." ¶386. But Exxon did exactly that. ¶¶122-136. Woods's knowledge that this statement was false is demonstrated by the facts outlined above, particularly that the Delaware Planning Team had for months been "turn[ing] the knob" on the software using false assumptions, which were contradicted by actual data, to reverse engineer the numbers that Woods had "blasted." ¶136.

**2020 Announcements of the Goal and Accompanying Statement.** Woods reiterated the Goal on January 31, 2020, ¶388, and March 5, 2020, ¶398. Further, on March 5, 2020, Woods stated that the Goal was "an outcome of the plans that we put together . . . ." ¶400. In addition to the facts listed above in connection with Woods's statements in 2019, Woods knew that these statements made in 2020 were false for the following reasons:

*First*, in September or October 2019, Woods and Bond met to discuss the 2019 Development Plan, a core component of which is anticipated drilling speed. ¶¶119, 162-163. Thus,

that Bond and Woods discussed the drilling speed assumptions during this meeting can be inferred.

*Second*, the NPV presented to Woods during the September or October 2019 meeting was $50 billion for the Delaware Basin. ¶¶132, 138. This was $10 billion, or 17%, **lower** than the $60 billion valuation for the Delaware Basin based on the prior year's development plan. ¶¶121, 132. Yet, Woods had "blasted" the Goal to the public that was 80% **higher**. A compelling inference can be drawn that Bond and Woods discussed the reasons for the decline in the NPV, *i.e.*, that the drilling assumptions in 2018 had been inflated and the NPV did not support the increased Goal.

Previously, the Court found that the FAC "lack[ed] details about Bond's and Woods's interactions[.]" Opinion at 12. The new facts concerning the 2019 meeting of Bond and Woods supply these missing details. Specifically, the SAC alleges: (i) a narrow date range during which the meeting occurred (September or October 2019), ¶¶161-163; (ii) who was present (Woods and Bond), ¶162; (iii) what was discussed ("the budget for each team and the amount of capital expenditure needed to achieve the goals of the reserves" and presentation of the false NPV), ¶161; and (iv) how the information was presented at the meetings (by PowerPoint), ¶163. Also, the person in charge of major projects of over $10 billion like the Permian Basin (*i.e.*, Bond), presented the Development Plan directly to Woods in person. ¶162. *See In re Apache Corp.*, 2022 WL 4277350, at *8 (scienter sufficiently alleged on less specific facts than those at issue here about defendants' access to reports about the Permian Basin based on statements from former employees) (collecting scienter cases in the Fifth Circuit).

Defendants ignore these details in arguing that Plaintiffs did not cure the defects that the Court found previously. MTD at 19-20. Defendants also argue that the source of these details – FE4, who worked with XTO and then Exxon for nearly 13 years, and who was sent to the Delaware Basin to research Exxon's drilling and production there, ¶161, and who further **participated in the**

***annual development planning process***, ¶¶162, 182-183 – undermined the credibility of the facts

he supplied. The SAC's new allegations about FE4's "participation" in the annual development

planning process directly refute Defendants' assertion that he "would not have specific knowledge

of Bond's, Woods's, and Mallon's communications." MTD at 20.[9] Defendants' demand that FE4

"explain how Woods or Mallon would have interpreted a purported $10 billion reduction in the

NPV" asks too much of Plaintiffs even under the PSLRA. *Id.* Regardless, the SAC explains how

Woods and Mallon interpreted the $10 billion decrease. *See* ¶¶262, 273.

*Third*, in the Fall of 2019, Drs. Gulden and Burch reported separately to HR that the Goal

was based on false drilling assumptions, and thereby triggered an investigation which reached

"senior management." ¶274. HR reports to the Management Committee, which includes Woods.

*Id.* Additionally, Woods is the only manager common to Drs. Gulden and Burch. ¶154. Contrary

to Defendants' argument, MTD at 29, a compelling inference can be drawn from these facts that

Woods knew, at least as of the Fall of 2019, that two respected Exxon scientists separately believed

that the drilling speed assumptions underlying the Goal were false.

