**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiff*,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, NEIL A. CHAPMAN, JACK WILLIAMS, NEIL A. HANSEN, DAVID ROSENTHAL, LIAM M. MALLON, JEFFREY J. WOODBURY, and SARA N. ORTWEIN,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:21-cv-00194-N |

**REPLY TO LEAD PLAINTIFFS' MEMORANDUM**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE SECOND AMENDED CLASS ACTION COMPLAINT**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, TX 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122

*Attorneys for Defendants Exxon Mobil*
*Corporation, Darren W. Woods, Liam M.*
*Mallon, and Melissa Bond*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

I.    The SAC fails to allege particularized facts to support a strong inference of
      scienter. ................................................................................................................... 2

      A.    The SAC does not link Woods to knowledge of any false information. ................. 2

            1.    Plaintiffs still do not plead that Woods knew that any learning
                  curve assumptions were false................................................................. 2

            2.    The SAC's "information and belief" allegations do not connect
                  Woods to Burch and Gulden's complaints and are mere position
                  pleading................................................................................................. 5

            3.    Plaintiffs have not alleged Woods's scienter with respect to Proved
                  Reserves or the Resource Base because they fail to allege Woods
                  knew the Proved Reserves or Resource Base were based on false
                  assumptions........................................................................................... 6

            4.    Plaintiffs' grab-bag of remaining scienter allegations do not
                  support a strong inference of Woods's scienter. ..................................... 7

      B.    Plaintiffs fail to allege that Mallon made any statements with scienter. ................. 9

      C.    Mallon and Bond did not "furnish" any fraudulent information because
            Plaintiffs fail to allege that Mallon and Bond had the requisite scienter to
            furnish information. ................................................................................................ 10

            1.    Plaintiffs do not allege that Mallon and Bond had reason to believe
                  the learning curve assumptions would be used in ExxonMobil's
                  public statements or that they intended to defraud. ................................ 10

            2.    The Opposition fails to rebut Defendants' additional scienter
                  arguments about "furnishing." ............................................................... 11

      D.    Plaintiffs fail to allege scienter for the unattributed statements because
            they fail to link the statements to any speaker. ...................................................... 14

II.   Plaintiffs fail to plead any actionable misstatements or omissions................................. 14

A.   ExxonMobil's production goal statements were forward-looking statements protected by the PSLRA's safe harbor. ................................................14

B.   Plaintiffs have not alleged ExxonMobil's Proved Reserves were misleading because Plaintiffs fail to link the purportedly inflated learning curve assumptions to the Proved Reserves. ...........................................................16

   1.   Plaintiffs' failure to plead with particularity that the GRRG used the Delaware Planning Group's learning curve assumptions is fatal. ........16

   2.   Because Proved Reserves are based on existing economic conditions, Plaintiffs cannot plead they include learning curve assumptions. ...............................................................................................17

C.   Plaintiffs cannot plead with particularity that ExxonMobil misrepresented its Resource Base. .....................................................................................17

D.   Plaintiffs cannot plead with particularity that ExxonMobil's statements about its rigorous or disciplined reserves process were false. ...............................18

E.   Plaintiffs cannot challenge statements they do not allege are false. ......................18

III.   Plaintiffs' "scheme" liability claims are unmoored from the facts and the law. ................20

CONCLUSION .................................................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ABC Arbitrage Plaintiffs Group v. Tchuruk*,
291 F.3d 336 (5th Cir. 2002).................................................................................................6, 8

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002).................................................................................................7, 8

*In re Apache Corp.*,
2022 WL 4277350 (S.D. Tex. Sept. 15, 2022)..........................................................................4

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005)....................................................................................................11

*In re BP p.l.c. Securities Litigation*,
843 F. Supp. 2d 712 (S.D. Tex. 2012).......................................................................................8

*In re Cognizant Technology Solutions Corp. Securities Litigation*,
2020 WL 3026564 (D.N.J. June 5, 2020) ...........................................................................11, 20

*Crutchfield v. Match Group, Inc.*,
529 F. Supp. 3d 570 (N.D. Tex. 2021).......................................................................................8

*Edgar v. Anadarko Petroleum Corp.*,
2019 WL 1167786 (S.D. Tex. Mar. 13, 2019) ..........................................................................4

*Electrical Workers Pension Fund, Local 103, I.B.E.W. v. Six Flags Entertainment Corp.*,
524 F. Supp. 3d 501 (N.D. Tex. 2021).....................................................................................16

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2001).....................................................................................15

*Glazer Capital Management, LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008).....................................................................................................3

*In re Hertz Global Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018).......................................................................................................8

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
537 F.3d 527 (5th Cir. 2008)....................................................................................................13

*Jacobowitz v. Range Resources Corp.*,
2022 WL 976003 (N.D. Tex. Mar. 31, 2022) ..........................................................................18

iii

*Knurr v. Orbital ATK Inc.*,
 294 F. Supp. 3d 498 (E.D. Va. 2018) .................................................................................11, 12

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*,
 810 F.3d 951 (5th Cir. 2016) ...............................................................................................5, 8

*Lorenzo v. SEC*,
 139 S. Ct. 1094 (2020) .............................................................................................................20

*Lormand v. US Unwired, Inc.*,
 565 F.3d 228 (5th Cir. 2009) .................................................................................................15

*Marcu v. Cheetah Mobile Inc.*,
 2020 WL 4016645 (S.D.N.Y. July 16, 2020) .......................................................................15

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*,
 2022 WL 377415 (N.D. Okla. Jan. 7, 2022) .........................................................................10

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
 540 F.3d 1049 (9th Cir. 2008) ..............................................................................................2, 9

*Municipal Employees' Retirement System of Michigan v. Pier 1 Imports, Inc.*,
 935 F.3d 424 (5th Cir. 2019) ...............................................................................................5, 11

*In re Nash Finch Co. Securities Litigation*,
 323 F. Supp. 2d 956 (D. Minn. 2004) ....................................................................................13

*Nykredit Portefolje Administration A/S v. ProPetro Holding Corp.*,
 2021 WL 9037758 (W.D. Tex. Sept. 13, 2021) .......................................................................8

