IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MENDI YOSHIKAWA, *et al.*, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-00194-N |
| | § | |
| EXXON MOBIL CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

This Order addresses Defendants Exxon Mobil Corp. ("ExxonMobil"), Darren W. Woods, Liam M. Mallon, and Melissa Bond's motion to dismiss [99] Plaintiffs'[1] Second Amended Complaint ("SAC") [92].  For the reasons stated below, the Court grants the motion in part and denies in part.

## I. ORIGINS OF THE DISPUTE

As discussed in the Court's prior order granting Defendants' first motion to dismiss [88], this is a federal securities putative class action on behalf of all persons and entities who purchased or otherwise acquired ExxonMobil common stock ("XOM") between March 7, 2018 and January 15, 2021 (the "Class Period").  Order 1, Sept. 29, 2022 ("First MTD Order").  Plaintiffs allege that ExxonMobil portrayed its oil and gas assets in the

---

[1] "Plaintiffs" refers to co-lead plaintiffs, The State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") and Amalgamated Bank.

Permian Basin[2] as more valuable than they were, and when ExxonMobil finally disclosed that its production goals could not be realized, the value of XOM shares declined. *Id.* at 1–2. Plaintiffs initially sued ExxonMobil and several of its personnel under Sections 10(b) and 20(a) of the Securities and Exchange Act (the "Exchange Act") and the related Rule 10b-5(b), alleging both affirmative misrepresentations of ExxonMobil's drilling potential in the Permian Basin and omissions of material information about the project's obstacles. *Id.* at 2. The Court initially dismissed Plaintiffs' claims for failure to adequately plead that any Defendant acted with the requisite state of mind, but granted leave to amend. *Id.* at 20, 37–38.

The SAC omits several of the original defendants, but maintains the Section 10(b) misrepresentation and omission claims against ExxonMobil and its officers Woods and Mallon, as well as the Section 20(a) control person claim against Woods. *See* SAC ¶¶ 437–40, 448. Plaintiffs also now assert a scheme liability claim against Melissa Bond, the former Senior Manager of Delaware Basin Development, alongside Mallon and ExxonMobil, and additionally name Mallon as a control person. *Id.* ¶¶ 441, 448. The SAC adds allegations that Bond and Mallon conspired to manipulate the valuation of ExxonMobil's Permian assets, of which Woods either would or should have learned from a meeting with Bond. *Id.* ¶¶ 123–32, 11–63. Further, the SAC recounts that ExxonMobil was found liable for unlawfully terminating two whistleblowers who raised concerns about

---

[2] The Permian Basin is an oil-and-gas rich area in west Texas and southeast New Mexico which also includes the Delaware Basin. SAC ¶ 41.

ExxonMobil's valuation of the Permian assets in response to negative press.  *Id.* ¶¶ 132–34, 137, 141–43, 146, 151–53, 155–57.  Defendants have again moved to dismiss.

## II. Legal Standards

### A.  *Motion to Dismiss*

When addressing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must determine whether the plaintiff has asserted a legally sufficient claim for relief.  *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).  "When reviewing a motion to dismiss, a district court must consider the complaint in its entirety, as well as … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (internal quotation marks omitted).

Section 10(b) claims are subject to Rule 9(b), which requires that plaintiffs alleging fraud or mistake state their claims with particularity.  *Owens v. Jastrow*, 789 F.3d 529, 534–35 (5th Cir. 2015).   Specifically, plaintiffs must set forth "the 'who, what, when, where, and how' of the events constituting fraud or mistake."  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008) (quoting *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) (internal quotations omitted)).   Plaintiffs also must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud."  *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004).  Allegations against defendants as a group, without more specific connections between an individual Defendant and an allegedly fraudulent act, should be disregarded.  *Owens*, 789 F.3d at 537–38.  Other inference-based allegations, such as

pleading based on a defendant's position, corporate culture, or common knowledge alone, are similarly too vague. *See* First MTD Order 6–8 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 433 (5th Cir. 2002); *Callinan v. Lexicon Pharma., Inc.*, 479 F.3d 379, 432 (S.D. Tex. 2020) (quoting *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010)); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 537 (5th Cir. 2008)).

