**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, <br><br>      *Plaintiff*, <br><br>      v. <br><br> EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, <br><br>      *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. 3:21-cv-00194-N

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND
<u>MEMORANDUM OF LAW IN SUPPORT</u>**

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, TX 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122

*Attorneys for Defendants Exxon Mobil
Corporation, Darren W. Woods, Liam M.
Mallon, and Melissa Bond*

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

GLOSSARY .......................................................................................................................v

INTRODUCTION ..............................................................................................................1

STATEMENT OF FACTS .................................................................................................3

I.      Plaintiffs' scheme liability claims are based on the theory that certain Defendants made misleading statements about the value of ExxonMobil's Permian Basin assets. ....................................................................................................................3

II.     Plaintiffs alleged that Bond participated in a scheme concerning "learning curve" assumptions that were purportedly embedded in several of the ExxonMobil public statements that the Court specifically found could not support a claim. ...........................5

III.    The Court dismissed Plaintiffs' Rule 10b-5(b) claims in their entirety, holding that Plaintiffs failed to allege an actionable misleading statement. ...........................................7

ARGUMENT......................................................................................................................9

I.      Rule 10b-5(a) and (c) prohibit only deceptive conduct that is made in connection with the purchase or sale of a security. ...............................................................10

II.     The Complaint does not connect Bond's purportedly deceptive conduct with the purchase or sale of any security. .......................................................................11

III.    Plaintiffs could not have relied on Bond's allegedly deceptive conduct. .........................17

IV.     Plaintiffs fail to plead ExxonMobil's scienter with respect to the alleged scheme. ..........19

V.      Plaintiffs cannot resurrect the dismissed claims challenging ExxonMobil's forward-looking statements regarding production goals by reframing them as part of an alleged scheme.......................................................................................21

VI.     Plaintiffs' control person claims under Section 20(a) should be dismissed. .....................23

CONCLUSION.................................................................................................................23

**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Alaska Electrical Pension Fund v. Flotek Industries, Inc.*,
915 F.3d 975 (5th Cir. 2019) .................................................................................2, 20

*Barrett v. PJT Partners Inc.*,
2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017).................................................................21

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................................17

*Burback v. Brock*,
2023 WL 4532803 (5th Cir. July 13, 2023).................................................................11

*Coggins v. Camber Energy Inc.*,
2023 WL 6202056 (S.D. Tex. Sept. 22, 2023) ...........................................................11

*Doe v. Columbia-Brazoria Independent School District*,
855 F.3d 681 (5th Cir. 2017) ...................................................................................10

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ...................................................................................10

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
258 F. Supp. 2d 576 (S.D. Tex. 2003) ......................................................................19

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ..................................................................16, 17

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) ...................................................................................3, 9

*Jones v. Dallas County*,
2014 WL 1632154 (N.D. Tex. Apr. 23, 2014) ...........................................................10

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) .............................................................................19

*Linenweber v. Southwest Airlines Co.*,
2023 WL 6149106 (N.D. Tex. Sept. 19, 2023)........................................................11, 20

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019)............................................................................................16

*Lovelace v. Software Spectrum Inc.*,
　　78 F.3d 1015 (5th Cir. 1996) ...................................................................................23

*In re Plains All American Pipeline, L.P. Securities Litigation*,
　　307 F. Supp. 3d 583 (S.D. Tex. 2018) .....................................................................20

*Regents of University of Cal. v. Credit Suisse First Boston (USA), Inc.*,
　　482 F.3d 372 (5th Cir. 2007) ..............................................................................18, 19

*Rosas v. Bexar County*,
　　2015 WL 1955406 (W.D. Tex. Apr. 29, 2015).........................................................13

*SEC v. Adoni*,
　　60 F. Supp. 2d 401 (D.N.J. 1999) .......................................................................16, 20

*SEC v. Collins & Aikman Corp.*,
　　524 F. Supp. 2d 477 (S.D.N.Y. 2007)......................................................................11

*SEC v. Mapp*,
　　240 F. Supp. 3d 569 (E.D. Tex. 2017)......................................................................10

*SEC v. Narayan*,
　　2017 WL 4652063 (N.D. Tex. Aug. 28, 2017).............................................10, 16, 20

*SEC v. Rio Tinto plc*,
　　41 F.4th 47 (2d Cir. 2022) ......................................................................................12

*SEC v. Simpson Capital Management, Inc.*,
　　586 F. Supp. 2d 196 (S.D.N.Y. 2008)......................................................................11

*In re SourceCorp Securities Litigation*,
　　2006 WL 8439544 (N.D. Tex. June 6, 2006) ...........................................................23

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta,*
　　*Inc.*, 552 U.S. 148 (2008).................................................................................17, 19

*Taubenfeld v. Hotels.com*,
　　385 F. Supp. 2d 587 (N.D. Tex. 2004) .....................................................................23

*Thomas v. Shiloh Industries, Inc.*,
　　2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018)..........................................................21

*In re Tupperware Brands Corp. Securities Litigation*,
　　2023 WL 5091802 (11th Cir. Aug. 8, 2023).......................................................16, 20

*Villare v. Abiomed, Inc.*,
　　2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)..........................................................21

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) .................................................................................23

*Young v. Nationwide Life Insurance Co.*,
   183 F.R.D. 502 (S.D. Tex. 1998).............................................................................19

## STATUTES

15 U.S.C. § 78u-5(c)(1) .........................................................................................3, 22, 23

## RULES

Fed. R. Civ. P. 12..........................................................................................................9, 10

## REGULATIONS

17 C.F.R. § 210.4-10(a)(22)................................................................................................14

17 C.F.R. § 240.10b-5.............................................................................................1, 10, 11

