**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND,<br><br>Defendants. | )<br>)<br>)<br>)<br>) Civil Action No.: 3:21-cv-00194-N<br>)<br>) <u>CLASS ACTION</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS .......................................................................................... 4

    A.  Defendant Bond Perpetrated a Scheme to Validate Defendants' False Production Statements ............................................................................ 4

    B.  Exxon's False Proved Reserves and Resource Base Figures Were Based On the Falsified Development Plan ......................................................... 7

    C.  The Court Sustained Plaintiffs' Scheme Liability Claim Against Bond and Exxon ........................................................................................................ 8

III.  ARGUMENT .............................................................................................................. 9

    A.  Defendants' Motion is Improper ............................................................................. 9

    B.  The Alleged Scheme Was Connected to Plaintiffs' Purchase of Securities ......... 11

        1.  Scheme Allegations Are Connected to Securities Transactions Wherever the Scheme Supports False Public Statements or Omissions...................................................................................................... 12

        2.  The Scheme Bolstered Defendants' False Production Goals ................... 13

        3.  Bond's Fabricated Learning Curve Assumptions Were Incorporated into the Company's Reported Proved Reserves and Resource Base........................................................................................... 16

        4.  The Market Relied on the Scheme............................................................ 19

    C.  Plaintiffs Adequately Allege Exxon Acted With Scienter................................... 21

    D.  The PSLRA Safe Harbor Does Not Apply to Plaintiffs' Claims......................... 24

    E.  Plaintiffs' 20(a) Claims Are Valid....................................................................... 25

IV.  CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Able Lab's Sec. Litig.*,
 2008 WL 1967509 (D.N.J. Mar. 24, 2008)......................................................................13, 14

*In re Adkins Supply, Inc.*,
 556 B.R. 285 (Bankr. N.D. Tex. 2016)..................................................................................11

*Affiliated Ute Citizens v. U.S.*,
 406 U.S. 128 (1972)..............................................................................................3, 19, 20, 21

*In re Alphabet Sec. Litig.*,
 1 F.4th 687 (9th Cir. 2021) ...................................................................................................12

*Barrett v. PJT P'ers Inc.*,
 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)........................................................................23

*Boyd v. Dallas Indep. Sch. Dist.*,
 2009 WL 159243 (N.D. Tex. Jan. 21, 2009) ..........................................................................9

*In re Cognizant Tech. Sols Corp. Sec. Litig.*,
 2020 WL 3026564 (D.N.J. June 5, 2020) .......................................................................21, 23

*Duffie v. Wichita Cnty.*,
 2014 WL 5796837 (N.D. Tex. Nov. 6, 2014).....................................................................1, 10

*E.G. by Gonzalez v. Bond*,
 2017 WL 3493124 (N.D. Tex. June 29, 2017), *R&R adopted*, 2017 WL
 3491853 (N.D. Tex. Aug. 14, 2017)................................................................................10, 19

*Estep v. City of Somerset, Ky.*,
 2011 WL 845847 (E.D. Ky. Mar. 8, 2011)............................................................................10

*Ettinoffe v. Sheikh*,
 2023 WL 3127665 (S.D. Tex. Apr. 26, 2023) .......................................................................11

*In re Firstenergy Corp.*,
 2022 WL 681320 (S.D. Ohio Mar. 7, 2022)....................................................................13, 20

*In re Galena Biopharma, Inc. Sec. Litig.*,
 117 F. Supp. 3d 1145 (D. Or. 2015) ......................................................................................15

*In re HealthSouth Corp. Sec. Litig.*,
 257 F.R.D. 260 (N.D. Ala. 2009)..............................................................................13, 14, 20

ii

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
 2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023) ..............................................................13, 20

*Kerr v. Exobox Tech's Corp.*,
 2012 WL 201872 (S.D. Tex. Jan. 23, 2012) .............................................................................22

*Knurr v. Orbital ATK Inc.*,
 294 F. Supp. 3d 498 (E.D. Va.) ....................................................................................4, 22, 23

*Lee v. Active Power, Inc.*,
 29 F. Supp. 3d 876 (W.D. Tex. 2014) ..........................................................................4, 21, 22

*Linenweber v. S.W. Airlines Co.*,
 2023 WL 6149106 (N.D. Tex. Sept. 19, 2023) ........................................................................23

*Lorenzo v. Securities and Exchange Commission*,
 139 S. Ct. 1094 (2019) .............................................................................................................12

*Lormand v. U.S. Unwired Inc.*,
 565 F.3d 228 (5th Cir. 2009) ....................................................................................................25

*Maverick Fund, Ltd. v. Mohawk Indus., Inc.*,
 2023 WL 2887603 (N.D. Ga. Mar. 31, 2023) ..........................................................................15

*In re Omnicare, Inc. Sec. Litig.*,
 769 F.3d 455 (6th Cir. 2014) ....................................................................................................24

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
 307 F. Supp. 3d 583 (S.D. Tex. 2018) ......................................................................................23

*Ramirez v. Exxon Mobil Corp.*,
 334 F. Supp. 3d 832 (N.D. Tex. 2018) ......................................................................................25

*Regents of University of California v. Credit Suisse First Boston (USA), Inc.*,
 482 F.3d 372 (5th Cir. 2007) ..............................................................................................20, 21

*S.E.C. v. Zandford*,
 535 U.S. 813 (2002) ..................................................................................................................12

*SEC v. Adoni*,
 60 F. Supp. 2d 401 (D.N.J. 1999) .............................................................................................19

*SEC v. City of Miami, Fla.*,
 988 F. Supp. 2d 1343 (S.D. Fla. 2013) .....................................................................................24

*SEC v. City of Victorville*,
 2018 WL 3201676 (C.D. Cal. Jan. 24, 2018) ..........................................................................22

*SEC v. Narayan*,
  2017 WL 4652063 (N.D. Tex. Aug. 28, 2017)................................................................19

*Sosa v. Coleman*,
  646 F.2d 991 (5th Cir.1981) ..........................................................................................9

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
  365 F.3d 353 (5th Cir. 2004) ............................................................................3, 21, 22

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ...................................................................................3, 16

*St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
  2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022)...........................................................20

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)......................................................................................................21

*Thomas v. Shiloh Indus., Inc.*,
  2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018)...............................................................23

*In re Tupperware Brands Corp. Sec. Litig.*,
  2023 WL 5091802 (11th Cir. Aug. 8, 2023)............................................................19, 23

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)...............................................................23

*Voest-Alpine Trading USA Corp. v. Bank of China*,
  142 F.3d 887 (5th Cir. 1998) ........................................................................................16

*W. Virginia Pipe Trades & Welfare Fund v. Medtronic, Inc.*,
  845 F.3d 384 (8th Cir. 2016) ............................................................................13, 14, 19

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)...........................................................12, 15, 19

**STATUTES**

PSLRA ....................................................................................................................4, 24, 25

**OTHER AUTHORITIES**

Rule 10(b) .................................................................................................................15

Rule 10b-5....................................................................................................................12, 25

Rule 12 ...................................................................................................................... passim

iv

I.    **INTRODUCTION**

Defendants' motion for judgment on the pleadings is nothing more than an improper attempt to have this Court reconsider its denial of their motion to dismiss Plaintiffs' scheme liability claims. It is littered with thinly veiled attempts to question the Court's prior findings and it does not assert a single argument, fact, or relevant legal authority that could not have been presented in its motion to dismiss. A Rule 12(c) motion may not be used that way. *See Duffie v. Wichita Cnty.*, 2014 WL 5796837, at *9 (N.D. Tex. Nov. 6, 2014). In the five months since the Court sustained Plaintiffs' scheme liability claims, there has been no change in the law or the alleged facts. Indeed, merits discovery is stayed. Defendants do not even attempt to point to anything that has changed since the Court ruled on Plaintiffs' complaint, and their motion should be denied on that basis alone.

