**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) Civil Action No.: 3:21-cv-00194-N |
|  | ) |
| v. | ) <u>CLASS ACTION</u> |
|  | ) |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, | ) ) ) ) |
| Defendants. | ) ) ) ) ) |

**APPENDIX IN SUPPORT OF LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

Lead Plaintiffs Amalgamated Bank and State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island, submit the following documents in support of their Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings.

| Exhibit | Description | Pages |
|---|---|---|
| A | Lead Plaintiffs' Memorandum of Law in Support of their Motion for Class Certification | A-01-A-35 |
| B | Expert Report of Matthew D. Cain, PHD, dated January 4, 2024 | A-36-A-95 |

Dated: January 29, 2024

/s/ *John Rizio-Hamilton*

John Rizio-Hamilton (pro hac vice)
johnr@blbglaw.com
Rebecca E. Boon (pro hac vice)
rebecca.boon@blbglaw.com
John J. Esmay (pro hac vice)
john.esmay@blbglaw.com
Thomas Sperber (pro hac vice)
thomas.sperber@blbglaw.com
Stephen Boscolo (pro hac vice)
stephen.boscolo@blbglaw.com
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

*Co-Lead Counsel for the Class and Counsel for Co-Lead Plaintiff State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island*

Respectfully submitted,

/s/ *Daniel L. Berger*

Daniel L. Berger (pro hac vice)
dberger@gelaw.com
Caitlin M. Moyna (pro hac vice)
cmoyna@gelaw.com
Lauren J. Salamon (pro hac vice)
lsalamon@gelaw.com
GRANT & EISENHOFER PA
485 Lexington Avenue
New York, New York 10017
Phone: (646) 722-8500
Fax: (646) 722-8501

*Co-Lead Counsel for the Class and Counsel for Co-Lead Plaintiff Amalgamated Bank*

Lewis T. LeClair
Texas Bar No. 12072500

lleclair@mckoolsmith.com
McKOOL SMITH PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, <br><br> Defendants. | Civil Action No.: 3:21-cv-00194-N |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**A-01**

**TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ................................................................................. 1

II.  FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY ............... 2

    A.  PLAINTIFFS ................................................................................................. 2

    B.  DEFENDANTS .............................................................................................. 3

    C.  ALLEGATIONS AGAINST DEFENDANTS ..................................................... 4

III.  ARGUMENT ...................................................................................................... 5

    A.  THIS ACTION SHOULD BE CERTIFIED AS A CLASS ACTION ..................... 5

    B.  RULE 23(A) IS SATISFIED .......................................................................... 6

        1.  The Proposed Class Is So Numerous That Joinder of All Respective Class Members Is Impracticable ............................................ 6

        2.  Questions of Law and Fact Are Common to Members of the Class .......... 7

        3.  The Proposed Class Representatives' Claims Are Typical ........................ 8

        4.  The Representative Parties and Their Counsel Are Adequate ................... 9

            a.  There Are No Conflicts Between the Class Representatives and the Class ................................................................................ 10

            b.  Plaintiffs Are Adequate to Serve as Class Representatives .......... 10

            c.  Proposed Class Counsel Are Adequate ........................................ 11

    C.  THE PROPOSED CLASS SATISFIES RULE 23(B)(3) ..................................... 12

        1.  Common Questions of Law and Fact Predominate Over Individual Questions .................................................................................. 13

            a.  The Fraud-On-The-Market Doctrine Presumes Reliance ............. 13

               (1)  Exxon Common Stock Experienced a High Weekly Trading Volume .................................................................. 15

               (2)  Numerous Financial Analysts Covered and Reported on Exxon During the Class Period ....................................... 16

i

(3)   The DMM Served as a Market Maker for Exxon ............. 17

(4)   Exxon's Public Float Sufficiently Satisfies the Form S-3 Eligibility Requirements ..................................................... 17

(5)   The Price of Exxon's Common Stock Reacted to New, Company-Specific Information During the Class Period . 18

(6)   Plaintiffs Satisfy the *Krogman* Factors ............................ 19

b.   Reliance Is Also Presumed Under *Affiliated Ute* ........................... 21

2.   A Class-Wide Damages Methodology Is Available .................................. 22

3.   A Class Action Is Superior to Other Available Methods of Adjudication ..................................................................................... 23

D.   ADDITIONAL MATTERS REQUIRED BY LR CV 23.2 ............................................... 24

IV.   CONCLUSION ............................................................................................................. 25

ii

**A-03**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated Ute Citizens v. U.S.*,
406 U.S. 128 (1972)................................................................................21, 22

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013)......................................................................................6

*In re Anadarko Petroleum Corp. Sec. Litig.*,
No. 4:20-cv-00576, 2022 WL 4544235 (S.D. Tex. Sept. 28, 2022).......................22

*Angell v. GEICO Advantage Ins. Co.*,
No. 4:20-CV-0799, 2021 WL 5585732 (S.D. Tex. Nov. 30, 2021) ........................9

*Barrie v. Intervoice-Brite, Inc.*,
No. 3:01–CV–1071–K, 2009 WL 3424614 (N.D. Tex. Oct. 26, 2009) ..................18

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................................13, 14

*Bennett v. Sprint Nextel Corp.*,
298 F.R.D. 498 (D. Kan. 2014)........................................................................16

*Bremer v. SolarWinds Corp.*,
Nos. 1:21-CV-2-RP, 1:21-CV-47-RP, 1:21-CV-138-RP, 2021 WL 2668827
(W.D. Tex. Mar. 11, 2021) ............................................................................12

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ...............................................15, 16, 17, 19, 22

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.,
HQ*,
322 F. Supp. 3d 676 (D. Md. 2018)..................................................................19

*City of Riviera Beach Gen. Emp. Ret. Sys. v. Macquarie Infrastructure Corp.*,
No. 18-CV-3608 (VSB), 2019 WL 364570 (S.D.N.Y. Jan. 30, 2019)..................12

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
No. H–14–3428, 2017 WL 2608243 (S.D. Tex. June 15, 2017) .....................12, 13

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)......................................................................................22

*Cruson v. Jackson Nat'l Life Ins. Co.*,
954 F.3d 240 (5th Cir. 2020) ..........................................................................5

*Daves v. Dallas Cty. Texas*,
No. 3:18-CV-0154-N, 2018 WL 4537202 (N.D. Tex. Sept. 20, 2018) ....................................8

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .........................................................................................7

*In re Deepwater Horizon*,
785 F.3d 1003 (5th Cir. 2015) .....................................................................................10

*In re Dell Inc.*,
No. A–06–CA–726–SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010)...................................6

*In re Diamond Foods, Inc. Sec. Litig.*,
295 F.R.D. 240 (N.D. Cal. 2013)...................................................................................16

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d. Cir. 2011)........................................................................................17

*E. Texas Motor Freight Sys., Inc. v. Rodriguez*,
431 U.S. 395 (1977).....................................................................................................10

*Einhorn v. AxoGen Inc.*,
No. 8:19-cv-69-EAK-AAS, 2019 WL 5636382 (M.D. Fla. Apr. 30, 2019)...........................11

*In re Enron Corp. Sec.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ......................................................................21, 23

*Feder v. Electronic Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) .........................................................................................9

*Finkel v. Docutel/Olivetti Corp.*,
817 F.2d 356 (5th Cir. 1987) .......................................................................................21

*In re Groupon Inc. Sec. Litig.*,
No. 12 C 2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ..............................................18

*Guenther v. BP Ret. Accumulation Plan*,
2021 WL 1216377 (S.D. Tex. Mar. 12, 2021)...................................................................10

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) (*Halliburton II*)........................................................................13, 14

*In re HealthSouth Corp. Sec. Litig.*,
257 F.R.D. 260 (N.D. Ala. 2009)...................................................................................14

*Hernandez v. City of Houston, Texas*,
No. 4:16-cv-3577, 2019 WL 2869157 (S.D. Tex. July 3, 2019) .............................................8

iv

*Horton v. Goose Creek Indep. Sch. Dist.*,
690 F.2d 470 (5th Cir. 1982) ...............................................................................10

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
No. 3:19-cv-00407, 2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)..................................8, 14

*KB Partners I, L.P. v. Barbier*,
No. A-11-CA-1034-SS, 2013 WL 2443217 (W.D. Tex. June 4, 2013) ....................................6

*Kirkpatrick v. HomeAway.com Inc.*,
No. 1:16-CV-733-LY, 2020 WL 7680558 (W.D. Tex. 2020)...................................................6

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................................15, 19, 20, 21, 22

*Lehocky v. Tidel Tech., Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004)..........................................................................7

*Ludlow v. BP, P.L.C.*,
800 F. 3d 674 (5th Cir. 2015) .............................................................................22

*Marcus v. J.C. Penny Co. Inc.*,
No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ........................16

*Okla. Firefighters Pension & Ret. Sys. v. Rayonier Advanced Materials, Inc.*,
No. 3:15-cv-546-J-32-PDB, 2015 WL 4730383 (M.D. Fla. Aug. 10, 2015) ..........................11

*Patel v. Reata Pharmaceuticals Inc.*,
549 F. Supp. 3d 559 (E.D. Tex. 2021)...................................................................11

*In re Pfizer Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) ...........................................................................12

*Prause v. TechnipFMC, PLC*,
No. 4:17-CV-2368, 2020 WL 3549686 (S.D. Tex. Mar.2 9, 2020........................................13

*Regents of the Univ. of California v. Credit Suisse First Boston (USA), Inc.*,
482 F.3 372, 384 (5th Cir. 2007) ..........................................................................21

*Rooney v. EZCORP, Inc.*,
330 F.R.D. 439 (W.D. Tex. 2019) .........................................................7, 8, 14, 22

*Rougier v. Applied Optoelectronics, Inc.*,
No. 4:17-cv-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019).....7, 11, 12, 13, 15, 16, 18, 19, 20, 22, 23

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
No. 3:18-cv-02902-WHA, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021).............................12

v

**A-06**

*Shen v. Exela Techs., Inc.*,
No. 3:20-CV-0691-D, 2023 WL 8527091 (N.D. Tex. Dec. 7, 2023)......................................24

*Slade v. Progressive Sec. Ins. Co.*,
856 F.3d 408 (5th Cir. 2017) ....................................................................................................9

*Spegele v. USAA Life Ins. Co.*,
336 F.R.D. 537 (W.D. Tex. 2020) ..........................................................................................7, 9

*St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
No. 3:18-cv-00988, 2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) ...............................8, 21

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y 2016).............................................................................................19

*Strougo v. Tivity Health, Inc.*,
No. 3:20-cv-00165, 2023 WL 3873305 (M.D. Tenn. June 7, 2023) .........................................9

*Torres v. S.G.E. Mgmt., L.L.C.*,
838 F.3d 629 (5th Cir. 2016) (en banc) ...................................................................................5

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ...................................................................................................15

*Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*,
247 F.3d 574 (5th Cir. 2001) ...................................................................................................22

*Vine v. PLS Fin. Servs., Inc.*,
331 F.R.D. 325 (E.D. Tex. 2019)............................................................................................24

*W. Virginia Pipe Trades & Welfare Fund v. Medtronic, Inc.*,
845 F. 3d 384 (8th Cir. 2016) ..................................................................................................14

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018)..........................................................................................9, 21

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)................................................................................................................7, 8

*In re XL Fleet Corp. Sec. Litig.*,
No. 3:20-cv-00165, 2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ...........................................14

*Zeidman v. J. Ray McDermott & Co.*,
651 F.2d 1030 (5th Cir.1981) ...................................................................................................6

**STATUTES AND RULES**

Securities Exchange Act of 1934:

vi

A-07

§ 10(b), 15 U.S.C. §78j(b) ...........................................................................1, 3, 23

§ 20(a), 15 U.S.C. §78t(a).................................................................................1, 3

Fed. R. Civ. P.:

Rule 23 ............................................................................................................2, 7

Rule 23(a).............................................................................................1, 5, 6, 8, 12

Rule 23(a)(1) ........................................................................................................6

Rule 23(a)(2) ........................................................................................................7

Rule 23(a)(3) ........................................................................................................8

Rule 23(a)(4) ........................................................................................................9

Rule 23(b) .......................................................................................................6, 12

Rule 23(b)(1).........................................................................................................5

Rule 23(b)(2).........................................................................................................5

Rule 23(b)(3).................................................................................1, 5, 6, 12, 22, 23, 24

Rule 23(g) ..........................................................................................................11

Tex. Local Civ. R.:

LR CV 23.2..................................................................................................1, 2, 24

Securities and Exchange Commission Rule 10b-5,
  17 C.F.R. § 240.14a-9(a) ...................................................................................21

Securities and Exchange Commission Rule 10b-5,
  17 C.F.R. § 240.14a-9(b) ..............................................................................3, 4, 5

Securities and Exchange Commission Rule 10b-5,
  17 C.F.R. § 240.14a-9(c) ...................................................................................21

Securities and Exchange Commission Regulation S-K,
  17 C.F.R. § 239.13 ...........................................................................................18

Lead Plaintiffs Amalgamated Bank ("Amalgamated") and State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement Systems of Rhode Island ("Rhode Island") (together, "Lead Plaintiffs") respectfully move this Court for an order certifying a Class of investors who purchased the common stock of Exxon Mobil Corporation ("Exxon" or the "Company") during the period of March 5, 2019 to January 15, 2021; appointing Lead Plaintiffs as Class Representatives; and approving their selection of counsel Grant & Eisenhofer P.A. ("G&E") and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Counsel.[1]

## I.    PRELIMINARY STATEMENT

This case presents strong claims on behalf of a Class that suffered significant damages following reports that Defendants had engaged in a fraudulent scheme. Defendants misled investors into believing that Exxon would be able to extract, develop and market more natural resources from its assets located in the southwestern United States than was possible based on data available to Exxon. Certification of this action on behalf of a Class will provide a critical step to ensuring the ability of investors to recover their losses. Securities cases are extremely well-suited to class action treatment and are routinely certified. This case is no different and readily satisfies the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("Rule 23"), and Rule 23.2 of the Local Civil Rules of this Court ("LR CV 23.2").

Defendants are Exxon, a New York Stock Exchange ("NYSE") listed company; and executives Darren Woods, Liam Mallon, and Melissa Bond (collectively, "Individual Defendants," and, together with Exxon, "Defendants"). Plaintiffs' claims are brought under Sections 10(b) and

---

[1] References to "¶" are to the numbered paragraphs of Plaintiffs' Second Amended Class Action Complaint (ECF No. 92) ("Complaint"). References to "Exhibit" or "Ex." herein refer to the Exhibits to the Declaration of Daniel L. Berger and John Rizio-Hamilton In Support of Plaintiffs' Motion for Class Certification ("Counsel Declaration" or "Counsel Decl."). Unless otherwise noted, all internal citations are omitted, and all emphases are added.

