# EXHIBIT B

2024 WL 1307103
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern Division.

In re: Washington Prime Group, Inc. Securities Litigation

Case No. 2:21-cv-2757
|
03/27/2024

JAMES L. GRAHAM, United States District Judge

Opinion and Order

**\*1** Plaintiffs bring this securities fraud class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C §§ 78j(b) and 78t(a). Plaintiffs purchased publicly-traded securities of Washington Prime Group, Inc. (WPG), which owned and operated shopping malls across the United States. WPG filed for bankruptcy in June 2021.

Being a mall owner in the 2010s was a challenge, as online sales grew and a new generation of consumers had relatively little interest in spending time in traditional malls. *See* Compl. (Doc. 47), ¶¶ 4–6, 51–55. Those trends prompted WPG in 2016 and 2017 to formulate a business plan under which it would engage in efforts to redevelop its mall properties. *Id*., ¶¶ 7, 69–70. Plaintiffs allege that WPG made false statements about the yields or returns which WPG stood to gain from its redevelopment efforts. WPG often cited 9-10% as the yield it obtained or expected to obtain, but plaintiffs contend that "the true yields for WPG's projects were only half what WPG reported, or 4-5%." *Id*., ¶ 120. Plaintiffs also allege that defendants made false statements about securing relief on WPG's debt covenants as it sought to navigate the liquidity crunch it faced in the wake of the COVID-19 pandemic.

This matter is before the Court on defendants' motion to dismiss. The motion raises a number of legal issues, including loss causation, protection under the safe harbor rule, and whether certain statements were no more than vague expressions of corporate optimism. For the reasons that follow, the Court grants the motion to dismiss.

## I. Factual Background
The following recitation of facts and allegations is derived from the Consolidated Class Action Complaint (the

"Complaint") and certain exhibits submitted by the parties. The exhibits consist of WPG's public filings with the United States Securities and Exchange Commission and filings made in WPG's bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas. The parties do not dispute the authenticity of the exhibits, and the Court may take judicial notice of the fact that the filings were made and what statements were made in them.[1] *See In re Omnicare, Inc. Sec. Litig*., 769 F.3d 455, 467 (6th Cir. 2014) (holding that a court may take judicial notice of the existence of SEC filings but "could not consider the statements contained in [SEC filings] for the truth of the matter asserted" at the motion to dismiss stage); *Lovelace v. Software Spectrum Inc*., 78 F.3d 1015, 1018 (5th Cir. 1996) (holding that a court may take judicial notice of SEC filings, though "[s]uch documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents").

### A. The Parties
**\*2** Defendant WPG spun off from the Simon Property Group in May 2014 as a self-managed real estate investment trust (REIT) which owned real estate. Its holdings consisted of a portfolio of about 90 to 100 enclosed and open-air malls. Common stock of WPG traded on the New York Stock Exchange. WPG also issued preferred shares.

WPG was incorporated in Indiana and had its principal place of business in Columbus, Ohio. Defendant Louis Conforti was the Chief Executive Officer of WPG. Defendant Mark Yale was Chief Financial Officer, and defendant Melissa Indest served as Executive Vice President.

The plaintiff class is defined as all non-insider and non-control persons who: (1) purchased WPG common stock, Series H preferred shares, and Series I preferred shares, or purchased call options or sold put options, from February 22, 2018 through March 3, 2021; and (2) held such securities through at least one of the alleged corrective disclosures on November 6, 2020, February 15, 2021 and March 4, 2021. Compl, ¶¶ 1, 244, 252, 254. The Court will discuss the corrective disclosures in more detail below.

### B. REITs and Financial Metrics
The Complaint contains allegations about the nature of REITs and the metrics which investors find relevant. REITs "are tax-advantaged companies that own or finance income-producing

real estate. To maintain their tax advantage, REITs must distribute 90% of their income as dividends." *Id*., ¶ 40.

Because "REITs are income investments," "when evaluating REIT investments, investors focus on metrics that show how much cash the operator is regularly generating from its operations and whether these cash flows are safe." *Id*., ¶ 41.

"Funds From Operations, or FFO, is a key metric for REIT investors. FFO is based on net income but eliminates certain accounting changes that are not applicable to REITs." *Id*., ¶ 42. "Calculating FFO begins with net income" and then, among other adjustments, "accounting gains or losses from property sales" are removed, because such sales are nonrecurring, and any interest income is removed, because "REITs are not in the business of lending." *Id*.

"Net operating income, or NOI, measures all income from properties minus all reasonably necessary operating costs. NOI excludes principal and interest payments on loans, capital expenditures, depreciation, amortization, and taxes." *Id*., ¶ 43.

"Return on invested capital, or ROIC, measures the profitability of the REIT's investment. It is measured as net annual income minus dividends divided by total debt plus equity. It can be measured for individual projects, groups of projects, or for whole companies....ROIC is similar to Return on Investment, or ROI." *Id*., ¶ 44.

Particularly important to this case is the term "yield." "To measure success, Defendants focused investors' attention on a metric called yield." *Id.*, ¶ 10. "While yield can be measured in different ways, Defendants emphasized on earnings call[s] that by yield, they meant ROIC (or equivalently ROI)." *Id.*, ¶ 93. Yield thus referred to annual income generated by a redevelopment project divided by the costs of the project. *Id*., ¶¶ 10, 93.

### C. WPG's Plans for Mall Redevelopment
Defendant Conforti began stating in late 2016 and early 2017 that redevelopment would be the key to WPG's success. *Id*., ¶¶ 70–72. WPG would need to get out of the passive "rent-collecting" business if it wanted to survive the "retail apocalypse," whereby online sales were claiming a growing percentage of overall retail sales and younger consumers were spurning traditional malls. *Id*., ¶¶ 51–55, 70–73.

 **\*3** In a struggling sector, WPG sought to distinguish its malls with the following plan: (1) acquire[ ] malls in smaller cities that are the only mall in town; and (2) redevelop[ ] the malls to replace struggling older stores like Sears and Macy's or youth fashion stores like Forever 21 with vibrant shops including brew pubs, athletic facilities, and higher-end sit-down restaurants. Guests would visit WPG malls not just to shop but also to engage in activities. By substituting these main street type businesses, Defendants claimed, WPG's malls would serve as what it called "dominant town centers" with "curated" offerings.

*Id*., ¶ 7.

Conforti characterized the plan as WPG's "thesis." *Id*., ¶ 58 (quoting a Sept. 15, 2020 public statement made by Conforti). WPG would redevelop malls in strong secondary markets to include "more vibrant community spaces like brew pubs, gyms, or dog runs, as well as higher-end food options than traditional mall food courts. The mall common areas might also host concerts or similar activities." *Id*., ¶ 59. WPG wanted its malls, which it preferred to call "retail venues," to provide "curated" experiences based on local preferences. *Id*., ¶¶ 61–67.

In a first quarter earnings call in 2017, Conforti stated, "Redevelopment is crucial...as we promote our hybrid asset model of combining Enclosed and Open Air [strip mall] formats into vibrant town centers." *Id*., ¶ 71. He stated that WPG had 45 redevelopment projects it was undergoing, with "projected average ROIs" of 9.5%. *Id.*

### D. The Allegedly Inflated Yield Numbers

### 1. The Investment Committee
WPG had an Investment Committee which met on a near monthly basis. The individual defendants were among the individuals who sat on the Committee, which reviewed

"all significant redevelopment projects proposed by WPG management employees." *Id.*, ¶ 101. Generally this meant reviewing all projects costing more than $1 million. *Id.*

The Committee required that extensive information for each proposed redevelopment project be presented in approval request memoranda and in deal sheets. *Id.*, ¶¶ 102, 105. The deal sheets contained detailed information about the various costs and projected returns of a project. *Id.*, ¶ 105.

For projects the Committee approved, the members signed approval forms and meeting minutes, which included "a summary of the principal economic terms of the approved transactions, including project costs and yields." *Id.*, ¶ 103.

Plaintiffs allege that defendants Indest and Yale, among others, had a practice of meeting after the Investment Committee meetings "to make 'manual adjustments' to project costs and yields as approved by the Investment Committee to make them look more profitable." *Id.*, ¶ 110. The adjustments included overstating the revenues to be generated by a project and understating the costs. *Id.*, ¶ 114. The alleged goal of the adjustments was to make the yield "as close to 10% as possible." *Id.*, ¶ 112.

### 2. Overstating Income

Plaintiffs allege that defendants used several methods to overstate income. One concerned "co-tenancy cures" for non-anchor stores. Under a typical co-tenancy provision in a lease, a non-anchor store's rent is reduced if an anchor space becomes empty or is leased to a competitor of the lessee. *Id.*, ¶ 125. Because many of WPG's properties lost anchors tenants (the bankruptcy of Sears being a major factor, *id.*, ¶ 84), WPG's redevelopment strategy often included bringing in a new anchor. When calculating the income expected from redevelopment, WPG included the "curing" effect that it would have on bringing non-anchor leases back to full rent. *Id.*, ¶ 128. Plaintiffs do not contest the legitimacy of including that effect in the calculation; however, they allege that defendants made a practice of double-counting the co-tenancy cure. For example, if bringing in an anchor tenant cured the monthly rent for a non-anchor and thereby raised the lowered rate of $600 back to a full rate of $1,000, then the curing effect would be $400. Plaintiffs allege that defendants would improperly double the $400 amount when calculating anticipated income. *Id.*, ¶ 129. According to plaintiffs, this practice of double-counting co-tenancy cures had the effect of overstating expected annual revenues by a total of $5 to $10 million over the course of any two-year period. *Id.*, ¶ 135.

**\*4** A second way WPG allegedly overstated income was by including speculative leases. Plaintiffs allege that WPG would include rent from anticipated or potential tenants in a redeveloped mall, even though the parties were only in preliminary talks and had not yet signed letters of intent. *Id.*, ¶ 140. In addition, when WPG found new anchor tenants, it would factor in the expected bump in non-anchor tenants which the anchor would draw. WPG included anticipated rents even though negotiations had not begun with potential non-anchor tenants. *Id.*, ¶¶ 142, 150–51. This practice of including speculative leases had the effect of overstating expected annual revenues by a total of about $10 million over the course of any two-year period. *Id.*, ¶ 162.

WPG also allegedly overstated income by not taking a vacancy discount for non-credit tenants (defined as those business which lack an investment-grade rating by a major credit-rating agency). Such tenants are generally on less-secure financial footing and carry a greater risk of creating a vacancy. Industry standards call for a "vacancy provision," which reduces expected rent income from non-credit tenants by 1-5%. *Id.*, ¶ 167. Plaintiffs allege that WPG failed to take a vacancy provision for non-credit tenants, which caused WPG to overstate expected annual revenues by a total of $4 to $5 million over the course of any two-year period. *Id.*, ¶ 162.

