## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | |
| *Plaintiff*, | ) ) ) | |
| v. | ) ) | Civil Action No. 3:21-cv-00194-N |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, | ) ) ) ) | |
| *Defendants*. | ) ) ) ) ) ) | |

**APPENDIX IN SUPPORT OF DEFENDANTS' RESPONSE TO LEAD PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED CLASS ACTION COMPLAINT AND MOTION FOR RECONSIDERATION AND BRIEF IN SUPPORT**

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, TX 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122

*Attorneys for Defendants Exxon Mobil Corporation, Darren W. Woods, Liam M. Mallon, and Melissa Bond*

In support of Defendants' Response to Lead Plaintiffs' Motion for Leave to File a Third

Amended Class Action Complaint and Motion for Reconsideration and Brief in Support, attached

are true and correct copies of the following documents:

| Exhibit No. | Description | Page(s) |
|---|---|---|
| A | Declaration of Wallis M. Hampton | A-1 – A-6 |
| 1 | Excerpts from Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, dated January 4, 2024 (unfiled) | A-7 – A-11 |
| 2 | December 20, 2019 presentation titled "Permian 2020 Plans" (EXXONPBA00097010-97053) | A-12 – A-55 |
| 3 | September 24, 2020 presentation titled "Section 2 Permian Spotlight" (EXXONPBA00095367-95495) | A-56 – A-184 |
| 4 | April 11, 2019 presentation titled "Delaware Planning Overview" (EXXONPBA00095587) | A-185 – A-188 |
| 5 | May 24, 2019 email from Emily Hills to Melissa Bond, Carl Brooks, Jason Gahr, and Kendal Decker attaching spreadsheet titled "19CP Drilling Assumptions_Update_24May2019" (EXXONPBA00049873-49875) | A-189 – A-194 |
| 6 | June 5, 2019 email from Kendal Decker to Melissa Bond (EXXONPBA00038932-38934) | A-195 – A-197 |
| 7 | May 20, 2019 email from Melissa Bond to Carman Mullins (EXXONPBA00049744-49745) | A-198 – A-204 |
| 8 | May 22, 2019 email from Kristin Youngless to Ozgur Ozen (EXXONPBA00049775-49777) | A-205 – A-207 |
| 9 | May 22, 2019 email from Florencia Kabas to Lindsey Gulden and Damian Burch (EXXONPBA00049849-49850) | A-208 – A-224 |

| Exhibit No. | Description | Page(s) |
|---|---|---|
| 10 | November 14, 2019 email from Damian Burch to Scott Clingman (EXXONPBA00002962-2965) | A-225 – A-228 |
| 11 | June 27, 2019 email from Diptesh Sharma to Melissa Bond, Ozgur Ozen, Michael O'Reilly, Alejandro Tello, and Caroline Breaux (EXXONPBA00088758) | A-229 |
| 12 | March 24, 2020 email from Timothy Pommett to Lindsey Gulden, James Hagemann, and Emily Hills attaching June 18, 2019 spreadsheet titled "2019 P&B Input Assumptions_06182019" (EXXONPBA00035918-35920) | A-230 – A-286 |
| 13 | Exxon Mobil Corporation's May 1, 2020 Earnings Call Transcript | A-287 – A-309 |
| 14 | March 14, 2020 email from Staale Gjervik (EXXONPBA00106133-106134) | A-310 – A-311 |
| 15 | Excerpts from Web Page from the World Health Organization's website titled "Coronavirus Disease (COVID-19) Pandemic" (retrieved October 28, 2024) | A-312 – A-313 |
| 16 | March 10, 2020 *Wall Street Journal* article titled "Inside Saudi Arabia's Decision to Launch an Oil-Price War" | A-314 – A-320 |
| 17 | August 20, 2024 email exchange Between Alex Forgione, Counsel for Plaintiffs, and Michael Restey, Counsel for Defendants | A-321 – A-331 |
| 18 | January 20, 2022 letter from David B. Reece, Assistant Director of the United States Securities and Exchange Commission, to David R. Woodcock, Assistant General Counsel to Exxon Mobil Corporation | A-332 |
| 19 | February 19, 2020 presentation titled "January Monthly Report Permian Basin" (EXXONPBA00116391) | A-333 – A-398 |

| Exhibit No. | Description | Page(s) |
|:---:|---|:---:|
| 20 | Excerpts from the Federal Reserve Bank of St. Louis's website titled "Crude Oil Prices: West Texas Intermediate (WTI) - Cushing, Oklahoma" (retrieved October 29, 2024) | A-399 – A-400 |
| 21 | December 10, 2019 presentation titled "4Q Upstream Reserve and Resource Committee Presentation – Unconventionals" (EXXONPBA00089139-89161) | A-401 – A-423 |
| 22 | September 23, 2019 letter to the ExxonMobil Management Committee titled "2019 Program Budget Addition for Upstream Oil & Gas" (EXXONPBA00114868) | A-424 – A-433 |

Dated: November 1, 2024

Respectfully submitted,

*Noelle M. Reed*

Noelle M. Reed
   State Bar No. 24044211
Abigail E. Davis
   State Bar No. 24139564
Wallis M. Hampton
   State Bar No. 00784199
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122
noelle.reed@skadden.com
abigail.sheehan@skadden.com
wallis.hampton@skadden.com

Michelle L. Davis
   State Bar No. 24038854
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
308 Bahama Court
Granbury, Texas 76048
Tel.: (713) 655-5197
Fax: (713) 483-9197
michelle.davis@skadden.com

Michael W. Restey Jr. (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Tel.: (212) 735-3000
Fax: (212) 735-2000
michael.restey@skadden.com

*Attorneys for Defendants*
*Exxon Mobil Corporation, Darren W. Woods,*
*Liam M. Mallon, and Melissa Bond*

5

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, <br><br> *Plaintiff,* <br><br> v. <br><br> EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, <br><br> *Defendants.* | Civil Action No. 3:21-cv-00194-N |

## DECLARATION OF WALLIS M. HAMPTON

1.       My name is Wallis M. Hampton.  I am a counsel in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), resident in the firm's Houston office.  I am over the age of 18, of sound mind, am competent to make this declaration, and every statement herein is based upon my personal knowledge or on information provided to me and is true and correct to the best of my knowledge.  I represent Defendants Exxon Mobil Corporation, Darren W. Woods, Liam M. Mallon, and Melissa Bond ("Defendants") in the above-captioned matter.

2.       I submit this declaration in support of Defendants' Response to Lead Plaintiffs' Motion for Leave to File a Third Amended Class Action Complaint and Motion for Reconsideration and Brief in Support.

A-1

3.      Attached as Exhibit 1 is a true and correct copy of excerpts from Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, which was served on Defendants on January 4, 2024.

4.      Attached as Exhibit 2 is a true and correct copy of a slide-deck Bates-stamped EXXONPBA00097010-97053, which was produced by Defendants to Lead Plaintiffs ("Plaintiffs") on August 16, 2024.

5.      Attached as Exhibit 3 is a true and correct copy of a slide-deck Bates-stamped EXXONPBA00095367-95495, which was produced by Defendants to Plaintiffs on July 5, 2024.

6.      Attached as Exhibit 4 is a true and correct copy of a slide-deck Bates-stamped EXXONPBA00095587, which was produced by Defendants to Plaintiffs on July 5, 2024.

7.      Attached as Exhibit 5 is a true and correct copy of an email with an excel sheet attachment, Bates-stamped EXXONPBA00049873-49875, which was produced by Defendants to Plaintiffs on May 24, 2024.

8.      Attached as Exhibit 6 is a true and correct copy of an email Bates-stamped EXXONPBA00038932-38934, which was produced by Defendants to Plaintiffs on May 24, 2024.

9.      Attached as Exhibit 7 is a true and correct copy of an email Bates-stamped EXXONPBA00049744-49745, which was produced by Defendants to Plaintiffs on May 24, 2024.

10.     Attached as Exhibit 8 is a true and correct copy of an email Bates-stamped EXXONPBA00049775-49777, which was produced by Defendants to Plaintiffs on May 24, 2024.

11.     Attached as Exhibit 9 is a true and correct copy of an email Bates-stamped EXXONPBA00049849-49850, which was produced by Defendants to Plaintiffs on May 24, 2024.

12.     Attached as Exhibit 10 is a true and correct copy of an email Bates-stamped EXXONPBA00002962-2965, produced by Defendants to Plaintiffs on May 3, 2024.

13.    Attached as Exhibit 11 is a true and correct copy of an email Bates-stamped EXXONPBA00088758, which was produced by Defendants to Plaintiffs on June 28, 2024.

14.    Attached as Exhibit 12 is a true and correct copy of an email with an excel sheet attachment, Bates-stamped EXXONPBA00035918-35920, which was produced by Defendants to Plaintiffs on May 24, 2024.

15.    Attached as Exhibit 13 is a true and correct copy of the transcript of an earnings call held by ExxonMobil on May 1, 2020.

16.    Attached as Exhibit 14 is a true and correct copy of an email Bates-stamped EXXONPBA00106133-106134, which was produced by Defendants to Plaintiffs on August 16, 2024.

17.    Attached as Exhibit 15 is a true and correct copy of excerpts from a web page from the World Health Organization's website titled "Coronavirus Disease (COVID-19) Pandemic."

18.    Attached as Exhibit 16 is a true and correct copy of a *Wall Street Journal* article dated March 10, 2020 titled "Inside Saudi Arabia's Decision to Launch an Oil-Price War."

19.    Attached as Exhibit 17 is a true and correct copy of emails exchanged between Alex Forgione, Counsel for Plaintiffs, and Michael Restey, Counsel for Defendants, on August 20, 2024.

20.    Attached as Exhibit 18 is a true and correct copy of a letter from David B. Reece, Assistant Director of the United States Securities and Exchange Commission, to David R. Woodcock, Assistant General Counsel to Exxon Mobil Corporation, dated January 20, 2022.

21.    Attached as Exhibit 19 is a true and correct copy of a slide-deck Bates-stamped EXXONPBA00116391, which was produced by Defendants to Plaintiffs on August 16, 2024.

3

A-3

22.    Attached as Exhibit 20 is a true and correct copy of excerpts from a webpage from the Federal Reserve Bank of St. Louis's website titled "Crude Oil Prices: West Texas Intermediate (WTI) - Cushing, Oklahoma."

23.    Attached as Exhibit 21 is a true and correct copy of a presentation Bates-stamped EXXONPBA00089139-89161, which was produced by Defendants to Plaintiffs on June 28, 2024.

24.    Attached as Exhibit 22 is a true and correct copy of a letter Bates-stamped EXXONPBA00114868-14877, which was produced by Defendants to Plaintiffs on August 16, 2024.

25.    The following chart identifies the documents that Plaintiffs appear to be referring to or quoting in the following paragraphs of Lead Plaintiffs' Proposed Third Amended Class Action Complaint and the dates that Defendants produced those documents.

| Paragraph Numer ¶ | Bates Number | Date Produced |
|---|---|---|
| 172 | EXXONPBA00048086 | May 24, 2024 |
| 173 | EXXONPBA00048482 | May 24, 2024 |
| 174 | EXXONPBA00048703 | May 24, 2024 |
| 175 | EXXONPBA00088718 | June 28, 2024 |
| 176 | EXXONPBA00089874 | June 28, 2024 |
| 176 | EXXONPBA00089874 | June 28, 2024 |
| 178 | EXXONPBA00049011 | May 24, 2024 |
| 178 | EXXONPBA00049012 | May 24, 2024 |
| 180 | EXXONPBA00089969 | June 28, 2024 |
| 180 | EXXONPBA00089970 | June 28, 2024 |
| 181 | EXXONPBA00090044 | June 28, 2024 |
| 182 | EXXONPBA00090000 | June 28, 2024 |
| 183 | EXXONPBA00049744 | May 24, 2024 |
| 183 | EXXONPBA00049775 | May 24, 2024 |
| 184 | EXXONPBA00049775 | May 24, 2024 |
| 187 | EXXONPBA00049849 | May 24, 2024 |
| 187 | EXXONPBA00049850 | May 24, 2024 |
| 188 | EXXONPBA00049858 | May 24, 2024 |
| 191-192 | EXXONPBA00087877 | June 28, 2024 |

4

A-4

| 191-192 | EXXONPBA00087878 | June 28, 2024 |
| 191-192 | EXXONPBA00087879 | June 28, 2024 |
| 194 | EXXONPBA00087869 | June 28, 2024 |
| 193 | EXXONPBA00090672 | June 28, 2024 |
| 195 | EXXONPBA00002962 | May 3, 2024 |
| 196 | EXXONPBA00002962 | May 3, 2024 |
| 196 | EXXONPBA00024995 | May 24, 2024 |
| 198 | EXXONPBA00004779 | May 3, 2024 |
| 199 | EXXONPBA00102858 | August 16, 2024 |
| 200 | EXXONPBA00039015 | May 24, 2024 |
| 200 | EXXONPBA00039015 | May 24, 2024 |
| 201 | EXXONPBA00088758 | June 28, 2024 |
| 202 | EXXONPBA00107150 | August 16, 2024 |
| 203 | EXXONPBA00039065 | May 24, 2024 |
| 203 | EXXONPBA00039069 | May 24, 2024 |
| 205 | EXXONPBA00107217 | August 16, 2024 |
| 206 | EXXONPBA00051250 | May 24, 2024 |
| 207 | EXXONPBA00085044 | June 28, 2024 |
| 207 | EXXONPBA00085044 | June 28, 2024 |
| 208 | EXXONPBA00088769 | June 28, 2024 |
| 210-213 | EXXONPBA00090679 | June 28, 2024 |
| 215-218 | EXXONPBA00083644 | June 28, 2024 |
| 215-218 | EXXONPBA00083645 | June 28, 2024 |
| 222-224 | EXXONPBA00083749 | June 28, 2024 |
| 222-224 | EXXONPBA00083750 | June 28, 2024 |
| 225 | EXXONPBA00037503 | May 24, 2024 |
| 227 | EXXONPBA00088057 | June 28, 2024 |
| 227 | EXXONPBA00088058 | June 28, 2024 |
| 209 | EXXONPBA00002962 | May 3, 2024 |
| 228 | EXXONPBA00088073 | June 28, 2024 |
| 228 | EXXONPBA00088075 | June 28, 2024 |
| 229 | EXXONPBA00085550 | June 28, 2024 |
| 230 | EXXONPBA00085552 | June 28, 2024 |
| 232 | EXXONPBA00113122 | August 16, 2024 |
| 232 | EXXONPBA00113123 | August 16, 2024 |
| 232 | EXXONPBA00113130 | August 16, 2024 |
| 234 | EXXONPBA00113130 | August 16, 2024 |
| 234 | EXXONPBA00113132 | August 16, 2024 |
| 235 | EXXONPBA00086071 | June 28, 2024 |
| 235 | EXXONPBA00086073 | June 28, 2024 |
| 237 | EXXONPBA00045470 | May 24, 2024 |

5

A-5

| 238 | EXXONPBA00047566 | May 24, 2024 |

26.    The following chart summarizes Defendants' document productions to Plaintiffs.

| Production Volume | Date | Number of Documents | Number of Pages |
|---|---|---|---|
| 1 | May 3, 2024 | 2,439 | 20,574 |
| 2 | May 24, 2024 | 8,256 | 36,934 |
| 3 | June 25, 2024 | 3,729 | 22,917 |
| 4 | June 28, 2024 | 1,972 | 14,924 |
| 5 | July 5, 2024 | 91 | 365 |
| 6 | August 16, 2024 | 5,941 | 24,266 |
| Total | | 22,428 | 119,980 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 1, 2024.