Additional facts supporting Woods's scienter are:

(i)     the Goal was 80% higher than Exxon's previously-announced goals, and its significance to Exxon and to investors demanded that Woods give his utmost attention to the accuracy of its data inputs, ¶¶106, 110;

(ii)    Exxon retaliated against Drs. Gulden and Burch when it suspected that they had spoken with the *Wall Street Journal*, ¶¶158-160;

(iii)   Woods reviewed the Development Plan each year, and was intimately familiar with its input and the processes that generated it, ¶¶162-164;

(iv)    Woods led Exxon's corporate culture of inflating reserves and refusing to take write-downs, ¶¶191, 193; *see also* ¶¶100-101, 188-193, 284;

---

[9] *Compare with Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 434 (5th Cir. 2019) (discounting former employee "who did not relate any interaction with" defendants); *Jacobowitz*, 2022 WL 976003, at *16 ("The CWs' general assertions are . . . untethered from the events relevant to [plaintiff's] theories of fraud").

31

(v)      Woods personally visited the Permian Basin where he "tour[ed] a well site where directional drilling and hydraulic fracturing technologies [were] being employed" and Exxon published a picture of Woods on-site as part of their press materials, ¶¶286-287;

(vi)      Woods spoke regularly with investors and analysts about the importance of the Permian Basin, ¶¶288-289, 362; and

(vii)      Woods was financially motivated to perpetrate the fraud, ¶¶294-295, 297.

Although the Court previously found that certain of these facts did not give rise to an inference of Woods's scienter, the SAC added new facts to address the Court's concerns. *See* ¶277 (new facts establishing retaliation); ¶¶281-84 (new facts about corporate culture); ¶¶286-87 (new details about Permian visit). Further, these facts, viewed holistically with the new facts that Woods discussed the fraudulent 2019 Development Plan with Bond, and also that Drs. Gulden and Burch reported that they believed Exxon was committing securities fraud to HR, which reported to the Management Committee, support a compelling inference that Woods knew that the 2019 Development Plan, and all metrics flowing from it, were based on false assumptions and inflated.

Defendants do not offer any competing innocent inference. Rather, they assert that Plaintiffs did not "allege that anyone told Woods that any learning curve assumptions were incorrect." MTD at 18. But the SAC's allegations strongly infer that Woods was told exactly that at his September or October 2019 meeting with Bond and when HR alerted the Management Committee to Drs. Gulden and Burch's complaints. ¶¶162-163; 144, 274-277. In any event, Plaintiffs need not allege such a "smoking gun" at this stage. *See Lormand*, 565 F.3d at 251.

### 2. Woods Made False Statements About Exxon's Proved Reserves and Resource Base With Scienter

The proved reserves and resource base figures are derived from the Development Plan, and false assumptions about drilling speeds artificially inflate these figures. Thus, because Woods knew that the Development Plan was based on false drilling speeds, *see supra* Section III.B.1, he

knew that the proved reserves and resource base figures were false. For example, the SAC alleges that at the September or October 2019 meeting, Woods and Bond specifically discussed the "reserves" and the fraudulently inflated Development Plan they were based on. ¶¶161-162.

Further, Woods increased Exxon's goal for oil production in the Permian to 1 million barrels a day by 2024, which was nearly an 80% increase over Exxon's prior stated goal. ¶106. But Woods was also aware, because of his involvement in the annual development planning process (including reviewing NPV figures), that the Delaware Basin's estimated NPV dropped from $60 billion in 2018 to $50 billion in 2019. ¶¶119, 131, 163. Woods was also aware of information that undermined the figures in Development Plan to such a degree that – if Woods did not have actual knowledge of the figures' falsity – created a "danger of misleading buyers or sellers . . . so obvious that [Woods] must have been aware of" the figures' inaccuracy. *Diodes*, 810 F.3d at 957; *see also In re Apache Corp.*, 2022 WL 4277350, at *7-8 (crediting allegations that defendants received "reports and updates" on Permian Basin and collecting Fifth Circuit cases where scienter was adequately alleged because defendants "knew facts or had access to information" or "received reports" suggesting their statements were false); *Nykredit Portefølje Admin. A/S v. ProPetro Holding Corp.*, 2021 WL 9037758, at *27 (W.D. Tex. Sept. 13, 2021) (scienter pled where "substantial indication that Smith had regular access to information that ProPetro was required by SEC rules to disclose but did not"); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (collecting cases where allegations sufficiently alleged scienter based on defendant's failure to check information for which they were responsible or oversaw).