*In re Omnicare, Inc. Securities Litigation*,
 769 F.3d 455 (6th Cir. 2014) ..................................................................................................12

*In re Plains All American Pipeline, L.P. Securities Litigation*,
 307 F. Supp. 3d 583 (S.D. Tex. 2018) ......................................................................................4

*SEC v. City of Miami*,
 988 F. Supp. 2d 1343 (S.D. Fla. 2013) ...................................................................................12

*SEC v. Rio Tinto plc*,
 41 F.4th 47 (2d Cir. 2022) .......................................................................................................20

*Southland Securities Corp. v. INSpire Insurance Solutions Inc.*,
 365 F.3d 353 (5th Cir. 2004) ..................................................................................................14

*Stone v. Life Partners Holdings, Inc.*,
 26 F. Supp. 3d 575 (W.D. Tex. 2014) .....................................................................................11

iv

*Taubenfeld v. Hotels.com*,
   385 F. Supp. 2d 587 (N.D. Tex. 2004) .................................................................................15

*Walker v. Rent-A-Center*,
   2005 WL 8161388 (E.D. Tex. July 25, 2005) .......................................................................14

*Wieland v. Stone Energy Corp.*,
   2007 WL 2903178 (W.D. La. Aug. 17, 2007) ......................................................................11

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...............................................................................................4

## Regulations

17 C.F.R. § 210.4-10(a)(22) ......................................................................................................17

## INTRODUCTION

Plaintiffs oddly choose to open their Opposition brief with a quote that illustrates exactly why the Second Amended Complaint ("SAC") should be dismissed. A newspaper reports that a person with no relevant knowledge or connection to any alleged "speaker" of a purported misstatement made a nonspecific allegation about a directive from unnamed "Management" to "override" unnamed experts in some unspecified way to support something "the CEO ha[d] already blasted to the public" (meaning, after the alleged misstatement to the public was already made). Perhaps recognizing that the "quote" says nothing at all, Plaintiffs add their own, invented details to attempt to convert it into a particularized allegation. They misleadingly claim Burch was "referring to Exxon's promise to deliver one million oil-equivalent barrels per day from its assets in the Permian basin by 2024." (Opp. 1.) But the article the quote is taken from doesn't specify which statements Burch was referring to or when they were made. More to the point, the SAC doesn't identify any such "promise." The SAC challenges statements about Exxon's forward-looking Permian drilling **plan**. A plan is not a promise.

Plaintiffs' failed attempt to spin straw from the *Washington Post* into pleading gold mirrors the approach in the entire SAC. They speculate without support that Bond and Woods "would have" met in September or October 2019, and that Bond "would have" told Woods that data was allegedly manipulated. But they do not, and cannot, allege that a meeting actually happened or, if it did, what was actually said. (Opp. 13-14; SAC ¶¶ 182, 271-72.) They contend that Woods knew that Burch and Gulden told HR that ExxonMobil allegedly used false assumptions. (Opp. 14; SAC ¶¶ 274-77.) But this is alleged only "on information and belief" and without any factual or logical support. (SAC ¶¶ 144, 154, 275, 277.) They argue that the SAC alleged Mallon's scienter because Mallon supposedly directed Bond to inflate inputs in the NPV. (Opp. 14; SAC ¶¶ 124-25.) But they cite no witness who observed any such direction, and the SAC alleges only that Mallon asked

1

Bond "to revisit" the NPV.  (SAC ¶¶ 14, 129, 263.)  It is Plaintiffs who convert this innocuous directive into "sum and substance" that fits their narrative.  And just as a plan is not a promise, an instruction to revise is not an instruction to falsify.  (SAC ¶¶ 124-25.)  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008) (directions to "improve business" are not "winking suggestion[s] that [employees] should perpetrate fraud").  And they nonsensically claim – without supporting fact allegations – that Bond and Mallon intended to defraud the public by changing the *internal* Development Plan to support company projections that had already been conveyed to the public.  (Opp. 15, 39; SAC ¶ 313.)

The rest of the Opposition repackages unsupported and legally infirm allegations this Court already considered and rejected.  The Opposition cannot, and did not, cure the defects the Court previously identified in granting the earlier motion to dismiss.  For these and the reasons below and in the Motion to Dismiss ("Mot."), the Court should dismiss the SAC with prejudice.

## ARGUMENT

**I.     The SAC fails to allege particularized facts to support a strong inference of scienter.**

The purportedly "new facts" in the SAC are actually just more of the same type of pleading that the First Amended Complaint ("FAC") impermissibly relied on.

**A.     The SAC does not link Woods to knowledge of any false information.**

**1.     Plaintiffs still do not plead that Woods knew that any learning curve assumptions were false.**

Plaintiffs concede that their claims about Woods's statements concerning production goals, Proved Reserves, and the Resource Base all rely on the same premise: that the NPV calculation incorporated as one of its many inputs an allegedly overly-optimistic learning curve assumption.  (Mot. 17-18.)  But Plaintiffs fail to allege that Woods knew or was deliberately reckless in not knowing the learning curve assumptions were purportedly inflated.  (*See* Dkt. 88 at 11-15.)  As

2

this Court previously held, Plaintiffs must "allege with particularity that Bond actually informed Woods that the reports were being manipulated or that Woods was severely reckless as to their falsity," including "additional details about Bond's and Woods' communications." (Dkt. 88 at 12.) The SAC fails to satisfy this pleading burden.

Plaintiffs do not identify any particular information allegedly conveyed to Woods that contradicted any statement made by Woods. Plaintiffs' insinuation that Bond and Woods "would have" met to discuss the entire Delaware Basin Plan in September or October 2019 is itself unsupported and cannot support an inference that Bond must have told Woods that the "drilling assumptions in 2018 had been inflated." (Opp. 30.) Plaintiffs argue in their Opposition that because the NPV was $10 billion lower than the previous year, "[a] compelling inference can be drawn that Bond and Woods discussed the reasons for the decline in the NPV." (*Id.*) Plaintiffs' argument is rank speculation. Plaintiffs plead nothing to show the change in NPV was so extraordinary that either the change itself or any particular underlying assumption within it must have been discussed. Plaintiffs themselves allege that the NPV depended on many assumptions, including commodity prices. (SAC ¶ 119.) And even if it were fair to speculate that Bond and Woods discussed "the reasons" for the decline in the NPV, an inference Plaintiffs concoct from whole cloth for the first time in the Opposition, (Opp. 30), it is far more plausible that Bond would have offered an innocent explanation for the change than that she told Woods it was based on unrealistic assumptions. *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008) (rejecting strong inference of scienter because it was more plausible that the person providing allegedly fraudulent numbers would have hidden their fraudulent nature from the speaker).