"[C]onditions of a person's mind" may be alleged generally, FED. R. CIV. P. 9(b), and the particularity standard may be relaxed where "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). But courts pay careful attention to allegations made on information and belief, as here, to ensure this exception is not misused as a "license to base claims of fraud on speculation and conclusory allegations." *Id.* (quoting *Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)) (internal quotations omitted). "[T]he complaint must set forth a factual basis for such belief." *Thompson*, 125 F.3d at 903 (citing *Kowal v. MCI Comms. Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir.1994); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)); *see also ABC Arbitrage*, 291 F.3d at 351, n.70 (citing *Thompson*, 125 F.3d at 903; 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1224 (2d ed. 1990)) ("[T]he special requirements of Rule 9(b) required even before the enactment of the [Private Securities Litigation Reform Act ('PSLRA')] that more be pleaded in the context of securities fraud claims.").

### B. Pleading Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), empowers the SEC to prescribe rules and regulations to protect the public from manipulative and deceptive securities practices. Rule 10b-5, implementing Section 10(b), makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Violations require scienter, or a "mental state embracing intent to deceive, manipulate, or defraud." *Mun. Emps.' Ret. Sys. of Michigan v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429–30 (5th Cir. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007)). "Both intent and 'severe recklessness' are sufficient." *Pier 1*, 935 F.3d at 430 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408–09 (5th Cir. 2001)).

There is "considerable overlap among the subsections of the Rule," *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019), but subsection (b) focuses on false statements and omissions, whereas scheme liability under (a) and (c) concerns conduct. *See SEC v. Mapp*, 240 F. Supp. 3d 569, 585 (E.D. Tex. 2017); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *18 (D.N.J. 2020). Thus, pleading each type of claim varies only slightly. The elements of a private Rule 10b-5(b) claim are: (1) a material misrepresentation or

omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss. *Owens*, 789 F.3d at 535 (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009)). Similarly, Rule 10b-5(a) and (c) claims "require allegations 'that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase of sale, and (4) that the defendant's actions caused the plaintiff's injuries.'" *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 720 (N.D. Tex. 2018) (quoting *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 678 n.45 (S.D. Tex. 2006)).

The PSLRA further heightens the pleading requirements in two ways. Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, plaintiffs must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). The latter "alters the usual contours of a Rule 12(b)(6) ruling" by requiring courts to "take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Cotter v. Gwyn*, 2016 WL 4479510, at *6 (E.D. La. 2016) (quoting *Lormand*, 565 F.3d at 239). When viewing the allegations holistically, the inference must be "cogent and compelling, not merely reasonable or permissible, in light

of other explanations." *Cotter*, 2016 WL 4479510, at *6 (internal quotations and citations omitted).

### C. Pleading Section 20(a) Claims

Section 20(a) of the Exchange Act "makes those who control others who violate section 10(b) jointly and severally liable 'unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'" *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (quoting 15 U.S.C. § 78t(a)). Thus, adequately pleading a primary violation is a prerequisite to stating a controlling person claim. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 221 (5th Cir. 2023). Additionally, plaintiffs must allege "that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 791. But unlike Rule 10b-5 claims, "[s]ection 20(a) claims are subject only to the pleading requirements of Rule 8, not the heightened requirements of Rule 9(b)." *Id.* Once plaintiffs have pled a primary violation with sufficient particularity, they "need only provide the defendant fair notice of the [controlling person] claim and the basis of the allegations." *Id.* (citing *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993)).

### III. THE COURT GRANTS THE MOTION IN PART AND DENIES IN PART

Plaintiffs' theory of Defendants' fraud spans more than 450 paragraphs. To facilitate analysis of Plaintiffs' claims, the Court recounts their central allegations here, then turns to the claims against each Defendant. Because "[i]nvocation of Rule 12(b)(6)

places the burden on the movant to show that dismissal is warranted," the Court addresses only the arguments that Defendants have raised. *Oliver v. Tower Semiconductor*, 2023 WL 2804390, at *2 (W.D. Tex. 2023).