**GLOSSARY**

| Term or Abbreviation | Description |
|---|---|
| Defendants | ExxonMobil and the Individual Defendants |
| Delaware Basin | A region within the Permian Basin (SAC ¶ 2) |
| ExxonMobil | Exxon Mobil Corporation |
| FAC | Plaintiff's First Amended Class Action Complaint (Dkt. 53) |
| GAAP | Generally Accepted Accounting Principles |
| Individual Defendants | Darren W. Woods, Liam M. Mallon, and Melissa Bond |
| Order | *Yoshikawa v. Exxon Mobil Corp.*, Civil Action No. 3:21-CV-00194-N, 2023 WL 5489054 (N.D. Tex. Aug. 24, 2023) (Dkt. 112) |
| Permian or Permian Basin | A hydrocarbon-rich region in parts of Texas and New Mexico (SAC ¶ 1) |
| Plaintiffs | The State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island and Amalgamated Bank |
| Proved Reserves | Quantities of oil and natural gas that, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible under existing economic and operating conditions and government regulations. Proved Reserves are determined using the average of first-of-month oil and natural gas prices during the reporting year (SAC ¶ 46) |
| PSLRA | Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 |
| Resource Base | The estimated quantities of oil and gas that are expected to be ultimately recoverable (including, but not limited to, Proved Reserves) (SAC ¶ 51) |
| SAC | Second Amended Complaint (Dkt. 92) |

Pursuant to Federal Rule of Civil Procedure 12(c), Defendants move for judgment on the pleadings seeking dismissal of the remaining claims for scheme liability and control person liability under the Securities Exchange Act of 1934 asserted in Plaintiffs' SAC.

**INTRODUCTION**

This Court's recent Order on Defendants' motion to dismiss the second amended complaint ("SAC") has left Plaintiffs without any viable claims. The Court determined that Plaintiffs had failed to state a claim under Rule 10b-5(b) against defendants Darren Woods and Liam Mallon, in part, because the SAC did not adequately allege that Melissa Bond had communicated information to them about her valuation of the Permian Basin assets. Severing the link between Bond's conduct and Woods and Mallon, the only alleged speakers, necessarily has an impact on the sufficiency of Plaintiffs' scheme liability claims against Bond and ExxonMobil under Rule 10b-5(a) and (c). The impact on Plaintiffs' surviving claims is now clear: without sufficient allegations that Bond communicated her valuation of the Permian Basin assets to the public, the complaint fails to plead the necessary connection between her alleged conduct and the securities markets. Instead, all that remain are allegations of purely internal corporate conduct that no court has found sufficient to satisfy the strictures of Rule 10b-5.

Under Rule 10b-5, liability arises for allegedly deceptive conduct only if that conduct was "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Here, the Court's decision severed any such link. The complaint does not allege that Bond made public statements on behalf of ExxonMobil. And the Court rejected the unsupported and conclusory allegations about meetings that Bond may have had with Woods and Mallon concerning the valuation of the Permian Basin assets. The complaint thus does not sufficiently plead that Bond's purely internal conduct flowed through Woods and Mallon – or through any other channel – to the

1

securities markets.  Nor can Plaintiffs' allegations concerning the publicly-disclosed Proved Reserves and Resource Base compensate for that failure: the complaint also fails to plead with particularity that Bond's allegedly improper valuation was incorporated into that public disclosure.

For related reasons, the complaint further fails to allege that any investor relied on Bond's conduct when purchasing securities.  In the absence of any connection between Bond's internal conduct and ExxonMobil's public disclosures, Plaintiffs cannot rely on the fraud-on-the-market presumption of reliance.  And because this Court has already concluded that the complaint fails to plead any actionable public misstatements or omissions, the presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), does not apply.

Also now missing is any inference that ExxonMobil acted with scienter in connection with the alleged scheme.  As the Fifth Circuit has made clear, a Rule 10b-5 plaintiff must allege scienter "with respect to the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."  *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019) (citation omitted).  This Court already held that Woods and Mallon lacked scienter.  Bond's alleged scienter cannot be imputed to ExxonMobil because the complaint does not allege that she was a speaker, which eliminates any basis for liability under Rule 10b-5(a) and (c) against ExxonMobil.  And because Defendants are entitled to dismissal of the remaining claims for primary liability, the claims for secondary liability under Section 20(a) fail as well.

And even if Plaintiffs had pleaded a viable theory of scheme liability, the safe harbor under the Private Securities Litigation Reform Act ("PSLRA") would prevent those claims from

proceeding because they are based on ExxonMobil's public statements concerning its production goals for the Permian Basin.  The PSLRA safe harbor applies to any claim under Section 10(b) "based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading."  15 U.S.C. § 78u-5(c)(1).  Here, the Court already held in its order dismissing an earlier iteration of the complaint that ExxonMobil's statements concerning its production goals for the Permian Basin were forward-looking, accompanied by meaningful cautionary language, and not made with knowledge of their falsity.  That prior ruling establishes that the safe harbor applies equally to Plaintiffs' remaining claims because they are based on those same statements.

For those reasons, all of Plaintiffs' remaining claims fail as a matter of law, and judgment on the pleadings should therefore be granted.

## STATEMENT OF FACTS[1]

I.    **Plaintiffs' scheme liability claims are based on the theory that certain Defendants made misleading statements about the value of ExxonMobil's Permian Basin assets.**

On September 10, 2021, Plaintiffs filed the FAC, alleging that ExxonMobil's production goals for the Permian Basin through 2024 were materially misleading.  The FAC asserted claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 against ExxonMobil and eight individual defendants.  (Dkt. 53 at 10.)  On September 29, 2022, the Court dismissed the FAC.  (Dkt. 88.)  As relevant here, the Court held that: (1) Plaintiffs had not pleaded a strong inference of scienter against any Defendant (Dkt. 88 at 4-20); and (2) ExxonMobil's statements that production goals were "on track," "on plan," or "on schedule"

---

[1]    As in a motion to dismiss under Rule 12(b), while the Court must "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff"; it should "not, however, 'accept as true conclusory allegations or unwarranted deductions of fact.'"  *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312-13 (5th Cir. 2002) (citations omitted).  The Court may also rely on documents incorporated by reference in the pleadings and matters on which the Court may take judicial notice.  *See id.*

3

to meet its one million oil-equivalent barrel per day target were protected by the PSLRA safe harbor (Dkt. 88 at 25-27).