Defendants' arguments are also without merit. Their primary argument is that the scheme has no alleged connection to any false statement. This is wrong. The SAC alleges in detail that the scheme to artificially inflate Exxon's development plan for the Delaware Basin (1) was orchestrated to provide support for the false public statements that Exxon's Permian assets would produce 1 million barrels of oil-equivalent per day by 2024, ¶¶123-30, 301, 310, 384; and (2) caused Exxon to report artificially inflated proved reserves and resource base figures in its SEC filings. ¶¶311, 315-40.[1] In its opinion sustaining the scheme liability claims, the Court specifically held as much, observing that "Bond instructed her team to manipulate internal valuations of ExxonMobil's Permian assets in order to support Woods' public [production] pledges to investors." ECF No. 112 ("Order") at 20. The Court also held that the SAC adequately alleged that

---

[1] Capitalized terms not defined herein have the meanings ascribed in the Second Amended Complaint ("SAC"). ECF No. 92. "¶" refers to Paragraphs in the SAC. "Mot." refers to Defendants' brief in support of their motion for judgment on the pleadings. ECF No. 123. Emphases in quotations are added and internal citations and quotations are omitted.

1

Bond "falsifi[ed] internal documents to make the company's financial state appear rosier than it was in reality." *Id.* at 20-21.

The Court's conclusions are amply supported by Plaintiffs' allegations. Plaintiffs rely on extensive testimony from whistleblowers at the heart of scheme who worked for Bond and stated that the express purpose animating Bond's fraudulent acts was to buttress Defendants' false production pledges to investors. ¶¶115-58. These same whistleblowers informed Exxon's management at the time that these production pledges were false, and that Exxon's resource base figures as reported in the Company's SEC filings were also false. ¶¶158(c)-(d). Moreover, at the time Defendants made their false pledges, they assured investors that Exxon's production goal was in fact based on the Company's development plan. For instance, Mallon told investors in June 2019, while the scheme was well underway, that Exxon's "innovative development plan is key" to achieving the production goal of 1 million barrels-per-day. ¶384. There is a clear connection between the scheme to artificially inflate the development plan and the alleged false statements, which satisfies the "in connection with" prong of Section 10(b).

Defendants also contend that the Court must hold as a matter of law that the falsified development plan could not have affected Exxon's proved reserves, because those reserves are solely backward looking, and the falsified development plan was partially forward looking. This argument contradicts Exxon's own statements and the Complaint's factual allegations, including accounting standards. Specifically, at the outset of the Class Period, Exxon stated that proved reserves for the Permian Basin incorporated Exxon's "growth plan," including "increased drilling activity" — the very data that Bond falsified. ¶340. Moreover, the Company's SEC filings and the relevant federal regulations show that proved reserves are contingent on having a five-year development plan in place, involve estimations of future oil production, and necessarily include

2

assumptions about how quickly Exxon would be able to drill wells during the development period. ¶¶315-19. At best, Defendants' arguments to the contrary prematurely raise factual disputes that cannot be resolved in Defendants' favor now. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 689-91 (5th Cir. 2014) ("industry-specific and inherently fact-bound proposition[s]" concerning the drilling of oil wells and accounting of oil reserves "cannot be verified on the face of the pleadings").

Defendants' related argument that Plaintiffs cannot establish reliance under either the *Basic* fraud-on-the market or *Affiliated Ute* presumptions of reliance is also wrong. As an initial matter, these are quintessential class certification questions, subject to discovery, and Defendants' motion flouts the Court's class certification schedule. Nevertheless, the Court can quickly dispatch Defendants' arguments because the *Basic* presumption applies here, as Bond's scheme propped up Defendants' baseless production goals and falsified Exxon's proved reserves and resource base reported in its SEC filings during the Class Period. Further, notwithstanding Defendants' arguments to the contrary, the *Affiliate Ute* presumption, which the Supreme Court adopted in a scheme liability case, applies because Bond's scheme hid from investors the true state of drilling in, and the value of, the Permian Basin.

Next, Defendants contend that Bond's scienter cannot be imputed to Exxon because no speaker of the alleged misstatements acted with scienter and Bond was not senior enough to bind the company. These arguments misstate the law. The controlling standard for imputing an employee's scienter to the company is set forth in *Southland Securities Corp. v. INSpire Insurance Solutions, Inc.*, which provides that imputation is appropriate where an employee "participated" in the fraudulent conduct by "ordering or approving any of such statements or furnishing information or language for inclusion therein or omission therefrom, or the like." 365 F.3d 353, 365-67 (5th

Cir. 2004). It does not turn on seniority. *See, e.g.*, *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 515 (E.D. Va.) ("The scienter of a ***lower-level employee*** can be imputed to the corporation."). Here, the *Southland* standard is satisfied because Bond falsified data that she knew was being used to validate Woods' and Mallon's false production goals and included in the Company's proved reserve and resource base calculations.  Contrary to what Defendants contend, the fact that Bond was not a speaking defendant is irrelevant: Courts routinely impute the scienter of non-speaking defendants to a company under *Southland. See, e.g.*, *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 882-85 (W.D. Tex. 2014) ("[T]he Court rejects Defendants' view that Wang's scienter cannot be imputed to Active Power because Wang did not 'make' the alleged false statements under *Janus* as this is not a legal requirement under *Southland*. Plaintiffs have sufficiently pleaded Wang furnished false information … . Accordingly, Wang's scienter may be imputed to Active Power.").