20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Pursuant to Rule 23, Plaintiffs seek certification of a Class consisting of all persons and entities who purchased Exxon common stock on the open market from March 5, 2019 to January 15, 2021, both dates inclusive (the "Class Period"), and were damaged thereby.[2]  Plaintiffs further request, pursuant to Rule 23, the Court (a) appoint Plaintiffs as Class Representatives; and (b) appoint Co-Lead Counsel, G&E and BLB&G, as Class Counsel.

As demonstrated below, this case meets all the requirements of Rule 23 and LR CV 23.2. The Class members are so numerous that joinder would be impracticable.  The proposed Class Representatives' claims present common questions of law and fact and are typical of other Class members' claims, and Plaintiffs are more than adequate to serve as Class Representatives.  The common questions here predominate over any individual questions, and the class action mechanism is the superior way to adjudicate these claims.   The accompanying Counsel Declaration, submitted in support of this Motion, which includes sworn declarations from each of the Class Representatives (Exs. A-B) and the report of Plaintiffs' expert economist, Matthew D. Cain, Ph.D., provides an ample record in support of the Motion (Ex. C, "Cain Report"). Accordingly, this case is suitable for class treatment.

## II.    FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY

### A.    PLAINTIFFS

On June 10, 2021, this Court appointed Amalgamated and Rhode Island as Lead Plaintiffs and G&E and BLB&G as Co-Lead Counsel. (ECF No. 43).

---

[2] Excluded from the Class are Defendants; Exxon's affiliates and subsidiaries; the officers and directors of Exxon and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest. *See* ¶ 425.

A-10

Plaintiffs here are well suited to lead this class action.  *See* Exs. A-B.  Lead Plaintiff Amalgamated is an investment bank that serves thousands of labor unions, nonprofits, social impact enterprises, political enterprises, and individuals.  Ex. A at ¶2.  Amalgamated currently has over $53.6 billion in assets under management.  As set forth in the certification previously filed with the Court (ECF No. 22-2), Amalgamated is the trustee for the LongView LargeCap 500 Index VEBA Fund, LongView LargeCap 500 Index Fund, LongView Large Cap 1000 Index Value Fund, and LongView Broad Market 3000 Index Fund, each of which purchased shares of Exxon common stock during the Class Period. *Id.*

Lead Plaintiff Rhode Island is a public pension fund that provides benefits to public employees in the State of Rhode Island.  Ex. B at ¶2.  Rhode Island manages approximately $10.5 billion in assets on behalf of its active and retired members. Rhode Island purchased shares of Exxon common stock during the Class Period and suffered damages as a result of the conduct complained of herein.  *Id.* at ¶3.

### B.    DEFENDANTS

Defendants in this action are: (1) Exxon; (2) Exxon's Chief Executive Officer Darren W. Woods ("Woods"); (3) Exxon's Vice President and the President of ExxonMobil Upstream Oil & Gas Company, Liam M. Mallon ("Mallon"); and (4) Exxon's Delaware Basin Development Manager, a senior executive in Exxon's Upstream Oil & Gas Division, Melissa Bond ("Bond"). ¶¶41-45.

The Complaint alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act for scheming to defraud investors during the period of March 7, 2018 to January 15, 2021. However, pursuant to this Court's order on Defendants' motion to dismiss, Plaintiffs' currently remaining claims are limited to the time period of March 5, 2019 through January 15, 2021, inclusive.  Plaintiffs reserve all rights as to the Court's dismissal of their Rule 10b-5(b) claims

against Defendants Woods and Mallon and all claims for alleged materially false and misleading statements and omissions made between March 7, 2018 and March 4, 2019, inclusive, if and when the Court issues a final dispositive ruling.

### C.   ALLEGATIONS AGAINST DEFENDANTS

Exxon is one of the world's largest, and best known, oil and gas companies.  ¶41.  It is engaged in the development, acquisition and exploitation of crude oil and natural gas resources worldwide.  *Id.*  Exxon owns considerable land in the Permian Basin, a large oil and gas reservoir in the southwestern United States.  *Id.*  Exxon's common stock trades on the NYSE under the ticker symbol "XOM."  *Id.*

Throughout the Class Period, Defendants Exxon and Bond engaged in a scheme to defraud investors concerning the value of Exxon's assets in the Permian Basin, which includes the Delaware Basin.  *Id.*  Specifically, when Defendant Woods told the public that Exxon would achieve a production goal of 1 million oil-equivalent barrels per day by 2024 in the Permian Basin, Defendant Bond sought to match Woods's claims by artificially inflating the value of Exxon's Delaware Basin development plan.  ¶¶105-243.  As confirmed by Exxon whistleblowers, Defendant Mallon instructed Defendant Bond to come up with a development plan that matched Woods' false production goal and to boost critical assumptions about drilling speeds to arrive at the desired result, among other things.  ¶¶122-26, 129.  Bond, in turn, dictated to her team to use overly aggressive "learning curve" drilling assumptions, which Exxon engineers told her were impossible to achieve.  ¶¶127-28, 130-32.

As detailed in the Complaint, Exxon used the overvalued development plan, which included falsified drilling assumptions, to substantiate not only its production goal but also Exxon's public proved reserve and resource base calculations.  ¶¶270-73.  For instance, Bond manipulated the development plan to match Woods's false production goals, and Exxon

4

specifically told investors days before the Class Period started that its reported proved reserve and resource base valuations were based on the plan. ¶¶103, 270. Defendant Bond knew that Exxon was reporting falsified information to investors from March 5, 2019 to March 5, 2020. *Id*.

As a result of this scheme, Exxon's stock price was artificially inflated. That is, until Defendants revealed the truth in a series of partially corrective disclosures. ¶¶244-53. First, as the market opened on January 31, 2020, during its Q4 2019 earnings call, Exxon disclosed that Permian Basin production had slowed. ¶244. In response, Exxon's stock dropped 4.1% on January 31, 2020, 2.2% on February 3, 2020 and 1.3% on February 4, 2020. *Id*. However, Woods assured investors that Exxon was still "on track" to meet its stated production goal for the Permian Basin. ¶246. Next, as the market opened on May 1, 2020, Exxon held its Q1 2020 earnings call and disclosed significant rig cuts and a reduction in the 2020-2021 Permian Basin production volumes. ¶249. Exxon's stock declined 7.2% in response. *Id*. Finally, on January 15, 2021, *The Wall Street Journal* reported on the whistleblower complaint that exposed Exxon's false drilling assumptions and fraudulently inflated development plan. ¶252. In response, Exxon's stock dropped 4.8%. *Id*.

## III.    ARGUMENT

### A.    THIS ACTION SHOULD BE CERTIFIED AS A CLASS ACTION

"To obtain class certification, parties must satisfy Federal Rule of Civil Procedure 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020) (quotations and internal brackets omitted); *see also Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 635 (5th Cir. 2016) (en banc) (same).

Rule 23(a) requires a class member seeking to sue as a representative of the entire class to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the

representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).  Plaintiffs satisfy all four of these requirements.

Plaintiffs must also satisfy at least one of the three options required under Rule 23(b).  Here, Plaintiffs satisfy Rule 23(b)(3), which requires Plaintiffs to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013).

## B.    RULE 23(A) IS SATISFIED

### 1.    The Proposed Class Is So Numerous That Joinder of All Respective Class Members Is Impracticable

"Under Rule 23(a)(1), a class may be certified only if 'the class is so numerous that joinder of all members is impracticable.'"  *Kirkpatrick v. HomeAway.com Inc.*, 2020 WL 7680558, at *4 (W.D. Tex. 2020).  "In this case, it would of course be highly difficult to join all the members of the proposed settlement class, which includes all persons who purchased or otherwise acquired the common stock of [Exxon] . . . .  For this reason, the Fifth Circuit has held the numerosity requirement is 'generally assumed to have been met in class action suits involving nationally traded securities.'"  *In re Dell Inc.*, 2010 WL 2371834, at *2 (W.D. Tex. June 11, 2010) (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir.1981)); *see also KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *11 (W.D. Tex. June 4, 2013) (class actions involving securities traded on national exchanges, such as the NYSE, satisfy Rule 23(a)'s numerosity requirement).

There are thousands of members of the proposed Class.  Exxon's common stock traded on the NYSE with an average weekly trading volume of approximately 106.4 million shares and

**A-14**

approximately 4.2 billion shares outstanding during the Class Period. Cain Report, ¶¶32, 64; *see, e.g.*, *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (numerosity found for NASDAQ-traded stock with more than 50 million outstanding shares and an average weekly trading volume of 2.7 million shares). "[T]he sheer number of shareholders alone, . . . indicates joinder of all class members is impracticable." *Lehocky v. Tidel Tech., Inc.*, 220 F.R.D. 491, 499 (S.D. Tex. 2004) (footnote omitted) (finding numerosity where company traded on the NASDAQ had over 17 million shares outstanding and 8,500 shareholders of record). Finally, the Class is geographically dispersed throughout the world, which further supports a finding that joinder of all such members would be impracticable. *See id.* ("the possible geographic diversity among potential plaintiffs weighs heavily in favor of class treatment").

**2.      Questions of Law and Fact Are Common to Members of the Class**

Courts require commonality, a question of law or fact common to the proposed class, in order to satisfy Rule 23(a)(2). *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 548 (W.D. Tex. 2020); Fed. R. Civ. P. 23(a)(2). The Fifth Circuit holds that Rule 23's commonality requirement simply requires that class members "have suffered the same injury" and "raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011)). "The claims of all Class Members hinge on common contentions that are capable of being resolved class-wide." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *6 (S.D. Tex. Nov. 13, 2019). Similar to the class in *Rougier*, Plaintiffs allege that Defendants made various misrepresentations and omissions via public press releases, ¶¶373, 376, 398; analyst and earnings calls, ¶¶388, 390, 400; investor conferences, ¶¶384, 386; and SEC filings, ¶¶392, 394, 396. "The materiality and veracity of those statements will be proven class-wide." *Rougier*, 2019 WL 6111303, at *6.

7

**A-15**

Moreover, courts routinely find that whether defendants engaged in a scheme to defraud investors is a question common to the class. *See Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *9 (M.D. Tenn. Feb. 24, 2023) (question of whether "[d]efendants were engaged in a scheme to defraud" established commonality); *St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *2 (M.D. Tenn. Sept. 30, 2022) (question of whether alleged scheme caused investor losses established commonality).

In this matter, numerous aspects of the claims of each Class member are subject to common proof and raise many Class-wide questions, including: (i) whether Defendants Exxon and Bond engaged in a scheme; (ii) whether, by virtue of the scheme, Defendants issued materially false or misleading statements; (iii) whether any Defendant knew or recklessly disregarded the scheme and/or the resulting false or misleading statements; (iv) whether such conduct caused the Class to sustain damages; and (v) the methodology for calculating such damages. *See Rooney*, 330 F.R.D. at 445-446. These common questions of law and fact satisfy Rule 23(a)'s commonality requirement.

### 3. The Proposed Class Representatives' Claims Are Typical

Under Rule 23(a)(3), Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[C]ommonality and typicality . . . tend to merge," as both requirements "serve as guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Daves v. Dallas Cty. Texas*, 2018 WL 4537202, at *2 (N.D. Tex. Sept. 20, 2018) (quoting *Wal-Mart*, 564 U.S. at 378 n. 5). The typicality test "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Hernandez v. City of Houston, Texas*, 2019 WL 2869157, at *3 (S.D. Tex. July 3, 2019).

Here, Plaintiffs' claims are typical of the other Class members' claims because they are all investors who acquired Exxon common stock during the Class Period and were all misled by the same scheme and false and misleading statements disseminated by Defendants. *See* ECF Nos. 22-2 and 22-3 (record of Plaintiffs' purchases in Exxon stock during the Class Period); *see also Strougo v. Tivity Health, Inc.*, 2023 WL 3873305, at \*3 (M.D. Tenn. June 7, 2023) (typicality satisfied where defendants artificially inflated share prices by engaging in a scheme to defraud and misrepresent company's performance); *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 286 (D. Minn. 2018) (finding typicality where all class members "suffered damages as a result of [defendants'] fraudulent scheme").

### 4.    The Representative Parties and Their Counsel Are Adequate

Under Rule 23(a)(4)'s adequacy prerequisite, courts examine whether "the representative parties will fairly and adequately protect the interests of the class."  To determine adequacy, the Fifth Circuit utilizes a three-prong test, pursuant to which the proposed class representatives must show that: (1) there are no conflicts of interest between them and the proposed class; (2) the proposed class representatives have the willingness and ability to play an active role in the litigation and vigorously represent the class while protecting the interests of the absentee class members; and (3) class counsel has the competence and ability to vigorously conduct the litigation. *Feder v. Electronic Data Sys. Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005); *see Spegele*, 336 F.R.D. at 552-53 (holding that proposed class representatives must have no conflict of interest with the class and "be willing to play an active role in the litigation"); *Angell v. GEICO Advantage Ins. Co.*, 2021 WL 5585732, at \*3 (S.D. Tex. Nov. 30, 2021) (quoting *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017)).  Plaintiffs satisfy all three prongs.

### a. There Are No Conflicts Between the Class Representatives and the Class

Here, there are no conflicts because Plaintiffs are "part of the class and possess the same interest" and have "suffer[ed] the same injury as the class members . . . ." *In re Deepwater Horizon*, 785 F.3d 1003, 1015 (5th Cir. 2015) (quoting *E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Like all other potential Class members, Plaintiffs purchased Exxon common stock during the Class Period and were subjected to the same fraudulent course of conduct by the Defendants. Ex. A at ¶ 2; Ex. B at ¶3. There are no conflicts between the proposed Class Representatives and the Class they seek to represent.

### b. Plaintiffs Are Adequate to Serve as Class Representatives

"A class representative is considered adequate when he has 'familiarity with the complaint and with the concept of a class action.'" *Guenther v. BP Ret. Accumulation Plan*, 2021 WL 1216377, at *8 (S.D. Tex. Mar. 12, 2021) (quoting *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982)). Here, Plaintiffs made significant investments in Exxon stock during the Class Period, are familiar with the case, have been actively engaged in the litigation, and regularly communicate with counsel regarding the status of the case. *See* Exs. A at ¶3; Ex. B at ¶4. The proposed Class Representatives have supervised and been involved in the case throughout. *See id.* Lead Plaintiffs also have demonstrated their adequacy here by, among other things, stepping forward to be appointed as Lead Plaintiffs, filing two detailed Complaints, defeating Defendants' motion to dismiss in part, and starting to pursue discovery. *See, e.g.*, ECF Nos. 20, 43, 53, 92, 112; Ex. A at ¶3; Ex. B at ¶4.