Finally, for one redevelopment project – the Town Center at Aurora in Denver, Colorado – WPG allegedly included a speculative form of rent known as "percentage rent." *Id.*, ¶ 174. Percentage rent refers to a lease provision under which the tenant must pay a percentage of its sales as rent if sales exceed a certain threshold. Because such provisions apply only if a store is popular, plaintiffs contend that considering percentage rate involves speculation. Plaintiffs allege that WPG used percentage rent to inflate expected income from the Aurora project by over $450,000. *Id.*

### 3. Understating Costs

Plaintiffs allege that defendants understated costs by not counting certain expenditures to modernize existing tenant spaces. When WPG brought in a new anchor tenant, the anchor tenant typically demanded that WPG modernize the space. *Id.*, ¶ 175. Existing tenants in turn would sometimes demand modernization of their part of the mall, so that it would not be viewed as "second class." *Id.*, ¶ 176. Plaintiffs allege that WPG should have, but did not, include the costs of modernizing other parts of a mall in calculating yield because those costs were driven by the anchor redevelopment. In one

instance, those costs approached $3 million and would have significantly decreased yield had they been included. *Id.*, ¶ 178 (Southern Park Mall in Youngstown, Ohio).

Plaintiffs next allege that with respect to two malls, defendants did not include as costs the amounts WPG spent to purchase properties from two companies which had owned their stores outright. *Id.*, ¶¶ 179–84 (Aurora and Polaris Fashion Place in Columbus, Ohio). Plaintiffs allege that purchasing the properties was part of the redevelopment plans and WPG's failure to include the purchase prices meant that costs were understated by over $5 million for each mall. *Id.*, ¶ 179.

A third way in which WPG allegedly understated costs was by counting profits from what plaintiffs call unrelated land sales. Plaintiffs point again to Aurora as an example. WPG sold parcels that were not designated for mall development and made a $1.5 million profit. It reduced the estimated costs of redevelopment by $1.5 million. Plaintiffs allege that the land sale was unrelated to the redevelopment plans and should not have been considered in the cost estimate. *Id.*, ¶¶ 187–90.

Finally, plaintiffs allege that WPG improperly classified a tax abatement for Southern Park Mall. From an accounting standpoint, a tax abatement can be subtracted from the costs of a project. But the abatement should be discounted to reflect that "the funds could be productively invested elsewhere during the intervening time." *Id.*, ¶ 194. Plaintiffs allege that WPG failed to discount the value of the abatement, which resulted in WPG understating the estimated costs for Southern Park by $1.3 million. *Id.*, ¶ 199.

### E. The Alleged False Statements Regarding Yield

**\*5**  The Complaint identifies eleven statements which were allegedly false. Seven of the statements were made by Conforti or Yale during public earnings calls or presentations, and the statements related to overall yield for WPG's development efforts and to how WPG calculated, at least in part, the yield numbers. The remaining four statements appeared in SEC filings and contained yield estimates for specific redevelopment projects.

### 1. Overall Yield Statements

The first alleged false statement was made by Conforti on February 22, 2018 (the beginning of the class period). It came during an earnings call [2] covering the fourth quarter of 2017. Conforti stated that WPG had "current redevelopment

of 37 projects ranging between $1 million and $60 million with an estimated return on invested capital of 10%." *Id.*, ¶ 255. Plaintiffs allege that the statement was false because WPG's internal numbers showed a "significantly lower" yield estimate, which they had subjected to manual adjustments in order to arrive at 10%. *Id.*, ¶ 256.

In response to a question posed to him at a March 7, 2018 conference, Conforti stated that "we get a 9.5%" in direct return. *Id.*, ¶ 257. He said that "we don't include adjacent space when we factor in...for redevelopment." *Id.* Plaintiffs allege that the yield number was inflated and that WPG did factor in the effect which redevelopment would have on improving rent on adjacent spaces.

In an April 26, 2018 earnings call, Conforti said WPG had 34 current projects with an "estimated return" of 10%, "not including the benefit to adjacent unproductive space." *Id.*, ¶ 259. Again, plaintiffs allege that the yield number was inflated and that WPG had engaged in speculation by factoring in the effect which redevelopment would have on improving rent for adjacent spaces.

At an REIT conference on June 5, 2018, Conforti responded to a question about leases by stating that "we're actually seeing quantified at about 9.5% return." *Id.*, ¶ 261. He added that WPG does not "play around with the fluffiness of, okay, an unproductive space . . . . "It's numerator/denominator.... [W]e're not in the speculative redevelopment business." *Id.* Plaintiffs allege that the yield number was false and that the other statements were misleading because WPG speculated by including the effects of redevelopment on unproductive spaces when they calculated yield estimates.

In an earnings call for the third quarter of 2018, Conforti stated that WPG is "extraordinarily rigorous pursuant to our investment methodology....There is no taking indirect adjacencies." *Id.*, ¶ 263. Plaintiffs allege that the statement was misleading because WPG was not rigorous in calculating yield, but manipulated income and costs to make the yield as close to 10% as possible. The alleged manipulation included factoring in speculative effects on adjacent spaces.

In a February 21, 2019 earnings call, Conforti stated that if WPG were to get less than 9% return on a project, "we would not develop." *Id.*, ¶ 265. Yale stated that the yield number factors in "rents, maybe some cotenancy cure." *Id.* Plaintiffs allege that WPG was engaging in redevelopment despite knowing that yield estimates were below 9%. They further

allege that Yale's statement was misleading because WPG included speculative rents and double-counted cotenancy effects.

**\*6** Finally, at an REIT investor conference on June 4, 2019, Conforti stated that "there is a direct return on invested capital of 8%, 9%, maybe 9.5%." *Id*., ¶ 267. Yale stated that redevelopment was not based on speculation but was "driven by signed leases." *Id*. Plaintiffs allege that the yield numbers were inflated and were in fact based on speculation, including speculative leases and "percentage rent."

### 2. Individual Projects

The next group of allegedly false statements appeared in Supplemental Information Reports which accompanied Form 8-Ks filed by WPG with the SEC. The first alleged false statement concerned the Mall at Fairfield Commons in Dayton, Ohio. WPG reported an estimated yield of 9-11% for the redevelopment project at that mall. The statement was made in filings dated October 25, 2018, February 21, 2019, April 25, 2019, July 25, 2019, and October 24, 2019. Plaintiffs allege that the statement was false because WPG's true expected yield was 6.6%. *Id*., ¶¶ 269–70.

For the Polaris Fashion Place redevelopment project, WPG reported an estimated yield of 4-5% in Supplemental Information Reports filed with the SEC on February 27, 2020, May 8, 2020, August 11, 2020, and November 5, 2020. Plaintiffs allege that the statement was false because WPG had improperly excluded significant costs and the true yield was 1.92%. *Id*., ¶¶ 271–72.

For the Southern Park redevelopment project, WPG reported an estimated yield of 8-9% in Supplemental Information Reports filed on February 27, 2020, May 8, 2020, August 11, 2020, and November 5, 2020. Plaintiffs allege that the statement was false because WPG's internal yield estimate was no more than 4%. *Id*., ¶¶ 273–74.

Finally, for the Town Center at Aurora redevelopment project, WPG reported an estimated yield of 5-6% in Supplemental Information Reports filed on February 27, 2020, May 8, 2020, August 11, 2020, and November 5, 2020. Plaintiffs allege that the statement was false because WPG's internal yield estimate was 2.04%. *Id*., ¶¶ 273–74.

### F. Debt Covenants

### 1. WPG's Cash Flow and Debt

Income from WPG's operating activities – the rent which it collected from leases – was its primary source of cash flow. Another source was property sales. *Id*., ¶¶ 200, 202, 206. As a REIT, WPG had to distribute 90% of its income as dividends.

The COVID-19 pandemic strained WPG's finances, reducing its cash flow from operating activities "from $209.3 million in 2019 to $78.6 million in 2020." *Id*., ¶ 202. Dividends, which WPG paid quarterly, dropped in correspondingly dramatic fashion. In 2019, WPG paid out a total of $237.5 million in dividends. In the first quarter of 2020, WPG cut dividends in half (to $0.125 per share) and paid out $42.3 million. It did not pay dividends for the remainder of 2020. *Id*., ¶ 203.

Taking on debt was a way to provide liquidity. As of December 31, 2019, WPG had issued publicly-traded bonds with a face value of $720 million. It also had credit facilities consisting of term loans of $350 million and $340 million and a revolving facility for borrowing up to $650 million. On April 14, 2020, WPG withdrew $120 million from the Revolver. *Id*., ¶¶ 220–21.

Plaintiffs allege that after WPG borrowed from the Revolver, it could borrow no more because its debt was subject to covenants. The bonds had covenants requiring that WPG's overall debt not exceed 60% of its total assets and that WPG's secured debt not exceed 40% of its total assets. Remedies for breach of the bond covenants included acceleration of maturity. A default could be waived by a two-thirds vote of the bond holders. *Id*., ¶¶ 225–26. At the end of 2019, WPG's debt was 56.9% of its total assets. *Id*., ¶ 223.

**\*7** The term loans and Revolver had similar covenants. Though these covenants measured total assets in a slightly different manner from the bond covenants, they too required that WPG's overall debt not exceed 60% of total assets and secured debt not exceed 40% of total assets. *Id*., ¶ 228.

In its May 7, 2020 Form 10-Q, WPG disclosed:

> We are engaged in discussions with our unsecured creditors and based upon these discussions we believe, to the extent that the impact of COVID-19 results in potential non-compliance with financial covenants, it is probable

that we will remain compliant with such covenants through some combination of waivers, modifications or other amendments to the related agreements. However, no assurances can be made in this regard, and if we are unable to agree on the terms of such waivers or changes, this could create substantial doubt about our ability to continue as a going concern through May 7, 2021.

*Id*., ¶ 230.

On August 17, 2020, WPG announced that it had entered into a modification of the credit facilities by signing Covenant Restructuring Agreements. Under the Agreements, the covenants on the credit facilities were loosened in exchange for WPG providing collateral made up of previously unencumbered property. *Id*., ¶ 236.

According to the Complaint, WPG made an effort to obtain covenant relief on the bonds as well. Ultimately, the senior noteholders were too "disorganized" and WPG was unable to obtain relief. *Id*., ¶ 236. The Complaint does not indicate when the process of WPG attempting to obtain relief on the bond covenants took place.