Wallis M. Hampton

6

A-6

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND,<br><br>Defendants. | Civil Action No.: 3:21-cv-00194-N |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR CLASS CERTIFICATION</u>

A-7

against Defendants Woods and Mallon and all claims for alleged materially false and misleading statements and omissions made between March 7, 2018 and March 4, 2019, inclusive, if and when the Court issues a final dispositive ruling.

### C.    ALLEGATIONS AGAINST DEFENDANTS

Exxon is one of the world's largest, and best known, oil and gas companies. ¶41. It is engaged in the development, acquisition and exploitation of crude oil and natural gas resources worldwide. *Id.* Exxon owns considerable land in the Permian Basin, a large oil and gas reservoir in the southwestern United States. *Id.* Exxon's common stock trades on the NYSE under the ticker symbol "XOM." *Id.*

Throughout the Class Period, Defendants Exxon and Bond engaged in a scheme to defraud investors concerning the value of Exxon's assets in the Permian Basin, which includes the Delaware Basin. *Id.* Specifically, when Defendant Woods told the public that Exxon would achieve a production goal of 1 million oil-equivalent barrels per day by 2024 in the Permian Basin, Defendant Bond sought to match Woods's claims by artificially inflating the value of Exxon's Delaware Basin development plan. ¶¶105-243. As confirmed by Exxon whistleblowers, Defendant Mallon instructed Defendant Bond to come up with a development plan that matched Woods' false production goal and to boost critical assumptions about drilling speeds to arrive at the desired result, among other things. ¶¶122-26, 129. Bond, in turn, dictated to her team to use overly aggressive "learning curve" drilling assumptions, which Exxon engineers told her were impossible to achieve. ¶¶127-28, 130-32.

As detailed in the Complaint, Exxon used the overvalued development plan, which included falsified drilling assumptions, to substantiate not only its production goal but also Exxon's public proved reserve and resource base calculations. ¶¶270-73. For instance, Bond manipulated the development plan to match Woods's false production goals, and Exxon

4

the Class certification by first class mail, which notice is supplemented by publication in prominent news outlets and on a case website. *See* Counsel Decl. ¶9. The estimated expense for such notice will be approximately $1.3-1.8 million, sourced from Lead Counsel. *Id.*

Second, the arrangements for payment of Lead Counsel's attorneys' fees are based on retainer agreements between Lead Plaintiffs and Lead Counsel which provide that attorneys' fees are fully contingent on a recovery in this matter, will be a reasonable percentage of any recovery, and are subject to the approval of the *Lead* Plaintiffs and ultimately the Court after the matter has been resolved. *Id.* ¶8. In addition, Liaison Counsel McKool Smith P.C. ("Liaison Counsel") has agreed to be paid on a fully contingent basis based on Liaison Counsel's lodestar, calculated at the same multiplier awarded to Lead Counsel. *Id.*

## IV.   CONCLUSION

For the foregoing reasons, and based on the additional information in the accompanying Declarations, Plaintiffs respectfully request that the Court: (a) enter an order certifying this action as a class action; (b) appoint Plaintiffs Amalgamated and Rhode Island as Class Representatives; and (c) appoint G&E and BLB&G as Class Counsel.

DATED:  January 4, 2024                    Respectfully submitted,

                                           */s/ Daniel L. Berger*

                                           **GRANT & EISENHOFER P.A.**
                                           Daniel L. Berger
                                           Caitlin M. Moyna
                                           Lauren J. Salamon
                                           485 Lexington Avenue
                                           New York, NY 10017
                                           Telephone: (646) 722-8500
                                           Facsimile: (646) 722-8501
                                           dberger@gelaw.com
                                           cmoyna@gelaw.com
                                           lsalamon@gelaw.com

25

A-9

*Counsel for Plaintiffs, Lead Counsel for the Class and proposed Class Counsel*


/s/ John Rizio-Hamilton


**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

John Rizio-Hamilton
Rebecca E. Boon
John Esmay
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
rebecca.boon@blbglaw.com
john.esmay@blbglaw.com

*Counsel for Plaintiffs, Lead Counsel for the Class and proposed Class Counsel*

Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
McKOOL SMITH PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

26

A-10

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2024, I served the foregoing and all accompanying declarations and exhibits by email to all counsel of record.

By: ___/s/ John Esmay___
John Esmay

# EXHIBIT 2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097010

2

A-13

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097011

3

A-14

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097012

4

A-15

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097013

5

A-16

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097014

6

A-17

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097015

7

A-18

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097016

A-19

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097017

9

A-20

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097018

10

A-21

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097019

11

A-22

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097020

12

A-23

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097021

A-24

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097022

14

A-25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097023

15

A-26

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097024

Case 3:21-cv-00194-N    Document 167    Filed 11/01/24    Page 35 of 461    PageID 4367

16

A-27

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097025

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097026

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097027

19

A-30

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097028

A-31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097029

A-32

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097030

22

A-33

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097031

23

A-34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097032

24

A-35

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097033

25

A-36

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097034

26

A-37

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097035

27

A-38

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097036

28

A-39

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097037

29

A-40

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097038

30

A-41

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097039

31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097040

32

A-43

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097041

33

A-44

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097042

34

A-45

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097043

35

A-46

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097044

36

A-47

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097045

37

A-48

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097046

38

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-49

EXXONPBA00097047

39

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-50

EXXONPBA00097048

A-51

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097049

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097050

A-53

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097051

A-54

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097052

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00097053

# EXHIBIT 3

A-56

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095367

A-57

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095368

A-58

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095369

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095370

A-60

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095371

A-61

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095372

A-62

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095373

A-63

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095374

A-64

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095375

A-65

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095376

A-66

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095377

A-67

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095378

A-68

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095379

A-69

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095380

A-70

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095381

A-71

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095382

A-72

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095383

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095384

A-74

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095385

A-75

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095386

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095387

A-77

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095388

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095389

A-79

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095390

A-80

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095391

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095392

A-82

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095393

A-83

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095394

A-84

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095395

A-85

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095396

A-86

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095397

A-87

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095398

A-88

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095399

A-89

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095400

A-90

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095401

A-91

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095402

A-92

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095403

A-93

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095404

A-94

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095405

A-95

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095406

A-96

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095407

A-97

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095408

A-98

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095409

A-99

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095410

A-100

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095411

A-101

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095412

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095413

A-103

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095414

A-104

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095415

A-105

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095416

A-106

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095417

A-107

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095418

A-108

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095419

A-109

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095420

A-110

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095421

A-111

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095422

A-112

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095423

A-113

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095424

A-114

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095425

A-115

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095426

A-116

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095427

A-117

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095428

A-118

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095429

A-119

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095430

A-120

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095431

A-121

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095432

A-122

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095433

A-123

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095434

A-124

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095435

A-125

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095436

A-126

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095437

A-127

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095438

A-128

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095439

A-129

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095440

A-130

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095441

A-131

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095442

A-132

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095443

A-133

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095444

A-134

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095445

A-135

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095446

A-136

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095447

A-137

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095448

A-138

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095449

A-139

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095450

A-140

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095451

A-141

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095452

A-142

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095453

A-143

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095454

A-144

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095455

A-145

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095456

A-146

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095457

A-147

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095458

A-148

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095459

A-149

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095460

A-150

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095461

A-151

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095462

A-152

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095463

A-153

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095464

A-154

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095465

A-155

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095466

A-156

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095467

A-157

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095468

A-158

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095469

A-159

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095470

A-160

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095471

A-161

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095472

A-162

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095473

A-163

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095474

A-164

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095475

A-165

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095476

A-166

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095477

A-167

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095478

A-168

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095479

A-169

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095480

A-170

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095481

A-171

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095482

A-172

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095483

A-173

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095484

A-174

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095485

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095486

A-176

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095487

A-177

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095488

A-178

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095489

A-179

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095490

A-180

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095491

A-181

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095492

A-182

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095493

A-183

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095494

A-184

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    EXXONPBA00095495

# EXHIBIT 4

File Produced Natively

A-185

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00095587

# EXHIBIT 5

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00049873

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-190

EXXONPBA00049874

File Produced Natively

A-191

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00049875

# EXHIBIT 6

A-195

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00038932

A-196

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00038933

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-197

EXXONPBA00038934

# EXHIBIT 7

A-198

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00049744

File Produced Natively

A-199

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00049745

# EXHIBIT 8

A-205

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00049775

A-206

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00049776

A-207

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-208

EXXONPBA00049849

File Produced Natively

A-209

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00049850

# EXHIBIT 10

A-225

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    EXXONPBA00002962

A-226

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00002963

A-227

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-228

EXXONPBA00002965

# EXHIBIT 11

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-229

EXXONPBA00088758

# EXHIBIT 12

A-230

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                                      EXXONPBA00035918

A-231

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

File Produced Natively

A-232

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00035920

A-286

# EXHIBIT 13

**S&P Global**
Market Intelligence

# Exxon Mobil Corporation NYSE:XOM
# FQ1 2020 Earnings Call Transcripts

## Friday, May 01, 2020 1:30 PM GMT

### S&P Global Market Intelligence Estimates

|  | -FQ1 2020- | | | -FQ2 2020- | -FY 2020- | -FY 2021- |
|---|---|---|---|---|---|---|
|  | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS Normalized** | 0.05 | 0.53 | ▲960.00 | (0.54) | (0.47) | 1.42 |
| **Revenue (mm)** | 58254.07 | 56158.00 | ▼(3.60 %) | 43010.37 | 200691.30 | 219381.89 |

Currency: USD
Consensus as of May-01-2020 1:02 PM GMT



**Stock Price [USD] vs. Volume [mm] with earnings surprise annotations**

| - EPS NORMALIZED - | | | |
|---|---|---|---|
|  | CONSENSUS | ACTUAL | SURPRISE |
| **FQ2 2019** | 0.71 | 0.61 | ▼1 (14.08 %) |
| **FQ3 2019** | 0.66 | 0.68 | ▲2 3.03 % |
| **FQ4 2019** | 0.45 | 0.41 | ▼3 (8.89 %) |
| **FQ1 2020** | 0.05 | 0.53 | ▲4 960.00 % |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

1

A-287

# Contents

# Table of Contents

| | | |
|---|---|---|
| **Call Participants** | ................................................................................... | **3** |
| **Presentation** | ................................................................................... | **4** |
| **Question and Answer** | ................................................................................... | **11** |

COPYRIGHT © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
**spglobal.com/marketintelligence**

A-288

# Call Participants

**EXECUTIVES**

**Darren W. Woods**
*Chairman & CEO*

**Stephen A. Littleton**
*VP of Investor Relations &*
*Corporate Secretary*

**ANALYSTS**

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research*
*Division*

**Douglas Todd Terreson**
*Evercore ISI Institutional Equities,*
*Research Division*

**Jason Gammel**
*Jefferies LLC, Research Division*

**Jeanine Wai**
*Barclays Bank PLC, Research*
*Division*

**Jonathon Rigby**
*UBS Investment Bank, Research*
*Division*

**Neil Singhvi Mehta**
*Goldman Sachs Group Inc.,*
*Research Division*

**Philip Mulkey Gresh**
*JP Morgan Chase & Co, Research*
*Division*

**Roger David Read**
*Wells Fargo Securities, LLC,*
*Research Division*

**Sam Jeffrey Margolin**
*Wolfe Research, LLC*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N    Document 167    Filed 11/01/24    Page 309 of 461    PageID 4641

# Presentation

**Operator**

Good day, everyone, and welcome to this Exxon Mobil Corporation First Quarter 2020 Earnings Call. Today's call is being recorded. At this time, I'd like to turn the call over to the Vice President of Investor Relations and Secretary, Mr. Stephen Littleton. Please go ahead, sir.

**Stephen A. Littleton**
*VP of Investor Relations & Corporate Secretary*

Thank you. Good morning, everyone. Welcome to our first quarter earnings call. We appreciate your participation and continued interest in Exxon Mobil. As a quick introduction, my name is Stephen Littleton. I assumed the role of Vice President of Investor Relations on March 15. Joining me on the call today is our Chairman and CEO, Darren Woods.

Before discussing our results, I would like to express our hope that all of you listening and your families are safe and taking the appropriate steps to fight the coronavirus. These are challenging and unprecedented times as the world deals with and adapts to the coronavirus pandemic. Global economies have slowed down significantly as governments work to contain the disease.

During the call today, we will put our results into context and share with you how our business performed in the first quarter. After I cover the quarterly financial and operating results, Darren will provide his perspectives, reflecting on the broader market environment and steps we're taking to both respond to these challenges and ensure we remain well positioned for the recovery.

Following Darren's remarks, I will be happy to address specifics on the quarterly reported results, while Darren will be available to take your question on broader themes, including the corporation's actions related to COVID, progress on major growth projects, strategic priorities and views on market fundamentals.

Our comments this morning will reference the slides available on the Investors section of our website. I would also like to draw your attention to the cautionary statement on Slide 2 and supplemental information at the end of this presentation.

As referenced in the cautionary statement, please take note that in light of the COVID-19 pandemic and reduced spending plans we've put in place, many of the forward-looking statements from our Investor Day have changed. We will provide a perspective on updates during this call and will provide a longer-term perspective as we head into next year.

I'll now highlight developments since the fourth quarter on the next slide. In the Upstream, liquids realizations fell significantly through the quarter, approximately 55%, as impacts from the coronavirus rippled through the global economy, significantly reducing demand. From an operational standpoint, liquids production increased by 2% from the fourth quarter, leading to the highest quarterly liquids production since 2016, including a 15% increase in liquids from the Permian. If we look at total production from the Permian, it has increased by 20%.

Kearl achieved record production in the first quarter, reflecting the benefit of the investment in additional ore crushing capacity, which will further reduce unit costs. Offshore Brazil, the Uirapuru exploration well discovered hydrocarbons, and results are now being analyzed to inform further exploration activities.

In the Downstream, refining margins fell to similar levels as first quarter 2019 and remain near 10-year lows, with the COVID impact significantly reducing demand in March. Refinery utilization was essentially flat with lower maintenance levels than the prior quarter, largely offset by reduced demand.

Margins improved in the Chemical business, benefiting from lower liquids feedstock prices. Our employees have stepped up in a significant way to support the ongoing COVID-19 response efforts. Darren will provide additional details on how we are maximizing production of key products, redirecting shareholder

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N  Document 167  Filed 11/01/24  Page 310 of 461  PageID 4642

contributions and lending our technical expertise to aid health care workers, first responders and others in the fight against the coronavirus.

Let's move to Slide 4 for an overview of first quarter results. The table on the left provides a view of first quarter results relative to fourth quarter 2019. For context, let me walk you through the impact of the identified items.

Starting with the fourth quarter 2019. The results of $5.7 billion included identified items of $3.9 billion, notably the Norway divestment. Excluding these items, fourth quarter results were $1.8 billion. Despite this challenging environment, the underlying business results, excluding identified items, were $2.3 billion, up $500 million from the fourth quarter. As shown in the middle section of this table, liquids growth and lower operating expenses increased earnings, while the absence of year-end LIFO impacts was a partial offset.