The following facts also support Woods's knowledge of the falsity of the reported figures:

*First*, Exxon disclosed in its SEC filings, including its year-end 10-Ks signed by Woods, that the proved reserves and resource base figures incorporated values from the Development Plan

(and specifically, its underlying drilling assumptions). ¶¶50, 70; *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 2010 WL 9077875, at *32 n. 56 (S.D. Tex. Jan. 19, 2010) ("SEC documents are attributable to corporate officers that are signatories.").

*Second*, the GRG, which worked closely with the Development Planning Team to generate the annual proved reserves, reported directly to the Management Committee, and thus Woods, ¶¶71, 77, 278.

*Third*, Woods perpetuated Exxon's corporate culture of failing to write down reserves, which continued throughout the Class Period. ¶¶188-190, 281-284.[10] As FE3 recalled, because "ExxonMobil never ever writes down reserves[,]" there was always talk of "albatrosses" on the Company's books. ¶101. Rhodes similarly described Exxon's strategy towards writing down reserves as "kicking the can down the road." ¶100. Enrique Rosero, Dr. Gulden's husband and a former Exxon employee, was demoted repeatedly and eventually forced to resign because he had "questioned whether Exxon would have to write down some of its oil and gas assets." ¶190. Given Exxon's hierarchical nature, Woods's position as "top god," and his admission that "[l]eaders influence culture by setting expectations, building structure, teaching others, and driving accountability," Woods was aware of and responsible for this culture. ¶¶191, 193, 284.

These new facts directly connect Woods "to the tone or culture issues" at Exxon, *see* Opinion at 7, and provide additional, corroborative detail, which bolster an inference of scienter, as opposed to the mere "mismanagement" at issue in *In re Hertz Global Holdings Inc.* cited by

---

[10] As one analyst noted, Exxon's refusal to write down reserves "raises serious questions of financial stewardship," as "it is impossible that no assets have been impaired." ¶189. As this Court found, "[t]one can be circumstantial evidence that supports an inference of scienter[.]" Opinion, at 7; *see Luna v. Marvell Tech, Grp.*, 2017 WL 2171273, at *4-5 (N.D. Cal. May 17, 2017).

Defendants. 905 F.3d 107, 117 (3d Cir. 2018).[11]

### 3.    Mallon Personally Directed Employees to Falsify Key Information Concerning Exxon's Publicly-Reported Metrics

Mallon directed Bond to falsify inputs into the Delaware NPV model so that it would (a) increase the NPV above the true $40 billion figure, and (b) produce artificially inflated numbers that would support the Goal. ¶¶122-136. He did this not once, but twice, first in March or April 2019, and again in May 2019 when he communicated that Bond and her team "had not lied hard enough yet." ¶129. Only when the NPV figure supported the Goal did Mallon approve the falsified 2019 Development Plan. And, on June 18, 2019, while the Delaware Planning Team was generating false numbers at Mallon's direction, Mallon reiterated the Goal – "[s]tarting with the Permian, we are on track to deliver on the million barrels a day by 2024" – attributing it to the "development plan" which he characterized as "key." ¶384.

In the face of Mallon's central role in the falsified 2019 Development Plan, Defendants claim only that Mallon did not know that the Goal was not achievable when he lied on June 18, 2019, and that the allegations that Mallon told Bond to increase the Delaware Basin NPV are not evidence of scienter. MTD at 22. This argument strains credulity: there is no innocent reason why Mallon would have directed Bond to increase the NPV.[12] Defendants argue that the reduced NPV

---

[11] Defendants impermissibly ask the Court to take judicial notice of Exxon's March 31, 2020 Form 10-Q (a document not referenced in the SAC) to dispute Plaintiffs' factual allegations of Exxon's well-documented "no write-down" policy. MTD at 14. "Defendants cannot introduce disputed facts though judicial notice at the dismissal stage . . . ." *Miller v. Stroman*, 2020 WL 2494576, at *3 (W.D. Tex. May 14, 2020) (denying request to take judicial notice of public records in a motion to dismiss where defendants did so to challenge plaintiff's factual assertions). Accordingly, the Court should disregard Defendants' reference and this argument entirely. Further, the write-down that Defendants did not take until after the end of the Class Period referenced in the SAC was half a billion dollars more than the "revision" noted by Defendants. ¶¶256-258.