Plaintiffs' argument that they need not explain why Woods would interpret a purported $10 billion reduction in NPV to mean the production goals statements were false also fails. (Opp. 31.)

3

If Plaintiffs mean to allege that the reduction in NPV *necessarily* means data had been manipulated – as opposed to any number of at least equally compelling innocent explanations, including a decline in any of the other NPV inputs – Plaintiffs must plead facts to support that theory. They do not. Under their logic, a court could infer scienter whenever a company's financial or operational performance declined. That would stand the strong inference requirement on its head.

Relying on FE4, Plaintiffs argue that the SAC adds "missing details" about Bond's and Woods's interactions. (Opp. 30.) But none of these "details" addresses *what was said* at the meeting. *Edgar v. Anadarko Petroleum Corp.*, 2019 WL 1167786, at *15 (S.D. Tex. Mar. 13, 2019) (alleging defendant attended meetings that discussed the subject of an alleged misstatement insufficient without pleading that facts contradicting public statements were disclosed); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 641 (S.D. Tex. 2018) ("*Plains II*") (requiring plaintiff to plead "contents of the reports"). At most, they show Woods knew as of September or October 2019 what the NPV was – not that he had reason to think it was inflated. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-1001 (9th Cir. 2009) (defendant's access to data did not raise inference that defendant knew data was manipulated).[1]

Even if Plaintiffs' allegations were sufficient to raise an inference that Woods knew something specific about the learning curve assumptions, the Court should disregard the allegations because "it is unclear from the pleadings how [FE4] would have specific knowledge of Bond's and Woods' communications." (Dkt. 88 at 12.) The SAC appears to simply assume that because FE4's team presented a PowerPoint to Bond, Bond "would have" presented this same

---

[1] In *In re Apache Corp.*, 2022 WL 4277350, at *4-7 (S.D. Tex. Sept. 15, 2022), relied upon by Plaintiffs, the court found a "tie" among competing scienter inferences when defendants received "explicit warnings" and "regular" updates about an oil field, "years of data" and an investigation contradicted statements, and held meetings discussing "production woes."

PowerPoint to Woods. (SAC ¶¶ 182-83, 271.) This is insufficient. *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 434 (5th Cir. 2019) (discounting allegations from witness who did not have direct interaction with defendant). Plaintiffs' own authority agrees. *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 n.2 (5th Cir. 2016) (confidential source allegations "afford no basis for drawing the plausible competing inferences required by *Tellabs*" (citation omitted)). Indeed, FE4 never says that Bond actually met with Woods. (Mot. 20; Opp. 30.) He merely alleges that Bond "would have" met with "executives" and that Bond "would have" presented a PowerPoint to "management." (SAC ¶¶ 182, 272.) Based on these vague allegations, Plaintiffs ask this Court to infer that Bond actually met with the CEO. This is illogical: neither FE4 nor Plaintiffs explain why Bond – who did not report directly to Woods – would have circumvented the reporting chain and presented to the CEO on a $10 billion project that Mallon was in charge of.

Plaintiffs' purported timeline is also insufficient to infer Woods's scienter. They allege Bond was unaware of concerns regarding drilling assumptions until October 23, 2019 (SAC ¶¶ 137-38, 158, 274), but also that Bond and Woods met "in either September or October" (SAC ¶ 271), Plaintiffs offer no plausible reason to assume that if the meeting occurred, it was in the last seven days of their own alleged two-month range. (Mot. 21.)

### 2. The SAC's "information and belief" allegations do not connect Woods to Burch and Gulden's complaints and are mere position pleading.

Plaintiffs' argument that Burch and Gulden reported to HR that the Development Plan used "false drilling assumptions" and that the ensuing investigation "reached 'senior management'" fails. (Opp. 31.) For one thing, Plaintiffs do not make particularized allegations showing that *Woods* was aware of the HR complaint or any investigation; they at most allege "on information and belief" that Woods knew of the investigation and approved the termination. (SAC ¶¶ 144, 154,

5

275, 277.)  But "courts pay careful attention" to "information and belief" allegations "to ensure that they have carried their burden to 'state with particularity *all facts on which that belief is formed.*'"  (Dkt. 88 at 5 (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).)  Plaintiffs have not carried this burden.

The SAC also lacks particularized allegations about what information from HR's purported "investigation" reached "senior management," which members of "senior management" it reached, or when.  Plaintiffs claim HR reports to the Management Committee, of which Woods is a member, and he is the only manager common to Burch and Gulden, (Opp. 31), but this is just a variation on "position" pleading the Court already rejected and does not support any inference that Woods knew any particular information about any investigation.  (Dkt. 88 at 8-9.)

> **3.    Plaintiffs have not alleged Woods's scienter with respect to Proved Reserves or the Resource Base because they fail to allege Woods knew the Proved Reserves or Resource Base were based on false assumptions.**

Plaintiffs' argument that, because Woods knew the Development Plan "was based on false drilling speeds," he necessarily knew that the Proved Reserves and Resource Base statements were false also fails.  (Opp. 32.)  As shown above, the SAC does not and cannot allege that Woods ever learned that the Development Plan was based on "false drilling speeds."[2]

Plaintiffs also argue that Woods's knowledge of the allegedly overly optimistic learning curve assumptions can be inferred from his signature on ExxonMobil's 10-K, which states that "proved reserves and resource base figures incorporated values from the Development Plan." (Opp. 33.)  But this does not mean that the Proved Reserves incorporated *every assumption* used

---

[2]    This phrase is yet another example of Plaintiffs falsely spinning their allegations.  Learning curve assumptions are just what they sound like: assumptions about how quickly drilling speeds will improve in the future.  Because they are a measure of a future event, they can turn out to be wrong, they can perhaps be unrealistic when made, but they cannot be "false."

in the Development Plan, let alone support the inference that Woods *knew* every assumption and granular detail incorporated into the global reserves estimate.  On the contrary, Proved Reserves are required to be calculated under "existing economic conditions."  (SAC ¶ 49.)  The learning curve, by its very nature, concerns *future* conditions.  (SAC ¶ 13.)  Plaintiffs do not rebut this argument, nor do they provide any rational basis to infer that Woods would believe the Proved Reserves would incorporate learning curve assumptions.