### A. Plaintiffs' Timeline of the Fraud

Plaintiffs trace the fraud at issue back to January 2017. Woods became ExxonMobil's new CEO, and the company announced a $6.6 billion acquisition of oil and gas assets in the Permian Basin. SAC ¶ 2. ExxonMobil and its officers touted its Permian assets as part of an aggressive growth strategy. *Id.* ¶¶ 58–62, 103–13. Then, on March 5, 2019, ExxonMobil's competitor Chevron announced a goal of producing 900,000 oil-equivalent barrels ("OEB") in the Permian by 2023. *Id.* ¶ 105. ExxonMobil followed suit 95 minutes later by announcing its own goal of producing more than 1,000,000 OEB in the Permian by as early as 2024 (the "Goal"). *Id.* ¶ 106.

Plaintiffs contend that Woods and ExxonMobil lacked any basis to announce the Goal, and indeed, the Goal was inconsistent with the production forecasts available at the time. ExxonMobil's projections derived from development plans, or growth plans, that estimated the value of the project. *See id.* ¶ 8. "The core component of a development plan is the schedule of wells to be drilled and completed . . . using projected numbers of drilling rigs and fracking crews and assumptions for drilling speed and completion speed." *Id.* ¶ 119. "[D]iscounting cash flow[,] estimated by combining the development plan schedule, estimates for oil and gas coming out of planned wells, cost calculations for development activities, and assumed commodity prices," yields the project's net present value ("NPV"). *Id.* ¶ 119. In other words, NPV is linked to how much oil and gas can be

produced and how quickly, among other factors.  The 2018 Development Plan for the Delaware Basin estimated an NPV of $60 billion, but actual drilling times and infrastructure development had turned out to be much slower than anticipated.  *Id.* ¶¶ 8, 10, 198, 200–02, 206–12.  During the 2019 planning cycle, which was still in process when the Goal was announced, calculations based on updated data yielded a reduced NPV of $40 billion.  *See id.* ¶¶ 10–11.

Due to pressure to support Woods and personal compensation incentives, Mallon and Bond allegedly conspired to artificially inflate the 2019 NPV estimate for the Delaware Basin by using impossible drilling assumptions.  *Id.* ¶¶ 11–15, 17–18.  Plaintiffs say Mallon rejected the first two NPVs Bond presented, telling her to find a way to increase the number.  *Id.* ¶ 124.  Bond then instructed the Delaware Planning Team to "claw back value" by revising their "learning curve assumptions" about how much drilling speeds could improve over time, and she ignored objections from at least one scientist involved.  *Id.* ¶¶ 13, 127–28, 130, 132.  Mallon eventually accepted a valuation of $50 billion in August 2019.  *Id.* ¶ 131.  According to an anonymous former employee ("FE4") who participated in the annual development planning process, Bond would have presented the final Development Plan to Mallon and Woods in person sometime in September or October 2019.  *Id.* 9 n.1; ¶¶ 162, 271.  FE4 says that the presentation would have included the production curve and final NPV, which Plaintiffs argue means that Woods "was at least severely reckless in not discovering that those numbers were artificially inflated."  *Id.* ¶ 163.

Further, Bond was present at an internal presentation of the plan on October 23, 2019, where drillers called the plan's assumptions "impossible." *Id.* ¶ 137. Bond deflected blame onto the scientist presenting and "did not seek any modification to the model." *Id.* However, ExxonMobil began reducing its projections for the Permian in January 2020. *See id.* ¶¶ 244, 249. Thus, Plaintiffs challenge numerous public statements made by ExxonMobil, Woods, and Mallon between March 5, 2019 and January 31, 2020, as well as Mallon and Bond's manipulation of the 2019 Development Plan for the Delaware Basin.

Plaintiffs also note ExxonMobil's treatment of two whistleblowers, Drs. Lindsey Gulden and Damian Burch. Gulden and Burch both supported technical analysis of ExxonMobil's upstream projects, which are those "through which Exxon explores for and produces crude oil and natural gas, including its oil resources in the Permian Basin." *Id.* ¶¶ 41, 117–18. Burch was the member of the Delaware Planning Team who voiced his hesitation to use Bond's desired learning curve assumptions, then was publicly blamed by her for "not understand[ing] mathematical modeling" when drillers challenged the 2019 NPV. *Id.* ¶¶ 132, 137. On the day of the presentation, Gulden submitted a complaint about the use of false data to the Human Resources Department, and Burch complained verbally shortly thereafter. *Id.* ¶¶ 141–42. HR promised that it "[would] definitely take care of it." *Id.* ¶ 143.