On October 31, 2022, Plaintiffs filed the SAC.  Plaintiffs again alleged that ExxonMobil's production goals for the Permian Basin through 2024 were materially misleading.  (*E.g.*, SAC ¶¶ 361-69, 373-74, 383-85, 387-90, 398-99.)  According to Plaintiffs, ExxonMobil could not reach its daily production goal of one million oil-equivalent barrels because its "learning curve" assumptions were materially inflated.  (SAC ¶¶ 361-69, 388-89.)  Notably, Plaintiffs reasserted these same allegations from the FAC even though this Court had expressly held that they were accompanied by language that cautioned investors that ExxonMobil's ability to meet the projections depended on a number of factors, including the timely completion of projects, reservoir performance, market changes, and unforeseen technical difficulties.  (*See* App. 9-12, 22, 40-42, 58, 85, 88, 94, 143-44, 146-47, 149, 151, 154-56, 162-63, 166-67, 169, 176, 182, 188, 191, 199, 202, 214, 222, 228.)

Plaintiffs also realleged in the SAC their challenges to ExxonMobil's estimates of Proved Reserves.  (SAC ¶¶ 351-58, 378-83, 392-97.)  Plaintiffs asserted that these statements were false because the Proved Reserves were allegedly based on "a fraudulent reserves process" that somehow incorporated false learning curve assumptions, though Plaintiffs failed to allege any facts linking those assumptions to the reserve process.  (*E.g.*, SAC ¶¶ 84-85, 100-01, 188, 344, 354.)  And because the Resource Base includes as one input the Proved Reserves (which in turn supposedly incorporated the learning curve assumptions), Plaintiffs repeated their allegation that the Resource Base was misstated based on the inflated Proved Reserves without addressing the many other inputs into that calculation.  (SAC ¶¶ 345-50, 370-74.)

II.    **Plaintiffs alleged that Bond participated in a scheme concerning "learning curve" assumptions that were purportedly embedded in several of the ExxonMobil public statements that the Court specifically found could not support a claim.**

Plaintiffs allege that Bond was ExxonMobil's Delaware Basin Development Manager during the Class Period.  (*Id.*)  Plaintiffs do not allege that Bond made any public statements, let alone statements about the net present value ("NPV") of the Delaware Basin or the learning curve assumptions purportedly incorporated within that calculation.  Nor do they allege that the results of the 2019 internal planning process were ever disclosed to investors.  Indeed, Plaintiffs' lengthy laundry list of allegedly false and misleading statements does not mention NPV, the $50 billion Permian Basin valuation, learning curve assumptions, or the Delaware Basin whatsoever.  (*Id.* ¶¶ 344-401.)

Instead, in light of this Court's Order, Plaintiffs put forth a novel scheme liability theory against Bond and ExxonMobil that is dependent on ExxonMobil disclosures Bond did not make or provide information for, intertwined with her supposedly deceptive after-the-fact internal conduct that has no well-pleaded connection to those disclosures.  Plaintiffs devote a mere 11 paragraphs of their 451-paragraph complaint to Bond's alleged participation in this unique "fraudulent scheme."  (*Id.* ¶¶ 298-309.)  At base, they allege that Bond included "false 'learning curve' drilling assumptions" in the **2019** Delaware Basin development plan to support Woods' *prior* statements to investors that ExxonMobil would "increase Permian production to one million barrels per day by 2024," and "to support" ExxonMobil's allegedly "inflated proved reserve and resource base valuations."  (*Id.* ¶ 298.)  Specifically, Plaintiffs allege that Bond "instructed the Delaware Planning Team to generate higher **2019** NPV estimates by revising the assumptions used to build the development plan in a way that would 'claw back' value."  (*Id.* ¶ 301.)  Bond allegedly then worked with the Delaware Development Planning Team to use "aggressive 'drilling learning

5

curve' assumptions" that would artificially increase the NPV of the Delaware Basin. (*Id.* ¶¶ 302-03.) But the SAC never explains *how* this alleged internal, post-statement conduct purportedly "supported" any disclosure to investors or reached investors at all.

Plaintiffs attempt to link this purely internal conduct to ExxonMobil's public statements in two ways, each of which has been rendered unsustainable by this Court's Order. First, Plaintiffs try to impute knowledge of Bond's conduct to Woods and Mallon, the makers of the public statements, by alleging a series of meetings Bond allegedly had with Mallon and Woods where she supposedly presented the results of her allegedly inflated Delaware Basin planning process. The SAC, however, does not allege any firsthand accounts or details concerning the subject matter or content of these alleged meetings. The Court thus rejected these allegations, holding that it could not "credit" allegations about meetings between Woods, Mallon and Bond because the "SAC lacks an adequate factual basis to support Plaintiffs' belief about what was communicated" during those meetings. (Order at 15, 17-18.)

Second, Plaintiffs attempt to connect Bond's work with the Planning Team to the Global Reserves and Resources Group ("GRRG") – the group that actually calculates Proved Reserves. (SAC ¶¶ 311, 347, 377, 379, 384, 420.) But as the SAC acknowledges, Proved Reserves reflect the estimated amount of hydrocarbons that ExxonMobil believed with reasonable certainty existed and could be economically produced *under **existing** economic and operating conditions* and government regulations (*e.g.*, they by definition do not include forward-looking assumptions like Bond's supposed "learning curve" assumptions). (*Id.* ¶ 332 (emphasis added).) And SEC regulations and GAAP require ExxonMobil to follow a specific process in estimating and disclosing Proved Reserves. (*See generally id.* ¶¶ 315-32.)

Plaintiffs allege that the GRRG generated reserves estimates as follows:

6

- reservoir engineers prepared reserves forecasts for their assigned areas and submitted them to their managers;

- their managers approved the forecasts;

- the GRRG reviewed and evaluated forecasts prepared by reservoir engineers, including analyses under different scenarios; and

- the GRRG generated the reserves using the SEC's mandated process for reserves.

(*E.g.*, *id.* ¶¶ 74-77.)

Plaintiffs also admit that the Planning Team and the GRRG are separate groups within ExxonMobil. (*Id.* ¶¶ 24, 71-73.) The SAC does not allege any facts to support an inference that the Planning Team, including Bond, had a role in—or even provided any information used in— the process of estimating reserves. Indeed, it does not allege that there was *any* overlap between the members of the Planning Team and the GRRG. Nor does the SAC contain any plausible allegations that Mallon or Bond ever provided the Planning Team's learning curve assumptions to the GRRG group, let alone that the GRRG group actually used Bond's learning curve assumptions or that Bond intended or believed that the GRRG group would rely on them.