Last, Defendants argue that the PSLRA safe harbor bars any scheme claim that involves statements that Exxon was "on track" to meet its production goals. But the Court has already held that portions of the alleged production goal statements are *not* forward looking and thus there is no basis to dismiss Plaintiffs' scheme claims. ECF No. 88 at 24-27. Moreover, even for statements the Court deemed forward looking, the safe harbor does not apply because the statements were not accompanied by adequate cautionary language and Bond and Exxon knew they were false. Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Defendant Bond Perpetrated a Scheme to Validate Defendants' False Production Statements

The SAC primarily concerns Exxon's misconduct concerning its oil and gas assets in the Permian Basin. ¶2. Each year Exxon's development and planning group created a "development plan" or "growth plan" that estimated the value of its assets and set production goals based on

various metrics. ¶69. The core component of the development plan was the schedule of wells to be drilled and completed, and the plan thus included assumptions for drilling and completion speed. ¶¶67-69, 119. Greater drilling speeds allowed Exxon to drill more wells (and extract more resources from the ground) over a shorter period of time. ¶¶119-21. This, in turn, resulted in greater daily production capacity and valuation of the assets, measured in "net present value" ("NPV"). Exxon's 2018 development plan for the Delaware Basin, which was based on drilling speed assumptions, estimated the NPV of the Company's Permian assets to be $60 billion. ¶119.

On March 5, 2019, the start of the Class Period, Defendant Woods stated that Exxon would produce 1 million barrels of oil-equivalent per day by 2024 from the Permian Basin. ¶¶122, 361. In announcing the goal, Woods specifically touted Exxon's "development plan" and said that the goal was "an outcome of the plans we put together." ¶310. Woods stressed Exxon's "very good progress" on "accelerated value capture in the Permian." ¶¶361-62. Woods and Mallon repeated these and similar statements throughout the Class Period when they told investors that the 1 million barrels goal was "on track" and supported by a legitimate "growth plan" or "development plan." ¶¶373, 384, 388.

These statements were false. The drilling assumptions that the 2018 development plan was based on—which Defendants admitted supported Woods' production pledge—had no basis in reality because they vastly overestimated the drilling speeds that were actually achieved. ¶¶119-20, 122, 299. The initial 2019 development plan, which was based on actual observed—and much slower—drilling speeds, showed that the NPV of the Permian Basin was only $40 billion, 33% lower than the $60 billion valuation of the same assets in 2018. ¶121.

Rather than back down from Wood's unattainable pledge, Bond, at the direction of Mallon, commenced a scheme to artificially inflate the NPV of Exxon's 2019 development plan for its

5

Delaware Basin assets. ¶¶123-32. The SAC details how Bond's scheme was designed to create support for Woods' March 5, 2019 statement. *Id.*

In particular, when Bond presented the initial 2019 development plan with just a $40 billion NPV to Mallon, Mallon instructed Bond to revise the plan so it would be consistent with Woods' 1 million barrels pledge. ¶¶123-25. With these marching orders, she instructed her planning team, which included whistleblowers Drs. Gulden and Burch, that the numbers she had presented were not acceptable and her team needed to revise their drilling assumptions in order to "claw back" value. ¶127. Bond's team understood that to create an aggressive development plan and "ensure conformity" with Woods' statement, they would need to assume that drilling speeds were faster than could realistically be achieved. ¶¶125, 301.

The initial tweaks did not go far enough for Mallon, and Bond directed her team to aggressively manipulate so-called "learning curve" drilling assumptions. ¶128.  These calculations assumed that drilling speeds increase the longer a drilling crew stayed in a certain area, and they could be manipulated to simulate faster drilling than could actually be achieved. ¶¶127-29. In May 2019, Mallon instructed Bond to inflate the plan even more and Bond dictated even more aggressive and unrealistic "learning curve" drilling assumptions to ultimately get to a $50 billion NPV. ¶¶129-30. During this process, in June 2019, Mallon reaffirmed the 1 million barrels-per-day goal to investors, highlighting that Exxon's "innovative development plan is key to that and we continue to see and achieve the milestones that we set out for ourselves." ¶384.

Drs. Gulden and Burch, scientists and oil reserve valuation experts on Bond's team that created the inflated 2019 development plan, blew the whistle on Defendant Bond's scheme. ¶¶132-43. Dr. Gulden analyzed Exxon's actual drilling-time data and observed that drilling assumptions used for the 2019 development plan had no basis in the actual engineering data. ¶134. Based on

their analysis, Gulden and Burch believed Exxon's April 26, 2019 SEC Form 8-K was false and they informed Exxon management that the 8-K's statements concerning the 1 million barrel production pledge and $10 billion barrel resource base were inaccurate. ¶158(c). Bond's "learning curve" assumptions resulted in a more than double increase in drilling speed over just five years. But, contrary to those learning curve assumptions, drilling speeds had not increased in the Delaware basin for the past several years. ¶¶132, 158(d). Dr. Gulden reported Bond's manipulation of the development plan to Exxon's HR department as "potential securities fraud." ¶158(g). Dr. Burch characterized Bond's manipulation as "Management" having told the team "to just override the experts so we can get to the number the CEO already blasted to the public." ¶140.

Indeed, after investigating their wrongful termination, OSHA found that Drs. Burch and Gulden "believed … Exxon was misleading the public and the SEC in their filings," and that they were protected by Sarbanes Oxley's whistleblower protections. ¶307.

B.    **Exxon's False Proved Reserves and Resource Base Figures Were Based On the Falsified Development Plan**

In addition to providing cover for Woods' and Mallon's false production pledges, the development plan—and related fraudulent drilling speeds—were used to calculate Exxon's reported proved reserves calculations and therefore also its resource base calculations.[2] Exxon specifically told investors less than ten days before the start of the Class Period that its proved reserves "in the Permian basin are supported by ExxonMobil's growth plan including increased drilling activity." ¶311. Moreover, in its 2018 and 2019 10-Ks, Exxon told investors that its proved undeveloped reserves "are recognized only if a development plan has been adopted indicating that

---

[2] Exxon's "resource base" is the number of oil-equivalent barrels that consisted of "proved reserves, plus other discovered resources that are expected to be ultimately recovered." ¶¶61, 66. Because it incorporated Exxon's proved reserves, Exxon's resource base also depended on assumed drilling speeds and Exxon's development plan.

the reserves are scheduled to be drilled within five years.'" ¶¶311, 317.

Plaintiffs also included in the SAC a section outlining the standards governing the calculation of proved reserves. ¶¶315-19. In particular, proved reserves are quantities of crude oil that a company estimates can be extracted from the ground within a certain period of time. ¶¶315-16. Proved reserves include reserves that either "can be reasonably expected to be recovered from a company's existing wells" or reserves that are expected to be produced from new wells. ¶317. Crucially, the calculation of expected production volume incorporates assumptions about how quickly and effectively the company will be able to drill new wells. ¶318. Thus, the manipulation of the 2019 development plan and drilling speeds caused the proved reserves to be overstated.

Moreover, Plaintiffs cited repeatedly to former employee Andrew Rhodes, a former reservoir engineer from Exxon's Global Reserves and Resources Group ("GRRG"), responsible for calculating proved reserves. ¶¶71, 74-77, 96. Rhodes corroborated that proved reserve calculations depended on assumptions about the number of wells that could be drilled in a certain area and once such an assumption was made, it could not be revised down. ¶96. Mr. Rhodes also described an annual "pressure to increase reserves … in connection with the year-end process." ¶91. GRRG was managed by Richard Ducharme, who reported directly to Mallon. ¶72. Mallon also had approval and ownership responsibility for Exxon's development plans, including its development plan for the Delaware Basin. ¶45.