Lead Plaintiffs are also exactly the types of institutional investors Congress sought to encourage to lead securities class actions when it enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The "PSLRA has been construed to afford a preference for securities

10

A-18

fraud litigation to be directed by institutional investors." *Patel v. Reata Pharmaceuticals Inc.*, 549 F. Supp. 3d 559, 571 (E.D. Tex. 2021). Amalgamated is the largest union-owned bank in the United States that has over $53.6 billion in investments under management. *See* Ex. A. Similarly, Rhode Island is a public pension plan that manages over $10 billion in investments. *See* Ex. B. Both entities are sophisticated investors that have the institutional knowledge and understanding that make them ideal Class Representatives.

The Court previously found that Amalgamated and Rhode Island were adequate to represent the Class. ECF No. 43, at 3. Nothing has changed to call into question that preliminary finding. There is no reason to doubt that Plaintiffs will continue to uphold their duties and responsibilities if certified as Class Representatives by the Court.

### c.    Proposed Class Counsel Are Adequate

To assess the adequacy of counsel, courts examine "[c]ounsel's participation in the suit and their experience in complex securities class actions." *Rougier*, 2019 WL 6111303, at *7.

Lead Plaintiffs' selected counsel are qualified and experienced, capable of vigorously prosecuting this action, and satisfy the requirements of Rule 23(g). *See* Exs. A-B. To date, and as noted above, G&E and BLB&G have worked with Lead Plaintiffs to: (i) identify and investigate the claims in this action; (ii) brief and ultimately defeat in part Defendants' motions to dismiss; and (iii) propound discovery requests on Defendants.

Moreover, both G&E and BLB&G have extensive experience litigating complex securities fraud class actions on behalf of injured investors. *See, e.g.*, *Einhorn v. AxoGen Inc.*, 2019 WL 5636382, at *2 (M.D. Fla. Apr. 30, 2019) ("Lead plaintiffs hired counsel [G&E] with extensive experience in securities fraud litigation."); *Okla. Firefighters Pension & Ret. Sys. v. Rayonier Advanced Materials, Inc.*, 2015 WL 4730383, at *2 (M.D. Fla. Aug. 10, 2015) ("[T]he Court determines that . . . Grant & Eisenhofer P.A. . . . ha[s] substantial experience in securities class

11

actions[.]"); *In re Pfizer Sec. Litig.*, 282 F.R.D. 38, 47 (S.D.N.Y. 2012) ("It is undisputed that Lead Counsel Grant & Eisenhofer is an experienced class action law firm and has served as lead counsel in dozens of securities fraud class actions."); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *8 (S.D. Tex. June 15, 2017) ("[BLB&G] are appointed as Class Counsel"); *Bremer v. SolarWinds Corp.*, 2021 WL 2668827, at *2 (W.D. Tex. Mar. 11, 2021) (approving BLB&G as lead counsel after "review[ing] [BLB&G]'s resume," and "extensive experience serving as lead counsel"); *City of Riviera Beach Gen. Emp. Ret. Sys. v. Macquarie Infrastructure Corp.*, 2019 WL 364570, at *8 (S.D.N.Y. Jan. 30, 2019) ("The attorneys at [BLB&G] have substantial experience with securities litigation and securities class actions, and have been found to be qualified to be lead counsel by other courts."); *see also* Exs. D and E (firm résumés of proposed Class Counsel). As such, proposed Class Counsel is qualified, experienced, and able to competently and vigorously prosecute this action.[3]

### C.    THE PROPOSED CLASS SATISFIES RULE 23(B)(3)

In addition to satisfying the prerequisites of Rule 23(a), this case also meets the requirements of Rule 23(b). Plaintiffs moving for certification must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Requiring that common issues predominate over individual issues prevents the class from degenerating into a series of individual trials." *Rougier*, 2019 WL 6111303, at *8.

---

[3] Lead Counsel note that they have brought the order in *SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021) to the attention of this Court and Lead Plaintiffs. (*See* ECF No. 28.)

12

A-20

### 1.　　Common Questions of Law and Fact Predominate Over Individual Questions

Common questions such as the existence of the scheme, the falsity and materiality of the alleged misstatements, Defendants' scienter, the existence of damages, and the method for determining damages, predominate over individual ones. *See, e.g.*, *Prause v. TechnipFMC, PLC*, 2020 WL 3549686, at *7 (S.D. Tex. Mar. 9, 2020) (finding that issues of falsity, materiality, and damages "demonstrate predominance," and that "issues for trial will include whether the 2016 Registration Statement contained false and misleading statements and, if so, the extent of damages incurred" and concluding that "[t]hese issues are common to the entire class"); *In re Cobalt Int'l Energy*, 2017 WL 2608243, at *4 ("Defendants admit that there are common issues of law and fact, such as whether the Defendants made misrepresentations, [and] whether those misrepresentations were material[.]").

### a.　　The Fraud-On-The-Market Doctrine Presumes Reliance

With respect to the element of reliance, the Supreme Court has held that securities fraud plaintiffs can satisfy the reliance element using the "fraud-on-the-market theory" which effectively "invoke[es] a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Rougier*, 2019 WL 6111303, at *8 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (*Halliburton II*)). Under this theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations . . . ." *Halliburton II*, 573 U.S. at 268 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988)).

To establish the Class is entitled to rely on the fraud-on-the-market presumption, Plaintiffs must demonstrate "(1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the stock traded in an efficient market; and (4) putative class

13

members traded the stock between the time the misrepresentations were made and when the truth was revealed." *Rooney*, 330 F.R.D. at 448 (quoting *Halliburton II*, 573 U.S. at 268) (internal quotations omitted). Where claims rest on scheme liability, such as Plaintiffs' here, the first two requirements are satisfied when the scheme supports alleged misrepresentations that are publicly known and material. *See Indiana Pub. Ret. Sys. v. AAC Holdings. Inc.*, 2023 WL 2592134, at *21 (M.D. Tenn. Feb. 24, 2023) (applying *Basic* presumption where executives' scheme to manipulate internal data regarding debt collection in turn inflated the company's public statements concerning its accounts receivables); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 277 (N.D. Ala. 2009) ("behind-the-scenes" fraudulent activity was communicated to the public for purposes of the *Basic* presumption through defendants' public endorsement of bond deals and favorable analyst reports); *see also W. Virginia Pipe Trades & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 394 (8th Cir. 2016) (executives' scheme paying physicians to falsify data "caused the production of information on which the market relied"); *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *7-8 (S.D.N.Y. Feb. 17, 2022) (investors relied on scheme creating fraudulent sales data through the company's public revenue projections and sales pipeline based on that data).

Plaintiffs satisfy the first two prerequisites because they have alleged that Defendants' scheme to inflate the 2019 Delaware Basin development plan was directly connected to the alleged material misrepresentations and omissions, which were disseminated publicly and were material. Specifically, they alleged that Defendants Mallon and Bond "employed false learning curve drilling assumptions in the Delaware Basin development plan . . . to artificially inflate the value of that development plan to support Defendant Woods' false statement to investors that Exxon would increase Permian production to one million barrels per day by 2024 and Exxon's falsely inflated proved reserve and resource base valuations, which were based on the development plan." ¶298.

14

A-22

Plaintiffs satisfy the fourth prerequisite by defining the Class as those who purchased Exxon common stock on or between the date of Defendants' first actionable misrepresentation (March 5, 2019) and the date of the final corrective disclosure (January 15, 2021).

With regard to the third prerequisite, courts in the Fifth Circuit consider the following five *Cammer* factors when evaluating whether a security was traded in an efficient market:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); [and] (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price[.]

*Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).

Additionally, Courts analyze the three *Krogman* factors, which include: "(1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float, which is the stock's trading volume without counting insider-owned stock." *Rougier*, 2019 WL 6111303, at *10 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)).

As demonstrated below, consideration of the above factors shows that the market for Exxon stock was efficient during the Class Period. In support of this Motion, Plaintiffs submit the expert report of Matthew D. Cain, Ph.D, an experienced financial economist and a Senior Fellow at the Center for Law and Business at Berkeley Law. Dr. Cain analyzed the factors from *Cammer* and *Krogman* utilized by courts in the Fifth Circuit and concluded that the market for Exxon common stock, which is traded on the NYSE, was efficient.

### (1) Exxon Common Stock Experienced a High Weekly Trading Volume

The first *Cammer* factor for deciding if a security was traded in an efficient market is the average weekly trading volume. According to the court in *Cammer*, "The reason the existence of

15

an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. The court dictated a threshold for deciding whether average weekly trading volume supports the presumption for an efficient market in stating that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." Here, the average weekly trading volume for Exxon was 106.4 million shares during the Class Period, which was 2.5% of shares outstanding. Cain Report, ¶¶31-32. This number easily exceeds the benchmark of weekly volume set at 2% of shares outstanding that justifies a "strong presumption" of market efficiency. *Cammer*, 711 F. Supp at 1286; Cain Report, ¶33.

### (2) Numerous Financial Analysts Covered and Reported on Exxon During the Class Period

During the Class Period, analysts from 50 separate firms, such as Credit Suisse, RBC Capital Markets, J.P. Morgan, and TD Cowen, issued a total of 822 reports on Exxon. Cain Report, ¶34. Such a large number of analyst reports indicate a greater likelihood that investors rely on information provided about the company and therefore supports a finding that the market for Exxon shares during the Class Period was efficient. *See Rougier*, 2019 WL 6111303, at *11 (expert identified at least 24 analysts reporting on defendant during the Class Period); *Marcus v. J.C. Penny Co. Inc.*, 2016 WL 8604331, at *7 (E.D. Tex. Aug. 29, 2016) ("[A]t least 25 securities analysts covered J.C. Penney during the Class Period . . . ."); *In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 248 (N.D. Cal. 2013) (13 analysts); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 508 (D. Kan. 2014) (25 analyst firms). Moreover, investors could also access information about Exxon from numerous other sources. Cain Report, ¶36. In fact, during the Class Period, sources such as *Dow Jones* Institutional News, *Associated Press* Newswires, *Reuters* News, *The*

16

A-24

*Wall Street Journal* Online, and *Business Wire*, among numerous others, published over 20,000 articles about Exxon. *Id.*

### (3) The DMM Served as a Market Maker for Exxon

Market makers are firms that facilitate buying and selling in a company's stock during trading hours, which are present in both over-the-counter markets and major exchanges. Cain Report, ¶38. The *Cammer* court held that, for over-the-counter markets without volume reporting, "the number of market makers for a security is probably the best single criterion" in determining market efficiency. *Cammer*, 711 F. Supp. at 1293. While the court held that market makers are an indicator of efficient markets for stock trading in over-the-counter markets, Exxon's common stock traded on the NYSE, an exchange that, since 2008, employs a Designated Market Maker ("DMM") for a given stock. Cain Report, ¶¶40, 41 n.46.

The DMM performs largely the same role for a stock on the NYSE as the role that multiple market makers perform for a stock on the NASDAQ: providing liquidity and facilitating a market in securities. *Id.* ¶40. As such, Exxon's public listing on the NYSE satisfies the purpose of this *Cammer* factor. *Id.* ¶42. "The listing of a security on a major exchange such as the NYSE . . . weighs in favor of a finding of market efficiency." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d. Cir. 2011). Moreover, Exxon had over 170 market makers and brokers providing similar activity over the Class Period, which also supports market efficiency. Cain Report, ¶42.

### (4) Exxon's Public Float Sufficiently Satisfies the Form S-3 Eligibility Requirements

The fourth *Cammer* factor, that a company is eligible to file a SEC Form S-3, helps to determine if a company traded in an efficient market because, "a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer." Cain Report, ¶44. Companies that are eligible to file a

A-25

Form S-3 are "[c]ompanies that file monthly reports with the SEC for one year and have a public equity float in excess of $75 million." *Rougier*, 2019 WL 6111303, at *12; *see also* 17 C.F.R. § 239.13. The SEC allows a company to file a Form S-3, a short form securities registration for companies whose stocks are actively traded and widely followed, when "the market operates efficiently for [qualifying] companies, i.e., that the disclosure in Exchange Act reports and other communications . . . such as press releases, has already been disseminated and accounted for by the market place." *Rougier*, 2019 WL 6111303, at *12.

Exxon was able to, and did, file an S-3, during the Class Period. Approximately 99% of Exxon's public float was held by non-affiliates during the Class Period. Cain Report, ¶69. Exxon's public float ranged between approximately $133 billion and $353 billion, far exceeding the $75 million threshold requirement making Exxon eligible to file on Form S-3 which it did during the Class Period. Cain Report, ¶¶44-45. This factor thus supports a finding of market efficiency. *See, e.g.*, *In re Groupon Inc. Sec. Litig.*, 2015 WL 1043321, at *4 (N.D. Ill. Mar. 5, 2015) (Groupon's $800 million market capitalization, more than 10 times the $75 million amount needed for S-3 registration, supports market efficiency).

### (5) The Price of Exxon's Common Stock Reacted to New, Company-Specific Information During the Class Period

The fifth factor evaluates "evidence of a causal relationship between unexpected corporate events or financial releases and an immediate response in the price of the stock [a]s an important indicator of market efficiency." *Rougier*, 2019 WL 6111303, at *12 (quoting *Barrie v. Intervoice-Brite, Inc.*, 2009 WL 3424614, at *11 (N.D. Tex. Oct. 26, 2009)). After performing a thorough event study and significant statistical analysis, Plaintiffs' expert determined that there was a cause-and-effect relationship between the release of unexpected Company-specific information and Exxon's common stock price during the Class Period. Cain Report, ¶¶46-62. The study revealed

18

A-26

immediate stock price reactions to public disclosures of unexpected material information, supporting the conclusion that Exxon's stock traded in an efficient market. *Id*.

Plaintiffs' expert reached this conclusion by comparing Exxon stock's behavior on "news days" with its behavior on days with little to "no news." Cain Report, ¶59. The no news trading days provide a benchmark in which little Company-specific information was revealed to the public. *Id*. Dr. Cain found that "3 out of 7 Exxon earnings announcements caused stock price movements that were statistically significant at the 95% level or better." *Id*. ¶60. In other words, "42.9% of the earnings announcements caused stock movements that were statistically significant at the 95% level." *Id*. ¶61. Comparatively, only 5.4% of no news trading days had statistically significant stock price movements. *Id*. "The difference between these two percentages is statistically significant at the 95% level." *Id*. This strongly supports evidence of a cause-and-effect relationship between new information and Exxon Common Stock price movements, which supports that Exxon traded in an efficient market. *Id*.; *see Rougier*, 2019 WL 6111303, at *12 (accepting the same analysis of the effect of company-specific news on the share price); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 688 (D. Md. 2018) (finding that the same analysis is the "typical tool used by experts to directly show market efficiency"); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320-21 (S.D.N.Y 2016) (same).