**2. The Alleged False Statements Regarding Covenants**

Plaintiffs allege that on two occasions defendants made false statements relating to the modification of WPG's covenants. The first occurred in an August 11, 2020 earnings call.[3] Yale stated that WPG was on track to receive lender approval of a modification to the credit facilities. "[T]he modification should provide us with a bridge to the other side of the pandemic." Compl., ¶ 277. Yale added, "[W]e believe the company should have the necessary flexibility that will allow us to navigate and maintain compliance with our modified credit facilities and bond covenants for the foreseeable future." *Id*.

Plaintiffs allege that Yale's remarks were false because WPG had not modified its bond covenants (only the credit facilities) and Yale knew WPG could not get to "the other side of the pandemic." Even if WPG had obtained relief on the credit facilities, WPG could not borrow money because it had not

modified the bond covenants. Plaintiffs argue that this left WPG unable to obtain the cash it needed to survive.

The second occasion was at a real estate conference on September 15, 2020. Responding to a question about WPG modifying its credit facilities, Yale said he was pleased to "have the support of our debt partners" and have "a bridge to get through the other side of the pandemic." *Id*., ¶ 279. "[T]here's ample flexibility in the modification for us to continue to reinvest through our redevelopment, which is most critical." *Id*. Conforti added that WPG had the support of its banking partners and debt partners. *Id*.

**\*8** Plaintiffs allege that these remarks were false because WPG had not received any changes to its bond covenants and could no longer borrow money. According to plaintiffs, WPG did not have the support of its bond holders and lacked the ability to withstand the pandemic.

**G. Corrective Disclosures**

The Complaint alleges that the value of WPG's stock fell following three public disclosures. The first came during a November 6, 2020 earnings call.[4] Yale announced that "the company did exceed the thresholds for several of the leverage bond covenants as at the end of the third quarter." *Id*., ¶ 241. Yale explained the covenants would be tripped only if WPG sought to incur additional debt and that "the company has no current plans to incur additional debt." *Id*. On the same day, WPG's stock price fell from a previous close of $5.72 per share to close at $5.04, a decrease of $0.68 per share. *Id*., ¶ 245.

The second disclosure occurred on February 15, 2021, the day on which WPG owed an interest payment of $23.2 million on the bonds. WPG announced that it had not paid the interest payment. *Id*., ¶ 252. On February 16, 2021, WPG's stock fell from its previous close of $12.06 per share to close at $7.49, down $4.57 (38%). On February 17, the share price fell to $6.09, down $1.40. *Id*., ¶ 253.

The third disclosure came on March 4, 2021 when Bloomberg reported that WPG was securing bankruptcy financing. *See id*., ¶ 254. The price of WPG's stock fell from its previous close of $6.58 to close at $2.51, down $4.07. *Id*.

**H. Fraud on the Market – Presumption of Reliance**

According to the Complaint, the market for WPG's securities was "open, well-developed and efficient at all relevant times."

*Id.*, ¶ 287. Its shares were traded on the NYSE, and 23.7 % of its float traded every week. WPG regularly filed public reports with the SEC and regularly communicated with the investing public and financial press. Three securities analysts followed WPG and wrote publicly available reports about WPG. *Id.*, ¶ 289.

Plaintiffs allege that the market for WPG's securities "promptly digested current information regarding [the company] from all publicly available sources and reflected such information in [its] share price." *Id.*, ¶ 290. It is further alleged that members of the plaintiff class "purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of [WPG's] securities and market information relating to [WPG]." *Id.*, ¶ 287.

The Complaint asserts that a class-wide presumption of reliance applies. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (in an efficient market, class members are presumed to have relied on materially false representations which artificially inflated share price). Defendants do not dispute the applicability of the presumption for purposes of the motion to dismiss.

## I. Causes of Action

The Complaint asserts two causes of action, the first under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The Complaint alleges that defendants defrauded the investing public in connection with the sale of WPG's securities. Defendants are alleged to have knowingly made false representations which caused the price of WPG's stock to be artificially inflated. The market price of WPG's securities declined upon the release of the three corrective disclosures outlined above. Members of the plaintiff class suffered injury when the share price decreased.

 *9  The second cause of action is for control person liability under Sections 20(a) of the Act, 15 U.S.C § 78t(a). The individual defendants allegedly occupied positions of control and authority over WPG and caused WPG to issue false and misleading information to the investing public.

## II. Motion to Dismiss Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. *Iqbal*, 556 U.S. at 679; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Twombly*, 550 U.S. at 555-56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." *Twombly*, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Though "[s]pecific facts are not necessary," *Erickson*, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-56. This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense....[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it

has not 'show[n]' – 'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### III. Discharge of Plaintiffs' Claims against WPG

**\*10** WPG filed for Chapter 11 bankruptcy on June 13, 2021 in the United States Bankruptcy Court for the Southern District of Texas. *See In re: Washington Prime Group, Inc. et al.*, Case No. 21-31948 (Bankr. S.D. Tex.). On September 3, 2021, the Bankruptcy Court entered a Confirmation Order approving a Plan of Reorganization.

The Bankruptcy Court discharged plaintiffs' pre-petition causes of action, including their securities fraud claims here, against debtor WPG. *See* Doc. 53-1, p. 12, ¶ 14; Doc. 53-2, Art. III(B)(13). *See also* 11 U.S.C. § 510(b) (the claims of a purchaser of stock in a corporation which files for bankruptcy are subordinate to the claims of general unsecured creditors); 11 U.S.C. § 1141(d) (the confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation").

Though plaintiffs cannot pursue recovery against WPG, they may proceed against the individual defendants, who were officers of WPG. The Complaint acknowledges that plaintiffs bring suit "to the extent of available insurance." Compl., ¶ 36. The Bankruptcy Court expressly allowed plaintiffs here to proceed with a class action suit to seek recovery under WPG's directors and officers insurance policy. *See* Doc. 53-1, p. 78, ¶ 80.

### IV. Elements of a Section 10(b) Claim and Special Pleading Standards

Section 10(b) of the Securities Exchange Act and Rule 10b–5 prohibit "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *Morse v. McWhorter*, 290 F.3d 795, 798 (6th Cir. 2002). "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008) (internal quotation marks omitted).

The United States Supreme Court has held that there six essential elements of a § 10(b) action: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014).

Special pleading requirements apply in securities fraud cases. Under Rule 9(b), the complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank.*, 547 F.3d at 570 (internal quotation marks omitted).

To establish scienter, a plaintiff must show that the defendant acted with an "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (internal quotation marks omitted). The Private Securities Litigation Reform Act (PSLRA) "imposes additional and more exacting pleading requirements for pleading scienter in a securities fraud case." *Id*. (internal quotation marks omitted). The complaint must "specify each statement alleged to have been misleading," "the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1), (2).

**\*11** In *Tellabs*, the Supreme Court instructed district courts to follow a three-step analysis when considering a motion to dismiss a private securities fraud complaint. First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id*. Third, if scienter is put at issue on a motion to dismiss, the court "must take into account plausible opposing inferences" and determine if the inference of scienter is such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 323–24.

### V. Statements Regarding Overall Yield and Methodology

#### A. Allegations

The Complaint alleges that Conforti and Yale combined to make seven false statements between February 22, 2018 and June 4, 2019. They made the statements in public during earnings calls or at industry conferences. Compl., ¶¶ 255–268.

Plaintiffs allege that the statements misled investors in two related ways. First, defendants allegedly overstated the overall yield number for WPG's redevelopment projects. The overall yield was at various times said to be from 8% to 10%. The yield was sometimes called an estimate and was at other times described as a number "we get" or "we're seeing."

Second, defendants allegedly misrepresented the factors which WPG considered, or did not consider, in calculating yield. They stated that WPG considered "signed leases," "rent" and "cotenancy cure," but did not include the effect which redevelopment would have on increasing rent for adjacent spaces. According to plaintiffs, WPG misled investors into believing that its methodology for calculating yield was rigorous, when in fact WPG used speculative considerations, such as the effect on adjacent spaces, in order to inflate the yield numbers.

### B. The Loss Causation Requirement

To state a claim under § 10(b), a plaintiff must plead two separate types of causation. The first is reliance, or transaction causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). A plaintiff must show that he relied on the misrepresentation or omission in making the decision to purchase or sell a security. *Id*. In a fraud-on-the-market case such as this one, the element of reliance is presumed if the statements are made or disclosed to the public. *See Stoneridge*, 552 U.S. at 159; *Basic*, 485 at 243. Defendants do not dispute that the presumption of reliance applies here.

A plaintiff must also establish loss causation, which is the "causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. In an open market, a "tangle of factors" affect price. *Id*. at 343. Section 10(b) "expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.' " *Id*. at 345–46 (quoting 15 U.S.C. § 78u–4(b)(4)). To plead loss causation, plaintiff must allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). Plaintiff must show "it was the very facts about which the defendant lied which caused its injuries." *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*,

475 F.3d 824, 842 (7th Cir. 2007). *See also MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1242 (11th Cir. 2023) (internal quotation marks omitted) ("[T]he plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.").

**\*12** The key to loss causation is showing that the company's share price fell "after the truth became known." *Dura*, 544 U.S. at 347. "[A] plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market." *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009). Thus, "a person who 'misrepresents the financial condition of a corporation in order to sell its stock' becomes liable to a relying purchaser 'for the loss' the purchaser sustains 'when the facts...become generally known' and 'as a result' share value 'depreciate[s].' " *Id*. at 345 (quoting Restatement of Torts § 548A, Comment b, at 107). *See also Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 474 (S.D.N.Y. 2014) ("[T]o establish loss causation, there must be an allegation that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.").

Loss causation is often established by showing the occurrence of a "corrective disclosure." "Under the corrective disclosure theory, a plaintiff alleges 'cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of fraud.' " *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). "Loss causation is 'easiest to show when a corrective disclosure reveals the fraud to the public and the [company's share] price subsequently drops.' " *In re KBC Asset Mgmt. N.V.*, 572 Fed. App'x 356, 360 (6th Cir. 2014) (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009)).

A related, but separate, method of establishing loss causation is through a "materialization of the risk" theory. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (clarifying that corrective disclosure and materialization of the risk are not "fundamentally different pathways for proving loss causation"). Whereas a corrective disclosure occurs upon an actual revelation of the truth, materialization of the risk occurs upon constructive disclosure. A plaintiff proceeding under

this theory must show that defendant's misrepresentations or omissions concealed a condition or risk which later materialized and negatively affected the company's stock price. *Id.* at 261–62.