U.S. GAAP first quarter earnings of a negative $600 million include the impacts of 2 separate noncash identified items. The first was an adjustment to inventory valuation. Given the significant drop in commodity prices in the first quarter, the book value of our inventory was adjusted downward to reflect the lower market values in accordance with U.S. GAAP. This lower cost of market adjustment resulted in a charge of $2.1 billion. It is important to note that we may see further adjustments during the year or potentially an unwinding of the first quarter impact depending on changes in commodity prices going forward.

The second item was related to impairments of about $800 million. Market conditions in the first quarter, which included significant reductions in both commodity prices and equity markets, required an assessment of carrying values for some assets. This evaluation resulted in noncash impairment charges of approximately $800 million to recognize reduced market values assigned to goodwill and an upstream equity company, again, consistent with U.S. GAAP.

Turning now to Slide 5. We'll look at each of our businesses in detail, excluding identified items I just discussed, starting with the Upstream. Upstream earnings, excluding identified items, decreased by approximately $1 billion largely driven by lower prices, which reduced earnings by more than $1.7 billion, with liquid realizations down 25% and gas realizations down 10% versus the fourth quarter. This was partly offset by favorable foreign exchange impacts and higher volumes primarily from strong growth in the Permian and Guyana. Lower expenses and favorable tax items were also a help to earnings.

On the next slides, I will provide more details on volumes. Liquids volumes grew by approximately 150,000 oil equivalent barrels per day compared to the first quarter of 2019. Divestments, primarily the Norway nonoperated business, reduced liquids volumes by 95,000 oil equivalent barrels per day. Growth of 100,000 oil equivalent barrels per day was underpinned by the Permian and Guyana Phase 1, ramp-up at Kearl and Hebron and the Upper Zakum project in Abu Dhabi.

Permian production in the quarter was more than 350,000 oil equivalent barrels per day, an increase of 56% versus the prior year or 126,000 oil equivalent barrels per day. Natural gas volumes were down 88,000 oil equivalent barrels per day versus the prior quarter driven by Norway and Mobile Bay divestments as well as lower demand.

Moving to Downstream on the next slide. Earnings, excluding identified items, increased by more than $400 million relative to the fourth quarter of 2019. The absence of year-end LIFO inventory adjustments and unfavorable foreign exchange impacts reduced earnings by nearly $700 million.

Favorable margin impacts increased earnings by more than $900 million. The increase was driven by positive mark-to-market trading benefits, which were partly offset by lower refining margins as demand declined in the quarter, particularly in March. We also saw impact related to no demand with COVID-19, but this was more than offset by lower expenses that increased earnings by $300 million.

Moving to the next slide, I will discuss Chemical results. Chemical earnings, excluding identified items, increased by more than $800 million with a significant improvement in margins from lower fee costs across the value chain, reflecting the benefit of integration. Additionally, lower expenses contributed approximately 30% of the earnings improvement.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N    Document 167    Filed 11/01/24    Page 311 of 461    PageID 4643

Let's turn to the next page for a look at first quarter cash profile. First quarter earnings, when adjusted for depreciation expense, noncash identified items, changes in working capital and other impacts, yielded $6.3 billion in cash flow from operating activities. Cash flow from operations and asset sales was $6.4 billion. Shareholder distributions were $3.7 billion, consistent with fourth quarter and leaving $2.7 billion after distributions.

First quarter additions to PP&E and net investments and advances were $6.5 billion. As noted in the press release, CapEx was $7.1 billion in the quarter. As the announced reductions are implemented, CapEx will trim down over the course of the remaining year.

Gross debt increased approximately $13 billion in the quarter as we took steps to increase liquidity in the current market environment. As a result, we ended the quarter with $11.4 billion of cash.

Turning to Slide 11. I will cover a few items for consideration with regards to our outlook for the second quarter. Given the challenging market conditions, production will be lower in the second quarter due to economic shut-ins and market-related curtailments. At this time, the estimated second quarter impact is 400,000 oil equivalent barrels per day. Also in the Upstream, natural gas production will be lower due to seasonal demand with an expected impact of approximately 100,000 oil equivalent barrels per day.

In the Downstream, we are seeing impact from reduced demand with continued pressure on refining margins. For the second quarter, we anticipate sparing of approximately 25% of our refining capacity. Scheduled maintenance is anticipated to be in line with levels from the first quarter.

In Chemical, we anticipate continued margin support from lower liquids feedstock pricing while noting that overall realizations remain near bottom cycle for many of our products. Sentiment for the second quarter Chemical demand is mixed, bearing across product segments. Demand for packaging and hygiene is expected to remain strong, while automotive and durables demand will continue to be challenged. Similar to Downstream, scheduled maintenance is expected to be in line with the previous quarter.

Corporate and financing expenses are expected to be about $900 million. Finally, we will continue to progress spending reductions in line with our recent announcement.

With that, I'll turn the call over to Darren.

**Darren W. Woods**
*Chairman & CEO*

Thank you, Stephen, and good morning, everybody. I hope all of you and your families are safe and healthy. We certainly appreciate you taking time to join us today.

I think we can all agree that these are very challenging times. And I know I speak for many when I say that our thoughts are with those who have been personally affected by this pandemic, with the health care workers and first responders who are on the front lines. This morning, I will discuss how we are approaching the current circumstances and how we are working to keep our people and communities safe, managing through the near-term market downturn and preserving long-term shareholder value.

As you well know, today, we face 2 acute challenges: a global threat to public health and a significant global economic downturn, resulting in a commodity price collapse. What started with an oversupply situation was made more extreme by a sudden and unprecedented drop in energy demand as the economy shut down to stop the spread of the virus. As a capital-intensive commodity business, we certainly weathered the ups and downs of many price cycles. However, I have to say, we've never seen anything like what the world is experiencing today.

Our response is primarily focused on 3 areas: protecting the health and safety of our employees and communities, keeping our operations running to provide the critical energy and products that support modern life and the COVID response efforts and aggressively reducing spend in today's depressed markets while preserving value to ensure we are in the best position for the eventual recovery.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N   Document 167   Filed 11/01/24   Page 312 of 461   PageID 4644

I know that there are a lot of different views on what the future holds, but I want to be clear on how we see it. The long-term fundamentals that drive our business have not changed. Despite the current uncertainty and volatility, the fundamentals that underpin our business remains strong.

Why do I say that? We know that in the coming decades, populations will grow to more than 9 billion people by 2040, up from just over 7 billion today. Billions of people will enter the middle class and seek lifestyles and products that require energy. Economies will expand once again. Of course, there are likely to be some bumps in the road over the short term, but historically, periods of economic contraction are followed by periods of significant growth.

Finally, as a result of growing populations, increased prosperity and economic expansion, energy consumption will increase. Even with the current downturn, projections show energy consumption growing by 20% through 2040. Most of the growth will be in developing nations, and more than half of that energy demand will be met by oil and natural gas.

As you all know, we are a company that focuses on the long term. Our strategy in business is based on long time horizons, which is why we always go back to the fundamentals. At the same time, we have to address short-term challenges, such as the unprecedented market conditions we face today, while not losing sight of long-term value. This is exactly what we're doing.

We're taking advantage of the options a deep portfolio and strong balance sheet provide, reprioritizing spend to conserve cash while progressing projects that structurally improve the company. We remain committed to our capital allocation priorities, investing in industry-advantaged projects that grow cash flow and support a reliable, growing dividend and strong balance sheet.

Obviously, in this environment, it's critical to strike the right balance across these priorities and to remain flexible to market developments, including an eventual recovery. And of course, we do all this while keeping our people and communities safe, protecting the environment and delivering the products that society rely on.

Further to that point, let me take a few minutes to discuss our response to the pandemic. Early into the pandemic, we activated our emergency response teams and implemented our business continuity plans. People who could began working from home, while additional cleaning, personal protective equipment and distancing protocols were put in place at our facilities. To date, we've been largely successful, limiting exposure and infections at our sites.

To support society's broader response, we increased our production of both isopropyl alcohol, a key ingredient in sanitizer, and specialty polypropylene used in medical masks and hospital gowns. On top of that, our people in Baton Rouge reconfigured operations to produce, blend, package and distribute medical-grade hand sanitizer. We're donating this product to health care providers and first responders in Louisiana, New York, New Jersey, New Mexico, Ohio, Pennsylvania and Texas.

We're also supporting efforts to design, produce and distribute new reusable medical masks and face shields to help with the shortages. And we're helping our communities around the world with donations to schools, support for food banks and fuel, meals and masks for health care workers and first responders. I'm extremely proud of our employees. They're taking care of themselves and their families, supporting response efforts around the world and doing their jobs, which is what I want to turn to next, starting with the pandemic's impact on the market.

This chart provides a perspective of third-party supply demand projections. The dotted lines represent IEA's forecast, and the blue shaded area shows the range of demand projections. As you can see, it's a pretty broad range. Our views are pretty consistent with the IEA's. April and May demand down 25% to 30%, reflecting significant reductions in the use of gasoline and jet fuel. As we reach the fourth quarter, we expect demand will be below last year due to lost economic activity.

Of course, there's a lot of uncertainty on the timing of the recovery. We're planning for a slow one as it takes time to restart businesses and for consumers' confidence to grow. Hopefully, it happens faster than we think.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N Document 167 Filed 11/01/24 Page 313 of 461 PageID 4645

For the full year, estimates range from a loss of 4 million to 12 million barrels per day. We expect it to be on the higher end of the range. As you can see from the red line, while significant, the announced cuts of OPEC+ totaling about 13 million barrels per day are insufficient to offset the loss in demand. We're seeing this in growing global inventories, low market prices and increasing number of shut-ins.

Based on the third-party demand projections and the announced OPEC+ reductions, supply and demand come into balance and then go short sometime in the second half of the year. When you factor in the growing number of industry shut-ins, this could happen faster than projected, again, depending on the recovery in demand. When it does happen, we don't expect to see a market response until the inventories are worked down. Bottom line here, it's going to be a very challenging summer with a pretty sloppy market as we move into the back half of the year.

We've adjusted our plans to a low price and margin environment through year-end. Our price projections tend to be at the low end of third-party estimates. Once again, I hope we're surprised with a quick recovery, which we have not ruled out, particularly given our ongoing experience in China.

While it's still early days, there are some reasons to be cautiously optimistic as signs of demand and economic activity are beginning to pick up in China, with April sales in 3 of our key businesses back in line with and slightly above the same period last year. It's too early to tell if this initial rebound will be sustained or if it reflects the broader economy or if it is even relevant to other economies around the world given the range of government responses and policies.

Nonetheless, I find it somewhat encouraging, and it supports what I know will be true in the medium to long term. Economies will recover. However, in the short term, we need to compensate for the significant loss in demand and revenue, which is why we announced a 15% reduction in cash OpEx and a 30% reduction in CapEx for 2020. We initiated an effort in the fourth quarter to drive efficiencies and lower cost, which has served as a springboard to this broader and much deeper effort.

Spending will be maintained on activities that are critical to the integrity of our operations, the safety of our people and the protection of the environment. We're focusing on capturing additional efficiencies and lower market prices, deferring less critical spend and prioritizing quick payout items. As you can see in the chart, these efforts are already yielding results.

As the year progresses, we expect to see further reductions to achieve our announced target. While doing this, we remain sensitive to the unknown. In particular, we are working hard to ensure we maintain the capacity to quickly respond to market changes. We want to be well positioned to capture the eventual upswing.

Turning to capital. We took a similar approach. You may recall during our Investor Day that we discussed reductions in our capital spend based on market conditions at the time. I said then that we would continue to monitor the market and make further reductions if required. Shortly thereafter, we intensified work with our venture partners, resource owners and contractors to optimize spend in light of the growing impacts of the pandemic.

We set an aggressive objective: reduce spend without compromising the project advantages or returns. Any inefficiencies had to be offset with market savings or other efficiencies. I'm very pleased with the work we have done to date. Through extensive collaboration, we've identified opportunities to reduce our CapEx by 30%, down to $23 billion, and more than offset deferral costs, preserving the returns and project advantages.

As we concluded much of this work during March, very little of it is reflected in our first quarter spend. As we progress through the year, we'll see the reductions ramp up. With a clear line of sight to the savings, I am very confident that we will meet our target. We're reducing small capital projects at most of our sites, growing the pace of some downstream and chemical projects and pushing out the development of Mozambique LNG. The largest share of the reduction will be in our unconventional business, specifically the Permian Basin, where the short-cycle investments are more readily adjusted.

Let me provide a perspective on this. As we discussed in March, we have the flexibility to reduce spend in the Permian while maintaining scale, preserving capital efficiency and maximizing resource recovery

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-NT   Document 167   Filed 11/01/24   Page 314 of 461   PageID 4646

through our cube developments. Neil showed these charts indicating the range of production associated with potential reductions in CapEx. Our revised plans are indicated by the red diamond at the bottom end of the range. Over the course of the year, we expect to ramp rigs down by about 75% in the Permian, ending the year at approximately 15 rigs.

Our remaining development activity will be focused on Poker Lake and the Delaware Basin, where we are seeing high productivity wells and maintaining a scale advantage. This will include utilization of the recently completed Line 1 at the Cowboy Central Delivery Point. Since most of 2020's production is locked in with the work already completed, reduction in capital spend will primarily affect 2021 where we expect volumes will be down 100,000 to 150,000 oil equivalent barrels per day from our previous estimates. In 2020, the impact of the reduced CapEx will be much lower at about 15,000 oil equivalent barrels per day.

A much larger production impact will be associated with shut-ins. With the high production rates of wells in the first 2 years of operation, it makes economic sense to shut these wells in during very low price environments. For this reason, we expect to shut in roughly 100,000 oil equivalent barrels per day. The duration of these shut-ins will obviously depend on the evolving price environment.

Let me move next to an update on Guyana. Guyana remains an integral part of our long-term growth plans and as such, is a high priority. Our Liza Phase 1 operations have been largely unaffected by the pandemic. Production ramp-up is progressing and should reach full capacity in the second quarter. We've also managed the impact on Liza Phase 2, keeping this project on schedule for a 2022 start-up.

Unfortunately, the ongoing election process and uncertainty around the next administration has slowed government approvals of the Payara development plan. In addition, the challenge of rotating crews due to the impact of COVID-19 has temporarily slowed our drilling campaign. As a result, we expect a delay in our future developments of roughly 6 to 12 months, pushing our production objective of more than 750,000 barrels per day into 2026.

Finally, let me say a few words about our financial capacity, which has been built for times like this. As you know, a strong balance sheet is a core competitive advantage and an integral part of our strategy, allowing us to maintain our capital allocation priorities across the price cycles. This approach has proven itself during these trying times, allowing us to selectively advance critical investments to structurally improve our business despite very low demand and margins.

We issued debt of $8.5 billion in the first quarter, increasing our debt to capital to 24% and raising cash balances to more than $11 billion. We also increased our revolving credit facilities to $15 billion. With our cash, this gives us a solid backstop in these uncertain and very volatile markets.

In anticipation of a slow economic recovery, we took advantage of a market window in April to issue another $9.5 billion of debt, taking our estimated debt to capital to 26% and increasing cash to about $18 billion. This provides a strong foundation to manage the remaining challenges in 2020. Of course, as always, we'll need to keep an eye on developments and respond accordingly.

In closing, I want to reemphasize that the fundamentals that underpin our business remain unchanged. Our capital allocation priorities also remain the same, investing to create value, rewarding shareholders with a reliable growing dividend and maintaining a strong balance sheet.