[12] Defendants argue that the SAC does not provide sufficient detail about the Bond/Mallon meetings. MTD at 22-23. That is incorrect. The SAC alleges that the meetings were in person in

would not have alerted Mallon that "near-term production goals were not attainable." MTD at 23. But Mallon's false statement did not concern "near-term production goals," and this argument ignores that Mallon directed that numbers be falsified. Defendants' argument regarding the "innovative development plan" similarly fails, MTD at 23; the SAC alleges that the Development Plan did not support the Goal, regardless of how "innovative" it may or may not have been.

Mallon's scienter is further supported by his financial incentive to inflate the Development Plan. ¶¶115, 126, 265. Drs. Gulden and Burch alleged that Mallon instructed Bond to increase valuations because his annual performance review was tied to how much these numbers went up. ¶115. Such facts "can enhance the strength of the inference of scienter[.]" Opinion, at 14.

### 4.      The Complaint Alleges Exxon's Corporate Scienter

In the Fifth Circuit, an employee's scienter is imputed to the company if the employee somehow "participated" in making false statements. *See Southland*, 365 F.3d at 366. Significantly, "participation" does not require the employee to have been the "maker" of the statement. *See, e.g.*, *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 881-85 (W.D. Tex. 2014). Participation includes "ordering or approving any of such statements or furnishing information or language for inclusion therein or omission therefrom, or the like." *Southland*, 365 F.3d at 366-67.[13] As this Court

---

Houston in March or April, May, and July 2019. ¶¶ 124, 129, 131. It also specifically alleges what Mallon communicated to Bond in directing her to falsify the NPV. *Id.*

[13] *See Lee*, 29 F. Supp. 3d at 882-85 (*Southland* "allows for the imputation of scienter from an employee who 'makes' a false statement *or* an employee . . . who 'furnished information' used in a false statement"); *Kerr v. Exobox Techs. Corp.*, 2012 WL 201872, at \*14 (S.D. Tex. Jan. 23, 2012) (under *Southland*, "Plaintiffs need only assert that Sonfield furnished the information or language for inclusion in order to attribute his scienter to Exobox"); *In re Cognizant Tech. Sol. Corp. Sec. Litig.*, 2020 WL 3026564, at \*25 (D.N.J. June 5, 2020) ("*Cognizant*") ("Courts that have applied the 'furnish information' standard under *Southland* have imputed an individual's scienter to a corporation where that person was *not* responsible for making any of the alleged misstatements, but supplied misinformation internally to other corporate individuals who then made the allegedly false statements with that information.") (citing cases).

36

explained, "the required state of mind must actually exist in the individual making (or being the cause of the making of) the misrepresentation." Opinion at 19-20 (citing *Lee*, 29 F. Supp. 3d at 883). While, as set forth in Sections III.B.1-3, *supra*, Exxon's scienter was derived from Woods and Mallon as speaking defendants, the SAC also pleads as an independent basis for Exxon's scienter that Mallon and Bond intentionally furnished false information for inclusion in Exxon's public statements.

### a.    Mallon and Bond Generated False Data Which They Knew Would Be Incorporated Into Exxon's Public Statements

Mallon and Bond furnished false data for inclusion in Defendants' false statements about the Goal, proved reserves, and resource base. At Mallon's direction to inflate the 2019 Development Plan in March or April 2019 and again in May 2019, Bond supplied "learning curve" drilling assumptions that impacted and distorted Exxon's statements to investors. ¶¶124-131.[14] Specifically, the false "learning curve" drilling assumptions inflated the proved reserves that Defendants reported to investors through the end of the Class Period, ¶¶378, 392, and rendered false Defendants' claims that Exxon's process for calculating proved reserves and resource base values was "rigorous" or otherwise reliable, ¶¶380, 382, 394, 396. As explained, the Goal was supported by the false Development Plan, ¶70, and Exxon's stated proved reserves (and therefore resource base as well) were based on the Development Plan, including "increased drilling activity." ¶¶49-51, 70. By falsifying and inflating the Development Plan, Mallon and Bond falsified and

---

[14] Defendants argue that "Plaintiffs have not alleged that Bond and Mallon knew of any concerns about Woods's April 26, 2019 statement until October 2019." MTD at 29. But Mallon directed Bond in March or April 2019 to inflate the NPV. ¶140; *see also* ¶124 (the takeaway message from the March or April meeting was that "Bond needed to bring him a new plan" that supported the Goal).