Finally, Plaintiffs argue that the GRRG reported directly to the Management Committee, and thus Woods.  (Opp. 34.)  Yet Plaintiffs plead no particularized allegations that the GRRG knew about the alleged use of inflated drilling speed learning curves, or that they specifically incorporated learning curve assumptions into their estimates at all.  The SAC contains no particularized allegations that anyone in the Planning Team described or sent learning curve assumptions to the GRRG or demanded the GRRG use an artificially inflated NPV.  (*See* Mot. 27-28.)  Plaintiffs' lone, conclusory allegation of unspecified "back and forth" between the teams, (SAC ¶ 164), does not begin to suffice:  Plaintiffs do not even attempt to say who told whom what, and when.  This is nothing more than position pleading, which is insufficient as a matter of law.  (Dkt. 88 at 6 ("[I]t is well established that an officer's position on its own is insufficient to support an inference of scienter . . . barring special circumstances which are inapplicable here.")); *see Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

### 4.   Plaintiffs' grab-bag of remaining scienter allegations do not support a strong inference of Woods's scienter.

Plaintiffs repeat several meritless arguments that this Court already rejected.  (Opp. 31-32.)

- *Core Operations*.  Plaintiffs argue that (1) because ExxonMobil's 2024 production goal was 80% higher than previous goals, it demanded Woods's "utmost attention"; (2) Woods was involved in planning and so must have known the cause of the lower NPV; and (3) it

was obvious the NPV was inflated.  (Opp. 31, 33.)[3]  This claim repackages the meritless core operations theory this Court previously rejected.  (Dkt. 88 at 8-9.)

- **Retaliation.**  Plaintiffs again argue that ExxonMobil retaliated against Burch and Gulden, (Opp. 31), but fail to plead particularized allegations linking the purported retaliation to Woods.  *See Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 599 (N.D. Tex. 2021). The bare allegation on "information and belief" that Woods "approved" of Burch's and Gulden's termination, (SAC ¶ 154), is not enough.  *See Tchuruk*, 291 F.3d at 350.

- *Access to Development Plan.*  Plaintiffs claim with no new facts that Woods reviewed the Development Plan and was "intimately familiar with its input and the processes that generated it."  (Opp. 31.)  This Court held that the FAC's similar scienter allegations that Woods had access to or received data were insufficient.  (Dkt. 88 at 12; Mot. 15-16.)

- *Corporate Culture.*  Plaintiffs' purported "additional, corroborative detail" does not "connect each Defendant to the tone or culture issues."  (Dkt. 88 at 7; Opp. 34.)  They claim "Woods led Exxon's corporate culture of inflating reserves and refusing to take write-downs," (Opp. 31), but do not connect him to pressure on employees to meet goals or avoid write-downs.  *See In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 117 (3d Cir. 2018).  The unremarkable allegation that Woods, as CEO, was a so-called "top god" of the corporate hierarchy, (Opp. 34), is an improper attempt to plead scienter based on his position.  (Dkt. 88 at 13.)

- *Site Visits.*  This Court already rejected Plaintiffs' reliance on Woods's single visit to Carlsbad, (Opp. 32), holding that it is "implausible to infer that the site visit necessarily advised Woods of all the issues Plaintiffs allege."  (Dkt. 88 at 11.)  A picture of Woods in the Permian adds nothing.  (SAC ¶ 286; Mot. 17.)

- *Understanding of Permian.*  This Court already rejected Plaintiffs' argument that "Woods spoke regularly with investors and analysts about the importance of the Permian Basin." (Opp. 32; Mot. 18.)  Plaintiffs claim that Woods referenced his "understanding" of the Permian, (SAC ¶¶ 288-89), but these statements were "innocuous" and Plaintiffs do not explain how they were severely reckless.  (Dkt. 88 at 11.)

- *Compensation.*  This Court already held that if allegations of incentive compensation showed scienter, "the executives of virtually every corporation in the United States would be subject to fraud allegations."  (Dkt. 88 at 14 (quoting *Abrams*, 292 F.3d at 434).)  The

---

[3]  In *Diodes*, 810 F.3d at 958, 961, the court held scienter cannot be drawn "simply from the magnitude" of a problem, which is what Plaintiffs attempt here.  Plaintiffs' authorities include more particular allegations of the significance at issue.  *Nykredit Portefolje Admin. A/S v. ProPetro Holding Corp.*, 2021 WL 9037758, at *7, 21 (W.D. Tex. Sept. 13, 2021) (CEO approved policy prohibiting securities as collateral and stated he was complying while using his securities as collateral for personal purchases); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 783 (S.D. Tex. 2012) (CEO who committed to "focus on safety like a laser" later "acknowledged his failures" after *Deepwater Horizon* spill).

8

SAC does nothing to remedy the insufficiency of the FAC motive allegations based on Woods's compensation.  (Opp. 32; *see also* Mot. 16-17.)

**B.      Plaintiffs fail to allege that Mallon made any statements with scienter.**

Plaintiffs' primary argument is that Mallon supposedly directed Bond to artificially increase the NPV to support ExxonMobil's production goals.  (Opp. 35.)  As an initial matter, the SAC fails to state the basis for its allegations that Bond and Mallon met at all.  Plaintiffs point to no witness or source for their allegations about these purported meetings. (Mot. 22-23.)