But despite HR's promises, Gulden and Burch heard nothing about their complaints — up until the *Wall Street Journal* contacted ExxonMobil in August 2020 about a forthcoming article. *Id.* ¶ 143. High-ranking employees then swiftly investigated and terminated both employees. *Id.* ¶¶ 144–54. Explaining their terminations, ExxonMobil

told Gulden that "management had lost confidence in her commitment to the Company" and Burch that he had "some very negative sentiments from the company strategy." *Id.* ¶¶ 152–53. Plaintiffs infer that because Woods was their only common manager, and Gulden's firing was approved by "senior management," Woods condoned retaliation against Gulden and Burch for whistleblowing about the value of the Permian assets. *Id.* ¶ 154.

### B. Discounting Allegations Pled on Information and Belief Inadequately

Plaintiffs have pled their allegations largely on information and belief based upon investigation of counsel. SAC 8. Because Rule 9(b) demands particularity, and the PSLRA deprives plaintiffs of having all inferences drawn in their favor, courts closely scrutinize such allegations. *See Bay v. Palmisano*, 2002 WL 31415713, at *3 (E.D. La. 2002) (quoting *ABC Arbitrage*, 291 F.3d at 351 n.69) ("Allegations 'made on investigation of counsel are equivalent to those made on information and belief' for purposes of the PSLRA," as are "any allegations that 'are not based on Plaintiffs' personal knowledge.'") (internal quotations omitted). Plaintiffs may not evade pleading requirements by disguising that they "do[] not know that something is a fact[,] but just suspect[] it or ha[ve] heard it." *Salermo v. Hughes Watters & Askanase LLP*, 516 F. Supp. 3d 696, 710 (S.D. Tex. 2021) (quoting *Donald J. Trump for President Inc. v. Pennsylvania*, 830 F. App'x 377, 387 (3d Cir. 2020)) (internal quotations omitted). Thus, courts should discount allegations made on information and belief that lack sufficient support. *Cf. Okla. Firefighters Pension & Ret. Sys.*, 58 F.4th at 207–08 ("[C]ourts must apply a discount to confidential witness allegations" because the heightened PSLRA standard requires

MEMORANDUM OPINION AND ORDER – PAGE 11

allegations to be tested for competing inferences, and that "process is obstructed when the witness is anonymous," but courts "may rely on assertions" accompanied by "details in the description of the source [that] substantiate that the source has the necessary knowledge.").

### C.  The Court Cannot Infer Woods's Scienter

For Plaintiffs' Rule 10b-5(b) claim against Woods to survive Defendants' motion to dismiss, the SAC must explain with particularity both the reasons that each statement or omission was misleading and the facts supporting a strong inference that Woods acted intentionally or severely recklessly.[3]  *Owens*, 789 F.3d at 535–36 (quoting 15 U.S.C. § 78u4(b)(2); *Lormand*, 565 F.3d at 251).  The Court concludes that Plaintiffs have failed to establish Woods's scienter as to the Section 10(b) claim[4] and thus dismisses it.

### 1.  Plaintiffs' Allegations Cannot Support Woods's Scienter for Statements Made Prior to the Alleged Meeting with Bond. –

Plaintiffs challenge several statements made in 2018 and early 2019 on grounds that the 2018 Development Plan was misleading.  But the fact that the 2018 plan turned out to be wrong does not mean that it was falsified, nor is it fraudulent to rely on that plan before its inaccuracy has been revealed.  Plaintiffs have not identified when it became clear that the 2018 plan's assumptions were overly optimistic, let alone that Woods was made aware of the issue before the Goal was announced in early

---

[3] The PSLRA offers a safe harbor for certain forward-looking statements, in which case severe recklessness is insufficient.  *See* 15 U.S.C. §§ 78u-5(c)(1)(B)(i), (ii)(II).  But because Plaintiffs have not established Woods's scienter, the Court need not reach the safe harbor issue, explained *infra*.

[4] Failure to plead scienter under Rule 9(b) and the PSLRA does not automatically warrant dismissal of the Section 20(a) claim, which lacks scienter as an essential element and is thus governed by the more lenient pleading standard of Rule 8.  *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 651–52 (S.D. Tex. 2021).  *See infra* Part III.G.