III. **The Court dismissed Plaintiffs' Rule 10b-5(b) claims in their entirety, holding that Plaintiffs failed to allege an actionable misleading statement.**

On August 24, 2023, the Court issued the Order granting, in part, Defendants' motion to dismiss the SAC. (Order at 1.) The Court dismissed the SAC's Rule 10b-5(b) misstatement and omission claims in their entirety because the SAC failed to adequately plead Woods's or Mallon's scienter with respect to any of the challenged statements, and, as a result, their scienter could not be imputed to ExxonMobil. (*Id.* at 12, 18, 22.) In particular, the Court held that it could not credit the SAC's allegations concerning a Fall 2019 meeting where Bond supposedly "would have" presented the 2019 development plan to Woods for approval. (*Id.* at 14-15.) The Court held that this allegation verged on "impermissible position pleading," as Plaintiffs avoided any concrete

statement of fact and instead claimed only that "Woods hypothetically 'would have' met with Bond by virtue of his responsibility as CEO to approve development planning." (*Id.* at 14.) Because the SAC failed to allege "any firsthand account of what transpired during the alleged meeting," the Court concluded that the SAC "lacks an adequate factual basis to support Plaintiffs' beliefs about what was communicated during Bond's 2019 Development Plan presentation." (*Id.* at 14-15.)

The Court also rejected the SAC's allegations concerning three other alleged meetings between Bond and Mallon, during which she allegedly disclosed the results of her allegedly inflated Delaware Basin valuation process. (*Id.* at 17; *see* SAC ¶¶ 301-05.) The Court noted that "Plaintiffs do not contend firsthand knowledge of these meetings, and they have not cited any external source for this information." (Order at 17.) Rather, Plaintiffs' witnesses could – at best – offer knowledge only of what Bond told the Delaware Basin Planning Team. (*Id.*) Accordingly, the Court determined that it could not credit Plaintiffs' allegations about ***any*** of the meetings between Bond and Mallon concerning the 2019 Delaware Basin NPV. (*Id.* at 17-18.)

In light of that conclusion, the Court did not reach Defendants' arguments that there were no actionable misstatements, including that (1) Plaintiffs failed to adequately allege that ExxonMobil's Proved Reserves and Resource Base were based on the Planning Team's allegedly inflated learning curve assumptions, and (2) certain of Plaintiffs' alleged misstatements were forward-looking and protected from liability under the PSLRA's safe harbor. (*Id.* at 12 n.3, 16 n.5.) But the Court has already addressed the latter argument in its earlier Order dismissing the FAC. There, the Court found that various ExxonMobil statements that it was "on track," "on schedule," or "on plan" to produce one million oil-equivalent barrels per day by 2014 were non-actionable forward-looking statements because they were coupled with cautionary language that

explicitly described the risks that Plaintiffs allege actually materialized and Plaintiffs had "not pleaded facts showing that Defendants knew the warned-of risks were already coming to fruition." (Dkt. 88 at 23-27.)

The Court nevertheless held that Plaintiffs had stated a scheme liability claim against Bond, and that Plaintiffs alleged conduct beyond the misstatements themselves, because Bond allegedly "instructed her team to manipulate internal valuations of ExxonMobil's Permian assets in order to support Woods' public pledges to investors." (Order at 20.) The SAC does not address, and as a result this Court did not consider, how Bond's conduct could possibly have "supported" Woods's prior statements without ever actually being communicated to Woods or any other Exxon speaker.

The Court also held that Plaintiffs sufficiently alleged Bond's scienter in connection with the purported scheme (*id.* at 21), and then imputed Bond's scienter to ExxonMobil because "Defendants ha[d] not asserted any deficiency in pleading scheme liability against ExxonMobil based on Bond" (*id.* at 22). Because the Court did not dismiss the scheme liability claims against ExxonMobil and Bond, it declined to dismiss the Section 20(a) control person claims against Woods and Mallon. (*Id.*)

On October 5, 2023, Defendants filed their answer to the SAC. (Dkt. 118.)

## ARGUMENT

Any party may move for judgment on the pleadings after the pleadings are closed, as long as the motion does not delay trial. Fed. R. Civ. P. 12(c). Rule 12(c) provides a procedure "to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (citation omitted). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same

9

standard as a motion to dismiss under Rule 12(b)(6)." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). A party can raise grounds for failure to state a claim on a Rule 12(c) motion that were not raised in a prior Rule 12 motion. *See Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 686 (5th Cir. 2017); *see also Jones v. Dallas Cnty.*, 2014 WL 1632154, at *2 n. 4 (N.D. Tex. Apr. 23, 2014); Fed. R. Civ. P. 12(h)(2).

I.    **Rule 10b-5(a) and (c) prohibit only deceptive conduct that is made in connection with the purchase or sale of a security.**

Rule 10b-5(a) and (c) make it unlawful to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Rule 10b-5(a) and (c) are "scheme liability code sections" that "focus on acts and conduct rather than a misstatement or omission." *SEC v. Mapp*, 240 F. Supp. 3d 569, 585 (E.D. Tex. 2017). "The concept of 'scheme liability' recognizes that because '[c]onduct itself can be deceptive,' a defendant may incur primary liability for securities fraud without making or using an 'oral or written statement.'" *SEC v. Narayan*, 2017 WL 4652063, at *3 (N.D. Tex. Aug. 28, 2017) (alteration in original) (citation omitted). Conduct found sufficient to support scheme liability claims includes "a stockbroker's scheme of 'selling his customer's securities and using the proceeds for his own benefit,'" "[m]arket manipulation, employment of a manipulative device, and engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent profits, and creating and distributing false research reports favorably reviewing a company."[2] *Id.* (alteration in original) (citations omitted).

---

[2]    While Rule 10b-5(a) and (c) have been employed to redress a wide variety of deceptive conduct in connection with the purchase or sale of securities, paradigmatic examples of scheme liability actions involve the use of deceptive trading practices directly in the securities markets. *See SEC v. Simpson Cap. Mgmt., Inc.*, 586 F. Supp. 2d 196, 199-200 (S.D.N.Y. 2008) (defendants devised scheme to place mutual fund trades after market close

Rule 10b-5(a) and (c) claims sound in fraud and are subject to Rule 9(b)'s heightened pleading requirements. *See Coggins v. Camber Energy Inc.*, 2023 WL 6202056, at \*12 (S.D. Tex. Sept. 22, 2023). The PSLRA's heightened scienter pleading requirements also apply to Rule 10b-5(a) and (c) claims. *See Linenweber v. Sw. Airlines Co.*, 2023 WL 6149106, at \*5 (N.D. Tex. Sept. 19, 2023).