### C.    The Court Sustained Plaintiffs' Scheme Liability Claim Against Bond and Exxon

On November 14, 2022, Defendants moved to dismiss Plaintiffs' SAC arguing, *inter alia*, for the dismissal of Plaintiffs' scheme liability claims. ECF No. 99 at 44.  They now repeat many of the same arguments they made in their November 2022 motion to dismiss, most of which are factual arguments that contradict the well-pled allegations in the SAC. For example, as here,

Defendants argued that "the NPV and the internal-planning learning curve assumptions are developed on a completely separate track from the proved reserves and resource base." *Id*. at 27. Defendants also argued, as here, that because Plaintiffs had not alleged that Defendants Mallon or Bond furnished the learning curve assumptions directly to the GRRG, they accordingly were not furnished for use in the resource base calculations. *Id*. at 28.

On August 24, 2023, the Court rejected Defendants' arguments and sustained Plaintiffs' scheme liability claims against Defendants Bond and Exxon. Order at 18-21. The Court found a clear connection between the scheme and Defendants' false statements, concluding that: (i) "Bond instructed her team to manipulate internal valuations of ExxonMobil's Permian assets *in order to support Woods'[] public pledges to investors*," *id*. at 20; and (ii) Plaintiffs "assert[ed] falsification of internal documents *to make the company's financial state appear rosier than it was in reality*." *Id*. at 21. Moreover, the Court held that Plaintiffs alleged Defendant Bond set out "*to substantiate Woods'[] promises to investors about ExxonMobil's future productivity in the Permian*." *Id.* Finally, the Court held that Bond and Exxon acted with scienter, stating that "Defendants have not asserted any deficiency in pleading scheme liability against ExxonMobil based on Bond." *Id*. at 22.

## III.    ARGUMENT

### A.    Defendants' Motion is Improper

Defendants' Motion for Judgment on the Pleadings is improper because it asserts arguments Defendants could have asserted in their motion to dismiss, and simply asks the Court to reconsider issues it already decided. In the Fifth Circuit, Rule 12(c) motions are "disfavored and rarely granted." *See Boyd v. Dallas Indep. Sch. Dist.*, 2009 WL 159243, at *1 (N.D. Tex. Jan. 21, 2009) (citing *Sosa v. Coleman,* 646 F.2d 991, 993 (5th Cir.1981)).

Rule 12(c) motions may not assert arguments that were previously available but not

9

asserted or that were previously rejected. *See Wichita Cnty.*, 2014 WL 5796837, at *9 ("The [Rule] 12(c) motion is not a vehicle for a party to assert arguments that it failed to timely assert in its earlier 12(b)(6) motion."); *Estep v. City of Somerset, Ky.*, 2011 WL 845847, at *2 (E.D. Ky. Mar. 8, 2011) ("If the defendant raises new arguments in his 12(c) motion that he could (and should) have raised in his 12(b)(6) motion, the court should usually deny the 12(c) motion, lest its first opinion be rendered merely advisory."). Nor does Rule 12(c) allow Defendants "an unfettered grant to seek reconsideration of arguments already raised and lost in a previous Rule 12(b)(6) motion." *E.G. by Gonzalez v. Bond*, 2017 WL 3493124, at *7 (N.D. Tex. June 29, 2017), *R&R adopted*, 2017 WL 3491853 (N.D. Tex. Aug. 14, 2017). The instant motion commits both sins.

Certain arguments Defendants raise in their Rule 12(c) motion were already decided. Specifically, this Court already determined that the Complaint alleged Bond acted with scienter, that Bond's scienter can be imputed to Exxon, that portions of mixed present and partially forward looking statements were actionable, and that Plaintiffs sufficiently alleged Section 20(a) control person claims. Order at 21-22; ECF No. 88 at 24-27. Despite these holdings, Defendants again assert that Plaintiffs failed to plead Exxon's scienter, that the control person claims should be dismissed, and that Plaintiffs re-pled non-actionable statements. Mot. at 19-22, 23. The Court need not decide these issues again.

Defendants also make arguments that they could have raised in their motion to dismiss. For example, Defendants assert that the Complaint does not connect Bond's deceptive conduct with the purchase or sale of a security, *id*. at 11-17, and that Plaintiffs could not have relied on Bond's deceptive conduct. *Id*. at 17-19.

But underlying these arguments is Defendants' inaccurate assertion that Bond's falsification of data did not support any public statement, and thus could not mislead investors. *Id*.

at 11. Once again, the Court addressed both of these points already when it determined that Bond's goal "was to substantiate Woods' promises to investors about ExxonMobil's future productivity in the Permian" and that "[t]he inference that Bond was at least severely reckless regarding the possibility that falsification of the 2019 development plan would mislead investors is 'at least as compelling as any . . . of nonfraudulent intent.'" Order at 21. It also determined that the "falsification of internal documents" was done to "make the company's financial state appear rosier than it was in reality." *Id.* at 20-21. Thus, Defendants' "new" arguments concerning the "connection with the purchase or sale of securities" and investors' reliance on Bond's deceptive conduct still require the Court to revisit findings it made just six months ago.

At base, the instant motion is Defendants' transparent attempt at a "second bite at the apple." Accordingly, it should be denied. *See In re Adkins Supply, Inc.*, 556 B.R. 285, 290 (Bankr. N.D. Tex. 2016) (denying Rule 12(c) motion because "Defendants have previously submitted a Rule 12(b)(6) motion to dismiss which the Court denied. Defendants do not deserve a second bite at the apple."); *Ettinoffe v. Sheikh*, 2023 WL 3127665, at *1 (S.D. Tex. Apr. 26, 2023) ("[T]o the extent that the present [12(c)] Motion rehashes the same arguments raised in the City's previous Motion to Dismiss, those issues have already been decided under the same standard that applies here, and the City may not take a second bite at the apple.").

B.     **The Alleged Scheme Was Connected to Plaintiffs' Purchase of Securities**

Defendants' motion should also be denied on the merits. Defendants' primary argument is that Plaintiffs failed to meet Section 10(b)'s requirement that the alleged fraud be "in connection with the purchase or sale of securities" because Bond's scheme to inflate the NPV of the Permian Basin assets was entirely internal and never publicly disclosed. Mot. 11-17. Defendants misstate both the law and the allegations in the SAC.