### (6)    Plaintiffs Satisfy the *Krogman* Factors

In addition to the five *Cammer* factors, Plaintiffs also satisfy the three *Krogman* factors of high market capitalization, large public float, and narrow bid-ask spread. First, a significant market capitalization, "calculated as the number of shares multiplied by the prevailing share price," "suggest market efficiency because stock purchasers have a greater incentive to invest in highly capitalized corporations." *Rougier*, 2019 WL 6111303, at *13. During the Class Period, Exxon's

19

market capitalization averaged $243.2 billion, which places it above the 95th percentile of all companies listed on both the NASDAQ and the NYSE from 2016-2018.  Cain Report, ¶64.

Second, courts also look to a company's "float," which is the percentage of shares held by the public, as opposed to corporate insiders.  *Rougier*, 2019 WL 6111303, at *13; *see also Krogman*, 202 F.R.D. at 478.  "A larger float relative to the total number of outstanding shares indicates that there is a large proportion of shares that are available to non-insiders, who can trade without restrictions and profit by trading on new information in the marketplace."  *Rougier*, 2019 WL 6111303, at *13.  Exxon's public float was approximately 4 billion shares, representing on average 99% of the Company's shares outstanding.  Cain Report, ¶69.  Additionally, at least 4,158 institutions held stock at some point during the Class Period.  *Id*. ¶71.  Further, "Exxon's institutional ownership as a percent of shares during the Class Period placed it between the 25th and 50th percentiles of NYSE and NASDAQ traded companies."  *Id*.  Institutional ownership of a stock is typically associated with strong competition for generating returns from the stock.

Third, a bid-ask spread "is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid)."  *Id*. ¶65.  "A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency."  *Rougier*, 2019 WL 6111303, at *13; *see Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade.").  Here, the average bid-ask spread for Exxon common stock during the Class Period was 0.02% and supports a finding of efficiency. Cain Report, ¶¶66-67; *see also Rougier*, 2019 WL 6111303, at *13 (company's "0.04% bid-ask spread was narrower than 79% of the common stocks on the NYSE and NASDAQ, and narrower than those found by

**A-28**

other courts to be indicators of market efficiency"). Thus, each of the *Krogman* factors support a finding of market efficiency. Cain Report, ¶¶63-64, 68-71.

### b. Reliance Is Also Presumed Under *Affiliated Ute*

Reliance can also be presumed under *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), because the claims involve an undisclosed scheme. *Id.* at 153-54; *see also Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987). In such cases, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material[.]" *Affiliated Ute*, 406 U.S. at 153-54. In this Circuit, the *Affiliated Ute* presumption applies wherever plaintiffs "(1) allege a case primarily based on omissions or non-disclosure, and (2) demonstrate that the defendant owed him a duty of disclosure." *See Regents of the Univ. of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3 372, 384 (5th Cir. 2007).

Here, the Court sustained claims under Rule 10b-5(a) and (c), which primarily concern the nondisclosure of Defendants' concealed scheme to coerce Exxon engineers to use false "learning curve" drilling assumptions to inflate the 2019 development plan for the Delaware Basin by at least $10 billion, a sum undoubtedly material to investors. ¶¶124-31, 441. Notably, *Affiliated Ute* was a scheme liability case where the misconduct was actionable under Rule 10b-5(a) and (c), just like this one, and courts have repeatedly applied *Affiliated Ute* in the context of scheme claims. *See Affiliated Ute*, 406 U.S. at 153; *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 289-90 (D. Minn. 2018) (scheme to pay physicians to hide adverse data in published clinical studies qualified for a presumption of reliance under *Affiliated Ute*); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 682-83, 739 (S.D. Tex. 2006) (applying *Affiliated Ute* where "concealed scheme to defraud" inflated company's public revenue statements); *St. Clair Cty. Emps.' Ret. Sys.*, 2022 WL 4598044 at *8 (applying the *Affiliated Ute* presumption to plaintiffs' scheme liability claims).

Moreover, there was a duty to disclose the concealed scheme here. Defendants Exxon and Bond knew that the artificially inflated development plan for the Delaware Basin "ensured conformity" with Defendant Woods' statement to investors that Exxon would achieve 1 million barrels per day by 2024 in the Permian, and that this false information was also reported to investors in Exxon's stated proved reserve and resource base metrics. ¶¶298-314. As a result, Defendants had a duty to disclose the material fact that all these figures were inflated by the scheme concerning the fraudulent valuation of the Delaware Basin development plan. *See, e.g.*, *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (a duty to speak arises when "one party voluntarily discloses some but less than all material facts").

*   *   *

Because Plaintiffs have established the fraud-on-the-market presumption of reliance under the factors set forth in *Cammer* and *Krogman*, and because Plaintiffs are alternatively entitled to a presumption of reliance under *Affiliated Ute*, they have shown that any potential individualized issues for members alleging Exchange Act claims do not predominate over common ones. Therefore, pursuant to Rule 23(b)(3), the proposed Class is "sufficiently cohesive to warrant adjudication" and demonstrates predominance. *Rooney*, 330 F.R.D. at 447-48.

**2.      A Class-Wide Damages Methodology Is Available**

A Class may be certified where there is a damages methodology that is "sound" and "produces commonality of damages." *Ludlow v. BP, P.L.C.*, 800 F. 3d 674, 683 (5th Cir. 2015) (*citing Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)). *Comcast* requires only that the damages theory be consistent with the liability theory and need not be exact. *Id.* at 685; *In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *6 (S.D. Tex. Sept. 28, 2022) (*Comcast* requires only that "damages be measured using a common methodology that's consistent with the theory of liability."); *Rougier*, 2019 WL 6111303, at *15 (same).

22

**A-30**

Plaintiffs' expert has determined that the methods to calculate artificial inflation can be applied Class-wide consistent with Plaintiffs' theory of liability. Cain Report, ¶78. Specifically, the damages methodologies that are available to measure the artificial inflation created by Defendants' misstatements, omissions, and/or schemes are: (1) event studies, which measure stock price reactions to corrective disclosures while subtracting any "confounding information"; (2) discount cash flow analysis ("DCF"), which estimates changes to firm value based on changes in future expected cash flows; and (3) loss causation analysis. *Id*. ¶¶79-81. These damages methodologies "are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the class period." *Id*. ¶82. The event study, or "out of pocket" class-wide damages methodology is the standard measure of calculating damages in securities fraud class actions and has been endorsed by numerous courts. *See In re Enron Corp. Sec.*, 529 F. Supp. 2d at 716 ("[T]raditionally damages have been determined in § 10(b) claims by the out-of-pocket measure . . . [i.e.,] the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure[.]") (collecting cases); *Rougier*, 2019 WL 6111303, at *15 (finding out-of-pocket measure of damages is "an accepted method for calculating Class members' out-of-pocket damages that are consistent with a fraud on the market theory of liability.").

### 3. A Class Action Is Superior to Other Available Methods of Adjudication

Allowing this case to proceed as a class action is a superior method for resolving Plaintiffs' claims and will provide the most efficient and fair adjudication. In considering superiority under Rule 23(b)(3), courts analyze four factors: (a) class members' interest in controlling separate actions; (b) the extent and nature of existing litigation concerning the same claims; (c) the

desirability of concentrating the litigation in a particular forum; and (d) the likely difficulties of managing a class action. *Vine v. PLS Fin. Servs., Inc.*, 331 F.R.D. 325, 341 (E.D. Tex. 2019).

Here, the Class members' interests in individually adjudicating separate actions are minimal: Plaintiffs are not aware of any separate actions concerning the same conduct at issue here brought on an individual or group basis by Exxon's shareholders; the Northern District of Texas, where the Company is based and many witnesses reside, is the appropriate forum for litigating this matter; and there are no issues in management of the litigation. *See id.* (finding Rule 23(b)(3) satisfied where no "single member would pursue her own action"; "no other actions commenced by or against members of the class have been filed"; "each of the events in question occurred in Texas and Texas law applies, making this forum an appropriate forum for this dispute"; and the "case [did] not present especially troubling management or administration issues"). Here, Plaintiffs have committed to, and have every incentive to, seek the maximum recovery possible for the Class. *See* Exs. A-E. Class members' interests would thus be best furthered if their claims could be litigated as a class action.

Consistent with the requirements of Rule 23(b)(3), the certification of this action as a class action would not only be superior to other available methods for fairly and efficiently adjudicating the controversy, it appears to be the sole method for fairly and efficiently litigating the claims of all members of the proposed Class.

### D.   ADDITIONAL MATTERS REQUIRED BY LR CV 23.2

Two additional matters must be addressed under LR CV 23.2. First, if the Class is certified by the Court, following an application and order of the Court, notice can be readily provided to Class members by the highly effective means typically used in securities class actions. *See, e.g.*, *Shen v. Exela Techs., Inc.*, 2023 WL 8527091, at * 2 (N.D. Tex. Dec. 7, 2023). This method utilizes shareholder and nominee records to identify potential Class members, who then are sent notice of

the Class certification by first class mail, which notice is supplemented by publication in prominent news outlets and on a case website. *See* Counsel Decl. ¶9. The estimated expense for such notice will be approximately $1.3-1.8 million, sourced from Lead Counsel. *Id.*

Second, the arrangements for payment of Lead Counsel's attorneys' fees are based on retainer agreements between Lead Plaintiffs and Lead Counsel which provide that attorneys' fees are fully contingent on a recovery in this matter, will be a reasonable percentage of any recovery, and are subject to the approval of the *Lead* Plaintiffs and ultimately the Court after the matter has been resolved. *Id.* ¶8. In addition, Liaison Counsel McKool Smith P.C. ("Liaison Counsel") has agreed to be paid on a fully contingent basis based on Liaison Counsel's lodestar, calculated at the same multiplier awarded to Lead Counsel. *Id.*

## IV.   CONCLUSION

For the foregoing reasons, and based on the additional information in the accompanying Declarations, Plaintiffs respectfully request that the Court: (a) enter an order certifying this action as a class action; (b) appoint Plaintiffs Amalgamated and Rhode Island as Class Representatives; and (c) appoint G&E and BLB&G as Class Counsel.

DATED:  January 4, 2024                Respectfully submitted,

                                       */s/ Daniel L. Berger*

                                       **GRANT & EISENHOFER P.A.**
                                       Daniel L. Berger
                                       Caitlin M. Moyna
                                       Lauren J. Salamon
                                       485 Lexington Avenue
                                       New York, NY 10017
                                       Telephone: (646) 722-8500
                                       Facsimile: (646) 722-8501
                                       dberger@gelaw.com
                                       cmoyna@gelaw.com
                                       lsalamon@gelaw.com

**A-33**

*Counsel for Plaintiffs, Lead Counsel for the Class and proposed Class Counsel*


/s/ John Rizio-Hamilton
_____


**BERNSTEIN LITOWITZ BERGER &
    GROSSMANN LLP**
John Rizio-Hamilton
Rebecca E. Boon
John Esmay
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
rebecca.boon@blbglaw.com
john.esmay@blbglaw.com

*Counsel for Plaintiffs, Lead Counsel for the Class and proposed Class Counsel*

Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
McKOOL SMITH PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

26

**A-34**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4, 2024, I served the foregoing and all accompanying declarations and exhibits by email to all counsel of record.


By:   */s/ John Esmay*
                John Esmay

**A-35**

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| In re EXXON MOBIL CORP. Securities Litigation | Civ. Action No. 3:21-cv-00194-N<br><br>CLASS ACTION |

EXPERT REPORT OF MATTHEW D. CAIN, PHD

January 4, 2024

**A-36**

**Table of Contents**

I.      **Qualifications**................................................................................................**2**

II.     **Introduction and Summary of Opinions**......................................................**3**

III.    **Case Background** ...........................................................................................**5**

    A.  **Overview of the Company and Allegations** ..................................................**5**

    B.  **Bases for Opinions on Market Efficiency** .....................................................**6**

IV.     **Evaluation of Market Efficiency Factors for Exxon Common Stock** ..........**10**

    A.  **Exxon is a Bellwether Firm**.........................................................................**10**

    B.  *Cammer* **Factor 1: Average Weekly Trading Volume** ....................................**12**

    C.  *Cammer* **Factor 2: Analyst Coverage** ..........................................................**13**

    D.  *Cammer* **Factor 3: Market Makers**................................................................**16**

    E.  *Cammer* **Factor 4: SEC Form S-3 Filing Eligibility**......................................**18**

    F.  *Cammer* **Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices** ....................................................................................**19**

      i.   **Event Study Methodology** ....................................................................... **20**

      ii.  **Cause and Effect Analysis Comparing Exxon Common Stock Price Behavior on News versus No News Days**.............................................................. **24**

    G.  **Additional Factor 1: Market Capitalization**..................................................**27**

    H.  **Additional Factor 2: Bid-Ask Spread** ...........................................................**28**

    I.  **Additional Factor 3: Public Float**.................................................................**29**

    J.  **Additional Factor 4: Institutional Ownership**................................................**30**

    K.  **Additional Factor 5: Autocorrelation** ...........................................................**31**

    L.  **Additional Factor 6: Options Trading** ...........................................................**32**

V.      **Ability to Calculate Damages on a Class-Wide Basis**..................................**33**

VI.     **Conclusion** ....................................................................................................**37**

**Appendix A**................................................................................................................**38**

**Appendix B** ...............................................................................................................**44**

**Exhibits** .....................................................................................................................**47**

1

I.    **Qualifications**

1.    I am a Ph.D. in Finance and a Senior Fellow at the Berkeley Center for Law and Business at the University of California - Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

2.    I worked at the United States Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research for which I was awarded the Chairman's Award for Economic Research.

3.    Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal,

2

**A-38**

accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

4.      Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank, where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

5.      In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

6.      I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the *Journal of Financial Economics*, *Journal of Law and Economics*, *Journal of Accounting and Economics*, *Journal of Empirical Legal Studies*, and *Journal of Financial and Quantitative Analysis.* My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony.