Materialization of the risk is a theory under which " 'negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.' " *Ohio Pub. Emps.*, 830 F.3d at 384–85 (quoting *Omnicom*, 597 F.3d at 511). For example, in *Ohio Public Employees*, Freddie Mac allegedly misrepresented that it had adhered to certain quality control standards which limited its exposure to nontraditional mortgages. The risk that Freddie Mac did not follow its control standards materialized when it was revealed that a large component of Freddie Mac's portfolio was facing significant losses. Those losses, plaintiffs alleged, stemmed from Freddie Mac's extension into the subprime mortgage market. The Sixth Circuit held that plaintiff adequately pleaded loss causation because of "the relationship between the risks allegedly concealed and the risks that subsequently materialized, as well as the close correlation between the alleged revelation or materialization of the risk and the immediate fall in stock price." *Id.* at 388 (internal quotation marks omitted).

**C. The Complaint Fails to State a Claim for Relief Based on a Materialization of the Risk Theory**

On its face, the Complaint proceeds under a corrective disclosure theory. The Complaint contains a section entitled "Loss Causation." Compl., ¶¶ 244–54. In that section, plaintiffs identify three public disclosures (occurring on November 6, 2020, February 15, 2021, and March 4, 2021) which caused the price of WPG's stock to drop. *Id.*, ¶¶ 244–45, 252–54. None of the three disclosures revealed that WPG's yield numbers for its mall redevelopment projects had been inflated or that WPG had not adhered to a certain methodology in calculating yield. Instead, the disclosures revealed that WPG had: (1) exceeded its debt covenants, which prevented WPG from borrowing additional funds, (2) failed to make an interest payment on its bonds, and (3) secured bankruptcy financing.

 **\*13**  Not surprisingly, defendants' motion to dismiss makes the straightforward argument that plaintiffs failed to plead loss causation with respect the statements of overall yield. The disclosures identified in the Complaint did not correct the allegedly false yield numbers or otherwise reveal the truth behind those statements, because the disclosures did not speak

to yield at all. The drop in share value was a reaction to something else, and not to the truth about the yield numbers.

In response, plaintiffs claim that their Complaint alleges a materialization of the risk theory. Plaintiffs characterize the materialization of the risk theory as "common" to situations "where a company faces a liquidity crisis or bankruptcy." Doc. 56 at PAGEID 1433. Plaintiffs provide a genericized example of a defendant who misrepresents "the quality of a portfolio." *Id*. When the portfolio collapses in a crisis, then the risk that the portfolio held assets of poor quality has materialized. Plaintiffs liken their example to this case. They argue that the yield numbers hid the fact that "WPG's malls were still decrepit, which risk materialized when the market learned that WPG had taken steps towards bankruptcy." *Id*.

Plaintiffs point to a handful of allegations in the Complaint which they believe support a materialization of the risk theory. *See id*. at PAGEID 1433–34. The inflated yield numbers communicated to investors that WPG had "vaunted malls." Compl., ¶ 217; *see also* Doc. 56 at PAGEID 1434 (plaintiffs' brief, saying that the malls should have been "prized assets"). Had the malls been as productive as WPG said they were, then the redeveloped malls would have had high value and WPG could have sold them during a liquidity crisis. Compl., ¶¶ 214, 217. In reality, redevelopment did not have "the impacts Defendants touted." *Id*., ¶ 218. "As a result, Defendants could not create any interest in WPG's properties. WPG could not rely on asset sales to remedy a deficit in its operating cash." *Id*.

Both the Supreme Court and the Sixth Circuit have held that a complaint must be dismissed if it does not establish "what the causal connection might be between [the] loss and the misrepresentation." *Dura*, 544 U.S. at 347; *accord D.E.&J. Ltd. P'ship v. Conaway*, 133 Fed. App'x 994, 1000 (6th Cir. 2005). Count I of the Complaint, asserting the § 10(b) claim, expressly alleges that plaintiffs' loss was caused when the "market price of Washington Prime Group securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members." Compl., ¶ 299. The only public disclosures alleged in the Complaint are the three public disclosures (dated November 6, 2020, February 15, 2021, and March 4, 2021), which the Complaint identifies as "corrective disclosures." *Id*., ¶ 1. Indeed, the proposed class itself is defined by the corrective disclosures. The Complaint brings suit on behalf of all persons who purchased WPG shares from February 22, 2018 through March 3, 2021 (the day before the final corrective disclosure) and held their securities "through at least one of the corrective disclosures."

*Id*., ¶ 1; *see also id*., ¶ 281 ("Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Washington Prime Group securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures."). Again, the corrective disclosures said nothing about the truth behind yield numbers.

 **\*14**  The Court finds that the substantive allegations fail to support a materialization of the risk theory of loss causation. "The materialization of risk theory...requires a direct connection between the risk that is hidden from investors and the subsequent loss suffered by those investors." *Salvani*, 50 F.Supp.3d at 475. The "subject" of the misrepresentations must be the cause of the loss suffered. *Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 173 (2d Cir. 2005); *see also Tricontinental*, 475 F.3d at 842 (plaintiff must show "it was the very facts about which the defendant lied which caused its injuries"). The Complaint alleges that the yield numbers were the subject of the misrepresentations. The risk which materialized and caused loss, according to plaintiffs' briefing, was not that WPG fell short of those yield numbers. It was something different: that WPG could not sell the redeveloped properties during a liquidity crisis.

In their brief, plaintiffs attempt to argue around the Complaint's lack of a connection between the alleged misrepresentations and the losses plaintiffs suffered. The Court finds these attempts to be unpersuasive. For instance, plaintiffs try to add to the statements which they would identify as being misrepresentations. They now argue that defendants Conforti and Yale made "illusory" promises that "WPG could liquidate assets for cash." Doc. 56 at PAGEID 1434. The Complaint does contain two allegations in which Conforti and Yale are alleged to have stated that WPG would consider "future asset sales" at "the right price" as "an option for future liquidity." Compl., ¶¶ 205, 209. But the Complaint does not identify these statements as misrepresentations, as it must under the PSLRA, nor does the Complaint in any way allege scienter with respect to the assertion that defendants spoke falsely when they stated they would be open to considering a future asset sale at the right price as an option for future liquidity. *See* 15 U.S.C. § 78u–4(b)(1), (2); *Tellabs*, 551 U.S. at 319; *Frank*., 547 F.3d at 570.

Next, plaintiffs point to the fact of WPG's bankruptcy as evidence of the materialization of the risk. If the redeveloped malls were as high-yielding as promised, then WPG would not have gone bankrupt, so the argument goes. The Court must reject this attempt to connect the misrepresentations to the loss. The disclosure that WPG was preparing to file for bankruptcy cannot serve as a catch-all to mean that everything WPG had previously told the market was false or that every misrepresentation spoken bore a causal relationship to the bankruptcy. *See D.E.&J. Ltd. P'ship*, 133 Fed. App'x at 1000 ("[T]he filing of a bankruptcy petition by itself does not a security fraud allegation make."). Plaintiffs must allege that the event of bankruptcy disclosed a prior misrepresentation to the market. *See id*., 133 Fed. App'x at 1000–01 ("[T]he observation that a stock price dropped on a particular day, whether as a result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss."). Specifically, plaintiffs must allege which among the "tangle of factors" is the one causing their loss. The Complaint's allegation of the occurrence of a bankruptcy, without more, does not suffice.

Plaintiffs argue that "the risk that WPG's assets could not be sold in an emergency fell within the zone of risk concealed by their false statements." Doc. 56 at PAGEID 1434. "[I]n the securities fraud context, 'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.' " *Ohio Pub. Emps*., 830 F.3d at 384 (quoting *Lentell*, 396 F.3d at 173) (emphasis omitted). *See also Omnicom*, 597 F.3d at 513 (zone of risk "is limited to only the foreseeable losses for which the intent of the laws is served by recovery") (internal quotation marks omitted).

 **\*15**  Plaintiffs attempt in their brief, in a way they did not in their Complaint, to set forth how the risk that materialized was in the zone of risk which was concealed. As a REIT, WPG had to distribute 90% of its income as dividends, which meant that it could not stockpile cash for a liquidity crisis. WPG instead had to rely on debt financing or selling assets. The COVID pandemic created a large divide between "good and bad malls." Had the redeveloped malls obtained the yields promised by defendants, they would have been productive malls which WPG could have sold to survive its liquidity crisis. But because the malls did not obtain the promised yields, WPG was unable to sell them and ran out of funds to pay creditors and maintain operations. In this way, plaintiffs argue it was foreseeable that "overstating redevelopment yields would leave WPG with no assets to sell in a downturn, leaving WPG unable to respond to a liquidity crisis." Doc. 56 at PAGEID 1434.

To be sure, the Complaint contains a few allegations which could be pieced together in relation to plaintiffs' zone of risk argument. *See* Compl., ¶ 40 (defining the characteristics of REITs), ¶ 211 (quoting a news article on the "bifurcation between good and bad quality" malls). But again the Complaint does not articulate sufficient facts to support the theory. The Complaint does not allege or define the zone of risk, nor does it show how the risk which caused the loss (which plaintiffs now contend to be the possibility that the redeveloped malls would be worthless) was within the zone of risk concealed by the misrepresentations (which are still the inflated yield numbers). *See Omnicom*, 597 F.3d at 514 (connection between concealed risk and loss cannot be tenuous); *Suez*, 250 F.3d at 96 ("The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement."); *Stratte-McClure v. Morgan Stanley*, No. 09 CIV. 2017 DAB, 2013 WL 297954, at *11 (S.D.N.Y. Jan. 18, 2013) (causal connection is insufficiently pled if it is attenuated).

As importantly, the Complaint itself contains allegations which undermine the zone of risk argument. For one, it acknowledges that even WPG's "bad" mall properties retained some value. Compl., ¶ 211 (quoting an article that bad malls were worth the value of "the land minus the cost of demolition"). These assets could have been sold, or so it would seem, to have created liquidity. According to the Complaint, WPG's actual yields were 4-5%. *Id.*, ¶ 120. It is unclear why malls yielding 9-10% would have been so valuable as to have allowed WPG to escape a liquidity crisis, but malls yielding only several percentage points lower were not.

Even if the malls had little value and could not be sold, the Complaint alleges that the market knew this fact – and thus the truth was disclosed – before the declines in share value preceding WPG's bankruptcy. For instance, the Complaint alleges that "Defendant Conforti explained in a presentation at the September 15, 2020 Bank of America Merrill Lynch Tower Global Real Estate Conference, [that] *there was no interest in WPG's properties*." *Id.*, ¶ 215 (emphasis added). In November 2020, WPG announced that it had sold one of its redeveloped malls to a residential housing developer who intended to bulldoze the mall. *Id.*, ¶ 217. The Complaint cites this sale as an example of WPG's malls being worth the value of "the land minus the cost of demolition." *Id.* The risk that WPG's redeveloped malls were not "prized assets"

in the time of the COVID pandemic was already known by the market well before the drops in stock price corresponding with plaintiffs' losses. *See KBC*, 572 Fed. App'x at 360 (holding that a loss causation theory "only works when a disclosed fact is new to the market....The problem with KBC's theory is that the May 31 affidavits—the alleged corrective disclosures—were old news.") (internal quotation marks and alterations omitted); *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) ("Of course, for the revelation to cause the plaintiffs' losses, the information must in a practical sense be new; otherwise the market will have processed and reacted to that information already.") (citing *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016)).