While we work to conserve cash in the near term, we remain focused on enhancing long-term value, leveraging our competitive advantages and the optionality provided by a deep portfolio of opportunities. We do all this while working to ensure the safety of our people and communities, and doing our part to support society response to the pandemic.

Our company remains strong. Our people have the skills, experience and fortitude to not only face the challenges but to find opportunity in them, emerging stronger than ever.

With that, I'll turn it back to Stephen, and we look forward to taking your questions.

**Stephen A. Littleton**
*VP of Investor Relations & Corporate Secretary*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N   Document 167   Filed 11/01/24   Page 315 of 461   PageID 4647

Thank you for your comments, Darren. We'll now be more than happy to take any questions you might have.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N Document 167 Filed 11/01/24 Page 316 of 461 PageID 4648

# Question and Answer

**Operator**

[Operator Instructions] We'll go first to Sam Margolin with Wolfe Research.

**Sam Jeffrey Margolin**
*Wolfe Research, LLC*

Hope all is well and you're safe. So you've been steadfast on your view of secular energy demand growth with a cyclical pace, and it's something you deploy a lot of human capital to. You're not just talking off agency forecasts or anything. So I wonder how that is moving around here in the early days of this crisis. For example, jet fuel, huge component of demand growth out to 2030 but maybe structurally changed.

If there's anything in your forecasts on the demand side that are changing on kind of on a structural or long-term basis that might inform how you deploy capital on the other side of the crisis period of the cycle within the prior range of your 5-year plan.

**Darren W. Woods**
*Chairman & CEO*

Well, thanks, Sam. Hope all is well with you and your family. Yes, we've looked at that. Frankly, it's real difficult to plan a longer-term horizon and factor in the impacts of what we're seeing today when what we're seeing today hasn't fully played out yet. And so I just caveat my comments with the fact that we're in the middle of this thing. And so we'll see how it kind of plays out through the rest of the year, if it sticks with the forecasts that are out there and what I showed in my prepared comments.

But if you look back in time, and you can take 9/11 as an example, you have these dips, and then over time, you see a recovery. And while you start from a lower point, you see a continued growth and a slope that's very consistent with what the world has experienced in the past.

I don't think events like this change the basic human nature or people's wants and desires. I don't think it changes people's drive to improve their living -- manage their prosperity. I don't think it changes the economic growth that's required to support growing populations, particularly in some of the developing world.

So as you look further out and get past this short-term challenge, I think we're going to be back to the same fundamentals that we've always talked about because people want a better standard of living for themselves and their family. That is a very basic human dynamic. And as I've shown before many times, as people's standards of living grows, as economies grow, the demand for energy will grow with it.

**Sam Jeffrey Margolin**
*Wolfe Research, LLC*

And then just as a follow-up to that theme of kind of exit rate capital spending relative to the prior 5-year plan, LNG Exxon had a number of projects identified that were pre-FID. The structural challenge with that asset class always seems like there were a lot of parties that were pursuing a utility model, which sort of compressed the returns profile of it as it just seemed like a very un-Exxon asset class in that regard.

As you think about restoring capital spending to some number closer to your prior 5-year range, is LNG the category that you think might have a structural slowdown in the outer years out to 2025? Or are those projects still very high on your priority list?

**Darren W. Woods**
*Chairman & CEO*

So I think, Sam, if you go back to the longer-term growth forecast and the demand for fuel, LNG and gas continues to be a fast-growing product and demand for LNG continues to grow. So I think that's going to continue to play a role.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I think the -- if you look at the capital projects that were sanctioned and moving forward, many of those have slowed down. Some have been canceled. So I think as we go through this year, there's going to be some things changing around, which projects get sanctioned and move forward, what the time frame of those projects are. And then, of course, the demand will pick back up, and we'll see gas continue to grow.

So my suspicion is we'll see some shifting around in the schedules. But again, the fundamentals are going to require additional LNG. And so I would expect to see that continue to be represented to a fairly large extent in our portfolio.

What I would say on the utilities type return, it really depends on the specifics of the project. I think you can't look at those as one asset class. As you move around the world, there are different dynamics and challenges and risks associated with different LNG projects. And what we look to do is to make sure that the returns of the specific projects meet our criteria.

And so that's, I think, how we look at it, and you got to kind of separate each one individually and look at it. We've got pretty high standards to make sure that we maintain the returns that we need to as a corporation. Thank you, Sam.

**Operator**

We'll go next to Jon Rigby with UBS.

**Jonathon Rigby**
*UBS Investment Bank, Research Division*

Can I -- just as a follow-on from that, just 2 things around that commentary about the slowdown and speed up of activity. Can you give a little bit more color on the process you go through about sort of identifying which assets you mothball or slow down, how you sort of identify how you preserve value through the sort of lower spending period?

And then internally, give some indication of how quickly you could mobilize again in terms of people and spending to move back up to the sort of cadence that you were running at pre-COVID, if that's possible. That's my first question.

**Darren W. Woods**
*Chairman & CEO*

Okay. Well, thanks, Jon. Yes, the process -- and if you recall when -- after our Investor Day is, as Saudis and Russia made their announcements and then the impact of the COVID started picking up, we, shortly after that, around mid-March, issued a statement that said we were going to revise our capital and OpEx targets for the year. We're going to significantly revise those and then basically announced about a month later what the reductions were.

The process we went through, I would characterize as a grassroots process in terms of bringing our businesses together, talking about the challenges and what we needed to do as a company, and then letting the businesses and our project organization step back and start engaging with the relevant stakeholders to figure out how best to make this change. And the point I made in my prepared remarks was a fundamental principle in looking at this was how do we do this, recognizing that stopping some projects in progress will have some inefficiencies and costs associated with it.

We need to offset those and find ways to do that, and this market ought to provide that. And the fact that everybody was experiencing these challenges ought to get people similar motivations to work together and find efficiencies. And so one key criteria was figuring out where those biggest opportunities were and therefore, taking advantage of that to make sure that we did not compromise the returns of the projects.

And so part of the criteria was understanding which ones had more flexibility than others. Hence, the large reductions in unconventional, the short-cycle investments, we had some -- a lot more opportunity in that space. So we saw a large reduction there. That was a key driver.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N Document 167 Filed 11/01/24 Page 318 of 461 PageID 4650

The other then was just looking at the payout of those projects, the opportunity, the rewards associated with them and thinking through from a economic profit standpoint how we want to think about those, what's the cost benefit of slowing some of those projects. And so that was another big factor.

And third then was working with our partners and the resource owners to get alignment on that. So that was a -- it was a fairly robust process with a number of people involved. We were fortunate to have our projects organization in place.

Last year, in April, first time in the company's history, we put all of our project efforts into one organization. And I will tell you, that has paid huge, huge dividends during this process, the ability to look across our entire portfolio, leverage the relationship with our contractors has been a big, big help.

With respect to your last part of your question around how quickly can you respond, I think you heard in my comments, again, we are anticipating a recovery. In fact, I know one will happen and that these projects remain attractive, and we'll want to pursue those. And so the big question is when and when will that recovery happen, when will we want to turn these back on.

So one of the challenges we gave the organization is while you are taking steps to make these reductions, keep an eye on the future and make sure we have a clear line of sight of how we'll restart and ramp things back up again. And so all the plans we put in place not only have a ramp-down plan, but we're also working how we could quickly ramp that back up.

And of course, that will vary by project and by the circumstances within those projects. But I feel, again, confident that this organization is striking a really good balance between taking short-term action but preserving long-term value.

**Jonathon Rigby**
*UBS Investment Bank, Research Division*

Right. Good. And then just as a follow-up, can I just get you to comment on Chem? It obviously, as you referenced, was still towards the bottom end of the cycle. But it seems to me, the last couple of quarters, there's been some signs of improvement. Is that temporary, the quarter, this 1Q primarily to do with the falling liquids price? Or is there some hope there that things are starting to get a little better, either internally operationally or from the macro?

**Darren W. Woods**
*Chairman & CEO*

Well, if you think -- what we've talked about in the past, what we're seeing in the chemical industry is what I'd call is a classic commodity cycle where we had a lot of capacity brought on in the short term. While growth remains good in those products, that excess capacity has overwhelmed that growth in the short term and therefore, driven margins down to what we're seeing at the back end of last year or really through last year. That has not changed. Continue to see basically a length in oversupply there. And the benefits we saw in the first quarter is really around feedstock and feedstock prices dropping off.

To the other point within that is just if you look at the mix of chemical products that we make, some of those, in response to what we're seeing with COVID and the products required, demand has grown pretty significantly. We happen to be in a position to make some specialty products that supply those markets and demand for those types of products. So we've seen a boost in that. And obviously, as the COVID impacts start to wind down, we should see some of that revert back to what would be standard demand levels.

I can tell you, the organization remains very focused on a challenging marketplace. Steve, you got anything to add to those?

**Stephen A. Littleton**
*VP of Investor Relations & Corporate Secretary*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

A-299

Yes. Jon, the other thing I'd add is, if you notice in the bar -- I mean the chart that we put out there, we did see really a significant improvement in our OpEx, which was the earnings benefit for us this quarter in the Chemical business.

**Darren W. Woods**
*Chairman & CEO*

That's a good point.

**Operator**

We'll go next to Neil Mehta with Goldman Sachs.

**Neil Singhvi Mehta**
*Goldman Sachs Group Inc., Research Division*

Darren, I guess the first question is around capital allocation and dividend sustainability. We saw one of your peers reduce their dividend in light of the macro environment. Just wanted to get your views on the right level of distribution, how you think about dividend growth and how you think about that in terms of prioritization around capital allocation.

**Darren W. Woods**
*Chairman & CEO*

Sure. I think as I said in my prepared remarks and I've repeated in some of our press release, the priorities in the capital allocation scheme that we've got have not changed with what we're seeing here in the short term. And again, it kind of comes back to a large business that has depleting assets. You've got to continue to invest in industry-advantaged accretive projects if you're going to sustain a strong foundation to support the business going forward, a successful business, to support a growing and reliable dividend and to maintain a strong balance sheet. So the project's investments are critical foundation to the long-term health of the business.

And then obviously, if you look at our shareholder base, about 70% of them are retail or long-term investors that look for our dividend and see that as an important source of stability in their income. And so we have a strong commitment to that. And then finally, making sure that we have a balance sheet to manage the volatility that we see in the ups and downs of the price cycles. Obviously, we're in a pretty deep -- pretty big dip here, which is outside of the normal price cycle volatility. But I think we're demonstrating that the balance sheet is handling that through this time frame.

So that priority remains the same. And then I think the question, and I talked about this in the Investor Day is how do you balance across those priorities in the short term. And so today, as we -- to face these very short-term challenging market headwinds, we are making sure that we're maintaining that dividend and continuing to advance the projects with the expectation that we'll see a recovery. Our revenues will rise, more cash will come in, which will allow us to continue to invest in those projects. And so that we're not making a trade-off on the medium to long term but one in the short-term based on the needs of our investment base.

And I would just tell you that we'll continue to strike that balance as we go forward. If this market evolves and we see changes in a recovery that's slower than what we have even anticipated, recognizing we've been pretty conservative in our outlook, we'll have to step back and look to see if we need to make any further adjustments there.

But my view is if you don't have those investments, you're not providing the foundation to support that dividend. A lot of the projects that we've been putting in place, the capital we've been spending here over the last couple of years, those projects are going to come online and start contributing cash. So I think we're going to begin to see here in the next year or so a lot of the benefits associated with the investments we have been making, and that will contribute to the cash and provide the basis to support the dividend.

**Neil Singhvi Mehta**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

A-300

Case 3:21-cv-00194-N   Document 167   Filed 11/01/24   Page 320 of 461   PageID 4652

*Goldman Sachs Group Inc., Research Division*

And the follow-up is just around the capital structure and the balance sheet. As you indicated in your slides, you've got a good balance sheet, and your leverage ratios are lower than your peer set. But you have been taking on debt at a quite accelerated pace here over the last couple of years. Is there a governor that you look at and say, we have -- we don't want to take on any more debt? And just talk about the importance and the strength of the balance sheet to you as you think about weighing those different priorities.

### Darren W. Woods
*Chairman & CEO*

Sure. I would just maybe start first with the draw that we've had on the balance sheet. And I think the context to keep in mind as we've done that is what I would call as a restructuring of the business or bringing in high-margin, profitable investments into the base to strengthen the structural capacity of the company.

And so that's been an important priority for us, and the reason why we've increased the investment is to make sure that we're building the capital base and the assets to be successful in the markets that we expect to be in here over the next decade. And so low cost, high-margin oil barrels, high-performance products and chemicals to meet the growing demand there and configuration of key integrated refining assets to make sure that we've got the yield profile that's consistent with demands that society have.

So those investments are pretty strategic and pretty foundation. And the idea was to structurally improve the business through those investments and so that has a priority. As we did that, we wanted to make sure that we maintained the capacity to manage the swings. And as you see today, we have that capacity. So we've managed that and met that objective.

And then as we look longer term, what's the right level, our view is it has to be sustainable, something that the business can continue to bear and allow us to have continued attractive and competitive access to the debt markets. And so making sure that we keep that in a range that allows us a good access and people continue to see us as a sound investment and basis for loaning money to is going to be important. So we try to keep all that balanced, recognizing that there are going to be short-term debt dips in that process.

We feel right now, where we're at, pretty good around where we've leveraged up to and the resources that we have available for us. We think we've got what we need to kind of manage through this year.

### Operator

We'll go next to Roger Read with Wells Fargo.

### Roger David Read
*Wells Fargo Securities, LLC, Research Division*

I guess what I'd like to ask, given the CapEx that you're doing, the ones the industry is doing, the -- I guess what's called on elective shut-ins, whether it's part of OPEC+ or price driven, what do you think the other side of this is in terms of depletion rates? And the reason I asked is at the follow-up breakfast after the investor event, it was a very clear discussion from Exxon side that this 6% to 8% annual decline is out there. And the comment from those of us on the analyst investor side was we haven't seen it. So is this something that brings that more to the fore? And how do you see that within Exxon's portfolio?

### Darren W. Woods
*Chairman & CEO*

Yes. Thanks for the question, Roger. I think that -- I don't think you're going to see that change. When you say you haven't seen it, our experience -- we're physically managing that every year. And so we're pretty confident in what the physics are associated with production of the oil and gas resources that we've got.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N Document 167 Filed 11/01/24 Page 321 of 461 PageID 4653

What often maybe obscures the view is a lot of work programs that companies are doing to maintain and offset that decline, which doesn't often -- they're not discrete projects, so to speak, so it's often hard to model those. But there is a lot of activity. In fact, we do that ourselves to offset that natural decline work. And that takes resources, that takes capital and investment spend.

So I think what you're going to find, which I'm not sure if this is where your question was heading, but as you strip out some of that work and those programs to reduce activity to mitigate that decline because the revenues aren't there to support it, I think you'll see that decline rate manifest itself more explicitly across the industry. So my view would be, you'll probably get a better visibility into that. It won't be a change per se around what naturally happens through production. It'll just be that the offsets aren't necessarily masking that underlying decline rate.

And then just stepping back maybe more broadly to your question. I was at the Investor Day, and I think as a company, we continue to believe that the industry as a whole has been underinvesting for the demand that's going to be needed in the future. Obviously, what's happened here with the coronavirus and the drop in prices is going to pull a lot more capital out of the industry as you've seen -- as you've already seen, which is going to exaggerate that issue. So I think on the back end of this thing, we're going to find a market that eventually gets a lot shorter than we were already anticipating.