inflated the Goal, the stated proved reserves, and the resource base. ¶¶308-309.[15]  Their scienter can therefore be imputed to Exxon. ¶312. *See, e.g.*, *Lee*, 29 F. Supp. 3d at 882 (imputing scienter from employee who told speaking defendants false information that they "ultimately broadcast . . . in various statements"); *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 515-16 (E.D. Va. 2018) (applying *Southland* and imputing to the corporate defendant the scienter of lower-level employees who "furnished false information on . . . cost overruns and profit rates to corporate officers for inclusion in SEC filings and other public reports"); *Cognizant*, 2020 WL 3026564 at *28 ("[F]urnishing information for the drafters of Cognizant's financial statements – that Coburn allegedly knew to be false in furtherance of the scheme – is sufficient to meet the corporate scienter standard articulated by the Fifth Circuit at the pleading stage."); *Pub. Employees' Ret. Sys. of Mississippi v. Mohawk Indus., Inc.*, 564 F. Supp. 3d 1272, 1303 (N.D. Ga. 2021) (denying motion to dismiss a non-speaking defendant where they furnished information).

Mallon and Bond also acted with the intent to defraud. At Mallon's direction, Bond instructed the Delaware Planning Team to falsify the assumptions that they used to calculate the NPV for the purpose of artificially inflating the production estimates and the NPV that Exxon used in its SEC filings. ¶313. Further, when Bond executed Mallon's instructions by directing Dr. Burch and others to "claw back" lost value and to use "learning curve assumptions" in calculating the NPV, Bond intended to artificially inflate the Development Plan, which she knew was used to support Exxon's statements to investors. *Id.* Bond instructed the Delaware Planning Team to use

---

[15] These allegations go far beyond the mere "approval" based on a "senior role" at issue in *In re Tupperware Brands Corp. Securities Litigation* which Defendants rely on. 2021 WL 6755476, at *4 (M.D. Fla. Aug. 9, 2021). Similarly, in *Edgar v. Anadarko Petroleum Corp.*, the sole basis for knowledge was the defendant's attendance at a meeting. 2019 WL 1167786, at *10 (S.D. Tex. Mar. 13, 2019). Here, Mallon personally directed Bond to artificially inflate the NPV. ¶¶124-126, 129.

these inflated metrics "***so that the 2019 NPV estimate would increase and so that production projections would be consistent with the CEO's public pledges***" to investors. *Id.*

Thus, Mallon and Bond acted with the requisite intent to defraud that makes their scienter imputable to Exxon. *See Stone v. Life P'ers Holdings, Inc.*, 26 F. Supp. 3d 575, 608-12 (W.D. Tex. 2014) (executives "active participants" in false statements where they "intentionally provided the company's outside auditor with erroneous information" which was incorporated into public filings); *Orbital ATK Inc.*, 294 F. Supp. 3d at 515-16 (defendants "had a bias towards maintaining a targeted profit rate, which led to inappropriate use of management reserves to maintain the targeted profit rate" and "actively suppressed information related to cost overruns and the override of certain controls due to a pressure to achieve cost savings and maintained a targeted profit rate"); *Cognizant*, 2020 WL 3026564, at *27 (defendants furnished false statements to conceal bribes).

The SAC does not merely allege that Mallon acted "to make [his] department appear well managed" or to "make himself look better." MTD at 26-27. In addition to the allegations that Mallon directed Bond "to make the plan consistent with the [Goal] that Woods had promised investors," Mallon's scienter can be inferred because he refused to write down reserves, which would have lowered his bonus. ¶¶125-126. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) ("Hammond had a motive for the revenue fraud: his bonus received for achieving targeted revenues."); *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *7 (W.D. La. Aug. 17, 2017) (crediting allegations of financial benefits "from the bonus system" where "bonuses were based on the growing reserves").

### b.      Defendants' Remaining Arguments Fail

Consistent with their false "déjà vu" narrative, Defendants attempt to gloss over the new details in the SAC that cured the deficiencies identified in the Court's Opinion. This effort fails.