More importantly, the SAC does not actually allege that Mallon directed Bond to falsify anything.  Plaintiffs simply invent in their Opposition a purported "quote" from Mallon, claiming Mallon said the Delaware Planning Team "had not lied hard enough yet."  (Opp. 35.)  But the SAC merely alleges that Mallon asked Bond to "revisit" long-term learning curves.  (SAC ¶ 14.)  It is Plaintiffs who repeatedly take this (unsupported) allegation and then assert on their own ipse dixit that "in sum and substance" this means Mallon told Bond to revise the Development Plan because it was inconsistent with ExxonMobil's stated goals.  (SAC ¶¶ 124-25.)  While Plaintiffs claim "there is no innocent reason why Mallon would have directed Bond to increase the NPV," they fail to explain why ExxonMobil would *not* want an internal plan that was consistent with external production goals.  (Opp. 35.)  If the internal plan contradicted the external statements, Plaintiffs would certainly have argued that that fact supported an inference of scienter.  There are many more plausible reasons for Mallon's alleged request to revisit learning curves.  The most plausible is that he believed the NPV in the initial draft was incorrect.  The NPV incorporates multiple assumptions, but Plaintiffs made no claims that the NPV decreased just because of drilling speed assumptions. A direction to revise assumptions is not the same as a direction to falsify, and Plaintiffs make no particularized allegations supporting that inference.  *See Metzler Inv. GMBH*, 540 F.3d at 1069 (CFO's statement that they were in a "gray area" was simply a "broader exhortation to improve

business," not a "winking suggestion that [employees] should perpetrate fraud").

Plaintiffs' argument that Mallon's performance review was tied to valuations fails to plead scienter for the reasons the Court has previously identified. (Opp. 36; Mot. 16-17; Dkt. 88 at 14, 16-17.) Plaintiffs cite a sentence in the Order recognizing that this circumstantial evidence can enhance the strength of an inference, but they ignore the Court's caution that this evidence "requires further factual basis than Plaintiffs have alleged." (Opp. 36; Dkt. 88 at 14.) Alleging that Burch and Gulden believed that Mallon instructed Bond to manipulate data because of his compensation, (SAC ¶ 115), fails to explain how Burch and Gulden knew about any interactions between Mallon and Bond, let alone Mallon's compensation.

### C. Mallon and Bond did not "furnish" any fraudulent information because Plaintiffs fail to allege that Mallon and Bond had the requisite scienter to furnish information.

#### 1. Plaintiffs do not allege that Mallon and Bond had reason to believe the learning curve assumptions would be used in ExxonMobil's public statements or that they intended to defraud.

Plaintiffs' argument depends entirely on the assertion that Bond "orchestrated the fraud at the express direction of Mallon." (Opp. 40.) But as shown in Section I.B above, the SAC fails to plead particularized allegations to support an inference that Mallon directed Bond to engage in fraud. Plaintiffs also still fail to plead that Mallon and Bond intended to defraud the public. (*See* Dkt. 88 at 17, 20.) *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 2022 WL 377415, at *26 (N.D. Okla. Jan. 7, 2022), is instructive. There, plaintiffs' allegation that the employee was trying to make himself look better by showing better numbers to the company's executive team did not suggest he was trying to defraud investors. (*See* Mot. 26-27.) This case is similar. Plaintiffs argue, without factual support, that Mallon and Bond wanted to inflate the NPV so "production projections would be consistent with the CEO's public pledges." (Opp. 39.) Even if true, the more reasonable inference is that Bond and Mallon wanted to do what

10

any competent employee would do – develop a plan to help the company meet its objectives rather than fall short of them.  (*See* Dkt. 88 at 20 (Plaintiffs failed to allege scienter because they did not show Bond intended to defraud rather than appear "efficient, organized, and well managed").)

Plaintiffs' assertion that Mallon "refused to write down reserves, which would have lowered his bonus," (Opp. 39), similarly fails to cogently plead relevant scienter.  Scienter is not generalized intent – it is intent to *defraud*.  Plaintiffs do not explain why a desire to increase one's bonus equates to a desire to defraud.  *Pier 1 Imps., Inc.*, 935 F.3d at 431 (concluding that incentive compensation cannot be the basis for scienter).[4]  Accordingly, Plaintiffs have not alleged scienter imputable to ExxonMobil.[5]

### 2. The Opposition fails to rebut Defendants' additional scienter arguments about "furnishing."

Plaintiffs have not cured the other deficient scienter allegations that this Court identified.  *First*, Plaintiffs have still not shown that Bond was "senior enough to be credited for corporate scienter." (Opp. 39-40.)  That Bond allegedly oversaw the creation of the Development Plan does not mean she was an "executive" or close enough to "the top of the reporting structure who interact

---

[4]  Plaintiffs' authority is inapposite.  In *Pier 1 Imports, Inc.* 935 F.3d at 431, the Fifth Circuit distinguished *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005), holding that incentive compensation proves motive in "a limited set of circumstances," when a "bonus is extremely high" and other allegations support scienter.  While the bonus in *Barrie* was 175% of defendant's salary, *id.*, Plaintiffs do not quantify Mallon's bonus.  In *Wieland v. Stone Energy Corp.*, 2007 WL 2903178, at *7 (W.D. La. Aug. 17, 2007), the court noted that motive alone "do[es] not establish a strong inference of scienter" but "enhance[s]" other allegations.

[5]  Plaintiffs' authority underscores the weakness of their particularized allegations.  *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 515-16 (E.D. Va. 2018) (employees "actively" suppressed information to achieve profit rate); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *26-27 (D.N.J. June 5, 2020) (employee intentionally concealed bribes as legit expenses); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 609-11 (W.D. Tex. 2014) (employees "intentionally manipulated" outside auditors with false hypotheticals).

11

with investors," as this Court concluded she must be.  (Dkt. 88 at 20.)[6]  Indeed, the organization

chart in the SAC refutes an inference of scienter, as Bond is not even in the chart.  (SAC ¶ 72.)

And for the reasons detailed in Section I.A.1, Plaintiffs cannot close the gap by alleging that Bond

presented the Development Plan to Woods.