MEMORANDUM OPINION AND ORDER – PAGE 12

March 2019.  *See* SAC ¶¶ 120 ("In 2018, the actual, real-world drilling speeds of Exxon's drilling in the Delaware Basin turned out to be considerably slower than the 2018 estimates."), 271 (first mentioning Woods's learning of the 2019 Development Plan through a presentation Bond would have given).  According to Plaintiffs, the 2019 budgeting process that revealed the deficiencies of the 2018 plan did not even begin until April.  *See id.* ¶ 161.  And the SAC fails to explain why the 2018 plan, if believed to be reliable, could not have supported the Goal.

Plaintiffs also have not explained why Woods would have had a reason to think in early September 2019 that the Goal's development was not a "legitimate bottoms-up process."  *See id.* ¶¶ 25, 267.  Indeed, the announcement of the Goal followed multiple increases to ExxonMobil's Permian resources in the previous year.  *See id.* ¶¶ 60 (addition of 800 million OEB to proved reserves), 61 (increased Permian resource base to 9.5 billion OEB).  Plaintiffs say that those figures were also fraudulent because ExxonMobil refused to take necessary write-downs, *see id.* ¶¶ 281, but their allegations lack a particularized connection to Woods.  *See, e.g.*, *id.* ¶¶ 99–101 (failing to connect Summer 2018 refusal to write down XTO reserves to Woods), 282 (assuming that the "[m]andate not to take write-downs" must connect to Woods by virtue of his role on the Management Committee).  And as this Court has explained previously, the facts that Woods toured well sites and there was "common knowledge" within the company also lack particularized detail about what Woods himself had learned.  *See* First MTD Order 7, 11.

Plaintiffs' remaining allegations are circumstantial.  Details such as Woods's position, compensation, and stock trades go to opportunity and motive, which do "*not*

fulfill the pleading requirements of the PSLRA" standing alone. *Owens*, 789 F.3d at 539 (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003). The SAC does not create a strong inference of Woods's scienter prior to the alleged meeting between Woods, Mallon, and Bond in September or October 2019.

   *2. The Court Must Discount the Alleged Meeting Between Woods, Mallon, and Bond. –* The earliest point at which Plaintiffs allege Woods would or should have gained direct knowledge of ExxonMobil's misrepresentations was Fall 2019, when Bond allegedly presented the finalized 2019 Development Plan to Woods for approval. *See* SAC ¶ 271. First, this allegation verges on impermissible position pleading — Plaintiffs avoid concrete statements of fact, claiming only that Woods hypothetically "would have" met with Bond by virtue of his responsibility as CEO to approve development planning. *See Abrams*, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."). But Plaintiffs also have not cited to any firsthand account of what transpired during the alleged meeting. Their witness, FE4, "participated in the annual development planning process" as a member of the team that "would have presented the PowerPoint presentation to Bond reflecting [] production data . . . *before* Bond presented it to executives including Defendant Woods." *Id.* ¶¶ 163, 182 (emphasis added). At most, FE4's contentions can support the fact that a meeting between Bond, Mallon, and Woods would have been standard procedure. No details in the SAC "substantiate that [FE4] has the necessary knowledge" of what Bond ultimately presented to Woods, and Plaintiffs have not offered any other allegations that corroborate his account. *See Okla. Firefighters*

*Pension & Ret. Sys.*, 58 F.4th at 208.  The SAC lacks an adequate factual basis to support Plaintiffs' beliefs about what was communicated during Bond's 2019 Development Plan presentation; thus, the Court cannot credit those allegations for purposes of Woods's scienter for statements made after September or October 2019.

***3. Gulden's and Burch's Terminations Alone Cannot Support Woods's Scienter.***  – Plaintiffs' final allegation is that Gulden's and Burch's terminations demonstrate Woods's knowledge of the fraud and an attempt to cover it up.  Plaintiffs permissibly allege on information and belief that Woods approved the terminations. Gulden was told that "Senior Management" had approved the decision to fire her, Woods was a member of Senior Management, and he was Gulden and Burch's only common manager.  *See* SAC ¶¶ 34, 154.  These allegations support an inference that he would have been made aware of an investigation within his chain of command.