II.     **The Complaint does not connect Bond's purportedly deceptive conduct with the purchase or sale of any security.**

Plaintiffs' scheme liability claim fails because Bond's supposedly deceptive conduct was not "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Deceptive conduct is "'in connection with the purchase or sale of securities if there is a relationship in which the fraud and the stock sale coincide or are more than tangentially related.'" *Burback v. Brock*, 2023 WL 4532803, at \*4 (5th Cir. July 13, 2023) (quoting *Roland v. Green*, 675 F.3d 503, 520 (5th Cir. 2012)).

Here, Plaintiffs manufacture their scheme liability claim based on Bond's alleged instruction to "her team to manipulate ***internal valuations*** of ExxonMobil's Permian assets" in order to "support Woods' public pledges to investors" in some unspecified manner. (Order at 20 (emphasis added); *see also* SAC ¶ 313.) Yet Plaintiffs do not (and cannot) allege that Bond, or anyone else, publicly disclosed the net present value of the Permian Basin assets or the relevant learning curve assumptions that were allegedly inflated. What Plaintiffs actually allege is that Bond manipulated an internal metric to match a ***prior*** public statement – not the other way around. And they never allege how this internal metric "supported" any public statement in any manner.

---

while making those trades appear to have been placed prior to market close). Other examples of typical scheme liability cases involve the use of fraudulent transactions to manipulate financial statements that are disclosed directly to investors. *See SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 480-81 (S.D.N.Y. 2007) (defendants engaged in fraudulent "round trip" transactions to artificially inflate income in financial statements).

11

The Court specifically held that the SAC did not allege that the product of Bond's work was communicated to any alleged speaker.  (Order at 12-13, 17.)  Indeed, the SAC does not allege that Bond's valuations were ever communicated to anyone.  Accordingly, the internal valuations could be connected to the purchase or sale of securities only if Bond provided the allegedly inflated Permian Basin yearly planning data to someone within ExxonMobil who then conveyed that information, or made statements based on that information, to the market.[3]

In light of the Court's Order, the SAC does not establish such a connection.  For example, Plaintiffs claim that the "false 'learning curve' drilling assumptions" somehow supported ExxonMobil's "growth plan of 1 million barrels per day by 2024 in the Permian that Defendant Woods and Exxon[Mobil] touted to investors during the Class Period."  (SAC ¶ 310.)  This theory depends exclusively on Plaintiffs' allegation that Bond "would have" presented the inflated Permian Basin data to Woods and Mallon during in-person meetings at some unidentified points in September or October of 2019.  (SAC ¶ 163, 182, 271.)  This Court has held that it could not credit these allegations.  (Order at 15, 17-18.)  As to Bond's meetings with Woods, this Court disregarded Plaintiffs' allegation for failing to "cite[] to any firsthand account of what transpired during the alleged meeting," holding that the SAC "lacks an adequate factual basis to support Plaintiffs' beliefs about what was communicated during Bond's 2019 Development Plan presentation."  (Order at 15.)  With respect to Bond's meetings with Mallon, this Court similarly stated that the Plaintiffs "d[id] not contend firsthand knowledge of these meetings"; "h[ad] not cited any external source for" information about the meetings; and had not "offered information

---

[3]   To the extent Plaintiffs argue that Bond engaged in a scheme to defraud the securities market by failing to prevent Woods and Mallon from making public misstatements about ExxonMobil's production in the Permian Basin, or by failing to correct those alleged misstatements, this would be an attempt to resuscitate an aiding and abetting claim that is not permissible in a private action brought pursuant to Rule 10b5-(a) and (c).  *See SEC v. Rio Tinto plc*, 41 F.4th 47, 54-55 (2d Cir. 2022).  And, as described above, Plaintiffs cannot link knowledge of Bond's conduct to anyone with a duty to correct the alleged misstatements.

suggesting that any witnesses referenced in the [SAC] would have reason to know that the meetings occurred or what Bond and Mallon discussed." (Order at 17.) Stripped of these deficient factual allegations in light of the Court's order, the SAC contains no well-pleaded factual allegations linking Bond's purportedly deceptive conduct with any public statement by Woods, Mallon, or ExxonMobil concerning the Permian Basin production goals.

The SAC also alleges in conclusory fashion that ExxonMobil's Proved Reserves and Resource Base "are calculated using the drilling assumptions in the development plan."[4] (SAC ¶¶ 66, 67, 311.) But that allegation is both incorrect and entirely inconsistent with the SAC itself, which makes clear that the NPV and the internal planning learning curve assumptions are developed on a completely separate track from the Proved Reserves and Resource Base. *See Rosas v. Bexar Cnty.*, 2015 WL 1955406, at *5 (W.D. Tex. Apr. 29, 2015) ("The Court need not accept as true an allegation contradicted by other specific factual allegations within Plaintiff's own Amended Complaint."). In fact, Proved Reserve estimates ***could not*** have used Bond's forward-looking learning curve assumptions, which by definition are a prediction of ***future*** operating conditions. (SAC ¶¶ 49, 50, 128, 158.) Proved Reserves are estimated using ***existing*** operating methods and a 12-month average price during the period ***preceding*** the date of the annual report. *See* 17 C.F.R. § 210.4-10(a)(22). In other words, learning curves are forward-looking and Proved Reserves are backward looking. There is no allegation that Bond or anyone else manipulated historic production information.

---

[4]    Plaintiffs allege that ExxonMobil "specifically told investors during the Class Period that Exxon's stated proved reserves 'in the Permian Basin are supported by ExxonMobil's growth plan including increased drilling activity.'" (SAC ¶¶ 311, 340.) But ExxonMobil made those statements in February 2018 and February 2019 – well before Bond's supposedly deceptive conduct in connection with the 2019 internal valuation. (*Id.* ¶ 70.)