11

### 1.    Scheme Allegations Are Connected to Securities Transactions Wherever the Scheme Supports False Public Statements or Omissions

Defendants assert that scheme liability usually only attaches in cases of market manipulation or the use of "deceptive trading practices directly in securities markets." *Id*. at 10, n.2, 11. They are incorrect. The Supreme Court has explained that Section 10(b) should be construed "not technically and restrictively," but "flexibly" to "effectuate its remedial purposes," and thus has "adopted a broad reading of the phrase 'in connection with the purchase or sale of any security.'" *S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002). In *Lorenzo v. Securities and Exchange Commission*, the Supreme Court held that provisions of Rule 10b-5(a) and (c) "capture a wide range of conduct," and firmly established that scheme liability is not limited to instances of pure market manipulation: rather, scheme liability claims may be brought in circumstances where false and misleading statements are part and parcel of the scheme. 139 S. Ct. 1094, 1101-03 (2019) (rejecting argument that "scheme liability claims … are violated only when conduct other than misstatements is involved"); *see, e.g.*, *In re Alphabet Sec. Litig.*, 1 F.4th 687, 709 & n.10 (9th Cir. 2021) (holding that the "argument that Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by *Lorenzo*"). Defendants themselves acknowledge that Rule 10b-5(a) and (c), "have been employed to redress a wide variety of deceptive conduct." Mot. at 10 n.2.

A scheme which supplies or omits information to bolster false or misleading public statements to investors, as Bond's scheme did, affects the market value of a security, and therefore satisfies the "in connection with" requirement. *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *6-8 (S.D.N.Y. Feb. 17, 2022) (creation of fraudulent sales data which bolstered public statements on which investors relied satisfied "in connection with" requirement); *see also Zandford*, 535 U.S. at 819 (explaining that Section 10(b) should be construed "not technically and

12

restrictively," but "flexibly" to "effectuate its remedial purposes," and thus adopting a "broad reading of the phrase 'in connection with the purchase or sale of any security'"); *W. Virginia Pipe Trades & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 394 (8th Cir. 2016) (overturning dismissal of scheme liability claim where scheme "caused the production of information on which the market relied"); *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *20 (M.D. Tenn. Feb. 24, 2023) (finding market could rely on undisclosed scheme).

Further, there is no requirement that the scheme itself be disclosed to the public, "because, naturally, for a scheme to succeed, it has to be concealed from the shareholders." *See* 2023 WL 2592134 at *19. Rather, a scheme which creates or omits information that will ultimately affect the price of a security provides the connection needed to sustain a scheme claim. *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 277 (N.D. Ala. 2009) (rejecting a claim that an undisclosed scheme was not actionable, because "the false representations UBS made to the public premised on [a fraudulent accounting scheme] became part of the mix of information on which the market relied"). Thus, the key question is whether the scheme affected the value of a security by bolstering false statements or concealing the truth from investors. *In re Firstenergy Corp.*, 2022 WL 681320, at *25 (S.D. Ohio Mar. 7, 2022).; *see also In re Able Lab's Sec. Litig.*, 2008 WL 1967509, at *21-22 (D.N.J. Mar. 24, 2008) (sustaining scheme claim where deceptive conduct concealed noncompliance with FDA regulations). As explained below, Bond's scheme did both.

### 2.      The Scheme Bolstered Defendants' False Production Goals

Plaintiffs readily satisfy the "in connection" standard because the ***very purpose*** of Defendants' scheme was to support untrue statements which Defendants made to the public concerning the pace at which Exxon could extract oil from the Permian Basin. Here, the scheme was conducted for the express purpose of bolstering Defendants' public misstatements about key business information. This had the effect of inflating the value of Exxon's securities. The Court

specifically held as such, opining that the scheme was conducted "to support Woods' public pledges to investors." Order at 20. Indeed, in support of the production pledge and resource base statements, Woods and Mallon pointed investors to Exxon's development plan, which Bond falsified. *See Medtronic, Inc.*, 845 F.3d at 394 (sustaining scheme claim where defendants used fraudulent physician accounts to buttress false claims). While telling investors that Exxon was on track to meet the goal to investors, Mallon stated that the development plan was "key" to reaching the target. ¶384. Similarly, Woods claimed that the goal was "an outcome" of the development plan Exxon had created. ¶310.

Defendants' ***own admissions*** demonstrate that Bond's fraudulently-created development plan was the basis for the public misstatements and omissions, and Bond's scheme prevented investors from learning the truth about Exxon's prospects for oil production from the Permian Basin. *See HealthSouth Corp.*, 257 F.R.D. at 277 (undisclosed scheme bolstered false statements and was "part of the mix of information on which the market relied").

Defendants' various attempts to muddy this issue fail. First, Defendants suggest that false statements must be made ***after*** the alleged scheme. Mot. at 11. This is wrong. Scheme liability can exist where the scheme is executed to make a false statement appear true and prevented the market from learning the truth. *See Able Lab's*, 2008 WL 1967509 at *21-22 (actionable scheme maintained defendants' facade of compliance with manufacturing standards). Moreover, Mallon and Woods continued to repeat the false production pledge and tie it to the development plan ***after*** the scheme was well underway. ¶¶376, 378, 380, 384, 386, 388, 392, 394, 398.

Second, Defendants claim that the scheme was not communicated to the market because Plaintiffs have not alleged that Bond communicated the inflated NPV figures to Woods or Mallon. Mot. at 12. Specifically, Defendants seize on the Court's conclusion that Bond's meetings with

14

Woods and Mallon to discuss the development plan did not give rise to Woods' or Mallon's scienter to argue that the false information could not have reached the public. But this argument conflates whether Woods or Mallon acted with scienter, with whether the scheme caused false information to reach the market. Woods' and Mallon's scienter is irrelevant: a speaker need not be aware that a fraudulent scheme gave rise to his false statement. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1196–97 (D. Or. 2015) ("Scheme liability is not contingent upon the defendant making a specific misrepresentation or public statement."); *see also Maverick Fund, Ltd. v. Mohawk Indus., Inc.*, 2023 WL 2887603, at *9-11 (N.D. Ga. Mar. 31, 2023) (speaker's knowledge immaterial to scheme liability claim concerning non-speaking conduct).

Regarding the only relevant question of whether Bond's fraudulent learning curve assumptions reached the public, the Court concluded yes: Bond's false assumptions supported Woods' public statements. Opinion at 20-21. This conclusion was supported by the allegations. Specifically, Mallon directed Bond to present a development plan that would support Woods's production goal. Bond executed those orders by directing her team to increase drilling speeds, which was accomplished by setting unrealistic learning curve assumptions. These false assumptions produced a development plan that inflated the NPV of the Permian Basin by $10 billion and appeared to support Woods' goal. ¶¶123-30. Regardless of whether Woods and Mallon acted with scienter, ***Bond*** engaged in a scheme that caused false information to reach and remain in the market. Under Rule 10(b), those allegations establish a connection between the scheme and the purchase or sale of a security. *XL Fleet Corp.*, 2022 WL 493629 at *7-8 (denying motion to dismiss where scheme inflated revenue projections reported to investors).

In any event, Woods' and Mallon's statements concerning the production goal are attributable to Exxon. And Exxon had scienter for the scheme through Bond, who knowingly

15

manipulated the development plan, as explained further below. Order at 21-22. *See also infra* III.C. Thus, to the extent scienter is relevant to the question of whether the scheme made its way to the market, Plaintiffs satisfy that requirement via Bond and Exxon.