## II.      Introduction and Summary of Opinions

7.      I have been asked by the Lead Plaintiffs in this matter to determine whether the market for Exxon Mobil Corp. ("Exxon" or the "Company") common stock ("Common Stock") was efficient during the period March 5, 2019-January 15, 2021, inclusive (the "Class Period").[1]

---

[1] I understand the Lead Plaintiffs to be Amalgamated Bank and the State of Rhode Island Office of the General Treasurer (on behalf of the Employees' Retirement System of Rhode Island), and Defendants to comprise Exxon Mobil Corp. ("Exxon"), Exxon's Chief Executive Officer Darren W. Woods, Exxon's Vice President and the President

8.      In addition, I have been asked to opine on whether the calculation of damages on a class-wide basis in this matter for purchasers of Exxon Common Stock during the Class Period is subject to a common methodology for all Class members in connection with their claims under U.S. Securities & Exchange Commission ("SEC") Rule 10b-5(a) and (c) adopted thereunder.

9.      The materials I have considered in forming my opinions are summarized in **Appendix B**. My time is billed at a rate of $950 per hour for my work on this matter. I have been assisted in this matter by staff at Cleveland Analytics, LLC working under my direction, and I receive further compensation based on those billings. My compensation is in no way contingent on the outcome of this case. My work is ongoing and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention.

10.     Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for Exxon's Common Stock was efficient during the Class Period.

11.     I have also formed the opinion that Common Stock damages in this matter can be calculated on a class-wide basis subject to a common methodology.

12.     The remainder of my report is organized as follows: **Section III** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section IV** presents my analyses of the market efficiency factors for the Common Stock during the Class Period. **Section V** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section VI** contains my conclusions.

---

of ExxonMobil Upstream Oil & Gas Company, Liam M. Mallon, and Exxon's Delaware Basin Development Manager, a Senior Manager in Exxon's Upstream Oil & Gas Division, Melissa Bond. *See* Second Amended Class Action Complaint for Violations of the Federal Securities Laws, No. 3:21-cv-00194-N (the "Complaint") (ECF No. 92).

### III.   Case Background

#### A.   Overview of the Company and Allegations

13.   Throughout the Class Period, Exxon's Common Stock was traded in the United States on the New York Stock Exchange (NYSE).[2] Prior to the start of the Class Period, Exxon hired a new CEO, Darren Woods, who announced a $6.6 billion acquisition of oil and gas assets in the Permian Basin (which includes the Delaware basin) shortly after being hired.[3] At the start of the Class Period, on March 5, 2019, Woods announced an aggressive extraction goal of 1 million oil-equivalent barrels per day from the Permian Basin by 2024.[4] That same day, Exxon announced an increase in the Permian Basin's resource base (to 10 billion oil-equivalent barrels) and stated to investors that the resource base was likely to grow further.[5]

14.   The Complaint alleges that throughout the Class Period, Defendants engaged in a scheme to artificially inflate the value of the Delaware Basin development plan to match Woods's public statements regarding his production goals.[6] The Complaint alleges that in 2019, the Company deliberately overvalued the Delaware Basin by at least $10 billion based on false "learning curve" drilling assumptions.[7]

15.   The Complaint alleges that the relevant truth was partially revealed on January 31, 2020 when Exxon held an earnings call which conveyed that quarter-over-quarter extraction was virtually flat at 294,000 barrels of oil-equivalent barrels per day – far short of analyst expectations

---

[2] Complaint, at ¶ 41.

[3] *Id.*, at ¶ 2-3.

[4] *Id.*, at ¶ 3.

[5] *Id.*

[6] *Id.*, at ¶¶ 7; 309.

[7] Complaint, at ¶ 4.

and Company guidance.[8] The Complaint further alleges that the relevant truth was partially revealed on May 1, 2020 when Exxon held another earnings call which conveyed that Exxon would reduce drilling rigs in the Permian Basin by 75% and that extraction volume would be down 100,000-150,000 oil equivalent barrels per day from prior estimates.[9] The Complaint further alleges that the relevant truth was finally revealed on January 15, 2021 when the *Wall Street Journal* published an article based on a whistleblower complaint wherein it described that the 2019 value of the Delaware Basin was overstated by $10 billion on the basis of inflated "learning curve" drilling speed assumptions.[10]

16.     As a result of Defendants' alleged scheme, investors allegedly traded Exxon Common Stock at artificially inflated prices during the Class Period.[11] **Exhibit 1** graphs the closing stock price and trading volume for Exxon's Common Stock shares throughout the Class Period.

### B.     Bases for Opinions on Market Efficiency

17.     I understand that Plaintiffs assert the "fraud-on-the-market" theory of class-wide reliance, *i.e.*, that shareholders rely on the alleged misrepresentations or material omissions of fact made by Defendants through their effect on stock prices in an informationally efficient market. A market is defined as informationally efficient if prices of securities trading in that market reflect all material, widely available public information, and rapidly change to reflect new, unanticipated, material, public information. As courts, including the United States Supreme Court, have repeatedly explained, the "fraud-on-the-market" theory of class-wide reliance holds that investors in securities traded in an informationally efficient market rely on any misrepresentations or

---

[8] *Id.*, at ¶ 244.

[9] *Id.*, at ¶ 249.

[10] *Id.*, at ¶ 252.

[11] *Id.*, at ¶¶ 402-418.

A-42

material omissions of fact because those statements or material omissions of fact have distorted the value of each class member's purchase price. As the Supreme Court explained in its *Basic Inc. v. Levinson* decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[12]

18.    This theory was also reaffirmed by the Supreme Court in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[13]

19.    Economic research and literature support the concept of market efficiency. For example, Nobel Prize winner Eugene Fama has observed that "[T]he evidence in support of the efficient markets model is extensive, and (somewhat uniquely in economics) contradictory evidence is sparse."[14]  More recently, Professor Fama reiterated that "the past research on market efficiency is among the most successful in empirical economics, with good prospects to remain so in the future."[15]  Indeed, research continues to support the empirical soundness of the efficient market hypothesis, as modern scholars have concluded that, in fact, "capital markets are more

---

[12] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

[13] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

[14] Eugene F. Fama, 1970, Efficient Capital Markets: A Review of Theory and Empirical Work, *Journal of Finance* 25, at p. 416.

[15] Eugene F. Fama, 1991, Efficient Capital Markets: II, *Journal of Finance* 46, at p. 1576.

7

A-43

efficient than previously recognized."[16] Academic research thus provides ample support for the concept of market efficiency of public exchange-traded securities.

20.    Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and NASDAQ, should be granted a presumption of efficiency for virtually all securities traded on them.[17] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges. The fact that Exxon's Common Stock traded in such a well-developed market on the stock exchanges discussed above leads to a strong presumption of market efficiency.

21.    The district court in *Cammer v. Bloom* developed a widely-cited five-factor test to evaluate whether a market is efficient for the purposes of establishing the presumption of investor reliance articulated by the Supreme Court in *Basic*.[18] In another widely-cited opinion, the district court in *Krogman v. Sterritt* articulated several additional factors useful in evaluating market efficiency.[19] Principles of economics and finance support the factors cited by the *Cammer* and *Krogman* courts as indicators of market efficiency. However, as explained below, it is important to understand that an assessment of market efficiency does not turn on any one single factor; rather, it is an assessment of all the factors together that allows one to reach the conclusion that a market for a security is efficient.

---

[16] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, *Review of Financial Studies* 33, at p. 2071.

[17] See *Cammer v. Bloom*, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.") (citing Bromberg & Lowenfels).

[18] 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).

[19] *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001).

22.    In the following section, I discuss the *Cammer* and *Krogman* factors and evaluate them in relation to Exxon Common Stock. In doing so, I compare the various factors for Exxon's Common Stock: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.  As discussed *infra*, my analyses and findings on the various market efficiency factors support the conclusion that Exxon Common Stock traded in an efficient market throughout the Class Period.

23.    One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[20] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[21] The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock....Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading

---

[20] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *The Accounting Review* 88, at pp. 667-705. ("*MRK Study*").

[21] MRK Study at pp. 678, 681-682.

A-45

volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[22]

24.    The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to [analyst-]covered peers."[23] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets. I then compare several of Exxon's market efficiency factors to the samples of firms in the MRK Study to assess whether Exxon's characteristics are consistent with firms operating in efficient markets.

25.    The following section presents my analyses and findings from the evaluation of various market efficiency factors for Exxon Common Stock during the Class Period.

## IV.    Evaluation of Market Efficiency Factors for Exxon Common Stock

### A.    Exxon is a Bellwether Firm

26.    Academic research documents that information transfers occur when one company's information (*e.g.*, an earnings announcement, management earnings forecast, larger-than-expected revenue changes, etc.) affects the returns of another firm. For example, a study by Baginski states: "An information transfer occurs when information released by firm $i$ generates an unexpected share price revision for firm $j$."[24] In his study, Baginski documents that the information contained in the management forecast issued by one company can "spill over" or transfer to the returns of a similar firm that did not provide a forecast.

---

[22] MRK Study at p. 667.

[23] MRK Study at p. 681 (footnotes omitted).

[24] Stephen P. Baginski, 1987, Intraindustry Information Transfers Associated with Management Forecasts of Earnings, *Journal of Accounting Research* 25, at p. 198.

A-46

27.      Related to information transfers is the notion of a "bellwether" firm. According to the American Heritage dictionary, "bellwether" is defined as: "One that serves as a leader or as a leading indicator of future trends."[25] In the context of publicly-traded companies, a "bellwether" firm is a large firm whose information events move not only its own securities' prices but also the market prices of other firms in the economy. For example, a study by Anilowski, *et al*. measures bellwether firms as the largest U.S. firms by market capitalization.[26] The authors document that management qualitative guidance from bellwether firms is not only positively associated with bellwether firms' own stock returns, but also the returns of the remaining firms in the stock market.[27] A study by Bonsall, *et al*. documents that management earnings guidance from bellwether firms contains value-relevant information for other firms both within and outside the bellwether's industry.[28]

28.      Exxon is one of the largest firms in the United States by market capitalization.[29] Media coverage of announcements by Exxon frequently note the price impacts on Exxon stock as well as corresponding returns for its industry and the overall stock market. For example, following Exxon's fourth quarter 2019 earnings release on January 31, 2020, *Investor's Business Daily* reported: "Weak earnings reports from Chevron and Exxon Mobil weighed on the Dow Jones

---

[25] https://www.ahdictionary.com/word/search.html?q=bellwether.

[26] Carol Anilowski, Mei Feng, Douglas J. Skinner, 2007, Does earnings guidance affect market returns? The nature and information content of aggregate earnings guidance, *Journal of Accounting and Economics* 44, at p. 58.

[27] *Id*., at p. 39: "Finally, we find that earnings guidance issued by the largest firms ('bellwethers') is associated with market returns in short event windows around its release, consistent with earnings guidance being informative at the market level, at least for certain large firms." At p. 59, Table 6, statistically significant correlations documented among bellwether firms' own returns and those of the total U.S. market, the S&P 500 index, and the NASDAQ market return.

[28] Sam Bonsall, Zahn Bozanic, and Paul Fischer, 2013, What Do Management Earnings Forecasts Convey About the Macroeconomy?, *Journal of Accounting Research* 51, at p. 1: "Further, we show that bellwether firms provide timely information about both industry-specific events and broader economic events."

[29] *See, e.g.*, https://companiesmarketcap.com/usa/largest-companies-in-the-usa-by-market-cap/ (last visited Oct. 31, 2023). Exxon was in the top 1% of U.S.-listed firms ranked by market capitalization during the Class Period (as of Dec. 31, 2020) according to the Center for Research in Security Prices (CRSP).

A-47

industrials. The Nasdaq composite was down 0.9%, and the S&P 500 gave back 1.1%."[30] Because Exxon is a bellwether firm, its announcements are followed by Exxon's own investors as well as investors in hundreds of other publicly-traded companies. Since investors in numerous companies closely watch and react to information reported by Exxon, its high level of investor attention provides strong evidence of market efficiency for Exxon Common Stock.

### B.   *Cammer* Factor 1: Average Weekly Trading Volume

29.    Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard [for exchange listing] because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[31]

30.    The first *Cammer* factor for stock trading volume has been defined by the *Cammer* court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[32]

---

[30] Ken Shreve, Jan. 31, 2020, Dow Jones Craters 400 Points As Exxon Mobil, Chevron Earnings Weigh; Amazon Breaks Out, *Investor's Business Daily*.

[31] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63, at p. 108.

[32] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

31.     **Exhibit 2** graphs Exxon's Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[33] The average weekly trading volume was 2.5% of Exxon's common shares outstanding over the Class Period. This level of trading volume exceeds both the 1% and 2% thresholds established by the *Cammer* court. As a result, Exxon's level of stock trading volume throughout the Class Period supports the conclusion that Exxon's Common Stock traded in an efficient market throughout the Class Period.

32.     I also note that the average weekly trading volume of Exxon's Common Stock over the Class Period was 106.4 million shares on the New York Stock Exchange. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[34] Additionally, Exxon's daily turnover rate of 0.50% during the Class Period placed it above the 25th percentile of all companies listed on the NASDAQ and the NYSE from 2016-2018.[35] Exxon's average weekly trading volume during the Class Period exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that Exxon's Common Stock traded in an efficient market throughout the Class Period.

**C.    *Cammer* Factor 2: Analyst Coverage**

33.     An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry. Analysts typically publish reports in which they may assess recent

---

[33] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[34] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

[35] Bhole, Bharat, Sunita Surana, and Frank Torchio, 2020, Benchmarking Market Efficiency Indicators for Securities Litigation, *University of Illinois Law Review Online* (the "Bhole Study"), at p. 102. The 25th percentile of daily turnover for the 2016-2018 sample period is 0.39%.

13

A-49

company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. Analyst coverage can be indicative of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The *Cammer* court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[36]

34.    In **Exhibit 3**, I report the analyst coverage of Exxon over the Class Period. I identified a total of 822 reports issued by analysts at 50 separate firms.[37] The list of analyst reports includes firms that conducted thorough and detailed research on Exxon and its industry, such as Credit Suisse, RBC Capital Markets, J.P. Morgan, and TD Cowen, among others. Collectively, this is a significant degree of analyst coverage which served to disseminate important new publicly available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations.

35.    This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[38] Charles M.C. Lee and Eric So documented that on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles

---

[36] *Cammer*, 711 F. Supp. at 1286.

[37] These statistics represent a lower bound of the analyst coverage of Exxon because many analyst reports are provided directly to investors but are not captured by third-party data vendors.

[38] MRK Study at 668.

by the total number of analyst forecasts issued.[39] In other words, many firms within the category of the least amount of analyst coverage in their sample were covered by only one or two analysts. Exxon's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest. Moreover, Exxon's high level of analyst coverage also placed it above the 95th percentile when compared with all companies listed on the NASDAQ and the NYSE from 2016-2018.[40] The significant analyst coverage of Exxon during the Class Period supports the conclusion that Exxon's Common Stock traded in an efficient market throughout the Class Period.