**\*16**  On the note of old news, the Complaint contains allegations that the market also already knew that WPG's yields were not actually as high as 9% or 10%. It alleges that "WPG reported notably lower yields for redevelopment of O'Connor Joint Venture properties." Compl., ¶ 122. And according to the Complaint, WPG reported estimated yields of just 4-5% for its Polaris Fashion Place project, 5-6% for the Town Center at Aurora redevelopment, and 5-6% for the Mall at Johnson City project. *Id.*, ¶¶ 148, 153, 157, 271, 275. In the SEC filing attached to the Complaint (Feb. 26, 2020 Form 8-K), WPG similarly disclosed that expected yields for other redevelopment projects were as low as 5-6% and 6-8%. *Id.* at PAGEID 912.

The Complaint alleges that the market knew too that WPG was facing a liquidity crunch. WPG's cash flow from operations dropped from $209.3 million in 2019 to $78.6 million in 2020. Compl., ¶ 202. Because WPG had to pay out 90% of its income as dividends, each quarter provided investors with a real-time indication of WPG's financial health. According to the Complaint, WPG had to slash dividends in the first quarter of 2020 and paid no dividends for the remainder of 2020. *Id.*, ¶ 203. Even pre-pandemic, WPG's February 26, 2020 Form 8-K disclosed that WPG's annual net income (after dividend payments) had dropped dramatically from 2018 to 2019. Doc. 53-4 at PAGEID 1247 (from over $100 million to $2.7 million). And later in May 2020, WPG's Form 10-Q disclosed a warning that, in light of WPG's debt covenants, there was "substantial doubt about our ability to continue as a going concern." Compl., ¶ 230; *see also* Doc. 53-7 at PAGEID 1282 (WPG's May 7, 2020 Form 10-Q: "As a result of the related events due to the COVID-19 pandemic, we may experience a material adverse effect on our income and expenses that could impact our ability to maintain

compliance with out credit facility and bond covenants."). An analyst commented in June 2020 that WPG's "shares have been one of the worst performing REITs this year." *Id.*, ¶ 231. *See also* Doc. 53-19 at PAGEID 1368 (Yale stating in September 2020 that WPG's NOI growth in the first half of 2020 was down 30% for enclosed malls).

Finally, there is the impact of the COVID pandemic, a fact the Complaint acknowledges. *See*, *e.g.*, Compl., ¶ 2 ("WPG had no resources to withstand the impact of COVID."); ¶ 202 ("COVID-19 put a strain on WPG's finances."); ¶ 210 ("COVID hit WPG, sharply reducing its revenues."). Attached to the Complaint is a March 2021 Bloomberg financial article stating that "U.S. mall values plunged an average of 60% after appraisals in 2020, a sign of more pain to come for retail properties even as the economy emerges from pandemic-enforced lockdowns." *Id.*, at PAGEID 915 (reporting that $4 billion in value was "erased" from 118 retail-anchored properties).

"[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors,...the plaintiff may be required to plead facts from which it would be reasonable to infer that the risks which materialized in her loss were risks concealed by the fraud rather than risks evident [to the market]." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (internal quotation marks omitted). *See also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("[T]o establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from disclosures of the truth behind the alleged misstatements.") (internal quotation marks omitted).

 *\*17*  Plaintiffs must plead facts from which it can be reasonably inferred that at least some of their losses can be connected to the risks concealed by the fraud rather than solely to COVID's impact on the retail mall sector. The Complaint fails to allege sufficient facts in this regard. Plaintiffs contend that the redeveloped malls should have been valuable assets. Yet, as discussed above, the Complaint itself alleges that the market knew in the first half of 2020 that WPG had little operating income and knew by September 2022 that WPG had been unable to generate interest in its malls. These disclosures came well in advance of the alleged materialization of the risk occurring "when

WPG announced that it had failed to make a payment on its bonds and again when Bloomberg revealed that WPG was securing bankruptcy financing, the preparatory steps to its bankruptcy." Doc. 56 at PAGEID 1434. WPG's liquidity crunch and subsequent bankruptcy cannot, under these alleged facts, be said to have been the materialization of the risk concealed by defendants' statements about yield numbers. *See Solow v. Citigroup, Inc.*, 507 Fed. App'x 81, 82 (2d Cir. 2013) ("The Complaint also fails to distinguish the effects of the fraud alleged from those caused by the adverse market conditions existing at the time."); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F.Supp.2d 349, 360 (S.D.N.Y. 2008) ("Ventura cannot successfully plead that his losses resulted solely or even partially from the purported materialization of the risk that the defendants allegedly concealed, rather than from intervening causes, such as the collapse of the Internet sector.").

Accordingly, the Court finds that the Complaint fails to state a claim under § 10(b) with respect to defendants' statements regarding overall yield.

## VI. Statements Regarding Individual Project Yields

The next set of allegedly false statements relate to yield estimates for individual mall redevelopment projects. Plaintiffs allege that defendants overstated the expected yield numbers for four projects: the Mall at Fairfield Commons, Polaris Fashion Place, Southern Park Mall, and the Town Center at Aurora. According to the Complaint, the inflated yield figures appeared in Supplemental Information Reports which WPG filed with its Form 8-Ks.

Defendants argue that the claims relating to these statements should be dismissed for two reasons: a failure to adequately plead loss causation and the application of the PSLRA's safe harbor provision. With respect to loss causation, the Court agrees for the reasons stated above in relation to the overall yield statements. The Court further finds that the individual project yield statements are entitled to safe harbor protection, as discussed below.

### A. Safe Harbor – Introduction

Congress created a safe harbor in the PSLRA based on the judicial "bespeaks caution" doctrine. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir. 2001). Under the safe harbor, the issuer of a security (or a person acting on behalf of the issuer) is not liable for an untrue statement under certain circumstances involving "forward-looking statements." 15

U.S.C. § 78u-5(c)(1). Of relevance here is the circumstance in which a forward-looking statement is identified as such and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id*. at § 78u-5(c)(1)(A)(i). *See also Helwig*, 251 F.3d at 547–48.

"[I]f the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind." *Miller v. Champion Enterprises Inc*., 346 F.3d 660, 672 (6th Cir. 2003).

**B. Forward-Looking Statements**
A "forward-looking statement" is defined to include three basic categories: (1) any financial "projection," such as projections of revenue, income, earnings, expenditures, dividends "or other financial items"; (2) statements "of the plans and objectives of management for future operations"; and (3) statements of "future economic performance." 15 U.S.C. § 78u–5(i)(1). Protection extends to "any statement of the assumptions underlying or relating to any statement" fitting within the three categories. *Id*. *See generally Helwig*, 251 F.3d at 547–48.

WPG's Supplemental Information Reports contained a prefatory "SAFE HARBOR" notice. Each notice stated, "Some of the information contained in this presentation includes forward looking statements. Such statements are subject to a number of risks and uncertainties which could cause actual results in the future to differ materially and adversely from those described in the forward-looking statements. Investors should consult the Company's filings with the Securities and Exchange Commission for a description of the various risks and uncertainties which could cause such a difference before deciding whether to invest." *See*, *e.g*., Doc. 47-1 at PAGEID 910.

 **\*18** The Reports presented financial information, including information relating to "Redevelopment Projects." *See*, *e.g*., *id*. at PAGEID 912. The projects were listed by name in a table. The table included the location of the project, the "opportunity" presented (in the case of Southern Park, for example, the plan to replace a formers Sears store with "new entertainment, dining, retail, and community green space"), the "estimated total costs" of the project, the "estimated project yield" (expressed as a percentage range), and the "estimated" year of completion. *Id*.

Defendants argue that the Safe Harbor notice in the Reports clearly identified the information contained therein as forward-looking. Defendants further allege that estimates of yield were projections of financial performance which fit well within the statutory definition of forward-looking.

Plaintiffs oppose both arguments. The Reports contained a great deal of information, and plaintiffs contend that the Safe Harbor notice did not specifically identify the yield estimates as forward-looking. Second, plaintiffs argue that the yield numbers were not forward-looking, but instead were backward-looking statements.

**1. Identified as Forward-Looking**
The Court finds that the Reports sufficiently identified the yield estimates as forward-looking statements. Plaintiffs are correct that the Reports, which were approximately 24 pages long, contained a substantial amount of information. Not all of it was forward-looking. For instance, the October 25, 2018 Report [5] contained financial data for the nine-month period ending on September 30, 2017. *Id*., p. 1. A reasonable investor would not have expected the Safe Harbor warning to apply to information so plainly relating to past performance. *See Kolominsky v. Root, Inc*., 667 F. Supp. 3d 685, 705 (S.D. Ohio 2023) (applying a "reasonable investor" standard: would the statements have put a reasonable investor on notice that the company was making a forward-looking statement?).

As a reader continued through the Report, he would have encountered language signaling where forward-looking statements appeared. *See Slayton v. Am. Express Co*., 604 F.3d 758, 769 (2d Cir. 2010) (adopting the SEC's position that to qualify as forward-looking, a statement need not be segregated in a "discrete section" marked "Forward–Looking Statements," nor need it be "specifically labeled" as "forward-looking"). For example, one section of the Report contained "Earnings Expectations," which listed WPG's projected FFO for the fourth quarter of 2018, which had not yet been completed. Oct. 25, 2018 Report, p. 9. This forward-looking material could be easily contrasted with other portions of the Report reviewing past events, including one which detailed leasing "results" for the period ending September 30, 2018. *Id*., p. 11.

A reasonable investor, having been cautioned that the Report contained some forward-looking statements, would have had no difficulty recognizing the yield estimates as being included

within that scope because the Report gave clear linguistic signals. *See Slayton.*, 604 F.3d at 769 (examining the "use of linguistic cues" to determine whether the reasonable investor was put "on notice that the company is making a forward-looking statement"). On the page which contained the yield estimates, the Report told readers that the information on the page concerned projects "under construction or approved for construction." Oct. 25, 2018 Report, p. 16. Dates stretching into the future were listed as "estimated completion" dates. Each project contained a description of the "opportunity" presented, which were the forward-looking plans or goals for each redeveloped mall. Financial data was labeled as "estimated." Readers were advised that future changes could cause the estimates to be inaccurate. In sum, the Court finds that the Reports adequately identified the yield estimates as forward-looking. *See Slayton.*, 604 F.3d at 769 (examining whether the statement "projects results in the future" by using words like "expect").