**Roger David Read**
*Wells Fargo Securities, LLC, Research Division*

Yes. That's -- I think that's the right direction. It's just been [ close to ] [indiscernible]

**Darren W. Woods**
*Chairman & CEO*

Welcome, Roger.

**Stephen A. Littleton**
*VP of Investor Relations & Corporate Secretary*

Thank you, Roger.

**Roger David Read**
*Wells Fargo Securities, LLC, Research Division*

I guess the next question I'd like to go to, on the Downstream, obviously, you've mentioned that things had improved or were improving in China. We'll see if that sustains. Within the U.S. and Europe, we've seen the first signs of some of the lockdowns come off. And I was just curious if you had any kind of more immediate responses in terms of North American or European demand trends.

**Darren W. Woods**
*Chairman & CEO*

Yes. No, that's something we're keeping a really close eye on, is what are the tell signs in terms of what we see. And April was significantly lower demand month than what we saw in March. And so I kind of saw that as the depth of the coronavirus impact.

If you look at kind of going forward into May -- and what we're using in terms of looking -- trying to get a view of that looking forward is sales out of our retail assets around the world and using that to see how -- what kind of demand response for people primarily around road transportation. And we are seeing improvements really across all 3 markets.

We've seen in May volumes trending up in Europe. We see that happening in the U.S., and we see that also in Asia, although Asia didn't drop nearly as far as Europe or the U.S. And so there are some, I'd say, encouraging early signs in the transportation sector, particularly road transportation. I think on aviation, that's probably going to take a little bit longer. We haven't seen any uptick in that space yet.

**Operator**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

We'll go next to Doug Leggate with Bank of America.

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

I hope everybody's doing well over there. And I just really appreciate all the comments you guys have been making about how you've adjusted your business to adapt to this situation we're in right now. I have 2 questions. They're really follow-ups, I guess, to what Neil asked, but I want to be a little bit more direct, if I may.

What are the circumstances -- Darren, I think you've been pretty clear. You've obviously underlined the issue of the dividend. But what are the circumstances where you would ever envisage that Exxon Mobil would cut its dividend?

**Darren W. Woods**
*Chairman & CEO*

Well, good morning, Doug, and everyone's fine here, so thank you for asking. I hope the same is true with you. Look, I know you're looking for a very explicit answer. And all I would tell you is we think it's -- the dividend is an important part of the value proposition that we provide to our shareholders, particularly given the base of our shareholders. It would depend on the circumstances that we see in the market and how prolonged we think those circumstances are going to exist.

So I mean I would just tell you, we're going to have to wait and see how the market plays itself out. If we find ourselves with some sustained structural deficit that says the business is going to have trouble over a much longer time period, we'd have to step back and rethink that.

But frankly, we're not seeing that today. If you look at some of the early signs, I think we see some encouragement in -- going into May. And so I think we're going to have to kind of play that by ear.

The beauty of the dividend is it's flexible. We -- the Board considers that every quarter, and we're obviously looking at the macro environment looking at some of the -- kind of telltales that are out there. We've got our organization working very hard around what are some leading metrics that we can keep an eye on to see which direction things are going. And so we're going to continue to look at that and make decisions as we go forward to ensure that for the long term, this business is strong and has a good foundation to provide continuing dividends out into the future and products that the world are going to need.

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

I understand it's a tough one to answer explicitly. I guess the perception out there is -- [ rather ] Shell has given you cover -- given the industry cover for a wholesale reset. I just wanted to see if you could offer some perspective. But I appreciate you answering to the extent you have. Well, my follow-up is just kind of -- go on, sure.

**Darren W. Woods**
*Chairman & CEO*

Doug, let me just say on that. Well, we're not -- I don't really look to what Shell is doing to decide our dividend policy, frankly. It's a function of our investment base and the commitment that we've made to them.

**Douglas George Blyth Leggate**
*BofA Merrill Lynch, Research Division*

And the opportunity's there, for sure. My follow-up is kind of related. The credit agencies took, obviously, took you down a notch. You've obviously added that and presumably, you shared with them what you were doing. Where -- is there a limit that you would be comfortable allowing the balance sheet to go? And

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N    Document 167    Filed 11/01/24    Page 323 of 461    PageID 4655

again, it's kind of dividend related as well, I guess. Your capital is flexible if the dividend is sacrosanct. Where does the balance sheet get to a level where you're not comfortable? And I'll leave it there.

**Darren W. Woods**
*Chairman & CEO*

Well, again, I know you like real specific numbers. But I would just tell you, one of the principles that we had in managing the balance sheet is to make sure that we maintain capacity because as we've just seen here this quarter, the market's got a lot of volatility in it. And therefore, we need to have a foundation or a base that allows us to accommodate that volatility. And we need to have access, competitive access to the market. So we're going to make sure that we stay in a range that allows us to competitively continue -- to competitively access the debt markets when we need them and make sure that we've got a buffer that allows us to run and continue to manage the ups and downs that are not going to away in this commodity-based business.

So again, it's an ongoing conversation, something that the Board and I spent time talking about and looking at. And we're going to kind of continue to adjust it as we go forward.

I mean the priorities that I've laid out around the investment, the dividends and the balance sheet -- and I used the term earlier this morning, I used it in our Investor Day, balance. We got to kind of balance it based on what we see happening in the marketplace. We -- today, we've taken a position that we believe balance in what we're seeing. As the quarter moves on, if things don't play out the way we think or we see something that's structurally very different than what we anticipate, we'll look at rebalancing then. It's just difficult to tell right now, frankly.

**Operator**

We'll go next to Doug Terreson with Evercore ISI.

**Douglas Todd Terreson**
*Evercore ISI Institutional Equities, Research Division*

So Darren, you reiterated your business plan, which you guys have had for a while, that global prosperity would drive investment and that you guys would end up excelling versus your peers through advantaged investments. And on this point, you kind of also indicated that your priorities for capital management aren't going to change but the pace probably would.

So my question is that, do you think that we'd know already that there are going to be broad changes to ExxonMobil and the industry's capital management program over the medium term? And so what might be different -- meaning you just use the word balance to describe the approach. Do you think we need better balance or maybe more balance? And also, how does consolidation play into all of this, that is, if you think it does, given the distress that we're seeing in the energy markets today?

**Darren W. Woods**
*Chairman & CEO*

Yes. Thanks, Doug. Hope all is well with you. On the balancing, I think that balance is going to be a very, I'll call it, sector-, maybe company-specific point in terms of where everyone stands with respect to their balance sheet, with their capacity, their scale, their integration. So I think the balance will be different. And in my view, some segments of our industry today needed better balance, and I think that will manifest itself. I think there -- you got to be able to survive through these downturns and position your company to do that. So I do think there's a balance that's needed there.

I also think that the demand will be there because of the fundamental role it plays in economic growth in people's lives. And so as much as the short term kind of swings the industry around, ultimately, the demand for the products will come back, and the industry is going to have to respond to that demand. And if, in the short term, a lot more conservatism comes in, a lot less capital flows into the marketplace, we'll open up that supply/demand balance going forward, and that will then incentivize things coming back in and frankly, may lead to less balance in terms of what you're talking about.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

A-304

Case 3:21-cv-00194-NT   Document 167   Filed 11/01/24   Page 324 of 461   PageID 4656

So I think it's really a function of the capacity and capability of companies to kind of weather through this short-term period. And I think some companies are better positioned to do that than others, which is -- probably leads you to your second point about consolidation.

And I think, again, that opportunity exists, particularly in periods like that. If you look back in time, when prices get low and companies get stressed, you see that tend to happen, not only in our industry but in other industries. So that's certainly a theme, which I think will resonate within the industry. Exactly how that plays itself out, though, I think we'll just have to wait and see.

**Douglas Todd Terreson**
*Evercore ISI Institutional Equities, Research Division*

Yes. Let me ask you something else about that. I mean it always -- there always seems to be the ability to have financial transactions work. But when you guys bought Mobil, there was obviously lots of strategic merit to that combination and other combinations during that period as well. So do you think that we're in an environment where there is enough strategic merit especially -- in combinations, especially for a company your size? Or do you think it's different this time around?

**Darren W. Woods**
*Chairman & CEO*

I come back to a lot of the value levers that we saw with the Exxon Mobil merger. I mean those value levers, I don't think have really changed over time. And so it's really a question of what opportunities are out there where you can see some of those, probably a subset of the value levers that we saw with that. And of course, as we look at opportunities -- I've been asked this a lot of times in these calls about acquisitions. And what I've always said is we have to look and find some unique value levers to justify the deal. And if you can't do that, then there's no space for the deal.

And that has really been, I think, the underlying criteria that we've had as we've looked at acquisitions, as we continue to look at acquisitions and opportunities, is can we find a way of creating and extracting unique value out of some acquisition or opportunity. And that's not going to change. We continue to look for those things. And if we find them [indiscernible]

**Operator**

We'll go next to Jeanine Wai with Barclays.

**Jeanine Wai**
*Barclays Bank PLC, Research Division*

My first question, maybe skipping gears real quick here, is on the Permian. And you've invested meaningful capital in the Permian, including on infrastructure spending. And your partners have indicated that the Wink-Webster pipeline has not been delayed. So is it fair to think that when Exxon eventually does resume some kind of higher level of overall corporate CapEx that the Permian would be the first call on growth capital from a returns perspective? And given the reduced CapEx in the Permian this year, is there any infrastructure build-out that you need to address before you get back to your prior growth trajectory? I know you mentioned that the Line 1 of the Cowboy facility was complete.

**Darren W. Woods**
*Chairman & CEO*

Yes. Thanks, Jeanine. So -- and Neil talked about this in our Investor Day as we looked at the range of flexibility that we had. And that was one of the points I think Neil tried to make was we -- even within in early March, as we looked at our investments in the unconventional space, that we did have opportunities to ramp down spend and investment there and still fully utilize the infrastructure that we are putting in place and making sure that we got a return on those investments. And frankly, it was pretty critical to do that and maintain scale and scale advantage in the cost.

If you think more broadly about what we're trying to do in the Permian, it's really with this long supply market in mind that we've got to find a way to get the cost -- the unit cost of production in the Permian

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N Document 167 Filed 11/01/24 Page 325 of 461 PageID 4657

down. And the way we're approaching that is through scale and technology. We think that's absolutely critical. And so our view is to make that investment in the Permian very competitive in an oversupplied market, which I would tell you, we're well on the way towards.

And so the cuts we've seen to date allow us to continue to preserve that capital efficiency. It allows us to do -- continue with the development, the cube developments to make sure we're maximizing the recovery, and it utilizes our above-surface facility. So I think that's where we're at today.

And we're looking now -- and you saw in the -- in the presentation that Stephen gave with the second quarter outlook, we are taking economic shut-ins in the Permian. And that's not a -- that's really a function of -- if you think about a lot of these wells that are early in their lives which just started up, you get very high production rates.

And from an economic -- maximizing the NPV of those wells, you're better off deferring that high production rate into a period with better pricing. And so a lot of the shut-ins that we're doing in the upstream are associated with kind of a value play around, making sure that we're bringing those high production rates into a market that's more conducive to high production rates.

And of course, looking forward, depending on how the market evolves, we've got the flexibility to bring a lot of those wells back on quickly and ramp up what we're doing in the unconventional space. So it is -- you all have talked about that. We've talked about it. That short-cycle investment gives us a lot of flexibility, and we're certainly leveraging it. There's a lot of value there, too.

I would tell you, we continue to feel very good about the ability for that resource when we get it online to compete in a low-price environment. The challenge we've got today is the investment we're making to get in that position, and that's kind of what's inhibiting us, but once we get into it, we feel really good about operating competitively in an oversupplied market.

**Jeanine Wai**
*Barclays Bank PLC, Research Division*

My follow-up question is maybe following up on some of the other questions but in a different way. Darren, you already have some pre-FID capital invested in attractive projects. And if we end up being in a prolonged oil price environment, at what point is it too detrimental to the long-term business to stay at the current CapEx level since at some point, you need to continue to invest in the business to grow the cash flow to sustain the dividend? And you mentioned earlier on the call that there is an economic cost for slowing down some of these projects, but you still think that there's long-term fundamentals that are intact.

**Darren W. Woods**
*Chairman & CEO*

Yes. I think, Jeanine, we'll have to watch and see how the world evolves. I mean I keep coming back to -- and I know you guys probably feel like it's a repetitive statement, but the basic drivers of energy demand have not changed with what we're seeing today. The demand drivers, the fact that energy plays such a critical role in people's everyday lives and the growth of economies mean that, that energy will be needed. So it's really a question of timing and the recovery.

And again, I think we're -- April is probably the depth of the impact in our industry. I hope that's true. Certainly, it's looking that way from the early signs. But we're going to have to let this kind of quarter play out. I think the second quarter will be a challenging quarter, but we'll have a better view around how the rest of the year is shaping up, and we'll continue to adjust it. We've got additional flexibility to use if we want to. And if we start to conclude that based on some structural change, which, frankly, it's hard to see right now, but if we see that, we'll adjust the plans again.

**Operator**

We'll go next to Jason Gammel with Jefferies.

**Jason Gammel**

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Case 3:21-cv-00194-N Document 167 Filed 11/01/24 Page 326 of 461 PageID 4658

*Jefferies LLC, Research Division*

I just wanted to see if I could get you to elaborate a little bit further on the sources of the production curtailments that you're going to be undertaking over the course of the quarter. And are they primarily based upon the economics of the individual plays? Or is some of this at the direction of host [ governments ]?

**Darren W. Woods**
*Chairman & CEO*

Yes. No. I would say the 400 Koebd that we put in Stephen's second quarter look ahead. And I would tell you, the way to think about that is about 2/3 of that roughly would be in the economic category, and about half of that in Kearl and then the other half in this economic steps that we're taking in the Permian, which is really around preserving value.

Kearl, with a low price environment, I think it's more challenged from a competitive or cost of supply basis. Permian, we get higher value by deferring some of those. And so about 1/3 -- out of Kearl, about 1/3 in the unconventional space and then about 1/3 associated with restrictions put on us by the governments around the world.

**Jason Gammel**
*Jefferies LLC, Research Division*

That's very useful. You actually somewhat preempted my follow-up question, which was going to note that the operational performance at Kearl has actually been quite strong. So you're talking about the potential economic shut-ins that -- could you maybe elaborate a little bit more about any logistical issues that could constrain Kearl from coming back in the near term?

**Darren W. Woods**
*Chairman & CEO*

Sure. I know there's been a lot written about that. I would have to tell you, this has been, again, another really great benefit of the reorganizations that we've done along the value chain with our Upstream. We made the change in our Downstream beginning of 2018. We made the change in the Upstream in April 2019.

And so if you look today, as we headed into this, our ability to see end to end, from the wellhead all the way down to the customers, I think, was the best in industry, frankly. Certainly, nobody had anything better in terms of that ability to see along. And so we were very early into that process making sure that we had a clear line of sight of how we would move the physicals and that we did not find logistics constraints.

Of course, you know we've been investing in logistics both out of Canada and Kearl with takeaway capacity there on the rail and in pipe. And we've invested in the Permian in takeaway capacity there. And so we've got, I think, a good line of sight of where the bottlenecks are going to happen and a really secure position with respect to the logistics to move the barrels.