*First*, Defendants contend that Bond was not senior enough to be credited for corporate

39

scienter. MTD at 24. This argument fails for several reasons. It ignores new details in the SAC demonstrating that Bond was senior enough to oversee, maintain, and orchestrate the fraudulent inflation of the Development Plan. ¶¶45, 300-312; *see also* ¶¶182-183, 271-272 (describing Bond's senior position in Exxon and FE4's basis for knowledge of Bond and Woods's interactions). The SAC further alleges that Bond directly presented the 2019 Development Plan to Woods, which addresses the Court's concern that Bond was "several levels removed from the employees at the top of the reporting structure who interact with investors." Opinion at 20. Further, Bond orchestrated the fraud at the express direction of Mallon, who bore oversight responsibility for the Development Plan and the reserves, and was undisputedly a "senior executive." Finally, there is no bright-line seniority test required for scienter to be imputed to a company. *See, e.g.*, *Orbital ATK Inc.*, 294 F. Supp. 3d at 515 (applying *Southland*'s "furnishing" standard and holding that "the scienter of a *lower-level employee* can be imputed to the corporation for the purposes of corporate liability under § 10(b)"); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 477 (6th Cir. 2014) ("[A] corporation is not insulated if lower-level employees, contributing to the misstatement, knowingly provide false information to their superiors with the intent to defraud the public."); *SEC v. City of Miami*, 988 F. Supp. 2d 1343, 1361 (S.D. Fla. 2013) (rejecting argument that "low level employee['s]" scienter could not be imputed).

*Second,* Defendants assert that the SAC does not allege that "Mallon and Bond furnished the learning curve assumptions to anyone, let alone furnished them for use in ExxonMobil's statements about production goals." MTD at 25-26. Again, Defendants resort to their blinders, ignoring that Mallon and Bond furnished information that was incorporated into Exxon's proved reserve and resource base and also rendered statements about the Goal false. ¶¶307-314.

*Third*, Defendants argue that the timeline precludes a finding that Woods's March and

April 2019 statements were false. MTD at 25-26. Putting aside that this challenges falsity, not corporate scienter, Defendants again ignore that Woods's March and April 2019 statements were false because they were, at best, based on a false Development Plan which was contradicted by the actual 2018 drilling speeds, and was actively being manipulated by Bond at Mallon's direction beginning in March or April 2019 – when the statements were made. ¶124.

*Fourth*, Defendants conflate issues by asserting that "Plaintiffs have never explained how someone would have interpreted a lowered valuation to mean that a near-term production goal was unattainable." MTD at 26. But Mallon, Bond, and Drs. Gulden and Burch did interpret the lower NPV to mean the Goal was not attainable. That is the precise reason why they determined it necessary to *raise* the NPV: so that the Goal would appear attainable. ¶¶124-132. Defendants do not offer any other reason why Bond and Mallon would have inflated the Delaware Basin's NPV.

*Fifth*, Defendants contend that when Woods referenced the "development plan" on March 5, 2020, he was excluding the Permian. MTD at 26. But the transcript makes clear that the opposite is true: Woods was answering a question about Exxon's production goals considering "***obviously*** the growth in the Permian." Dkt. 99-1, A-225. Immediately preceding Woods's statement that the Goal was "an outcome of the plans that we've put together," Senior Vice President and Management Committee member Neil Chapman noted that "5 million [barrels of oil equivalent per day] comes from primarily the increases in ***getting up to 1 million barrels a day in the Permian***," and that "the large elements in growth come … ***from the Permian*** …." *Id.*

*Sixth*, Defendants contend that "Plaintiffs do not plead with particularity that Mallon or Bond knew that the GRRG would use the Planning Team's learning curve assumptions when generating the Proved Reserves estimate or the Resource Base." MTD at 27-29. But the SAC does allege this, and the Court previously rejected this argument. Opinion at 31-32; ¶¶309-312. Further,

41

Mallon knew that the proved reserves were based on the Development Plan from his oversight responsibility over the GRG, which was responsible for the reserves, ¶¶72-73, a fact which strengthens, not undermines, his scienter.[16]

### 5.    Plaintiffs Sufficiently Plead Scienter for All Alleged Misstatements

Woods made all of the false and misleading statements Defendants claim are "unattributed" because they were signed by Woods, issued by Exxon and attributed to Woods, included in press releases quoting Woods, or otherwise closely linked to other statements made by Woods.[17] "Corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue . . . includ[ing] a signature on the document." *Southland*, 365 F.3d at 365; *see North Port Firefighters Pension-Local Option Plan v. Temple Island, Inc.*, 936 F. Supp. 2d 722, 743-45 (N.D. Tex. Mar. 28, 2013) (director who signed cover letter accompanying Form 8-K made the statements within the 8-K). Because Woods signed cover letters introducing the reports, he "made" the statements within them. Woods was likewise the "maker" of press releases that he is quoted in. *See Walker v. Rent-A-Center*, 2005 WL 8161388, at *22 (E.D. Tex. July 25, 2005) (defendant was "maker" of press release which directly quoted him).