*Second*, Plaintiffs' argument that "Mallon and Bond furnished information that was

incorporated into" public statements fails.  (Opp. 40.)  While the SAC attempts to claim Bond

created inflated learning curve assumptions that were ultimately "included in Exxon's statements

to investors," (SAC ¶ 310), Plaintiffs do not allege that Mallon or Bond actually delivered learning

curve assumptions to anyone who prepared the statements at issue.

*Third*, the SAC refutes any claim that Mallon or Bond furnished false data for Woods's

March or April 2019 statements because it alleges those statements were made before Mallon or

Bond are alleged to have created false assumptions.  Plaintiffs' claim that the statements were

"contradicted by the actual 2018 drilling speeds" and that the Development Plan "was actively

being manipulated by Bond at Mallon's direction beginning in March or April 2019 – when the

statements were made" misses the point.  (Opp. 40-41.)  Plaintiffs allege no particularized

allegations that "drilling speeds" or an in-progress plan were provided to Woods before he made

the challenged statements.  (Mot. 25-26.)

*Fourth*, Plaintiffs argue Bond and Mallon inflated the NPV because they interpreted the

lower NPV to mean ExxonMobil's production goal was unattainable.  (Opp. 41.)  Plaintiffs ignore

---

[6]   Plaintiffs' cases are distinguishable and contradict the Court's holding.  (Dkt. 88 at 6.)  *See Orbital ATK Inc.*, 294 F. Supp. 3d at 515 (low-level employees furnished false information with intent to maintain a company-wide profit rate); *In re Omnicare, Inc. Securities Litigation* 769 F.3d 455, 475-76 (6th Cir. 2014) (court cautioned against attributing the knowledge of low-level employees for scienter);  *SEC v. City of Miami*, 988 F. Supp. 2d 1343, 1360-61 (S.D. Fla. 2013) (court held that the employee was a high-ranking official).

that "the more reasonable inference is that Mallon believed that ExxonMobil could have deployed additional rigs or employed more people to increase its production in the development plan." (Mot. 23.)  It is a more reasonable inference that Bond and Mallon expected ExxonMobil to meet the Development Plan it developed – even if ambitious – rather than develop a plan that would set ExxonMobil up for failure.  *In re Nash Finch Co. Sec. Litig.*, 323 F. Supp. 2d 956, 964 (D. Minn. 2004) (making a plan "seem successful" does not show scienter when "[i]t is difficult to conceive of any corporate plan which would not have improved profitability as a goal").

*Fifth*, Plaintiffs argue that Woods's reference on March 5, 2020 "to the outcome of the plans that we've put together" refers specifically to the 2019 Permian NPV.  (SAC ¶ 310; Opp. 41; Dkt. 99-1, App. 225.)  No particularized allegations support this argument.  Plaintiffs argue an analyst and Neil Chapman mentioned the Permian as part of their exchange about the global production goal.  (Opp. 41; Dkt. 99-1, App. 225.)  But Woods merely stated "5 million barrels" – the global goal – "is an outcome of the plans that we've put together"; he did not refer to the Permian or any particular plan, let alone the 2019 plan.  (Dkt. 99-1, App. 225.)  Plaintiffs allege no basis to conclude that Bond or Mallon "furnished" any information for this statement.

*Sixth*, Plaintiffs do not plead with particularity that Mallon or Bond knew that the GRRG would use learning curve assumptions when generating the Proved Reserves or the Resource Base. The Opposition's general allegations of Mallon's and Bond's knowledge do not support a strong inference of scienter.  *See Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 539 (5th Cir. 2008) (holding that merely stating defendants knew is insufficient to allege scienter).  The SAC itself acknowledges that the GRRG, not the Planning Team, generates Proved Reserves.  (SAC ¶¶ 43, 71, 74-83, 278; *see* Mot. 27-28.)  Mallon's oversight responsibility over the GRRG does not demonstrate that he had scienter – Plaintiffs do not claim Mallon directed the

13

GRRG to use the purportedly inflated learning curve assumptions.  (Opp. 41-42; *see* Mot. 28.) And because Plaintiffs fail to plead that Mallon or Bond furnished the learning curve assumptions to the GRRG when it generated Proved Reserves estimates, Plaintiffs fail to allege they furnished learning curve assumptions for use in estimating the Resource Base.

> **D.**      **Plaintiffs fail to allege scienter for the unattributed statements because they fail to link the statements to any speaker.**

Plaintiffs argue that they plead scienter for the unattributed statements, (SAC ¶¶ 345, 349, 370-71, 378, 380, 382), because the statements were signed by Woods, attributed to him, included in press releases quoting him, or "closely linked to other statements made by Woods." (Opp. 42.) But Plaintiffs generically plead what a "Summary Annual Report stated" or "Exxon stated." (*E.g.*, SAC ¶¶ 345, 370-71, 378, 380.)  Imputing liability to a corporate defendant requires the officer to have had the requisite scienter.  *See Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 365-66 (5th Cir. 2004).  None of the unattributed statements in the press releases is a quote from Woods, and Woods did not sign any of the releases. (SAC ¶¶ 345, 349, 370-71.)  Plaintiffs' reliance on *Walker v. Rent-A-Center*, 2005 WL 8161388, at *22 (E.D. Tex. July 25, 2005) is misplaced, as those plaintiffs quoted the speaker directly or the "maker" of the statement signed the document.

**II.**      **Plaintiffs fail to plead any actionable misstatements or omissions.**

> **A.**      **ExxonMobil's production goal statements were forward-looking statements protected by the PSLRA's safe harbor.**

This Court correctly held that statements about production goals are forward-looking statements protected by the PSLRA's safe harbor. (Dkt. 88 at 25-27.)  All but one of Plaintiffs' allegations rely on their claim the "'learning curve' drilling assumption[]" was "inflated" or "false." (SAC ¶¶ 346, 348, 350, 352, 354, 356, 358, 360, 363, 366, 368, 372, 374, 375, 377, 379, 381, 383, 385, 387, 389, 393, 395, 397, 399, 401; Mot. 32.)  Because the statements discussed ExxonMobil's ability to improve future operations, they reflected "plans and objectives of management for future

14

operations . . . [and] future economic performance." *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591 (N.D. Tex. 2004) (Godbey, J.).