However, the inference that Woods retaliated against Gulden and Burch to cover up the Permian fraud is weakened by the fact that the investigation took place well after ExxonMobil had already begun to disclose its lower-than-projected capacity in the Permian.  *Compare* SAC ¶ 244 (first stock drop occurred following disclosure on January 31, 2020 that daily OEB production was "virtually flat quarter to quarter") *with* ¶ 145 (ExxonMobil began investigation after it was contacted by the *Wall Street Journal* on August 27, 2020).  In fact, two of the three stock drops giving rise to this suit had already occurred.  *See id.* ¶¶ 244 (following January 31, 2020), 249 (following May 1, 2020 announcement of significant rig cuts and decreased daily volume estimates), 252 (final drop following January 15, 2021 *Wall Street Journal* article about the whistleblower

MEMORANDUM OPINION AND ORDER – PAGE 15

complaint).  Moreover, Gulden and Burch were terminated several months after the final disputed statement in this case, *compare* SAC ¶ 392 (challenging information in ExxonMobil's 2019 Form 10-K filed February 26, 2020) with ¶¶ 151–52 (terminated on October 2020 and December 2020 respectively), and Plaintiffs offer no further allegations clarifying if or when Woods learned of the fraud during the Class Period.  Accordingly, the allegations about Woods's purported involvement with the retaliation against Gulden and Burch fail to create a "cogent and compelling" inference "at least as compelling as any . . . of nonfraudulent intent" that Woods made the challenged statements and omissions knowingly or severely recklessly.  *Lormand*, 565 F.3d at 252 (quoting *Tellabs*, 551 U.S. at 314).

While a "smoking gun" is not required at this stage, Plaintiffs must still allege some factual basis, beyond motive and opportunity, to believe that Woods knew ExxonMobil's drilling data did not support its external projections when he made the disputed statements and omissions.  *See Lormand*, 565 F.3d at 251 (quoting *Tellabs*, 551 U.S. at 324).  They have not done so.  The Court accordingly dismisses Plaintiffs' Section 10(b) claim against Woods.

### D.  The Court Cannot Infer Mallon's Scienter

Plaintiffs assert claims under Rule 10b-5(a), (b), and (c) against Mallon.  Each claim requires that Plaintiffs explain with particularity the facts supporting a strong inference that Mallon acted knowingly or severely recklessly.[5]  *Owens*, 789 F.3d at 535–36 (quoting 15

---

[5] The PSLRA offers a safe harbor for certain forward-looking statements, in which case severe recklessness is insufficient.  *See* 15 U.S.C. §§ 78u-5(c)(1)(B)(i), (ii)(II).  But

U.S.C. § 78u4(b)(2); *Lormand*, 565 F.3d at 251).  The Court concludes that Plaintiffs have failed to establish Mallon's scienter as to their Section 10(b) claims[6] against him and thus dismisses them.

> ### 1. The Court Must Discount the Alleged Meetings Between Bond and Mallon. –

Plaintiffs' primary support for Mallon's scienter is their contention that Bond and Mallon met in person three times to discuss the 2019 Development Plan, and in the first two, he directed her to "revisit the long-term learning curves."  SAC ¶¶ 124, 129, 131.  But Plaintiffs do not contend firsthand knowledge of these meetings, and they have not cited any external source for this information.  Nor have Plaintiffs offered information suggesting that any witness referenced in the SAC would have reason to know that the meetings occurred or what Bond and Mallon discussed.  At most, Plaintiffs' witnesses can offer knowledge of what Bond told the Delaware planning team, and there are no allegations that Bond told her team about Mallon.  Relaxation of Rule 9(b) "cannot be construed to eviscerate [the particularity requirement] in its entirety by permitting rank speculation." *Kafi, Inc. v. Sand Canyon Corp.*, 2022 WL 3084480, at *6 (S.D. Tex. 2022) (quoting *Moon v. Harrison Piping Supply*, 375 F. Supp. 2d 577, 593 (E.D. Mich. 2005), rev'd in part on other grounds, 465 F.3d 719 (6th Cir. 2006)).  Accordingly, the Court

---

because Plaintiffs have not established Mallon's scienter, the Court need not reach the safe harbor issue, explained *infra*.