Moreover, even if Plaintiffs had alleged that the Proved Reserves somehow incorporated forward-looking learning curve assumptions, Plaintiffs have not alleged that the Proved Reserves actually incorporated ***Bond's*** allegedly inflated learning curve assumptions. Plaintiffs allege that ExxonMobil's Proved Reserves are generated by the GRRG, not the Planning Team with which Bond allegedly worked. (SAC ¶¶ 43, 71, 74-83, 278.) They do not allege that Bond or anyone in the Planning Team sent any learning curve assumptions to the GRRG for use in generating Proved Reserves estimates. Nor do they allege that Mallon, while directly supervising the head of the GRRG, ever ordered the GRRG to use the allegedly inflated NPV of the Delaware Basin assets or any particular learning curve assumptions. (*Id.* ¶¶ 278-280.) As this Court held, Plaintiffs fail to plead that Mallon even knew about Bond's allegedly deceptive conduct. (Order at 17-18.) Instead, Plaintiffs rely on a single witness – Andrew Rhodes – to connect Bond's allegedly inflated learning curve assumptions to the process for estimating the Proved Reserves. (*Id.* ¶¶ 74-91.) But Rhodes' explanation of the reserves estimation process does not mention Bond or any alleged use of the Planning Team's learning curve assumptions in the Proved Reserves estimates. (*See id.*) To the contrary, Rhodes stated that the "group of individuals responsible for reviewing reserves would put a report together at year-end that reflected the reserves in the Permian Basin and any change from the prior year and review the report with the reservoir engineers." (*Id.* ¶¶ 75-77, 83.) And he claims only that there was some unidentified pressure to "scrunch" decline curves (*id.* ¶¶ 84-94), which are used to predict a well's production ***after*** it has been drilled and completed and do not relate to learning curve assumptions (*id.* ¶¶ 185, 128).

Without a well-pleaded allegation as to how the Proved Reserves purportedly incorporated Bond's allegedly inflated learning curve assumptions, Plaintiffs also fail to connect any allegedly inflated assumptions to the Resource Base. Plaintiffs allege that ExxonMobil's Proved Reserves

(which would include Proved Reserves in the Permian Basin) were included as a subset of ExxonMobil's broader Resource Base.  (*See* SAC ¶ 51.)  According to Plaintiffs, if the Proved Reserves incorporated Bond's allegedly inflated learning curve assumption, the Resource Base did as well because, by definition, the Proved Reserves were a subset of the Resource Base.  (*See id.* ¶ 66 ("Thus, both the 'proved reserve' and the 'resource base,' which includes the proved reserve, are calculated using the drilling assumptions in the development plan.").)[5]  Plaintiffs' pleading failure on Proved Reserves is thus fatal to its Resource Base theory.  Because Plaintiffs failed to sufficiently allege that the Proved Reserves incorporated Bond's inflated learning curve assumptions, they also fail to sufficiently allege that the Resource Base included them.

Given this Court's ruling that the SAC fails to provide any factual allegations linking Bond's allegedly deceptive conduct to Woods or Mallon (Order at 14-15, 17-18), and the SAC's failure to allege any other link to a public statement, Bond's purely internal conduct in connection with the 2019 annual planning process cannot be linked to any statement made to any investor, and thus did not coincide with or tangentially relate to the purchase or sale of any securities.  *See SEC v. Narayan*, 2017 WL 4652063, at *8 (internal conduct such as backdating documents, paying finders' fees and making loans not sufficient to support a claim for scheme liability in the absence of an action by defendants directed towards investors); *see also SEC v. Adoni*, 60 F. Supp. 2d 401, 409 (D.N.J. 1999) (fraudulent internal bookkeeping, with no allegation that the fraud "touched upon, or was in any way related to, the company's securities," was not actionable under Section 10(b)); *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *1 (11th Cir. Aug. 8,

---

[5]  Plaintiffs fail to explain why the Resource Base – which consists of "proved reserves, *plus* other discovered resources that are expected to be *ultimately* recovered" at any point in time (SAC ¶ 51 (emphasis added)) – incorporated a timing-based element like Bond's learning curve assumptions.  Nor do they explain how an assumption about how many days it would take to drill wells would have any bearing on how many hydrocarbons would ultimately be recovered, irrespective of the timeline on which they were recovered.

15

2023) (dismissing Rule 10b-5(b) claim for failure to plead scienter where "[t]he lower-level corporate officials that the shareholders point to may have known about the fraud—or even orchestrated the fraud themselves—but the complaint failed to directly connect them to the alleged misstatements").

This conclusion is entirely consistent with *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), which did nothing to eliminate the "in connection with" requirement. *Id.* at 1098. Under *Lorenzo* and every other scheme liability case, Plaintiffs still were required to allege plausible facts demonstrating that Bond's deceptive conduct was in connection with the purchase or sale of a security. They haven't done that. Nor could they on the complaint's remaining allegations. Indeed, Defendants are not aware of any Court finding an adequately pleaded scheme liability claim where the purported deceptive conduct was purely internal and allegedly done to support statements made before the conduct, with no connection to the markets. Plaintiffs' scheme liability claim may be novel, but it cannot withstand the routine application of Rule 10b-5's plain language.

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.* does not alter this conclusion. 514 F. Supp. 3d 942 (S.D. Tex. 2021). As an initial matter, the defendants in that action did not move to dismiss, or even address, the plaintiff's scheme liability claims, and thus did not argue that the defendants' deceptive conduct was not in connection with the purchase or sale of any security. *Anadarko*, 514 F. Supp. at 951, 953. Regardless, the conduct that the court relied upon to sustain the scheme liability claims in that action was alleged to have had a direct impact on the purchase or sale of Anadarko securities by affirmatively preventing disclosure of the fraud to third parties and the investing public. For example, the defendants directed employees to provide "outdated, misleading maps" to Anadarko's third-party partners in the Shenandoah Basin project to ensure that those partners "could not expose the truth." *Id.* at 954. Similarly,

16

Anadarko was alleged to have represented to employees, in response to specific threats from those employees to disclose the truth about Shenandoah Basin to investors, that they were prohibited from doing so pursuant to a confidentiality agreement they signed as a condition of employment. *Id.* at 951.