### 3.    Bond's Fabricated Learning Curve Assumptions Were Incorporated into the Company's Reported Proved Reserves and Resource Base

Defendants argue that the learning curve assumptions were not incorporated into the Company's reported proved reserves and resource base figures, therefore precluding investors' reliance on Bond's scheme. Mot. at 13-15. At best, these arguments raise factual disputes about the calculation of reserves that cannot be resolved at the pleading stage without the benefit of discovery and expert testimony. A Rule 12(c) motion "is appropriate only if material facts are not in dispute and questions of law are all that remain." *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 891 (5th Cir. 1998). Indeed, the Fifth Circuit reversed a district court's dismissal based on fact-based arguments in a similar context. *Houston Am. Energy Corp.*, 758 F.3d at 689 (rejecting oil company's arguments concerning reserves, holding that "such an industry-specific and inherently fact-bound proposition cannot be verified on the face of the pleadings").

Moreover, the SAC alleges that Bond's inflated learning curve assumptions inflated the Company's publicly reported proved reserves and resource base, on which investors relied. The SAC details the regulatory and accounting standards governing the calculation of proved reserves, ¶¶315-38, which include assumptions about how efficiently the Company will be able to drill and develop a given area. ¶318. Exxon's 2019 development plan for the Permian Basin included Bond's manipulated learning curve assumptions, which dramatically increased the number of wells Exxon expected to drill, and thus increased proved reserves. ¶¶158, 274.

Exxon's reported resource base was also inflated by Bond's scheme because proved reserves are a component of the resource base calculation. ¶¶51, 66-67. It matters not, as

16

Defendants argue, that the resource base calculation also includes "other discovered resources that are . . . ultimately recovered." Mot. at 15 n.5. Indeed, Drs. Gulden and Burch identified the resource base increase (and the production pledge) reported in Exxon's April 26, 2019 8-K as inaccurate because actual drilling-time data yielded lower resource base figures, and they accordingly informed Exxon management that the filing was misleading. ¶158(c)-(d).

Moreover, Exxon explicitly acknowledged in its 10-Ks both before and after Bond perpetrated the scheme that undeveloped reserves, a major component of overall proved reserves, required that "*a development plan has been adopted indicating that the reserves are scheduled to be drilled within five years*." ¶¶50, 70, 311, 317, 340. In other words, the assumed number of drilled wells used to calculate proved reserves depended explicitly on Exxon's development plan.

Defendants argue, without any support, that this straightforward connection between proved reserves and Exxon's development plan cannot exist because learning curve assumptions concern the future and are forward looking, and proved reserves are purely backward looking and rely only on "existing operating methods" that must be based solely on "historic production information." Mot. at 13. Defendants' improper attempt to raise factual disputes should be rejected.

Further, Defendants are wrong on the facts. Exxon admitted twice that its proved reserves contained assumptions about future drilling because they incorporated Exxon's "growth *plan* including increased drilling activity." ¶¶311, 351. Defendants futilely try to wave these admissions away by arguing that this disclosure was made just before Bond's scheme commenced. Mot. at 13 n.4. But Defendants do not (and, at this stage of the litigation, cannot) assert any facts that Exxon deviated from its stated practice of incorporating the development plan and drilling assumptions into proved reserve calculations. Indeed, Exxon repeated at the end of its fiscal year 2019 (after Bond perpetrated the scheme) that its proved reserves were based on Exxon's development plan

17

and five-year drilling plan. ¶317.

In addition, Defendants' argument that proved reserves are purely backward looking relies on cherry-picked snippets of text from regulations that Defendants take out of context or simply misrepresent. Mot. at 6, 13 (arguing proved reserves are estimated using "existing economic and operating conditions" and the average price during the 12-month period prior to the date of financial report). In fact, the regulations defining proved reserves reference a company's *expectations* about the quantity of oil and gas the company estimates it ***will produce in the future***. 17 C.F.R. § 210.4-10(a)(22). Similarly, the Financial Accounting Standards Board defines proved reserves as "those quantities of oil and gas, which … can be estimated with reasonable certainty ***to be economically producible—from a given date forward***." ¶332. Thus, the estimation inherently involves assumptions about future drilling speed. Defendants never explain why "existing . . . operating methods" would not include assumed drilling speeds, especially given proved reserves concern a company's ***future*** expectations about the quantity of oil it will produce, "regardless of whether deterministic ***or probabilistic methods*** are used."  17 C.F.R. § 210.4-10(a)(22).[3]

Next, Defendants argue that even if Plaintiffs alleged that proved reserves incorporated learning curve assumptions, Plaintiffs have not alleged that ***Bond's*** false learning curve assumptions were used in calculating proved reserves. Mot. at 14.  But this argument ignores that Bond's false learning curve assumptions were part of Exxon's 2019 Development Plan, ¶¶123-31, which was used to calculate proved reserves. ¶¶311, 317, 340. Indeed, Drs. Gulden and Burch stated that Woods' production pledge and Exxon's resource base reports were false ***because*** they

---

[3] Moreover, Defendants' argument that there is no evidence that any historical data was altered is not true. Mot. at 13. Bond's team objected to the use of the manipulated learning curve assumption because they were "contradicted by the actual historical drilling speed data from 2018." ¶132.

incorporated Bond's fabricated learning curve assumptions. ¶158.[4]

Fundamentally, because Bond's conduct supported Defendants' untrue public statements, and was thus not "purely internal," it was in connection with the purchase or sale of securities. *XL Fleet Corp.*, 2022 WL 493629 at *6-8 (manipulating sales data which bolstered public statements was "in connection with purchase or sale of security"). Defendants' cases concerning "purely internal conduct" are inapposite. Mot. at 15 (*citing SEC v. Narayan*, 2017 WL 4652063, at *8 (N.D. Tex. Aug. 28, 2017); *SEC v. Adoni*, 60 F. Supp. 2d 401, 409 (D.N.J. 1999); *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *1 (11th Cir. Aug. 8, 2023)).

### 4.      The Market Relied on the Scheme

Defendants argue that Plaintiffs are not entitled to the *Basic* fraud-on-the-market or *Affiliated Ute* presumptions to establish reliance. Mot. at 17-18. This fact-based question cannot be resolved on the pleadings, and is more appropriately considered in Plaintiffs' Motion for Class Certification, Ex. A at 13-22, and the report of an expert economist Plaintiffs attached in support thereof. Ex. B. Defendants' attempt to preemptively litigate these issues prior to development of a full record frustrates the Court's class certification schedule and wastes the Court's resources. *See Bond*, 2017 WL 3493124 at *7 (denying 12(c) motion that would "undermine judicial economy").

Defendants' argument fails on the merits regardless. Allegations that a fraudulent scheme affected publicly reported statements establishes reliance at the pleading stage. *See Medtronic, Inc.*, 845 F.3d at 394 (sustaining claims where scheme "caused the production of the information on which the market relied"); *XL Fleet Corp.*, 2022 WL 493629 at *7-8 (sustaining claims where investors relied on public statements based on fraudulent sales data).