36.    In addition to the analyst coverage documented above, investors could access information about Exxon from a variety of other sources. For example, I conducted a search of press and news articles about Exxon using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Institutional News, Associated Press Newswires, Reuters News, The Wall Street Journal Online, Business Wire, and numerous other outlets. This search produced over 20,000 articles throughout the Class Period.[41] Investors can also receive information from online research forums, such as SeekingAlpha, short sellers, and other investor research services, which offer both free and subscription-based research reports.

37.    Moreover, Exxon produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about Exxon from a variety of sources during the Class Period. As a result, the analyst

---

[39] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124, at p. 336 (see Table 1, Panel B – "COV").

[40] Bhole Study, at 104: 95th percentile defined as 26 analysts.

[41] The articles were identified through a Factiva search including Exxon's company tag over all available sources.

coverage, number of analyst research reports produced, and substantial public dissemination of news, SEC filings, and information about Exxon supports the conclusion that its Common Stock traded in a well-developed and informationally efficient market throughout the Class Period.

### D.    *Cammer* Factor 3: Market Makers

38.    The third *Cammer* factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[42] Market makers are present on major exchanges as well as over-the-counter markets. In particular, market makers can facilitate market efficiency in an over-the-counter market because they are:

> [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[43]

39.    In evaluating market efficiency by looking at market makers, the *Cammer* court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[44]

40.    The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume

---

[42] "A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[43] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19, at p. 291.

[44] *Cammer*, 711 F. Supp. at 1293.

reporting. However, Exxon's Common Stock traded on the NYSE throughout the Class Period. Similar to other large, national exchanges, the NYSE reports volume, prices, bid-ask spreads, and other trading details which ensure the market for stocks remains well-developed, liquid, and efficient. The *Cammer* court thus stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[45]

41.     I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[46]) as being informationally efficient.[47] Moreover, I understand that courts view institutional investors as potentially providing similar benefits to

---

[45] *Cammer,* 711 F. Supp. at 1292.

[46] The NYSE Market Model, *NYSE*, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." *See also*: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[47] *See*, *e.g.*, *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2012) ("One defendant in *Cammer* contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that 'the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.' But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker") (citations omitted). *See also Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST, 2016 WL 4706418 at *6 (N.D. Ca. Dec. 22, 2016): "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."

17

A-53

market makers by supplying trading liquidity and informationally efficient and informed trading.[48]

Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss further in **Section IV.I** below, Exxon's Common Stock was widely held by institutional investors during the Class Period.[49]

42.     As a result, Exxon's public listings on the NYSE, a well-developed and established national exchange, satisfies the intent of this *Cammer* factor. Moreover, Exxon had over 170 market makers and brokers providing similar activity during the Class Period.[50] In sum, Exxon easily satisfies this *Cammer* factor by virtue of the Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Exxon Common Stock throughout the Class Period.

**E.    *Cammer* Factor 4: SEC Form S-3 Filing Eligibility**

43.     The fourth *Cammer* factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[51]

---

[48] *See*, *e.g.*, *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[49] Exxon Common Stock was held by at least 4,158 institutional investors at some point during the Class Period (see Exhibit 10). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 51.8% of shares outstanding on Sep. 30, 2020 to a maximum of 56.3% of shares outstanding on March 31, 2019, according to data from S&P Capital IQ. These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in S&P Capital IQ's coverage.

[50] Bloomberg "RANK" function.

[51] *Cammer*, 711 F. Supp. at 1287.

18

44.    Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a class of securities subject to the Securities Exchange Act of 1934 ("Exchange Act"), the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, and the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases.[52] Exxon also greatly exceeded the $75 million public float threshold required to file an S-3. As shown in **Exhibit 8**, Exxon's Common Stock market cap averaged $243.2 billion, and ranged from approximately $133 billion to $353 billion during the Class Period.[53] The logic and intuition behind this factor as discussed by the *Cammer* court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

45.    To the best of my knowledge, Exxon made all required filings with the SEC in a timely manner during the Class Period and satisfied the other S-3 requirements. Moreover, Exxon filed an SEC Form S-3ASR during the Class Period.[54] As a result, this factor is consistent with the efficiency of the market for Exxon Common Stock throughout the Class Period.

F.    *Cammer* **Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices**

46.    The fifth *Cammer* factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information. The *Cammer* court held:

---

[52] https://www.sec.gov/files/forms-3.pdf.

[53] SEC rules set a minimum threshold of $75 million of voting and non-voting stock held by non-affiliates (*see id.*) As shown in Exhibit 10, only 0.2% of Exxon's Common Stock was held by insiders during the Class Period.

[54] https://www.sec.gov/Archives/edgar/data/34088/000119312520068776/0001193125-20-068776-index.html.

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[55]

47.    Below, I present empirical analysis that demonstrates Exxon's Common Stock exhibited the type of cause-and-effect relationship between company-specific information flow and price movement described in *Cammer* and *Krogman*. I compare the behavior of Exxon Common Stock on days when company-specific news is issued with its behavior on days when no such news is issued. This analysis demonstrates that Exxon's Common Stock price reacted rapidly to company-specific news and, thus, further supports the conclusion that Exxon Common Stock traded in an efficient market throughout the Class Period.

### i.    Event Study Methodology

48.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I ran empirical tests using the results of an event study.  Event studies are widely used by economists to measure the reaction of a security to the disclosure of new, issuer-specific information, including in connection with assessments of market efficiency in securities litigation.[56] As Professor Fama has explained:

> The cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns. When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration. As a result, event studies can give a clear picture of the speed of adjustment of prices to information.
>
> There is a large event-study literature on issues in corporate finance. The results indicate that on average stock prices adjust quickly to information about investment decisions, dividend changes, changes in capital structure, and corporate-control transactions. This

---

[55] *Cammer,* 711 F. Supp. at 1291.

[56] *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 13.

evidence tilts me toward the conclusion that prices adjust efficiently to firm-specific information. More important, the research uncovers empirical regularities, many surprising, that enrich our understanding of investment, financing, and corporate-control events, and give rise to interesting theoretical work.[57]

49.    To determine whether Exxon stock price movements on any given date are statistically significant, I performed an event study using generally-accepted economic methods, specifying a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, part of an event study method, an economist tests whether the deviation from expected price movements (*i.e.*, the abnormal return) is "statistically significant," *i.e.*, sufficiently large compared to the usual volatility in the company's stock price return such that simple random movement can be rejected as the cause.

50.    I applied these widely-used and generally-accepted econometric methodologies to perform the event study here. Specifically, in order to isolate the impact of company-specific news on Exxon's stock price during the Class Period, I performed regression analyses to measure the relationship between Exxon's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Exxon's industry. By modeling how Exxon's stock price returns

---

[57] Eugene F. Fama, 1991, Efficient Capital Markets: II, *Journal of Finance* 46, at p. 1607.

moved relative to an overall market index and an industry index, I could also measure the Company's response to company-specific news.

51.     As discussed in **Section IV.A** above, Exxon is a bellwether firm, meaning that disclosures relating to the Company can have information spillover effects into the energy industry and the broader stock market. If an information event relating to Exxon influences the returns of other firms in its industry or the market as a whole, the statistical power of the event study will be reduced. I use equal weighted indices for the market and industry indices in my event study to reduce some of this information spillover effect. Nonetheless, I consider the statistical significance of the event study results to be conservative because Exxon's stock returns may cause similar movements in the industry and market returns at certain points in time.

52.     The event study regression analysis is conducted over the Class Period (March 5, 2019 to January 15, 2021, inclusive). For each trading day, I constructed a regression model using data from the prior 120 trading days ("Estimation Window").[58] To study the relationship between Exxon's stock price returns and overall market factors, I used the S&P 500 Equal Weight Total Return (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between Exxon's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Exxon's

---

[58] I utilized an Estimation Window of 120 trading days, which equates to approximately six calendar months. *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *Business Lawyer* 49, at p. 569; A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at p. 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

particular industry, I used the S&P Oil & Gas Exploration & Production Select Industry Total Return Index (the "Industry Index").[59]

53.    I established the relationship between the daily return of the Company's stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[60] As shown in **Exhibit 4**, the event study models revealed a positive relation between the Company's daily returns and those of the overall stock market and industry throughout the Class Period. In other words, movements of the Market Index and the Industry Index help explain movements in Exxon's stock price. Consistent with generally-accepted econometric methods, this allowed me to predict the expected daily return of the Company on a date once I had controlled for that day's market and industry returns. Again, in accordance with standard event-study methodology, I then subtracted the predicted return from the actual return to get the "abnormal" return, which represents the component of the return that is not attributable to market-wide or industry-wide movements.

54.    Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company's stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much idiosyncratic company-specific volatility or "randomness" remains in the price movement of Exxon's common stock, after controlling for the

---

[59] According to Bloomberg, this equal-weighted industry index had between 41 and 74 constituents throughout the Class Period. Exxon was a member of this industry index during the Class Period. I removed Exxon's returns from this index calculation.

[60] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. *See* A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35; Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50, at p. 1597.

Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

### ii.    Cause and Effect Analysis Comparing Exxon Common Stock Price Behavior on News Versus No News Days

55.    A generally-accepted and peer-reviewed approach to evaluating whether a stock price responds to news (including with regard to testing market efficiency in the securities class action context) is to compare the stock's behavior on news days with its behavior on other days with relatively little or no news.[61] In showing that a security's price is more volatile on news days than on no news days to a statistically significant degree indicates that the security responds promptly to news and, therefore, supports a finding of efficiency.

56.    Importantly, research has shown that in an efficient market, a security will exhibit some large price movements despite the absence of news and, conversely, there will be news without large price movements.[62] For instance, a company may announce earnings that are in line with investor expectations; while such an announcement is clearly important to investors, it will not have altered the total mix of information significantly enough to elicit a statistically significant stock price movement. Likewise, a disclosure may contain a mix of positive and negative information. Further, if a company's disclosure conceals important information, the effect of the concealment would generally not result in a significant stock price movement but would maintain

---

[61] Paul Ferrillo, Frederick Dunbar, and David Tabak, 2004, The 'Less Than' Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, *St. John's Law Review* 78, at pp. 120-21; Miguel O. Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57. This approach been repeatedly accepted by courts evaluating market efficiency in the securities class action context. *See, e.g.*: Memorandum Opinion, *In re Under Armour Sec. Litig.*, No. 1:17-cv-00388 (D. Md. Sept. 29, 2022), ECF No. 245; Opinion, *Bond v. Clover Health Invs., Corp.,* No. 3:21-cv-00096 (M.D. Tenn. Feb. 28, 2022), ECF No. 87; Order, *In re QuantumScape Sec. Class Action Litig.*, No. 3:21-cv-00058 (N.D. Cal. Dec. 19, 2022), ECF No. 183.

[62] *See* Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence from Firm-Specific News, *Review of Financial Studies* 32, at 1004; Ray Fair, 2002, Events That Shook the Market, *Journal of Business* 75, at pp. 713, 714.

24

the price at its then-current level. Accordingly, a generally-accepted, peer-reviewed methodology accepted by numerous courts is to compare stock price behavior on a *group* of "news days" to stock price behavior on a *group* of "no news days."

57.    Here, I performed an analysis comparing the behavior of Exxon Common Stock on days where news was disclosed versus days with little to no news. My analysis demonstrates that the price of Exxon stock was more volatile on news than on no news days to a statistically significant degree. This result supports the conclusion that there was a "cause and effect relationship between company disclosures and resulting movements in stock price" for Exxon Common Stock during the Class Period and, thus, further supports a finding of market efficiency.

58.    To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed Exxon's quarterly earnings announcements (the "News Days"). These announcements represent a potential opportunity for the public release of new value-relevant Company information to investors. One would not expect every earnings announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance, because the information may contain a mix of both positive and negative information, and because of information spillovers to the broader industry and market as discussed above. The mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information, and other company-specific news can cause company stock prices to move in an efficient market.

59.    I compared the stock returns and trading volume of Exxon's Common Stock on News Days versus those metrics on trading days that contained little or no news during the Class

25

Period (the "No News Days").[63] The No News Days provide a benchmark measurement of days in which relatively little Company-specific information was provided to the market. If Exxon's stock prices tend to move more significantly following News Days than on the No News Days, this would support a conclusion of market efficiency.

60.    **Exhibit 6** reports the results of the event study using Exxon Common Stock returns. The columns list the market impact dates, raw return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, the p-value corresponding to statistical significance, and a description of the earnings announcement on each date. Overall, 3 out of 7 Exxon earnings announcements caused stock price movements that were statistically significant at the 95% level or better.  I compare this rate with that on the No News Days in the following exhibit.

61.    **Exhibit 7** summarizes the statistical comparison of Exxon's Common Stock returns and trading volume following the 7 News Days versus these metrics as measured on the 117 No News Days. As shown in the **Exhibit 7**, 42.9% of the earnings announcements caused stock movements that were statistically significant at the 95% level. This compares to 6.0% of the No News Days with statistically significant stock price movements. The difference between these two percentages is statistically significant at the 95% level. These results provide strong evidence of a cause-and-effect relationship between new information and Exxon Common Stock price movements. Moreover, relative to the No News Days, the News Days had a higher average absolute abnormal return and greater trading volume.

---

[63] No News Days were identified as dates with no Dow Jones source Factiva headlines. For purposes of considering news to identify No News Days, I ignored headlines that merely identified stock price or volume movements on a given date without discussing any other information.

26

62.    In summary, relative to other trading days contained in each event study's Estimation Window, News Days caused a greater proportion of statistically significant stock price movements at the 95% level. This finding establishes a clear cause-and-effect relationship between new company-specific information and Exxon Common Stock price movements. As a result, this *Cammer* Factor 5 analysis supports the conclusion that Exxon Common Stock traded in an efficient market during the Class Period.

### G.    Additional Factor 1: Market Capitalization

63.    I have also considered several additional factors beyond the five *Cammer* factors, the first of which is the total value of stock outstanding, or market capitalization. The *Cammer* court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency."[64] Moreover, the *Krogman* court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[65] As stated previously, the MRK Study found that firms lacking analyst coverage had other indicators of trading in less developed and efficient markets, including smaller market capitalizations. The median market capitalization of the MRK Sample firms was $27.91 million.[66] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[67] This study supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

---

[64] *Cammer*, 711 F. Supp. at 1287.

[65] *Krogman,* 202 F.R.D. at 478.

[66] MRK Study at p. 678 (Table 3).

[67] MRK Study at p. 678 (Table 3).