### 2. Substantively Forward-Looking

 **\*19**  The Court further finds that the yield estimates were in fact forward-looking. Plaintiffs' argument to the contrary is not entirely clear, but they suggest that forward-looking statements must be "pure predictions about the future" based on considerations "for which there is no formula." Doc. 56 at PAGEID 1414 at n.16. Plaintiffs argue that WPG arrived at the yield numbers by taking "current" or "existing" revenue data and making a "numerator/denominator" calculation. Because the Report posted the results of those calculations, the yield figures were "backward-looking statement[s] concerning a future event." Doc. 56 at PAGEID 1397, 1414.

The Court rejects plaintiffs' argument. It cannot be the case that the dividing line between forward-looking and backward-looking is whether a calculation is involved. Congress defined forward-looking statements to include projections of "financial items" such as revenue, income, earnings, expenditures, and dividends. These projections naturally will be the result of a calculation.

"The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made. If so, then the statement is not forward-looking." *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) (internal quotation marks omitted). When a statement reports past results and data, then its truth can be verified at the time it is made. But a statement making financial or economic projections, even if requiring

calculation, cannot be verified because it is predicting future events and items, such as expected sales or expected costs.

Plaintiffs stress that WPG used existing data to make the estimated yield calculations. This alone does not remove the yield estimates from safe harbor protection. A company wanting to make a reliable projection of financial items likely would follow a formula based in part on past or current performance. By including the "assumptions underlying" a company's financial projections within the definition of forward-looking statements, Congress granted protection to future predictions which to some degree incorporate or rely on existing data concerning past or present performance. *See Miller*, 346 F.3d at 677 (holding that a company's prediction of having a "continuation of outstanding earnings growth," while based on "some present circumstances," qualified as forward-looking); *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016) (holding that a statement was forward-looking because it made a "prediction" – a "calculation of what the final quarterly financial results *would be*" – even if it was based in part on "currently available" financial information) (emphasis in original).

WPG's project yield estimates were not calculations based solely on past or current data. As presented in the Reports, they represented an inexact financial projection, expressed as a percentage range, of future annual income divided by total costs once a redevelopment project was completed. *See* Compl., ¶ 133 (alleging that yield estimates were based on "anticipated rents from all stores after redevelopment"), ¶¶ 151, 160 (describing how WPG estimated yield based on assumptions about rent it would receive from spaces that were not yet designed or leased), ¶ 163 (alleging that WPG assumed 100% occupancy once redevelopment was completed).

The Reports used the word "estimated" to describe both the yield figures and the costs on which they were based, and the Reports said the yield estimates were "subject to adjustment" based on future events. *See Miller*, 346 F.3d at 677 (holding that earnings "estimates" are "classically forward-looking"). The yield figures were thus both financial projections and estimates of future economic performance. *See* 15 U.S.C. § 78u-5(i)(1)(A),(C); *Grant v. Ursula Mgmt., LLC*, No. 20CV2953WFKAKT, 2021 WL 8382243, at \*4 (E.D.N.Y. Oct. 6, 2021) (holding that a hedge fund managers' prediction of "consistent cash yields of 5 to 8%" was "a forward-looking statement as it directly relates to the future performance of the Fund"). Their veracity could not be ascertained when WPG issued the Reports because actual yield could not

have been known or calculated until future events transpired, including the completion of the mall redevelopment projects. *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 281 (3d Cir. 2010) ("Statements about future profitability and assumptions underlying management's expectations about the future fall squarely within the definition of forward-looking statement.").

 **\*20** The Court's conclusion is not altered by plaintiffs' assertion that WPG calculated the yield estimates using only "locked-in" returns. Doc. 56 at PAGEID 1391. The relevant allegation in the Complaint concerns a statement Conforti made at a REIT conference on June 5, 2018. *See* Compl., ¶ 96. Conforti was asked a question about how WPG "look[s] at tenant diversification and if the tenant doesn't renew." *Id*. In his response, as quoted in the Complaint, he did not say that WPG used "locked-in" returns in determining yield estimates. Rather, he responded that return on invested capital was a "numerator/denominator" calculation. *Id*. He added, "When we embark upon the development, and that development is vastly leased, we're not in the speculative redevelopment business." *Id*.

To the extent Conforti's response suggested that the numerator component (annual income) of WPG's yield calculation contained a relatively predictable source of future income – rent on "vastly leased" space – he nonetheless did not guarantee that income was "locked-in" or impervious to future events and changes. He instead expressed a degree of confidence that WPG would see good returns on redevelopment projects because of the level of lease commitments. And Conforti said nothing of the denominator component (total costs) being fixed or locked-in. The Reports expressly stated that costs for the redevelopment projects were estimated and subject to change. This meant that yield too could vary with changes in costs.

The Court thus finds that the project yield estimates in the Reports were forward-looking statements. Even plaintiffs ultimately acknowledge that "[t]o arrive at the yield estimates, Defendants presumed that the business plan would work." Doc. 56 at PAGEID 1407 (emphasis omitted); *see also id*. at PAGEID 1415 ("[I]t is inherently true that WPG's redevelopment projects might not achieve their goals.").

**C. Meaningful Cautionary Language**
Having determined that the yield estimates were forward-looking statements and were so identified, the Court turns to whether they were "accompanied by meaningful cautionary

statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. *Id*. at § 78u-5(c)(1)(A)(i); *see also id*. at § 78u-5(e) (providing that on a motion to dismiss under the safe harbor rule, a court should consider any cautionary statement accompanying the forward-looking statement). If so, safe harbor protection applies to the statements no matter defendants' state of mind. *Miller*, 346 F.3d at 672.

"Meaningful" cautionary statements contain more than boilerplate warnings. *Helwig*, 251 F.3d at 558–59. They "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." *Id*. (internal quotation marks omitted). While the cautionary language need not exhaustively list all potential risk factors, it must be tailored in some way to the "specific future projections, estimates or opinions which the plaintiffs challenge." *Id*. (internal quotation marks and alterations omitted). The court must look "to whether the defendant meaningfully alerted investors to the risks that might prevent it from reaching its financial targets." *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc*., 614 Fed. App'x 237, 243 (6th Cir. 2015). *See also Southland Sec. Corp. v. INSpire Ins. Sols., Inc*., 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.").

 **\*21** Plaintiffs argue that investors did not receive meaningful cautionary statements because the Safe Harbor notice in each Report was a boilerplate warning. The Court would be inclined to agree if the notice were the only warning investors received. The notice generally advised that the forward-looking statements were "subject to a number of risks and uncertainties which could cause actual results in the future to differ materially and adversely from those described in the forward-looking statements." *See*, *e.g*., Doc. 47-1 at PAGEID 910. This language did not provide tailored warnings based on the risks specific to WPG and its business.

Investors, however, received additional and more specific warnings. On the page where the Report listed the yield estimates, footnotes cautioned investors that the estimates were subject to changes "inherent in the development process." *See*, *e.g*., *id*. at PAGEID 912. The footnotes did not

enumerate the potential changes, but a reasonable investor – applying common sense and viewing the context of the other information presented in the table – would appreciate that redevelopment projects can take longer than estimated, can exceed costs, and can experience changes in potential tenants and the intended "opportunity," all of which in turn could materially affect yield. *See In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 302 (S.D.N.Y. 2010) (a reasonable investor employs common sense); *S.E.C. v. Reynolds*, No. CIV.A.3-08-CV-0384-B, 2008 WL 3850550, at *5 (N.D. Tex. Aug. 19, 2008) ("A reasonable investor relies on common sense and objective facts....").

Moreover, the Safe Harbor notice in the Reports instructed investors to "consult the Company's filings with the Securities and Exchange Commission for a description of the various risks and uncertainties which could cause such a difference before deciding whether to invest." Doc. 47-1 at PAGEID 910. As courts have held, "[c]autionary statements disclosed in SEC filings may be incorporated by reference; they do not have to be in the same document as the forward-looking statements." *Aetna*, 617 F.3d at 282 (internal quotation marks omitted); *see also Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 921 (8th Cir. 2015).

Defendants correctly point out that WPG's filings with the SEC contained extensive and tailored warnings. For example, on October 25, 2018 (the same day WPG filed the first Report at issue in this case), WPG filed a Form 10-Q [6] that contained a section entitled "Forward-Looking Statements." This section disclosed numerous risks which could prevent WPG from reaching its yield estimates and other goals. The risks specific to WPG's business included: changes in "real estate and capital markets"; "changes in asset quality"; "liquidity" of real estate holdings; tenant "bankruptcies" or other changes to the "financial stability of tenants within the retail industry"; changes in mall "rental rates"; the failure to achieve the desired "retail store occupancy" rates; the failure to achieve the desired "same store operating income"; changes in "relationships with anchor tenants"; availability of financing; competition; "trends in the retail industry"; and changes in "economic and market conditions." Oct. 25, 2018 Form 10-Q, p. 46. Investors were expressly warned that these and other factors created a risk of the "failure to achieve projected returns or yields on (re)development and investment properties." *Id*. Later SEC filings likewise listed these risk factors and similarly warned investors that WPG might fail to achieve its projected yields for the redevelopment projects. [7]

**\*22** WPG's Annual Form 10-K filings also contained "Risk Factor" warnings, to which the Form 10-Qs made reference. For example, WPG's Form 10-K for the 2018 fiscal year [8] identified numerous risks specific to WPG's "Business and Operations" and expounded upon them in full paragraph discussions. Among the risks disclosed were: the failure to renew tenant leases; the failure to lease newly-developed properties; the loss of anchor tenants; "higher than projected costs" for redevelopment projects (and the reasons why costs could go higher); the relative illiquidity of WPG's real estate assets; fluctuations in the "level of revenues realized" by tenants (which could depend on consumer spending, unemployment, online shopping behavior, and more); and tenant bankruptcies and store closures. Feb. 21, 2019 Form 10-K, pp. 9–18. These specific warnings put reasonable investors on notice that future income and future costs relating to WPG's redevelopment projects were subject to many risks and variables which could prevent WPG from achieving its yield estimates.

**D. Conclusion**

The Court finds that the Reports' yield estimates for the four redevelopment projects (the Mall at Fairfield Commons, Polaris Fashion Place, Southern Park Mall, and the Town Center at Aurora) were forward-looking statements which were identified as such and were accompanied by meaningful cautionary statements. Importantly, WPG's cautionary statements warned investors of the very risk which actually materialized – that WPG might not achieve the yield estimates for the projects. *See Helwig*, 251 F.3d at 559 (" '[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.' ") (quoting *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999)); *Miller*, 346 F.3d at 678 (cautionary language was meaningful because it "disclosed the exact risk that occurred in this situation"); *Julianello*, 791 F.3d at 922 (cautionary language was meaningful because it warned investors "of precisely the risks about which they now complain").