And we've applied -- our team has basically been keeping an eye on that around the world, not just out of those 2 resource plays but everywhere that we lift barrel is making sure that we've got a clear line of sight of how we keep them flowing to the extent that the economics warrant that. So we have not seen the logistics constraints that others have talked about just because of the fact that the organization was able to kind of see some of those coming and take the appropriate steps to make sure we didn't get caught with any of them.

**Operator**

We'll go next to Phil Gresh with JPMorgan.

**Philip Mulkey Gresh**
*JP Morgan Chase & Co, Research Division*

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

Case 3:21-cv-00194-N    Document 167    Filed 11/01/24    Page 327 of 461    PageID 4659

So one of the, I guess, bridges of the multiyear guidance was your asset sale plan. And I'm just wondering -- obviously, this is a tougher environment for asset sales. So I guess is it fair to assume that, that lever -- the next 1 to 2 years might get pushed back a bit? And then in terms of the impact, kind of shorter term on the balance sheet from that is that you need to -- with the lower prices, you need to lean more in the balance sheet in the interim.

So just curious how you think about toggling between those 2 items. And I guess it does all kind of come back to the dividend question being asked. Is it -- if the asset sale bridge isn't there, do you look to the flexibility that dividend is something that can help?

### Darren W. Woods
*Chairman & CEO*

Yes. Sure, Phil. I would tell you, you're absolutely -- the activity that we have, the focus that we have around restructuring the portfolio and high-grading that portfolio hasn't really changed, so the drivers and the motivation remain there. The work list that we have with respect to getting assets in the marketplace and the divestments are still in place. It's really a question of what we said all along is our ability to execute that divestment program will be a function of finding buyers who put a value on those assets, a value that's higher than what we see with them and so that we find a deal space and transact.

And I think your point, which is a valid one and absolutely correct, I think, is going to be harder to do that in an environment like this where people are strapped of cash. So I would expect to see that divestment program slowed just because of the market dynamics and the buyer, seller -- the availability of buyers. And we're not counting on that with respect to how we think about the business and how we're going to fund the ongoing business. We have not assumed that we're going to benefit from asset sales. All of our plans are based on essentially managing with the portfolio that we have.

### Philip Mulkey Gresh
*JP Morgan Chase & Co, Research Division*

Okay, great. The second one, I guess, this one is just around the quarter for Steve. In your 8-K, you gave, obviously, the guidance items around these inventory impacts, and you also gave guidance around the derivative impacts on the Downstream side of the business. I think there's a little confusion on Downstream specifically with those derivative impacts. But could you just clarify the magnitude of that benefit that was baked into, I think, the margin bar in the bridge?

### Stephen A. Littleton
*VP of Investor Relations & Corporate Secretary*

Yes. Phil, if you look at the margin factor, included in that was the benefit of financial derivatives of about $1.3 billion or so, plus or minus. And then obviously, that was offset by weaker refining margins. They brought it back down to about a $900-plus million benefit to the Downstream business.

### Operator

At this time, I'll turn the call back to the speakers for closing remarks.

### Stephen A. Littleton
*VP of Investor Relations & Corporate Secretary*

Okay. Thank you for your time and thoughtful questions this morning. We appreciate you allowing us the opportunity to highlight first quarter results and the steps we're taking to not only manage through these challenging times but to position ourselves for long-term growth in the eventual recovery. We appreciate your interest and hope you enjoy the rest of your day. Thank you, and please be safe.

### Operator
This does conclude today's conference. We thank you for your participation.

Copyright © 2020 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2020 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2020 S&P Global Market Intelligence.

# EXHIBIT 14

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-310

EXXONPBA00106133

A-311

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00106134

# EXHIBIT 15

 | **Europe**

## Emergencies

Overview        **Situations**        Our work in emergencies        Action plan        Emergenc

# Coronavirus disease (COVID-19) pandemic

©

## Overview

## Links and resources

The coronavirus disease 2019 (COVID-19) pandemic is a global outbreak of coronavirus – an infectious disease caused by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).

Cases of novel coronavirus (nCoV) were first detected in China in December 2019, with the virus spreading rapidly to other countries across the world. This led WHO to declare a Public Health Emergency of International Concern (PHEIC) on 30 January 2020 and to characterize the outbreak as a pandemic on 11 March 2020.

A-312

On 5 May 2023, more than three years into the pandemic, the WHO Emergency Committee on COVID-19 recommended to the Director-General, who accepted the recommendation, that given the disease was by now well established and ongoing, it no longer fit the definition of a PHEIC. This does not mean the pandemic itself is over, but the global emergency it caused is – for now. A review committee will be established to develop long-term, standing recommendations for countries on how to manage COVID-19 on an ongoing basis.

Since the COVID-19 pandemic started, over 2 million people in the European Region have died from the disease.

On 25 October 2023 WHO/Europe made several changes to its respiratory virus surveillance and data reporting systems. The COVID-19 Situation Dashboard played a pivotal role in providing essential information during the early stages of the pandemic. However, the landscape has now shifted, and so have data needs.

A new WHO/Europe COVID-19 Information Hub is replacing the previous COVID-19 Situation Dashboard to serve as a comprehensive resource, providing links to the most current health information, datasets and products concerning COVID-19.

Within the Hub, WHO/Europe and the European Centre for Disease Prevention and Control (ECDC)'s weekly European Respiratory Virus Surveillance Summary (ERVISS) displays integrated surveillance data for influenza, COVID-19, and respiratory syncytial virus (RSV) in the WHO European Region, including the European Union (EU)/European Economic Area (EEA).

Information for the public and media    ⊕

Situation updates    ⊕

European Respiratory Virus Surveillance Summary    ⊕

WHO/Europe COVID-19 Information Hub    ⊕

COVID-19 vaccination    ⊕

Technical guidance and publications    ⊕

A-313

# EXHIBIT 16

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/saudi-russia-disclose-dueling-output-plans-amid-intensifying-oil-market-war-11583835347

COMMODITIES

# Inside Saudi Arabia's Decision to Launch an Oil-Price War

Riyadh prepares emergency budget for oil at $12 to $20 a barrel; 'It's all about egos now'

By *Summer Said* [Follow] and *Benoit Faucon* [Follow]

*Updated March 10, 2020 10:00 am ET*



Saudi Crown Prince Mohammed bin Salman. Saudi Arabia slashed its crude prices and said it would boost its output next month. PHOTO: POOL NEW/REUTERS

Saudi Arabia and Russia intensified an escalating oil-market war on Tuesday, with Riyadh set to raise output to record levels and Moscow saying it was ready to pump more crude.

State-run Saudi Arabian Oil Co. said it would boost production to 12.3 million barrels a day in April, some 300,000 barrels a day over the company's previous maximum sustained capacity.

Russian Energy Minister Alexander Novak, meanwhile, said his country could rapidly open its own taps.

Oil prices lost a fifth of their value Monday, after Saudi Arabia over the weekend slashed its crude prices and signaled it would boost its output next month. The move followed Russia's rejection of a Saudi-backed plan by the Organization of the Petroleum Exporting Countries to cut crude output in response to dwindling demand in China and elsewhere.

Even as the price war escalated with fresh salvos from both sides, former Saudi energy minister Khalid al-Falih was in talks with Mr. Novak in an attempt to reverse the production hikes and revive the collective OPEC-Russia output curbs, according to Saudi government advisers and officials.

Mr. Falih, who negotiated the initial production cuts in 2016, is now Saudi Arabia's minister of investments. His outreach to Mr. Novak is done with the approval of Saudi authorities, the advisers said. If Mr. Falih's mediation succeeds, the advisers and officials said, OPEC and its allies including Russia will convene an emergency meeting in April.

Mr. Novak said Moscow isn't ruling out further cooperation with OPEC, adding that the next scheduled meeting is planned for May or June.

"The doors are not closed," he said.

Amid the escalating fight, President Trump called Saudi Crown Prince Mohammad bin Salman on Monday to discuss global energy markets, the White House said Tuesday morning. The leaders also discussed "other critical regional and bilateral issues," according to a statement.

A-315



**Global Glut**

Oil prices have fallen as demand from China has slowed and Saudi Arabia has pledged to pump more.

Crude-oil futures, price a barrel

As of Oct. 28, 2:51 p.m. ET

Source: FactSet

Saudi Arabia and Russia's decisions to flood markets are surprising, as China—the world's largest oil importer—has been hobbled by the deadly coronavirus, which has hurt its demand for oil after refineries and factories were forced to shut.

Saudi Arabia's struggle for oil-market supremacy might earn it a sliver of market share at the expense of Russia and rival U.S. shale producers, but the cost of a price war might be too much for the kingdom to bear, analysts and oil officials say.

The combination of declining global consumption and rising supply pushed Brent crude, the benchmark for global prices, to its sharpest decline since the first Gulf War in 1991 on Monday. Some of these losses were recouped Tuesday as the Brent oil price gained 8% amid a broader revival in markets.

Saudi Arabia's aggressive discounts are targeting some of Russia's core markets in China and Northern Europe. The kingdom is also taking aim at U.S. oil producers, Saudi and OPEC officials said.

The Russian energy minister declined to comment and the Saudi energy minister didn't respond to a request for comment. A spokeswoman for the Saudi

A-316

investment ministry denied that discussions had taken place between Mr. Falih and Mr. Novak.

Some oil officials say they struggle to see the logic behind Saudi Arabia's decisions. Others see the battle as tied to Prince Mohammed's recent efforts to tighten his grip on power and raise his international clout, according to people involved in the OPEC talks.

Russia's failure to find common ground with Saudi Arabia and OPEC on oil cuts was preceded by talks in early February between Riyadh and Moscow that focused on the possibility of forging a broader, long-term alliance. Under one scenario, Saudi Arabia would have sped up its investments inside sanctions-hit Russia and backed the Kremlin's military efforts in Syria, according to people familiar with the matter.

Ultimately, the crown prince didn't commit to a deal, say the people familiar with the matter, because he didn't want to alienate the U.S. Weeks later, roughly at the same time that Russia was refusing to endorse the Saudi-backed plan to cut oil output, Mr. Putin was initiating a rapprochement with Turkey, a Saudi foe, the people said.

"It's all about egos now, not about the oil market," said a Saudi-government adviser.

Meanwhile, Prince Mohammed saw the OPEC debate as a way to assert his broad influence over the kingdom's oil policies and to prove to his older brother, Saudi energy minister Prince Abdulaziz bin Salman, that he could force Russia's hand, according to people familiar with his thinking.

In a terse phone call to Prince Abdulaziz late Thursday, the crown prince overruled his brother, who had agreed to a three-month production cut with OPEC, and extended the proposed cuts through the end of the year, these people said.

A-317



Prince Abdulaziz bin Salman, Saudi Arabia's energy minister, on Thursday. PHOTO: CHRISTIAN BRUNA/SHUTTERSTOCK

The crown prince ordered the minister to force OPEC to adopt the decision—even if that meant risking any hope that Russia would join in, they said.

Now the kingdom is pursuing a strategy of undercutting its rivals by drowning markets with cheaper oil—a move that has a tendency to backfire, say longtime market watchers.

On Saturday, the Saudi energy ministry told Aramco officials that instead of cutting production, they should pump more oil and lower the price. Saudi Arabia soon spread the word throughout the market. "It was the Saudi declaration of war against Putin," said a senior Saudi official.

Within hours, officials at the finance ministry were tasked with preparing a budget scenario that envisions benchmark Brent crude prices dropping into a $12-$20 a barrel range. All Saudi ministries were also asked to cut their spending significantly to prepare for this scenario.

But the strategy has backfired before.

In 2014, then-Saudi oil minister Ali al-Naimi persuaded OPEC to pump at will to compete with U.S. shale producers. His rationale was that the cartel's members had the ability to produce at extremely low costs. But after the price of Brent crude fell below $28 a barrel in early 2016, the Saudi royal family fired him. His successor, Mr. Falih, negotiated a pact between OPEC and Russia to cut production in the first OPEC+ deal. Within months, oil prices more than doubled.

A-318

The move to depress prices also missed its mark in the 1980s and led to a period known in oil circles as the "Lost Decade." In 1986, OPEC faced competition from rising North Sea production. Saudi Arabia's delegation was so upset about OPEC members flouting the group's production agreements that it unleashed a flood of oil that sank prices for a prolonged period.

Eventually, Saudi Arabia backtracked and cut production, but the move wasn't a complete failure, as it helped score a political victory against the Soviet Union. Riyadh had been backing insurgents battling Russia in Afghanistan—many of whom would later found al Qaeda. As the oil price fell to around $30 a barrel, Russia faced a budget crisis that contributed to food shortages and an end to its war in Afghanistan. Its then-leader Mikhail Gorbachev retreated from Kabul and launched the restructuring of Russia under his perestroika policy.

Russia is better prepared to weather low oil prices than in the past. Oil is now accounts for less than a third of budget revenue. The country has also accumulated massive reserves. The Russian finance ministry said Monday that it could withstand 10 years of prices at $25 to $30 a barrel.

Still, some Russian producers say the oil-market war is excessive.

"I'm in shock. This is a very unexpected, irrational decision to put it mildly," Leonid Fedun, vice president of Russian private producer Lukoil was reported as telling Russian newspaper the Bell. Russian oil companies would like to increase production, he said, but that won't make up for losses from falling prices.

The mood is more somber in Saudi Arabia, which needs oil prices over $60 a barrel to balance its budget, according to Saudi officials. The kingdom is now contending with its own coronavirus outbreak, moving Monday to suspend all air travel with many of its neighbors.

Saudi Arabia's national oil company Aramco fell about 7% to 27.95 riyals ($7.45) a share on the Saudi domestic exchange Monday. The Saudi price decrease has "literally burned all global energy investors," said a Saudi official. "[Saudi Aramco] Won't sell a share to foreigners again," he said, referring to the Crown Prince's plan to list Aramco internationally.

—*Rory Jones, Donna Abdulaziz and Georgi Kantchev contributed to this article*

A-319

**Write to** Summer Said at summer.said@wsj.com and Benoit Faucon at benoit.faucon@wsj.com

*Appeared in the March 11, 2020, print edition.*

# EXHIBIT 17

**From:**     Alex Forgione
**To:**       Restey, Michael W (NYC); 'Rebecca Boon'; Caitlin Moyna; 'John Esmay'
**Subject:**  [Ext] RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194
**Date:**     8/20/2024 1:08:00 PM
**CC:**       'Thomas Sperber'; 'John Rizio-Hamilton'; 'Stephen Boscolo'; Daniel Berger; Lauren Salamon; Reed, Noelle M (HOU); Davis, Abby (HOU); Milstead, Virginia (LAC); Hampton, Wallis M (HOU); Docket, Houston (HOU); Davis, Michelle L (HOU); Cecilia Stein; Timothy Clark Dauz
**BCC:**

**Message:**
Mike,

Please find the draft of the Joint Stipulation Regarding Lead Plaintiffs' Motion for Leave to Amend and Related Briefing Schedule attached. I am confirming that, in light of Plaintiffs' motion, the depositions will not proceed as scheduled.