### C.    THE COMPLAINT ALLEGES SCHEME LIABILITY AGAINST DEFENDANTS

[16] Rhodes's account is consistent with allegations that Mallon knew that the proved reserves were based on the Development Plan. The SAC alleges that the reservoir engineers and development planners worked together. ¶69. Rhodes also explained that the production forecast was one of two key inputs into the reserves. ¶¶77, 83, 89-90. Rhodes's account is corroborated by FE3. ¶93.

[17] *See* Dkt. 99-1, A-141-A-144 (March 7, 2018 press release quoted in SAC Paragraph 345 quoting Woods); Dkt. 99-1, A-145-A-147 (May 30, 2018 press release quoted in SAC Paragraph 349 quoting Woods); ¶364 ("The March 6, 2019 press release quoted Defendant Woods[.]"); ¶¶370-371 (quoting nearly identical statements from the March 5 and March 6, 2019 press releases, which included quotes from Woods); ¶376 (noting that the 2018 Summary Annual Report discussed in ¶¶378, 380, and 382 contained an opening letter signed by Woods).

**MALLON, BOND, AND EXXON**

Defendants Mallon, Bond, and Exxon are also liable under SEC Rules 10b-5(a) and (c) for disseminating false information through Exxon and engaging in deceptive conduct. In *Lorenzo v. SEC*, the Supreme Court held that persons who disseminate false statements with the intent to defraud – even if they are not the "makers" of the statements – can be liable under Rule 10b-5(a) and (c), known as "scheme liability." 139 S. Ct. 1094 (2019). The defendant in *Lorenzo* was a broker who sent an email drafted by his boss to investors knowing that it was false. The Court held that although the broker was not the "maker" of the statement under *Janus*, he employed a "scheme" and "artifice to defraud" under Rule 10b-5(a), and he also engaged in a "practice, or course of business" that "operate[d] . . . as a fraud or deceit" under Rule 10b-5(c). *Id*. at 1100-03.

Notably, courts have held that "under *Lorenzo*, unlike prior precedent, a plaintiff need not necessarily allege deceptive conduct that extends beyond the alleged misstatement itself." *Cognizant*, 2020 WL 3026564, at *17 ("scheme liability can be based purely on conduct involving *only* a misstatement");[18] *compare with* MTD at 44 (citing inapposite authority).[19] However, pleading both deceptive conduct and dissemination of false information strengthens a scheme-

---

[18] *See SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021) ("*Lorenzo* instructs that a plaintiff may make out a scheme liability claim by identifying manipulative or deceptive acts grounded in alleged misrepresentations or omissions."); *Boston Ret. Sys. v. Alexion Pharms., Inc.,* 2021 WL 3675180, at *141-42 (D. Conn. Aug. 19, 2021) (same); *SEC v. Winemaster*, 2021 WL 1172773, at *23-24 (N.D. Ill. Mar. 29, 2021) (same); *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *9-11 (S.D.N.Y. Mar. 30, 2021) (same); *In re Alphabet, Inc. Sec. Litig.*, 2021 WL 2448223, at *15 (9th Cir. June 16, 2021) (same).

[19] *SEC v. Narayan* predates *Lorenzo* and recites a now outdated standard. *Compare Narayan*, 2017 WL 4652063, at *7 (N.D. Tex. Aug. 28, 2017), *with Sequential Brands*, 2021 WL 4482215, at *6. *Anadarko*, citing *Lorenzo*, **sustained** the plaintiff's 10b-5(a) claim on similar facts. 514 F. Supp. 3d at 951. In *SEC v. Rio Tinto Plc*, the Second Circuit merely considered (on interlocutory appeal) whether *Lorenzo* abrogated another Second Circuit case, and declined to take up the issue of "whether the scheme liability claims in [that] complaint allege something beyond misstatements and omissions." 41 F.4th 47, 53-54 (2d Cir. 2022).