Plaintiffs do not dispute the statements are forward-looking, or that ExxonMobil accompanied them with cautionary language. Rather, Plaintiffs contend they've now pled facts sufficient to plead that "the warned-of risks were no longer merely theoretical and had in fact already materialized." (Opp. 22.) But "liability on that basis [that risks had begun to materialize] turns on Defendants' knowledge of that, which Plaintiffs have failed to establish." (Dkt. 88 at 23.) Plaintiffs' failure to allege scienter precludes this theory.

In any event, the "materialized risk" cases require that the risk had *already actually caused* the company's results to differ from what the company's statement predicted. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244, 247 (5th Cir. 2009) (concluding that cautionary language was insufficient because, among other reasons, the defendants had already "received adverse financial information confirming their dire predictions"' and "some damage from these risks had already materialized"); *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 953 (S.D. Tex. 2001) (cautionary language insufficient when oil well was dry at time of statements and already "needed 'a significant downward adjustment'"). The learning curve was, by definition, an assumption about whether ExxonMobil could improve its performance in the future. And the supposedly "false" learning curve cannot mean that the risk of ExxonMobil failing to meet its 2024 production goal had already materialized because 2024 has not happened yet. Regardless of whether historical drilling rates in 2018 or Burch's and Gulden's analyses suggested success was unlikely, it cannot be known whether the learning curve is wrong and ExxonMobil will meet its goal until 2024. *See Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *6 (S.D.N.Y. July 16, 2020) (rejecting argument that risk had already materialized when "it remained

– indeed, still remains – hypothetical").

> **B.    Plaintiffs have not alleged ExxonMobil's Proved Reserves were misleading because Plaintiffs fail to link the purportedly inflated learning curve assumptions to the Proved Reserves.**
>
> **1.    Plaintiffs' failure to plead with particularity that the GRRG used the Delaware Planning Group's learning curve assumptions is fatal.**

The backbone of Plaintiffs' lawsuit concerns the learning curve assumptions – but Plaintiffs do not plead with particularity that the Proved Reserves incorporated the Development Plan's learning curve assumptions.  Their reliance on Rhodes and FE3 is unavailing.  (Opp. 16.)  Neither claimed to have assisted in estimating Proved Reserves for the Permian or claimed that the Proved Reserves incorporated the learning curve assumptions, and the SAC therefore does not plead particularized allegations about whether the Permian reserves used improper assumptions.  (Mot. 39-40; SAC ¶¶ 165-68.)  Courts regularly disregard allegations of witnesses who were not in a position to know the facts asserted.  *See, e.g.*, *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. Six Flags Ent. Corp.*, 524 F. Supp. 3d 501, 526 (N.D. Tex. 2021) (discounting confidential witness because plaintiffs failed to plead how witness would have had personal knowledge of relevant facts).  In fact, *none* of Plaintiffs' witnesses claims that the learning curve was used in generating Proved Reserves.

None of Plaintiffs' other allegations shows that the Proved Reserves used the learning curve assumptions.  Plaintiffs point to OSHA's Findings and Preliminary Order, which states Burch and Gulden believed unidentified "SEC filings and information [Exxon] disclosed to the public" were "inflated" (SAC ¶ 155), but they never stated that Proved Reserves were inflated.  On the contrary, the SEC filing to which Plaintiffs refer was the April 26, 2019 Form 8-K announcing the goal and describing the size of the Resource Base in the Permian.  (SAC ¶ 158(c); Opp. 18.)  It says nothing about Proved Reserves.  While Plaintiffs trumpet their interviews of Burch and Golden, they do

16

not allege that either witness said that the Proved Reserves used the learning curve assumptions.

### 2. Because Proved Reserves are based on existing economic conditions, Plaintiffs cannot plead they include learning curve assumptions.

Plaintiffs do not address Defendants' argument that learning curve assumptions, by definition, are an attempt to predict *future* operating conditions. Proved Reserves, however, are estimated using *existing* operating methods and a 12-month average price during the period preceding the annual report. 17 C.F.R. § 210.4-10(a)(22). As such, learning curve assumptions are irrelevant to Proved Reserves, and there is no reason to believe the GRRG would include them in its Proved Reserves calculation. (Mot. 39; Opp. 17.) Accordingly, Plaintiffs have not pleaded with particularity that learning curve assumptions were used to generate the Proved Reserves.

### C. Plaintiffs cannot plead with particularity that ExxonMobil misrepresented its Resource Base.

Plaintiffs' argument that ExxonMobil's Resource Base figures were overstated "[b]ecause the false resource base figures incorporate false proved reserves" also fails. (Opp. 18; SAC ¶¶ 7, 60, 66.) Plaintiffs' theory depends on the assumption that Proved Reserves were misstated, but as shown in Section II.B, they have not sufficiently alleged that the Proved Reserves were misstated.

Plaintiffs' reliance on OSHA's second-hand description of what Burch and Gulden supposedly believed fails to plead with particularity that ExxonMobil misreported its Resource Base. (Opp. 18.) As explained in the Motion, the report identifies two statements in the April 26, 2019 Form 8-K – one about production goals and one about the Resource Base – and states that Burch and Gulden "believed" that "this statement" was not accurate. (Mot. 41; SAC ¶ 158(c).) Plaintiffs make no particularized allegations to support an inference that this "belief" related to the Resource Base, rather than goals, and their own allegations reflect that Burch's and Gulden's concerns were focused on production goals. (SAC ¶¶ 132, 134, 140, 141, 158(d)-(g).)

Plaintiffs' only response is to claim that Defendants are somehow asking the Court to ignore

17

their SAC and the OSHA findings.  (Opp. 18, 40.)  Not so.  Neither the SAC nor OSHA's findings say anything to support the inference that Burch and Gulden believed the *Resource Base* was misstated.  The Court need not accept as true conclusory allegations unsupported by the facts alleged.  *See Jacobowitz v. Range Res. Corp.*, 2022 WL 976003, at \*11 (N.D. Tex. Mar. 31, 2022).

### D. Plaintiffs cannot plead with particularity that ExxonMobil's statements about its rigorous or disciplined reserves process were false.