[6] Failure to plead scienter under Rule 9(b) and the PSLRA does not automatically warrant dismissal of the Section 20(a) claim, which lacks scienter as an essential element and is thus governed by the more lenient pleading standard of Rule 8.  *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 651–52 (S.D. Tex. 2021).  *See infra* Part III.G.

cannot credit Plaintiffs' allegations about Bond and Mallon's meetings and discussions about the 2019 NPV.

***2. Plaintiffs' Remaining Allegations Cannot Support a Strong Inference of Mallon's Scienter.*** **–** Beyond his alleged meetings with Bond, Plaintiffs have offered only speculation about Mallon's motives and opportunities.  As this Court has explained, "compensation structure arguments . . . cannot create an inference of scienter alone," as otherwise, "the executives of virtually every corporation in the United States would be subject to fraud allegations."  First MTD Order 14 (quoting *Abrams*, 292 F.3d at 434). Further, Mallon cannot be charged with knowledge of errors in reserves calculations and the need for write-downs based solely on the fact that the responsible entity, the Global Reserves and Resources Group, reported to him.  *See* SAC ¶¶ 71–72; *Abrams*, 292 F.3d at 432.  And Mallon did not assume that role until April 1, 2019, well after the only specific example Plaintiffs offer of when someone in management recognized the need for a write-down in the "XTO reserves" — which were much broader than just the Permian.  *See* SAC ¶¶ 298, 99, 92 (noting that the responsibilities for one Reservoir Engineer at XTO included reserves reporting for North Dakota assets).  Plaintiffs have not alleged enough to create a strong inference of Mallon's scienter, and the Court accordingly dismisses their Section 10(b) claims against him.

### E.  Plaintiffs Have Stated a Scheme Liability Claim Against Bond

Plaintiffs have also asserted a scheme liability claim against Bond under Section 10(b) and Rule 10b-5(a) and (c).  The Court concludes that Plaintiffs have adequately pled

that Bond engaged in deceptive conduct with scienter, and thus denies the motion to dismiss Plaintiffs' Section 10(b) claim against her.

   **1.  Plaintiffs Have Alleged Deceptive Conduct. –**  Defendants argue that Plaintiffs' scheme liability claims fail because they must plead deceptive conduct beyond the misstatements and omissions, but have failed to do so.  In private actions, liability for misstatements and omissions has historically been cabined to the "maker," as only the SEC is authorized to bring actions for aiding and abetting liability.  *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011).  Additionally, private litigants bringing claims under subsection (b) must satisfy the additional PSLRA pleading requirement to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief," to "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Thus, courts hesitated for years to "allow[] subsections (a) and (c) of Rule 10b-5 to be used as a 'back door into liability for those who help others make a false statement or omission in violation of subsection (b).'"  *Mapp*, 240 F. Supp. 3d at 585 (quoting *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 793 (S.D. Tex. 2008)).

   But the Supreme Court has carved out a path to scheme liability premised on conduct relating to misstatement. In *Lorenzo v. SEC*, the Court held that subsections (a) and (c) could cover the dissemination of misstatements where the dissemination is inherently deceptive or is preceded by other deceptive conduct.  *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *17 (discussing *Lorenzo*, 139 S. Ct. at 1100–

MEMORANDUM OPINION AND ORDER – PAGE 19

01).  In other words, *Lorenzo* did not overrule the holding in *Janus* that Section 10(b) does

not cover those who merely facilitate the preparation of misstatements.  *Lorenzo*, 139 S.

Ct. at 1103 (discussing *Janus*, 564 U.S. at 146–48) ("[W]e can assume that *Janus* would

remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates*

false information — provided, of course, that the individual is not involved in some other

form of fraud.") (emphasis in original).  Dissemination is a form of conduct, and "the

scheme subsections can cover conduct that involves a misstatement even if the defendant

was not the maker of it."  *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) (citing

*Lorenzo*, 139 S. Ct. at 1102).

       Plaintiffs have alleged conduct beyond the disputed statements and omissions

themselves.  Plaintiffs' counsel interviewed ExxonMobil employees who worked for Bond,

and allegedly, Bond instructed her team to manipulate internal valuations of ExxonMobil's

Permian assets in order to support Woods's public pledges to investors.[7]  SAC ¶ 313.