The SAC alleges no such direct connection between Bond's after-the-fact, purely internal deceptive conduct and disclosures to investors. Her alleged conduct simply had no connection with the purchase or sale of any security. Accordingly, the SAC's unsupported scheme liability claims fail and the Court should grant Defendants' motion.

III.   **Plaintiffs could not have relied on Bond's allegedly deceptive conduct.**

This Court's Order also forecloses any allegation that Plaintiffs relied to their detriment on Bond's purportedly deceptive conduct. Reliance is a necessary element for any private right of action brought pursuant to Rule 10b-5, including scheme liability claims. *See Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988); *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). Here, Plaintiffs seek to invoke *Basic's* fraud-on-the-market presumption of reliance, which applies only where a defendant made "public misstatements or failed to disclose material facts." (SAC ¶¶ 422-24.)

But there is a fatal mismatch between the *Basic* fraud-on-the-market doctrine and Plaintiffs' remaining scheme claim. Plaintiffs do not allege that Bond's purported instruction to her team to manipulate internal valuations of ExxonMobil's Permian assets was publicly disclosed or known. Instead, Plaintiffs attempt to connect Bond's allegedly deceptive conduct to the market by claiming that the inflated learning curve assumptions were conveyed to Woods and Mallon to support ExxonMobil's public statements concerning the production goals in the Permian Basin, Proved Reserves, and Resource Base. (*See, e.g.*, SAC ¶¶ 310-14.) But as described above, (1) this

Court has already held that it will not credit allegations concerning the meeting between Woods, Bond, and Mallon where "Bond allegedly presented the finalized 2019 Development Plan to Woods for approval," severing the only link in the SAC between Bond's allegedly deceptive conduct and any public statements concerning the Permian Basin production goals (*see supra* Part II; *see also* Order at 14-15); and (2) the SAC does not allege that Bond's valuation-related conduct had any impact on the GRRG group's calculation of Proved Reserves or ExxonMobil's estimate of its Resource Base (*supra* Part II).

Plaintiffs also invoke the *Affiliated Ute* presumption of reliance because their claims are purportedly "predicated upon omissions of material fact that there was a duty to disclose." (SAC ¶ 421 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)).) But *Affiliated Ute* applies only to claims based **primarily** on omissions. *See Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 381 (5th Cir. 2007). Here, to the extent Plaintiffs have alleged any connection between Bond's conduct and public statements, it is because Bond's purportedly deceptive conduct was done to support, and supposedly incorporated in, **affirmative misstatements** regarding ExxonMobil's Permian Basin production goals, Proved Reserves, and Resource Base. (*See, e.g.*, SAC ¶ 309 (Bond "knowingly used false data to exaggerate drilling output and artificially inflate the Delaware Basin development plan," which Bond knew "was being reported to investors in Woods' statements about the 1 million barrels Permian goal, as well as Exxon's stated proved reserve and resource base valuations").) Accordingly, this case is not one "primarily based on omissions" and the *Affiliated Ute* presumption does not apply. *Regents of Univ. of Cal.*, 482 F.3d at 384.

To the extent Plaintiffs attempt to recast their claims as the failure to correct alleged misstatements concerning ExxonMobil's Permian Basin production goals, Proved Reserves and

Resource Base, Plaintiffs cannot show that there was any duty to correct because the SAC is devoid of allegations that the speakers ever had reason to believe the statements were false and this Court determined that the speakers lacked scienter for those statements.  Plaintiffs have not alleged any link between Bond and the preparation of ExxonMobil's public disclosures, nor do they allege that Bond provided the supposedly fraudulent learning curve assumptions to any individual that made the alleged misstatements.  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 633 (S.D. Tex. 2003).[6]

In reality, Plaintiffs are trying to apply Section 10(b) "beyond the securities markets . . . [to] the realm of ordinary business operations."  *Stoneridge*, 552 U.S. at 161.  But Bond's purely internal conduct falls outside the scope of the federal securities laws, and this Court should grant Defendants' motion on this basis alone.  *See Narayan*, 2017 WL 4652063, at *10; *see also Adoni*, 60 F. Supp. 2d at 409.

IV.     **Plaintiffs fail to plead ExxonMobil's scienter with respect to the alleged scheme.**

In this Circuit, the standard for imputing an individual's scienter to a corporation is couched in terms of misstatements and omissions that directly touch the securities markets:

> Scienter "must be alleged with respect to the individual corporate official or officials *who make or issue the statement* (or order or approve it or its making or issuance, *or who furnish information or language for inclusion therein,* or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."

---

[6]   This argument is also belied by the plain language of the SAC and would be nothing more than an improper and circular attempt to transform misstatements into omissions.  *See Krogman v. Sterritt*, 202 F.R.D. 467, 479 n.15 (N.D. Tex. 2001) ("[A]n attempted recharacterization of a claim from a misrepresentation to an omission claim . . . 'would result in every case of misrepresentation becoming a case of omission as a result of defendant's failure to correct a misrepresentation.'" (citation omitted)); *see also Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502, 510 (S.D. Tex. 1998) ("Plaintiffs attempt to fall within the 'omission case' category [of *Affiliated Ute*] by arguing that the crux of their complaint is not Defendants' misrepresentations but rather Defendants' omission of statements which would clarify any confusion between the funds.  This argument cannot prevail, however, because such a circular argument would result in every case of misrepresentation becoming a case of omission as a result of the defendant's failure to correct a misrepresentation.").

19

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019) (emphasis added) (citation omitted).

To the extent Plaintiffs' scheme liability claims rely on bundling Bond's purely internal conduct with public statements made by others without knowledge of that conduct to make the required connection to the purchase or sale of any security, Defendants are not aware of any court crediting such a theory and, in any event, the SAC could not meet the standard if one had. Bond indisputably did not make any of the at-issue statements. And the Court already determined that Woods and Mallon lacked scienter for those statements. (Order at 12, 17.) Absent scienter from the actual speakers, Bond's scienter for her so-called scheme cannot be imputed to ExxonMobil. *See Linenweber*, 2023 WL 6149106, at *14 (no scienter where allegations did not show that any officer defendants were aware of specific safety and compliance issues prior to speaking on the topic); *see also In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 642 (S.D. Tex. 2018) (no scienter where there was no basis to assume that a lower-level executive shared information with senior management); *see also In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802 at *1.