Moreover, Plaintiffs are entitled to the *Basic* presumption because they have demonstrated

---

[4] Defendants also ignore allegations attributed to Rhodes that corroborated allegations that the proved reserve calculation considered drilling assumptions from the development plan. ¶96.

19

that their claims satisfy each of its prerequisites. Ex. A at 13-21. Because the alleged scheme supported defendants' public statements, the *Basic* presumption of reliance applies. *See AAC Holdings. Inc.*, 2023 WL 2592134 at *21 (applying Basic presumption where executives' scheme to manipulate internal data inflated the company's public statements); *HealthSouth Corp.*, 257 F.R.D. at 277 (applying *Basic* presumption where internal fraudulent activity was communicated to the public through defendants' public endorsement of bond deals and favorable analyst reports).

The *Affiliated Ute* presumption also applies because Bond's scheme consisted primarily of omissions, and as such "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128, 153-154 (1972); *see also* Ex. A at 21 (explaining applicability of *Affiliated Ute* to Plaintiffs' claims). As Plaintiffs allege, Bond prevented the market from learning that Exxon's development plan for the Permian Basin was inflated by at least $10 billion and that drilling rates in the Permian were much slower than previously assumed.

Defendants argue that *Affiliated Ute* does not apply because the scheme involved misstatements. Mot. at 18. But Defendants cannot have it both ways: they argue that Plaintiffs are not entitled to the *Basic* presumption because they failed to connect the scheme to the public misstatements, and also that ***those same misstatements*** preclude application of *Affiliated Ute*. In any event, courts routinely find that both the *Basic* and *Affiliate Ute* presumptions apply to scheme claims involving both misstatements and omissions. *See Firstenergy Corp.*, 2022 WL 681320 at *25 (applying *Basic* and *Affiliated Ute* presumptions to plaintiff's misstatements and omissions, respectively); *St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *8 (M.D. Tenn. Sept. 30, 2022) (applying *Affiliated Ute* despite alleged misstatements).

Defendants' reliance on *Regents of University of California v. Credit Suisse First Boston (USA), Inc.* does not help them. There, the court did not analyze what qualified as being "primarily

20

based" on omissions, but "*assum[ed] arguendo* that plaintiffs' case primarily concern[ed] improper omissions." 482 F.3d 372, 384 (5th Cir. 2007). The court determined that *Affiliated Ute* did not apply because the bank defendants at issue "did not owe plaintiffs any duty to disclose." *Id.* Defendants do not argue that Exxon had no duty to Plaintiffs here. Defendants' reliance on the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 161 (2008) is also inapt. Mot. at 18. *Stoneridge* concerned conduct by *third parties* involved in a kickback scheme that had no part in any public statements. *Id*. at 160-61. Here, Plaintiffs alleged that a senior Exxon employee falsified data to support Exxon's false public statements.

### C.      Plaintiffs Adequately Allege Exxon Acted With Scienter

As Plaintiffs established in their opposition to Defendants' motion to dismiss, Bond's scienter can be imputed to Exxon because Bond knowingly falsified information supporting the false production pledges, and knowingly falsified information that inflated Exxon's reported proved reserves and resource base. ECF No. 103 at 37-38.

Scienter is imputed to the company if an employee "participated" in the fraudulent conduct by "ordering or approving any of such statements *or furnishing information or language for inclusion therein or omission therefrom, or the like*." *Southland*, 365 F.3d at 366-67; *see also In re Cognizant Tech. Sols Corp. Sec. Litig.*, 2020 WL 3026564, at \*25-27 (D.N.J. June 5, 2020) (imputing scienter of non-speaking scheme liability defendants to corporation under *Southland*); *Active Power*, 29 F. Supp. 3d at 882-85 (*Southland* "allows for the imputation of scienter from an employee … who furnished information used in a false statement"). Here, Bond not only participated in the fraud; she *orchestrated* it by furnishing false information that supported the untrue production pledges and caused the reserves to be falsely inflated.

Indeed, the Court sustained Exxon's scienter for the scheme *vis-à-vis* Bond, noting

"Defendants have not asserted any deficiency in pleading scheme liability against ExxonMobil **based on Bond**." Order at 21-22 (finding that Plaintiffs "adequately pled" that Bond "falsif[ied] internal documents to make the company's financial state appear rosier than it was in reality").

Regretting their decision not to challenge Exxon's scienter in their motion to dismiss, Defendants now misstate the law and ignore Plaintiffs' well-pled allegations. First, Defendants claim that Bond's scienter cannot count towards Exxon "absent scienter from the actual speakers." Mot. at 19-20. That is not the law. *Southland* dictates that corporate scienter can come from ***any*** participant in the fraud, whether by speaking ***or*** ordering ***or*** approving ***or*** furnishing information "***or the like***." 365 F.3d at 366-67. Courts have held that under *Southland*, an employee does not need to be the speaker or "maker" of a statement under *Janus* for their scienter to be imputed to the Company. *See Active Power, Inc.*, 29 F. Supp. 3d at 881-85 ("[T]he Court rejects Defendants' view that Wang's scienter cannot be imputed to Active Power because Wang did not 'make' the alleged false statements under *Janus* as this is not a legal requirement under *Southland*. Plaintiffs have sufficiently pleaded Wang furnished false information … . Accordingly, Wang's scienter may be imputed to Active Power."); *Kerr v. Exobox Tech's Corp.*, 2012 WL 201872, at *14 (S.D. Tex. Jan. 23, 2012) ("The Court finds no reason to read *Janus* to limit the liability of the corporation on grounds of scienter. Exobox 'made' the statements contained in the public filings under *Janus*; Plaintiffs need only assert that Sonfield furnished the information or language for inclusion in order to attribute his scienter to Exobox."); *Orbital ATK*, 294 F. Supp. 3d at 514-15 ("[T]he Fifth Circuit [in *Southland*] determined that the scienter of a corporate agent who causes a misleading statement to be made is relevant and may be imputed to the corporation for purposes of corporate liability, even where that individual does not himself make the statement."); *see also SEC v. City of Victorville*, 2018 WL 3201676, at *4-5 (C.D. Cal. Jan. 24, 2018) ("That Metzler is

22

not the 'maker' of the statement for the purposes of primary liability under *Janus* does not mean that he did not 'participate in making' the statement for purposes of imputing his scienter to the Authority."). Rather, "furnishing information" that made statements false, like Bond did here, ¶¶123-32, is sufficient to allege corporate scienter. *See, e.g.*, *Cognizant Tech. Sol's Corp.*, 2020 WL 3026564 at \*25-28 (knowingly furnishing false information is sufficient under *Southland*); *Orbital ATK Inc.*, 294 F. Supp. 3d at 514-15 (imputing scienter of non-speaking employee who furnished false information).