A-63

64.    **Exhibit 8** reports Exxon's market capitalization throughout the Class Period.[68] This market capitalization averaged $243.2 billion over the Class Period. Exxon's total market capitalization places it above the 95th percentile of all companies listed on either the NASDAQ and the NYSE from 2016-2018.[69]   Exxon's market capitalization also exceeded the MRK Sample firms and Covered firms on an inflation-adjusted basis.[70] Exxon's number of shares outstanding were approximately 4.2 billion during the Class Period. Exxon's market capitalization, shares outstanding available for trading, and its sizeable float as discussed below, are consistent with the conclusion that the Common Stock traded in an efficient market during the Class Period.

## H.    Additional Factor 2: Bid-Ask Spread

65.    The *Krogman* court considered the bid-ask spread as another factor that can indicate market efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[71] The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

---

[68] Bloomberg daily reported "CURRENT_MARKET_CAP_SHARE_CLASS" variable.

[69] Bhole Study, at 107: 95th percentile of market capitalization defined as $28.78 billion.

[70]    Source:   U.S.   Bureau   of   Labor   Statistics,   CPI   Inflation   Calculator,   available   at: https://www.bls.gov/data/inflation_calculator.htm.

[71] *Krogman*, 202 F.R.D. at 478.

**A-64**

66.     I analyzed the bid-ask spread of Exxon's Common Stock during the Class Period. **Exhibit 9** reports the monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[72] This spread averaged 0.02% over the Class Period.

67.     By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%.[73] Exxon's bid-ask spread was significantly smaller than both of these values, indicating that investors could trade Exxon's Common Stock at very low relative cost. Additionally, Exxon's average bid-ask spread over the Class Period places it at or below the 10th percentile of all companies listed on NASDAQ and the NYSE from 2016-2018.[74] As a result, Exxon's bid-ask spread supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

### I.     Additional Factor 3: Public Float

68.     The *Krogman* court also considered the public float of a company in weighing market efficiency.[75] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

69.     **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for Exxon Common Stock during the Class Period. As shown in the exhibit, Exxon insiders held

---

[72] Bloomberg daily reported "AVERAGE_BID_ASK_SPREAD_%" variable.

[73] MRK Study at p. 678 (Table 3).

[74] Bhole Study, at p. 105, 5th and 10th percentiles of bid-ask spread both defined as 0.02%.

[75] "In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." *Krogman*, 202 F.R.D. at 478.

0.2% of the Common Stock during the Class Period. Approximately 99% of Exxon's public float was held by institutions and other outside investors. Overall, over 4 billion shares of Common Stock were available for trading in the public float during the Class Period. This large degree of public float for Exxon's Common Stock supports the conclusion that it traded in an efficient market throughout the Class Period.

### J.    Additional Factor 4: Institutional Ownership

70.    Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

71.    I also report the total institutional ownership of Exxon Common Stock in **Exhibit 10,** which shows that at least 4,158 institutions held the stock at some point during the Class Period. By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[76] Exxon's institutional ownership base greatly exceeds both of these levels. Moreover, Exxon's institutional ownership as a percent of shares during the Class Period placed it between the 25th and 50th percentiles of NYSE and NASDAQ traded companies.[77] Thus, the significant institutional ownership base for Exxon Common Stock supports the conclusion that the Common Stock traded in an efficient market throughout the Class Period.

---

[76] MRK Study at p. 678 (Table 3).

[77] Bhole Study, at p. 106: 25th percentile defined as institutional ownership of 33.58% of shares outstanding; 50th percentile defined as 68.26%.

### K.    Additional Factor 5: Autocorrelation

72.    Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns, a potential phenomenon that has been widely studied in the academic literature.[78] The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters, and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly-available information about prior stock price movements would not be fully reflected in current stock prices.

73.    I use an established methodology, *i.e.*, a regression analysis, to test for autocorrelation in Exxon's Common Stock returns.[79] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading

---

[78] *See, e.g.*: Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6, at pp. 95-101.

[79] I evaluate abnormal returns, the calculation of which was described in the *Cammer* factor five analysis section of this report (IV.E).

day.[80] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

74.      **Exhibit 11** presents the results from the autocorrelation test for Exxon's Common Stock during the Class Period. Panel A reports that the autocorrelation coefficient over the full Class Period is statistically significant; however, the quarterly autocorrelation coefficients are not statistically significant at the 95% level in any quarter except one (2019 Q3). In order to evaluate the potential for arbitrage opportunities, Panel B reports the autocorrelation test results using Exxon's raw daily stock returns. In this panel, the autocorrelation coefficient over the full Class Period is not statistically significant. Thus, I find no evidence of persistent autocorrelation in Exxon's Common Stock returns. This finding supports the conclusion that Exxon's Common Stock traded in an efficient market throughout the Class Period.

## L.    Additional Factor 6: Options Trading

75.      Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[81] Thus, options trading on a company's stock can improve price discovery and

---

[80] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61, at pp. 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6, at pp. 98-99.

[81] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53 at p. 718. See also: Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90, at p. 75.

support a finding of market efficiency, relative to a company without any options trading. According to Bloomberg, Exxon Common Stock had over 23 million call option contracts and over 14 million put option contracts traded during the Class Period. The presence of options trading supports the conclusion that Exxon Common Stock traded in an efficient market throughout the Class Period.

### V. Ability to Calculate Damages on a Class-Wide Basis

76.     I have been asked by Counsel to evaluate whether per-share damages for purchasers of Exxon Common Stock can be assessed for all Class members under SEC Rule 10b-5(a) and (c) based upon a methodology common to all Class members and consistent with Lead Plaintiffs' theory of liability. The "out-of-pocket" method of calculating damages represents a standard and well-accepted methodology under §10(b) of the Exchange Act, and is equally applicable under SEC Rule 10b-5(a) and (c). This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[82] This limit on damages can also be applied class-wide. I understand that this out-of-pocket methodology has been widely accepted for use across §10(b) matters.

77.     The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities

---

[82] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, 2017 WL 6533665 at 737, 748-49 (Dec. 22, 1995).

A-69

transactions. Artificial inflation per share is quantified for each day of the Class Period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in §10(b) and SEC Rule 10b-5(a) and (c) matters such as this is well-established and formulaic across all Class members.

78.     The quantification of artificial inflation per share is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

79.     Event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions, misrepresentations, and/or schemes.[83] To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Exxon securities can be determined on a common, class-wide basis using various accepted methodologies.  The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process and will be based on the specific set of facts and circumstances in a given case.

80.     Separately, valuation models can also be relied upon to estimate artificial inflation. For example, the widely-used discounted cash flow analysis (DCF) valuation approach estimates changes to firm value based on changes in future expected cash flows. As Fama and French

---

[83] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

explain: "A stock's price can always be expressed as the present value of expected future cash flows discounted at the expected return on the stock."[84] Discounting the changes in future expected cash flows resulting from alleged misrepresentations, omissions, and/or schemes to the net present value (NPV) based on a firm's risk-adjusted discount rate can provide an alternative, reliable measure of artificial inflation as the input to the out-of-pocket damages methodology.[85]

81.    A loss causation analysis can also document how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also would incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have evolved throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual Class member identities or circumstances.

82.    The damages methodologies I have laid out above for SEC Rule 10b-5(a) and (c) claims are flexible and able to incorporate alternative findings regarding the quantification, as well

---

[84] Eugene F. Fama and Kenneth R. French, 2004, The Capital Asset Pricing Model: Theory and Evidence, *Journal of Economic Perspectives* 18, at p. 41.

[85] *See, e.g.*, Frank Partnoy, 2022, Market Prices vs. Fundamental Value: The Case for Using Discounted Cash Flow Analysis in Securities Class Actions, *Business Lawyer* 77, at pp. 1060-1063.

A-71

as the timing, of artificial inflation and how it evolves over the Class Period.  The methodologies I have described above to calculate damages can be modified based on alternative findings the finder of fact may determine, including, but not limited to: (1) any confounding information versus corrective information; and (2) methods for back-casting inflation over the Class Period.

83.    First, irrespective of what the ultimate finder of fact, *i.e.*, the jury, determines is the appropriate percentage of abnormal return that can be attributed to the release of corrective versus confounding information, this percentage can easily be inserted into the standard damages model that I have already described – the out-of-pocket formula. Regardless of how the jury weighs evidence, whether it finds that any such disaggregation analysis I may conduct is the most appropriate, or determines that based upon the evidence, a different amount is more appropriate, this finding can simply be incorporated into the damages calculation. Second, should the jury determine that the true economic inflation evolved over the Class Period, my out-of-pocket damages model can still account for such a scenario and can mechanically calculate damages on a class-wide basis. Third, should the jury decide that the first actionable misstatement and/or omission relating to the scheme liability allegations happened at a date later than March 5, 2019, prior to such date, inflation could simply be set to zero.  If the jury determines that a change to inflation would be necessary over the Class Period, any such change can easily be incorporated into the model.

84.    To summarize, I have not been asked to calculate damages in this matter. Such analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that Common Stock damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## VI.    Conclusion

85.    In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that Exxon's Common Stock traded in an efficient market throughout the Class Period. Moreover, it is my opinion that Common Stock damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

86.    I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Respectfully Submitted,

_____

Matthew D. Cain

**A-73**

**Appendix A**                                                           A-74

## Matthew D. Cain, Ph.D.                                    January 2024

E-mail: mdcain@outlook.com                                      Homepage
Mobile: 574-485-8065                                                 SSRN

### Education

Ph.D., Finance, August 2007              Purdue University, West Lafayette, IN
B.S., Finance, May 2001                  Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A (with Adam B. Badawi and Steven Davidoff Solomon), *Journal of Law and Economics*, forthcoming.

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics* 144, 492-522 (2022).

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92-128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

### Presentations

- All Indiana Conference
- American Bar Association, Business Law, Private Equity M&A Subcommittee meeting
- American Finance Association, annual meetings
- American Law and Economics Association, Stanford Law School
- American Law and Economics Association, University of Chicago
- Argentum Centre for Private Equity Symposium, Bergen, Norway
- Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden

**A-75**

A-76

- Arizona State University College of Law
- Berkeley Center for Law and Business
- The Brattle Group
- Conference on Empirical Legal Studies, Yale Law School
- Cornell University, finance class guest lectures
- Cornerstone Research
- Financial Management Association, annual meeting
- George Washington University Law School
- Indiana University
- Institute for Law and Economics, University of Pennsylvania
- Ohio State
- Ohio University
- Oxera, London
- Penn State
- Purdue Alumni Conference
- Purdue University
- U.C. Berkeley M&A Roundtable, New York
- U.C. Berkeley School of Law
- U.S. Securities and Exchange Commission
- University of Arizona
- University of Colorado
- University of Florida
- University of Georgia
- University of Kentucky
- University of North Carolina at Chapel Hill
- University of Notre Dame
- University of Oregon
- University of Pittsburgh
- Vanderbilt University Law School
- Virginia Commonwealth University
- Virginia Tech
- Western Finance Association, annual meeting

**Journal Referee**:  *Review of Financial Studies, Journal of Financial and Quantitative Analysis, Journal of Corporate Finance, Journal of Banking and Finance, European Financial Management, Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics, Annals of Finance, Journal of Economics and Business*

40

**Teaching Experience**

UC Berkeley School of Law

　　LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022-2023

　　LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2023


University of Notre Dame, Mendoza College of Business

　　FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013

　　FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013


Purdue University, Krannert School of Management

　　MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008

　　MGMT 610: Financial Management I (MBA Core), Fall: 2007


**Expert Witness Experience**

- *In re Vaxart, Inc. Securities Litigation*, Case No. 3:20-cv-05949-VC (N.D. Ca.). Report November 2023.

- *William C. Theodore, et al. v. PureCycle Technologies, Inc., et al.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.). Report November 2023.

- *Robert Lematta et al. v. Casper Sleep, Inc., et al.*, Case No. 1:20-cv-02744 (E.D. N.Y.). Report November 2023.

- *In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL (S.D. N.Y.). Report October 2023.

- *Jonnie Homyk, et al. v. ChemoCentryx, Inc. and Thomas J. Schall*, Case No. 4:21-cv-03343 (N.D. Ca.). Report August 2023. Deposition October 2023.

- *In re Vale S.A. Securities Litigation*, Case No. 19-cv-526-RJD-SJB (E.D. N.Y.). Rebuttal Report April 2023. Deposition September 2023.

- *In re Romeo Power Inc. Securities Litigation*, Case No. 1:21-cv-03362-LGS (S.D. N.Y.). Report March 2023. Deposition April 2023.

- *Luis Torres, et al. v. Berry Corporation, et al.*, Case No. 3:20-cv-3464-S (N.D. Tx.). Report February 2023. Rebuttal Report May 2023.

- *In re Lyft, Inc. Securities Litigation*, Case No. 4:19-cv-02690-HSG (N.D. Ca.). Report February 2023.

- *Thomas S. Swanson, et al. v. Interface, Inc., et al.*, Case No. 1:20-cv-05518-BMC (E.D. N.Y.). Report January 2023.

- *Seafarers Pension Plan, derivatively on behalf of The Boeing Company v. Robert A. Bradway, et al. and The Boeing Company*, Case No. 1:19-cv-08095 (N.D. Ill.). Declaration November 2022.

**A-77**

- *In re: CBL & Associates Properties, Inc. Securities Litigation*, Case No. 1:19-cv-00181-JRG-CHS (E.D. Tenn.). Report August 2022. Deposition October 2022. Rebuttal Report December 2022.

- *Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, Case No. 2:21-cv-03382-HB (E.D. Pa.). Report July 2022. Deposition February 2023. Rebuttal Report May 2023.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.). Report July 2022. Deposition September 2022. Rebuttal Report November 2022.

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.). Report July 2022. Deposition August 2022.

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-21-0002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021. Report April 2023. Rebuttal Report June 2023. Deposition July 2023.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D. N.Y). Report November 2021. Deposition December 2021. Declaration February 2022.

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021. Trial July-August 2022.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv-01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv-01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. N.Y.). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. N.Y.). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

42

**A-78**

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv-00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

43

**A-79**

**Appendix B**

# Documents Considered

**Court Documents:**

- Second Amended Class Action Complaint for Violations of the Federal Securities Laws, No. 3:21-cv-00194-N (ECF No. 92).

- Memorandum Opinion and Order dated August 24, 2023, No. 3:21-cv-00194-N (ECF No. 112).

**Court Decisions and Securities Law:**

- *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

- Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *Bond v. Clover Health Investments, Corp., et al.*, Case No. 3:21-cv-00096 (M.D. Tenn.).

- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).

- *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST (N.D. Ca. 2016).

- *In re Countrywide Financial Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Ca. 2009).