Accordingly, the yield estimates receive protection under the PSLRA's safe harbor provision and defendants are not liable for the statements. *See* 15 U.S.C. § 78u-5(c)(1).

**VII. Statements Regarding Debt Covenants**

The final set of alleged misrepresentations concern statements which Yale and Conforti made in August and September 2020. Both statements related to WPG's efforts to obtain a modification to its credit facilities.

### A. August 11, 2020 Earnings Call

#### 1. Two Theories Asserted in the Complaint

Plaintiffs allege that defendants made false statements when discussing a modification to the credit facilities (the term loans and Revolver) in an August 11, 2020 earnings call. Yale stated:

> Obviously, the significant news from a balance sheet perspective involves the pending credit facilities modification. Today, we've received the requisite lender consents for such modification and we expect to close by the end of the week on the revised facility. As [Conforti] mentioned, through the immediate waiver of certain financial covenants and less restrictive thresholds into next year, including a permanent increase to the limit for overall leverage to 65%, **the modification should provide us with a bridge to the other side of the pandemic**.
>
> ...
>
> We should also mention that we are in compliance with the bond covenants as of the second quarter of 2020 both prior to and proforma for the credit facilities modification. When considering the uncertainty associated with COVID, significant risks exist to any projections, [but] we believe the company should have the necessary flexibility that will allow us to navigate and maintain compliance with our **modified credit facilities and bond covenants for the foreseeable future**.

Compl., ¶ 277 (emphasis in the Complaint).

The Court notes some confusion between the parties over what exactly plaintiffs believe is false about Yale's remarks. In their motion to dismiss, defendants interpret the Complaint as raising the allegation that Yale spoke falsely in saying WPG should have "a bridge to the other side of the pandemic" and should have the flexibility necessary "for the foreseeable future." Defendants argue that Yale's comments are vague, non-actionable expressions of corporate optimism. *See Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc*., 583 F.3d 935, 944 (6th Cir. 2009).

**\*23** In their opposition to the motion, plaintiffs do not squarely respond to defendants' argument. Plaintiffs instead argue that Yale falsely "implied" that the bond covenants were being modified. Doc. 56 at PAGEID 1423–24. This alleged implication was false because WPG was modifying only the credit facilities.

The Complaint itself contains language relating to each theory. First, with respect to the statements on which defendants focus, the Complaint alleges that Yale billed the modification to be "a bridge to the other side of the pandemic" but "[i]t was no such thing." Compl., ¶¶ 22–23. Defendants allegedly knew WPG "could no longer borrow money" and thus would not be able to "dig itself out of the hole created by the pandemic." *Id*., ¶¶ 238, 278. Second, with respect to the language on which plaintiffs focus, the Complaint also alleges that Yale's comments were false because "WPG had not received any changes to the bond covenants." *Id*., ¶ 278.

The Court thus concludes that the Complaint asserts both theories, but, as is discussed below, finds that neither theory can survive the motion to dismiss.

#### 2. Vague, Optimistic Statements are Not Material

Defendants are correct that vague expressions of corporate optimism are not material.

"Courts have consistently found immaterial a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important." *Indiana State*, 583 F.3d at 944 (internal quotation marks omitted). Statements which "do nothing more than vaguely predict positive future results" are "so banal and ubiquitous" that they "cannot engender reliance by reasonable investors." *Id*.

Here, Yale expressed his opinion that the credit facilities modification "should" provide WPG with a "bridge to the other side of the pandemic." He gave no concrete numbers, plans, or financial details as to how WPG would survive the pandemic. He made no promises. Indeed, he emphasized the "uncertainty associated with COVID" and the "significant

risks" of making "any projections," which qualified his optimism that the modification "should" give WPG the "flexibility" needed to "navigate" the situation "for the foreseeable future." Compl., ¶ 277.

The Court readily finds that Yale's comments are the type of "loosely optimistic statements" which no reasonable investor would find to be material – a conclusion which plaintiffs do not attempt to dispute in response to the motion to dismiss. *See Indiana State*, 583 F.3d at 944 (statement that "earnings growth outlook remains positive given our strong underlying fundamentals and our proven growth strategy" was not actionable); *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (statement which "escapes objective verification" is not actionable).

### 3. Purported Statement about Modifying the Bond Covenants

#### a. No Plausible Misrepresentation Alleged

The Court turns to plaintiffs' theory that Yale falsely implied WPG was modifying its bond covenants. This theory rests on Yale's statement that WPG should be able to "maintain compliance with our *modified credit facilities and bond covenants* for the foreseeable future." Compl., ¶ 277 (emphasis added). Though plaintiffs do not explain the basis of their theory, the Court believes it is grammatical in nature – the adjective "modified" applies to both nouns which follow it: "credit facilities" and "bond covenants."

**\*24** Reasonable minds could disagree over whether a modifier should apply to all items proximate to it. *Cf. Lockhart v. United States*, 577 U.S. 347, 351 (2016) (discussing the issue of applying a qualifier to words or phrases which are in immediate contact with the qualifier, versus applying a qualifier to words or phrases which are more remote). Yale's statement leaves room for interpretation. He did not say "modified credit facilities and modified bond covenants," but he also did not say "bond covenants and modified credit facilities." Viewing the statement in isolation, the Court finds plaintiff's interpretation to be plausible – Yale's phrasing could have implied that the both the credit facilities and the bond covenants were being modified.

The problem, however, is that plaintiffs' interpretation fails to account for context, which it must. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005) ("The context of statements is often telling."). Courts must consider "the total mix of information available" to a

reasonable investor, *id.* at 669, particularly in a fraud-on-the-market case presuming the existence of an efficient market which promptly digests publicly available information.

The most useful context comes from the statements Yale had already made during the August 11 earnings call. He drew attention to the "significant news" of a "pending credit facilities modification." He expected lender consent for "such modification" and anticipated closing "on the revised facility" by the end of the week. It was this "modification" (in the singular, not the plural) which Yale felt would be WPG's bridge to the other side of the pandemic. Yale did not mention any modification to the bond covenants. Even in the remarks immediately preceding the one at issue, Yale drew a distinction between the credit facilities – for which the "modification" was WPG's focus – and the bond covenants – for which "compliance" was the focus. Compl., ¶ 277. At no time during the earnings call did Yale say there had been, or would be, modifications to the bond covenants.

And at no other time are defendants alleged to have told the market that WPG had entered into modifications of the bond covenants. According to the Complaint, WPG made an effort to renegotiate the bond covenants, but senior noteholders were too "disorganized" for a deal to happen. Compl., ¶ 239. The Complaint does not allege that defendants told the market that a deal was pending or had been closed.

In larger context, Yale prefaced his comments by referring to "[o]bviously, the significant news...." A day earlier, on August 10, WPG had filed a Form 8-K with the SEC in which it disclosed that that the company "has received the requisite lender consents for the modification of its existing $1.3B credit facilities." [9] WPG made no mention of a modification to the bond covenants in the Form 8-K.

The Court thus finds that the Complaint fails to plausibly allege that Yale misrepresented that WPG was modifying its bond covenants.

#### b. Loss Causation

Even if Yale's comments could have been construed by a reasonable investor to suggest that the bond covenants were being modified, the Complaint fails to allege the element of loss causation. WPG announced to the public on August 17 that it had formally signed agreements to modify the credit facilities. *See* Compl. ¶ 235. To the extent Yale's August 11 comments raised the possibility in an investor's

mind that the deal on which WPG "expect[ed] to close by the end of the week" would include modifications to both the credit facilities and the bond covenants, the August 17 announcement dispelled that notion. *See* Compl. ¶¶ 232, 233, 235.

**\*25** The August 17 press release to which the Complaint refers was included in WPG's Form 8-K filed on the same day. The Form 8-K disclosed that WPG had entered into modifications of only its "existing credit facilities," which were defined in the Form 8-K as the term loans and Revolver. No mention was made of modifications to the bond covenants. [10] The press release itself was entitled, "Washington Prime Group Announces Amendments to Its Credit Facilities." [11] Conforti stated in the release, "I'm pleased to announce the successful modification of our credit facilities without any reduction to their size of change to maturity dates." Again, no mention was made of a modification to the bond covenants.

In order for plaintiffs to plead loss causation, they must allege a drop in share price after WPG disclosed on August 17, 2020 that only the credit facilities had been modified. *See Indiana State*, 583 F.3d at 944 (holding that loss causation had not been adequately pled because plaintiff failed to "show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market") (citing *Dura*, 544 U.S. at 346–47). The Complaint fails to make such an allegation. The first corrective disclosure and corresponding drop in share value which are alleged in the Complaint did not occur until November 6, 2020, when WPG issued a statement that it had exceeded its debt covenants. *See* Compl., ¶ 244.

Accordingly, the Court finds that plaintiffs' claims as to the statements Yale made during the August 11, 2020 earnings call fail as a matter of law.

**B. September 15, 2020 Conference**

**1. Two Theories Asserted**

At a real estate conference on September 15, 2020, Yale responded to a question asking him to "describe the modification of your $1.3 billion credit facility" as follows:

> Yes. So, I mean, we're certainly pleased to be able to execute on that,

have the support of our debt partners, **really a bridge to get through the other side of the pandemic. That was important to us, to make sure we got the flexibility that we believe we needed with our covenants. We also wanted to make sure that we had the flexibility to continue to run our business. And there's ample flexibility in the modification for us to continue to reinvest through our redevelopment, which is most critical.** And it did come at a cost in terms of pricing. We had to provide some temporary collateral, but not full security. And I think it demonstrates the fact that our banking partners believe there's clearly a path forward for us. And they're being supportive because if they didn't, they probably would have taken a different tack with regard to the modification. So, simply put, it provides a bridge to the other side. And that's what we were looking for.

Compl., ¶ 279 (emphasis in the Complaint).

Conforti then added,

> **Yes. I mean, I'd just on just very quickly, they have our banking partners throughout the capital structure.** And I think it's a function of us focusing on operating infrastructure, tenant diversification, common area activation, adaptive reuse, that we are the logical aggregator in this business. **And our debt partners, and again, throughout the capital stack, have in effect, told us as such.** And we are incrementalists. We are doing things on a step-by-step basis and this was a very favorable outcome of every kind of modification. And they wouldn't have been – they wouldn't

have evidenced this flexibility if not for their belief in us, and just stay tuned.

*Id.* (emphasis in the Complaint).