Best,
Alex

---

**From:** Restey, Michael W <Michael.Restey@skadden.com>
**Sent:** Tuesday, August 20, 2024 12:51 PM
**To:** Alex Forgione <aforgione@gelaw.com>; 'Rebecca Boon' <Rebecca.Boon@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; 'John Esmay' <John.Esmay@blbglaw.com>
**Cc:** 'Thomas Sperber' <Thomas.Sperber@blbglaw.com>; 'John Rizio-Hamilton' <Johnr@blbglaw.com>; 'Stephen Boscolo' <Stephen.Boscolo@blbglaw.com>; Daniel Berger <dberger@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>; Reed, Noelle M <Noelle.Reed@skadden.com>; Davis, Abby <Abigail.Sheehan@skadden.com>; Milstead, Virginia <Virginia.Milstead@skadden.com>; Hampton, Wallis M <Wallis.Hampton@skadden.com>; Docket, Houston <dockethouston@skadden.com>; Davis, Michelle L <Michelle.Davis@skadden.com>; Cecilia Stein <cstein@gelaw.com>; Timothy Clark Dauz <tdauz@gelaw.com>; Restey, Michael W <Michael.Restey@skadden.com>
**Subject:** RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Counsel,

As you are aware, you notified us minutes before Mr. Ozen's deposition was scheduled to begin this morning that you intend to file a motion seeking leave to amend the operative complaint and believe that class certification-related discovery and briefing should be put on hold pending the Court's decision on that motion. You also stated that you intend to send us a stipulation reflecting this adjustment to the schedule today. We have yet to receive your draft stipulation. As we advised you yesterday, in light of the upcoming August 22 deadline, if we are not able to reach an

1

A-321

agreement on the stipulation today, we intend to file a motion requesting an abatement of the current class certification-related deadlines while this issue is resolved.

Additionally, given your representations this morning, we understand that all noticed depositions will not proceed at this time, and we will so advise the witnesses.

Regards,
Mike

---

**From:** Restey, Michael W (NYC)
**Sent:** Monday, August 19, 2024 7:12 PM
**To:** 'Alex Forgione' <aforgione@gelaw.com>; 'Rebecca Boon' <Rebecca.Boon@blbglaw.com>; 'Caitlin Moyna' <cmoyna@gelaw.com>; 'John Esmay' <John.Esmay@blbglaw.com>
**Cc:** 'Thomas Sperber' <Thomas.Sperber@blbglaw.com>; 'John Rizio-Hamilton' <Johnr@blbglaw.com>; 'Stephen Boscolo' <Stephen.Boscolo@blbglaw.com>; 'Daniel Berger' <dberger@gelaw.com>; 'Lauren Salamon' <lsalamon@gelaw.com>; Reed, Noelle M (HOU) <Noelle.Reed@skadden.com>; Davis, Abby (HOU) <Abigail.Sheehan@skadden.com>; Milstead, Virginia (LAC) <Virginia.Milstead@skadden.com>; Hampton, Wallis M (HOU) <Wallis.Hampton@skadden.com>; Docket, Houston (HOU) <dockethouston@skadden.com>; Davis, Michelle L (HOU) <Michelle.Davis@skadden.com>; 'Cecilia Stein' <cstein@gelaw.com>; 'Timothy Clark Dauz' <tdauz@gelaw.com>; Restey, Michael W (NYC) <Michael.Restey@skadden.com>
**Subject:** RE: [Ext] RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Counsel,

Given that August 22 is quickly approaching, we intend to make a motion tomorrow, as necessary, for the following modification of the briefing schedule:

1. Defendants' Opposition, including all supporting evidence and supporting brief, will be served on Plaintiffs on September 25, 2024;
2. Lead Plaintiffs' Reply, including rebuttal evidence, if any, and supporting brief, will be served on Defendants on November 11, 2024; and
3. The Parties will file with the Court Lead Plaintiffs' Motion for Class Certification, Defendants' Opposition, and Lead Plaintiffs' Reply, together with all supporting evidence and briefs, on November 21, 2024.

Please let us know plaintiffs' position on the motion.

Regards,
Mike

2

A-322

**From:** Restey, Michael W (NYC)
**Sent:** Friday, August 16, 2024 9:26 AM
**To:** 'Alex Forgione' <aforgione@gelaw.com>; 'Rebecca Boon'
<Rebecca.Boon@blbglaw.com>; 'Caitlin Moyna' <cmoyna@gelaw.com>; 'John Esmay'
<John.Esmay@blbglaw.com>
**Cc:** 'Thomas Sperber' <Thomas.Sperber@blbglaw.com>; 'John Rizio-Hamilton'
<Johnr@blbglaw.com>; 'Stephen Boscolo' <Stephen.Boscolo@blbglaw.com>; 'Daniel
Berger' <dberger@gelaw.com>; 'Lauren Salamon' <lsalamon@gelaw.com>; Reed, Noelle
M (HOU) <Noelle.Reed@skadden.com>; Davis, Abby (HOU)
<Abigail.Sheehan@skadden.com>; Milstead, Virginia (LAC)
<Virginia.Milstead@skadden.com>; Hampton, Wallis M (HOU)
<Wallis.Hampton@skadden.com>; Docket, Houston (HOU)
<dockethouston@skadden.com>; Davis, Michelle L (HOU)
<Michelle.Davis@skadden.com>; 'Cecilia Stein' <cstein@gelaw.com>; 'Timothy Clark
Dauz' <tdauz@gelaw.com>; Restey, Michael W (NYC) <Michael.Restey@skadden.com>
**Subject:** RE: [Ext] RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Counsel,

I'm following up on my email below.  Please let us know if this proposal is amenable.

Best,
Mike

**From:** Restey, Michael W (NYC)
**Sent:** Monday, August 12, 2024 3:27 PM
**To:** 'Alex Forgione' <aforgione@gelaw.com>; Rebecca Boon
<Rebecca.Boon@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; John Esmay
<John.Esmay@blbglaw.com>
**Cc:** Thomas Sperber <Thomas.Sperber@blbglaw.com>; John Rizio-Hamilton
<Johnr@blbglaw.com>; Stephen Boscolo <Stephen.Boscolo@blbglaw.com>; Daniel
Berger <dberger@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>; Reed, Noelle M
(HOU) <Noelle.Reed@skadden.com>; Davis, Abby (HOU)
<Abigail.Sheehan@skadden.com>; Milstead, Virginia (LAC)
<Virginia.Milstead@skadden.com>; Hampton, Wallis M (HOU)
<Wallis.Hampton@skadden.com>; Docket, Houston (HOU)
<dockethouston@skadden.com>; Davis, Michelle L (HOU)
<Michelle.Davis@skadden.com>; Cecilia Stein <cstein@gelaw.com>; Timothy Clark Dauz
<tdauz@gelaw.com>; Restey, Michael W (NYC) <Michael.Restey@skadden.com>
**Subject:** RE: [Ext] RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Alex,

We think it makes sense to set up the stipulation as follows:

3

A-323

- The parties have agreed to take the following depositions outside of the class certification discovery deadline: [list the depositions];
- The deadline to take the deposition of Defendants' expert will be November 4, 2024;
- Neither party has agreed to any additional discovery beyond what has been served or scheduled as of the date of this stipulation;
- The parties agree to meet and confer (and if needed, seek Court guidance) regarding any discovery a party believes is necessitated by the depositions scheduled outside the discovery deadline;
- Assuming neither party seeks additional discovery, Defendants' Opposition, including all supporting evidence and supporting brief, will be served on Plaintiffs on September 25, 2024;
- Lead Plaintiffs' Reply, including rebuttal evidence, if any, and supporting brief, will be served on Defendants on November 11, 2024; and
- The Parties will file with the Court Lead Plaintiffs' Motion for Class Certification, Defendants' Opposition, and Lead Plaintiffs' Reply, together with all supporting evidence and briefs, on November 21, 2024.

Please let us know if this works.

Best,
Mike

-----Original Message-----
From: Alex Forgione <aforgione@gelaw.com>
Sent: Monday, August 5, 2024 6:22 PM
To: Restey, Michael W (NYC) <Michael.Restey@skadden.com>; Rebecca Boon <Rebecca.Boon@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; John Esmay <John.Esmay@blbglaw.com>
Cc: Thomas Sperber <Thomas.Sperber@blbglaw.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; Stephen Boscolo <Stephen.Boscolo@blbglaw.com>; Daniel Berger <dberger@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>; Reed, Noelle M (HOU) <Noelle.Reed@skadden.com>; Davis, Abby (HOU) <Abigail.Sheehan@skadden.com>; Milstead, Virginia (LAC) <Virginia.Milstead@skadden.com>; Hampton, Wallis M (HOU) <Wallis.Hampton@skadden.com>; Docket, Houston (HOU) <dockethouston@skadden.com>; Davis, Michelle L (HOU) <Michelle.Davis@skadden.com>; Cecilia Stein <cstein@gelaw.com>; Timothy Clark Dauz <tdauz@gelaw.com>
Subject: [Ext] RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Mike,

Now that the deposition dates have been confirmed, we should discuss the extension of the Class Certification discovery deadlines and get the stipulation on file. As previously noted, we are willing to agree to the below schedule, which includes your 5-day extension for your opposition brief deadline. We propose a Class Certification deadline for September 25 to allow time for all of the depositions. If Defendants agree to this extension, Plaintiffs will agree to not seek additional discovery absent compelling circumstances based on testimony given during the depositions.

4

A-324

1. The completion of Class Certification discovery, excluding the deposition of Defendants' expert, will be on September 25, 2024;
2. Defendants' Opposition, including all supporting evidence and supporting brief, will be served on Plaintiffs on September 25, 2024;
3. The deadline to take the deposition of Defendants' expert will be November 4, 2024;
4. Lead Plaintiffs' Reply, including rebuttal evidence, if any, and supporting brief, will be served on Defendants on November 11, 2024; and
5. The Parties will file with the Court Lead Plaintiffs' Motion for Class Certification, Defendants' Opposition, and Lead Plaintiffs' Reply, together with all supporting evidence and briefs, on November 21, 2024.

If Defendants agree to this schedule, we will prepare a new version of the draft stipulation and send it to you for final approval.

Thanks,
Alex

From: Restey, Michael W <Michael.Restey@skadden.com>
Sent: Wednesday, July 24, 2024 9:21 PM
To: 'Rebecca Boon' <Rebecca.Boon@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; John Esmay <John.Esmay@blbglaw.com>
Cc: Thomas Sperber <Thomas.Sperber@blbglaw.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; Stephen Boscolo <Stephen.Boscolo@blbglaw.com>; Daniel Berger <dberger@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>; Alex Forgione <aforgione@gelaw.com>; Reed, Noelle M <Noelle.Reed@skadden.com>; Davis, Abby <Abigail.Sheehan@skadden.com>; Milstead, Virginia <Virginia.Milstead@skadden.com>; Hampton, Wallis M <Wallis.Hampton@skadden.com>; Docket, Houston <dockethouston@skadden.com>; Davis, Michelle L <Michelle.Davis@skadden.com>; Restey, Michael W <Michael.Restey@skadden.com>
Subject: RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Rebecca,

Respectfully, it appears to be Lead Plaintiffs who are asking for an accommodation on scheduling. And we are happy to try to work with you given that you have advised that you are unable to depose Ms. Bond on the date we offered in August or put up your witnesses before the August 22 discovery close. While we appreciate your willingness to schedule the Gulden and Burch depositions at a time when Defendants' counsel can attend them, that rescheduling was necessary only because you scheduled those depositions – again – without conferring with us about our availability, even though we had had previously raised that very issue with the Court when you unilaterally scheduled those depositions the first time.

What we would suggest as the most productive way forward is to confirm all of the outstanding deposition dates, lock those in, and once those dates are confirmed, negotiate any necessary adjustments to the schedule. To that end, we will provide additional available dates for Ms. Bond and Mr. Gjervik as soon as we have them. Finally, while we are willing to complete the depositions we've discussed outside of the discovery deadline, we will not agree that any extension to do so allows either party to notice or serve any additional discovery.

5

Regards,
Mike

From: Rebecca Boon <Rebecca.Boon@blbglaw.com<mailto:Rebecca.Boon@blbglaw.com>>
Sent: Wednesday, July 24, 2024 2:44 PM
To: Restey, Michael W (NYC) <Michael.Restey@skadden.com<mailto:Michael.Restey@skadden.com>>;
'Caitlin Moyna' <cmoyna@gelaw.com<mailto:cmoyna@gelaw.com>>; John Esmay
<John.Esmay@blbglaw.com<mailto:John.Esmay@blbglaw.com>>
Cc: Thomas Sperber <Thomas.Sperber@blbglaw.com<mailto:Thomas.Sperber@blbglaw.com>>; John
Rizio-Hamilton <Johnr@blbglaw.com<mailto:Johnr@blbglaw.com>>; Stephen Boscolo
<Stephen.Boscolo@blbglaw.com<mailto:Stephen.Boscolo@blbglaw.com>>; Daniel Berger
<dberger@gelaw.com<mailto:dberger@gelaw.com>>; Lauren Salamon
<lsalamon@gelaw.com<mailto:lsalamon@gelaw.com>>; Alex Forgione
<aforgione@gelaw.com<mailto:aforgione@gelaw.com>>; Reed, Noelle M (HOU)
<Noelle.Reed@skadden.com<mailto:Noelle.Reed@skadden.com>>; Davis, Abby (HOU)
<Abigail.Sheehan@skadden.com<mailto:Abigail.Sheehan@skadden.com>>; Milstead, Virginia (LAC)
<Virginia.Milstead@skadden.com<mailto:Virginia.Milstead@skadden.com>>; Hampton, Wallis M (HOU)
<Wallis.Hampton@skadden.com<mailto:Wallis.Hampton@skadden.com>>; Docket, Houston (HOU)
<dockethouston@skadden.com<mailto:dockethouston@skadden.com>>; Davis, Michelle L (HOU)
<Michelle.Davis@skadden.com<mailto:Michelle.Davis@skadden.com>>
Subject: [Ext] RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Mike,

Your proposal does not work for us. We pushed out the schedule to accommodate you, and all
deadlines should move, as reflected in the stipulation we sent you. We would be willing to agree to the
below schedule, which accepts your 5-day extension to your opposition brief deadline and moves the
other deadlines accordingly.

1.      The completion of Class Certification discovery, excluding the deposition of Defendants' expert,
will be on September 25, 2024;
2.      Defendants' Opposition, including all supporting evidence and supporting brief, will be served
on Plaintiffs on September 25, 2024;
3.      The deadline to take the deposition of Defendants' expert will be November 4, 2024;
4.      Lead Plaintiffs' Reply, including rebuttal evidence, if any, and supporting brief, will be served on
Defendants on November 11, 2024; and
5.      The Parties will file with the Court Lead Plaintiffs' Motion for Class Certification, Defendants'
Opposition, and Lead Plaintiffs' Reply, together with all supporting evidence and briefs, on November
21, 2024.

Regarding your depositions, Plaintiffs and Matt Cain are not available on the dates you
proposed. Amalgamated is available on September 16 and 17; Rhode Island and Matt Cain are checking
availability for the first two weeks of September. We will revert with dates as soon as we have them.