43

liability claim. For example, in *Cognizant* the court upheld scheme liability claims against a defendant who participated in bribery and disseminated false public statements to cover it up. *See id.* at *17-18; *see Winemaster*, 2021 WL 1172773, at *23-24 (scheme liability for negotiating contracts and concealing them from auditor).

Likewise, here, Mallon and Bond actively participated in disseminating false statements and engaged in deceptive conduct. *First*, Mallon and Bond directed that employees artificially inflate the Development Plan "for the sole purpose of inflating the NPV estimate and production projections." ¶305. Mallon and Bond directed the use of false learning curve assumptions "[t]o ensure conformity" with Woods's "public pledge." ¶301. Mallon and Bond also knew that Exxon's stated proved reserves and resource base valuations were based on the Development Plan. ¶308.

*Second*, Mallon and Bond engaged in deceptive conduct because they actively participated in and directed the manipulation of the Development Plan. ¶¶300-314. Falsifying the plan took months, and involved multiple meetings between Bond and Mallon until the NPV was inflated enough for Mallon's approval. ¶¶302-303. Bond ignored the engineers' objections to using the false learning curve assumptions. ¶¶132, 305. When questioned about the "impossible" drilling speeds during a team-wide meeting, Bond told the audience that Dr. Burch, the presenter, must have made a mistake, instead of admitting that the learning curve assumptions were fabricated. ¶306. This is a separate act of deception and advances the finding of a scheme. Not only did Bond cover up the truth during the meeting when the numbers were challenged by another scientist, after the meeting, the numbers were not changed or corrected. ¶137-139.

Further, in violation of SOX's whistleblower protection provision, and with Mallon's knowledge, Exxon illegally retaliated against Drs. Gulden and Burch, who called attention the fraud, by commissioning a sham investigation of their claims and then terminating them. ¶275.

These allegations plead scheme liability under *Lorenzo*. *See, e.g.*, *Anadarko*, 514 F. Supp. 3d at 951 (sustaining scheme liability claims against company that disseminated false information and retaliated against whistleblowers); *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *7 (S.D.N.Y. Feb. 17, 2022) (sustaining scheme liability claims against non-speaker individual defendant where he and his team prepared data used to create "false reports about projected sales" that were incorporated into public statements); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 664-65 (E.D. Va. 2021) (sustaining scheme liability claims based on allegations including "act[ing] in concert to deceive the FDA . . . including submitting falsified data and studies").

Defendants' only response to Plaintiffs' well-pleaded scheme liability allegations is that "a proper pleading of scheme liability requires that the complaint allege conduct beyond misrepresentations or omissions." MTD at 44. This fails for two reasons. First, as explained, under *Lorenzo*, "scheme liability can be based purely on conduct involving only a misstatement." *Cognizant*, 2020 WL 3026564, at *17. Second, Plaintiffs pleaded deceptive conduct by Mallon and Bond beyond simply the false and misleading statements at issue. *See* ¶¶298-309.

## IV.    CONCLUSION

For the foregoing reasons, the Motion should be DENIED. Should the Court grant the Motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2) ("The Court should freely give leave when justice so requires.").

Dated: December 5, 2022                  Respectfully submitted,

                                         */s/ Daniel L. Berger*
                                         Daniel L. Berger (*pro hac vice*)
                                         dberger@gelaw.com
                                         Barbara J. Hart (*pro hac vice*)
                                         bhart@gelaw.com
                                         Caitlin M. Moyna (*pro hac vice*)
                                         cmoyna@gelaw.com
                                         Lauren Salamon (*pro hac vice forthcoming*)

lsalamon@gelaw.com
**GRANT & EISENHOFER PA**
485 Lexington Avenue
New York, New York 10017
Phone: (646) 722-8500
Fax: (646) 722-8501

*Co-Lead Counsel for the Class and Counsel for Co-Lead Plaintiff Amalgamated Bank*

John Rizio-Hamilton (*pro hac vice*)
johnr@blbglaw.com
Rebecca E. Boon (*pro hac vice*)
rebecca.boon@blbglaw.com
Thomas Sperber (*pro hac vice*)
thomas.sperber@blbglaw.com
Stephen Boscolo (*pro hac vice*)
stephen.boscolo@blbglaw.com
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for the Class and Counsel for Co-Lead Plaintiff State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island*

Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
**McKOOL SMITH PC**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

46