Although the Court held that statements concerning the "rigorous" reserves process are *actionable*, (Dkt. 88 at 34-35), Plaintiffs still must allege the challenged statements were *false*. (SAC ¶¶ 353, 357, 359, 380, 382, 394, 396.)  As shown in the Motion – and unrebutted by Plaintiffs – for these statements to be actionable, Plaintiffs must allege not that the process described in the statements did not measure up to a vague standard of rigor, but rather there *was not in fact* a process.  (Dkt. 88 at 34-35; Mot. 43.)  Plaintiffs have not alleged GRRG failed to engage a process for determining Proved Reserves; in fact, they allege the opposite.  (Opp. 20; SAC ¶¶ 71-77.)

### E. Plaintiffs cannot challenge statements they do not allege are false.

Plaintiffs' challenges to the remaining statements also fail.

***Misattributed Statement During March 6, 2019 Investor Day Call.***  (SAC ¶¶ 9, 109, 122, 367-69.)  Plaintiffs misattribute Chapman's statement during this call to Woods.  The call transcript attributes the statement, "It goes back to the development plan that we have in place . . ." to Chapman.  (*Compare* Opp. 23; SAC ¶¶ 9, 109, 122, 367-69 *with* Dkt. 99-1, App. 173.)  Plaintiffs plead no allegations regarding Chapman's scienter, so this claim should be dismissed.

In any event, Plaintiffs fail to plead the statement was false.  Plaintiffs' conjecture that Woods created the goal "out of thin air" and announced the production goal 95 minutes after Chevron announced its goal is not just unsupported by particularized facts – it is ridiculous.  (Opp. 2, 23.)  Investor calls are planned events.  It is unreasonable to assume that a CEO invented and

18

announced a corporate goal simply because a competitor announced its goal.  None of Plaintiffs' witnesses was in a position to know why Woods made the announcement, nor does the SAC allege that it was unusual for ExxonMobil to discuss its production goals.  The SAC includes no particularized allegations that ExxonMobil expected some competitive benefit from announcing a more ambitious goal immediately after Chevron, especially if ExxonMobil did not have, as Plaintiffs contend, means to accomplish that goal.

Moreover, the SAC does not include particularized allegations to support an inference that ExxonMobil's production goal was unachievable simply because 2018 drilling speeds were allegedly slower than the 2018 plan had assumed.  Chapman explained that part of the "development plan that we have in place" involved building up infrastructure to increase production. (Dkt. 99-1, App. 173.)  If actual drilling speed was slower than anticipated, that does not mean that it would not or could not increase in the future.  Plaintiffs plead no particularized allegations that any Defendant knew of slower-than-expected drilling speeds; indeed, Plaintiffs allege that Burch did not email the Planning Team his and Gulden's studies of the 2018 assumptions until June 18, 2019, after the statement was made.  (SAC ¶¶ 134, 158(e).)

*ExxonMobil's development of resources to maximize recovery.*  (SAC ¶ 386.)  Plaintiffs also argue the statement that ExxonMobil "didn't go out say how do we achieve 1 million barrels a day and then go figure out if we got inventory to drill that" had "falsely described . . . how Exxon employed data to calculate the Goal." (Opp. 25.)  But the statement neither stated nor implied anything about how ExxonMobil employed data.  Immediately after the quoted section, Woods continued: "We're trying to sustain an economic return.  And so . . . if that means sustaining the million barrels, we'll do that.  If that means coming off a million barrels, we'll do that as well." (Mot. 36.)  Thus, the statement was about ExxonMobil's priorities in general.

19

***Statements about "accelerating" or exceeding value or operations.***  (SAC ¶¶ 361, 364, 376, 390.)  Plaintiffs' challenge to statements regarding "accelerating" value or operations and to statements made in connection with the production goal also fails.  (Opp. 26-27.)  Plaintiffs do not dispute their failure to allege that, at the time ExxonMobil made these statements, it was not producing more hydrocarbons than it previously had.  (Mot. 35.)  Instead, Plaintiffs argue that if drilling times were "slower than expected," that means they had not "accelerated."  (Opp. 27.)  This is plainly untrue.  Something can be slower than expected and yet faster than it had been.

### III.    Plaintiffs' "scheme" liability claims are unmoored from the facts and the law.

As the Motion explained, scheme liability cannot be based purely on misstatements.  In response, Plaintiffs rely primarily on an unpublished 2020 District of New Jersey decision.  (Opp. 43 (citing *Cognizant*, 2020 WL 3026564, at *17).)  But Plaintiffs fail to address squarely *SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022), which concluded that *Lorenzo* had not abrogated the cases holding that "an actionable scheme liability claim also requires something *beyond* misstatements and omissions."  *Id.* at 49, 53 (emphasis added).

Second, Plaintiffs fail to plead any purported deceptive conduct separate from alleged misstatements.  (Opp. 44-45.)  Plaintiffs claim that Mallon's purported knowledge of the alleged HR investigation and retaliation is deceptive, but Plaintiffs have not pleaded a basis for such "knowledge" nor connected any retaliation to any participant in the alleged scheme.  (Opp. 44; SAC ¶¶ 72, 274-75.)  And Plaintiffs have not pleaded that any Defendant acted with scienter.  *See Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2020) ("tak[ing] for granted" that defendant acted with an "intent to deceive, manipulate, or defraud" when finding scheme liability).

### CONCLUSION

Plaintiffs have now had three chances to plead a viable claim.  The Court should dismiss the SAC without leave to replead.

Dated: December 19, 2022

Respectfully submitted,

*/s/ Noelle M. Reed*

Noelle M. Reed
   State Bar No. 24044211
Wallis M. Hampton
   State Bar No. 00784199
Brent M. Hanson
   State Bar No. 24106051
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122
noelle.reed@skadden.com
wallis.hampton@skadden.com
brent.hanson@skadden.com

Michelle L. Davis
   State Bar No. 24038854
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
308 Bahama Court
Granbury, Texas 76048
Tel.: (713) 655-5197
Fax: (713) 483-9197
michelle.davis@skadden.com

*Attorneys for Defendants Exxon Mobil*
*Corporation, Darren W. Woods, Liam M.*
*Mallon, and Melissa Bond*

21