Another district court evaluated similar allegations in *Georgia Firefighters' Pension Fund

v. Anadarko Petroleum Corp.* that the defendants "direct[ed] employees to use outdated,

misleading maps that made [the project] seem more commercially viable tha[n] it really

was." 514 F. Supp. 942, 954 (S.D. Tex. 2021).  Alongside allegations of various omissions,

the court found that the plaintiff had adequately alleged a Rule 10b-5(c) claim.  *Id.*  The

Court concludes that Plaintiffs here have also adequately pled more than the misstatements

---

[7] Defendants have not challenged Plaintiffs' reliance on Gulden and Burch's OSHA
complaint, so the Court does not address whether allegations based partially on its contents
must be discounted.

and omissions themselves by asserting falsification of internal documents to make the company's financial state appear rosier than it was in reality.

Having rejected Defendants' sole argument about whether Plaintiffs pled a "deceptive or manipulative act," *see Ranieri*, 336 F. Supp. 3d at 720 (quoting *In re Enron Corp. Sec.*, 529 F. Supp. 2d at 678 n.45), the Court turns to scienter.

**2. Plaintiffs Have Created a Strong Inference of Bond's Scienter.** – Because Defendants argue that Bond did not engage in actionable deceptive conduct, they also have not raised her scienter to do so; Defendants addressed Bond's scienter only in the context of making false statements or furnishing false information for inclusion in false statements. *See* Defs.' Mot. Dismiss 31–32 ("Plaintiffs have not alleged that Bond or Mallon made any actionable public statements with scienter" or "intended to defraud the public by furnishing false information for use in public statements."). But even assuming their scienter challenge extends to Bond's scheme liability, Plaintiffs' allegations are sufficient. The SAC contends that Bond not only ignored numerous objections to the propriety of using the inflated learning curve assumptions, but explicitly stated that her goal was to substantiate Woods's promises to investors about ExxonMobil's future productivity in the Permian. The inference that Bond was at least severely reckless regarding the possibility that falsification of the 2019 Development Plan would mislead investors is "at least as compelling as any . . . of nonfraudulent intent." *Lormand*, 565 F.3d at 252 (quoting *Tellabs*, 551 U.S. at 314).

Because the Court rejects Defendants' challenges to Bond's misconduct and scienter, the Court denies the motion to dismiss the scheme liability claim against Bond.

MEMORANDUM OPINION AND ORDER – PAGE 21

### F. The Court Can Infer ExxonMobil's Scienter for Scheme Liability, but Not the Misstatements and Omissions Claims

"A defendant corporation has the requisite state of mind when the corporate officer making the statement does so knowing it is false." *Ramirez v. ExxonMobil Corp.*, 334 F. Supp. 3d 832, 852 (N.D. Tex. 2018) (quoting *Southland*, 365 F.3d at 366). Because Plaintiffs have not adequately pled scienter for either Woods or Mallon, there is no basis to impute scienter to ExxonMobil, and the Rule 10b-5(b) claim against it must also be dismissed.

However, the Court found Defendants' challenges to the scheme liability claim against Bond to be unavailing, and Defendants have not asserted any deficiency in pleading scheme liability against ExxonMobil based on Bond. Accordingly, the Court declines to dismiss the Rule 10b-5(a) and (c) claim against ExxonMobil.

### G. Defendants' Argument Against Section 20(a) Liability Fails

Defendants' sole argument against controlling person liability is that Plaintiffs have not adequately pled a primary violation, which the Court has rejected. Accordingly, the Court denies Defendants' motion to dismiss Plaintiffs' Section 20(a) claims.

### CONCLUSION

For the reasons set forth above, the Court grants the motion to dismiss all claims under Section 10(b) of the Exchange Act and Rule 10b-5(b) and the claim under Rule 10b-5(a) and (c) against Mallon. Because Plaintiffs have had three opportunities to plead their claims, the Court dismisses those claims with prejudice. However, the Court denies the motion to dismiss the claims under Rule 10b-5(a) and (c) against Bond and ExxonMobil.

Signed August 24, 2023.


_____
David C. Godbey
Chief United States District Judge