Nor can Bond's scienter, standing alone, be imputed to ExxonMobil to support an Exchange Act claim. "Whether an employee's 'scienter can be imputed to [the company] depends on whether [she] was a sufficiently senior officer at the company.'" *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *22 (S.D.N.Y. Sept. 21, 2021) (alterations in original) (citation omitted). Bond doesn't meet that standard – she was the Development Manager solely for the Delaware Basin, a region in the Permian that falls under the Permian Business Unit (SAC ¶ 45), one of many projects within ExxonMobil.

As the Court previously held, Bond was "not an executive and is several levels removed from the employees at the top of the reporting structure who interact with investors." (Dkt. 88 at 20.) And Bond was not listed as an executive officer in ExxonMobil's SEC filings. (*See* App. 17-19, 52-54.) Accordingly, her scienter cannot be imputed to ExxonMobil. *See, e.g.*, *Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867, at *4 (S.D.N.Y. Sept. 19, 2018) (individual accounting controller was not "sufficiently senior . . . for his scienter to be imputed to the Company" because he was "at least two levels removed from []executive-level management," "remained a low- to mid-level manager responsible for just a slice of the Company's accounting," and "was not involved in [defendants'] public disclosure procedures"); *see also Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *8 (S.D.N.Y. Sept. 8, 2017) (declining to impute scienter of partner to company where partner "worked in one of four lines of business" within unit that accounted for only one-third of company's overall business, "was not a C-suite level employee," was not a part of the company's "senior management," and did not "report[] directly to senior management").

V.    **Plaintiffs cannot resurrect the dismissed claims challenging ExxonMobil's forward-looking statements regarding production goals by reframing them as part of an alleged scheme.**

The PSLRA provides a safe harbor for forward-looking statements in "any private action" brought pursuant to Section 10(b) that is "***based on*** an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading." 15 U.S.C. § 78u-5(c)(1) (emphasis added). The safe harbor applies if the forward-looking statement meets either of two disjunctive prongs: (1) the statements were accompanied by meaningful cautionary language; or (2) the statements were not made with actual knowledge of their falsity. (Dkt. 88 at 21 (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B)).) Here, if the Court finds a cognizable scheme liability claim based on a connection between Bond's internal conduct and Defendants' public statements

21

concerning the Permian Basin production goals – which Plaintiffs allege were materially misleading – then Plaintiffs' scheme liability claim is necessarily "based on an untrue statement of a material fact or omission of a material fact." Under the plain language of the PSLRA, the safe harbor would then apply. Plaintiffs cannot strip the protection afforded to forward-looking statements by recasting them as one piece of an alleged scheme.

Defendants' projections of future performance in the Permian Basin – statements that Permian Basin production was "on plan" or "on track" to produce one million oil-equivalent barrels per day by 2014 – are classic forward-looking statements protected from liability under the PSLRA's safe harbor. (*See* Dkt. 99 at 33-34.) Indeed, the Court previously dismissed these statements, and Plaintiffs realleged them in the SAC with almost no alteration. (*See* Dkt. 88 at 25-27; *see also* SAC ¶¶ 361, 362, 364-65, 373, 384, 390, 398.) These projections were accompanied by meaningful cautionary language that explicitly warned of the risks that Plaintiffs allege actually materialized. (*See* Dkt. 88 at 22-24; *see also* App. 9-12, 22, 40-42, 58, 85, 88, 94, 143-44, 146-47, 149, 151, 154-56, 162-63, 166-67, 169, 176, 182, 188, 191, 199, 202, 214, 222, 228.) And because the Court's Order held that Plaintiffs failed to plead scienter against Woods and Mallon, they necessarily also failed to plead that Woods or Mallon knew that the Permian Basin production goals were false. (Order at 12-18.)

Similarly, all but one (SAC ¶¶ 390-91) of Plaintiffs' purported misstatements rely on their contention that ExxonMobil's "'learning curve' drilling assumption[]" was "inflated" or "false." (SAC ¶¶ 346, 348, 350, 352, 354, 356, 358, 360, 363, 366, 368, 372, 374-5, 377, 379, 381, 383, 385, 387, 389, 393, 395, 397, 399, 401.) But "'statement[s] of the assumptions underlying or relating' to a declared objective are also deemed to be forward-looking statements." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (alteration in original) (quoting 15 U.S.C. § 78u-

22

5(i)(1)(D)) (cited by Dkt. 88 at 24); *see also Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591 (N.D. Tex. 2004) (Godbey, J.) ("statements of the plans and objectives of management for future operations" are forward-looking statements).  As the Court has already recognized, each statement Plaintiffs identified was accompanied by meaningful cautionary language, and Defendants did not make any of the statements with knowledge of their falsity.  (Dkt. 88 at 22-24; *see* Order at 12-18.)  Accordingly, the statements that Plaintiffs allege were false because of learning curve assumptions are insulated from liability under the PSLRA's safe harbor.

## VI.    **Plaintiffs' control person claims under Section 20(a) should be dismissed.**

Because Defendants are entitled to judgment on the pleadings on Plaintiffs' remaining primary liability claim, Plaintiffs' control person claims against Woods and Mallon should also be dismissed.  *See In re SourceCorp Sec. Litig.*, 2006 WL 8439544, at *4 (N.D. Tex. June 6, 2006) (Godbey, J.); *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996) (similar).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for judgment on the pleadings and dismiss with prejudice Plaintiffs' remaining claims.

Dated: January 8, 2024

Respectfully submitted,

*/s/ Noelle M. Reed*
Noelle M. Reed
   State Bar No. 24044211
Wallis M. Hampton
   State Bar No. 00784199
Brent M. Hanson
   State Bar No. 24106051
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122
noelle.reed@skadden.com
wallis.hampton@skadden.com
brent.hanson@skadden.com

Michelle L. Davis
   State Bar No. 24038854
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
308 Bahama Court
Granbury, Texas 76048
Tel.: (713) 655-5197
Fax: (713) 483-9197
michelle.davis@skadden.com

*Attorneys for Defendants Exxon Mobil*
*Corporation, Darren W. Woods, Liam M.*
*Mallon, and Melissa Bond*

24