Defendants' cases are inapposite. *See Linenweber v. S.W. Airlines Co.*, 2023 WL 6149106, at \*14 (N.D. Tex. Sept. 19, 2023) (no scienter found for non-speaking **and** speaking defendants); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 642 (S.D. Tex. 2018) (scienter allegations based solely on "individual defendants' positions as senior executives and their access to internal information"); *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802 at \*1 (11th Cir. Aug. 8, 2023) (finding that individual defendants did not furnish information or language for inclusion in false statements).

Second, Defendants incorrectly contend that Bond's scienter cannot be imputed to Exxon because she was not senior enough. *See* Mot. at 20-21.[5] That misstates the law: seniority is not required under *Southland*. Even if Bond was a low-level employee—she was not—her scienter is imputed to Exxon because she furnished information that validated and created false statements. That is all that *Southland* requires. *See, e.g.*, *Orbital ATK Inc.*, 294 F. Supp. 3d at 515 (under *Southland*, "the scienter of a **lower-level employee** can be imputed to the corporation for the

---

[5] Defendants cite solely to cases from the Southern District of New York for this proposition. *See* Mot. at 20-21. None apply the *Southland* standard that is the law in this Circuit. *See generally Villare v. Abiomed, Inc.*, 2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021); *Thomas v. Shiloh Indus., Inc.*, 2018 WL 4500867 (S.D.N.Y. Sept. 19, 2018); *Barrett v. PJT P'ers Inc.*, 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017). Accordingly, they are irrelevant to the analysis before this Court.

purposes of corporate liability under § 10(b)"). Courts from around the country are in accord. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 477 (6th Cir. 2014) ("[A] corporation is not insulated if lower-level employees, contributing to the misstatement, knowingly provide false information to their superiors with the intent to defraud the public."); *SEC v. City of Miami, Fla.*, 988 F. Supp. 2d 1343, 1351, 1361 (S.D. Fla. 2013) (imputing scienter of "low level employee" alleged to have "furnished materially false and misleading information that was incorporated into the [corporate defendant's] filings").

Thus, the Court should not alter its finding that Plaintiffs alleged Exxon's scienter.

### D.    The PSLRA Safe Harbor Does Not Apply to Plaintiffs' Claims

In a last-ditch argument, Defendants claim that Plaintiffs are attempting to "resurrect" statements purportedly covered by the PSLRA safe harbor. Mot. 21-22. But the Court has already ruled that portions of "on track" statements regarding the production pledge were ***not*** forward looking to the extent they were "accompanied by assertions of specific past or present circumstances that make the objective possible, the truth or falsity of which is discernable at the time the statement is made," and that such mixed statements are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." ECF No. 88 at 24.

Plaintiffs' SAC adhered to the Court's order. With respect to March 2019 statements, the SAC alleged that Woods' production pledge was based on a "significant acceleration of value," "accelerated value capture in the Permian," and "exceeding the pace" of expected operations. ¶¶362, 364. The Court held these statements were ***not*** forward looking and were actionable. ECF No. 88 at 25-26 ("'[A]ccelerated value capture' suggests that Exxon is extracting resources in the Permian [at] a faster rate than before, which would be measurable in the present.").[6] Thus, the

---

[6] S*ee also* ¶376 (affirming production pledge in June 18, 2019 because of "accelerated operations in the Permian Basin"); ¶390 (claiming that the "value proposition" for the Permian had not

24

PSLRA safe harbor provides no basis to dismiss the SAC.

Even if some of the "on track" statements alleged in the SAC are forward looking, Exxon's generic cautionary language was insufficient and Bond and Exxon knew that the statements were false when made.[7] *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 851 (N.D. Tex. 2018) (no meaningful cautionary language where Exxon had actual knowledge that statements were false); *Lormand v. U.S. Unwired Inc.*, 565 F.3d 228, 247 (5th Cir. 2009) (warnings did not "provide sufficiently meaningful caution about clearly present danger that was materializing").

Here, Exxon's generic warnings failed to caution investors that at the time of the misstatements the 1 million barrel-per-day production goal did not reflect Exxon's actual drilling data from the Permian Basin from 2018. ¶¶119-20. In early 2019, when Bond and her team first put together the 2019 development plan using actual drilling data from 2018, she learned that the value of the Delaware Basin holdings did not match Woods' production pledge. ¶121. From then on, Bond knew that Woods' production pledge did not reflect the Company's true drilling speeds in the Permian Basin. Thus, Exxon's risk warnings were inadequate because she and Exxon had "recognized signs that those risks had already materialized." *U.S. Unwired Inc.,* 565 F.3d at 249.

### E.  Plaintiffs' 20(a) Claims Are Valid

Because Defendants have not shown that Plaintiffs' primary liability claims are invalid, their argument with respect to Plaintiffs' control person claims fails.

## IV.  CONCLUSION

Accordingly, Defendants' Motion for Judgment on the Pleadings should be denied in full.

---

changed or improved, when in fact it had gone down by at least $10 billion).

[7] The Court's prior finding that the statements were accompanied by adequate cautionary language should not control and does not compel the same here. ECF No. 88 at 21-24. The Court's analysis only considered Woods' and Mallon's knowledge for 10b-5(b) claims. *Id.* at 21, 23. Here, the Court must consider whether Bond's and Exxon's knowledge in the context of Plaintiffs' claims under Rule 10b-5(a) and (c) preclude application of the safe harbor. It does.

Dated: January 29, 2024                         Respectfully submitted,

/s/ *John Rizio-Hamilton*                       /s/ *Daniel L. Berger*

John Rizio-Hamilton (pro hac vice)              Daniel L. Berger (pro hac vice)
johnr@blbglaw.com                               dberger@gelaw.com
Rebecca E. Boon (pro hac vice)                  Caitlin M. Moyna (pro hac vice)
rebecca.boon@blbglaw.com                        cmoyna@gelaw.com
John J. Esmay (pro hac vice)                    Lauren J. Salamon (pro hac vice)
john.esmay@blbglaw.com                          lsalamon@gelaw.com
Thomas Sperber (pro hac vice)                   GRANT & EISENHOFER PA
thomas.sperber@blbglaw.com                      485 Lexington Avenue
Stephen Boscolo (pro hac vice)                  New York, New York 10017
stephen.boscolo@blbglaw.com                     Phone: (646) 722-8500
BERNSTEIN LITOWITZ BERGER &                     Fax: (646) 722-8501
GROSSMANN LLP
1251 Avenue of the Americas                     *Co-Lead Counsel for the Class and Counsel*
New York, New York 10020                        *for Co-Lead Plaintiff Amalgamated Bank*
Phone: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for the Class and Counsel*     Lewis T. LeClair
*for Co-Lead Plaintiff State of Rhode Island,*  Texas Bar No. 12072500
*Office of the General Treasurer, on behalf of* lleclair@mckoolsmith.com
*the Employees' Retirement System of Rhode*     McKOOL SMITH PC
*Island*                                        300 Crescent Court, Suite 1500
                                                Dallas, Texas 75201
                                                Phone: (214) 978-4000
                                                Fax: (214) 978-4044

                                                *Liaison Counsel for the Class*

26