- *In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281* (N.D. Ala. 2009*).*

- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

- *In re: QuantumScape Securities Class Action Litigation*, Case No. 3:21-cv-00058-WHO (N.D. Ca.).

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.).

- *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Ca. 2 012)*.*

**Academic Literature:**

- Carol Anilowski, Mei Feng, Douglas J. Skinner, 2007, Does earnings guidance affect market returns? The nature and information content of aggregate earnings guidance, *Journal of Accounting and Economics* 44.

- Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, *Journal of Finance* 61.

- Stephen P. Baginski, 1987, Intraindustry Information Transfers Associated with Management Forecasts of Earnings, Journal of Accounting Research 25.

- Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, *Journal of Corporate Law* 19.

- Bharat Bhole, Sunita Surana, and Frank Torchio, 2020, Benchmarking Market Efficiency Indicators for Securities Litigation, *University of Illinois Law Review Online*.

- Sam Bonsall, Zahn Bozanic, and Paul Fischer, 2013, What Do Management Earnings Forecasts Convey About the Macroeconomy?, *Journal of Accounting Research* 51.

- Jacob Boudoukh, Ronen Feldman, Shimon Kogan, and Matthew Richardson, 2019, Information, Trading, and Volatility: Evidence from Firm-Specific News, *The Review of Financial Studies* 32.

- Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, *Journal of Finance* 50.

- Ray Fair, 2002, Events That Shook the Market, *Journal of Business* 75.

- Eugene F. Fama, 1970, Efficient Capital Markets: A Review of Theory and Empirical Work, *Journal of Finance* 25.

- Eugene F. Fama, 1991, Efficient Capital Markets: II. *Journal of Finance* 46.

- Eugene F. Fama and Kenneth R. French, 2004, The Capital Asset Pricing Model: Theory and Evidence, *Journal of Economic Perspectives* 18.

- Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, 2004, The Less Than Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-on-the-Market Cases, *St. John's Law Rev.* 78.

- Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies. *Review of Financial Studies* 33.

- Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, *Journal of Financial Economics* 6.

- Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, *Journal of Finance* 53.

- Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, *Journal of Financial Economics* 124.

- A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 13.

- Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49.

- Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, *Accounting Review* 88.

- Frank Partnoy, 2022, Using Discounted Cash Flow Analysis in Securities Class Actions, *Business Lawyer* 77.

- Stephen A. Ross, 1976, Options and Efficiency, *Quarterly Journal of Economics* 90.

**A-81**

- Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, *Law and Contemporary Problems* 63.

- O. Miguel Villanueva and Steven Feinstein, 2021, Stock Price Reactivity to Earnings Announcements: The Role of the Cammer/Krogman Factors, *Review of Quantitative Finance and Accounting* 57.

**Data Sources:**

- Bloomberg Terminal

- CRSP

- Exxon Press Releases and SEC Filings

- Factiva News

- S&P Capital IQ

- SEC Edgar Online

**Other:**

- https://www.ahdictionary.com/word/search.html?q=bellwether

- https://www.bls.gov/data/inflation_calculator.htm

- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers

- http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess

- https://www.nyse.com/market-model

- https://www.sec.gov/Archives/edgar/data/34088/000119312520068776/0001193125-20-068776-index.html

- https://www.sec.gov/files/forms-3.pdf

- Ken Shreve, Jan. 31, 2020, Dow Jones Craters 400 Points As Exxon Mobil, Chevron Earnings Weigh; Amazon Breaks Out, *Investor's Business Daily*

- All data and documents cited throughout this report

**Exhibits**

**A-83**

**Exhibit 1**



**Exxon Common Stock Closing Stock Price and Daily Volume**
**March 5, 2019 – January 15, 2021**

Data source: Bloomberg.

**A-84**

**Exhibit 2**

### Exxon Weekly Trading Volume
### March 5, 2019 – January 15, 2021



Class Period: March 5, 2019 - January 15, 2021

Average Weekly Volume: 2.5%

■ Weekly Volume as % of Shares Outstanding

Data source: Bloomberg. Note: Average weekly trading volume is calculated by analyzing each group of five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period.

49

**A-85**

**Exhibit 3**

| Analyst Coverage, Class Period (March 5, 2019 - January 15, 2021) | | | | |
|---|---|---|---|---|
| **N Contributor** | **Count** | | **N Contributor** | **Count** |
| 1 Credit Suisse | 143 | | 26 Validea | 7 |
| 2 RBC Capital Markets | 60 | | 27 ValuEngine, Inc | 7 |
| 3 Stock Traders Daily Research | 52 | | 28 CGS-CIMB Research | 6 |
| 4 JPMorgan | 50 | | 29 JPMorgan Econ & FI | 6 |
| 5 TD Cowen | 42 | | 30 The Business Research Company | 6 |
| 6 Wolfe Research | 41 | | 31 Wright Reports | 6 |
| 7 Trefis | 37 | | 32 BNP Paribas Exane | 5 |
| 8 Wells Fargo Securities | 34 | | 33 BMO Capital Markets | 4 |
| 9 Scotiabank GBM | 33 | | 34 CLSA | 3 |
| 10 Zacks Equity Research | 32 | | 35 Roth MKM | 3 |
| 11 EVERCORE ISI | 29 | | 36 Societe Generale | 3 |
| 12 CapitalCube | 23 | | 37 Stephens Inc. | 3 |
| 13 Truist Securities | 20 | | 38 Susquehanna Financial Group | 3 |
| 14 Marktfeld | 18 | | 39 HSBC | 2 |
| 15 BuySellSignals Research | 17 | | 40 Aegis Capital | 1 |
| 16 SEENSCO | 17 | | 41 Baptista Research | 1 |
| 17 Macquarie Research | 16 | | 42 Boston Energy Research | 1 |
| 18 PriceTarget Research | 16 | | 43 Carbon Tracker | 1 |
| 19 Piper Sandler Companies | 14 | | 44 Eugene Investment & Securities | 1 |
| 20 Acquisdata | 10 | | 45 Fundamental Research Corp | 1 |
| 21 Berenberg | 10 | | 46 H.C. Wainwright & Co., LLC | 1 |
| 22 Corporate Watchdog Reports | 9 | | 47 NH Investment & Securities | 1 |
| 23 Sadif Analytics Prime | 9 | | 48 ReachX Limited | 1 |
| 24 Argus Research Corporation | 8 | | 49 Streetwise Reports | 1 |
| 25 GlobalData | 7 | | 50 VRS (Valuation & Research Specialists) | 1 |
| | | | **Total Reports Issued** | **822** |

Source: Investext.

**Exhibit 4**



**Coefficients from Rolling Event Study Regressions**
**March 5, 2019 – January 15, 2021**

Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

51

**A-87**

**Exhibit 5**

**Root Mean Squared Error (RMSE) from Rolling Event Study Regressions**
**March 5, 2019 – January 15, 2021**



Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

**A-88**

**Exhibit 6**

**Exxon News Days and Common Stock Abnormal Returns**

| | Market Impact Date | Raw Return | Abnormal Return | Abnormal Return ($/share) | t-Statistic | p-Value | News Day Description |
|---|---|---|---|---|---|---|---|
| [1] | 4/26/2019 | -2.1% | -1.9% | -$1.24 | -2.52 | (0.013) | 1Q 2019 Earnings Release |
| [2] | 8/2/2019 | -1.0% | -0.4% | -$0.26 | -0.67 | (0.507) | 2Q 2019 Earnings Release |
| [3] | 11/1/2019 | 3.0% | 1.5% | $0.81 | 2.36 | (0.020) | 3Q 2019 Earnings Release |
| [4] | 1/31/2020 | -4.1% | -2.2% | -$1.14 | -2.91 | (0.004) | 4Q 2019 Earnings Release |
| [5] | 5/1/2020 | -7.2% | -2.8% | -$1.06 | -1.81 | (0.072) | 1Q 2020 Earnings Release |
| [6] | 7/31/2020 | 0.5% | 0.9% | $0.31 | 0.52 | (0.601) | 2Q 2020 Earnings Release |
| [7] | 10/30/2020 | -1.1% | -0.6% | -$0.17 | -0.50 | (0.622) | 3Q 2020 Earnings Release |

Data sources: Bloomberg, SEC filings, Factiva, Complaint. Note: Regression models described in notes below Exhibit 7.

53

**A-89**

**Exhibit 7**

**Comparison of Statistical Significance on Exxon Common Stock**
**for News Days vs. No News Days During the Class Period**

| Statistic | News Days | No News Days | p-Value of Difference |
|---|---|---|---|
| N | 7 | 117 | |
| Significant Days at 95% Confidence Level | 3 | 7 | |
| % Significant Days at 95% Confidence Level | 42.9% | 6.0% | 0.011 |
| Average Absolute Abnormal Return | 1.4% | 0.9% | 0.177 |
| Average Volume (Millions) | 29.0 | 20.2 | 0.088 |

Data sources: Bloomberg, SEC filings, Factiva. Notes: The event study estimations are based on rolling regressions of the 120 trading days preceding each date of analysis. The regression models control for the S&P 500 Equal Weight Total Return ("Market Index") and the S&P Oil & Gas Exploration & Production Select Industry Total Return Index ("Industry Index"). Exxon's returns are removed from the Industry Index returns. The estimations exclude the alleged Corrective Disclosures, all News Days identified in Exhibit 6, and the following additional news and corresponding market impact dates which caused increases in the regressions' Root Mean Squared Errors: March 9, 2020 ("Coronavirus, Russia Send Oil Stocks Plunging…", *Investor's Business Daily*), March 17, 2020 ("Exxon to Cut Spending 'Significantly' After S&P Move", *Bloomberg*), April 1, 2020 ("Trump Set to Meet With Oil Executives Reeling From Price Drop", *Bloomberg*), April 2, 2020 (Oil Soars as Trump Flags Saudi-Russia Production Deal", *New York Times*), April 17, 2020 ("Stocks Extend Weekly Rally on U.S. Reopening Plan", *Crain's*), April 20, 2020 ("Dow Futures, Energy Stocks Are Falling as Oil Takes a Dive", *Barrons*), October 29, 2020 ("Exxon to Cut 14,000 From Global Workforce Due to Oil Slump", *Bloomberg*), November 9, 2020 ("Exxon Mobil Leads Energy Shares Higher on Pfizer Vaccine Boost: Oil Price Surge", *TheStreet.com*), and November 24, 2020 ("Exxon, Chevron Shares Surge as Oil Tops $45", *Dow Jones Institutional News*).

**A-90**

**Exhibit 8**



**Exxon Common Stock Market Capitalization**
**March 5, 2019 – January 15, 2021**

Data source: Bloomberg.

A-91

**Exhibit 9**



**Exxon Common Stock Average Bid-Ask Spread**
**March 5, 2019 – January 15, 2021**

Data source: Bloomberg.

**A-92**

**Exhibit 10**

### Exxon Common Stock Public Float, Insider Holdings, and Institutional Ownership

| Quarter End | Shares Outstanding (mm) | Institutions (#) | Insider Holdings (mm) | Short Interest (mm) | Public Float (mm) | Insider Holdings % of Shares Outstanding | Inst. Holdings (mm) | Inst. Holdings % of Shares Outstanding | Inst. Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] − [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2019 | 4,235 | 3,058 | 6.18 | 39.52 | 4,268 | 0.1% | 2,383 | 56.3% | 55.8% |
| 6/30/2019 | 4,231 | 3,024 | 6.80 | 33.10 | 4,257 | 0.2% | 2,376 | 56.2% | 55.8% |
| 9/30/2019 | 4,231 | 2,988 | 6.01 | 41.42 | 4,267 | 0.1% | 2,364 | 55.9% | 55.4% |
| 12/31/2019 | 4,231 | 3,179 | 7.89 | 38.81 | 4,262 | 0.2% | 2,379 | 56.2% | 55.8% |
| 3/31/2020 | 4,232 | 2,899 | 6.48 | 65.87 | 4,292 | 0.2% | 2,273 | 53.7% | 53.0% |
| 6/30/2020 | 4,228 | 2,905 | 5.82 | 53.07 | 4,275 | 0.1% | 2,221 | 52.5% | 52.0% |
| 9/30/2020 | 4,228 | 2,713 | 5.93 | 44.81 | 4,267 | 0.1% | 2,189 | 51.8% | 51.3% |
| 12/31/2020 | 4,228 | 2,907 | 8.27 | 44.06 | 4,264 | 0.2% | 2,208 | 52.2% | 51.8% |
| 3/31/2020 | 4,232 | 3,052 | 5.23 | 65.87 | 4,293 | 0.1% | 2,243 | 53.0% | 52.3% |
| **Total Unique Institutions:** | | 4,158 | | **Averages Over Class Period:** | | 0.2% | | 54.2% | 53.7% |

Data sources: Bloomberg, S&P Capital IQ, SEC filings.

57

**A-93**

**Exhibit 11**

## Test for Autocorrelation During the Class Period

| | Panel A: Abnormal Returns | | |
|---|---|---|---|
| | Coefficient | T-Statistic | P-Value |
| 2019 Q1 | -0.16 | -1.36 | 0.191 |
| 2019 Q2 | -0.24 | -1.86 | 0.068 |
| 2019 Q3 | -0.34 | -2.21 | 0.031 |
| 2019 Q4 | -0.02 | -0.11 | 0.915 |
| 2020 Q1 | -0.12 | -0.80 | 0.427 |
| 2020 Q2 | -0.19 | -1.22 | 0.229 |
| 2020 Q3 | -0.18 | -1.63 | 0.109 |
| 2020 Q4 | -0.08 | -0.73 | 0.469 |
| 2021 Q1 | -0.49 | -1.03 | 0.331 |
| Class Period | -0.14 | -2.03 | 0.043 |

**A-94**

**Panel B: Common Stock Raw Returns**

|  | Coefficient | T-Statistic | P-Value |
|---|---|---|---|
| 2019 Q1 | -0.45 | -1.94 | 0.070 |
| 2019 Q2 | -0.05 | -0.40 | 0.688 |
| 2019 Q3 | -0.02 | -0.19 | 0.851 |
| 2019 Q4 | 0.04 | 0.22 | 0.828 |
| 2020 Q1 | -0.20 | -1.13 | 0.262 |
| 2020 Q2 | -0.13 | -1.10 | 0.278 |
| 2020 Q3 | -0.15 | -1.39 | 0.168 |
| 2020 Q4 | -0.02 | -0.13 | 0.897 |
| 2021 Q1 | -0.52 | -0.82 | 0.437 |
| Class Period | -0.09 | -1.32 | 0.189 |

Data sources: Bloomberg, SEC filings, Factiva. The first and last quarters include only trading days that fall within the Class Period.

A-95