**\*26** The parties once more take different views of what the Complaint alleges to be false about defendants' statements. Defendants interpret the Complaint as alleging that Yale and Conforti spoke falsely in referring to the credit facilities modification as "a bridge to the other side of the pandemic" and as providing "the flexibility to continue to run our business." Defendants contend that the comments are nothing more than vague optimism.

Plaintiffs again do not squarely respond. In their view, Yale and Conforti misleadingly "suggested" that WPG had the support of all of its creditors and had obtained relief on all of its debt covenants (not only the credit facilities but also the bonds). Doc. 56 at PAGEID 1423.

The Court finds, as it did with Yale's August 11 remarks, that the Complaint contains allegations asserting both theories. *See* Compl., ¶ 238 (alleging that the modification had not made "WPG's position any more secure" and it would not be able to survive the pandemic), ¶ 280 (alleging that "WPG had not received any changes to the bond covenants" and did not have the confidence of all of its creditors).

Even so, the Court again finds that both theories fail as a matter of law.

**2. Vague, Optimistic Statements are Not Material**
The September 15 statements express the same type of optimism which the August 11 ones did. Yale repeated his view that the credit facilities modification would be a "bridge to the other side of the pandemic." He reiterated his belief that it would provide the needed "flexibility" to "continue to run our business." He thought it showed WPG's banking partners were "being supportive" and believed there was a "path forward for us." Conforti called the situation "a very favorable outcome." Yale cautioned that the modification came "at a cost in terms of pricing" and that WPG had to provide temporary collateral.

The Court here too finds that Yale's and Conforti's comments are vague, loosely optimistic statements of opinion – a

conclusion which plaintiffs again do not attempt to dispute. While Yale said WPG would stick to its plan of "reinvesting through our redevelopment," defendants made no promises and offered no concrete numbers or financial details as to how WPG would withstand the pandemic. In sum, the Court finds that the comments at issue are not actionable. *See In re Sona Nanotech, Inc. Sec. Litig.*, 562 F. Supp. 3d 715, 725 (C.D. Cal. 2021) ("Plaintiffs claim this statement is a misrepresentation because the statement presented a falsely optimistic picture for FDA submission when the metrics of the clinical testing should have indicated otherwise. But this statement is just a hopeful statement by Regan that did not come true.").

**3. Purported Statements about Modifying the Bond Covenants**
Plaintiffs argue that defendants falsely "suggested" that WPG had the support of "all WPG's bankers and debt partners" and "had obtained covenant relief for all of its debt." Doc. 56 at PAGEID 1423. Once more, plaintiffs do not explain the basis for their theory, but the Court believes a fair assumption is that plaintiffs would associate "banking partners" with the credit facilities and "debt partners" with the bonds. At the very least, plaintiffs would argue that defendants, by suggesting they had the support of both types of partners throughout the capital structure or stack, were implying that they had received across-the-board covenant relief.

The Court must reject this theory. In context, Yale and Conforti were responding to a question about "the modification of your $1.3 billion credit facility." They never stated that all of WPG's creditors had agreed to covenant relief or that WPG had obtained relief on all of WPG's debt. And though the two men vaguely suggested they had the support of WPG's banking partners and debt partners, they never represented that the support took the concrete form of a modification or waiver of the bond covenants. As discussed above, defendants did not at any other time state that WPG was modifying its bond covenants. The Complaint alleges that WPG tried to obtained bond relied, but failed. The Complaint does not allege that WPG told investors that a deal was pending or had been closed.

**\*27** But even if Yale's and Conforti's comments could have caused a reasonable investor to momentarily think the bond covenants were being modified, the Complaint again fails to allege the element of loss causation. A Form 8-K and accompanying press release filed by WPG with the SEC on the same day, September 15, contained no mention of relief

to the bond covenants. [12] A reasonable investor would have realized almost immediately that WPG had not obtained bond covenant relief. Because the Complaint does not allege that WPG's share price dropped when this truth became known, plaintiffs have not properly pleaded loss causation.

Accordingly, the Court finds that plaintiffs' claims as to defendants' statements at the September 15, 2020 conference fail as a matter of law.

## VIII. Scheme Liability

Rule 10b-5, in addition to prohibiting the making of untrue statements of material fact in connection with the sale of a securities, prohibits employing a "device, scheme, or artifice to defraud" and engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a),(c). While there may be overlap between a claim for scheme liability and a claim based on a misrepresentation or omission, scheme liability must be based on "something *beyond* misstatements and omissions." *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original); *see also Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525 (6th Cir. 2023) ("Rules 10b–5(a) and (c) encompass conduct beyond disclosure violations....A scheme-liability claim is therefore different and separate from a nondisclosure claim.") (internal quotation marks omitted).

In their opposition to the motion to dismiss, plaintiffs contend that defendants failed to seek dismissal of plaintiffs' claims for scheme liability. Understandably, defendants reply that they did not mention scheme liability in their motion because the Complaint does not purport to assert such a claim. The actionable conduct identified in the Complaint concerns only defendants' alleged misrepresentations. Aside from recanting Rule 10b-5's language, *see* Compl., ¶ 294, the Complaint does not contain any substantive allegations supporting a theory of scheme liability based on conduct beyond the alleged misstatements.

Plaintiffs, in arguing in that they have sufficiently pleaded a deceptive or manipulative act, point back to the alleged misrepresentations. In particular, the acts they identify as being deceptive are defendants' communications with the investing public. *See* Doc. 56 at PAGEID 1426 (stating that defendants engaged in deceptive conduct by "reporting" and "present[ing]" the inflated yield numbers to investors). This

reinforces the Court's conclusion that the Complaint does not assert a claim for scheme liability.

Plaintiffs nonetheless argue that defendants engaged in the deceptive act of making manual adjustments to the deal sheets which were presented to WPG's Investment Committee. The deal sheets reflected WPG's internal analysis of anticipated yield for the various redevelopment projects. Defendants allegedly adjusted estimated income and estimated costs in order to increase the yield numbers. *See* Compl., ¶ 110.

Plaintiffs cite *S.E.C. v. City of Miami, Fla.*, 988 F. Supp. 2d 1343, 1351 (S.D. Fla. 2013), for the proposition that a company commits a deceptive act if it prepares misleading financial documents. But a critical distinction exists between *City of Miami* and this case. In that case and others like it, false financial documents were presented to auditors, credit rating agencies, financial institutions or other third parties to deceive them and accomplish a step in furtherance of the scheme, such as obtaining a clean audit or favorable credit rating. The company's scheme in those cases was to deceive external systems – audits, credit ratings, etc. – in order to maintain or increase the desirability of the company's securities in the eyes of investors. *See*, *e.g.*, *City of Miami.*, 988 F. Supp. 2d at 1351 (auditor and credit ratings agency); *S.E.C. v. AgFeed Indus., Inc.*, No. 3:14-CV-00663, 2016 WL 10934942, at *15 (M.D. Tenn. July 21, 2016) (outside advisors).

**\*28** In contrast, WPG's adjusted deal sheets went nowhere beyond its own managers. There is no allegation that the deal sheets were externally distributed, examined, or reviewed. Defendants' actions in adjusting the deal sheets thus did not "operate as a fraud or deceit upon any person," as is required for a deceptive act to support a claim of scheme liability. 17 C.F.R. § 240.10b-5(c).

## IV. Section 20(a) Claim

The Complaint asserts a claim for control person liability under Sections 20(a) of the Securities Exchange Act, 15 U.S.C § 78t(a). A § 20(a) claim is derivative of a § 10(b) claim and thus "there can be no liability under § 20(a) without an underlying violation of securities law." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 816 (6th Cir. 2022); *see also Dougherty*, 905 F.3d at 984. Because the Court has found that the Complaint fails to state a claim under § 10(b), the control person claim must be dismissed.

## X. Conclusion

Case 3:21-cv-00194-N   Document 152-1   Filed 05/13/24   Page 24 of 25   PageID 3419

Accordingly, defendants' motion to dismiss (doc. 52) is GRANTED.

*s/ James L. Graham*

JAMES L. GRAHAM

United States District Judge

DATE: March 27, 2024

**All Citations**

Slip Copy, 2024 WL 1307103

## Footnotes

1   The parties have not attached each and every document which WPG filed with the SEC during the class period. Plaintiffs attached one of WPG's filings to the Complaint as a representative "example." *See* Compl., ¶ 95, Ex. A. Defendants have attached several more SEC filings to their motion to dismiss. *See* Doc. 53. Because WPG's SEC filings are of public record and because the parties have made them integral to their claims and defenses, the Court may take judicial notice of all of WPG's SEC filings during the class period. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (holding that "when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC"); *Buckner v. JP Morgan Chase*, No. 1:17-CV-302, 2017 WL 6594018, at *6 n.2 (S.D. Ohio Dec. 22, 2017).

2   An earnings call is "a quasi-public conference call held by a company's management" after the release of quarterly or annual financial results. *Shupe v. Rocket Companies, Inc.*, 660 F.Supp.3d 647, 660 (E.D. Mich. 2023) (internal quotation marks omitted). Management discusses the company's financial performance and answers questions from participants, including financial analysts, investors, and the media. *Id.*

3   The Complaint does not identify a date for the earnings call, but simply calls it the "Q2 2020 Earnings Call." *Id.*, ¶ 277. According to defendants (and not disputed by plaintiffs), the earnings call took place on August 11, 2020. *See* Defs.' Mot. to Dismiss (Doc. 52), p. 20.

4   The Complaint twice identifies 2021 as the year in which the November 6 disclosure occurred. *Id.*, ¶¶ 241, 244. This is likely an error because November 6, 2021 post-dates WPG's bankruptcy filing in June 2021. Elsewhere, the Complaint says that 2020 was the year. *Id.*, ¶ 24.

5   https://www.sec.gov/Archives/edgar/data/1594686/000159468618000029/a2018q3exhibit992supplemen.htm

6   https://www.sec.gov/Archives/edgar/data/1594686/000159468618000031/wpg10-qseptember302018.htm

7   https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001594686/000159468619000034/wpg10-

qseptember302019.htm (Oct. 24, 2019 10-Q);

https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001594686/000159468620000034/wpg-

20200930.htm (Nov. 6, 2020 10-Q)

8   https://www.sec.gov/Archives/edgar/data/1594686/000159468619000007/wpg201810-k.htm   (Feb.   21, 2019)

| 9 | https://www.sec.gov/Archives/edgar/data/1594686/000159468620000026/exhibit991-2q20.htm |
|---|---|
| 10 | https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/1594686/000143774920018190/wpg20200815_8k.htm |
| 11 | https://www.sec.gov/Archives/edgar/data/1594686/000143774920018190/ex_200032.htm |
| 12 | https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001594686/000143774920019000/wpg20200915_8k.htm |

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.