Regards,
Rebecca

Rebecca Boon
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1594
Fax: (212) 554-1444


From: Restey, Michael W <Michael.Restey@skadden.com<mailto:Michael.Restey@skadden.com>>
Sent: Tuesday, July 23, 2024 7:23 PM
To: 'Caitlin Moyna' <cmoyna@gelaw.com<mailto:cmoyna@gelaw.com>>; John Esmay
<John.Esmay@blbglaw.com<mailto:John.Esmay@blbglaw.com>>
Cc: Rebecca Boon <Rebecca.Boon@blbglaw.com<mailto:Rebecca.Boon@blbglaw.com>>; Thomas
Sperber <Thomas.Sperber@blbglaw.com<mailto:Thomas.Sperber@blbglaw.com>>; John Rizio-Hamilton
<Johnr@blbglaw.com<mailto:Johnr@blbglaw.com>>; Stephen Boscolo
<Stephen.Boscolo@blbglaw.com<mailto:Stephen.Boscolo@blbglaw.com>>; Daniel Berger
<dberger@gelaw.com<mailto:dberger@gelaw.com>>; Lauren Salamon
<lsalamon@gelaw.com<mailto:lsalamon@gelaw.com>>; Alex Forgione
<aforgione@gelaw.com<mailto:aforgione@gelaw.com>>; Reed, Noelle M
<Noelle.Reed@skadden.com<mailto:Noelle.Reed@skadden.com>>; Davis, Abby
<Abigail.Sheehan@skadden.com<mailto:Abigail.Sheehan@skadden.com>>; Milstead, Virginia
<Virginia.Milstead@skadden.com<mailto:Virginia.Milstead@skadden.com>>; Hampton, Wallis M
<Wallis.Hampton@skadden.com<mailto:Wallis.Hampton@skadden.com>>; Docket, Houston
<dockethouston@skadden.com<mailto:dockethouston@skadden.com>>; Davis, Michelle L
<Michelle.Davis@skadden.com<mailto:Michelle.Davis@skadden.com>>; Restey, Michael W
<Michael.Restey@skadden.com<mailto:Michael.Restey@skadden.com>>
Subject: RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

[This message is from an external sender] _____ Caitlin,

Thanks for sending over the draft stipulation. Attached are our proposed edits in track changes. Given that the Court's scheduling order permits the parties to alter most deadlines by written agreement without need for court approval, we have limited this stipulation solely to the revised briefing and submission dates. We can keep the August 22 close of discovery and agree in writing that certain depositions – Burch, Gulden, Gjervik, Bond, and defendants' expert – will take place after that date. We have also built in a few extra days after the Gulden deposition on September 20 to accommodate receipt of an expedited transcript for incorporation into the papers, as necessary.

Separately, please let us know if we can confirm the August 5 and 7 dates for the 30(b)(6) depositions of Lead Plaintiffs Amalgamated and Rhode Island. If those dates are not available, please provide availability through August 22. Similarly, please let us know whether Dr. Cain is available for his deposition on August 14 and, if not, his availability prior to August 22.

We will be back to you shortly regarding dates for Bond and Gjervik.

Regards,
Mike

7

A-327

From: Caitlin Moyna <cmoyna@gelaw.com<mailto:cmoyna@gelaw.com>>
Sent: Monday, July 22, 2024 6:49 PM
To: Restey, Michael W (NYC) <Michael.Restey@skadden.com<mailto:Michael.Restey@skadden.com>>;
'John Esmay' <John.Esmay@blbglaw.com<mailto:John.Esmay@blbglaw.com>>
Cc: Rebecca Boon <Rebecca.Boon@blbglaw.com<mailto:Rebecca.Boon@blbglaw.com>>; Thomas
Sperber <Thomas.Sperber@blbglaw.com<mailto:Thomas.Sperber@blbglaw.com>>; John Rizio-Hamilton
<Johnr@blbglaw.com<mailto:Johnr@blbglaw.com>>; Stephen Boscolo
<Stephen.Boscolo@blbglaw.com<mailto:Stephen.Boscolo@blbglaw.com>>; Daniel Berger
<dberger@gelaw.com<mailto:dberger@gelaw.com>>; Lauren Salamon
<lsalamon@gelaw.com<mailto:lsalamon@gelaw.com>>; Alex Forgione
<aforgione@gelaw.com<mailto:aforgione@gelaw.com>>; Reed, Noelle M (HOU)
<Noelle.Reed@skadden.com<mailto:Noelle.Reed@skadden.com>>; Davis, Abby (HOU)
<Abigail.Sheehan@skadden.com<mailto:Abigail.Sheehan@skadden.com>>; Milstead, Virginia (LAC)
<Virginia.Milstead@skadden.com<mailto:Virginia.Milstead@skadden.com>>; Hampton, Wallis M (HOU)
<Wallis.Hampton@skadden.com<mailto:Wallis.Hampton@skadden.com>>; Hanson, Brent M (HOU)
<Brent.Hanson@skadden.com<mailto:Brent.Hanson@skadden.com>>; Docket, Houston (HOU)
<dockethouston@skadden.com<mailto:dockethouston@skadden.com>>; Davis, Michelle L (HOU)
<Michelle.Davis@skadden.com<mailto:Michelle.Davis@skadden.com>>
Subject: [Ext] RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Dear Mike,

In light of the agreement to hold the depositions of Dr. Gulden and Dr. Burch in September, we have
prepared the attached stipulation which extends all remaining dates in the class certification discovery
and briefing schedule by 29 days.  Please let us know any edits, and we will get it filed.

Further, please provide a new date for Ms. Bond, and a date for Mr. Gjervik, as soon as possible, so that
we can confirm our schedules.

Finally, we had previously planned to take Dr. Gulden's deposition in Washington D.C. because that was
where she would be for the prior date we had scheduled, but in fact she is located in Boston, and that is
where we will take her deposition on September 20.  Dr. Burch's deposition will be in Houston, in line
with the subpoena you issued for him (however, it will be on September 18, not 19, as previously
discussed).

Best regards,
Caitlin

Caitlin M. Moyna
Office: (646) 722-8513
Cell: (917) 595-8671

From: Restey, Michael W <Michael.Restey@skadden.com<mailto:Michael.Restey@skadden.com>>
Sent: Monday, July 22, 2024 5:58 PM
To: 'John Esmay' <John.Esmay@blbglaw.com<mailto:John.Esmay@blbglaw.com>>; Caitlin Moyna
<cmoyna@gelaw.com<mailto:cmoyna@gelaw.com>>

8

A-328

Cc: Rebecca Boon <Rebecca.Boon@blbglaw.com<mailto:Rebecca.Boon@blbglaw.com>>; Thomas Sperber <Thomas.Sperber@blbglaw.com<mailto:Thomas.Sperber@blbglaw.com>>; John Rizio-Hamilton <Johnr@blbglaw.com<mailto:Johnr@blbglaw.com>>; Stephen Boscolo <Stephen.Boscolo@blbglaw.com<mailto:Stephen.Boscolo@blbglaw.com>>; Daniel Berger <dberger@gelaw.com<mailto:dberger@gelaw.com>>; Lauren Salamon <lsalamon@gelaw.com<mailto:lsalamon@gelaw.com>>; Alex Forgione <aforgione@gelaw.com<mailto:aforgione@gelaw.com>>; Reed, Noelle M <Noelle.Reed@skadden.com<mailto:Noelle.Reed@skadden.com>>; Davis, Abby <Abigail.Sheehan@skadden.com<mailto:Abigail.Sheehan@skadden.com>>; Milstead, Virginia <Virginia.Milstead@skadden.com<mailto:Virginia.Milstead@skadden.com>>; Hampton, Wallis M <Wallis.Hampton@skadden.com<mailto:Wallis.Hampton@skadden.com>>; Hanson, Brent M <Brent.Hanson@skadden.com<mailto:Brent.Hanson@skadden.com>>; Docket, Houston <dockethouston@skadden.com<mailto:dockethouston@skadden.com>>; Davis, Michelle L <Michelle.Davis@skadden.com<mailto:Michelle.Davis@skadden.com>>; Restey, Michael W <Michael.Restey@skadden.com<mailto:Michael.Restey@skadden.com>>
Subject: RE: Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Thanks, John.  Confirming receipt.

From: John Esmay <John.Esmay@blbglaw.com<mailto:John.Esmay@blbglaw.com>>
Sent: Monday, July 22, 2024 5:39 PM
To: Restey, Michael W (NYC) <Michael.Restey@skadden.com<mailto:Michael.Restey@skadden.com>>; 'Caitlin Moyna' <cmoyna@gelaw.com<mailto:cmoyna@gelaw.com>>
Cc: Rebecca Boon <Rebecca.Boon@blbglaw.com<mailto:Rebecca.Boon@blbglaw.com>>; Thomas Sperber <Thomas.Sperber@blbglaw.com<mailto:Thomas.Sperber@blbglaw.com>>; John Rizio-Hamilton <Johnr@blbglaw.com<mailto:Johnr@blbglaw.com>>; Stephen Boscolo <Stephen.Boscolo@blbglaw.com<mailto:Stephen.Boscolo@blbglaw.com>>; Daniel Berger <dberger@gelaw.com<mailto:dberger@gelaw.com>>; Lauren Salamon <lsalamon@gelaw.com<mailto:lsalamon@gelaw.com>>; Alex Forgione <aforgione@gelaw.com<mailto:aforgione@gelaw.com>>; Reed, Noelle M (HOU) <Noelle.Reed@skadden.com<mailto:Noelle.Reed@skadden.com>>; Davis, Abby (HOU) <Abigail.Sheehan@skadden.com<mailto:Abigail.Sheehan@skadden.com>>; Milstead, Virginia (LAC) <Virginia.Milstead@skadden.com<mailto:Virginia.Milstead@skadden.com>>; Hampton, Wallis M (HOU) <Wallis.Hampton@skadden.com<mailto:Wallis.Hampton@skadden.com>>; Hanson, Brent M (HOU) <Brent.Hanson@skadden.com<mailto:Brent.Hanson@skadden.com>>; Docket, Houston (HOU) <dockethouston@skadden.com<mailto:dockethouston@skadden.com>>; Davis, Michelle L (HOU) <Michelle.Davis@skadden.com<mailto:Michelle.Davis@skadden.com>>
Subject: [Ext] Yoshikawa v. Exxon Mobil Corp., No. 21-cv-00194

Counsel,

In accordance with the parties' Joint Stipulation to Extend the Class Certification Schedule, endorsed by Judge Godbey on June 11, 2024 (ECF No. 154), Plaintiffs designate Dr. Matthew D. Cain as a rebuttal expert. In addition, Plaintiffs may employ Paul Parsons of University of Texas and/or Randall Wright of Wright & Company as rebuttal experts if necessary to rebut evidence Defendants submit supporting their opposition to Plaintiffs' motion for class certification.

Regards, John

9

A-329

John Esmay | BLB&G
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, New York 10020
tel: 212-554-1283 | fax: 212-554-1444

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

============================================================================

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

============================================================================

------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

============================================================================

--------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named

10

A-330

A-331

herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

======================================================================
==========

**Attachments:**

Exxon - Joint Stipulation re Motion for Leave to Amend.docx

11

# EXHIBIT 18



**FORT WORTH
REGIONAL OFFICE**

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION**
BURNETT PLAZA, 801 CHERRY STREET, SUITE 1900, UNIT 18
FORT WORTH, TX 76102

January 20, 2022

*Via e-mail*

Exxon Mobil Corporation
c/o David R. Woodcock
Assistant General Counsel – Corporate Law
david.r.woodcock@exxonmobil.com

    Re:    In the Matter of Exxon Mobil (FW-04425)

Dear Mr. Woodcock:

    We have concluded the investigation as to Exxon Mobil Corporation. Based on the information we have as of this date, we do not intend to recommend an enforcement action by the Commission against Exxon Mobil. We are providing this notice under the guidelines set out in the final paragraph of Securities Act Release No. 5310, which states in part that the notice "must in no way be construed as indicating that the party has been exonerated or that no action may ultimately result from the staff's investigation." (The full text of Release No. 5310 can be found at:
http://www.sec.gov/divisions/enforce/wells-release.pdf.)

        Sincerely,

        /s
        David Reece
        Assistant Director

A-332

# EXHIBIT 19

File Produced Natively

A-333

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00116391

A-335

A-336

4

A-338

A-340

8

A-342

A-345

13

14

A-347

A-348

A-350

A-351

A-352

A-353

A-354

A-355

A-356

A-362

34

A-368

A-370

A-371

A-372

41

42

A-376

A-378

A-379

A-381

51

A-385

A-390

63

# EXHIBIT 20

FRED will undergo scheduled maintenance on October 31 at 2 PM Central Time. Connection to some features may be unavailable. Thank you for your patience and we apologize for any inconvenience.    ×



Categories > Prices > Commodities

☆ Crude Oil Prices: West Texas Intermediate (WTI) - Cushing, Oklahoma (DCOILWTICO)    DOWNLOAD ⬇

| Observation | Units: | Frequency: | |
|---|---|---|---|
| 2020-05-01: 19.72 | Dollars per Barrel, Not Seasonally Adjusted | Daily | 1Y \| 5Y \| 10Y \| Max |
| (+ more) | | | |
| Updated: Oct 23, 2024 12:03 PM CDT | | | 2020-01-01    2020-05-01    EDIT GRAPH ⚙ |

Shaded areas indicate U.S. recessions.    Source: U.S. Energy Information Administration    fred.stlouisfed.org

Share Links 🔗    Account Tools 👤

NOTES

**Source:** U.S. Energy Information Administration ↗    **Release:** Spot Prices ↗
**Units:** Dollars per Barrel, Not Seasonally Adjusted
**Frequency:** Daily
Definitions, Sources and Explanatory Notes
**Suggested Citation:**
U.S. Energy Information Administration, Crude Oil Prices: West Texas Intermediate (WTI) - Cushing, Oklahoma [DCOILWTICO], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/DCOILWTICO, October 29, 2024.

RELATED DATA AND CONTENT

**Data Suggestions Based On Your Search**

Crude Oil Prices: Brent - Europe

Spot Crude Oil Price: West Texas Intermediate (WTI)

Henry Hub Natural Gas Spot Price

Global price of Brent Crude

See More...

A-399

**Content Suggestions**



FRED Blog
WTI vs. Brent oil prices: When
and why do they diverge?

FRED Blog
Oil prices and expected
inflation

FRED Blog
FRED gets real, unless you
want to keep it nominal

ALFRED Vintage Series
Crude Oil Prices: West Texas
Intermediate (WTI) - Cushing,
Oklahoma

See More...

**Other Formats**

Annual, Not Seasonally Adjusted    Monthly, Not Seasonally Adjusted    Weekly, Not Seasonally Adjusted

**Related Categories**

Commodities    Prices

**Releases**

More Series from Spot Prices

**Tags**

West    West Texas Intermediate    Intermediate    Crude    Energy Information Administration    Oil    Daily

Commodities    Price    Nation    Public Domain: Citation Requested    Not Seasonally Adjusted

United States of America

Filter  0

NEED HELP?

Questions or Comments

FRED Help

SUBSCRIBE TO THE FRED
NEWSLETTER

Email    Subscribe

FOLLOW US

Federal Reserve Bank of St. Louis, One Federal Reserve Bank Plaza, St. Louis,
MO 63102

Legal    Privacy Notice & Policy

A-400

# EXHIBIT 21

A-401

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089139

A-402

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089140

A-403

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089141

A-404

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089142

A-405

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089143

A-406

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089144

A-407

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089145

A-408

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089146

A-409

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089147

A-410

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089148

A-411

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089149

A-412

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089150

A-413

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089151

A-414

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089152

A-415

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089153

A-416

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089154

A-417

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089155

A-418

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089156

A-419

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089157

A-420

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089158

A-421

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089159

A-422

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089160

A-423

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00089161

# EXHIBIT 22

A-424

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                          EXXONPBA00114868

A-425

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

A-426

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                                        EXXONPBA00114870

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00114871

A-428

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00114872

A-429

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00114873

A-430

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00114874

A-431

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00114875

A-432

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00114876

A-433

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXXONPBA00114877