**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, ) ) ) ) *Plaintiff*, ) ) ) v. ) ) ) EXXON MOBIL CORPORATION, ) DARREN W. WOODS, NEIL A. ) CHAPMAN, JACK WILLIAMS, NEIL A. ) HANSEN, DAVID ROSENTHAL, LIAM ) M. MALLON, JEFFREY J. WOODBURY, ) and SARA N. ORTWEIN, ) ) ) *Defendants*. ) ) | Civil Action No. 3:21-cv-00194-N |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
THE DECLARATION OF D. RANDALL WRIGHT, P.E.**

In support of Defendants' Motion to Exclude the Declaration of D. Randall Wright, P.E.,

attached are true and correct copies of the following documents:

| Exhibit No. | Description | Page(s) |
|---|---|---|
| A | Declaration of Wallis M. Hampton | A-1 – A-3 |
| 1 | Plaintiffs' Renewed Motion for Class Certification and Brief in Support | A-4 – A-39 |
| 2 | Defendants' Opposition to Plaintiffs' Renewed Motion for Class Certification | A-40 – A-72 |
| 3 | Declaration of Allen Ferrell, Ph.D. | A-73 – A-126 |
| 4 | Reply In Support of Plaintiffs' Renewed Motion for Class Certification | A-127 – A-159 |
| 5 | Expert Rebuttal Declaration of D. Randall Wright, P.E. | A-160 – A-216 |
| 6 | Email thread between counsel for Defendants and counsel for Plaintiffs, dated July 24-30, 2025 | A-217 – A-225 |
| 7 | Declaration of Max Boone, dated June 19, 2025 | A-226 – A-229 |

1

| Exhibit No. | Description | Page(s) |
|---|---|---|
| 8 | Excerpts from the transcript of the deposition of Damian Burch, Ph.D., taken May 16, 2025 | A-230 – A-235 |
| 9 | Excerpts from the transcript of the deposition of Lindsey Gulden, Ph.D., taken May 9, 2025 | A-236 – A-249 |

Dated: August 22, 2025                    Respectfully submitted,

*/s/ Noelle M. Reed*
Noelle M. Reed
   State Bar No. 24044211
Abigail E. Davis
   State Bar No. 24139564
Wallis M. Hampton
   State Bar No. 00784199
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122
noelle.reed@skadden.com
abigail.sheehan@skadden.com
wallis.hampton@skadden.com

Michelle L. Davis
   State Bar No. 24038854
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
308 Bahama Court
Granbury, Texas 76048
Tel.: (713) 655-5197
Fax: (713) 483-9197
michelle.davis@skadden.com

Michael W. Restey Jr. (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Tel.: (212) 735-3000
Fax: (212) 735-2000
michael.restey@skadden.com

*Attorneys for Defendants*
*Exxon Mobil Corporation, Darren W. Woods,*
*Liam M. Mallon, and Melissa Bond*

3

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) ) | Civil Action No. 3:21-cv-00194-N |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, | ) ) ) ) | |
| *Defendants*. | ) ) ) ) ) ) | |

**DECLARATION OF WALLIS M. HAMPTON**

1.     My name is Wallis M. Hampton.  I am a counsel in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), resident in the firm's Houston office.  I am over the age of 18, of sound mind, am competent to make this declaration, and every statement herein is based upon my personal knowledge or on information provided to me and is true and correct to the best of my knowledge.  I represent Defendants Exxon Mobil Corporation, Darren W. Woods, Liam M. Mallon, and Melissa Bond ("Defendants") in the above-captioned matter.

2.     I submit this declaration in support of Defendants' Motion to Exclude the Declaration of D. Randall Wright, P.E. (the "Motion").

3.     Attached as Exhibit 1 is a true and correct copy of Plaintiffs' Renewed Motion for Class Certification and Brief in Support ("Class Motion"), which Plaintiffs served on Defendants on February 7, 2025.

A-1

4. Attached as Exhibit 2 is a true and correct copy of Defendants' Opposition to Plaintiffs' Renewed Motion for Class Certification ("Class Opposition"), which Defendants served on Plaintiffs on June 23, 2025.

5. Attached as Exhibit 3 is a true and correct copy of the Declaration of Allen Ferrell, Ph.D. dated June 20, 2025 ("Ferrell Declaration"), which was attached to the Class Opposition.

6. Attached as Exhibit 4 is a true and correct copy of the Reply in Further Support of Plaintiffs' Renewed Motion for Class Certification ("Class Reply"), which Plaintiffs served on Defendants on August 6, 2025.

7. Attached as Exhibit 5 is a true and correct copy of the Expert Rebuttal Declaration of D. Randall Wright, P.E. dated August 6, 2025 ("Wright Declaration"), which was attached to the Class Reply.

8. Attached as Exhibit 6 is a true and correct copy of an email thread between counsel for Defendants and counsel for Plaintiffs, dated July 24-30, 2025.

9. Attached as Exhibit 7 is a true and correct copy of the Declaration of Max Boone dated June 19, 2025, which was attached to the Class Opposition.

10. Attached as Exhibit 8 is a true and correct copy of excerpts from the transcript of the deposition of Damian Burch, Ph.D., taken May 16, 2025.

11. Attached as Exhibit 9 is a true and correct copy of excerpts from the transcript of the deposition of Lindsey Gulden, Ph.D., taken May 9, 2025.

12. Defendants produced 16,487 documents by the July 8, 2024 deadline for substantial completion of document discovery.

13. Of the documents cited in the Wright Declaration, all but seven were produced before Plaintiffs served their Class Motion on February 7, 2025. Those seven documents are:

2

EXXONPBA00120506, EXXONPBA00120670, EXXONPBA00120666 (Burch 31), EXXONPBA00120664 (Burch 33), EXXONPBA00120491 (Mallon 21), PwC-Exxon-18516, and PwC-Exxon-18529.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 22, 2025.

Wallis M. Hampton

A-3

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND,<br><br>Defendants. | Civil Action No.: 3:21-cv-00194-N |

**PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION
<u>AND BRIEF IN SUPPORT</u>**

A-4

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY ............... 2

        A.      PLAINTIFFS ...................................................................................... 2

        B.      DEFENDANTS ................................................................................... 3

        C.      ALLEGATIONS AGAINST DEFENDANTS .................................................. 4

III.    ARGUMENT ............................................................................................ 6

        A.      THIS ACTION SHOULD BE CERTIFIED AS A CLASS ACTION ...................... 6

        B.      RULE 23(A) IS SATISFIED .................................................................. 7

                1.      The Proposed Class Is So Numerous That Joinder of All
                        Respective Class Members Is Impracticable ............................... 7

                2.      Questions of Law and Fact Are Common to Members of the Class .......... 8

                3.      The Proposed Class Representatives' Claims Are Typical......................... 9

                4.      The Representative Parties and Their Counsel Are Adequate.................. 10

                        a.      There Are No Conflicts Between the Class Representatives
                                and the Class ................................................................ 10

                        b.      Plaintiffs Are Adequate to Serve as Class Representatives.......... 10

                        c.      Proposed Class Counsel Are Adequate........................................ 12

        C.      THE PROPOSED CLASS SATISFIES RULE 23(B)(3).................................... 13

                1.      Common Questions of Law and Fact Predominate Over Individual
                        Questions.................................................................................. 13

                        a.      The Fraud-On-The-Market Doctrine Presumes Reliance ............. 13

                                (1)     Exxon Common Stock Experienced a High Weekly
                                        Trading Volume ................................................................ 16

                                (2)     Numerous Financial Analysts Covered and Reported on
                                        Exxon During the Class Period........................................... 16

A-5

(3)    The DMM Served as a Market Maker for Exxon ............. 17

(4)    Exxon's Public Float Sufficiently Satisfies the Form S-3 Eligibility Requirements .................................................... 18

(5)    The Price of Exxon's Common Stock Reacted to New, Company-Specific Information During the Class Period . 19

(6)    Plaintiffs Satisfy the *Krogman* Factors ............................ 20

b.    Reliance Is Also Presumed Under *Affiliated Ute* .......................... 21

2.    A Class-Wide Damages Methodology Is Available ................................ 23

3.    A Class Action Is Superior to Other Available Methods of Adjudication ......................................................................................... 24

D.    ADDITIONAL MATTERS REQUIRED BY LR CV 23.2 ............................................. 25

IV.    CONCLUSION ...................................................................................................... 25

ii

A-6

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Affiliated Ute Citizens v. U.S.*,
406 U.S. 128 (1972) .................................................................................................21, 22, 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) ..............................................................................................................6

*Angell v. GEICO Advantage Ins. Co.*,
No. 4:20-CV-0799, 2021 WL 5585732 (S.D. Tex. Nov. 30, 2021) .......................................10

*Barrie v. Intervoice-Brite, Inc.*,
No. 3:01–CV–1071–K, 2009 WL 3424614 (N.D. Tex. Oct. 26, 2009) ..................................19

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)..............................................................................................................14

*Bennett v. Sprint Nextel Corp.*,
298 F.R.D. 498 (D. Kan. 2014)..............................................................................................17

*Bremer v. SolarWinds Corp.*,
Nos. 1:21-CV-2-RP, 1:21-CV-47-RP, 1:21-CV-138-RP, 2021 WL 2668827
(W.D. Tex. Mar. 11, 2021) ....................................................................................................12

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ................................................................................. *passim*

*In re Cassava Scis., Inc. Sec. Litig*,
No. 1:21-cv-00751-DAE, 2024 WL 4824243 (W.D. Tex. Nov. 15, 2024)............................20

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.,
HQ*,
322 F. Supp. 3d 676 (D. Md. 2018)......................................................................................20

*City of Riviera Beach Gen. Emp. Ret. Sys. v. Macquarie Infrastructure Corp.*,
No. 18-CV-3608 (VSB), 2019 WL 364570 (S.D.N.Y. Jan. 30, 2019)..................................12

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
No. H–14–3428, 2017 WL 2608243 (S.D. Tex. June 15, 2017) ......................................12, 13

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)................................................................................................................23

*Cruson v. Jackson Nat'l Life Ins. Co.*,
954 F.3d 240 (5th Cir. 2020) .................................................................................................6

*Daves v. Dallas Cty. Texas*,
  No. 3:18-CV-0154-N, 2018 WL 4537202 (N.D. Tex. Sept. 20, 2018) .....................................9

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .........................................................................................................8

*In re Deepwater Horizon*,
  785 F.3d 1003 (5th Cir. 2015) ......................................................................................................10

*In re Dell Inc.*,
  No. A–06–CA–726–SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010)..................................7

*In re Diamond Foods, Inc. Sec. Litig.*,
  295 F.R.D. 240 (N.D. Cal. 2013)................................................................................................17

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d. Cir. 2011).......................................................................................................18

*E. Texas Motor Freight Sys., Inc. v. Rodriguez*,
  431 U.S. 395 (1977)......................................................................................................................10

*Einhorn v. AxoGen Inc.*,
  No. 8:19-cv-69-EAK-AAS, 2019 WL 5636382 (M.D. Fla. Apr. 30, 2019)...........................12

*In re Enron Corp. Sec.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ...............................................................................22, 23

*Feder v. Elec. Data Sys. Corp.*,
  429 F.3d 125 (5th Cir. 2005) .......................................................................................................10

*Finkel v. Docutel/Olivetti Corp.*,
  817 F.2d 356 (5th Cir. 1987) .......................................................................................................21

*In re Groupon Inc. Sec. Litig.*,
  No. 12 C 2450, 2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ..................................................19

*Guenther v. BP Ret. Accumulation Plan*,
  2021 WL 1216377 (S.D. Tex. Mar. 12, 2021)...........................................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) (*Halliburton II*)........................................................................................14

*In re HealthSouth Corp. Sec. Litig.*,
  257 F.R.D. 260 (N.D. Ala. 2009)................................................................................................14

*Hernandez v. City of Houston, Texas*,
  No. 4:16-cv-3577, 2019 WL 2869157 (S.D. Tex. July 3, 2019) ...............................................9

iv

*Horton v. Goose Creek Indep. Sch. Dist.*,
690 F.2d 470 (5th Cir. 1982) ...............................................................................11

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
No. 3:19-cv-00407, 2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)..................................8, 14

*KB Partners I, L.P. v. Barbier*,
No. A-11-CA-1034-SS, 2013 WL 2443217 (W.D. Tex. June 4, 2013) ....................................7

*Kirkpatrick v. HomeAway.com Inc.*,
No. 1:16-CV-733-LY, 2020 WL 7680558 (W.D. Tex. 2020)....................................................7

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001)....................................................................16, 20, 21, 22

*Lehocky v. Tidel Tech., Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004)...........................................................................................7

*Ludlow v. BP, P.L.C.*,
800 F. 3d 674 (5th Cir. 2015) ..............................................................................................23

*Marcus v. J.C. Penny Co. Inc.*,
No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) .......................17

*Okla. Firefighters Pension & Ret. Sys. v. Rayonier Advanced Materials, Inc.*,
No. 3:15-cv-546-J-32-PDB, 2015 WL 4730383 (M.D. Fla. Aug. 10, 2015) ..........................12

*Patel v. Reata Pharms. Inc.*,
549 F. Supp. 3d 559 (E.D. Tex. 2021)...................................................................................11

*In re Pfizer Sec. Litig.*,
282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................................................12

*Prause v. TechnipFMC, PLC*,
No. 4:17-CV-2368, 2020 WL 3549686 (S.D. Tex. Mar.2 9, 2020.........................................13

*Regents of the Univ. of California v. Credit Suisse First Boston (USA), Inc.*,
482 F.3 372, 384 (5th Cir. 2007) ..........................................................................................21

*Rooney v. EZCORP, Inc.*,
330 F.R.D. 439 (W.D. Tex. 2019) .............................................................................7, 9, 14, 23

*Rougier v. Applied Optoelectronics, Inc.*,
No. 4:17-cv-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019)............................... *passim*

*Shen v. Exela Techs., Inc.*,
No. 3:20-CV-0691-D, 2023 WL 8527091 (N.D. Tex. Dec. 7, 2023).....................................25

v

*Slade v. Progressive Sec. Ins. Co.*,
856 F.3d 408 (5th Cir. 2017) ...............................................................................10

*Spegele v. USAA Life Ins. Co.*,
336 F.R.D. 537 (W.D. Tex. 2020) ....................................................................8, 10

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) .................................................................................4

*St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
No. 3:18-cv-00988, 2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) ...............8, 22

*Strougo v. Tivity Health, Inc.*,
No. 3:20-cv-00165, 2023 WL 3873305 (M.D. Tenn. June 7, 2023) .......................9

*Torres v. S.G.E. Mgmt., L.L.C.*,
838 F.3d 629 (5th Cir. 2016) (en banc) ................................................................6

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ...............................................................................15

*Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*,
247 F.3d 574 (5th Cir. 2001) ...............................................................................22

*Vine v. PLS Fin. Servs., Inc.*,
331 F.R.D. 325 (E.D. Tex. 2019)..........................................................................24

*W. Virginia Pipe Trades & Welfare Fund v. Medtronic, Inc.*,
845 F.3d 384 (8th Cir. 2016) ...............................................................................14

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018)........................................................................9, 22

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................................8, 9

*In re XL Fleet Corp. Sec. Litig.*,
No. 3:20-cv-00165, 2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ........................14

*Zeidman v. J. Ray McDermott & Co.*,
651 F.2d 1030 (5th Cir.1981) ................................................................................7

**STATUTES AND RULES**

Securities Exchange Act of 1934:

§ 10(b), 15 U.S.C. §78j(b) .................................................................1, 3, 4, 23

§ 20(a), 15 U.S.C. §78t(a)............................................................................1, 3

vi

Fed. R. Civ. P.:

Rule 23 ...................................................................................................................1, 2, 8

Rule 23(a)...........................................................................................................1, 6, 7, 9, 13

Rule 23(a)(1).......................................................................................................................7

Rule 23(a)(2).......................................................................................................................8

Rule 23(a)(3).......................................................................................................................9

Rule 23(a)(4).....................................................................................................................10

Rule 23(b) .....................................................................................................................6, 13

Rule 23(b)(1)......................................................................................................................6

Rule 23(b)(3)............................................................................................................ *passim*

Rule 23(g) ........................................................................................................................12

Tex. Local Civ. R.:

LR CV 23.2...............................................................................................................1, 2, 25

Securities and Exchange Commission Rule 10b-5,
    17 C.F.R. § 240.14a-9(a) ..............................................................................................22

Securities and Exchange Commission Rule 10b-5,
    17 C.F.R. § 240.14a-9(b) ................................................................................................4

Securities and Exchange Commission Rule 10b-5,
    17 C.F.R. § 240.14a-9(c) ..............................................................................................22

Securities and Exchange Commission Regulation S-K,
    17 C.F.R. § 239.13 ........................................................................................................18

Lead Plaintiffs Amalgamated Bank ("Amalgamated") and State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement Systems of Rhode Island ("Rhode Island") (together, "Lead Plaintiffs") respectfully move this Court for an order certifying a Class of investors who purchased the common stock of Exxon Mobil Corporation ("Exxon" or the "Company") during the period of March 5, 2019 to January 15, 2021, inclusive; appointing Lead Plaintiffs as Class Representatives; and approving their selection of counsel Grant & Eisenhofer P.A. ("G&E") and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Class Counsel.[1]

## I. PRELIMINARY STATEMENT

This case presents strong claims on behalf of a Class that suffered significant damages following reports that Defendants had engaged in a fraudulent scheme. Defendants misled investors into believing that Exxon would be able to extract, develop and market more natural resources from its assets located in the southwestern United States than was possible based on data available to Exxon. Certification of this action on behalf of a Class will provide a critical step to ensuring the ability of investors to recover their losses. Securities cases are extremely well-suited to class action treatment and are routinely certified. This case is no different and readily satisfies the requirements of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("Rule 23"), and Rule 23.2 of the Local Civil Rules of this Court ("LR CV 23.2").

Defendants are Exxon, a New York Stock Exchange ("NYSE") listed company; and executives Darren Woods, Liam Mallon, and Melissa Bond (collectively, "Individual Defendants," and, together with Exxon, "Defendants"). Plaintiffs' claims are brought under Sections 10(b) and

---

[1] References to "¶" are to the numbered paragraphs of Plaintiffs' Second Amended Class Action Complaint (ECF No. 92) ("Complaint"). References to "A-__" herein refer to the Exhibits to the Appendix in Support of Lead Plaintiffs' Renewed Motion for Class Certification. Unless otherwise noted, all internal citations are omitted, and all emphases are added.

20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  Pursuant to Rule 23, Plaintiffs seek certification of a Class consisting of all persons and entities who purchased Exxon common stock on the open market from March 5, 2019 to January 15, 2021, both dates inclusive (the "Class Period"), and were damaged thereby.[2]  Plaintiffs further request that, pursuant to Rule 23, the Court (a) appoint Plaintiffs as Class Representatives; and (b) appoint Co-Lead Counsel, G&E and BLB&G, as Class Counsel.

As demonstrated below, this case meets all the requirements of Rule 23 and LR CV 23.2. The Class members are so numerous that joinder would be impracticable.  The proposed Class Representatives' claims present common questions of law and fact and are typical of other Class members' claims, and Plaintiffs are more than adequate to serve as Class Representatives.  The common questions here predominate over any individual questions, and the class action mechanism is the superior way to adjudicate these claims.  The accompanying Counsel Declaration, submitted in support of this Motion, which includes sworn declarations from each of the Class Representatives (A-6-A-8, A-9-A-11) and the report of Plaintiffs' expert economist, Matthew D. Cain, Ph.D., provides an ample record in support of the Motion (A-12-A-72, "Cain Report").  Accordingly, this case is suitable for class treatment.

## II.    FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY

### A.    PLAINTIFFS

On June 10, 2021, this Court appointed Amalgamated and Rhode Island as Lead Plaintiffs and G&E and BLB&G as Co-Lead Counsel. (ECF No. 43).

---

[2] Excluded from the Class are Defendants; Exxon's affiliates and subsidiaries; the officers and directors of Exxon and its subsidiaries and affiliates at all relevant times; members of the immediate family of any excluded person; heirs, successors, and assigns of any excluded person or entity; and any entity in which any excluded person has or had a controlling interest. *See* ¶ 425.

A-13

Plaintiffs here are well suited to lead this class action.  *See* A-6-A-11.  Lead Plaintiff Amalgamated is an investment bank that serves thousands of labor unions, nonprofits, social impact enterprises, political enterprises, and individuals.  A-6 ¶2.  Amalgamated currently has over $49.6 billion in assets under management.  As set forth in the certification previously filed with the Court (ECF No. 22-2), Amalgamated is the trustee for the LongView LargeCap 500 Index VEBA Fund, LongView LargeCap 500 Index Fund, LongView Large Cap 1000 Index Value Fund, and LongView Broad Market 3000 Index Fund, each of which purchased shares of Exxon common stock during the Class Period. *Id.*

Lead Plaintiff Rhode Island is a public pension fund that provides benefits to public employees in the State of Rhode Island.  A-10 ¶2.  Rhode Island manages approximately $11.5 billion in assets on behalf of its active and retired members. Rhode Island purchased shares of Exxon common stock during the Class Period and suffered damages as a result of the conduct complained of herein.  *Id.* ¶3.

### B.   DEFENDANTS

Defendants in this action are: (1) Exxon; (2) Exxon's Chief Executive Officer Darren W. Woods ("Woods"); (3) Exxon's Vice President and the President of ExxonMobil Upstream Oil & Gas Company, Liam M. Mallon ("Mallon"); and (4) Exxon's Delaware Basin Development Manager, a senior executive in Exxon's Upstream Oil & Gas Division, Melissa Bond ("Bond"). ¶¶41-45.

The Complaint alleges that Defendants violated Sections 10(b) and 20(a) of the Exchange Act for scheming to defraud investors during the period of March 7, 2018 to January 15, 2021, inclusive.  However, pursuant to this Court's order on Defendants' motion to dismiss, Plaintiffs' currently remaining claims are limited to the time period of March 5, 2019 through January 15, 2021, inclusive.

3

Consistent with the Court's August 12, 2024 Order, Plaintiffs currently challenge statements issued in Exxon's name, not those "made by Woods or Mallon" only. *See* ECF No. 157 at 9. In this Circuit, a corporate defendant like Exxon is liable for statements issued in its own name. As the Fifth Circuit held in *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004):

> Respecting the potential section 10(b) liability of [the corporation] itself, however, as all of the individual defendants were executive officers of [the company] whose actions were intended to benefit [the company], we will treat as having been made by [the company] the particular complained of statements in the SEC filings, reports and releases issued in its name.

*Southland Sec. Corp.*, 365 F.3d at 365-66.[3] Statements issued in Exxon's name within the proposed Class Period of March 5, 2019 through January 15, 2021, inclusive, include statements alleged at ¶¶361, 364-65, 370-71, 373, 376, 378, 380, 382, 388, 392, 394, 396, and 398.[4]

Plaintiffs reserve all rights as to the Court's dismissal of their Rule 10b-5(b) claims against Defendants Woods and Mallon and all claims for alleged materially false and misleading statements and omissions made between March 7, 2018 and January 15, 2021, inclusive, including those made by Woods and Mallon, if and when the Court issues a final dispositive ruling.

### C.   ALLEGATIONS AGAINST DEFENDANTS

Exxon is one of the world's largest, and best known, oil and gas companies. ¶41. It is engaged in the development, acquisition and exploitation of crude oil and natural gas resources

---

[3] The Fifth Circuit further held in *Southland* that a corporate defendant can be liable for statements made by corporate executives within the scope of their authority at the corporation. *See Southland Sec. Corp.*, 365 F.3d at 365-66 ("Statements attributed to individual defendants are also treated as having been made by [the company], as all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company."). Therefore, under *Southland*, Exxon can be liable for all the statements alleged in the Complaint, including the statements made by Woods and Mallon.

[4] *See* ¶¶361, 364, 370-71, 373, 398 (Exxon press releases); ¶¶365, 388 (investor presentations); ¶¶376, 378, 380, 382 (Summary Annual Report); ¶¶392, 394, 396 (Form 10-K).

4

worldwide. *Id*. Exxon owns considerable land in the Permian Basin, a large oil and gas reservoir in the southwestern United States. *Id.* Exxon's common stock trades on the NYSE under the ticker symbol "XOM." *Id.*

Throughout the Class Period, Defendants Exxon and Bond engaged in a scheme to defraud investors concerning the value of Exxon's assets in the Permian Basin, which includes the Delaware Basin. *Id.* Specifically, when Exxon announced it would achieve a production goal of 1 million oil-equivalent barrels per day by 2024 in the Permian Basin, Defendant Bond sought to match Exxon's claims by artificially inflating the value of Exxon's Delaware Basin development plan. ¶¶105-243. As confirmed by Exxon whistleblowers, Defendant Mallon instructed Defendant Bond to come up with a development plan that matched Exxon's false production goal and to boost critical assumptions about drilling speeds to arrive at the desired result. ¶¶122-26, 129. Bond, in turn, dictated to her team to use overly aggressive "learning curve" drilling assumptions, which Exxon engineers told her were impossible to achieve. ¶¶127-28, 130-32.

As detailed in the Complaint, Exxon used the overvalued development plan, which included falsified drilling assumptions, to substantiate not only its production goal but also Exxon's public proved reserve and resource base calculations. ¶¶66-67. For instance, Bond manipulated the development plan to match Exxon's false production goals, and Exxon specifically told investors days before the Class Period started that its reported proved reserve and resource base valuations were based on the plan. ¶¶103, 270. Defendant Bond knew that Exxon was reporting falsified information to investors from March 5, 2019 to March 5, 2020. *Id.*

As a result of this scheme, Exxon's stock price was artificially inflated. That is, until Defendants revealed the truth in a series of partially corrective disclosures. ¶¶244-53. First, as the market opened on January 31, 2020, during its Q4 2019 earnings call, Exxon disclosed that

5

Permian Basin production had slowed. ¶244. In response, Exxon's stock dropped 4.1% on January 31, 2020, 2.2% on February 3, 2020 and 1.3% on February 4, 2020. *Id*. Next, as the market opened on May 1, 2020, Exxon held its Q1 2020 earnings call and disclosed significant rig cuts and a reduction in the 2020-2021 Permian Basin production volumes. ¶249. Exxon's stock declined 7.2% in response. *Id*. Finally, on January 15, 2021, *The Wall Street Journal* reported on the whistleblower complaint that exposed Exxon's false drilling assumptions and fraudulently inflated development plan. ¶252. In response, Exxon's stock dropped 4.8%. *Id*.

## III.  ARGUMENT

### A.  THIS ACTION SHOULD BE CERTIFIED AS A CLASS ACTION

"To obtain class certification, parties must satisfy Federal Rule of Civil Procedure 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3)." *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020); *see also Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 635 (5th Cir. 2016) (en banc) (same).

Rule 23(a) requires a class member seeking to sue as a representative of the entire class to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Plaintiffs satisfy all four of these requirements.

Plaintiffs must also satisfy at least one of the three options required under Rule 23(b). Here, Plaintiffs satisfy Rule 23(b)(3), which requires Plaintiffs to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013).

**B.      RULE 23(A) IS SATISFIED**

**1.      The Proposed Class Is So Numerous That Joinder of All Respective Class Members Is Impracticable**

"Under Rule 23(a)(1), a class may be certified only if 'the class is so numerous that joinder of all members is impracticable.'" *Kirkpatrick v. HomeAway.com Inc.*, 2020 WL 7680558, at *4 (W.D. Tex. 2020). "In this case, it would of course be highly difficult to join all the members of the proposed settlement class, which includes all persons who purchased or otherwise acquired the common stock of [Exxon] . . . .  For this reason, the Fifth Circuit has held the numerosity requirement is 'generally assumed to have been met in class action suits involving nationally traded securities.'" *In re Dell Inc.*, 2010 WL 2371834, at *2 (W.D. Tex. June 11, 2010) (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir.1981)); *see also KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *11 (W.D. Tex. June 4, 2013) (class actions involving securities traded on national exchanges like the NYSE satisfy the numerosity requirement).

There are thousands of members of the proposed Class.  Exxon's common stock traded on the NYSE with an average weekly trading volume of approximately 106.4 million shares and approximately 4.2 billion shares outstanding during the Class Period. Cain Report, ¶¶32 (A-25), 64 (A-40); *see, e.g.*, *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (numerosity found for NASDAQ-traded stock with more than 50 million outstanding shares and an average weekly trading volume of 2.7 million shares).  "[T]he sheer number of shareholders alone, . . . indicates joinder of all class members is impracticable." *Lehocky v. Tidel Tech., Inc.*, 220 F.R.D. 491, 499 (S.D. Tex. 2004) (footnote omitted) (finding numerosity where company traded on the NASDAQ had over 17 million shares outstanding and 8,500 shareholders of record).  Finally, the Class is geographically dispersed throughout the world, which further supports a finding that joinder of all such members would be impracticable.  *See id*. ("the possible geographic diversity

7

among potential plaintiffs weighs heavily in favor of class treatment").

### 2. Questions of Law and Fact Are Common to Members of the Class

Courts require commonality, a question of law or fact common to the proposed class, in order to satisfy Rule 23(a)(2). *Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 548 (W.D. Tex. 2020); Fed. R. Civ. P. 23(a)(2). The Fifth Circuit holds that Rule 23's commonality requirement simply requires that class members "have suffered the same injury" and "raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011)). "The claims of all Class Members hinge on common contentions that are capable of being resolved class-wide." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *6 (S.D. Tex. Nov. 13, 2019). Similar to the class in *Rougier*, Plaintiffs allege that Defendants made various misrepresentations and omissions via public press releases, ¶¶361, 364, 370-71, 373, 398; analyst and earnings call presentations, ¶¶365, 388; Exxon's Summary Annual Report, ¶¶376, 378, 380, 382; and Exxon's SEC filings, ¶¶392, 394, 396. "The materiality and veracity of those statements will be proven class-wide." *Rougier*, 2019 WL 6111303, at *6.

Moreover, courts routinely find that whether defendants engaged in a scheme to defraud investors is a question common to the class. *See Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *9 (M.D. Tenn. Feb. 24, 2023) (question of whether "[d]efendants were engaged in a scheme to defraud" established commonality); *St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *2 (M.D. Tenn. Sept. 30, 2022) (question of whether alleged scheme caused investor losses established commonality).

Here, numerous aspects of the claims of each Class member are subject to common proof and raise many Class-wide questions, including: (i) whether Defendants Exxon and Bond engaged in a scheme; (ii) whether, by virtue of the scheme, Defendants issued materially false or misleading

8

statements; (iii) whether any Defendant knew or recklessly disregarded the scheme and/or the resulting false or misleading statements; (iv) whether such conduct caused the Class to sustain damages; and (v) the methodology for calculating such damages. *See Rooney*, 330 F.R.D. at 445-446. These common questions of law and fact satisfy Rule 23(a)'s commonality requirement.

### 3. The Proposed Class Representatives' Claims Are Typical

Under Rule 23(a)(3), Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[C]ommonality and typicality . . . tend to merge," as both requirements "serve as guideposts for determining . . . whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Daves v. Dallas Cty. Texas*, 2018 WL 4537202, at *2 (N.D. Tex. Sept. 20, 2018) (quoting *Wal-Mart*, 564 U.S. at 378 n.5). The typicality test "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Hernandez v. City of Houston, Texas*, 2019 WL 2869157, at *3 (S.D. Tex. July 3, 2019).

Here, Plaintiffs' claims are typical of the other Class members' claims because they are all investors who acquired Exxon common stock during the Class Period and were all misled by the same scheme and false and misleading statements disseminated by Defendants. *See* ECF Nos. 22-2 and 22-3 (record of Plaintiffs' purchases in Exxon stock during the Class Period); *see also Strougo v. Tivity Health, Inc.*, 2023 WL 3873305, at *3 (M.D. Tenn. June 7, 2023) (typicality satisfied where defendants artificially inflated share prices by engaging in a scheme to defraud and misrepresent company's performance); *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 286 (D. Minn. 2018) (finding typicality where all class members "suffered damages as a result of [defendants'] fraudulent scheme").

9

**4. The Representative Parties and Their Counsel Are Adequate**

Under Rule 23(a)(4)'s adequacy prerequisite, courts examine whether "the representative parties will fairly and adequately protect the interests of the class." To determine adequacy, the Fifth Circuit utilizes a three-prong test, pursuant to which the proposed class representatives must show that: (1) there are no conflicts of interest between them and the proposed class; (2) the proposed class representatives have the willingness and ability to play an active role in the litigation and vigorously represent the class while protecting the interests of the absentee class members; and (3) class counsel has the competence and ability to vigorously conduct the litigation. *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005); *see Spegele*, 336 F.R.D. at 552-53 (holding that proposed class representatives must have no conflict of interest with the class and "be willing to play an active role in the litigation"); *Angell v. GEICO Advantage Ins. Co.*, 2021 WL 5585732, at *3 (S.D. Tex. Nov. 30, 2021) (quoting *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017)). Plaintiffs satisfy all three prongs.

**a. There Are No Conflicts Between the Class Representatives and the Class**

Here, there are no conflicts because Plaintiffs are "part of the class and possess the same interest" and have "suffer[ed] the same injury as the class members . . . ." *In re Deepwater Horizon*, 785 F.3d 1003, 1015 (5th Cir. 2015) (quoting *E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Like all other potential Class members, Plaintiffs purchased Exxon common stock during the Class Period and were subjected to the same fraudulent course of conduct by the Defendants. A-6 ¶ 2; A-10 ¶3. There are no conflicts between the proposed Class Representatives and the Class they seek to represent.

**b. Plaintiffs Are Adequate to Serve as Class Representatives**

"A class representative is considered adequate when he has 'familiarity with the complaint

10

and with the concept of a class action.'" *Guenther v. BP Ret. Accumulation Plan*, 2021 WL 1216377, at \*8 (S.D. Tex. Mar. 12, 2021) (quoting *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982)).  Here, Plaintiffs made significant investments in Exxon stock during the Class Period, are familiar with the case, have been actively engaged in the litigation, and regularly communicate with counsel regarding the status of the case.  *See* A-7 ¶3; A-11 ¶4.  The proposed Class Representatives have supervised and been involved in the case throughout.  *See id.*  Lead Plaintiffs also have demonstrated their adequacy here by, among other things, stepping forward to be appointed as Lead Plaintiffs, filing two detailed Complaints, defeating Defendants' motion to dismiss in part, and starting to pursue discovery.  *See, e.g.*, ECF Nos. 20, 43, 53, 92, 112; A-7 ¶3; A-11 ¶4.

Lead Plaintiffs are also exactly the types of institutional investors Congress sought to encourage to lead securities class actions when it enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The "PSLRA has been construed to afford a preference for securities fraud litigation to be directed by institutional investors." *Patel v. Reata Pharms. Inc.*, 549 F. Supp. 3d 559, 571 (E.D. Tex. 2021).  Amalgamated is a union-owned bank that has over $49.6 billion in investments under management.  *See* A-6 ¶2.  Similarly, Rhode Island is a public pension plan that manages over $11 billion in investments.  *See* A-10 ¶2.  Both entities are sophisticated investors that have the institutional knowledge and understanding that make them ideal Class Representatives.

The Court previously found that Amalgamated and Rhode Island were adequate to represent the Class. ECF No. 43, at 3.  Nothing has changed to call into question that preliminary finding.  There is no reason to doubt that Plaintiffs will continue to uphold their duties and responsibilities if certified as Class Representatives by the Court.

### c.      Proposed Class Counsel Are Adequate

To assess the adequacy of counsel, courts examine "[c]ounsel's participation in the suit and their experience in complex securities class actions." *Rougier*, 2019 WL 6111303, at *7.

Lead Plaintiffs' selected counsel are qualified and experienced, capable of vigorously prosecuting this action, and satisfy the requirements of Rule 23(g). *See* A-73-A-159. To date, and as noted above, G&E and BLB&G have worked with Lead Plaintiffs to: (i) identify and investigate the claims in this action; (ii) brief and ultimately defeat in part Defendants' motions to dismiss; and (iii) propound discovery requests on Defendants.

Moreover, both G&E and BLB&G have extensive experience litigating complex securities fraud class actions on behalf of injured investors. *See, e.g.*, *Einhorn v. AxoGen Inc.*, 2019 WL 5636382, at *2 (M.D. Fla. Apr. 30, 2019) ("Lead plaintiffs hired counsel [G&E] with extensive experience in securities fraud litigation."); *Okla. Firefighters Pension & Ret. Sys. v. Rayonier Advanced Materials, Inc.*, 2015 WL 4730383, at *2 (M.D. Fla. Aug. 10, 2015) ("[T]he Court determines that . . . Grant & Eisenhofer P.A. . . . ha[s] substantial experience in securities class actions[.]"); *In re Pfizer Sec. Litig.*, 282 F.R.D. 38, 47 (S.D.N.Y. 2012) ("It is undisputed that Lead Counsel Grant & Eisenhofer is an experienced class action law firm and has served as lead counsel in dozens of securities fraud class actions."); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *8 (S.D. Tex. June 15, 2017) ("[BLB&G] are appointed as Class Counsel"); *Bremer v. SolarWinds Corp.*, 2021 WL 2668827, at *2 (W.D. Tex. Mar. 11, 2021) (approving BLB&G as lead counsel after "review[ing] [BLB&G]'s resume," and "extensive experience serving as lead counsel"); *City of Riviera Beach Gen. Emp. Ret. Sys. v. Macquarie Infrastructure Corp.*, 2019 WL 364570, at *8 (S.D.N.Y. Jan. 30, 2019) ("The attorneys at [BLB&G] have substantial experience with securities litigation and securities class actions, and have been found to be qualified to be lead counsel by other courts."); *see also* A-73-A-159 (firm résumés of proposed Class

Counsel).  As such, proposed Class Counsel is qualified, experienced, and able to competently and vigorously prosecute this action.

### C.    THE PROPOSED CLASS SATISFIES RULE 23(B)(3)

In addition to satisfying the prerequisites of Rule 23(a), this case also meets the requirements of Rule 23(b).  Plaintiffs moving for certification must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "Requiring that common issues predominate over individual issues prevents the class from degenerating into a series of individual trials."  *Rougier*, 2019 WL 6111303, at *8.

### 1.    Common Questions of Law and Fact Predominate Over Individual Questions

Common questions such as the existence of the scheme, the falsity and materiality of the alleged misstatements, Defendants' scienter, the existence of damages, and the method for determining damages, predominate over individual ones.  *See, e.g.*, *Prause v. TechnipFMC, PLC*, 2020 WL 3549686, at *7 (S.D. Tex. Mar. 9, 2020) (finding that issues of falsity, materiality, and damages "demonstrate predominance," and that "issues for trial will include whether the 2016 Registration Statement contained false and misleading statements and, if so, the extent of damages incurred" and concluding that "[t]hese issues are common to the entire class"); *In re Cobalt Int'l Energy*, 2017 WL 2608243, at *4 ("Defendants admit that there are common issues of law and fact, such as whether the Defendants made misrepresentations, [and] whether those misrepresentations were material[.]").

### a.    The Fraud-On-The-Market Doctrine Presumes Reliance

The Supreme Court has held that securities fraud plaintiffs can satisfy the element of

13

reliance using the "fraud-on-the-market theory," which "invoke[es] a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Rougier*, 2019 WL 6111303, at *8 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) (*Halliburton II*)). Under this theory, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations . . . ." *Halliburton II*, 573 U.S. at 268 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988)).

To establish the Class is entitled to rely on the fraud-on-the-market presumption, Plaintiffs must demonstrate "(1) the alleged misrepresentations were publicly known; (2) the alleged misrepresentations were material; (3) the stock traded in an efficient market; and (4) putative class members traded the stock between the time the misrepresentations were made and when the truth was revealed." *Rooney*, 330 F.R.D. at 448 (quoting *Halliburton II*, 573 U.S. at 268) (internal quotations omitted). Where claims rest on scheme liability, such as Plaintiffs' here, the first two requirements are satisfied when the scheme supports alleged misrepresentations that are publicly known and material. *See AAC Holdings*, 2023 WL 2592134, at *21 (applying *Basic* presumption where executives' scheme to manipulate internal data regarding debt collection in turn inflated the company's public statements concerning its accounts receivable); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 277 (N.D. Ala. 2009) ("behind-the-scenes" fraudulent activity was communicated to the public for purposes of the *Basic* presumption through defendants' public endorsement of bond deals and favorable analyst reports); *see also W. Virginia Pipe Trades & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 394 (8th Cir. 2016) (executives' scheme paying physicians to falsify data "caused the production of information on which the market relied"); *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *7-8 (S.D.N.Y. Feb. 17, 2022) (investors relied on scheme creating fraudulent sales data through the company's public revenue projections and

14

sales pipeline based on that data).

Plaintiffs satisfy the first two prerequisites because they have alleged that Defendants' scheme to inflate the 2019 Delaware Basin development plan was directly connected to the alleged material misrepresentations and omissions, which were disseminated publicly and were material. Specifically, they alleged that Defendants Mallon and Bond "employed false learning curve drilling assumptions in the Delaware Basin development plan . . . to artificially inflate the value of that development plan to support" Exxon's "false statement to investors that Exxon would increase Permian production to one million barrels per day by 2024 and Exxon's falsely inflated proved reserve and resource base valuations, which were based on the development plan." ¶298.

Plaintiffs satisfy the fourth prerequisite by defining the Class as those who purchased Exxon common stock on or between the date of Exxon's first actionable misrepresentation (March 5, 2019) and the date of the final corrective disclosure (January 15, 2021).

With regard to the third prerequisite, courts in the Fifth Circuit consider the following five *Cammer* factors when evaluating whether a security was traded in an efficient market:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); [and] (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price[.]

*Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)).

Additionally, Courts analyze the three *Krogman* factors, which include: "(1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float, which is the stock's trading volume without counting insider-owned stock." *Rougier*, 2019 WL 6111303, at *10 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)).

15

As demonstrated below, consideration of the above factors shows that the market for Exxon stock was efficient during the Class Period.  In support of this Motion, Plaintiffs submit the expert report of Matthew D. Cain, Ph.D, an experienced financial economist and a Senior Fellow at the Center for Law and Business at Berkeley Law.  Dr. Cain analyzed the factors from *Cammer* and *Krogman* utilized by courts in the Fifth Circuit and concluded that the market for Exxon common stock, which is traded on the NYSE, was efficient.

### (1) Exxon Common Stock Experienced a High Weekly Trading Volume

The first *Cammer* factor for deciding if a security was traded in an efficient market is the average weekly trading volume.  According to the court in *Cammer*, "The reason the existence of an actively traded market, as evidenced by a large weekly volume of stock trades, suggests there is an efficient market is because it implies significant investor interest in the company. Such interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  *Cammer*, 711 F. Supp. at 1286.  The court dictated a threshold for deciding whether average weekly trading volume supports the presumption for an efficient market in stating that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."  Here, the average weekly trading volume for Exxon was 106.4 million shares during the Class Period, which was 2.5% of shares outstanding.  Cain Report, ¶¶31-32 (A-25).  This number easily exceeds the benchmark of weekly volume set at 2% of shares outstanding that justifies a "strong presumption" of market efficiency.  *Cammer*, 711 F. Supp at 1286; Cain Report, ¶33 (A-25-A-26).

### (2) Numerous Financial Analysts Covered and Reported on Exxon During the Class Period

During the Class Period, analysts from 50 separate firms, such as Credit Suisse, RBC

Capital Markets, J.P. Morgan, and TD Cowen, issued a total of 822 reports on Exxon. Cain Report, ¶34 (A-26). Such a large number of analyst reports indicate a greater likelihood that investors rely on information provided about the company and therefore supports a finding that the market for Exxon shares during the Class Period was efficient. *See Rougier*, 2019 WL 6111303, at *11 (expert identified at least 24 analysts reporting on defendant during the Class Period); *Marcus v. J.C. Penny Co. Inc.*, 2016 WL 8604331, at *7 (E.D. Tex. Aug. 29, 2016) ("[A]t least 25 securities analysts covered J.C. Penney during the Class Period . . . ."); *In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 248 (N.D. Cal. 2013) (13 analysts); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 508 (D. Kan. 2014) (25 analyst firms). Moreover, investors could also access information about Exxon from numerous other sources. Cain Report, ¶36 (A-27). In fact, during the Class Period, sources such as *Dow Jones* Institutional News, *Associated Press* Newswires, *Reuters* News, *The Wall Street Journal* Online, and *Business Wire*, among numerous others, published over 20,000 articles about Exxon. *Id.*

### (3)    The DMM Served as a Market Maker for Exxon

Market makers are firms that facilitate buying and selling in a company's stock during trading hours, which are present in both over-the-counter markets and major exchanges. Cain Report, ¶38 (A-28). The *Cammer* court held that, for over-the-counter markets without volume reporting, "the number of market makers for a security is probably the best single criterion" in determining market efficiency. *Cammer*, 711 F. Supp. at 1293. While the court held that market makers are an indicator of efficient markets for stock trading in over-the-counter markets, Exxon's common stock traded on the NYSE, an exchange that, since 2008, employs a Designated Market Maker ("DMM") for a given stock. Cain Report, ¶¶40, 41 n.46 (A-29). The DMM performs largely the same role for a stock on the NYSE that multiple market makers perform for a stock on the NASDAQ: providing liquidity and facilitating a market in securities. *Id*. ¶40 (A-29).

17

A-28

As such, Exxon's public listing on the NYSE satisfies the purpose of this *Cammer* factor. *Id*. ¶42 (A-30). "The listing of a security on a major exchange such as the NYSE . . . weighs in favor of a finding of market efficiency." *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d. Cir. 2011). Moreover, Exxon had over 170 market makers and brokers providing similar activity over the Class Period, which also supports market efficiency. Cain Report, ¶42 (A-30).

### (4)    Exxon's Public Float Sufficiently Satisfies the Form S-3 Eligibility Requirements

The fourth *Cammer* factor, that a company is eligible to file a SEC Form S-3, helps to determine if a company traded in an efficient market because, "a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer." Cain Report, ¶44 (A-31). Companies that are eligible to file a Form S-3 are "[c]ompanies that file monthly reports with the SEC for one year and have a public equity float in excess of $75 million." *Rougier*, 2019 WL 6111303, at *12; *see also* 17 C.F.R. § 239.13. The SEC allows a company to file a Form S-3, a short form securities registration for companies whose stocks are actively traded and widely followed, when "the market operates efficiently for [qualifying] companies, i.e., that the disclosure in Exchange Act reports and other communications . . . such as press releases, has already been disseminated and accounted for by the market place." *Rougier*, 2019 WL 6111303, at *12.

Exxon was able to, and did, file an S-3, during the Class Period. Approximately 99% of Exxon's public float was held by non-affiliates during the Class Period. Cain Report, ¶69 (A-41-A-42). Exxon's public float ranged between approximately $133 billion and $353 billion, far exceeding the $75 million threshold requirement making Exxon eligible to file on Form S-3 which it did during the Class Period. Cain Report, ¶¶44-45 (A-31). This factor thus supports a finding of market efficiency. *See, e.g.*, *In re Groupon Inc. Sec. Litig.*, 2015 WL 1043321, at *4 (N.D. Ill.

18

A-29

Mar. 5, 2015) (Groupon's $800 million market capitalization, more than 10 times the $75 million amount needed for S-3 registration, supports market efficiency).

(5)    **The Price of Exxon's Common Stock Reacted to New, Company-Specific Information During the Class Period**

The fifth factor evaluates "evidence of a causal relationship between unexpected corporate events or financial releases and an immediate response in the price of the stock [a]s an important indicator of market efficiency." *Rougier*, 2019 WL 6111303, at *12 (quoting *Barrie v. Intervoice-Brite, Inc.*, 2009 WL 3424614, at *11 (N.D. Tex. Oct. 26, 2009)). After performing a thorough event study and significant statistical analysis, Plaintiffs' expert determined that there was a cause-and-effect relationship between the release of unexpected Company-specific information and Exxon's common stock price during the Class Period. Cain Report, ¶¶46-62 (A-32-A-39). The study revealed immediate stock price reactions to public disclosures of unexpected material information, supporting the conclusion that Exxon's stock traded in an efficient market. *Id*.

Plaintiffs' expert reached this conclusion by comparing Exxon stock's behavior on "news days" with its behavior on days with little to "no news." Cain Report, ¶59 (A-37-A-38). The no news trading days provide a benchmark in which little Company-specific information was revealed to the public. *Id*. Dr. Cain found that "3 out of 7 Exxon earnings announcements caused stock price movements that were statistically significant at the 95% level or better." *Id*. ¶60 (A-38). In other words, "42.9% of the earnings announcements caused stock movements that were statistically significant at the 95% level." *Id*. ¶61 (A-38). Comparatively, only 5.4% of no news trading days had statistically significant stock price movements. *Id*. "The difference between these two percentages is statistically significant at the 95% level." *Id*. This strongly supports evidence of a cause-and-effect relationship between new information and Exxon Common Stock price movements, which supports that Exxon traded in an efficient market. *Id*.; *see In re Cassava*

19

*Scis., Inc. Sec. Litig.*, 2024 WL 4824243, at *14 n.12 (W.D. Tex. Nov. 15, 2024) ("Event studies are widely accepted evidence to show the impact of a particular event on a stock price."); *Rougier*, 2019 WL 6111303, at *12 (accepting the same analysis of the effect of company-specific news on the share price); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 688 (D. Md. 2018) (this analysis is the "typical tool used by experts to directly show market efficiency").

### (6)    Plaintiffs Satisfy the *Krogman* Factors

In addition to the five *Cammer* factors, Plaintiffs also satisfy the three *Krogman* factors of high market capitalization, large public float, and narrow bid-ask spread.  First, a significant market capitalization, "calculated as the number of shares multiplied by the prevailing share price," "suggest market efficiency because stock purchasers have a greater incentive to invest in highly capitalized corporations." *Rougier*, 2019 WL 6111303, at *13.  During the Class Period, Exxon's market capitalization averaged $243.2 billion, which places it above the 95th percentile of all companies listed on both the NASDAQ and the NYSE from 2016-2018.  Cain Report, ¶64 (A-40).

Second, courts also look to a company's "float," which is the percentage of shares held by the public, as opposed to corporate insiders.  *Rougier*, 2019 WL 6111303, at *13; *see also Krogman*, 202 F.R.D. at 478.  "A larger float relative to the total number of outstanding shares indicates that there is a large proportion of shares that are available to non-insiders, who can trade without restrictions and profit by trading on new information in the marketplace." *Rougier*, 2019 WL 6111303, at *13.  Exxon's public float was approximately 4 billion shares, representing on average 99% of the Company's shares outstanding.  Cain Report, ¶69 (A-41-A-42).  Additionally, at least 4,158 institutions held stock at some point during the Class Period.  *Id*. ¶71 (A-42).  Further, "Exxon's institutional ownership as a percent of shares during the Class Period placed it between the 25th and 50th percentiles of NYSE and NASDAQ traded companies." *Id*.  Institutional

ownership of a stock is typically associated with strong competition for generating returns from the stock.

Third, a bid-ask spread "is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid)." *Id*. ¶65 (A-40). "A narrow bid-ask spread is indicative of higher trading volume and courts consider it as a factor for determining market efficiency." *Rougier*, 2019 WL 6111303, at *13; *see Krogman*, 202 F.R.D. at 478 ("A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."). Here, the average bid-ask spread for Exxon common stock during the Class Period was 0.02% and supports a finding of efficiency. Cain Report, ¶¶66-67 (A-41); *see also Rougier*, 2019 WL 6111303, at *13 (company's "0.04% bid-ask spread was narrower than 79% of the common stocks on the NYSE and NASDAQ, and narrower than those found by other courts to be indicators of market efficiency"). Thus, each of the *Krogman* factors support a finding of market efficiency. Cain Report, ¶¶63-64 (A-39-A-40), 68-71 (A-41-A-42).

### b.    Reliance Is Also Presumed Under *Affiliated Ute*

Reliance can also be presumed under *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), because the claims involve an undisclosed scheme. *Id.* at 153-54; *see also Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987). In such cases, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material[.]" *Affiliated Ute*, 406 U.S. at 153-54. In this Circuit, the *Affiliated Ute* presumption applies wherever plaintiffs "(1) allege a case primarily based on omissions or non-disclosure, and (2) demonstrate that the defendant owed him a duty of disclosure." *See Regents of the Univ. of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3 372, 384 (5th Cir. 2007).

Here, the Court sustained claims under Rule 10b-5(a) and (c), which primarily concern the

21

nondisclosure of Defendants' concealed scheme to coerce Exxon engineers to use false "learning curve" drilling assumptions to inflate the 2019 development plan for the Delaware Basin by at least $10 billion, a sum undoubtedly material to investors. ¶¶124-31, 441. Notably, *Affiliated Ute* was a scheme liability case where the misconduct was actionable under Rule 10b-5(a) and (c), just like this one, and courts have repeatedly applied *Affiliated Ute* in the context of scheme claims. *See Affiliated Ute*, 406 U.S. at 153; *Medtronic, Inc.*, 325 F.R.D. at 289-90 (scheme to pay physicians to hide adverse data in published clinical studies qualified for a presumption of reliance under *Affiliated Ute*); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 682-83, 739 (S.D. Tex. 2006) (applying *Affiliated Ute* where "concealed scheme to defraud" inflated company's public revenue statements); *St. Clair Cty. Emps.' Ret. Sys.*, 2022 WL 4598044 at *8 (applying *Affiliated Ute* to scheme liability claims).

Moreover, there was a duty to disclose the concealed scheme here. Defendants Exxon and Bond knew that the artificially inflated development plan for the Delaware Basin "ensured conformity" with Exxon's statement to investors that Exxon would achieve 1 million barrels per day by 2024 in the Permian, and that this false information was also reported to investors in Exxon's stated proved reserve and resource base metrics. ¶¶298-314. As a result, Defendants had a duty to disclose the material fact that all these figures were inflated by the scheme concerning the fraudulent valuation of the Delaware Basin development plan. *See, e.g.*, *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (a duty to speak arises when "one party voluntarily discloses some but less than all material facts").

*     *     *

Because Plaintiffs have established the fraud-on-the-market presumption of reliance under the factors set forth in *Cammer* and *Krogman*, and because Plaintiffs are alternatively entitled to a presumption of reliance under *Affiliated Ute*, they have shown that any potential individualized

22

issues for members alleging Exchange Act claims do not predominate over common ones. Therefore, pursuant to Rule 23(b)(3), the proposed Class is "sufficiently cohesive to warrant adjudication" and demonstrates predominance. *Rooney*, 330 F.R.D. at 447-48.

### 2.    A Class-Wide Damages Methodology Is Available

A Class may be certified where there is a damages methodology that is "sound" and "produces commonality of damages." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (*citing Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)). *Comcast* requires only that the damages theory be consistent with the liability theory and need not be exact. *Id.* at 685; *Rougier*, 2019 WL 6111303, at *15 (*Comcast* requires only that "damages be consistent with the theory of liability.").

Plaintiffs' expert has determined that the methods to calculate artificial inflation can be applied Class-wide consistent with Plaintiffs' theory of liability.    Cain Report, ¶78 (A-46). Specifically, the damages methodologies that are available to measure the artificial inflation created by Defendants' misstatements, omissions, and/or schemes are: (1) event studies, which measure stock price reactions to corrective disclosures while subtracting any "confounding information"; (2) discount cash flow analysis ("DCF"), which estimates changes to firm value based on changes in future expected cash flows; and (3) loss causation analysis. *Id*. ¶¶79-81 (A-46-A-47).  These damages methodologies "are flexible and able to incorporate alternative findings regarding the quantification, as well as the timing, of artificial inflation and how it evolves over the class period." *Id*. ¶82 (A-47-A-48). The event study, or "out of pocket" class-wide damages methodology is the standard measure of calculating damages in securities fraud class actions and has been endorsed by numerous courts. *See In re Enron Corp. Sec.*, 529 F. Supp. 2d at 716 ("[T]raditionally damages have been determined in § 10(b) claims by the out-of-pocket measure . . . [i.e.,] the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure[.]")

(collecting cases); *Rougier*, 2019 WL 6111303, at \*15 (finding that out-of-pocket measure of damages is "an accepted method for calculating Class members' out-of-pocket damages that are consistent with a fraud on the market theory of liability.").

### 3.    A Class Action Is Superior to Other Available Methods of Adjudication

Allowing this case to proceed as a class action is a superior method for resolving Plaintiffs' claims and will provide the most efficient and fair adjudication.  In considering superiority under Rule 23(b)(3), courts analyze four factors: (a) class members' interest in controlling separate actions; (b) the extent and nature of existing litigation concerning the same claims; (c) the desirability of concentrating the litigation in a particular forum; and (d) the likely difficulties of managing a class action.  *Vine v. PLS Fin. Servs., Inc.*, 331 F.R.D. 325, 341 (E.D. Tex. 2019).

Here, the Class members' interests in individually adjudicating separate actions are minimal: Plaintiffs are not aware of any separate actions concerning the same conduct at issue here brought on an individual or group basis by Exxon's shareholders; the Northern District of Texas, where the Company is based and many witnesses reside, is the appropriate forum for litigating this matter; and there are no issues in management of the litigation.  *See id.* (finding Rule 23(b)(3) satisfied where no "single member would pursue her own action"; "no other actions commenced by or against members of the class have been filed"; "each of the events in question occurred in Texas and Texas law applies, making this forum an appropriate forum for this dispute"; and the "case [did] not present especially troubling management or administration issues").  Here, Plaintiffs have committed to, and have every incentive to, seek the maximum recovery possible for the Class.  *See* A-6-A-159.  Class members' interests would thus be best furthered if their claims could be litigated as a class action.

Consistent with the requirements of Rule 23(b)(3), the certification of this action as a class

24

action would not only be superior to other available methods for fairly and efficiently adjudicating the controversy, it appears to be the sole method for fairly and efficiently litigating the claims of all members of the proposed Class.

### D.    ADDITIONAL MATTERS REQUIRED BY LR CV 23.2

Two additional matters must be addressed under LR CV 23.2.  First, if the Class is certified by the Court, following an application and order of the Court, notice can be readily provided to Class members by the highly effective means typically used in securities class actions. *See, e.g.*, *Shen v. Exela Techs., Inc.*, 2023 WL 8527091, at * 2 (N.D. Tex. Dec. 7, 2023). This method utilizes shareholder and nominee records to identify potential Class members, who then are sent notice of the Class certification by first class mail, which notice is supplemented by publication in prominent news outlets and on a case website.  *See* A-4 ¶8.  The estimated expense for such notice will be approximately $1.3-1.8 million, sourced from Lead Counsel.  *Id.* Second, the arrangements for payment of Lead Counsel's attorneys' fees are based on retainer agreements between Lead Plaintiffs and Lead Counsel which provide that attorneys' fees are fully contingent on a recovery in this matter, will be a reasonable percentage of any recovery, and are subject to the approval of the Lead Plaintiffs and ultimately the Court after the matter has been resolved.  A-4 ¶7.  In addition, Liaison Counsel McKool Smith P.C. has agreed to be paid on a fully contingent basis based on its lodestar, calculated at the same multiplier awarded to Lead Counsel.  *Id.*

## IV.    CONCLUSION

For the foregoing reasons, and based on the additional information in the accompanying Declarations, Plaintiffs respectfully request that the Court: (a) enter an order certifying this action as a class action; (b) appoint Plaintiffs Amalgamated and Rhode Island as Class Representatives; and (c) appoint G&E and BLB&G as Class Counsel.

DATED:  February 7, 2025

Respectfully submitted,

/s/ Caitlin M. Moyna

**GRANT & EISENHOFER P.A.**
Caitlin M. Moyna
Lauren J. Salamon
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
cmoyna@gelaw.com
lsalamon@gelaw.com

*Counsel for Plaintiffs, Lead Counsel for the Class and proposed Class Counsel*

/s/ John Rizio-Hamilton

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
John Rizio-Hamilton
Rebecca E. Boon
John Esmay
Michael M. Mathai
Thomas Z. Sperber
Stephen Boscolo
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
johnr@blbglaw.com
rebecca.boon@blbglaw.com
john.esmay@blbglaw.com
michael.mathai@blbglaw.com
thomas.sperber@blbglaw.com
stephen.boscolo@blbglaw.com

*Counsel for Plaintiffs, Lead Counsel for the Class and proposed Class Counsel*

26

A-37

Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
McKOOL SMITH PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

27

A-38

**CERTIFICATE OF CONFERENCE**

On February 3, 2025, counsel for the parties including Thomas Sperber on behalf of Plaintiffs and Michael Restey on behalf of Defendants conferred regarding the schedule for briefing Plaintiffs' Renewed Motion for Class Certification. Defendants oppose this motion.

By:  */s/ Michael M. Mathai*
     Michael M. Mathai

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I served the foregoing and all accompanying declarations and exhibits by email to all counsel of record.

By:  */s/ Michael M. Mathai*
     Michael M. Mathai

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) Civil Action No. 3:21-cv-00194-N |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, | ) ) ) ) ) |
| *Defendants*. | ) ) ) ) ) ) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'**
**RENEWED MOTION FOR CLASS CERTIFICATION**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, TX 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122

*Attorneys for Defendants Exxon Mobil*
*Corporation, Darren W. Woods, Liam M.*
*Mallon, and Melissa Bond*

A-40

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... iii

GLOSSARY ................................................................................................................... vi

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ...........................................................................................2

I.      Discovery has disproved the alleged "scheme" to incorporate "impossible" drilling learning curves into a Company Plan that is the basis of Plaintiffs' Motion. ......................2

II.     Class certification discovery refutes Plaintiffs' theory of the case. ....................................4

        A.      The drilling learning curves in the 2019 Company Plan could not have been unachievable because ExxonMobil achieved (and exceeded) them. ..............4

        B.      Plaintiffs proffer no evidence that the learning curves were incorporated in ExxonMobil's publicly disclosed SEC Proved Reserves (including SEC PUDs) or Resource Base. ..........................................................................................6

III.    Rhode Island offers no evidence that it is a member of the proposed class. .......................7

IV.     Amalgamated does not own ExxonMobil stock and manages funds that hold ExxonMobil stock for the purpose of pursuing an anti-fossil fuel agenda. .........................7

STANDARD OF REVIEW .............................................................................................9

ARGUMENT...................................................................................................................9

I.      Plaintiffs' proposed class cannot be certified because common issues do not predominate over individual issues of reliance....................................................................9

        A.      Plaintiffs can't prove that the *Basic* presumption applies to their scheme claim..........................................................................................................................10

                1.      Because the Court has already severed any link between the alleged scheme and the Production Goal statements, Plaintiffs cannot use those statements to establish a presumption of reliance. .........11

                2.      SEC Proved Reserves do not incorporate drilling learning curves............12

                3.      The Resource Base is not affected by drilling learning curves..................12

        B.      Defendants have rebutted the *Basic* presumption of reliance with the expert analysis of Dr. Allen Ferrell.........................................................................13

i

A-41

1.     None of the identified disclosures corrected any statement about SEC Proved Reserves, and the alleged statements about SEC Proved Reserves had no price impact. .........................................................15

2.     Neither the alleged misstatements concerning the Resource Base nor the alleged corrective disclosures had a price impact..........................15

3.     The Court has already ruled that Plaintiffs cannot bring claims based on Production Goal statements, and there is no price impact related to those statements. ........................................................16

(a)     The January 31, 2020 disclosure didn't correct any alleged misrepresentation and there was no statistically significant price reaction to the disclosure. .....................................................16

(b)     The May 1, 2020 corrective disclosure had no price impact because the allegedly corrective information was disclosed nearly one month earlier. ...............................................................17

(c)     The January 15, 2021 *Wall Street Journal* article did not include new information or correct a prior disclosure. ..................18

C.     Plaintiffs cannot rely on *Affiliated Ute* because their case is not premised on omissions.....................................................................................19

D.     Plaintiffs have failed to prove a Class Period that comports with their allegations in the SAC. .......................................................................20

II.     Plaintiffs are subject to unique defenses that make them atypical and inadequate as class representatives. ....................................................................................20

A.     Rhode Island profited from its transactions during the Class Period and so cannot serve as a class representative. ..............................................20

B.     Amalgamated is neither a typical class member nor adequate because it uses ExxonMobil stock to promote its anti-fossil fuel activist agenda..................23

CONCLUSION.................................................................................................24

CERTIFICATE OF SERVICE ...........................................................................26

ii

## TABLE OF AUTHORITIES

### CASES

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)................................................................................2

*Alaska Electrical Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ...............................................................10

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (5th Cir. 1997)................................................................24

*Arkansas Teacher Retirement System v. Goldman Sachs Group*,
    77 F.4th 74 (2d Cir. 2023) ...................................................................15

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).........................................................................2, 13

*In re Bausch & Lomb Inc. Securities Litigation*,
    244 F.R.D. 169 (W.D.N.Y. 2007).....................................................21, 22

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) ...............................................................24

*Born v. Quad/Graphics, Inc.*,
    2020 WL 994427 (S.D.N.Y. Mar. 2, 2020) .........................................21

*Borochoff v. Glaxosmithkline PLC*,
    246 F.R.D. 201 (S.D.N.Y. 2007) .........................................................22

*In re Boston Scientific Corp. ERISA Litigation*,
    254 F.R.D. 24 (D. Mass. 2008).............................................................22

*Brown v. Kelly*,
    609 F.3d 467 (2d Cir. 2010)..................................................................10

*In re Carreker Corp. Securities Litigation*,
    2003 WL 27396764 (N.D. Tex. Aug. 14, 2003)..................................22

*Castano v. American Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ..................................................................10

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................................................9

*East Texas Motor Freight System Inc. v. Rodriguez*,
    431 U.S. 395 (1977)..............................................................................22

iii

A-43

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015) ("*Halliburton III*") ......................................................14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011) ("*Halliburton I*")..........................................................................10, 11

*Frompovicz v. Niagara Bottling, LLC*,
   420 F. Supp. 3d 361 (E.D. Pa. 2019) ...............................................................................24

*Funeral Consumers Alliance v. Service Corp. International*,
   695 F.3d 330 (5th Cir. 2012) ..............................................................................................9

*General Telephone Co. of Southwest v. Falcon*,
   457 U.S. 147 (1982)....................................................................................................21, 22

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement Fund System*,
   594 U.S. 113 (2021)...........................................................................................................13

*In re Goodyear Tire & Rubber Co. Securities Litigation*,
   2004 WL 3314943 (N.D. Ohio May 12, 2004).............................................................21, 23

*Greenberg* v. *Crossroads Systems, Inc.*,
   364 F.3d 657 (5th Cir. 2004) .............................................................................................14

*Griffin v. GK Intelligent Systems, Inc.*,
   196 F.R.D. 298 (S.D. Tex. 2000)......................................................................................22

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ("*Halliburton II*") .........................................................2, 9, 10, 11, 13

*Hirsch v. USHealth Advisors, LLC*,
   337 F.R.D. 118 (N.D. Tex. 2020) ......................................................................................23

*IBEW Local 98 Pension Fund v. Best Buy*,
   818 F.3d 775 (8th Cir. 2016) .............................................................................................14

*Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
   537 F.3d 527 (5th Cir. 2008) .............................................................................................19

*James v. City of Dallas, Tex.*,
   254 F.3d 551 (5th Cir. 2001) .............................................................................................23

*Lineberry v. Addshoppers, Inc.*,
   2025 WL 1533136 (N.D. Cal. May 29, 2025)...................................................................22

*O'Sullivan v. Countrywide Home Loans, Inc.*,
   319 F.3d 732 (5th Cir. 2003) .............................................................................................21

iv

*Parker v. Hyperdynamics Corp.*,
    126 F. Supp. 3d 830 (S.D. Tex. 2015) ...............................................................20

*Plymouth County Retirement System v. Apache Corp.*,
    566 F. Supp. 3d 712 (S.D. Tex. 2021) ..........................................................21, 22

*Regents of University of Cal. v. Credit Suisse First Bos. (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) ...........................................................................19

*Rotstain v. Trustmark National Bank*,
    2017 WL 11662671 (N.D. Tex. Nov. 7, 2017).....................................................9

*Shaffer v. Digital Generation, Inc.*,
    2013 WL 12430537 (N.D. Tex. Sept. 19, 2013)..................................................23

*In re Stone & Webster, Inc. Securities Litigation*,
    2007 WL 9822718 (D. Mass. Sept. 7, 2007) ......................................................24

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008).............................................................................10, 11, 19

*Tijerina v. Philip Morris Inc.*,
    1996 WL 885617 (N.D. Tex. Oct. 8, 1996)........................................................21

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017).............................................................................19

*Weisz v. Calpine Corp.*,
    2002 WL 32818827 (N.D. Cal. Aug. 19, 2002) .................................................21

**STATUTES**

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ...........................................................................22

**REGULATIONS**

17 C.F.R. § 210.4–10(22) ........................................................................................6

17 C.F.R. § 240.10b-5..........................................................................................3, 19

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 23........................................................................................ *passim*

v

A-45

**GLOSSARY**

| Term or Abbreviation | Description |
|---|---|
| Class Period | Plaintiffs' proposed class period of March 5, 2019 to January 15, 2021, inclusive |
| Defendants | ExxonMobil and the Individual Defendants |
| Delaware Basin | A region within the Permian Basin (SAC ¶ 2) |
| ExxonMobil | Exxon Mobil Corporation |
| Individual Defendants | Darren W. Woods, Liam M. Mallon, and Melissa Bond |
| MJP Order | August 12, 2024 Memorandum Opinion and Order on the Motion for Judgment on the Pleadings (Dkt. 157) |
| Motion | Plaintiffs' Renewed Motion for Class Certification, served on February 7, 2025 |
| MTD Order | August 24, 2023 Memorandum Opinion and Order on Defendants' Motion to Dismiss the SAC (Dkt. 112) |
| Permian or Permian Basin | A hydrocarbon-rich region in parts of Texas and New Mexico (SAC ¶ 1) |
| Plaintiffs | The State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island and Amalgamated Bank |
| Resource Base or Permian Resource Base | The estimated quantities of oil and gas in the Permian that are expected to be ultimately recoverable (including, but not limited to, Proved Reserves) (SAC ¶ 51) |
| SEC Proved Reserves | Quantities of oil and natural gas that, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible under existing economic and operating conditions and government regulations |
| SAC | Second Amended Complaint (Dkt. 92) |
| SOF | Factual Background in this Opposition |

A-47

## INTRODUCTION

For two years, Plaintiffs have shielded their lone surviving "scheme" claim under the protection of the pleading standard. They've leveraged that position to take broad merits discovery into their theory that Melissa Bond and others engaged in a "scheme" to adopt "impossible" learning curve assumptions to somehow internally support goals ExxonMobil announced *before* the purported scheme. But class certification requires proof – not pleading. Plaintiffs do not even attempt to meet their burden to link their pleaded scheme to investors. Nor could they – discovery shows that ExxonMobil met and exceeded the purportedly "impossible" drilling learning curves. And the whistleblowers allegedly "told by" Bond to falsify learning curves?  ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███ ████████████  In short, no class can be certified in this case because the extensive discovery Plaintiffs insisted upon has debunked the "scheme" on which their claim is premised.

Nor can Plaintiffs link their pleaded scheme to any misstatement. This Court has now twice held that it has "severed the connection between [Plaintiffs'] alleged scheme and the public statements made by [Darren] Woods or [Liam] Mallon regarding ExxonMobil's prospects for oil production." (Dkt. 157 at 8-9 (citing Dkt. 112 at 12-18).) And Plaintiffs make no effort in their Motion to prove a link to alleged misstatements about SEC Proved Reserves or the Resource Base. Nor could they, as discovery has severed this link, too.

Plaintiffs' Motion simply ignores these inescapable facts – relying on the allegations in their Complaint rather than evidence and doggedly clinging to the rejected theory that their alleged "scheme" is connected to shareholders through the severed statements about ExxonMobil's 2024 production goals in the Permian (the "Production Goal"). But facts do not cease to exist because they are ignored. And Plaintiffs cannot rely on mere allegations; they must prove that they satisfy

1

A-48

the requirements for class certification. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*"). Without evidence establishing a link between the scheme as alleged and a misrepresentation to shareholders, Plaintiffs cannot take advantage of the rebuttable presumption of classwide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). And without one of those presumptions, individual issues of reliance predominate and preclude Plaintiffs from meeting their burden to establish that the requirements of Rule 23(b)(3) are satisfied. But even if the *Basic* or *Affiliated Ute* presumption applied, Defendants have rebutted that presumption with evidence that the statements identified in the SAC had no price impact on ExxonMobil stock.

Separately, no class should be certified because Rhode Island *cannot* and Amalgamated *should not* serve as a class representative. Rhode Island sold nearly twice as many shares as it purchased during the Class Period – netting a profit of $669,431. Because Rhode Island has not proved that it suffered any damages, it is not a member of that class and is subject to unique defenses that make it atypical and inadequate as a class representative. And Amalgamated is an anti-fossil fuel activist shareholder that manages funds that hold ExxonMobil stock and directs transactions in ExxonMobil stock not for its value but to promote a "transition away from fossil fuels." (App. 32.) Amalgamated's anti-fossil fuel activism makes it atypical of, and subject to different defenses than, members of the proposed class, who are alleged to have purchased ExxonMobil stock on the promise that it would *increase* its production of fossil fuels.

## FACTUAL BACKGROUND

I.     **Discovery has disproved the alleged "scheme" to incorporate "impossible" drilling learning curves into a Company Plan that is the basis of Plaintiffs' Motion.**

Plaintiffs' only surviving claim is a scheme liability claim allegedly connected to shareholders through ExxonMobil's disclosures of SEC Proved Reserves and the Permian

2

A-49

Resource Base.  Plaintiffs alleged claims based on materially false and misleading statements under 17 C.F.R. § 240.10b-5(b) ("Rule 10b-5") and a "scheme" liability claim under Rule 10b-5(a) and (c).  (*E.g.*, SAC ¶¶ 437, 441.)  This Court dismissed all but the scheme liability claim in its August 24, 2023 order granting Defendants' Motion to Dismiss.  The surviving scheme claim alleges that (1) on March 5, 2019, ExxonMobil CEO Darren Woods advised investors that the Company's goal was to produce more than 1 million oil-equivalent barrels per day by as early as 2024 from the Permian Basin (the "Production Goal"), and (2) on some unspecified date *after* that statement, Defendants Mallon and Bond incorporated unachievable drilling learning curves in the 2019 Company Plan to support that goal.  (*Id.* ¶¶ 3, 7-18.)

██████████████████████████████████████████

████████████████████     ████████     ████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████ According to Plaintiffs, the so-called "impossible" drilling learning curves used in the 2019 Company Plan were also incorporated into ExxonMobil's statements about its SEC Proved Reserves and the Permian Resource Base.  (SAC ¶¶ 52, 53, 66; *see also* Dkt. 157 at 9 (MJP Order summarizing Plaintiffs' theory).)

In its August 12, 2024 Order, the Court confirmed that because its August 24, 2023 Order "severed the connection between the alleged scheme and the public statements made by Woods or Mallon regarding ExxonMobil's prospects for oil production, . . . Plaintiffs *cannot rely on public statement[s] made by Woods or Mallon* to plead that the alleged scheme impacted the purchase or sale of any security."  (Dkt. 157 at 8-9 (emphasis added).)  This left the claim that the alleged learning curve scheme affected disclosures of SEC Proved Reserves and the Resource Base as the

only alleged link between the purely internal "scheme" and any statement to investors. That link has been severed by discovery.

The SAC alleges that the internal scheme inflated ExxonMobil's stock price until the truth was revealed through three alleged corrective disclosures – none of which is about SEC Proved Reserves or the Resource Base:

- A January 31, 2020 Q4 2019 earnings call in which ExxonMobil stated that "Permian Basin production had slowed" (Mot. 5-6; *see also* SAC ¶ 244);

- A May 1, 2020 Q1 2020 earnings call disclosing "significant rig cuts and a reduction in the 2020-2021 Permian Basin production volumes" during the COVID pandemic (Mot. 6; *see also* SAC ¶ 249); and

- A January 15, 2021 *Wall Street Journal* article reporting on an alleged SEC investigation and "whistleblower complaint" (Mot. 6; *see also* SAC ¶¶ 252-53).

## II.    Class certification discovery refutes Plaintiffs' theory of the case.

### A.    The drilling learning curves in the 2019 Company Plan could not have been unachievable because ExxonMobil achieved (and exceeded) them.

Plaintiffs' scheme liability theory hinges on the allegation that former employees Burch and Gulden were "told" by Defendants Mallon and Bond to incorporate "impossible" drilling learning curves for the Delaware Basin in the 2019 Company Plan. (*E.g.*, SAC ¶¶ 14, 153.) ████ ████████████████████████████████ While the SAC alleges that Bond "mandated" the learning curve assumptions (*Id.* ¶ 137) and directed Burch to use them (*Id.* ¶ 313), ████████

4

The record also shows that the learning curve assumptions were far from "impossible." For example:



███████████████████████████████

- ██████████████████████████████████████████████
  ██████████████████████████████████████████████
  ████████████████████████████

- On March 3, 2021 – before Plaintiffs filed the SAC – ExxonMobil reported that "2020 Delaware drilling rates were more than 50% better than the full year 2018 results and 40% better than our 2019 plan," and "[d]rilling and completion costs were 40% lower." (App. 352).

- And on March 2, 2022, ExxonMobil reported a "120% improvement" in "daily drilling lateral feet" and ">35% improvement" in "drilling and completions cost" compared to 2019 data. (App. 416.)

Notably, Plaintiffs do not and cannot challenge the veracity of these disclosures.

**B.    Plaintiffs proffer no evidence that the learning curves were incorporated in ExxonMobil's publicly disclosed SEC Proved Reserves (including SEC PUDs) or Resource Base.**

The discovery record also conclusively establishes that learning curves in the 2019 Company plan were not incorporated in ExxonMobil's publicly disclosed SEC Proved Reserves and Resource Base. The SEC defines SEC Proved Reserves as "those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible – from a given date forward, from known reservoirs, and *under existing economic conditions, operating methods and government regulations.*" 17 C.F.R. § 210.4–10(22) (emphasis added); ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████  ████████████  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  The documents produced in discovery confirm this:

- ████████████████████████████████████

6

A-52



## III.    Rhode Island offers no evidence that it is a member of the proposed class.

During the Class Period, Rhode Island purchased 37,998 shares but it sold 83,242, for a net gain of $669,431. (App. 573.) Plaintiffs' Motion proffers no evidence that Rhode Island suffered *any* damages nor that it is a member of the class that it purports to represent.

## IV.    Amalgamated does not own ExxonMobil stock and manages funds that hold ExxonMobil stock for the purpose of pursuing an anti-fossil fuel agenda.

Amalgamated is a shareholder activist that claims it is leading the charge in the "transition away from fossil fuels." (App. 32.) It is also a founding member of the Net Zero Alliance, which encourages banks and their clients to transition away from fossil fuels. (App. 577; App. 592 at 122:16-23.)  Accordingly, Amalgamated does not directly invest in, or lend to, fossil fuel

7

companies. (App. 585 at 93:3-6, App. 586 at 94:17-21, App. 588 at 96:2-6; App. 602.)

Amalgamated is the trustee of four "LongView" funds that purchased ExxonMobil stock during the Class Period. (App. 581 at 51:24-53:1; App. 595 at 134:14-17.) Amalgamated created these funds "to promote advocacy through ownership," (App. 604; App. 584 at 87:2-5) and its "shareholder activism is done on behalf of [these] funds." (App. 588 at 96:13-24.) The LongView funds "regularly engage in shareholder activism, with a particular focus on . . . climate change" (App. 603; *see also* App. 590 at 98:5-9, App. 590 at 98:20-99:1) and encourage companies in which they invest to "lower energy and natural resource consumption." (App. 606; App. 593 at 127:15-128:5.) Amalgamated believes this shareholder activism – including shareholder litigation – "distinguishes [its] index funds from similarly situated funds." (App. 604.)

In particular, Amalgamated "engage[s] in shareholder activism through [its] active proxy voting policies and [its] shareholder litigation and shareholder engagement." (App. 593 at 127:8-12.) In other words, Amalgamated does not manage the holdings of the LongView funds in the hope that ExxonMobil and other fossil fuel companies will produce *more* oil and gas – it holds them so it can *discourage* fossil fuel production.

Amalgamated's proxy votes on ExxonMobil climate proposals underscore that it is not aligned with most ExxonMobil shareholders. ██████████████████████ ██████████████████████████████████████ (App. 685; ██████████ ) 92.6 percent of the shares that were voted rejected this proposal. (App. 691.) ████████ ████████████████████████████████████ ██████████████████████████ (App. 693; ██████████ ) 95.9 percent of the shares that were voted rejected this proposal. (App. 699.) Despite an anti-fossil fuel agenda that permeates its *raison d'être*, Amalgamated now claims that it purchased ExxonMobil stock because it was deceived into

thinking that ExxonMobil would produce more fossil fuel than it actually believed it could.

## STANDARD OF REVIEW

Rule 23 is not a "mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "Plaintiffs wishing to proceed through a class action must "actually *prove* – not simply plead – that their proposed class satisfies each requirement of Rule 23, including . . . the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*") (emphasis in original). Plaintiffs cannot rely on allegations, but must "affirmatively demonstrate" all four prerequisites of Rule 23(a) and "also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33 (citation omitted).

In conducting a Rule 23 analysis, courts are to consider the "relevant claims, defenses, facts, and substantive law presented in the case." *Funeral Consumers All. v. Serv. Corp. Int'l*, 695 F.3d 330, 345-46 (5th Cir. 2012) (citation omitted). The Supreme Court has held that it "may be necessary for the [trial] court to probe behind the pleadings before coming to rest on the certification question." *Comcast*, 569 U.S. at 33; *see also Rotstain v. Trustmark Nat'l Bank*, 2017 WL 11662671, at *1 (N.D. Tex. Nov. 7, 2017) (Godbey, J.) (similar). The Court should not certify a class unless it is satisfied "after a *rigorous* analysis, that the prerequisites of Rule 23(a) have been satisfied," and that Rule 23(b)(3)'s predominance criterion – which is "even more demanding than Rule 23(a)" has been satisfied. *Comcast*, 569 U.S. at 33-34 (emphasis added) (citations omitted).

## ARGUMENT

I.    **Plaintiffs' proposed class cannot be certified because common issues do not predominate over individual issues of reliance.**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is

9

superior to other available methods for fairly and efficiently adjudicating the controversy." "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). To show Rule 23(b)(3) predominance for their scheme liability claim, Plaintiffs must prove by a preponderance of the evidence that all members of the class relied on the purported scheme. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*"); *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) (preponderance standard). Conversely, "a fraud class action cannot be certified when individual reliance will be an issue." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996). Plaintiffs try to meet their burden by relying on the *Basic* or *Affiliated Ute* presumptions of reliance. But they proffer no evidence that either presumption applies.

A.      **Plaintiffs can't prove that the *Basic* presumption applies to their scheme claim.**

In *Basic*, the Supreme Court permitted plaintiffs to establish classwide reliance via a rebuttable presumption, but only if plaintiffs prove that certain conditions are met. *See generally Halliburton I*, 563 U.S. at 811. The *Basic* presumption rests on the fraud-on-the-market theory, which posits that "an investor presumptively relies on a defendant's misrepresentation if that 'information is reflected in the market price' of the stock at the time of the relevant transaction" and "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 811-12 (citations omitted). As the Fifth Circuit explained, "undisclosed information cannot drive down the market price of a stock. Only information known to the market can cause a loss. For this reason, only information known to the market is relevant under the fraud-on-the-market theory of class wide reliance." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).

To take advantage of the *Basic* presumption, Plaintiffs must show: "(1) that the alleged

10

misrepresentations [on which their claims are based] were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded stock between the time the misrepresentations were made and when the truth was revealed."[1] *Halliburton II*, 573 U.S. at 268. Plaintiffs concede that "[w]here claims rest on scheme liability . . . the first two requirements are satisfied *when the scheme supports alleged misrepresentations that are publicly known and material*." (Mot. 14 (emphasis added).) The *Basic* presumption does not apply in scheme liability cases where the alleged deceptive acts are not communicated to the public. *See Stoneridge*, 552 U.S. at 159.

Plaintiffs do no more than conclusorily contend that they can rely on the *Basic* presumption because "they have *alleged* that Defendants' scheme to inflate the 2019 [Company Plan] was directly connected to the alleged material misrepresentations and omissions" that were disseminated publicly. (Mot. 15 (emphasis added).) But Plaintiffs cannot rest on allegations. They must now *prove* that the Rule 23(b)(3) predominance requirement is met. *See Halliburton II*, 573 U.S. at 276.

Plaintiffs received in discovery approximately 120,000 pages of documents about the learning curves in the Company Plan. (App. 1 ¶ 3.) Their Motion cites none of that evidence. Instead, it cites a single paragraph of their own Complaint to support their claim that the alleged scheme is connected to a public statement. (Mot. at 15 (citing SAC ¶ 298.) This is insufficient to meet their burden to prove that *Basic* applies. *See Halliburton I*, 563 U.S. at 809-10.

      1.      **Because the Court has already severed any link between the alleged scheme and the Production Goal statements, Plaintiffs cannot use those statements to establish a presumption of reliance.**

---

[1] At class certification, Plaintiffs are not required to show materiality. *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Fund Sys.*, 594 U.S. 113, 119 (2021).

11

This Court already rejected Plaintiffs' attempt to connect their alleged scheme to ExxonMobil's public statements regarding the Permian Production Goal. (Mot. 5.) (*See* Dkt. 112 at 22; Dkt. 157 at 8-9; Dkt. 178.) Plaintiffs try to circumvent this Court's orders by arguing that they "currently challenge" statements made by "Exxon" rather than statements made specifically by Woods or Mallon. (Mot. 4.) But their Class Period begins with the exact March 2019 Production Goal statement the Court "severed" from the scheme. (Dkt. 157 at 8-9.) Even if the Court had not foreclosed Plaintiffs' reliance on the Production Goal statements, Plaintiffs cannot logically contend that a scheme that the SAC alleges came to fruition no earlier than August 2019 was somehow incorporated into Production Goal statements made months earlier in March 2019.

### 2.    SEC Proved Reserves do not incorporate drilling learning curves.

Plaintiffs proffer no evidence to meet their burden to show that learning curves from the 2019 Company Plan were incorporated into SEC Proved Reserves communicated to investors. Nor could they. As discussed above, ExxonMobil excluded learning curves from the estimate of SEC Proved Reserves. *See generally* SOF § II(B). Because Plaintiffs have not met, and cannot meet, their evidentiary burden to connect their alleged scheme to the public reporting of SEC Proved Reserves, these statements cannot support application of the *Basic* presumption.

### 3.    The Resource Base is not affected by drilling learning curves.

Plaintiffs' claim related to statements about the Resource Base fails for two independent reasons. The first is that the claim is entirely derivative of the disproved SEC Proved Reserves claim. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

12

A-58

**B.    Defendants have rebutted the *Basic* presumption of reliance with the expert analysis of Dr. Allen Ferrell.**

Even if Plaintiffs had proved that the *Basic* presumption applied, Defendants can rebut that presumption with evidence that the alleged misrepresentations did not cause ExxonMobil's stock price to increase or evidence that a corresponding corrective disclosure did not cause the stock price to decrease – that is, that the misrepresentations had no price impact. *See Halliburton II*, 573 U.S. at 279-80. "Any showing that severs the link" between the alleged misrepresentations or corrective disclosures and the price paid or received by the shareholder "will be sufficient to rebut the presumption of reliance." *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988); *see also Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 114 (2021). Dr. Allen Ferrell's[2] report establishes that Defendants have "severed the link" and rebutted the *Basic* presumption.[3]

Dr. Ferrell conducted an event study, which is a well-accepted statistical tool used to determine whether the stock price increases or decreases after a company-specific event (e.g., an alleged public misrepresentation or corrective disclosure) were caused by that event or instead resulted from market and industry developments or random price fluctuations. *See Halliburton II*, 573 U.S. at 280 (stating that a party can "introduce evidence of the *existence* of price impact in connection with 'event studies'") (emphasis in original); (App. 902 ¶¶ 18-20.). Dr. Ferrell's event

---

[2]    Dr. Ferrell holds a Ph.D. in economics from MIT and is a Harvard law professor. (App. 895 ¶ 1.) He has published more than thirty articles. (*Id.* ¶ 3).

[3]    As described above, the class certification record establishes that there was no connection between the allegedly fraudulent learning curves in the 2019 Company Plan and public statements regarding ExxonMobil's SEC Proved Reserves and Resource Base. (*See* SOF § II(B).) Accordingly, even if the *Basic* presumption applied, the same evidence rebuts any price impact derived from the alleged misrepresentations and corrective disclosures that are unconnected to the purportedly fraudulent conduct.

study examined the relationship between ExxonMobil's share price movements and the market during a one-year period before each alleged misstatement and corrective disclosure. Based on that historical relationship, Dr. Ferrell estimated the predicted ExxonMobil stock price movement on the relevant date for each alleged misrepresentation or corrective disclosure. The actual stock price movement is subtracted from the predicted stock price movement to determine what is called a "residual return" – the portion of ExxonMobil's stock price movement that is the result of ExxonMobil-specific factors as opposed to broader market and industry developments. Dr. Ferrell also assessed whether the residual return was statistically significant. If it is not, that indicates the movement is a result of random price movements or industry developments and not the market's reaction to ExxonMobil-specific information.

Dr. Ferrell's event study determined that there was no statistically significant price movement in reaction to any of the alleged misrepresentations. (App. 905 ¶¶ 30-31, 34-37, 38-42.) Dr. Ferrell also determined that there was no statistically significant price reaction (i.e., no price impact) to Plaintiffs' January 31, 2020 alleged corrective disclosure supposedly notifying the market that Permian Basin production had slowed. (App. 913 ¶¶ 43-46.)

In addition to the event study, Dr. Ferrell analyzed the content of the corrective disclosures to determine whether they contained new information, because "a stock's price will not change upon the release of confirmatory information, i.e., information already known to the market." *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004); *see also IBEW Loc. 98 Pension Fund v. Best Buy*, 818 F.3d 775, 782 (8th Cir. 2016) (statements that "added nothing to what was already public" have no price impact); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 272 (N.D. Tex. 2015) (*"Halliburton III"*) (no price impact where the alleged corrective disclosure contained no information "that was not already impounded in the market price of the

14

A-60

stock"). As to the purported corrective disclosures on May 1, 2020 and January 15, 2021, Dr. Ferrell concluded that, although there was a statistically significant movement in ExxonMobil's stock price on those dates, there was no price impact because the supposedly corrective information had already been disclosed. (App. 914 ¶¶ 48-52, 58-63.) He also compared the content of the corrective disclosures to the alleged misrepresentations and concluded that there was no connection between the two disclosures. *See Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp.*, 77 F.4th 74, 98, 102 (2d Cir. 2023).

### 1. None of the identified disclosures corrected any statement about SEC Proved Reserves, and the alleged statements about SEC Proved Reserves had no price impact.

Dr. Ferrell's event study demonstrates that neither of the two alleged misrepresentations concerning ExxonMobil's SEC Proved Reserves caused a statistically significant positive price reaction (i.e., inflation) in ExxonMobil stock. (App. 905 ¶¶ 30-31.) In addition, none of the three alleged corrective disclosures mentions the SEC Proved Reserves, much less "corrects" any alleged misstatements. (*See* App. 700-808.) Plaintiffs do not identify any analyst commentary linking any of the alleged corrective disclosures with ExxonMobil's prior statements regarding its SEC Proved Reserves. (SAC ¶¶ 412, 414-15.) And Dr. Ferrell found no analyst reports drawing that connection. (App. 907 ¶ 32.) The alleged corrective disclosures did "not directly refer . . . to the alleged misstatement[s]," making clear that there is no "strong link between misrepresentation and corrective disclosure" to provide "sturdy ground to use the back-end price drop as a proxy for front-end inflation." *Goldman*, 77 F.4th at 98, 102.

### 2. Neither the alleged misstatements concerning the Resource Base nor the alleged corrective disclosures had a price impact.

Dr. Ferrell's event study also confirmed that there is no statistically significant stock price reaction on the four dates that ExxonMobil allegedly made misrepresentations about the Resource

15

Base.  (App. 907 ¶¶ 34-35.)  Nor was there any price impact from the alleged corrective disclosures.  None of the alleged corrective disclosures mentions the Permian Resource Base, and Plaintiffs do not identify any analyst commentary associating those disclosures with the Permian Resource Base.  Dr. Ferrell confirmed that there was no such analyst commentary.  (App. 909 ¶ 36.)

3.   **The Court has already ruled that Plaintiffs cannot bring claims based on Production Goal statements, and there is no price impact related to those statements.**

As discussed above, this Court has held that Plaintiffs cannot base a scheme claim on the Production Goal statements.  Dr. Ferrell nevertheless examined them in his event study and determined that there was no statistically significant stock price reaction to any of the seven alleged Production Goal statements or to the three alleged corrective disclosures.  (App. 909 ¶¶ 38-40.) And the alleged corrective disclosures do not even mention the SEC Proved Reserves or Resource Base, so they could not have had any price impact on the remaining claims in the case.

(a)   **The January 31, 2020 disclosure didn't correct any alleged misrepresentation and there was no statistically significant price reaction to the disclosure.**

Plaintiffs allege that in an earnings call on January 31, 2020, Darren Woods presented a slide reflecting that Q4 2019 production was virtually flat compared to Q3 2019 and was below industry analyst estimates and the Company's guidance.  (SAC ¶ 244.)  There is no price impact associated with this purported corrective disclosure for two reasons.

First, this disclosure does not refer to, let alone "correct," the Production Goal statements, drilling learning curves, or the 2019 Company Plan.  (*See* App. 724.)  And no analyst drew any inference between ExxonMobil's January 2020 disclosure of its actual production of 294,000 OEBD in Q4 2019 and the Production Goal of 1 million OEBD by 2024.  (App. 913 ¶ 45.)  Second, Dr. Ferrell's event study shows that ExxonMobil's residual return on January 31, 2020 was *not*

16

statistically significant (i.e., it had no price impact). (App. 913 ¶ 44.)

> **(b)** **The May 1, 2020 corrective disclosure had no price impact because the allegedly corrective information was disclosed nearly one month earlier.**

In an efficient market, information known or expected information is already incorporated into the stock price. Accordingly, courts consistently recognize that an alleged corrective disclosure that does not disclose new information cannot have a price impact. *See* Argument § I(B).

Plaintiffs contend that a statement during ExxonMobil's May 1, 2020 earnings call that ExxonMobil "expect[ed] to ramp rigs down by about 75% in the Permian, ending the year at approximately 15 rigs" and that the "reduction in capital spend" would reduce 2020 volumes by approximately 15,000 oil equivalent barrels and 2021 volumes by 100,000 – 150,000 oil-equivalent barrels (App. 762), somehow "corrected" the Production Goal statements. (SAC ¶¶ 249, 411.) This earnings call took place during the pandemic and the Russian/Saudi oil price war, when the oil and gas industry faced unprecedented market conditions. (App. 765.) And as Dr. Ferrell notes, this call also followed ExxonMobil's April 7, 2020 press release disclosing the same information about ExxonMobil's response to the pandemic. There could be no price impact from the May 1, 2020 disclosure of information already in the market. (*See* App. 915 at Ex. 5.)

Moreover, there is once again a mismatch between the purported corrective disclosure and the alleged misstatements it was supposedly correcting. Both the May 1, 2020 and April 7, 2020 press releases tied the capex reduction to low commodity prices resulting from oversupply and demand weakness from the COVID-19 pandemic. (App. 759, App. 810.) Neither of these disclosures mentioned the Production Goal nor tied ExxonMobil's reduction in capex and the resulting predicted decrease in 2020 and 2021 production volumes to the 2019 Company Plan or drilling learning curves. And none of the 32 analyst reports issued between April 7-11, 2020 and

17

May 1-4, 2020 connected ExxonMobil's 2020-2021 capital expenditure reduction or rig reduction to ExxonMobil's Permian Production Goal for 2024. (App. 917 ¶ 54.)

Dr. Ferrell's event study also shows that ExxonMobil's residual return on April 7, 2020 – the date rig and capital reductions were first disclosed – was *positive 2.37%*. (App. 916 ¶ 51.) In other words, ExxonMobil's stock price increased relative to the market generally and to its peers in response to this news. That means that there was no price impact. (*Id.*) And while ExxonMobil's stock price declined after May 1, 2020, analysts did not attribute the decline to any corrective information or to the Production Goal. They tied it to unrelated factors. (App. 918 ¶ 55.)

### (c)    The January 15, 2021 *Wall Street Journal* article did not include new information or correct a prior disclosure.

Plaintiffs allege that a January 15, 2021 *Wall Street Journal* article titled "Exxon Draws SEC Probe Over Permian Basin Asset Valuation" was the final corrective disclosure. Plaintiffs allege that the article reported that a whistleblower had filed a complaint claiming that Exxon's *2018* drilling assumptions were false and that Exxon had overvalued the Delaware Basin by $10 billion. (*See* SAC ¶ 252.) But Plaintiffs challenge the *2019* drilling assumptions. And again, the *Wall Street Journal* had "previously reported" this supposedly corrective information in a September 13, 2020 article (App. 806) – and there was no statistically significant price reaction to that earlier article. (App. 918 ¶¶ 57-61.) Contemporaneous market reactions confirm that this was not new information. (App. 920 ¶¶ 62-63.) Analysts' reactions focused on the impact of disclosing an SEC investigation – not the already-disclosed whistleblower complaints.[4]  (*Id.*)  Accordingly, this so-called corrective information could not have had an impact on ExxonMobil's share price

---

[4]    As this Court is aware, on January 20, 2022, the SEC told ExxonMobil that it did not intend to recommend an enforcement action. (App. 832; *see also* Dkt. 77-1 (attaching SEC letter).)

on January 15, 2021.

### C.    Plaintiffs cannot rely on *Affiliated Ute* because their case is not premised on omissions.

Plaintiffs' attempt to rely in the alternative on the *Affiliated Ute* presumption of reliance is equally unavailing. (Mot. 21-22.) "[T]o invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure." *Regents of Univ. of Cal. v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). Plaintiffs do neither.

The *Affiliated Ute* presumption applies only where "no positive statements exist [because] reliance as a practical matter is impossible to prove." *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (citation omitted). But scheme liability must be premised on a scheme "in connection with the purchase or sale of securities." 17 C.F.R. § 240.10b-5(b). The SAC alleges that the connection between the alleged internal scheme and the purchase and sale of securities is through alleged misrepresentations – not omissions. (Mot. 5; *see also* SAC ¶¶ 3, 23, 52, 344.) Indeed, Plaintiffs' Motion contains a passing reference to "omissions" but then refers only to alleged misrepresentations. (Mot. 15.) Because Plaintiffs' claim is not based on omissions, *Affiliated Ute* does not apply.

Even if this were an omission claim, Plaintiffs have not demonstrated the second *Affiliated Ute* prong – that there was any duty to disclose the drilling learning curves used in the 2019 Company Plan. When the alleged basis for a duty to disclose is a public statement rendered misleading by a purported omission, the duty to disclose arises only where the "omitted fact is material to the statement in that it alters the meaning of the statement." *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 541 (5th Cir. 2008). Here, the link

19

Plaintiffs allege between the drilling learning curves and information shared with investors is exclusively through SEC Proved Reserves and the Resource Base. Since neither of those disclosures incorporated the learning curves, the omission of information about the learning curves cannot have been material to those statements. (*See* SOF § II(B).) Accordingly, there was no duty to disclose the supposedly fraudulent internal learning curves. Nor is there a freestanding duty to disclose, and Plaintiffs do not argue that there is. *See Parker v. Hyperdynamics Corp.*, 126 F. Supp. 3d 830, 843 (S.D. Tex. 2015) (citation omitted).

### D. Plaintiffs have failed to prove a Class Period that comports with their allegations in the SAC.

Plaintiffs fail to identify a viable Class Period in their Motion. Plaintiffs fail to identify in their Motion evidence of when the alleged scheme began, when it became incorporated in any meaningful way in the 2019 Company Plan, or when it was allegedly incorporated into any disclosure about SEC Proved Reserves or the Resource Base. The cornerstone of their claim is that drilling learning curves in the 2019 Company Plan somehow affected ExxonMobil's public statements about SEC Proved Reserves and the Resource Base. ██████████████████

██████████████████ and Plaintiffs' proposed Class begins in March 2019. (App. 124.) A scheme cannot travel back in time. Plaintiffs fail to explain how their Class Period – which begins before the SAC alleges that any scheme began and ends with a January 2021 *Wall Street Journal* article that repeated information from a September 2020 article – could possibly be sustained.

### II. Plaintiffs are subject to unique defenses that make them atypical and inadequate as class representatives.

### A. Rhode Island profited from its transactions during the Class Period and so cannot serve as a class representative.

An "inherent prerequisite to the class certification inquiry" is "whether plaintiffs have . . .

20

A-66

stated an injury-in-fact." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 742-43 (5th Cir. 2003). The Supreme Court "ha[s] repeatedly held that 'a class representative must be part of the class and "possess the same interests and suffer the same injury" as the class members.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (citation omitted).

The premise of Plaintiffs' lawsuit is that ExxonMobil's stock price was inflated during the Class Period. Under that theory, purchasers during the Class Period overpaid by the amount of the inflation at any given time in the stock price – and sellers during the Class Period benefitted by that same amount. Accordingly, investors who sold during the Class Period may have profited from the alleged inflation. And Rhode Island is a net seller and a net gainer, having sold 45,244 more ExxonMobil shares than it purchased and netting $669,431 more from stock sales than it paid for stock purchases during the Class Period. (*See* App. 573; ▇▇▇▇▇▇▇▇▇▇▇) Net sellers and net gainers are consistently rejected as lead plaintiffs because "they may in fact have profited, rather than suffered, as a result of the inflated stock prices." *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007) (collecting cases).[5]

Rhode Island has offered no evidence showing how it was damaged in light of these stock

---

[5]     *See also Weisz v. Calpine Corp.*, 2002 WL 32818827, at *7 (N.D. Cal. Aug. 19, 2002) (in-and-out trader who sold almost twice as many shares as it purchased during the class period could not serve as lead plaintiff because it "may have actually profited, not suffered losses, as a result of the allegedly artificially inflated stock price"); *Plymouth Cnty. Ret. Sys. v. Apache Corp.*, 566 F. Supp. 3d 712, 718 (S.D. Tex. 2021) (party who profited from stock sales during class period could not be lead plaintiff); *Born v. Quad/Graphics, Inc.*, 2020 WL 994427, at *2 (S.D.N.Y. Mar. 2, 2020) (net seller and net gainer "effectively disqualifie[d]" as class representative); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 2004 WL 3314943, at *4 (N.D. Ohio May 12, 2004) (similar); *see also Tijerina v. Philip Morris Inc.*, 1996 WL 885617, at *3 (N.D. Tex. Oct. 8, 1996) (plaintiff who suffered no injury could not represent class of injured people).

21

transactions.[6] Accordingly, it cannot serve as class representative. *See Falcon*, 457 U.S. at 156; *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (purported representatives suffered no injuries and thus "evident[ly] lack[ed] class membership"); *In re Bos. Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 32 (D. Mass. 2008) (denying class certification because lead plaintiffs were net sellers and "failed to demonstrate individual injury [and] . . . standing").

Moreover, class representatives are neither typical nor adequate if "the specific problems with the named plaintiffs' claims would overshadow the question whether the defendants are liable to the class." *Lineberry v. Addshoppers, Inc.*, 2025 WL 1533136, at *1 (N.D. Cal. May 29, 2025). Rhode Island's sales during the Class Period subject it to unique defenses that would overshadow the class claims. For example, this Court has recognized that, while an in-and-out trader could in theory suffer recoverable damages, he might not, "and a great deal of time, effort and expense will undoubtedly be incurred to determine if he is subject to a unique no damage defense." *In re Carreker Corp. Sec. Litig.*, 2003 WL 27396764, at *1 (N.D. Tex. Aug. 14, 2003). Other courts have reached the same conclusion.[7]

---

[6] When selecting the lead plaintiff in PSLRA cases, courts consider who has the "largest financial interest in the relief sought by the class." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Courts often determine this using a "last in, first out" ("LIFO") analysis. *Plymouth*, 566 F. Supp. 3d at 717. ███████████████████████████████████████

███████████████████████████████████████
███ Accordingly, Rhode Island's LIFO analysis that purports to show losses of ~$7 million based on the original proposed class period provides no evidence of Rhode Island's actual damages under the currently proposed Class Period. *See Plymouth*, 566 F. Supp. 3d at 719 (holding that LIFO losses are "completely irrelevant" to a "net gainer" during the class period).

[7] *See, e.g., Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000) (putative class representative was "not typical of most members of the putative class because she realized a net gain"); *Borochoff v. Glaxosmithkline PLC*, 246 F.R.D. 201, 205 (S.D.N.Y. 2007) (net seller "[did] not adequately represent the proposed class of purchasers"); *Plymouth*, 566 F. Supp. 3d at 718 (net seller was "subject to unique defenses"); *Bausch & Lomb*, 244 F.R.D. at 174 (party's "status as a net gainer may 'subject [it] to unique defenses that render such plaintiff

22

This analysis assumes that Plaintiffs' Class Period is viable. But as described above, Plaintiffs have not established how they can proceed with a Class Period that begins in March 2019 before the alleged scheme even began and ends with a January 2021 disclosure of information already in the market.[8]

**B.    Amalgamated is neither a typical class member nor adequate because it uses ExxonMobil stock to promote its anti-fossil fuel activist agenda.**

In evaluating typicality, "the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001). Accordingly, "a defense or counter claim defeats typicality if it is likely to become the litigation's focus." *Hirsch v. USHealth Advisors, LLC*, 337 F.R.D. 118, 133 (N.D. Tex. 2020). Amalgamated is not a typical class member. It is an anti-fossil fuel activist that (1) opposes ExxonMobil's core business, (2) markets the LongView funds as a vehicle for Amalgamated to pursue its environmental agenda through shareholder activism and lawsuits, and (3) takes positions that squarely conflict with the interests of the majority of ExxonMobil's shareholders – including the putative class. *See generally* SOF § IV.

In a case that centers on ExxonMobil's alleged failure to deliver on projected oil production

---

incapable of adequately representing the class" (alteration in original) (citation omitted)); *Goodyear*, 2004 WL 3314943, at *4 (entities who sold most or all of their shares before disclosure of alleged fraud "may be subject to unique defenses"); *see also Shaffer v. Digit. Generation, Inc.*, 2013 WL 12430537, at *3 (N.D. Tex. Sept. 19, 2013) (Godbey, J.) (holding that a putative class representative's daytrading "raises serious concerns about his typicality and his susceptibility to unique defenses").

[8]    Narrowing the Class Period may make both Plaintiffs net sellers/gainers. For example (and without conceding that any Class Period is viable), under a Class Period that began February 26, 2020 (the first date after the purported scheme on which any alleged misstatement was made) and ended January 15, 2021 (with the *Wall Street Journal* article), Rhode Island sold 63,213 more shares than it purchased, netting $2,250,122, and Amalgamated is also a net seller/gainer with sales of 55,114 more shares than it purchased and net proceeds of $2,351,651 (App. 830-31.) Neither Plaintiff would be typical or adequate under that narrower class period.

23

volume goals, Amalgamated's history of shareholder activism and its antipathy to ExxonMobil's core business will subject it to arguments and defenses that would not apply to typical ExxonMobil shareholders. This makes Amalgamated atypical, with interests that put it directly at odds with the interests of class members. *See In re Stone & Webster, Inc. Sec. Litig.*, 2007 WL 9822718, at *7-8 (D. Mass. Sept. 7, 2007) ("shareholder activists" who purchased shares to "engag[e] in activist strategies" were atypical because they were "subject to unique defenses").

Amalgamated is also an inadequate class representative. The adequacy inquiry "serves to uncover conflicts of interest between named plaintiffs and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (5th Cir. 1997). A class representative is inadequate if it has conflicts with the class. *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 480 (5th Cir. 2001). Plaintiffs' longstanding antagonism towards ExxonMobil's production of fossil fuels means that it is antagonistic to the interests of ExxonMobil's shareholder base. *See Frompovicz v. Niagara Bottling, LLC*, 420 F. Supp. 3d 361, 371-72 (E.D. Pa. 2019) (collecting cases). In *Frompovicz*, for example, the court found that the putative class representative's "long-standing grudge" against the defendant inhibited his ability to fairly represent the interest of the proposed class. *Id.* at 372. Amalgamated's interest is not in ExxonMobil meeting the Production Goal or increasing it production of fossil fuels. To the contrary, it holds stock to thwart that goal.

## CONCLUSION

Defendants respectfully submit that Plaintiffs' Motion for Class Certification should be denied.

24

Dated: June 23, 2025

Respectfully submitted,

*/s/ Noelle M. Reed*

Noelle M. Reed
   State Bar No. 24044211
Wallis M. Hampton
   State Bar No. 00784199

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1000 Louisiana Street, Suite 6800
Houston, Texas 77002
Tel.: (713) 655-5122
Fax: (713) 483-9122
noelle.reed@skadden.com
wallis.hampton@skadden.com

Michelle L. Davis
   State Bar No. 24038854
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
308 Bahama Court
Granbury, Texas 76048
Tel.: (713) 655-5197
Fax: (713) 483-9197
michelle.davis@skadden.com

*Attorneys for Defendants Exxon Mobil
Corporation, Darren W. Woods, Liam M.
Mallon, and Melissa Bond*

25

A-71

A-72

## CERTIFICATE OF SERVICE

I certify that on June 23, 2025, I served the foregoing document and the Appendix in Support of Defendants' Opposition to Plaintiffs' Renewed Motion for Class Certification on all counsel of record by email.

/s/ *Wallis M. Hampton*
Wallis M. Hampton

26

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 3:21-cv-00194-N |

**DECLARATION OF ALLEN FERRELL, Ph.D.**

**JUNE 20, 2025**

**Table of Contents**

I.    Qualifications ................................................................................................... 1

II.    Plaintiffs' Allegations ....................................................................................... 2

III.    Assignment and Summary of Opinions ............................................................. 5

IV.    Scientific Foundations for Price Impact Analysis ............................................. 7

    A.    Stock Price Behavior and Efficient Markets ............................................... 7

    B.    Price Impact and the Alleged Truth ......................................................... 10

V.    Analysis of Plaintiffs' Claims ......................................................................... 11

    A.    ExxonMobil Proved Reserves Claim ....................................................... 11

    B.    Permian Resource Base Claim ................................................................. 13

    C.    Permian Production Goal Claim ............................................................... 15

VI.    Conclusion ...................................................................................................... 27

## I.      Qualifications

1.      I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.      I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, a research associate at the National Bureau of Economic Research, and a visiting professor at Stanford. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), a member of the American Bar Association Task Force on Corporate Governance and of the American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.      I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the U.S. Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of corporate and securities matters, including matters involving mergers & acquisitions and damages. My expert testimony in the last four years, publications in the last ten years, and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

4.      I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my supervision, through the date of this report. I am being compensated for my work on this matter at an hourly rate of $1,600, including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions and conclusions, or the outcome of this matter.

1

5.      The materials I have relied upon in reaching the opinions and conclusions set out in this report are listed in **Appendix B**.

6.      The analyses, opinions, and conclusions expressed in this report are subject to change or modification including if additional relevant information becomes available which bears on the analyses, opinions, or conclusions contained herein. I may also seek to respond to opinions or analyses proffered by other experts or questioning from counsel at deposition.

## II.      Plaintiffs' Allegations

7.      Lead Plaintiffs Amalgamated Bank and The State of Rhode Island, Office of the General Treasurer, on behalf of the Employees' Retirement System of Rhode Island ("Plaintiffs") filed this lawsuit alleging violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of purchasers of ExxonMobil common stock from March 7, 2018 through January 15, 2021 (the "Initial Class Period").[1] Plaintiffs alleged that defendants Exxon Mobil Corporation ("ExxonMobil," "Exxon," or the "Company") and certain of its officers and directors made allegedly false and misleading statements and omissions that misrepresented (a) the amount of ExxonMobil's proved reserves beginning in February 2019,[2] (b) the size of the Permian resource base beginning in March 2018,[3] and (c) the Permian production goal of 1 million oil-equivalent

---

[1] Second Amended Class Action Complaint for Violations of the Federal Securities Laws, Mendi Yoshikawa v. ExxonMobil Corporation, et al., U.S.D.C. N.D. Texas, Dallas Division, C.A. No. 3:21-cv-00194-N, filed October 31, 2022 ("Complaint"), p.1.

The individual defendants are Darren W. Woods (ExxonMobil's Chairman and CEO), Liam M. Mallon (VP of ExxonMobil and President of ExxonMobil Upstream Oil and Gas Company), and Melissa Bond (ExxonMobil's former Delaware Basin Development Manager and a Senior Manager at ExxonMobil's Upstream Oil & Gas Division). Complaint, p. 1 & ¶ 45.

[2] Complaint, ¶ 351.

[3] Complaint, ¶ 61. I understand that Plaintiffs' claim that the size of the resource base was inflated is based on their claim that ExxonMobil's proved reserves, which are a component of the resource base, were inflated. Memorandum Opinion and Order on Motion for Judgment on the Pleadings, filed August 12, 2024, at 9-10 (the Court stated that Plaintiffs claim that Exxon's 2019 development plan, which included Ms. Bond's learning curve assumptions, increased proved reserves and Exxon's resource base was also inflated by Ms. Bond's scheme because proved reserves are a component of the resource base calculation.).

ExxonMobil states that, in general, proved reserves are a component of the resource base, but also includes other components. See,, e.g., ExxonMobil 2019 Investor Day Presentation, March 6, 2019, at 118 ("The resource base includes quantities of oil and natural gas classified as proved reserves, as well as quantities that are not yet classified as proved reserves but that are expected to be ultimately recoverable. The term 'resource base' or similar terms are not intended to correspond to SEC definitions such as 'probable' or 'possible' reserves. 'Potential' resource amounts are not currently included in the resource base.").

barrels per day by as early as 2024 beginning in March 2019.[4] I refer to this as the "Section 10(b) Allegation."

8.    Plaintiffs also allege that Mr. Mallon and Ms. Bond were participants in an allegedly fraudulent scheme to support: (1) certain statements regarding ExxonMobil's proved reserves, (2) the resource base valuation for the Permian Basin of 10 billion oil-equivalent barrels, and (3) Mr. Woods' March 5, 2019 statement that ExxonMobil's goal was to produce 1 million barrels per day from the Permian by 2024.[5] Plaintiffs allege that Mr. Mallon directed Ms. Bond, in several in-person meetings, to manipulate certain metrics used in ExxonMobil's company plan – particularly the drilling learning curve – in order to create a plan with sufficient value (NPV) and volume production to support ExxonMobil's public statements concerning the Permian Basin production goal, reserves and resource base.[6] Among other things, Plaintiffs allege that two ExxonMobil employees believed that the stated production goal and resource base valuations that were repeated in ExxonMobil's Form 8-K filed on April 26, 2019 were "not accurate and they informed management about the misleading SEC filings."[7] I refer to this as the "Scheme Liability Allegation."

---

[4] Complaint, ¶ 47 & § X.

[5] Alleged misrepresentation regarding the resource base: Complaint, ¶ 314 ("… Exxon's stated proved reserves and resource base valuations which Mallon and Bond knew were based on the development plan.") & ExxonMobil Press Release, "ExxonMobil to increase, accelerate Permian output to 1 million barrels per day by 2024," March 5, 2019 ("The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue.").

Alleged misrepresentations regarding production goal: Complaint, ¶¶ 344 ("[B]eginning on March 5, 2019, Defendants touted a production goal of 1 million oil-equivalent barrels per day by 2024 in the Permian Basin."), ¶ 301 ("In order '[t]o ensure conformity' with Defendant Woods' 'public pledge' of 1 million barrels per day by 2024 in the Permian, and at Defendant Mallon's direction to inflate the plan, Defendant Bond ' instructed the Delaware Planning Team to generate higher 2019 NPV estimates by revising the assumptions used to build the development plan in a way that would 'claw back' value.'") & ¶ 314 ("Thus, Mallon and Bond acted with intent in furnishing information for inclusion in false statements, including Woods' public pledge of 1 million barrels per day in the Permian by 2024."). See also ExxonMobil Press Release, "ExxonMobil to increase, accelerate Permian output to 1 million barrels per day by 2024," March 5, 2019 ("ExxonMobil said today it has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024 – an increase of nearly 80 percent and a significant acceleration of value.").

[6] Complaint, ¶¶ 119-131.

[7] Complaint, ¶ 311.

3

9.     Plaintiffs allege that ExxonMobil's stock price was artificially inflated during the Purported Class Period as a result of the alleged scheme. However, I understand that the Court in this case has dismissed the Section 10(b) Allegation but denied the motion to dismiss the Scheme Liability Allegation against Ms. Bond and ExxonMobil.[8] As a result, I understand that Plaintiff is no longer seeking to certify a class covering the Initial Class Period, but instead purports to seek certification of a class consisting of purchasers of ExxonMobil common stock from March 5, 2019 through January 15, 2021 (the "Putative Class Period").

10.     In addition, I understand that, after the Court dismissed the Section 10(b) Allegation, Defendants moved to dismiss the Scheme Liability Allegation, arguing that there was no connection between the alleged scheme to inflate the drilling learning curves used in the ExxonMobil company plan and the purchase or sale of any ExxonMobil securities. I further understand that, according to the Court's order on that motion, the Scheme Liability Allegations (i) cannot be connected to the purchase or sale of any ExxonMobil securities through the alleged misrepresentations regarding the Permian production goal of 1 million oil-equivalent barrels per day by as early as 2024 and (ii) had adequately alleged a connection between the purported scheme and the purchase or sale of ExxonMobil securities based on the Plaintiffs' allegation that the fraudulent learning curves were incorporated into ExxonMobil's publicly-disclosed SEC proved reserves and resource base.[9] Nonetheless, for purposes of this report, I analyze all three categories of alleged misrepresentations.

11.     Plaintiffs allege ExxonMobil dissipated the alleged artificial inflation in its stock price through the following alleged corrective disclosures:[10]

a. **January 31, 2020 ExxonMobil Q4 2019 Earnings Call**

During the call, Defendant Woods presented a "green blob" slide stating that fourth quarter 2019 production was "294 Koebd" or 294,000 barrels of oil-equivalent per day, compared to 293,000 barrels of oil-equivalent per day for the third quarter of

---

[8] Memorandum Opinion and Order on Motion to Dismiss, filed August 24, 2023.

[9] Memorandum Opinion and Order on Motion for Judgment on the Pleadings, filed August 12, 2024, at 8-10 (Citing to Order on Motion to Dismiss, filed August 24, 2023, at 12-18 and stating that "the Court severed the connection between Bond's alleged scheme and the public statements made by Woods or Mallon regarding ExxonMobil's prospects for oil production." Also, the Court stated that Plaintiffs claim that Exxon's 2019 development plan, which included Ms. Bond's learning curve assumptions, increased proved reserves and Exxon's resource base was also inflated by Ms. Bond's scheme because proved reserves are a component of the resource base calculation.).

[10] Complaint, ¶ 402.

2019. Production was virtually flat quarter-over-quarter and fell below industry estimates, as well as the Company's own guidance.[11]

**b.  May 1, 2020 ExxonMobil Q1 2019 Earnings Call**

Defendants disclosed significant rig cuts of 75% of current rigs in the Permian and that lower capital expenditures, including the rig cuts, would reduce 2020 Permian volumes by ~15 KBoed (to ~345 KBoed total production excluding shut-ins) in 2020 and by 100-150 KBoed (to 450-500 KBoed total production) in 2021.[12]

**c.  January 15, 2021 *Wall Street Journal***

[T]he Wall Street Journal reported that whistleblowers had filed a complaint in the fall of 2020 regarding the fraudulently inflated valuation of the Permian Basin asset. The whistleblower complaint alleged that several individuals involved with the valuation were instructed by management to use false data in the assumptions that the Company used to value the Delaware Basin. The pressure to deliver on Defendant Woods' March 2019 promise that the Permian Basin would achieve 1 million oil-equivalent barrels per day by 2024 "permeated the organization," even though, according to the whistleblower, "no one I knew in the organization thought this was possible." As described in the whistleblower complaint, after employees delivered the lower internal valuation of $40 billion for the Delaware Basin in connection with Exxon's annual planning process for 2019, they were pressured by the Delaware development manager, who at the time was Defendant Bond, to "claw back" some of the reduction in the valuation by "using different assumptions, including a more optimistic 'learning curve' that estimated the rate at which they would improve drilling times." Despite this, employees continued to view the faster drilling time assumptions as unrealistic. One employee submitted the revised estimates in a file entitled "This is a Lie." After further debate and consultation, the value was adjusted to $50 billion.[13]

12.    On February 7, 2025, Plaintiffs submitted the Expert Report of Matthew D. Cain, Ph.D. ("Cain Report"). Dr. Cain opines that the "the market for Exxon's Common Stock was efficient during the [period March 5, 2019 to January 15, 2021]."[14]

## III.    Assignment and Summary of Opinions

13.    I was asked by Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Defendants, to analyze whether the alleged misrepresentations and corrective disclosures

---

[11] Complaint, ¶ 403.

[12] Complaint, ¶ 408.

[13] Complaint, ¶ 412.

[14] Cain Report, ¶ 10.

identified in the Complaint regarding the alleged Scheme Liability Allegation had an impact on ExxonMobil's stock price.

14.    Based on my professional experience, review of the materials listed in **Appendix B**, and analyses, I have formed the following principal opinion: that there is no price impact associated with the alleged misrepresentations concerning the ExxonMobil proved reserves, Permian resource base, and Permian production goal. The bases for my conclusion are as follows:

a.  With regards to the ExxonMobil proved reserves claim (i.e., allegedly misrepresenting the amount of total proved reserves reported by ExxonMobil), none of the alleged misrepresentations caused a positive and statistically significant price reaction in ExxonMobil stock and none of the alleged corrective disclosures were connected to the alleged misrepresentations related to the ExxonMobil proved reserves claim.

b.  With regards to the Permian resource base claim (i.e., allegedly misrepresenting the size of the resource base in the Permian as approximately 10 billion oil-equivalent barrels), none of the alleged misrepresentations caused a positive and statistically significant price reaction in ExxonMobil stock and none of the alleged corrective disclosures were connected to the alleged misrepresentations related to the Permian resource base claim.

c.  With regards to the Permian production goal claim (i.e., allegedly misrepresenting the Permian Basin growth plans that it can produce more than 1 million oil-equivalent barrels per day by as early as 2024), none of the alleged misrepresentations caused a positive and statistically significant price reaction in ExxonMobil stock. Moreover, concerning the three alleged corrective disclosures:

i.  There was no statistically significant price reaction on the first alleged corrective disclosure on January 31, 2020.

ii. On May 1, 2020, while there was a statistically significant and negative price reaction on that date, the alleged corrective disclosure was previously disclosed (i.e., stale), which would not elicit a stock price reaction if the market for ExxonMobil stock was efficient (as Plaintiffs presume and their expert, Dr. Cain, contends). Market participants instead noted the negative impact of the disappointment over ExxonMobil not taking further actions to preserve the balance sheet and the confusion or differing opinion as to what ExxonMobil's "clean" earnings per share should have been.

iii. On January 15, 2021, while there was a statistically significant and negative price reaction on that date, the alleged corrective disclosure was previously disclosed (i.e., stale), which would not elicit a stock price reaction if the market for ExxonMobil stock was efficient (as Plaintiffs presume and their expert, Dr. Cain, contends). Market participants instead noted the negative impact of disclosing an SEC investigation on ExxonMobil's stock price performance.

6

A-80

iv. On all three alleged corrective disclosure dates, no analyst made a connection or drew any inference between the alleged corrective disclosure and the alleged misrepresentations concerning the Permian production goal of 1 million barrels of oil-equivalent per day by 2024.

## IV.   Scientific Foundations for Price Impact Analysis

15. I will begin by providing an overview of academic research on stock price behavior and efficient markets before turning to the analytical framework for a price impact analysis.

### A.  Stock Price Behavior and Efficient Markets

16. In an efficient market, a company's stock price reflects the total mix of publicly available value-relevant information. Value-relevant information is information that affects the present value of expected future cash flows of the company and/or the risks thereof.[15] Thus, only the disclosure of value-relevant information can affect stock prices.

17. A central tenet of the efficient markets hypothesis is that stock prices "quickly and fully" reflect new information.[16] Known or expected information (i.e., "stale" information) would have already been priced in an efficient market and is already part of the existing total mix of publicly available information.[17] Only new, publicly available information will result in a revision of the market's assessment of the company's expected future cash flows and, consequently, its stock price. That is, only new information is "news" in an efficient market and only new information can be value-relevant.

---

[15] R. Brealey, S. Myers, and F. Allen, 2020, *Principles of Corporate Finance,* McGraw-Hill/Irwin, at 337-340.

[16] C. Jones, 2013, *Investments: Analysis and Management,* Wiley, at 320.

[17] See, e.g., Z. Bodie, A. Kane and A. Marcus, 2014, *Investments,* 10th ed., at 359 ("The notion of informationally efficient markets leads to a powerful research methodology. If security prices reflect all currently available information, then price changes must reflect new information."); E. Fama, F. Fisher, M. Jensen, and R. Roll, 1969, "The Adjustment of Stock Prices to New Information," *International Economic Review,* Vol. 10, 1-21, at 20 ("Thus the results of the study lend considerable support to the conclusion that the stock market is 'efficient' in the sense that stock prices adjust very rapidly to new information."); S. Ross, 2005, *Neoclassical Finance,* Princeton University Press, at 42 (market efficiency "implies that the future returns on assets will largely depend not on the information currently possessed by the market but, rather, on new information that comes to the market, that is, on news. An investor whose information is the same or inferior to the information already incorporated into the prices will have no ability to predict the news and, therefore, no ability to outperform the market.").

7

18.    Event studies are a common tool used by financial economists to evaluate whether information is value-relevant.[18] An event study controls for market and industry effects on the stock price using market and industry indices as proxies. In this case, I use the S&P Total Return Index as the market proxy and S&P Integrated Oil & Gas Index as the industry proxy.

19.    The event study estimates the historical relationship between ExxonMobil's return and the returns of the market and industry indices. I use a one-year period prior to each event date as the estimation period. This historical relationship allows me to estimate a "predicted return" for ExxonMobil on each event date.

20.    By subtracting from the actual return the predicted return, the event study isolates the company-specific portion of the stock price movement. This portion of the company's stock return is called the "residual return." To conclude that the residual return is not due to random price movements, the residual return must be statistically significant. Positive and statistically significant residual returns are denoted by t-statistics that are greater than or equal to 1.96, while negative and statistically significant residual returns are denoted by t-statistics that are less than or equal to -1.96.[19]

21.    The time period being examined is called the "event window." The event window can vary depending on whether the event is announced during or outside of trading hours.[20] If an event is disclosed during trading hours, the event window would compare the close price on the prior day to the ***close*** price on the day of the event ("close-to-close"). If an event is disclosed

---

[18] See, e.g., A. Ferrell and A. Saha, 2007, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer,* Vol. 63, 163-186.

[19] Using a threshold of 1.96 for the absolute value of the t-statistic is equal to using a 95% confidence interval. Using a 95% confidence interval for determining statistical significance is a standard metric for event studies. *See* Federal Judicial Center, 2011, Reference Manual on Scientific Evidence, National Academies Press, at 320 ("In most scientific work, the level of statistical significance required to reject the null hypothesis (i.e., to obtain a statistically significant result) is set conventionally at 0.05, or 5%. The significance level measures the probability that the null hypothesis will be rejected incorrectly. In general, the lower the percentage required for statistical significance, the more difficult it is to reject the null hypothesis; therefore, the lower the probability that one will err in doing so. Although the 5% criterion is typical, reporting of more stringent 1% significance tests or less stringent 10% tests can also provide useful information.").

[20] See, e.g., A. McWilliams and D. Siegel, 1997, "Event Studies in Management Research: Theoretical and Empirical Issues," *The Academy of Management Journal,* Vol. 40, at 626-657 at 636 ("In the absence of uncertainty about when information is actually revealed to the market, it is difficult to justify a long window. As noted earlier, the assumption of market efficiency implies almost instantaneous adjustment in stock price to the arrival of new information.").

outside of trading hours, one possible event window to be considered would compare the close price on the prior day to the ***open*** price on the day following the event ("close-to-open"), if the market fully prices that event by the open. This is because after-market trading prices, to the extent they are available, may not be considered reliable given the lack of trading during after-hours and, thus, the reported price might fully reflect the new information only when the market opens.[21] **Appendix C** provides a detailed discussion of the ExxonMobil event study methodology.

22.      The analysis of stock price behavior does not end with a finding of a statistically significant residual return. Suppose that an event study finds a statistically significant residual that is contemporaneous with a public disclosure of firm specific information. In order to attribute the stock price movement to the public disclosure, there is still another crucial step in the analysis. As one textbook explains:

> An event study can tell us that something happened, but it can't tell us why. To explain positive or negative [residuals], we must closely examine the events and institutions involved. . . . [The event study technique] only – though this is substantial – helps delineate what needs to be explained.[22]

Only by comparing the information being studied with the pre-existing total mix of information can a researcher reliably determine whether a particular disclosure is likely responsible for a stock price movement. For example, if markets are efficient, then stock prices should currently reflect all publicly available information and, therefore, stock prices should only react to the disclosure of "new", i.e., unexpected information.[23] Thus, if the particular disclosure at issue was simply repeating information already known to the market, a researcher could not attribute, consistent with efficient markets, a residual return – regardless of whether it happens to be statistically significant – to such a disclosure. Similarly, if there is reason to conclude that the particular disclosure consisted of information not considered value-relevant by the market, then a researcher could not attribute, consistent with efficient markets, the residual return to such a disclosure. Disclosures that simply repeat information already known to the market or that pertain to matters

---

[21] J. Gerlach and J. Lee, 2011, "Is the Opening Price Efficient? Evidence from After-Hours Earnings Announcements," https://ssrn.com/abstract=1786880 (last accessed June 19, 2025), at abstract (The authors find that open prices for large capitalization, heavily traded stocks are highly efficient) and p. 4 & appendix (The data used in the study includes ExxonMobil.).

[22] B. Black and R. Gilson, 1995, *The Law and Finance of Corporate Acquisitions,* The Foundation Press, at 221.

[23] *See supra* ¶ 16 & n. 16.

that are irrelevant to market participants would not cause a revision in the company's expected future cash flows and, hence, its stock price.

## B. Price Impact and the Alleged Truth

23.     The price impact inquiry consists of analyzing the following hypothetical: if the company had revealed to the market the alleged truth instead of concealing it by making the alleged misrepresentations (i.e., misstatements or omissions), would such a disclosure have resulted in a stock price movement? If so, the alleged misrepresentations have a price impact. It is crucial to emphasize that the alleged truth that could and should have been disclosed earlier is a function of the plaintiffs' theory of liability. Once the truth that had been allegedly misstated or omitted has been identified, a financial economist can then apply the scientific framework discussed above, including event study analysis, to test for price impact.

24.     To apply the scientific framework to this question, the standard approach is to analyze the stock price behavior when the alleged misrepresentations and attendant corrective disclosures actually occurred.

25.     If the alleged misrepresentations constitute new, value-relevant information and they in fact caused the market to view the company more favorably than before, then one would expect to observe a positive and statistically significant residual return on these alleged misrepresentation dates.

26.     By comparison, if an alleged misrepresentation is an omission or repeats information already known to the market, one would not expect to observe a price reaction at the time of the alleged misrepresentation. Instead, one would observe the price reaction on the date that the alleged truth was revealed – i.e., on the alleged corrective disclosure dates. If the alleged corrective disclosures in fact caused the market to view the company less favorably than before, then one would expect to observe a negative and statistically significant residual return on the alleged corrective disclosure dates. Of course, if a disclosure of negative information is unconnected to the alleged truth concealed by the alleged misrepresentations, then any price reaction to that disclosure is not informative of price impact.

27.     As discussed earlier, the analysis of stock price behavior does not end with a finding of a statistically significant residual return. For example, on the alleged corrective disclosure date, one would have to compare the information being studied to the total mix of information to

10

determine if the allegedly corrective information was new information since only information that is new could be expected to elicit a stock price reaction. Moreover, the allegedly corrective information needs to reveal the alleged truth that was allegedly concealed previously by the misrepresentations.

28.    I now turn to applying the scientific framework discussed above to assess whether there was any impact on ExxonMobil's stock price associated with the alleged misrepresentations. I do this in two steps. First, I will assess whether the alleged misrepresentations caused a price reaction when made by analyzing whether they caused positive and statistically significant residual returns on the dates such alleged misrepresentations were made. Second, I will assess whether the alleged corrective disclosures that purportedly reveal the alleged truth caused a price reaction on dates when the alleged corrective disclosures were made.

## V.    Analysis of Plaintiffs' Claims

29.    In this section, I analyze the alleged misrepresentations related to the Scheme Liability Allegation, which Plaintiffs allege began with Defendants' affirmative statements made on March 5, 2019. I discuss the alleged misrepresentations in turn as follows. I first discuss the ExxonMobil proved reserves claim, then Permian resource base claim, and finally the Permian production goal claim.

### A.    ExxonMobil Proved Reserves Claim

30.    **Exhibit 1** summarizes the alleged misrepresentation dates related to the ExxonMobil proved reserves claim. If the first alleged misrepresentation regarding ExxonMobil's proved reserves on June 18, 2019 constituted new, value-relevant information to the market, then I would expect to observe a positive and statistically significant price reaction in ExxonMobil stock on that day. However, as the exhibit shows, ExxonMobil's residual return on June 18, 2019 was **_not_** statistically significant and, thus, there was no price impact by virtue of causing a statistically significant price increase.

11

**Exhibit 1**
**Event Study Results on Alleged Misrepresentation Dates**
**Regarding ExxonMobil's Proved Reserves**

| Event Date/ Time | Outside Trading Hours? | Alleged Misrepresentation | Resid Return | t-Stat | Stat. Sig & Pos.? |
|---|---|---|---|---|---|
| 06/18/19 (8:35 AM) | Yes | 2018 Summary Annual Report stated that "total proved reserves" for year-end 2018 were 24,293 million barrels of oil-equivalent. It also stated: (i) "The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures," and (ii) any changes to the reserve figures are "made within a well-established, disciplined process driven by senior level geoscience and engineering professionals, assisted by the Global Reserves and Resources group which has significant technical experience, culminating in reviews with and approval by senior management." Complaint ¶¶ 378-383. | -0.08% | -0.20 | No |
| 02/26/20 (4:15 PM) | Yes | ExxonMobil filed its 2019 Form 10-K stating that its "'total proved reserves' for year-end 2019 were 22,445 million barrels of oil-equivalent." The same 10-K also stated that the "estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressures," and any changes to the reserve figures are "made within a well-established, disciplined process driven by senior level geoscience and engineering professionals, assisted by the Global Reserves and Resources group which has significant technical experience, culminating in reviews with and approval by senior management." Complaint, ¶¶ 392-397. | -0.33% | -0.93 | No |

**Notes:** If "Outside of Trading Hours?" is a "Yes," then the residual returns and t-statistics reported above are based on a close-to-open event study. If "No," then the residual returns and t-statistics above are based on a close-to-close event study. Statistically significant and positive residual returns are denoted by t-statistics that are greater than or equal to 1.96. *See* **Appendix C** for details of the ExxonMobil event study methodology.

31.     The second alleged misrepresentation concerning ExxonMobil's proved reserves on February 26, 2020 also did **_not_** elicit a statistically significant price reaction in ExxonMobil stock. Thus, there is no reliable economic basis to conclude that the alleged misrepresentations related to ExxonMobil's proved reserves have a price impact by virtue of causing a positive and statistically significant price change. Given that the same conclusion holds for June 18, 2019, it follows that

12

the February 26, 2020 alleged misrepresentation could not have maintained inflation allegedly introduced into the stock price on June 18, 2019 by virtue of causing a statistically significant price increase.

32.     As discussed above, there are three allegedly corrective disclosure dates: January 31, 2020, May 1, 2020, and January 15, 2021. As an initial matter, the return on January 31, 2020 is not statistically significant.[24] Moreover, none of the alleged corrective disclosures on January 31, 2020, May 1, 2020, and January 15, 2021 or the analyst commentary cited by Plaintiffs in the Complaint associated with those dates are connected to the alleged misrepresentations regarding ExxonMobil's proved reserves.[25] The alleged corrective disclosures do not reference ExxonMobil's proved reserves or the methodology by which they are estimated. Moreover, based on my review of analyst reports around the alleged corrective disclosure dates – i.e., January 31 to February 3, 2020, May 1 to May 4, 2020, and January 15 to 17, 2021 (*see* **Appendix B**) – no analyst made a connection or drew any inference between the alleged corrective disclosures and the alleged misrepresentations regarding ExxonMobil's proved reserves.

33.     Based on the above analysis, there is no price impact associated with the alleged misrepresentations regarding ExxonMobil's proved reserves.

### B.     Permian Resource Base Claim

34.     **Exhibit 2** summarizes the alleged misrepresentation dates related to the Permian resource base claim. If the first alleged misstatement regarding the Permian resource base claim on March 5, 2019 (i.e., the size of ExxonMobil's resource base in the Permian being approximately $10 billion oil-equivalent barrels) constituted new, value-relevant information to the market, then I would expect to observe a positive and statistically significant price reaction in ExxonMobil stock on that day.[26] However, as the exhibit shows, ExxonMobil's residual return on March 5, 2019 was

---

[24] *See infra*, Exhibit 4.

[25] Complaint, ¶¶ 412, 414-415.

[26] I understand that (i) Plaintiffs also allege that Defendant Bond's allegedly inflated learning curve assumptions were incorporated in ExxonMobil's reported total proved reserves and the Permian resource base, but that (ii) Defendants dispute this relation. See Lead Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment on the Pleadings, filed January 29, 2024, at 16. Regardless, I am not aware of any affirmative statement by Defendants about proved reserves on March 5, 2019. Moreover, even assuming Plaintiffs' allegations about the proved reserves were true, I understand that Plaintiffs' allegation is that the alleged overstatement of the Permian proved reserves would be reflected in

***not*** statistically significant and, thus, there was no price impact by virtue of causing a statistically significant price increase.

**Exhibit 2**
**Event Study Results on Alleged Misrepresentation Dates**
**Regarding the Permian Resource Base**

| Event Date/ Time | Outside Trading Hours? | Alleged Misrepresentation | Resid Return | t-Stat | Stat. Sig & Pos.? |
|---|---|---|---|---|---|
| 03/05/19 (9:00 AM) | Yes | ExxonMobil Press Release stating: "The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue." Complaint, ¶ 370. | -0.09% | -0.19 | No |
| 03/06/19 (7:30 AM) | Yes | ExxonMobil Press Release stating: "In the Permian, the size of the company's net resource is 10 billion oil-equivalent barrels and is expected to grow further." Complaint, ¶¶ 371-372. | -1.52% | -3.05 | No |
| 04/26/19 (7:58 AM) | Yes | ExxonMobil Form 8-K stating: "The size of the company's resource base in the Permian is approximately 10 billion oil-equivalent barrels and is likely to grow further as analysis and development activities continue." Complaint, ¶¶ 373, 375. | -2.56% | -4.77 | No |
| 01/31/20 (9:30 AM) | No | ExxonMobil Q4 2019 Earnings Call including a "green blob" slide stating that the "Permian volume growth on schedule." Also, Mr. Woods stated that the "potential of [the operations in the Permian] and the value propositions that we've talked about haven't changed, if anything, we like it better." Complaint, ¶¶ 388-391. | -1.04% | -1.57 | No |

**Notes:** If "Outside of Trading Hours?" is a "Yes," then the residual returns and t-statistics reported above are based on a close-to-open event study. If "No," then the residual returns and t-statistics above are based on a close-to-close event study. Statistically significant and positive residual returns are denoted by t-statistics that are greater than or equal to 1.96. *See* **Appendix C** for details of the ExxonMobil event study methodology.

35.     **Exhibit 2** also shows the results of the event study analysis for the remaining alleged misrepresentation dates related to the Permian resource base. As the exhibit shows, none of the remaining alleged misrepresentation dates have a ***positive*** and statistically significant residual return (i.e., a residual return with a t-statistic greater than 1.96). Therefore, the alleged misrepresentations did not introduce artificial inflation by virtue of causing a positive and

---

the alleged overstatement of the Permian resource base; thus, my analysis of the allegation regarding the Permian resource base would also be applicable to the allegation regarding the Permian proved reserves.

14

statistically significant stock price reaction. Given that the same conclusion holds for March 5, 2019, it follows that the subsequent alleged misrepresentations could not have maintained inflation allegedly introduced into the stock price on March 5, 2019 by virtue of causing a statistically significant price increase.

36.     None of the alleged corrective disclosures on January 31, 2020 (which, in any event did not result in a statistically significant return), May 1, 2020, and January 15, 2021 or the analyst commentary cited by Plaintiffs in the Complaint associated with those dates are connected to the alleged misrepresentations regarding the Permian resource base.[27] The alleged corrective disclosures do not reference the size of ExxonMobil's Permian resource base. Moreover, based on my review of analyst reports around the alleged corrective disclosure dates – i.e., January 31 to February 3, 2020, May 1 to May 4, 2020, and January 15 to 17, 2021 (*see* **Appendix B**) – no analyst made a connection or drew any inference between the alleged corrective disclosures and the alleged misrepresentations regarding ExxonMobil's resource base.

37.     Based on the above analysis, there is no price impact associated with the alleged misrepresentations regarding ExxonMobil's proved reserves.

### C.     Permian Production Goal Claim

38.     **Exhibit 3** summarizes the alleged misrepresentation dates related to the Permian production goal claim. If the first alleged misstatement regarding the Permian production goal claim on March 5, 2019 (i.e., the Permian production goal of 1 million barrels of oil by 2024) constituted new, value-relevant information to the market, then I would expect to observe a positive and statistically significant price reaction in ExxonMobil stock on that day. However, as the exhibit shows, ExxonMobil's residual return on March 5, 2019 was ***not*** statistically significant and, thus, the alleged misrepresentation on March 5, 2019 had no price impact by virtue of causing a statistically significant price increase.

---

[27] Complaint, ¶¶ 412, 414-415.

**Exhibit 3**
**Event Study Results on Alleged Misrepresentation Dates**
**Regarding the Permian Production Goal**

| Event Date/ Time | Outside Trading Hours? | Alleged Misrepresentation | Resid Return | t-Stat | Stat. Sig & Pos.? |
|---|---|---|---|---|---|
| 03/05/19 (9:00 AM) | Yes | ExxonMobil Press Release stating it "revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024—an increase of nearly 80 percent and a significant acceleration in value." Complaint, ¶¶ 361, 363. | -0.09% | -0.19 | No |
| 03/06/19 (8:00 AM) | Yes | ExxonMobil 2019 Investor Day. Mr. Woods stated: "In the Upstream, we made very good progress on our five (sic) [four] key focus areas: significant growth in Guyana, more attractive acreage captured in the Permian and Brazil, accelerated value capture in the Permian, and then we have made advances in our strategic LNG portfolio" Complaint, ¶¶ 362-369. | -1.52% | -3.05 | No |
| 04/26/19 (7:58 AM) | Yes | ExxonMobil Form 8-K stating: "ExxonMobil has revised its Permian Basin growth plans to produce more than 1 million oil-equivalent barrels per day by as early as 2024." Complaint, ¶¶ 373-374. | -2.56% | -4.77 | No |
| 06/18/19 (8:35 AM) | Yes | ExxonMobil 2018 Summary Annual Report stating: "[w]e accelerated operations in the Permian Basin in Texas and New Mexico, building on our 2017 acquisition of high-quality, contiguous acreage that will enable significant low-cost production growth." Complaint, ¶¶ 376-377.<br><br>Ms. Mallon at the J.P. Morgan Energy Conference stated: "Starting with the Permian, we are on track to deliver on the million barrels a day by 2024." Complaint, ¶¶ 384-385. | -0.08% | -0.20 | No |
| 09/04/19 (7:30 AM) | Yes | At the Barclays CEO Energy-Power Conference, Mr. Woods stated: "We didn't go out [and] say how do we achieve [a] million barrels a day and then go figure out if we've got inventory to drill that. What we ended up saying is develop the resource in a way that we think maximizes the recovery. It's a very grassroots buildup from the beginning of the fundamentals. And then once we figured out what was the optimal development of that, we stacked [up] the volume[s] to see what it came out to be, and that was what it came out to be." Complaint, ¶¶ 386-387. | 0.46% | 1.27 | No |
| 01/31/20 (9:30 AM) | No | In response to a question from a Goldman Sachs analyst, Mr. Woods stated that Exxon's production goal for the Permian was "clearly on track." Complaint, ¶ 388. | -1.04% | -1.57 | No |
| 03/05/20 (7:30 AM) | Yes | ExxonMobil 2020 Investor Day. Mr. Woods stated: "In the Permian Basin, production volumes increased and remain on track to exceed 1 million oil-equivalent barrels per day | -1.50% | -4.07 | No |

16

A-90

**Exhibit 3**
**Event Study Results on Alleged Misrepresentation Dates**
**Regarding the Permian Production Goal**

| Event Date/ Time | Outside Trading Hours? | Alleged Misrepresentation | Resid Return | t-Stat | Stat. Sig & Pos.? |
|---|---|---|---|---|---|
| | | by 2024" and the barrel per day goal to get to 5 million barrels per day by 2025 "is not aspirational. It is an outcome of the plans that we put together and our best assessment of how we risked divestments and how that all fits together." Complaint, ¶¶ 398-401. | | | |

**Notes:** If "Outside of Trading Hours?" is a "Yes," then the residual returns and t-statistics reported above are based on a close-to-open event study. If "No," then the residual returns and t-statistics above are based on a close-to-close event study. Statistically significant and positive residual returns are denoted by t-statistics that are greater than or equal to 1.96. *See* **Appendix C** for details of the ExxonMobil event study methodology.

39.     In addition, Plaintiffs allege that Defendants' statement concerning the production goal of 1 million oil-equivalent barrels per day by as early as 2024 on March 5, 2019 was in response to a statement by Chevron (i.e., one of ExxonMobil's largest competitors) made at 7:25 AM on March 5, 2019 that it intended to reach net oil-equivalent production of 900,000 barrels per day in the Permian Basin by 2023.[28] Plaintiffs' allegation implies that Chevron's statement about production goals in the Permian was value-relevant such that it allegedly compelled ExxonMobil to make its own announcement about its production goals in the Permian. Thus, I can use Chevron's disclosure to test whether statements about production goals in the Permian cause a positive and statistically significant price reaction.[29] Similar to my findings for ExxonMobil, the event study analysis on Chevron's stock on March 5, 2019 also shows that Chevron's statements about its production goals in the Permian was ***not*** statistically significant and, thus, did not elicit a price reaction in Chevron's stock.[30] This result is consistent with the event study result that March 5, 2019, for ExxonMobil, is not statistically significant.

---

[28] Complaint, ¶ 105.

[29] The Permian was an important development for Chevron in 1Q 2019. See, e.g., *Bloomberg,* "Exxon, Chevron Wow Wall Street With Permian-Fueled Gains," February 1, 2019 ("Soaring production in North America's most prolific oil field [Permian] helped propel Exxon Mobil Corp. and Chevron Corp. to bigger-than-expected fourth-quarter profits.").

[30] On March 5, 2019, Chevron's residual return based on a close-to-open event study was -0.16% with a t-statistic of -0.39 – i.e., ***not*** statistically significant. See, **Appendix C** for details of the Chevron event study methodology.

17

A-91

40.    **Exhibit 3** also shows the results of the event study analysis for the remaining alleged misrepresentation dates related to the Permian production goal. As the exhibit shows, none of the remaining alleged misrepresentation dates have a ***positive*** and statistically significant residual return (i.e., a residual return with a t-statistic greater than 1.96). Therefore, the alleged misrepresentations did not introduce artificial inflation by virtue of causing a positive and statistically significant stock price reaction. Given that the same conclusion holds for March 5, 2019, it follows that the subsequent alleged misrepresentations could not have maintained inflation allegedly introduced into the stock price on March 5, 2019 by virtue of causing a statistically significant price increase.

41.    I now turn to analyze the three alleged corrective disclosures in the Complaint,[31] which are all related to the Permian production goal claim. I use the scientific framework I described in **Section IV** to perform my analysis. As explained below, there is no reliable economic evidence that the revelation of the alleged truth concealed by the alleged misrepresentations had a price impact on ExxonMobil stock.

42.    **Exhibit 4** contains the results of the event study analysis on the alleged corrective disclosure dates. I discuss each of the alleged corrective disclosures in turn below.

**Exhibit 4**
**Event Study Results on Alleged Corrective Disclosure Dates**
**Regarding the Permian Production Goal**

| Event Date/ Time | Outside Trading Hours? | Alleged Corrective Disclosure | Resid Return | t-Stat | Stat Sig & Neg? |
|---|---|---|---|---|---|
| 01/31/20 (9:30 AM) | No | ExxonMobil discloses that Permian Basin production has slowed down, but allegedly continues to mislead investors about its 1 million barrels per day goal. Complaint, p. 74. | -1.04% | -1.57 | No |
| 05/01/20 (9:30 AM) | No | ExxonMobil discloses significant rig cuts and a reduction in 2020-2021 Permian Basin production volumes. Complaint, p. 76. | -4.58% | -3.77 | Yes |

[31] To identify additional potential corrective disclosures related to the alleged misrepresentations on March 5, 2019 of 1 million barrels of oil-equivalent per day by 2024, I reviewed all news articles on the Factiva database from March 5, 2019 to January 15, 2021 that meet the following criteria: (a) "ExxonMobil" or "Exxon Mobil" in the headline or lead paragraph of the article; (b) "Permian" anywhere in the text of the article; and (c) either of the terms "oil-equivalent barrels per day," "boe," "kboe," "bopd," "MMBoed," "Mboed," "mmboe/d," or "mboe/d" near 10 words of either "2024" anywhere in the text of the article. This search resulted in 135 articles, which I have listed in **Appendix B**. Based on my review of these articles, I did not find any additional potential corrective disclosures during the relevant period. Thus, I only analyze the three alleged corrective disclosures identified in the Complaint.

18

**Exhibit 4**
**Event Study Results on Alleged Corrective Disclosure Dates**
**Regarding the Permian Production Goal**

| Event Date/ Time | Outside Trading Hours? | Alleged Corrective Disclosure | Resid Return | t-Stat | Stat Sig & Neg? |
|---|---|---|---|---|---|
| 01/15/21 (8:17 AM) | Yes | The *Wall Street Journal* reported that a whistleblower complaint described ExxonMobil using inflated drilling assumptions saved in a file called "This is a Lie" to overvalue the Delaware Basin by $10 billion. Complaint, p. 77. The article also noted that, according to the whistleblower complaint, the "pressure to deliver on [Mr.] Woods's March 2019 promise that the Permian Basin would achieve 1 million oil-equivalent barrels per day by 2024 'permeated the organization' [and that] 'no one [the whistleblower] knew in the organization thought this [goal] was possible.'" Complaint, ¶ 412. | -1.70% | -2.35 | Yes |

**Notes:** If "Outside of Trading Hours?" is a "Yes," then the residual returns and t-statistics reported above are based on a close-to-open event study. If "No," then the residual returns and t-statistics above are based on a close-to-close event study. Statistically significant and negative residual returns are denoted by t-statistics that are less than or equal to -1.96. *See* **Appendix C** for details of the ExxonMobil event study methodology.

>    *i.*    *January 31, 2020*

43.    Plaintiffs state that during ExxonMobil's Q4 2019 earnings call on January 31, 2020, Mr. Woods "presented a 'green blob' slide … stating that fourth quarter 2019 production was '294 Koebd' or 294,000 barrels of oil-equivalent per day, which was virtually flat quarter to quarter compared to 293,000 barrels of oil-equivalent per day for the third quarter of 2019. This fell below estimates made by industry analysts as well as the Company's own guidance."[32]

44.    However, as shown in **Exhibit 2**, ExxonMobil's residual return on that day was ***not*** statistically significant.

45.    Moreover, based on my review of 36 ExxonMobil analyst reports from January 31, 2020 to February 3, 2020 (*see* **Appendix B**), no analyst made a connection or drew any inference between the production of 294,000 barrels of oil-equivalent per day ***in Q4 2019*** and the alleged

---

[32] Complaint, ¶ 244.

misrepresentations concerning the Permian production goal of 1 million barrels of oil-equivalent per day ***by 2024***.[33]

46.     Given the above, the alleged corrective disclosure on January 31, 2020 did not elicit a price reaction in ExxonMobil stock.

> ii.     *May 1, 2020*

47.     Plaintiffs allege that during ExxonMobil's Q1 2020 earnings call on May 1, 2020, "Defendants disclosed that Exxon was cutting rigs by 75% in the Permian, and that decreased capital expenditures would reduce Permian volumes in 2020 and 2021."[34] Plaintiffs specifically note Mr. Woods' statement that: "[R]eduction in capital spend will primarily affect 2021 where we expect volumes will be down 100,000 to 150,000 oil equivalent barrels per day from our previous estimates. In 2020, the impact of the reduced CapEx will be much lower, at about 15,000 oil equivalent barrels per day."[35]

48.     While ExxonMobil's stock price movement on that day was negative and statistically significant (*see* **Exhibit 4**), the Company's statements regarding the reduction in capital expenditures was stale information, as these statements were made earlier on April 7, 2020. *See* **Exhibit 5**. Consistent with this, in the Complaint, Plaintiffs cite to a May 1, 2020 Raymond James report stating: "This was the final quarter with Permian uplift on a sequential basis, ***in view of the rig count having been slashed as part of the overall 30% spending cut unveiled on April 7***."[36]

---

[33] Two of the 36 analyst reports noted that the flat Permian production in 4Q2019 was a negative for ExxonMobil. First, in a January 31, 2020 report, J.P. Morgan analysts discussed that ExxonMobil shares were down approximately 4% as "investors were discouraged with the continued FCF weakness and flattish Permian production q/q." Second, in a February 3, 2020 report, Scotiabank stated that "although the headline EPS is within the 8-K range, we think investors will be surprised by the poor Permian results. … Permian results continue to be lumpy likely due to the company's approach of the super pad concept (cube development). While super pad drilling may provide economies of scale, we think it significantly increases the risk of potential operational missteps. Due to the timing of their well completion, we think 1Q20 Permian production will remain unimpressive as the company will launch their first cube development in the first quarter." However, none of these two analysts discussed the impact (if any) of the flat Permian quarterly production results in 4Q2019 on their estimates of Permian production beyond 1Q2020. (See, J.P. Morgan, "Exxon Mobil Corp; 2020 EPS Risk Remains Even at $65/bbl Brent," January 31, 2020; and Scotiabank, "Exxon Mobil Corporation; Still a Show-Me Story, Too Early to Buy," February 3, 2020).

[34] Complaint, ¶ 249.

[35] Complaint, ¶ 249.

[36] Complaint, ¶ 250.

**Exhibit 5**
**Comparison of Defendants' Statements Regarding Capital Expenditures**
**On April 7, 2020 and May 1, 2020**

| Statement on April 7, 2020[37] | Statement on May 1, 2020[38] |
|---|---|
| ExxonMobil said today it is ***reducing its 2020 capital spending by 30 percent*** and lowering cash operating expenses by 15 percent in response to low commodity prices resulting from oversupply and demand weakness from the COVID-19 pandemic.<br><br>***Capital investments for 2020 are now expected to be about $23 billion,*** down from the previously announced $33 billion.<br><br>***The largest share of the capital spending reduction will be in the Permian Basin,*** where short-cycle investments can be more readily adjusted to respond to market conditions, while preserving value over the long term. Reduced activity will affect the pace of drilling and well completions until market conditions improve. Importantly, the reductions will not compromise the scale, functional excellence and cube development advantages that are maximizing resource recovery and value in the Permian. | You may recall during our Investor Day that we discussed reductions in our capital spend based on market conditions at the time. I said then that we would continue to monitor the market and make further reductions if required.<br><br>I'm very pleased with the work we have done to date. Through extensive collaboration, we've identified opportunities to reduce our capex by ***30%, down to $23 billion,*** and more than offset deferral costs, preserving the returns and project advantages. … ***The largest share of the reduction will be in our unconventional business, specifically the Permian Basin***, where the short-cycle investments are more readily adjusted. |

49. In addition, the alleged corrective information on May 1, 2020 regarding reduction in output by "about 15,000 oil equivalent barrels per day" in 2020 and reduction in volume by "100,000 to 150,000 oil equivalent barrels per day" in 2021 from previous estimates was also stale information.[39] These figures had also been previously disclosed on April 7, 2020 when Mr. Woods,

---

[37] ExxonMobil Press Release, "ExxonMobil Reduces 2020 Capex by 30%, Cash Opex by 15%; Maintains Long-Term Outlook," April 7, 2020, 7:02 AM..

[38] ExxonMobil FQ1 2020 Earnings Call Transcript, May 1, 2020.

[39] Complaint, ¶ 249. See also, ExxonMobil FQ1 2020 Earnings Call Transcript, May 1, 2020 ("Since most of 2020's production is locked in with the work already completed, reduction in capital spend will primarily affect 2021 where we expect volumes will be down 100,000 to 150,000 oil equivalent barrels per day from our previous estimates. In 2020, the impact of the reduced capex will be much lower at about 15,000 oil equivalent barrels per day.").

21

ExxonMobil's CEO, stated that ExxonMobil "now expects to reduce output by around 15,000 bpd this year [2020], and 100,000 to 150,000 barrels per day in 2021."[40]

50.    Moreover, a 75% reduction in the number of rigs in the Permian was stale information to the market as of May 1, 2020,[41] as market participants were already expecting a similar percentage reduction in rigs weeks earlier. In fact, an April 7, 2020 *Financial Post* article reported that ExxonMobil "recently had 58 drilling rigs at work in the Permian, but that will likely fall to 15, said analysts with Tudor, Pickering, Holt & Co."[42] – i.e., a reduction in rigs of 74%.

51.    On April 7, 2020, ExxonMobil's residual return was ***positive*** 2.37% with a t-statistic of 4.19 – i.e., not negative and statistically significant. *See* **Appendix C.**

52.    Thus, if the market for ExxonMobil's stock is efficient (as Plaintiffs presume and their expert, Dr. Cain, contends[43]), ExxonMobil's stock price would not react to the disclosure of the same or expected information on May 1, 2020.

53.    Additionally, both the ExxonMobil April 7, 2020 and May 1, 2020 press releases state that the reduction in its 2020 capital spending and lowering of cash operating expenses was "in response to low commodity prices resulting from oversupply and demand weakness from the COVID-19 pandemic."[44] This response by ExxonMobil to the COVID-19 pandemic is consistent with the responses by oil and gas companies to the COVID-19 pandemic in mid-March 2020. For example, a March 18, 2020 *USA Today* article reported: "Oil and gas companies began to reduce their operations in the Permian Basin as the spread of coronavirus and COVID-19 was blamed for stymieing global energy demands and leading to subsequent multi-week drop in the price of oil.

---

[40] See, *KFGO*, "Last but not least: Exxon chops spending by 30%," April 7, 2020, 7:31 AM, https://kfgo.com/2020/04/07/last-but-not-least-exxon-chops-spending-by-30/ (last accessed June 19, 2025). See also, *Financial Times,* "Exxon Slashes Capital Investment by $10bn," April 7, 2020 ("Production from Permian shale this year [2020] would fall by about 15,000 barrels of oil equivalent a day, said Mr Woods. Previously, Exxon said output would come in at about 360,000 b/d. In 2021 output is projected to be 100,000 to 150,000 b/d lower than the target of 600,000 b/d.").

[41] Complaint, ¶ 249.

[42] *Financial Post,* "Last but not least: Exxon chops spending by 30%," April 7, 2020, https://financialpost.com/pmn/business-pmn/last-but-not-least-exxon-chops-spending-by-30-5,(last accessed June 19, 2025).

[43] Complaint, ¶ 422 & Cain Report, ¶ 10.

[44] ExxonMobil Press Release, "ExxonMobil Reduces 2020 Capex by 30%, Cash Opex by 15%; Maintains Long-Term Outlook," April 7, 2020 & ExxonMobil Press Release, "ExxonMobil reports results for first quarter 2020," May 1, 2020.

22

… Further leading to global market tensions, a price war was ongoing between Saudi Arabia and Russia as the two nations – which are the second- and third-largest producers of oil in the world after the U.S. – failed to agree on supply cuts intended to drive the price up."[45] Following these events, oil and gas companies cut their capital spending and reduced their rig counts in the Permian.[46] As shown in **Exhibit 3**, the last alleged misrepresentation regarding the Permian production goal was made on March 5, 2020, which is six days before the World Health Organization declared COVID-19 a global pandemic on March 11, 2020.[47] Therefore, even if the information disclosed on May 1, 2020 was not stale, there is no reliable economic basis to conclude that this information could and should have been disclosed as of the time the alleged misrepresentations were made.

54.    Moreover, based on my review of 32 ExxonMobil analyst reports from April 7 to April 11, 2020 and from May 1 to May 4, 2020 (*see* **Appendix B**), no analyst made a connection or drew any inference between the reduction in capital expenditures, including the reduction of rigs in the Permian, and the alleged misrepresentations concerning ExxonMobil's Permian production goal of 1 million barrels of oil-equivalent per day by 2024.[48]

---

[45] *USA Today,* "Oil companies cut Permian Basin operations amid staggering price drop led by coronavirus," March 18, 2020.

[46] *USA Today,* "Oil companies cut Permian Basin operations amid staggering price drop led by coronavirus," March 18, 2020 ("In response to such market declines, Houston-based Apache Corporation announced it would pull all its oil and gas rigs out of the Permian to save on short-term spending. The company planned to reduce its 2020 capital investment by almost $1 billion. In the coming weeks, the company would reduce its Permian rig count to zero, read a March 12 news release, to limit its exposure to short-cycle oil projects. … Meanwhile, Pioneer Resources, which operates mostly in the Delaware Basin on the western side of the Permian – one of the largest acreage holders in the region – also announced a significant cut in operations. The company's rig count will be cut from 22 to 11, read a news release, while completion crews will be reduced from six to two or three. Overall, Pioneer's capital budget was to be cut by 45 percent.")

[47] World Health Organization, "WHO Director-General's opening remarks at the media briefing on COVI-19 – 11 March 2020 ("We have therefore made the assessment that COVID-19 can be characterized as a pandemic.")

[48] In a May 3, 2020 report, analysts at Credit Suisse noted their view of the long-term impact of ExxonMobil's guide related to shut-ins in 2Q 2020 on Permian production goals, stating: "XOM also guided to ~100 MBoed of expected shut-ins in 2Q in the play as part of the aforementioned ~400 MBoed companywide curtailment. … Longer term, we now expect production to reach ~750 Mboed by YE2024, with XOM's previous target of reaching ~1 MMBoed by YE24 pushed beyond 2025." See, Credit Suisse, "1Q CFPS Beats; Despite Large 2Q Shut-Ins, Raising Estimates on Better Cost Performance," May 3, 2020, at 3. However, the shut-ins are a result of the COVID-19 pandemic that occurred in early 2020 and, therefore, the impact of the shut-ins could not have been known on March 5, 2019 – i.e., the date of the

23

55.    Instead, market participants noted disappointing ExxonMobil disclosures on May 1, 2020 due to factors unrelated to the Permian production goal. For example, in a report dated May 4, 2020, Scotiabank analysts said "it appears that the gigantic adjusted EPS beat was mainly due to the company's treatment of inventory valuation impacts as a special item," and that "in contrast to other major peers," they were "surprised that XOM has not further reduced its capex despite the expected large cash burn over the next couple of years, which likely disappointed the market." Scotiabank further stated that "under the current market uncertainty, investors would have preferred a greater focus on near-term liquidity and cash preservation, as well as better addressing the ballooning debt."[49]

56.    Given the above, the alleged corrective disclosure on May 1, 2020 did not elicit a price reaction in ExxonMobil stock.

### iii.    January 15, 2021

57.    On January 15, 2021, before market open, the *Wall Street Journal* published an article titled "Exxon Draws SEC Probe Over Permian Basin Asset Valuation." Plaintiffs allege that "the truth concerning Defendants' fraud was finally revealed when the *Wall Street Journal* reported that a whistleblower complaint described how Exxon's 2018 drilling assumptions were false and that Exxon had determined in 2019 to fraudulently overvalue the Delaware Basin by $10 billion, using inflated drilling assumptions saved in a file called 'This is a Lie.'"[50]

58.    While ExxonMobil's stock price movement on that day was negative and statistically significant (*see* **Exhibit 4**),[51] the $10 billion valuation disagreement based on allegedly overstated drilling assumptions was not new information. As **Exhibit 6** shows, the $10 billion valuation disagreement (i.e., difference between what "Exxon managers in 2018 had initially pegged" as the value of $60 million and the ultimate value of $50 billion) was disclosed approximately four months earlier in a *Wall Street Journal* article on September 13, 2020

---

alleged misrepresentation. See, e.g., ExxonMobil, "First Quarter 2020 Results," May 1, 2020, at 11 ("Economic shut-ins and market curtailments as result of COVID-19; ~400 Koebd."). Therefore, there is no connection between the shut-ins in 2Q 2020 that caused Credit Suisse to revise their long-term estimate of ExxonMobil's Permian production goal and the alleged misrepresentations.

[49] Scotiabank, "Exxon Mobil Corporation Solid 1Q but Cash Burn Remains a Concern," May 4, 2020.

[50] Complaint, ¶ 252.

[51] Based on a close-to-close event study, the residual return is -1.96% with a t-statistic of -1.27 (i.e., ***not*** statistically significant).

24

(Sunday). The fact that this was previously disclosed was explained in the same January 15, 2021 *Wall Street Journal* article, which noted that the "Journal previously reported that there had been internal disagreements over the valuation."[52]

**Exhibit 6**
**Excerpts Regarding the Valuation Disagreement of the Delaware Basin**
**In the September 13, 2020 and January 15, 2021 Wall Street Journal Articles**

| September 13, 2020 WSJ Article[53] | January 15, 2021 WSJ Article[54] |
|---|---|
| For one area called the Delaware, some ***Exxon managers in 2018 had initially pegged the net present value of those holdings at about $60 billion***, according to several employees.<br><br>Some involved in the project ***estimated last summer that the area's net present value was closer to $40 billion*** because they believed Exxon was overestimating how quickly it could drill, according to the people. ***After additional debate and consultation, the value was adjusted to about $50 billion***, said the people. | As the Journal previously reported, some ***Exxon managers in 2018 had initially pegged the net present value of the Delaware Basin at about $60 billion***. But some employees involved in Exxon's annual development planning ***estimated during the summer of 2019 that the area's net present value was closer to $40 billion***.<br><br>Some employees objected to using the new learning curve, which they viewed as unrealistic, and one employee submitted the revised estimates in a file named "This is a Lie," according to the complaint. The development planners ***ultimately estimated that the net present value was $50 billion***. |

59.    As the exhibit also shows, the $10 billion valuation dispute mentioned in the *Wall Street Journal* article is a dispute concerning the **_net present value_** of the Delaware Basin. I understand that this was an internal valuation and ExxonMobil did not make any public statements, nor do Plaintiffs allege any misrepresentations, regarding the net present value of the Delaware Basin.

---

[52] *Wall Street Journal,* "Exxon Draws SEC Probe Over Permian Basin Asset Valuation," January 15, 2021 8:17 AM.

[53] *Wall Street Journal,* "Exxon Used to Be America's Most Valuable Company. What Happened?" September 13, 2020 6:50 PM.

[54] *Wall Street Journal,* "Exxon Draws SEC Probe Over Permian Basin Asset Valuation," January 15, 2021 8:17 AM.

25

60.     Regardless, on September 14, 2020 (i.e., the first trading day following the *Wall Street Journal* article), ExxonMobil's residual return was 0.10% with a t-statistic of 0.16 – i.e., not statistically significant. *See* **Appendix C.**

61.     Thus, if the market for ExxonMobil's stock is efficient (as Plaintiffs presume and their expert, Dr. Cain, contends[55]), ExxonMobil's stock price would not react to the disclosure of the same information on January 15, 2021.

62.     Moreover, based on my review of 7 ExxonMobil analyst reports from September 13 to 19, 2020 and January 15 to 17, 2021 (see **Appendix B**), no analyst made a connection or drew any inference between the $10 billion net present value of the Delaware Basin disagreement and the alleged misrepresentations concerning the Permian production goal of 1 million barrels of oil-equivalent per day by 2024.

63.     Instead, market participants noted the negative impact of disclosing an SEC investigation on ExxonMobil's stock price performance. For example, in a report dated January 15, 2021, Wells Fargo stated: "Headline of an SEC investigation is never a good thing for short-term stock price performance in our view."[56] Plaintiffs appear to recognize this in their complaint, as it relies on a *Bloomberg* report from January 15, 2021, which was titled "Exxon Falls After Report of SEC Probe into Permian Valuation," and explained that "Exxon Mobil Corp. slumped after a newspaper report said the company is being investigated by the U.S. Securities and Exchange Commission for allegedly overvaluing a key asset in the Permian Basin."[57] This is consistent with the academic literature, which finds that the mere announcement of an SEC investigation is associated with a negative and statistically significant stock price reaction. Solomon and Soltes (2021) find that announcements of SEC fraud investigations result in a cumulative return of -4.13%.[58]

64.     Critically, I understand Plaintiffs' claims are based on the failure to disclose that certain individuals at ExxonMobil fraudulently inflated the drilling assumptions in the Company's

---

[55] Complaint, ¶ 422 & Cain Report, ¶ 10.

[56] Wells Fargo, "XOM: SEC Probes XOM's Permian Valuation," January 15, 2021.

[57] Complaint ¶ 253.

[58] D.H. Solomon and E. Soltes, 2020, "Is 'Not Guilty' the Same as 'Innocent'? Evidence from SEC Financial Fraud Investigations," https://ssrn.com/abstract=3402780 (last accessed June 19, 2025), 1-55, at 17 ("The average three-day characteristic-adjusted return is large and negative, at -4.13%. In this regard, SEC fraud investigations are viewed by the market as being significant bad news.").

2019 Company Plan to support the Permian production goal and increase the valuation of the Delaware Basin, which they claim was specifically corrected by the January 15, 2021, *The Wall Street Journal* article.[59] I further understand Plaintiffs are not alleging that ExxonMobil failed to disclose an SEC investigation. Accordingly, because the underlying information regarding the use of fraudulent drilling assumptions in the 2019 Company Plan to inflate the value of the Delaware Basin had previously been disclosed, the new information regarding the SEC investigation is not related to any misstatement made under Plaintiffs' theory.

65.    Moreover, I understand that, on January 20, 2022, the SEC informed ExxonMobil that it has concluded its investigation and that it did not intend to recommend an enforcement action against ExxonMobil.[60] Solomon and Soltes (2021) find that, even in cases when a firm discloses an SEC investigation and ultimately no action was taken against the firm, one would expect to observe a negative and statistically significant price reaction on the announcement date of the SEC investigation. The authors find that, in such a scenario, firms experienced a statistically significant -2.90% upon the disclosure of the existence of an SEC investigation.[61]

66.    Given the above, the alleged corrective disclosure on January 15, 2021 did not elicit a price reaction in ExxonMobil stock.

## VI.    Conclusion

67.    Based on the findings in this report, I conclude that there is no price impact associated with the alleged misrepresentations.

68.    I declare under penalty of perjury that the foregoing is true and correct. Executed on June 20, 2025.

Allen Ferrell

---

[59] Complaint ¶ 64.

[60] Exhibit 1 to the Declaration of Noelle M. Reed, filed February 9, 2022 (letter from the SEC to ExxonMobil, dated January 20, 2022. Re: In the Matter of Exxon Mobil (FW-044256)).

[61] D.H. Solomon and E. Soltes, 2020, "Is 'Not Guilty' the Same as 'Innocent'? Evidence from SEC Financial Fraud Investigations," https://ssrn.com/abstract=3402780 (last accessed June 19, 2025), 1-55, at 17 ("The constant is -2.90, with a $t$ statistic of -4.89, meaning that firms that have no ultimate action taken against them have a return of -2.90% when they disclose the existence of the investigation.").

27

**Appendix A**

May, 2025

## Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

**CURRENT POSITIONS**

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

**EDUCATION**

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

**PREVIOUS POSITIONS**

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

1

A-102

**Appendix A**

**COURSES TAUGHT**

*Blockchain & Cryptocurrencies*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*
*Contracts*

**REFEREE FOR FOLLOWING JOURNALS**

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

**CONSULTING AREAS**

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

**Papers**

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, forthcoming *Journal of Accounting Research* (2025)

"Hidden History of Securities Damages", 1 University of Chicago Business Law Review 97 (2022)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

2

**Appendix A**

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

3

**Appendix A**

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

"Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with

4

**Appendix A**

Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

**TESTIMONY LAST FIVE YEARS**

*In re Anadarko Petroleum Corporation Securities Litigation*, C.A. No. 4:20-CV-00576, Expert report and deposition on March 2, 2023 and court hearing on May 12, 2025

*In re Turquoise Hill Resources Ltd. Securities Litigation*, Case No. 1:20-cv-8585-LJL, Expert report and deposition on April 29, 2025

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019, trial testimony June 7, 2022 and deposition on January 27, 2025

*Homyk v. ChemoCentryx*, Case No. 4:21-CV-03343-JST, Expert reports and depositions on January 6, 2024 and December 4, 2024

*Alesco Preferred Funding et al v. ACP re LTD et al,* Index Case No. 655881/2017, Expert reports and deposition on August 9, 2024

*BLST Northstar v. Santander*, Case No. 22-cv-2210, Expert reports and deposition on August 2, 2024

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert reports and depositions on August 26, 2021 and May 29, 2024

*Gelt Trading v. Co-Diagnostics*, Case No. 2:20-CV-00368-CMR, Expert report and deposition on March 1, 2024

*In re Ripple Labs Litigation*, Case No. 4:18-CV-06753-PJH, Expert report and deposition on October 16, 2023

*Chabot v. Walgreens*, Case No. 1:18-CV-02118-CCC-KM, Expert report and deposition on October 6, 2023

*XOG Litigation Trust v. Kelley*, Case No. 01-22-0002-3114, Expert report and deposition on August 31, 2023 and testimony on October 25, 2023

*CRCM v. Getty Images Holdings*, Case No. 1:23-CV-01074-JSR, Expert report and deposition on August 14, 2023

*Halperin & Davis, Co-Trustees of Appvion Liquidating Trust v. Richards et al.*, Case No. 17-12082, Expert report and deposition on August 9, 2023

*IBM v. GlobalFoundries U.S. Inc.*, Case Index No. 653625/2021, Expert report and deposition on June 27, 2023

5

**Appendix A**

*In Re Madison Square Garden Entertainment Corp. Stockholders Litigation*, C.A. No. 2021-0468-KSJM, Expert report and deposition on February 22, 2023

*Politan Capital Management v. Masimo Corporation et al*, C.A. No. 2022-0948-NAC, Expert report and deposition on February 5, 2023

*Restanca v. House of Lithium*, C.A. No. 2022-0690-PAF, Expert report and deposition on November 21, 2022 and testimony on December 7, 2022

*Roberts et al. v. Zuora*, Case No. 3:19-cv-03422-SI, Expert report and testimony on October 25, 2022

*United States v. Milton*, 21 Crim. 478, Expert testimony on September 30 & October 3, 2022

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

*EIG Energy Fund v. Keppel Offshore & Marine LTD*, Case No.18-cv-01047-PGG, Expert report and deposition on December 9, 2021

*Purple Mountain Trust v. Wells Fargo et al.*, Case No. 3:18-cv-03948-JD, Expert report and deposition on December 3, 2021

*In re Robinhood Litigation,* Case No. Case No. 3:20-cv-01626-JD, Expert reports and deposition on September 30, 2021

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert report and deposition on August 26, 2021

*Pearlstein et al. v. Blackberry Limited*, Case No. 1:13-cv-7060-CM, Expert report and deposition on November 3, 2020

6

**Appendix B: Materials Relied Upon**

**Case Related Documents**

1. Second Amended Class Action Complaint for Violations of the Federal Securities Laws, Mendi Yoshikawa v. ExxonMobil Corporation, et al., U.S.D.C. N.D. Texas, Dallas Division, C.A. No. 3:21-cv-00194-N, filed October 31, 2022

2. Exhibit 1 to the Declaration of Noelle M. Reed, filed February 9, 2022 (letter from the SEC to ExxonMobil, dated January 20, 2022. Re: In the Matter of Exxon Mobil (FW-044256))

3. Memorandum Opinion and Order on Motion to Dismiss, filed August 24, 2023

4. Lead Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment on the Pleadings, filed January 29, 2024

5. Memorandum Opinion and Order on Motion for Judgment on the Pleadings, filed August 12, 2024

6. Expert Report of Matthew D. Cain, Ph.D., February 7, 2025


**SEC Filings,  Press Releases, and Earnings Calls**

7. ExxonMobil Press Release, "ExxonMobil to Increase, Accelerate Permian Output to 1 Million Barrels Per Day by 2024," March 5, 2019

8. ExxonMobil Press Release, "ExxonMobil Updates Growth Plans, Significant Additional Upside Possible," March 6, 2019

9. ExxonMobil Form 8-K, April 26, 2019

10. ExxonMobil Form 10-K for the fiscal year ended December 31, 2019

11. ExxonMobil FQ4 2019 Earnings Call Transcript, January 31, 2020

12. ExxonMobil Press Release, "ExxonMobil Outlines Progress on Long-Term Growth Strategy," March 5, 2020

13. ExxonMobil Press Release, "ExxonMobil Reduces 2020 Capex by 30%, Cash Opex by 15%; Maintains Long-Term Outlook," April 7, 2020

14. ExxonMobil Press Release, "ExxonMobil reports results for first quarter 2020," May 1, 2020

15. ExxonMobil FQ1 2020 Earnings Call Transcript, May 1, 2020

16. ExxonMobil, "First Quarter 2020 Results," FQ1 Earnings Presentation, May 1, 2020


**Academic Publications**

17. Z. Bodie, A. Kane and A. Marcus, 2014, *Investments,* 10th ed.  McGraw Hill

18. R. Brealey, S. Myers, and F. Allen, 2020, *Principles of Corporate Finance,* McGraw-Hill/Irwin

1

19. E. Fama, L. Fisher, M. Jensen, and R. Roll, 1969, "The Adjustment of Stock Prices to New Information," *International Economic Review,* Vol. 10, 1-21

20. A. Ferrell and A. Saha, 2007, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," *The Business Lawyer,* Vol. 63, 163-186

21. J. Gerlach and J. Lee, 2011, "Is the Opening Price Efficient? Evidence from After-Hours Earnings Announcements," https://ssrn.com/abstract=1786880 (last accessed June 19, 2025)

22. R. Gilson and B. Black, 1995, *The Law and Finance of Corporate Acquisitions*, 2nd ed. The Foundation Press

23. C. Jones, 2013, *Investments: Analysis and Management,* 12th ed. Wiley

24. A. McWilliams and D. Siegel, 1997, "Event Studies in Management Research: Theoretical and Empirical Issues," *The Academy of Management Journal,* Vol. 40, 626-657

25. S. Ross, 2005, *Neoclassical Finance,* Princeton University Press

26. D. Solomon and E. Soltes, 2020, "Is 'Not Guilty' the Same as 'Innocent'? Evidence from SEC Financial Fraud Investigations," https://ssrn.com/abstract=3402780 (last accessed June 19, 2025)


**News Articles**

27. *Bloomberg,* "Exxon, Chevron Wow Wall Street With Permian-Fueled Gains," February 1, 2019, 11:54 AM

28. *USA Today*, "Oil companies cut Permian Basin operations amid staggering price drop led by coronavirus," March 18, 2020

29. *Financial Post,* "Last but not least: Exxon chops spending by 30%," April 7, 2020, https://financialpost.com/pmn/business-pmn/last-but-not-least-exxon-chops-spending-by-30-5 (last accessed June 19, 2025)

30. *Financial Times,* "Exxon Slashes Capital Investment by $10bn," April 7, 2020

31. *KFGO*, "Last but not least: Exxon chops spending by 30%," April 7, 2020, 7:31 AM, https://kfgo.com/2020/04/07/last-but-not-least-exxon-chops-spending-by-30/ (last accessed June 19, 2025)

32. *Wall Street Journal,* "Exxon Used to Be America's Most Valuable Company. What Happened?" September 13, 2020, 6:50 PM

33. *Wall Street Journal,* "Exxon Draws SEC Probe Over Permian Basin Asset Valuation," January 15, 2021, 8:17 AM

34. *Bloomberg*, "Exxon Falls After Report of SEC Probe into Permian Valuation," January 15, 2021, Updated, 12:33 AM

News Articles from March 5, 2019 to January 15, 2021

35. *Business Wire*, "ExxonMobil to Increase, Accelerate Permian Output to 1 Million Barrels Per Day by 2024," March 5, 2019

36. *ThomasNet News*, "ExxonMobil to Increase, Accelerate Permian Output to 1 Million Barrels per Day by 2024," March 28, 2019

37. *Platts Energy Trader*, "Permian Basin gains drive ExxonMobil, Chevron first quarter production rise," April 29, 2019

38. *SNL Financial Extra*, "Exxon hikes Permian production growth target to 1 million boe/d by 2024," March 5, 2019

39. *Platts Commodity News*, "CORRECTION: ExxonMobil raises production outlook as it balances offshore and onshore growth," March 6, 2019

40. *Dow Jones Institutional News*, "Press Release: ExxonMobil Earns $2.4 Billion in First Quarter 2019," April 26, 2019

41. N*GI The Weekly Gas Market Report*, "ExxonMobil Shareholders Follow Board Recommendations, Defeat Activist Proposals," May 29, 2019

42. *CNEgypt*, "Chevron eyes 900,000 b/d from Permian by yearend 2023," March 7, 2019

43. *Platts Inside F.E.R.C.'s Gas Market Report*, "Permian Basin gains drive ExxonMobil, Chevron first quarter production rise," May 3, 2019

44. *Business Wire*, "ExxonMobil Progresses Growth Plans and Efforts to Advance Lower-Emissions Technologies," May 29, 2019

45. *SNL Daily Gas Report*, "Big oil placing big bets that Permian Basin expansion will drive earnings," March 11, 2019

46. *RTT News*, "ExxonMobil To Boost Permian Basin Output To 1 Mln Barrels Per Day By 2024," March 5, 2019

47. *Dow Jones Newswires Chinese (English*), "Exxon Mobil: Production in the Permian Is Expected to Exceed 1 M Oil-Equivalent Barrels Per Day by 2024 >XOM," March 6, 2019

48. *Reuters News*, "BRIEF-Exxon Mobil Reports Quarterly Earnings Per Share Of $0.55," April 26, 2019

49. *NGI's Shale Daily*, "ExxonMobil Permian New Mexico Forecast to Generate $64B for State Over 40 Years," May 17, 2019

50. *Dow Jones Institutional News*, "Exxon Expects to Boost 'Earnings Potential' by Over 140% by 2025 Under Certain Conditions," May 29, 2019

51. *Business and Financial Times*, "ExxonMobil to increase, accelerate Permian output to 1 million barrels per day by 2024," March 8, 2019

52. *CommsMEA.com*, "ExxonMobil, Chevron ramp up Permian oil output," March 7, 2019

53. *Platts Energy Trader*, "ExxonMobil, Chevron see Permian Basin production growth continuing," August 5, 2019

3

54. *Platts Commodity News*, "CORRECTION: ExxonMobil ups production outlook on Permian, Guyana growth," March 7, 2019

55. *Awareness Times*, "Chevron and ExxonMobil plan to raise US unconventional oil and gas output," March 7, 2019

56. *NGI The Weekly Gas Market Report*, "ExxonMobil Hikes '19 Capex 35% to $30B to Build Production, Profits," March 6, 2019

57. *International Oil Daily*, "Exxon Targets Record Output With Drilling Push," March 7, 2019

58. *SNL Energy Finance Daily*, "Big oil placing big bets that Permian Basin expansion will drive earnings," March 11, 2019

59. *SNL Gas Week*, "Permian M&A deals may be off table as most oil majors say they are full," May 13, 2019

60. *Key Energy News*, "Chevron and ExxonMobil plan to raise US unconventional oil and gas output," March 6, 2019

61. *Dow Jones Newswires Chinese (English),* "Exxon Plans to Boost Production in Permian Basin," March 5, 2019

62. *ConstructionWeekOnline.com*, "ExxonMobil to accelerate Permian production by 80%," March 7, 2019

63. *VIQ FD Disclosure*, "Event Brief of Q1 2019 Exxon Mobil Corp Earnings Call - Final," April 26, 2019

64. *Bahrain News Agency*, "ExxonMobil: Permian basin work to benefit New Mexico," May 18, 2019

65. *Energy Weekly News*, "Exxon Mobil Corporation; ExxonMobil Permian Development to Provide $64 Billion in Benefits to New Mexico: Study," May 31, 2019

66. *NGI's Daily Gas Price Index*, "ExxonMobil Shareholders Follow Board Recommendations, Defeat Activist Proposals," May 29, 2019

67. *SNL Financial Extra*, "Permian M&A deals may be off table as most oil majors say they are full," May 09, 2019

68. *Business Wire*, "ExxonMobil Permian Development to Provide $64 Billion in Benefits to New Mexico: Study," May 17, 2019

69. *Energy & Power*, "ExxonMobil Plans to Produce 1m boe/d in Permian by 2024," April 15, 2019

70. *Process Worldwide Online*, "Exxon Mobil to Continue Growth Plans and Advance Lower-Emissions Technologies," June 09, 2019

71. *Business Wire*, "ExxonMobil Earns $2.4 Billion in First Quarter 2019," April 26, 2019

72. *Natural Gas Week*, "Chevron, Exxon Expansions Likely to Add Several Bcf/d of Gas in Permian," March 11, 2019

4

73. *PortNews*, "ExxonMobil progresses growth plans and efforts to advance lower emissions technologies," June 1, 2019

74. *NGI The Weekly Gas Market Report*, "ExxonMobil Boosts Permian Plans, Estimates Resource Base of 10 Billion Boe and 'Likely to Grow'," April 26, 2019

75. *Financial Times*, "Exxon to step up hunt for deals in Texas shale region," April 27, 2019

76. *VIQ FD Disclosure*, "Event Brief of Q2 2019 Exxon Mobil Corp Earnings Call - Final," August 2, 2019

77. *CNEgypt*, "ExxonMobil, Chevron see Permian Basin production growth continuing," August 5, 2019

78. *CQ FD Disclosure*, "Q1 2019 Exxon Mobil Corp Earnings Call - Final," April 26, 2019

79. *Financial Times*, "Exxon to step up hunt for deals in Texas shale region," April 27, 2019

80. *Financial Times*, "Exxon to step up hunt for deals in Texas shale region," April 27, 2019

81. *ArabianBusiness.com*, "Permian Basin gains drive ExxonMobil, Chevron first quarter production rise," April 27, 2019

82. *Platts Oilgram Price Report*, "Chevron, ExxonMobil eye big increases in Permian growth into the 2020s," March 6, 2019

83. *Platts Oilgram Price Report*, "Americas crude," April 29, 2019

84. *Platts Oilgram News*, "ExxonMobil, Chevron see Permian Basin production growth continuing," August 5, 2019

85. *Platts Oilgram Price Report*, "Permian Basin gains drive ExxonMobil, Chevron first quarter production rise," May 3, 2019

86. *NGI The Weekly Gas Market Report*, "ExxonMobil Permian New Mexico Forecast to Generate $64B for State Over 40 Years," May 17, 2019

87. *The Oil Daily*, "Exxon Targets Record Output With Drilling Push," March 7, 2019

88. *ArabianSupplyChain.com*, "Chevron, ExxonMobil Announce Plans to Step Up Oil Production in Permian Basin," March 28, 2019

89. *Business Wire*, "ExxonMobil Updates Growth Plans, Significant Additional Upside Possible," March 6, 2019

90. *Platts Commodity News*, "UPDATE: Permian Basin gains drive ExxonMobil, Chevron first quarter production rise," April 26, 2019

91. *Platts Commodity News*, "ExxonMobil, Chevron see Permian Basin production growth continuing," August 2, 2019

92. *Platts Commodity News*, "UPDATE: Chevron, ExxonMobil eye big increases in Permian growth into the 2020s," March 5, 2019

93. *Energy Intelligence Finance*, "Investors Take Skeptical View of Exxon's Growth Plans," March 13, 2019

5

94. *NGI The Weekly Gas Market Report*, "ExxonMobil, Chevron Putting Bullseye on Permian," March 6, 2019

95. *The Oil Daily*, "Chevron, Exxon Unveil Big Permian Plans," March 6, 2019

96. *Contify Energy News*, "ExxonMobil Earns $2.4 Billion in First Quarter 2019," April 26, 2019

97. *Dow Jones Institutional News*, "Press Release: ExxonMobil Permian Development to Provide $64 Billion in Benefits to New Mexico: Study," May 17, 2019

98. *Dow Jones Institutional News*, "Press Release: ExxonMobil Progresses Growth Plans and Efforts to Advance Lower Emissions Technologies," May 29, 2019

99. *Contify Energy News*, "ExxonMobil to Increase, Accelerate Permian Output to 1 Million Barrels Per Day by 2024," March 5, 2019

100. *SNL Financial Extra*, "Exxon's stock slides as executives announce increased spending plan," March 6, 2019

101. *Financial Times (FT.Com), "Exxon looks at rejoining US shale consolidation wave*," April 26, 2019

102. *Contify Energy News, "ExxonMobil Progresses Growth Plans and Efforts to Advance Lower-Emissions Technologies*," May 29, 2019

103. *NGI's Shale Daily, "ExxonMobil, Chevron Putting Bullseye on Permian*," March 6, 2019

104. *Platts Gas Daily, "Permian Basin gains drive ExxonMobil, Chevron first quarter production rise*," April 29, 2019

105. *Platts Gas Daily, "ExxonMobil, Chevron see Permian Basin production growth continuing*," August 5, 2019

106. *SNL Energy M&A Review*, "Exxon hikes Permian production growth target to 1 million boe/d by 2024," April 1, 2019

107. *CE NoticiasFinancieras*, "ExxonMobil To Boost Permian Basin Output To 1 Mln Barrels Per Day By 2024," March 5, 2019

108. *NGI's Daily Gas Price Index*, "ExxonMobil Eyes Permian Output Surge by Nearly 80% in Next Five Years," March 5, 2019

109. *Contify Energy News*, "ExxonMobil Updates Growth Plans, Significant Additional Upside Possible," March 6, 2019

110. *Albuquerque Business First Online*, "Large energy cos. announce big plans in the Permian," March 6, 2019

111. *SNL Daily Gas Report*, "Exxon's stock slides as executives announce increased spending plan," March 7, 2019

112. *NGI's Daily Gas Price Index*, "ExxonMobil Boosts Permian Plans, Estimates Resource Base of 10 Billion Boe and 'Likely to Grow'," April 26, 2019

113. *CQ FD Disclosure*, "Q2 2019 Exxon Mobil Corp Earnings Call - Final," August 2, 2019

6

A-113

114. *ThomasNet News*, "ExxonMobil Updates Growth Plans, Significant Additional Upside Possible," March 28, 2019

115. *Petroleum Review*, "ExxonMobil has revised its Permian Basin growth plans to produce more than 1mn...," April 1, 2019

116. *Dow Jones Institutional News*, "Press Release: ExxonMobil Updates Growth Plans, Significant Additional Upside Possible," March 6, 2019

117. *Company Reports*, "ExxonMobil plans to increase Permian output by 80%.," March 7, 2019

118. *Bahrain News Agency*, "ExxonMobil to invest $2bn to expand Baytown petrochemical complex," May 3, 2019

119. *Platts Oilgram Price Report*, "ExxonMobil, Chevron see Permian Basin production growth continuing," August 5, 2019

120. *Platts Oilgram News*, "Chevron, ExxonMobil eye big increases in Permian growth into the 2020s," March 6, 2019

121. *Platts Oilgram News*, "Permian Basin gains drive ExxonMobil, Chevron first quarter production rise," April 29, 2019

122. *MarketLine News and Comment*, "ExxonMobil to invest $2bn for Baytown petrochemical expansion project in US," May 2, 2019

123. *SNL Energy M&A Review*, "Permian M&A deals may be off table as most oil majors say they are full," June 1, 2019

124. *NGI's All News Access*, "ExxonMobil's Permian Output Jumps 90%, New Gulf Coast Cracker Exceeding Capacity," August 2, 2019

125. *Platts Commodity News*, "PRESS RELEASE: ExxonMobil to Increase, Accelerate Permian Output to 1 Million Barrels Per Day by 2024," March 5, 2019

126. *Platts Commodity News*, "PRESS RELEASE: ExxonMobil Updates Growth Plans, Significant Additional Upside Possible," March 6, 2019

127. *Dow Jones Institutional News*, "Exxon Plans to Boost Production in Permian Basin," March 5, 2019

128. *NGI's Daily Gas Price Index*, "ExxonMobil Hikes '19 Capex 35% to $30B to Build Production, Profits," March 6, 2019

129. *Gulf Oil & Gas*, "Exxon's Permian Production to Yield $64B for New Mexico," May 17, 2019

130. *Dow Jones Institutional News*, "Press Release: ExxonMobil to Increase, Accelerate Permian Output to 1 Million Barrels Per Day by 2024," March 5, 2019

131. *SNL Daily Gas Report*, "Exxon hikes Permian production growth target to 1 million boe/d by 2024," March 6, 2019

132. *SNL Daily Gas Report*, "Permian M&A deals may be off table as most oil majors say they are full," May 10, 2019

7

133. *Platts Gas Daily*, "Chevron, ExxonMobil eye big increases in Permian growth into the 2020s," March 6, 2019

134. *Platts Oilgram News*, "ExxonMobil ups output outlook with Permian, Guyana growth," March 7, 2019

135. *NGI's All News Access*, "ExxonMobil, Chevron Taking Independents to School in Permian," August 6, 2019

136. *NGI's All News Access*, "ExxonMobil's Trio of Priorities Pinned to Prized LNG Prospects, Permian and Guyana," March 6, 2020

137. *Platts Commodity News*, "ExxonMobil lowers 2020 production target, slows Permian growth," March 5, 2020

138. *Dow Jones Institutional News*, "Press Release: ExxonMobil Reports Results for Third Quarter 2020," October 30, 2020

139. *Theflyonthewall.com*, "underpinned by the long-term fundamentals of growing demand. The strength of our...," March 5, 2020

140. *Contify Energy News*, "ExxonMobil reports results for third quarter 2020," October 30, 2020

141. *SNL Gas Week*, "Exxon could reduce Permian rig count by 20% through 2021 due to weak oil prices," March 9, 2020

142. *CommsMEA.com*, "Exxon Keeps Up $35 Billion Annual Spending Despite Oil Rout," March 7, 2020

143. *SNL Daily Gas Report*, "Exxon could reduce Permian rig count by 20% through 2021 due to weak oil prices," March 6, 2020

144. *Platts Gas Daily*, "ExxonMobil lowers 2020 production target, slows Permian growth," March 6, 2020

145. *SNL Canada Energy Week*, "Exxon could step up divestitures, write down $30B in gas assets," November 2, 2020

146. *ForeignAffairs.co.nz*, "MIL-OSI Energy: ExxonMobil Outlines Progress on Long-Term Growth Strategy," March 6, 2020

147. *SNL Energy M&A Review*, "Exxon could step up divestitures, write down $30B in gas assets," November 1, 2020

148. *SNL Canada Energy Week*, "Exxon could reduce Permian rig count by 20% through 2021 due to weak oil prices," March 9, 2020

149. *SNL Energy Finance Daily*, "Exxon could step up divestitures, write down $30B in gas assets," November 2, 2020

150. *SNL Daily Gas Report*, "Exxon could step up divestitures, write down $30B in gas assets," November 2, 2020

151. *Reuters News*, "BRIEF-ExxonMobil Anticipates Investment Level Of Up To $33 Bln For 2020," March 5, 2020

8

152. *Platts Oilgram News*, "ExxonMobil lowers 2020 production target, slows Permian growth," March 6, 2020

153. *Petroleum Intelligence Weekly*, "US Majors Show Permian Can Drive Output Growth," August 9, 2019

154. *Dow Jones Institutional News*, "Press Release: ExxonMobil Outlines Progress on Long-Term Growth Strategy," March 5, 2020

155. *Contify Energy News*, "ExxonMobil Outlines Progress on Long-Term Growth Strategy," March 5, 2020

156. *Platts Inside F.E.R.C.'s Gas Market Report*, "ExxonMobil, Chevron see Permian Basin production growth continuing," August 9, 2019

157. *Business Wire*, "ExxonMobil Outlines Progress on Long-Term Growth Strategy," March 5, 2020

158. *Business News Americas*, "ExxonMobil Outlines Progress on Long-Term Growth Strategy," March 5, 2020

159. *SNL Daily Gas Report*, "Exxon sets capital expenditures of up to $35B annually through 2025," March 6, 2020

160. *Asharq Al-Awsat*, "Exxonmobil Lowers 2020 Production Target, Slows Permian Growth," March 6, 2020

161. *Platts Commodity News*, "After closing US Gulf acquisition, W&T eyes at 'least' one more transaction this year: CEO," September 3, 2019

162. *NGI's All News Access*, "ExxonMobil Testing Support for Permian Delaware Crude Pipeline," September 16, 2019

163. *NGI's All News Access*, "Dismal Henry Hub Price Leads ExxonMobil to Trim North American (Permian) Natural Gas Production," March 5, 2020

164. *CommercialInteriorDesign.com*, "ExxonMobil to earmark $33B on 2020 capital spending," March 7, 2020

165. *Business Wire*, "ExxonMobil Reports Results for Third Quarter 2020," October 30, 2020

166. *The Oil Daily*, "SEC Probes Exxon Permian Valuation: Report," January 15, 2021

167. *SNL Financial Extra*, "Exxon could reduce Permian rig count by 20% through 2021 due to weak oil prices," March 5, 2020

168. *Gulf Oil & Gas*, "ExxonMobil Outlines Progress on Long Term Growth Strategy," March 5, 2020

169. *SNL Financial Extra*, "Exxon sets capital expenditures of up to $35B annually through 2025," March 5, 2020

**Analyst Reports**

January 31, 2020 to February 3, 2020

9

170. Bank of America Global Research, "4Q19 First look: EPS miss; chems / refining weigh, against solid operations," January 31, 2020

171. Barclays, 4Q'19 EPS Misses vs. Street; Permian Production ~Flat QoQ," January 31, 2020

172. Berenberg, "Q4 miss on chemicals and gas," January 31, 2020

173. BMO Capital Markets, "Exxon Mobil Corp: Coverage Suspended," January 31, 2020

174. CFRA, "CFRA Keeps Hold Opinion on Shares of Exxon Mobil," January 31, 2020

175. CFRA, "Exxon Mobil Corporation," January 31, 2020

176. Citi, "Exxon Mobil Corp (XOM): Results: 4Q19 a Further Normalization of Financial Performance," January 31, 2020

177. Cowen, "4Q19 Earnings Quick Take," January 31, 2020

178. Cowen, "Steadfast in Counter Cyclical Spending: Cash Deficit to Continue Near Term," January 31, 2020

179. Credit Suisse, "ExxonMobil Corporation: 4Q EPS In Line with Reduced Expectations; Maintains 2020 Capex Guide Leading to Another Large FCF Deficit," January 31, 2020

180. Credit Suisse, "ExxonMobil Corporation: 4Q EPS In Line with Reduced Expectations; Defends aggressive Counter-Cyclical Capex Program," January 31, 2020

181. Evercore ISI, "Initial Impression – Results Weaker; Guyana Prolific; Strategic Asset Sales Underway," January 31, 2020

182. Goldman Sachs, "Exxon Mobil Corp. (XOM): First Take: Slight EPS miss versus lowered expectations; focus on US oil, capital spend outlook," January 31, 2020

183. Jefferies, "ExxonMobil: 4Q19: Tough Chems but Delivery on CFFO," January 31, 2020

184. J.P. Morgan, "Exxon Mobil Corp: 4Q19 Quick Take," January 31, 2020

185. J.P. Morgan, "4Q19: Disappointing Results Due to Weakness in Downstream; Chemicals Expected to Be Weak in 2020," January 31, 2020

186. J.P. Morgan, "2020 EPS Risk Remains Even at $65/bbl Brent," January 31, 2020

187. Mizuho, "ExxonMobil Corporation (XOM): 4Q19 Variance - Big Unit in Line, Adj EPS 41c vs Consensus 43c," January 31, 2020

188. Morningstar, "Disappointing Fourth-Quarter Earnings for Shell As Weak Price Environments Persist," January 31, 2020

189. Raymond James, "Bad Chemistry: Margin Collapse Pushes Segment Earnings to Sub-Financial Crisis Levels," January 31, 2020

190. RBC Capital Markets, "ExxonMobil - 4Q19 - Chemicals weakness hits home," January 31, 2020

191. RBC Capital Markets, "ExxonMobil - Conference call takeaways...some good news in March?" January 31, 2020

192. Scotiabank, "Exxon Mobil Corporation: 4Q19 Earnings First Glance," January 31, 2020

10

A-117

193. Simmons Energy, "ExxonMobil Corp. (XOM): Q4'19 Quick Look: Running Into the Wind to Close the Funding Gap," January 31, 2020

194. UBS, "4Q19: Earnings saved by LIFO adjustments as Chems drag," January 31, 2020

195. Wells Fargo, "CVX/XOM/RDSB: A Tough End To 2019," January 31, 2020

196. Wolfe Research, "4Q Recap – Swimming Against the Cycle," January 31, 2020

197. CFRA, "Exxon Mobil Corporation," February 1, 2020

198. Berenberg, "In a tough spot," February 3, 2020

199. Bank of America Global Research, "Q419 recap: nothing broken .. still the only major capable of sustained div growth," February 3, 2020

200. CFRA, "Exxon Mobil Corporation," February 3, 2020

201. Evercore ISI, "Results Weaker, Strategic Asset Sales Underway, Maintain Neutral," February 3, 2020

202. Morningstar, "Macroeconomic Headwinds Weigh on Fourth-Quarter Earnings; Exxon Steps Up Permian Production," February 3, 2020

203. ScotiaBank, "Exxon Mobil Corporation: Still a Show-Me Story, Too Early to Buy," February 3, 2020

204. UBS, "ExxonMobil: 4Q19: Cyclical headwinds with limited structural help as yet," *February* 3, 2020

205. Wells Fargo, XOM/CVX/RDSALN – Q4 2019 Review," February 3, 2020

April 7, 2020 to April 11, 2020

206. Cowen, "2020 Capex Cuts Exceed Expectations," April 7, 2020

207. Scotiabank, "U.S. Integrated Oil, Refining, and Large Cap E&P," April 7, 2020

208. Mizuho, "The Big Unit Backs Off; Cut PT CVX & XOM on Lowered Oil Price," April 8, 2020

209. Wolfe Research, "Global Integrateds & Refiners: 1Q Preview – Dividends are Sacred," April 8, 2020

May 1, 2020 to May 4, 2020

210. Bank of America Global Research, "1Q20 earnings first look: good time to have a good quarter," May 1, 2020

211. CFRA, "Exxon Mobil Corporation," May 1, 2020

212. Cowen, "1Q20 EARNINGS QUICK TAKE," May 1, 2020

213. Cowen, "TAKING THE CORRECT, PATIENT APPROACH," May 1, 2020

214. Credit Suisse, "1Q CFPS Beats; Expects Material Shut-ins in 2Q and Maintains 2020 Capex Budget and Capital Allocation Priorities," May 1, 2020

11

215. Evercore ISI, "Initial Impression – Positive Surprise; Capital Lower; Measured Curtailments," May 1, 2020

216. Jefferies, "ExxonMobil: Ahead of Expectations," May 1, 2020

217. J.P. Morgan, "Exxon Mobil Corp: 1Q20 Quick Take," May 1, 2020

218. Mizuho, "ExxonMobil Corporation (XOM): 1Q20 Variance- XOM Beats, Adj EPS 53c vs *Consensus* 0c," May 1, 2020

219. Raymond James, "Supporting $15 Billion Dividend Payout Carries a Price: Leverage Rising to Multi-Decade Highs," May 1, 2020

220. RBC Capital Markets, "ExxonMobil - 1Q20 - Beat across the board," May 1, 2020

221. Scotiabank, "Exxon Mobil Corporation First Glance of 1Q20 Results," May 1, 2020

222. Simmon's Energy, "ExxonMobil Corp. (XOM): Q1'20 Quick Look: Solid Quarter, But Ultimately Not Enough," May 1, 2020

223. UBS, "ExxonMobil: 1Q20: Signs of progress even amid challenging market conditions," May 1, 2020

224. Wells Fargo, "CVX/XOM: Into The Fire; Adjusting EPS, Raising Price Targets," May 1, 2020

225. Wolfe Research, "1Q Recap – Cash Balance Set up for Full Year Dividend Payout," May 1, 2020

226. CFRA, "Exxon Mobil Corporation," May 2, 2020

227. Barclays, "Post Q1 Thoughts; Prepared For When the Market Improves, But Interim Path Still in Question," May 3, 2020

228. Credit Suisse, "ExxonMobil Corporation: 1Q CFPS Beats; Despite Large 2Q Shut-Ins, Raising Estimates on Better Cost Performance," May 3, 2020

229. J.P. Morgan, "Exxon Mobil Corp: The Beauty of a Flexible Dividend," May 3, 2020

230. Bank of American Global Research, "1Q20 earnings recap: resilience matters (but so does a balanced view of earnings)," May 4, 2020

231. CFRA, "Exxon Mobil Corporation," May 4, 2020

232. Citi, "Exxon Mobil Corp (XOM): 1Q20 Sees Sharp Adjustment Within a Cyclical Frame," May 4, 2020

233. Evercore ISI, "Exxon Mobil Corp: Maintains Dividend; Yield 8.1%," May 4, 2020

234. Morningstar, "Exxon's Q1 Earnings Take Hit on Noncash Charges; Worse to Come but Shares Look Appealing," May 4, 2020

235. Raymond James, "Energy Stat: Plastic Bag Bans a Global Phenomenon, but Compared to *COVID's Impact, a Rounding Error for Oil Demand,*" May 4, 2020

236. Scotiabank, "Exxon Mobil Corporation Solid 1Q but Cash Burn Remains a Concern," May 4, 2020

237. UBS, "ExxonMobil: 1Q20: Raising price target to reflect encouraging signs," May 4, 2020

12

A-119

September 13, 2020 to September 19, 2020

    238. CFRA, "Exxon Mobil Corporation," September 19, 2020

    239. Jefferson Research, "OUR EVALUATION OF XOM," September 18, 2020

January 15, 2021 to January 17, 2021

    240. Jefferson Research, "OUR EVALUATION OF XOM," January 15, 2021

    241. Wells Fargo, "XOM: SEC Probes XOM's Permian Valuation," January 15, 2021

    242. CFRA, "Exxon Mobil Corporation," January 16, 2021

    243. UBS, "ExxonMobil: Whistleblower complaint over Permian basin," January 17, 2021

    244. JPM, "JPM E&P Shale Well Watcher, Midland Basin County Analysis; XOM Delaware Basin Well Productivity," January 19, 2021

Other Analyst Reports

    245. Credit Suisse,"1Q CFPS Beats; Despite Large 2Q Shut-Ins, Raising Estimates on Better Cost Performance," May 3, 2020

    246. Wells Fargo, "XOM: SEC Probes XOM's Permian Valuation," January 15, 2021

    247. Raymond James, "Supporting $15 Billion Dividend Payout Carries a Price: Leverage Rising to Multi-Decade Highs," May 1, 2020

**Other Documents**

    248. ExxonMobil 2019 Investor Day Presentation, March 6, 2019

    249. Federal Judicial Center, 2011, *Reference Manual on Scientific Evidence*, 3rd ed. National Academies Press

    250. World Health Organization, "WHO Director-General's opening remarks at the media briefing on COVID-19 – 11 March 2020," March 11, 2020

    251. S&P Dow Jones Indices, "S&P U.S. Indices Methodology," March 2025

    252. S&P Dow Jones Indices, "S&P Float Adjustment Methodology," April 2025

    253. S&P Dow Jones Indices, "Index Mathematics Methodology," March 2025

    254. ExxonMobil 2018 Financial & Operating Review, April 2, 2019

    255. ExxonMobil 2018 Summary Annual Report, June 18, 2019

    256. J.P. Morgan 2019 Energy Conference, June 18-19, 2019

    257. Barclays CEO Energy-Power Conference, September 4, 2019

13

A-120

**Data**

258. Bloomberg, L.P.

259. Center for Research in Security Prices, LLC (CRSP)

260. Factiva

All other documents cited in the report and appendices.

14

A-121

**Appendix C**

**A.    ExxonMobil Event Study Methodology**

1.      For the purposes of my ExxonMobil event study analysis, I regress ExxonMobil's stock price returns on the S&P 500 Total Return Index (to control for market movements) and the S&P Integrated Oil & Gas Total Return Index (to control for industry movements).

2.      I run two variations of the event study. One variation uses an event window that compares the prior day close to the closing price on the day in which the event occurs ("close-to-close"). This approach is used for events that occur during trading hours. The other variation compares the prior day close to the opening price of the following day ("close-to-open"). This approach is used for any event occurring overnight.

**B.    ExxonMobil Close-to-Close Event Study**

**i.     ExxonMobil's Return**

3.      As the dependent variable of my regression model, I use ExxonMobil's dividend-adjusted returns, which are calculated as Eq. (1). In calculating the return, I add the dividends on the ex-dividend dates.

**Eq. (1):**      $\text{Close-to-Close Return}_t = \dfrac{\text{Close Price}_t + \text{Dividends}_t}{\text{Close Price}_{t-1}} - 1$

**ii.    Proxy for Market**

4.      I select the S&P 500 Total Return Index as the proxy for price movements in the market ("market index"). Using Eq. (2), I remove ExxonMobil's daily dividend-adjusted close-to-close return from the market index based on ExxonMobil's computed daily weights.

**Eq. (2):**      $\text{Market Return}_t = \dfrac{\text{Market Index Return}_t - \text{ExxonMobil Weight}_{t-1} \times \text{Exxon Mobil Div. Adj. Return}_t}{1 - \text{ExxonMobil Weight}_{t-1}}$

5.      The daily weight of ExxonMobil in the S&P 500 Total Return Index is computed as the daily market capitalization of ExxonMobil divided by the daily market capitalization of the market index. The market capitalization of ExxonMobil and the market index is obtained from Bloomberg L.P.

**iii.   Proxy for Industry**

6.      I select the S&P Integrated Oil & Gas Total Return Index as the proxy for price movements in the oil and gas industry ("industry index"). During the Class Period, the S&P Integrated Oil & Gas Total Return Index's constituents are ExxonMobil, Chevron, and Occidental Petroleum. I also use Eq. (2) to remove ExxonMobil's daily dividend-adjusted return from the industry index based on daily ExxonMobil weights obtained from Bloomberg L.P. I remove the market return from the industry index.

1

A-122

### iv.      Estimation Period and Dummy Variable

7.      For each event date, parameter estimates from a market model is estimated based on returns over the 252 trading days prior to the event date. I also use a "dummy" variable to eliminate from the estimation period any price effects on alleged misrepresentations and alleged corrective disclosure dates. Specifically, I add a dummy variable for each of the following dates: March 5, 2019, March 6, 2019, April 26, 2019, June 18, 2019, September 4, 2019, January 31, 2020, February 27, 2020, March 5, 2020, May 1, 2020, and January 15, 2021. Each event date dummy takes on the value of 1 for the dummy's event date and 0 on other dates.

## C.      ExxonMobil Close-to-Open Event Study

8.      For the close-to-open event study, I use a similar model specification as the close-to-close event study. However, instead of computing close-to-close returns on ExxonMobil's stock price, the market index, and the industry index, I compute close-to-open returns.

### i.      ExxonMobil's Return

9.      I use Eq. (3) to compute ExxonMobil's close-to-open returns.

**Eq. (3):**        $\text{Close-to-Open Return}_t = \dfrac{\text{Open Price}_t + \text{Dividends}_t}{\text{Close Price}_{t-1}} - 1$

### ii.      Proxy for Market

10.      I use Eq. (4) to compute the S&P 500 Total Return Index's close-to-open returns.

**Eq. (4):**        $\text{Close-to-Open Return}_t = \dfrac{\text{Open Price}_t}{\text{Close Price}_{t-1}} - 1$

11.      I remove ExxonMobil's daily dividend-adjusted close to open return from the market index based on the same daily weights used in the close-to-close event study (*see supra* ¶ 4).

### iii.      Proxy for Industry

12.      To compute close-to-open returns for the industry index, I reconstruct the S&P Integrated Oil & Gas Total Return Index from the individual constituents' open and close prices and dividends on the ex-dividend dates. I base the reconstruction of the index on the methodology provided in the "S&P Index Mathematics Methodology" and the "S&P U.S. Indices Methodology" white papers.[1] The index is weighted by float-adjusted market capitalization.

13.      As shown in Eq. (5), I compute a daily index level for the open and the close prices by first taking the product of the price of each stock, the number of outstanding shares per stock, and an "Investable Weight Factor" ("IWF"). I then sum this product across all index constituents and divide this amount by the "divisor." The price, shares outstanding, and divisor components for each constituent of the index are obtained from Bloomberg L.P. The IWF for each constituent of

---

[1] See, S&P Dow Jones Indices, "Index Mathematics Methodology," March 2025, at 6-9 and 21.

2

the index is obtained from S&P Dow Jones Indices. The IWF is the percentage of total shares outstanding that are included in the index calculation.[2]

**Eq. (5):**     $\text{Index Level}_t = \dfrac{\sum_i \text{Price}_{i,t} \times \text{Shares Outstanding}_{i,t} \times \text{IWF}_{i,t}}{\text{Divisor}_t}$

14.     I use Eq. (6) to compute the daily index dividend level.

**Eq. (6):**     $\text{Index Dividend Level}_t = \dfrac{\sum_i \text{Dividend}_{i,t} \times \text{Shares Outstanding}_{i,t}}{\text{Divisor}_t}$

15.     Eq. (7) shows the formula to compute the daily total return ("DTR") for the index for the open and close.

**Eq. (7):**     $\text{DTR}_t = \dfrac{\text{Index Level}_t + \text{Index Dividend Level}_t}{\text{Index Level}_{t-1}} - 1$

16.     Next, I use Eq. (8) to compute a total return index for the open and close:

**Eq. (8):**     $\text{Total Return Index}_t = \text{Total Return Index}_{t-1} \times (1+\text{DTR}_t)$

17.     Finally, I use Eq. (9) to compute the industry index close-to-open return.

**Eq. (9):**     $\text{Close to Open Return}_t = \dfrac{\text{Open Price}_t}{\text{Close Price}_{t-1}} - 1$

18.     I remove ExxonMobil's dividend-adjusted close-to-open return from the industry index's close-to-open return based on implied weights of ExxonMobil computed when constructing the industry index. I also remove the close-to-open market return from the industry index's close-to-open return.

19.     The results of the above analyses are shown in **Tables C-1** and **C-2**.

---

[2] See, S&P Dow Jones Indices, "Float Adjustment Methodology," April 2025. See also, S&P Dow Jones Indices, "Index Mathematics Methodology," March 2025, at 5. The index divisor "is adjusted to offset the change in market value of the index … [and] to provide a continuous measure of market valuation when faced with changes to the stocks included in the index [e.g., inclusion or deletion of stocks and corporate actions]."

3

**Table C-1**
**ExxonMobil Event Study for Dates in Exhibit 1, Exhibit 2, and Exhibit 3**

| Date | Outside Market Hours? | Close-to-Close | | | | Close-to-Open | | |
|---|---|---|---|---|---|---|---|---|
| | | Residual Return | t-Statistic | Stat Sig & Pos? | | Residual Return | t-Statistic | Stat Sig & Pos? |
| 03/05/19 | Yes | -0.59% | -0.75 | No | | **-0.09%** | **-0.19** | **No** |
| 03/06/19 | Yes | -0.83% | -1.05 | No | | **-1.52%** | **-3.05** | **No** |
| 04/26/19 | Yes | -1.91% | -2.47 | No | | **-2.56%** | **-4.77** | **No** |
| 06/18/19 | Yes | -0.17% | -0.25 | No | | **-0.08%** | **-0.20** | **No** |
| 09/04/19 | Yes | 0.10% | 0.15 | No | | **0.46%** | **1.27** | **No** |
| 01/31/20 | No | **-1.04%** | **-1.57** | **No** | | | | |
| 02/26/20 | Yes | -1.36% | -1.98 | No | | **-0.33%** | **-0.93** | **No** |
| 03/05/20 | Yes | -1.89% | -2.51 | No | | **-1.50%** | **-4.07** | **No** |

Notes: Bolded residual returns and t-statistics denote residual returns and t-statistics that are reported in Exhibits 1, 2 and 3.

**Table C-2**
**ExxonMobil Event Study for Dates in Exhibit 4 and Paragraphs 51 & 60**

| Date | Outside Market Hours? | Close-to-Close | | | | Close-to-Open | | |
|---|---|---|---|---|---|---|---|---|
| | | Residual Return | t-Statistic | Stat Sig & Neg? | | Residual Return | t-Statistic | Stat Sig & Neg? |
| **Dates in Exhibit 4** | | | | | | | | |
| 01/31/20 | No | **-1.04%** | **-1.57** | **No** | | | | |
| 05/01/20 | No | **-4.58%** | **-3.77** | **Yes** | | | | |
| 01/15/21 | Yes | -1.96% | -1.27 | No | | **-1.70%** | **-2.35** | **Yes** |
| **Date in ¶ 51** | | | | | | | | |
| 04/07/20 | Yes | 1.77% | 1.61 | No | | **2.37%** | **4.19** | **No** |
| **Date in ¶ 60** | | | | | | | | |
| 09/14/20 | Yes | -0.54% | -0.39 | No | | **0.10%** | **0.16** | **No** |

Notes: Bolded residual returns and t-statistics denote residual returns and t-statistics that are reported in Exhibit 4 and ¶¶ 51 & 60.

4

A-125

**D.      Chevron Event Study Methodology**

20.      I also conduct a close-to-close and close-to-open event study for Chevron to analyze whether statements about production goals in the Permian on March 5, 2019 is associated with a statistically significance price movement. I regress Chevron's stock price returns on the S&P 500 Total Return Index (to control for market movements) and the S&P Integrated Oil & Gas Index (to control for industry movements). I use the same methodology discussed above to calculate the returns for the market index and the industry index except that I exclude Chevron (instead of ExxonMobil) from both indices. I also perform a sensitivity analysis by removing both Chevron and ExxonMobil from the market and industry indices, which leaves Occidental Petroleum Corp as the only remaining constituent of the S&P Integrated Oil & Gas Index.

21.      The result of this analysis is shown in **Table C-3**. The table also shows that removing both ExxonMobil and Chevron from the market and industry indices does not make a difference.

**Table C-3**
**Chevron Event Study**

| Date | Outside Market Hours? | Close-to-Close | | | Close-to-Open | | |
|------|------------------------|-----------------|-------------|------------------|-------------------|-------------|------------------|
| | | Residual Return | t-Statistic | Stat Sig & Neg? | Residual Return | t-Statistic | Stat Sig & Neg? |
| Removing Chevron from Market and Industry Indices | | | | | | | |
| 03/05/19 | Yes | 1.05% | 1.21 | No | **-0.16%** | **-0.39** | **No** |
| Removing ExxonMobil and Chevron from Market and Industry Indices | | | | | | | |
| 03/05/19 | Yes | 0.92% | 1.00 | No | -0.25% | -0.54 | No |

Notes: Bolded residual return and t-statistic denote residual return and t-statistic that are reported in footnote 30.

5

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| MENDI YOSHIKAWA, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) Civil Action No.: 3:21-cv-00194-N |
| v. | ) ) ) |
| EXXON MOBIL CORPORATION, DARREN W. WOODS, LIAM M. MALLON, and MELISSA BOND, | ) ) ) ) |
| Defendants. | ) ) ) ) ) ) |

**REPLY IN FURTHER SUPPORT OF PLAINTIFFS'**
**RENEWED MOTION FOR CLASS CERTIFICATION**

*CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*

A-127

**TABLE OF CONTENTS**

**Page**

I.     DEFENDANTS FAIL TO REBUT THE PRESUMPTION OF RELIANCE ................... 1

     A.     Defendants Ignore the Class Certification Burden-Shifting Framework................ 1

     B.     Defendants' Merits Arguments Fail......................................................................... 2

     C.     The Production Goal Statements Support a Presumption of Reliance .................. 3

         1.     A Scheme Claim Does Not Require An Actionable Misstatement ............ 4

         2.     The Scheme Impacted Both the Production Goal Statements and Exxon's Stock Price ................................................................................... 6

         3.     Corporate Production Goal Statements Remain Actionable..................... 10

     D.     The Proved Reserves/Resource Base Statements Support the *Basic* Presumption ..................................................................................................... 13

     E.     Defendants' Remaining Price Impact Arguments Fail ........................................ 14

         1.     The statements about Proved Reserves had price impact. ....................... 15

         2.     The Resource Base misrepresentations had price impact. ....................... 16

         3.     The Production Goal statements had price impact .................................. 16

             a.     The January 31, 2020 disclosure corrected the alleged misrepresentations, and there was a statistically significant price reaction to the disclosure. ................................................... 17

             b.     The May 1, 2020 corrective disclosure had price impact. ............ 18

             c.     The January 15, 2021 *Wall Street Journal* article......................... 20

     F.     The *Affiliated Ute* Presumption Also Applies ..................................................... 21

II.    PLAINTIFFS ARE NEITHER ATYPICAL NOR INADEQUATE............................... 22

     A.     Rhode Island Has Damages and Is Typical and Adequate .................................. 23

     B.     Amalgamated's Climate Change Positions Are Not Disqualifying...................... 24

i

# TABLE OF AUTHORITIES

**CASES**                                                                              **Page(s)**

*Affiliated Ute Citizens of Utah v. U.S.*,
    406 U.S. 128 (1972)............................................................................................1, 5, 21

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ..................................................................................15

*In re Allergan PLC Sec. Litig.*,
    2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021)...........................................................19

*Amgen v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)...................................................................................2, 11, 18, 21

*In re Apache Corp. Sec. Litig.*,
    2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..............................................................18

*In re Apple Inc. Sec. Litig.*,
    2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ..............................................................14

*In re Aqua Metals, Inc. Sec. Litig.*,
    2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ...........................................................6

*Baker v. SeaWorld Ent., Inc.*,
    2020 WL 241441 (S.D. Cal. Jan. 16, 2020)..............................................................24

*Berger v. Compaq Computer Corp.*,
    257 F.3d 475 (5th Cir. 2001) ...................................................................................25

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................................17

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    337 F.R.D. 193 (D. Minn. 2020)........................................................................15, 18

*In Re Chicago Bridge & Iron Co.*,
    2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019)...........................................................18

*City of Pontiac Gen. Emps' Ret. Sys. v. Wal-Mart Stores, Inc.*,
    2016 WL 5400373 (W.D. Ark. Sept. 20, 2016)........................................................24

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2020 WL 3026564 (D.N.J. June 5, 2020).................................................................11

*Del. Cnty Empl's Ret. Sys. v. Cabot Oil & Gas Corp.*,
    2023 WL 6300569 (S.D. Tex. Sept. 27, 2023) .........................................................14

ii

*In re Elec. Data Sys. Corp. Sec. Litig.*,
226 F.R.D. 559 (E.D. Tex. 2005),
*aff'd* 429 F.3d 125 (5th Cir. 2005)..............................................................................22

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ..........................................................................4

*In re Firstenergy Corp.*,
2022 WL 681320 (S.D. Oh. Mar. 7, 2022)....................................................................5

*Fogarazzo v. Lehman Bros., Inc.*,
263 F.R.D. 90 (S.D.N.Y. 2009) ............................................................................17, 21

*Frompovicz v. Niagara Bottling, LLC*,
420 F. Supp. 3d 361 (E.D. Pa. 2019) ..........................................................................25

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .........................................................................4, 6

*Goldman Sachs Grp., Inc. v. Arkansas Teacher Retirement Sys.*,
594 U.S. 113 (2021)....................................................................................................1, 2

*Hall v. Johnson & Johnson*,
2023 WL 9017023 (D.N.J. Dec. 29, 2023)..................................................................19

*Halman Aldubi Provident and Pension Funds Ltd. v. Teva Pharm's Indust. Ltd.*,
2023 WL 7285167 (E.D. Pa. Nov. 3, 2023) ...............................................................21

*Homyk v. ChemoCentryx, Inc.*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024)................................................................2

*Ind. Pub. Ret. Sys. v. AAC Hldgs., Inc.*,
2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)...........................................................5

*Kerr v. Exobox Techs. Corp.*,
2012 WL 201872 (S.D. Tex. Jan. 23, 2012) ...............................................................11

*Knurr v. Orbital ATK Inc.*,
294 F. Supp. 3d 498 (E.D. Va. 2018) .........................................................................12

*Lee v. Active Power, Inc.*,
29 F. Supp. 3d 876 (W.D. Tex. 2014)..........................................................................11

*Lehocky v. Tidel Tech's, Inc.*,
220 F.R.D. 491 (S.D. Tex. 2004).....................................................................17, 18, 22

*Lorenzo v. Sec. and Exch. Comm.*,
587 U.S. 71 (2019)........................................................................................................5

iii

*In re MGM Mirage Sec. Litig.*,
2010 WL 4316754 (D. Nev. Oct. 25, 2010) ...............................................................24

*In re Montage Technology Grp. Ltd. Sec. Litig.*,
2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ...........................................................24

*In re Mylan N.V. Sec. Litig.*,
2025 WL 1874621 (W.D. Pa. July 8, 2025) ...........................................................4, 5

*Okla. Firefighters Pens. and Ret. Sys. v. Six Flags Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ......................................................................................22

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) .....................................................................................12

*Parmelee v. Santander Consumer USA Holdings*,
2018 WL 276338 (N.D. Tex. Jan. 3, 2018) ..............................................................15

*Plumbers & Pipefitters Loc. 572 Pension Fund v. Cisco Sys., Inc.*,
2004 WL 5326262 (N.D. Cal. May 27, 2004) ..........................................................23

*Prantil v. Arkema France S.A.*,
2022 WL 1570022 (S.D. Tex. May 18, 2022) .............................................................2

*Public Emplys. Ret. Sys. of Miss. v. Amedisys Inc.*,
769 F.3d 313 (5th Cir. 2014) .....................................................................................15

*Regents of the Univ. of CA v. Credit Suisse First Boston (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007) ............................................................................. passim

*Robbins v. Durham School Servs, L.P.*,
2010 WL 11601207 (W.D. Tex. July 12, 2010) ........................................................22

*Rooney v. EZCorp, Inc.*,
330 F.R.D. 439 (W.D. Tex. 2019) .............................................................................18

*S.E.C. v. Farmer*,
2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ...............................................................4

*S.E.C. v. Jaitley*,
2023 WL 9105678 (W.D. Tex. Nov. 13, 2023) ........................................................4, 5

*S.E.C. v. Miami*,
988 F. Supp. 2d 1343 (S.D. Fla. 2013) .....................................................................12

*Schneider v. Natera*,
2025 WL 369243 (W.D. Tex. Jan. 28, 2025),
*R&R adopted*, 2025 WL 880256 (W.D. Tex. Mar. 21, 2025) ........................2, 18, 22

iv

*Schott v. Nobilis Health Corp.*,
211 F. Supp. 3d 936 (S.D. Tex. 2016) ...................................................................15

*In re Signet Jewelers Ltd. Sec. Litig.*,
2019 WL 3001084 (S.D.N.Y. July 10, 2019) .........................................................19

*Smilovits v. First Solar, Inc.*,
2019 WL 6698199 (D. Ariz. Dec. 9, 2019) ............................................................24

*Southland Sec. Corp. v. INSpire Ins. Sols.*, *Inc.*,
365 F.3d 353 (5th Cir. 2004) ......................................................................10, 11, 12

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ................................................................................15

*St. Clair Cnty Empls' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022)...............................................2, 21

*In re Stone & Webster, Inc. Sec. Litig.*,
2007 WL 9822718 (D. Mass. Sept. 7, 2007) .........................................................25

*Stoneridge Inv. P'ers, LLC v. Scientific-Atlanta*,
552 U.S. 148 (2008).................................................................................................6

*In re Under Armor Sec. Litig.*,
2024 WL 2230177 (D. Md. May 16, 2024)............................................................24

*Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*,
247 F.3d 574 (5th Cir. 2001) ................................................................................22

*In re Upstart Holdings, Inc. Sec. Litig.*,
348 F.R.D. 612 (S.D. Ohio 2025)..........................................................................24

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)...................................................................................15

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018).............................................................................21

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017).....................................................................................20

*West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
57 F. Supp. 3d 950 (D. Minn. Sept. 29, 2014)........................................................6

**OTHER AUTHORITIES**

17 C.F.R. §240.10b-5...........................................................................................4, 6, 11

v

A-132

## I.    DEFENDANTS FAIL TO REBUT THE PRESUMPTION OF RELIANCE

### A.    Defendants Ignore the Class Certification Burden-Shifting Framework

Defendants incorrectly contend that Plaintiffs have not offered evidence to trigger the presumption of reliance. In securities class actions, a plaintiff triggers the *Basic* presumption by showing "publicity, market efficiency, and market timing." *Goldman Sachs Grp., Inc. v. Arkansas Teacher Retirement Sys.*, 594 U.S. 113, 119 (2021). Plaintiffs made this showing in their opening papers, including through Dr. Cain's market efficiency report. Defendants ***do not dispute*** that the Production Goal and Proved Reserves/Resource Base statements were public, that the market for Exxon stock was efficient, or that class members traded during the Class Period.

Defendants contend that Plaintiffs did not prove that the scheme is connected to Defendants' statements. This argument fails. ***First***, such proof is not a predicate for the *Basic* or *Affiliated Ute* presumption of reliance. ***Second***, Plaintiffs nevertheless proffered (i) statements by the whistleblowers and OSHA's findings, set forth in the Complaint, connecting the alleged scheme to Defendants' public statements (¶¶115-40, 155-60), and (ii) Defendants' admission that the Production Goal was based on the development plan, which the scheme inflated (¶384). ***Third***, Plaintiffs filed their opening brief months before class discovery closed, before any fact or expert depositions had occurred, and thus before the record had been developed. This submission is Plaintiffs' first chance to address the complete class discovery record, which reveals substantial evidence connecting the scheme, Exxon's statements, and Exxon's stock price, as detailed herein.

Defendants bear the burden of rebutting the *Basic* presumption. They must "***in fact*** … sever" ***completely*** the link between the statements and the stock price. *Goldman*, 594 U.S. at 125. Rebutting the presumption is no light burden: "mere production of *some* evidence relevant to price impact would rarely" rebut the presumption. *Id.* at 126 (emphasis in original). Partially severing the connection is ***not*** enough: "the inquiry is whether Defendants have proven a ***complete*** lack of

price impact during the Class Period." *St. Clair Cnty Empls' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, *5 (M.D. Tenn. Sept. 30, 2022); *Homyk v. ChemoCentryx, Inc.*, 2024 WL 1141699, at *4 (N.D. Cal. Mar. 6, 2024) (same).

## B.     Defendants' Merits Arguments Fail

In sections entitled "Discovery has *disproved* the alleged 'scheme'" and "Class certification discovery refutes Plaintiffs' *theory of the case*," Defendants advance several broad, pure merits arguments that do not concern Rule 23, including (i) whether Bond furnished the false learning curves to the drilling team; (ii) whether the learning curves were achievable and whether Exxon met them; and (iii) whether the record shows that the accelerated learning curves supported the Production Goal statements as of March 2019 or a later time. Opp. 2-7, 12, 20.

These merits arguments fail for three reasons. *First*, even after *Goldman*, courts do not "try the case or undertake a summary judgment style review" in deciding class certification. *Prantil v. Arkema France S.A.*, 2022 WL 1570022, at *44 (S.D. Tex. May 18, 2022); *see id.* at *49 ("There is a difference between considering the merits and requiring a group of would-be class action plaintiffs to prove their case at this procedural stage."). Further, the Court bifurcated discovery: merits discovery has not finished. To require Plaintiffs to prosecute the merits on an incomplete record would be unfair and impermissibly extend the limits of the class certification inquiry by converting this into a premature summary judgment motion. *Second*, class certification only "requires a showing that *questions* common to the class predominate, *not that those questions will be answered, on the merits, in favor of the class*." *Amgen v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (merits questions "will prevail or fail [for the class] in unison"); *Schneider v. Natera*, 2025 WL 369243, at *7 (W.D. Tex. Jan. 28, 2025) ("common questions" on the merits left to summary judgment or trial).

*Third*, if the Court wishes to consider these merits issues even though they are not proper

2

at class certification, discovery to date *corroborates* Plaintiffs' theory of the case. While the full merits record has not been developed, the evidence cited herein and detailed in the Wright Rebuttal Declaration (A-2375-2424) ("Wright Dec.") shows that: ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

### C.    The Production Goal Statements Support a Presumption of Reliance

Defendants argue that Plaintiffs cannot rely on the "Production Goal" or "green blob" statements to establish reliance because the Court's Order denying Defendants' Motion for Judgment on the Pleadings eliminated those statements as actionable misstatements made with scienter. Opp. 11-12. This argument fails. *First*, Plaintiffs do not need an *actionable* misstatement made by a defendant *with scienter* to show that the scheme was transmitted into the stock price. *Second*, even if an actionable misstatement were required, the Court's Order did not eliminate

3

Exxon's corporate Production Goal statements as actionable misstatements.

### 1.    A Scheme Claim Does Not Require An Actionable Misstatement

Plaintiffs are not required to plead and prove an actionable misstatement made with scienter in order to show reliance for a scheme claim. The law requires only that the scheme be transmitted into the stock price through a public communication, whether it is independently actionable or not. Here, copious record evidence shows that the scheme supported the Production Goal statements and that these statements impacted the market.

Defendants' position contradicts Supreme Court precedent, which has "made crystal clear that a misrepresentation need *not* be involved and that a suit could be based on Rule 10b-5(a) or (c)" without an actionable misstatement. *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 585 (S.D. Tex. 2002). *See S.E.C. v. Jaitley*, 2023 WL 9105678, at *6 (W.D. Tex. Nov. 13, 2023) ("[T]he concept of 'scheme liability' recognizes that because 'conduct itself can be deceptive,' a defendant may incur primary liability for securities fraud without making or using an 'oral or written statement.'"); *S.E.C. v. Farmer*, 2015 WL 5838867, at *14 (S.D. Tex. Oct. 7, 2015) (same); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1196-97 (D. Or. 2015) ("Scheme liability is *not* contingent upon the defendant making a specific misrepresentation or public statement."); *In re Mylan N.V. Sec. Litig.*, 2025 WL 1874621, at *9 (W.D. Pa. July 8, 2025) ("***Plaintiff is right that a scheme claim is not limited to actionable statements***.").

This well-developed law is based on the text of Rule 10b-5 itself. Subsections 5(a) and 5(c), which govern scheme liability claims, cover a broader swath of wrongdoing than subsection 5(b), which governs misstatement claims. Specifically, 5(a) forbids "employ[ment of] *any* device, *scheme*, or artifice to defraud," without requiring any actionable misstatements. Similarly, 5(c) forbids engaging in "***any act, practice, or course of business*** which operates or would operate as a fraud or deceit," without requiring any misstatement. 17 C.F.R. §240.10b-5. As the Supreme

4

Court acknowledged 50 years ago in a seminal scheme liability case, 10b-5(b) "specifies the making of an untrue statement of a material fact and the omission to state a material fact. *The first and third subparagraphs are not so restricted*." *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 152-53 (1972) (sustaining scheme liability claim despite "no positive representation or recommendation"). In 2019, the Supreme Court reaffirmed this interpretation, noting that the "expansive language" of subsections 5(a) and (c) "capture a wide range of conduct." *Lorenzo v. Sec. and Exch. Comm.*, 587 U.S. 71, 79, 81 (2019); *see Jaitley*, 2023 WL 9105678, at *6 ("Scheme liability provisions are broad and capture a wide range of conduct."). Under Defendants' argument – i.e., that the Production Goal statements cannot support a presumption of reliance because they are not actionable misrepresentations – subsections 5(a) and (c) would be narrowed to the same scope as subsection 5(b). That contradicts the Rule's text and the substantial authority above.

While a scheme claim does not require an *actionable misstatement*, the scheme must be transmitted to the stock price through *some* public-facing communication. Thus, in *Mylan*, the court rejected defendants' bid to "narrow" the plaintiff's scheme claim to just an alleged 10b-5(b) misstatement. *Mylan*, 2025 WL 1874621, at *9. The court reasoned that "a scheme claim is not limited to actionable statements," and all that is required for reliance is that "the scheme must have been communicated *in some manner* to the market." *Id.* In assessing what sort of communication will suffice, courts have held that a scheme liability plaintiff need not "prove public knowledge of the deceptive nature of the Defendant's acts." *Ind. Pub. Ret. Sys. v. AAC Hldgs., Inc.*, 2023 WL 2592134, at *21 (M.D. Tenn. Feb. 24, 2023). Rather, *Basic* reliance can arise from "a deceptive public-facing 'cover' that would be reflected in share prices and relied on by investors." *In re Firstenergy Corp.*, 2022 WL 681320, at *27 (S.D. Oh. Mar. 7, 2022). This makes sense: "for [a] scheme to succeed, it *ha[s] to be concealed* from shareholders." *Id.*

5

A-138

Accordingly, courts have held that public statements by non-defendants, or statements that were dismissed as 10b-5(b) claims, *are* sufficient to relay the scheme to investors. For example, in *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 982 (D. Minn. Sept. 29, 2014), the court held that "the conduct alleged had *another way of reaching the public* [besides actionable misstatements] – through the studies published [in a third party medical journal], *which are not the basis of Plaintiffs' Rule 10b–5(b) claim*." *Id. See also In re Aqua Metals, Inc. Sec. Litig.*, 2019 WL 3817849, at *8-9 (N.D. Cal. Aug. 14, 2019) (dismissing 5(b) but sustaining 5(a) and (c) claims, finding that statements by analysts fooled by internal scheme inflated the stock price); *Galena*, 117 F. Supp. 3d at 1198-99 (*Basic* reliance supported by "public statements – some of which were allegedly false and misleading *and some of which were not, but were made in furtherance of the alleged scheme*").

Defendants cite to *Stoneridge Inv. P'ers, LLC v. Scientific-Atlanta*, 552 U.S. 148 (2008) for the proposition that "the *Basic* presumption does not apply in scheme liability cases where the alleged deceptive acts are not communicated to the public." Opp. 11. Here, as set forth in the Cain Rebuttal Declaration (A-2282-2360) ("Cain Dec."), the effect of the scheme *was* communicated to the public through the statements concerning the Production Goal and the Proved Reserves/Resource Base. A-2311-58 (Cain Dec. §V). Moreover, *Stoneridge* did not concern claims against the company that "issued the financial statements and the securities in question," but only claims against *third-party entities* that entered into transactions with that company. The alleged scheme did not support *any* company statement, but instead sought to "fool" its auditor, Arthur Andersen. *Stoneridge*, 552 U.S. at 153-54. Here, the scheme supported public statements that Exxon made and investors relied on.

### 2. The Scheme Impacted Both the Production Goal Statements and Exxon's Stock Price

6

Contrary to Defendants' contentions, the record shows that the scheme impacted the Production Goal statements, which in turn maintained inflation in Exxon's stock price, thus demonstrating that the scheme affected the stock price. *First*, Defendants used accelerated learning curves to artificially inflate that development plan *for the purpose of supporting the Production Goal statements to investors, thus tying the scheme to the statements*. *See supra* at 3.

7

A-139



8



Moreover, as Dr. Cain opines, investors considered the Production Goal statements to be important. Analysts focused on them and *raised* their price targets for Exxon stock based in part on them – consistent with price impact. A-2313-35 (Cain Dec. §V.B). Based on the Company's

9

A-141

own disclosures, analysts also reported that the Production Goal was based on Exxon's "*development plan*" – the very plan that the scheme distorted – further showing that the scheme was impounded into Exxon's stock price. *Id.* The record demonstrates that the scheme served to support the Production Goal statements and influence the market for Exxon stock.

### 3.    Corporate Production Goal Statements Remain Actionable

Even if a scheme claim required an actionable misstatement made with scienter, Exxon's corporate statements satisfy such a requirement. In its August 12, 2024 Order, the Court noted that it "severed the connection between Bond's alleged scheme and the public statements made by Woods or Mallon regarding ExxonMobil's prospects for oil production" because Plaintiffs had not adequately pled that Woods or Mallon had scienter. ECF No. 157 at 8-9 (citing ECF No. 112 at 12-18). However, the Court specifically *limited* its holding to statements "*made by Woods or Mallon*," and did *not* sever from the scheme *corporate Production Goal statements made by Exxon*. Exxon made numerous corporate Production Goal and "green blob" statements in press releases, SEC filings and investor presentations during the Class Period. *See* ¶¶361, 364-65, 373, 388, 398; A-188; 210; 215; 254; 276; 299; 339-40; 425-26; 429; 461; 514; 529; 637-38; A-2289-96 (Cain Dec. §III).[1]

Under *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353 (5th Cir. 2004), a corporation, as opposed to an individual, is the maker of all statements "issued in its name," including in "SEC filings, reports and releases." *Id.* at 365-66. The Production Goal/green blob statements are thus paradigmatic corporate statements. *Id.*; A-2289-96 (Cain Dec. §III). The Court need not examine at this stage whether such statements were made with scienter because scienter

---

[1] Defendants assert that the March 5, 2019 Production Goal statement was "the exact … statement the Court 'severed' from the scheme." Opp. 12. Not so. *Exxon* issued a press release that day that stated, "*ExxonMobil said* today it has revised its Permian Basin growth plans to produce more than 1 million barrels per day by as early as 2024." A-299; *See* ¶361; A-2290-95 (Cain Dec. ¶15).

is a purely "common question" that provides no basis to deny class certification, scienter goes only to the merits, and scienter is reserved for trial. *Amgen*, 568 U.S. at 467-69 ("Absent proof of [scienter], the claim of the Rule 10b–5 class will fail in its entirety; there will be no remaining individual questions to adjudicate.")

If the Court nevertheless were to conduct this pure merits-based inquiry prematurely, the record demonstrates scienter for these statements. Under *Southland*, Exxon's scienter is derived from ***any agent*** who "order[s] or approve[s] [a statement] or its making or issuance, or who furnish[es] information or language for inclusion [in misstatements] … or omission therefrom, or the like." *Southland*, 365 F.3d at 366-67. Courts have thus consistently imputed scienter of non-speaking agents under *Southland*. *See Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 882 (W.D. Tex. 2014) (corporate scienter established through agent who furnished false information to others); *Kerr v. Exobox Techs. Corp.*, 2012 WL 201872, at *14 (S.D. Tex. Jan. 23, 2012) (scienter for corporation established by agent who engaged in scheme); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *25-27 (D.N.J. June 5, 2020) (imputing scienter of non-speaking scheme liability defendants to corporation).

Discovery shows that Mallon, Bond, Chapman, and Gjervik reviewed or approved the corporate statements, or furnished information for inclusion therein, "or the like" – and thus, their scienter is imputed to Exxon under *Southland*. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████ Indeed, on January 31, 2020, Exxon presented a "green blob" slide representing that "Permian volume growth [was] on schedule" based on "4Q19 production." A-461.

It is not dispositive that the Court previously determined that the Complaint had not alleged that Bond was "an executive," and that she appeared to be "removed from the employees at the top of the reporting structure who interact with investors." ECF No. 88 at 20. Under *Southland*, seniority is not the touchstone. *See Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 515 (E.D. Va. 2018) (under *Southland*, "the scienter of a *lower-level employee* can be imputed to the corporation for the purposes of corporate liability"); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 477 (6th Cir. 2014) ("[A] corporation is not insulated if lower-level employees, contributing to the misstatement, knowingly provide false information ...."); *S.E.C. v. Miami*, 988 F. Supp. 2d 1343, 1361 (S.D. Fla. 2013) (rejecting argument that "low level employee['s]" scienter could not be imputed).

Further, as discussed above, █████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

12



**D.    The Proved Reserves/Resource Base Statements Support the *Basic* Presumption**

Contrary to what Defendants contend, the Proved Reserves/Resource Base *were* "tainted"

by the false learning curves.

13

A-145



Thus, the Proved Reserves statements *were* "tainted" by the internal scheme.

### E.    Defendants' Remaining Price Impact Arguments Fail

Price impact can be observed either "on the 'front-end' (i.e., misstatements causing … inflation) or on the 'back-end' (i.e., a decline in price caused by the corrective disclosures)." *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *7 (N.D. Cal. Feb. 4, 2022); *Del. Cnty Empl's Ret. Sys.*

14

*v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at \*7 (S.D. Tex. Sept. 27, 2023) (same). "Defendants must affirmatively disprove **both** to satisfy their burden." *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 209 (D. Minn. 2020). Defendants have not done so.

### 1.    The statements about Proved Reserves had price impact.

As Dr. Cain explains, Dr. Ferrell's opinion that the Proved Reserves misrepresentations did not cause a statistically significant positive front-end price increase is unreliable, and also irrelevant because Plaintiffs rely on a price maintenance theory. A-2296-2311 (Cain Dec. §IV); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016) ("statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price."). ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

In arguing that there is no "connection" between these misstatements and the corrective disclosures because the disclosures do not "mention the SEC Proved Reserves or Resource Base" (Opp. 16), Defendants effectively impose a requirement that a corrective disclosure must be a mirror image of the alleged misstatements. This is not the standard. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (vacating denial of class certification after emphasizing a corrective disclosure "need **not** precisely mirror an earlier misrepresentation"). Rather, a corrective disclosure merely "must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Public Emplys. Ret. Sys. of Miss. v. Amedisys Inc.*, 769 F.3d 313, 321-22 (5th Cir. 2014); *see Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 688 (5th Cir. 2014) (same); *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 950 (S.D. Tex. 2016) (correctives must be "related to" or "relevant to" alleged misrepresentations but need not "precisely mirror" them); *Parmelee v. Santander Consumer USA Holdings*, 2018 WL 276338, at \*6 (N.D. Tex. Jan. 3, 2018) (same).

15

The first two corrective disclosures concern Exxon's Permian production, which relates directly to Exxon's inflated development plan, and the third corrective disclosure concerned specific fraudulent inputs to the same plan. A-2335-58 (Cain Dec. §§V.C-E). These disclosures are relevant to the Proved Reserves because inputs from the development plan that were the product of the scheme were used to calculate the SEC Proved Reserves. ¶80; █████████████ ████████████ Exxon told investors that its Proved Reserves *were* supported by its development plan. ¶80. Contrary to what Defendants contend, analysts *did* draw this connection, reporting that the issues disclosed on January 15, 2021 "*will drive [Exxon's] assessment of proved reserves and resources*". A-2358 (Cain Dec. ¶103). The *Goldman* principle quoted by Defendants applies only when the misrepresentations are purely generic, 77 F.4th at 102, ████████████ ████████████

### 2.    The Resource Base misrepresentations had price impact.

Dr. Ferrell's opinion that there was no statistically significant price increase on the Resource Base misrepresentation days is again irrelevant in a price maintenance case. The corrective disclosures are relevant to the Resource Base for the same reason that they are connected to the Proved Reserves, as the Proved Reserves comprised part of the Resource Base. Plaintiffs *have* identified analyst commentary associating the corrective disclosures with the Resource Base (*see* A-2313-35 (Cain Dec. §V.B)). Further, the *Goldman* principle does not apply because the Resource Base misstatements are not generic under *Goldman*.

### 3.    The Production Goal statements had price impact

Dr. Ferrell's opinion that the stock price did not rise in response to the Production Goal statements is unreliable (*see* A-2308-11 (Cain Dec. §IV.D)) and, again, irrelevant in a price maintenance case. Significantly, *analysts repeatedly based their price targets on the Production Goal and emphasized its importance*, demonstrating materiality. A-2313-35 (Cain Dec. §V.B).

16

A-148

A-149

Defendants' statement that Dr. Ferrell found no stock price reaction to the three alleged corrective disclosures is wrong: he found that two of the three dates *had statistically significant declines*, and his analysis of the January 31, 2020 decline is flawed. A-2301-08 (Cain Dec. §IV.C).

> **a.    The January 31, 2020 disclosure corrected the alleged misrepresentations, and there was a statistically significant price reaction to the disclosure.**

The January 31, 2020 disclosure *is* connected to the Production Goal statements because it disclosed that Permian production was flat. ¶244. Exxon and analysts alike explicitly connected the flat production and the Production Goal. A-2335-43 (Cain Dec. §V.C). On January 31, Exxon presented the flat production number on a "green blob" slide that showed how it impacted the Production Goal. A-461. At least two analysts, seeking reassurance that the Production Goal was "on track," asked whether this disclosure impacted the Production Goal. A-2337-38 (Cain Dec. ¶¶74-75). Other analysts drew the same connections. A-2338-42 (Cain Dec. ¶78).

Second, Dr. Cain has demonstrated that the drop on January 31, 2020 *was* statistically significant at 99.6%, well over the 95% confidence level. A-66; A-2302 (Cain Dec. ¶29). If Dr. Ferrell had properly analyzed the 3-day window of January 31, February 3, and February 4, that the Complaint alleged (¶244), statistical significance for this disclosure would be *99% under his own event study*. A-2305-08 (Cain Dec. ¶¶35-40). *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015) (a "two- to three-day window is common in event studies"); *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 104-05 (S.D.N.Y. 2009) (rejecting arguments against three-day window, finding no rebuttal of *Basic*); *Lehocky v. Tidel Tech's, Inc.*, 220 F.R.D. 491, 506-08 (S.D. Tex. 2004) (crediting two-day window). Further, Dr. Ferrell's event study is defective because it used an industry index with only two companies in it. ███████ (Cain Dec. ¶¶32-35). Even using his flawed index and analyzing January 31 alone, Ferrell's event study yields statistical significance of 88%, which does not allow one to entirely

17

rule out price impact. (And that figure rises to 94% when the event study results are interpreted under a one-sided test.) *Id.* His cut off of 95% for statistical significance is not required by either the law or the academic literature, and even he admits that 90% is "informative." DX A-902; *see In Re Chicago Bridge & Iron Co.*, 2019 WL 5287980, at *14 (S.D.N.Y. Oct. 18, 2019) ("experts and courts should consider returns that fall somewhat below the [95%] level"); *see also Rooney v. EZCorp, Inc.*, 330 F.R.D. 439, 450 & n.10 (W.D. Tex. 2019) (defendants failed to prove no price impact for returns at 77% level); A-2302 (Cain Dec. ¶30 n.47).

In any event, even "a lack of statistical significance standing alone cannot rebut the *Basic* assumption." *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *12 (S.D. Tex. Feb. 9, 2024). Notably, Defendants' argument applies to only one of three drops, which is insufficient to "sever[] the link." *CenturyLink*, 337 F.R.D. at 210.

### b. The May 1, 2020 corrective disclosure had price impact.

The 75% rig cut disclosed on May 1 corrected Exxon's misrepresentations because Exxon's ability to achieve the Production Goal depended on the number of rigs it had in operation. A-912-14; ████████████████████████ Analysts understood this connection. A-2343-51 (Cain Dec. §V.D). Dr. Ferrell acknowledges in footnote 48 of his report that Credit Suisse *did* connect the May 1, 2020 disclosure to the Production Goal. *See* A-2300 (Cain Dec. ¶26 & n.39).

Defendants' assertion that the rig cut was disclosed on April 7, 2020 is a "truth on the market defense," in which a defendant contends that earlier-disclosed information renders later-disclosed information stale and immaterial. "The Supreme Court has held that truth-on-the-market evidence – used to show absence of materiality – need not be considered at the class-certification stage." *Schneider v. Natera*, 2025 WL 369243, at *7 (W.D. Tex. Jan. 28, 2025) (quoting *Amgen*, 568 U.S. at 482). Because truth-on-the market is a common merits question, it is "properly considered at trial or summary judgment – not at the class certification stage." *Id.*

18

Should the Court reach the merits, ███████████████████████ ████████████████████████████████ Dr. Ferrell points to one article predicting a *potential* 75% rig cut after the April 7 disclosure. DX A-22; ████████ But he omits the most relevant part of the article, which states point blank: "***Exxon did not detail its Permian spending cuts***." A-2344 (Cain Dec. ¶84). One prediction in one news article does not prove that the "truth was on the market" and entirely negate price impact. This is particularly true when the May 1 disclosure of the rig cuts by Exxon produced a statistically significant reaction and triggered analyst commentary on the news. A-2343-51 (Cain Dec. §V.D). There is a value-relevant difference between one article predicting a cut and ***Exxon itself disclosing the fact of the cut***. *Hall v. Johnson & Johnson*, 2023 WL 9017023, at \*12 (D.N.J. Dec. 29, 2023) (distinguishing between prior reports of "***potential[]***" liability and disclosure that thousands of plaintiffs sought to bring claims against company). Similar contentions by Dr. Ferrell have been rejected. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at \*16 (S.D.N.Y. July 10, 2019) (Dr. Ferrell's "contention that the market was fully apprised of all material facts contained in the *Washington Post* article prior to that article's publication is simply not correct").

Moreover, there is no "mismatch" between the corrective disclosure and the alleged misstatements simply because Exxon discussed oil prices and Covid in its press releases. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ His

blanket factual assertion that the market was reacting *only* to Covid is not sufficient to prove a lack of price impact. *See In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at \*10 (S.D.N.Y. Sept. 8,

19

A-151

2021) (defendants "must demonstrate . . . that the other events explain the entire price drop"); A-2300-01 (Cain Dec. §IV.B).

Dr. Ferrell's opinion that Exxon's residual return was positive on April 7 is irrelevant because May 1 is when the 75% rig cut was disclosed by Exxon.

### c.    The January 15, 2021 *Wall Street Journal* article

Defendants mischaracterize the facts in arguing that Plaintiffs "challenge the *2019* drilling assumptions" while the January 15 article discussed only 2018 assumptions. But the article explains that, after Exxon learned that its 2018 drilling assumptions were wrong, it employed false drilling learning curves to inflate its *2019* drilling assumptions. A-2091-94. The paragraph of the Complaint cited by Defendants explained this connection. ¶252.

The *Wall Street Journal* had *not* "previously reported" the salient corrective information – nor is the *Journal* in the business of reporting old news. *See* ¶146; A-2095. ██████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ *see* A-2357 (Cain Dec.

¶101). Analysts were not merely reacting to an SEC investigation, but rather to the substance of the allegations. In any event, reacting to the SEC investigation would not demonstrate a lack of price impact because the investigation was connected to the corrective facts. *Waggoner v. Barclays PLC*, 875 F.3d 79, 104-05 (2d Cir. 2017) (finding price impact where some portion of stock

decrease attributed to concerns about future regulatory actions and potential fines); *Halman Aldubi Provident and Pension Funds Ltd. v. Teva Pharm's Indust. Ltd.*, 2023 WL 7285167, at \*23 (E.D. Pa. Nov. 3, 2023) (rejecting argument that failure to disaggregate effect of "potential exposure to fines and penalties" precluded certification).

F.    The *Affiliated Ute* Presumption Also Applies

*Affiliated Ute* is a scheme liability case that provides a presumption of reliance wherever plaintiffs "(1) allege a case primarily based on omissions or non-disclosure, and (2) demonstrate that the defendant owed him a duty of disclosure." *Regents of the Univ. of CA v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007). Defendants argue that Plaintiffs' claims are not "premised on" omissions because the scheme supported misrepresentations. Opp. 19-20. Defendants ignore that claims can be "primarily" omissions-based even where they also involve statements. *See Acadia*, 2022 WL 4598044, at \*8-9 (applying *Affiliated Ute* where "Plaintiffs also challenge affirmative misrepresentations," and noting that the "failure to disclose certain information is what makes the alleged misrepresentations misleading or false"); *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 289 (D. Minn. 2018) (applying *Affiliated Ute* where misstatements omitted "*quid pro quo* arrangements"); *Lehman Bros.*, 232 F.R.D. at 186 ("*Affiliated Ute* presumption … is not undermined simply because a defendant makes misstatements at the same time it omits material information"). Here, Defendants concealed that Exxon's Production Goal and Reserves reporting were the product of a development plan artificially inflated with baseless learning curve assumptions. Investors would have considered these omitted facts material in making investment decisions. A-2313-35 (Cain Dec. §V.B).

Defendants' arguments with regard to duty to disclose (Opp. 19-20) amount to materiality challenges, but proof of materiality is not required because it is a "common question." *Amgen*, 568

21

U.S. at 467-68. In any event, the Production Goal and Proved Reserves and Resource Base statements *did* create a duty to disclose the scheme. For example, Exxon repeatedly assured investors that the Production Goal was based on the "innovative development plan," and was "on track" A-2289-96 (Cain Dec. §III), which triggered a duty to disclose that the goal and the development plan were the product of artificially accelerated learning curves, *see, e.g., Okla. Firefighters Pens. and Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 217-18 (5th Cir. 2023) ("statements about 'ongoing' construction 'progressing'" created duty to disclose "crucial information" of lack of meaningful progress); *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (a duty to speak arises when "one party voluntarily discloses some but less than all material facts"). As another example, the Proved Reserves figures created a duty to disclose the scheme because they were inflated by the accelerated curves.

## II.   PLAINTIFFS ARE NEITHER ATYPICAL NOR INADEQUATE

Defendants argue that Rhode Island and Amalgamated are subject to unique defenses that make them atypical and inadequate. Demonstrating typicality is "not a demanding test" and simply "focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent." *Schneider v. Natera, Inc.*, 2025 WL 369243, at *3 (W.D. Tex. Jan. 28, 2025), *R&R adopted*, 2025 WL 880256 (W.D. Tex. Mar. 21, 2025). "[T]ypicality does not require a complete identity of claims, but rather the representative's claims must simply have the essential characteristics of the putative class." *Robbins v. Durham School Servs, L.P.*, 2010 WL 11601207, at *4 (W.D. Tex. July 12, 2010). "Factual differences do not defeat typicality if the claims arise from a similar course of conduct and share the same legal theories." *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 565 (E.D. Tex. 2005), *aff'd* 429 F.3d 125, 136-37 (5th Cir. 2005). "[T]he key inquiry is whether a class representative would be required to devote considerable time to rebut the Defendants' claim."

22

A-155

*Lehocky v. Tidel Tech's, Inc.*, 220 F.R.D. 491, 501 (S.D. Tex. 2004).

### A.    Rhode Island Has Damages and Is Typical and Adequate

Defendants argue that Rhode Island is a so-called "net seller and [] net gainer" that is atypical because it has no damages. Opp. 21. Defendants are wrong. As explained in the Cain Declaration, under either a FIFO or a LIFO analysis, Rhode Island suffered losses from its Class Period transactions – i.e., starting on March 5, 2019. *See* A-2358-59 (Cain Dec. §VI).

Defendants offer a blunt calculation in which they compare total sale proceeds to total purchase expenditures. Opp. 21 (citing DX A-573). This rough math makes no attempt to measure damages attributable to the fraud. A-2358-59 (Cain Dec. §VI). Damages in securities cases are based on the artificial inflation in the stock when purchased, minus any remaining artificial inflation in that stock when sold. Defendants make no effort to identify: (1) what portion of Rhode Island's sales proceeds represent gains above the price it originally paid for that stock; (2) what portion of any gain is due to artificial inflation; or (3) how much artificial inflation remained when sold. Defendants assume that *the entire value* of Rhode Island's sales proceeds is "profit" *and* that this entire "profit" is due to artificial inflation caused by the alleged fraud – *neither* of which is true. A-2358-59 (Cain Dec. §VI). ███████████████████████████████

████ Defendants' analysis also ignores that 78% of Rhode Island's Class Period sales occurred *after* the first corrective disclosure (A-2359 (Cain Dec. ¶107)) – which means that they *were* damaged. Defendants' analysis also improperly matches pre-class period purchases with Class Period sales. A-2358-59 (Cain Dec. §VI). This is wrong because sales of shares purchased *before* the Class Period are irrelevant to whether a plaintiff suffered a loss on the shares it subsequently purchased *during* the Class Period.

In all events, because Plaintiffs have presented calculations demonstrating *both* FIFO *and* LIFO losses, Defendants' flawed analysis should be rejected. *See Plumbers & Pipefitters Loc. 572*

*Pension Fund v. Cisco Sys., Inc.*, 2004 WL 5326262 (N.D. Cal. May 27, 2004) (accepting plaintiffs' FIFO calculation over challenge by defendants of net gainer); *City of Pontiac Gen. Emps' Ret. Sys. v. Wal-Mart Stores, Inc.*, 2016 WL 5400373, at *6 (W.D. Ark. Sept. 20, 2016) ("Defendants have failed to show that the FIFO method is preferable [to LIFO] in this case").

Given that Rhode Island has damages, the blunt net seller/net gainer analysis is not fatal to typicality or even really informative. Indeed, "[a] net seller merely sells more shares than it purchased during the Class Period and may well still suffer a loss." *In re MGM Mirage Sec. Litig.*, 2010 WL 4316754, at *4 (D. Nev. Oct. 25, 2010); *see In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 625 (S.D. Ohio 2025) ("a net profit on securities does not contradict a claim of fraud as to those same securities."); *In re Montage Technology Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *4 (N.D. Cal. Apr. 21, 2016) (rejecting atypicality argument based on net gainer contention).

Disputes concerning the precise amount of Rhode Island's damages will be resolved at a later phase of the case. Securities fraud class action trials are commonly separated into two phases: Phase One concerns common *class-wide* elements of the claim, and Phase Two addresses *all individualized* issues, including the calculation of individual class member damages. *See In re Under Armor Sec. Litig.*, 2024 WL 2230177, at *1 (D. Md. May 16, 2024) (bifurcating trial into class-wide liability Phase One and individual class member issues Phase Two); *Baker v. SeaWorld Ent., Inc.*, 2020 WL 241441, at *1 (S.D. Cal. Jan. 16, 2020) (same); *Smilovits v. First Solar, Inc.*, 2019 WL 6698199, at *7 (D. Ariz. Dec. 9, 2019) (same). Because Phase Two is the appropriate venue to resolve individualized damages calculations, such issues pose no bar to class certification.

### B.    Amalgamated's Climate Change Positions Are Not Disqualifying

Defendants argue that Amalgamated's concern about climate change renders it inadequate. Opp. 24. But the Longview Funds at issue are index funds, and Exxon stock was purchased simply to replicate the S&P and/or Russell indices, not for the purpose of implementing change at Exxon

24

or anywhere else. A-2106.[2] Further, Amalgamated's views on fossil fuels do not negate its interest in securing the highest possible recovery for investors. *See* Mot. 10 (explaining standards for adequacy and determining conflicts). Amalgamated has demonstrated its commitment to this goal by serving as Lead Plaintiff for the past four years, and there is no reason to suggest that Amalgamated will not continue to serve as a faithful fiduciary to the class.

Defendants point to positions on climate change issues Amalgamated took which purportedly conflict with the majority of Exxon's shareholders. Opp. 8. But these do not conflict with Exxon's *own* positions, much less those of Exxon's shareholders. ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████

Disagreement on issues extraneous to the litigation, such as the role of fossil fuels in climate change, does not create disabling conflicts. Defendants' cases do not hold otherwise. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483 (5th Cir. 2001) merely holds that a class representative must "be informed" about the claims and "demonstrate they are directing the litigation." In *Frompovicz v. Niagara Bottling, LLC*, 420 F. Supp. 3d 361, 372 (E.D. Pa. 2019), a non-securities case, the class representative admitted that suing the defendant was a "pastime." In *In re Stone & Webster, Inc. Sec. Litig.*, 2007 WL 9822718, at *7-8 (D. Mass. Sept. 7, 2007) friends of the proposed class representatives were board members of the defendant company who might have passed on inside information; their "status as 'shareholder activists'" was not disqualifying.

---

[2] Amalgamated testified that the bank "having an investing focus on environmental considerations" does "not apply to Amalgamated Bank as trustee of the Longview funds." A-2107-08.

25

Dated: August 6, 2025

Respectfully submitted,

/s/ John Rizio-Hamilton
John Rizio-Hamilton (*pro hac vice*)
johnr@blbglaw.com
Rebecca E. Boon (*pro hac vice*)
rebecca.boon@blbglaw.com
John Esmay (*pro hac vice*)
john.esmay@blbglaw.com
Thomas Z. Sperber (*pro hac vice*)
thomas.sperber@blbglaw.com
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Plaintiffs, Lead Counsel for the
Class and proposed Class Counsel*

Caitlin M. Moyna
cmoyna@gelaw.com
Lauren J. Salamon
lsalamon@gelaw.com
**GRANT & EISENHOFER PA**
485 Lexington Avenue
New York, New York 10017
Phone: (646)722-8500
Fax: (646) 7222-8501

*Co-Lead Counsel for Co-Lead Plaintiff
Amalgamated Bank*

Lewis T. LeClair
Texas Bar No. 12072500
lleclair@mckoolsmith.com
**McKOOL SMITH PC**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4000
Fax: (214) 978-4044

*Liaison Counsel for the Class*

26

A-158

A-159

## CERTIFICATE OF SERVICE

I certify that on August 6, 2025, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

/s/ John Rizio-Hamilton
John Rizio-Hamilton

A-159

# EXHIBIT 5



A-160





A-162



A-163



A-164



A-165









A-170





A-172



A-173



A-174



A-175







A-178





A-180











A-185







A-188



A-189



A-190



A-191





A-193



A-194







A-197



A-198





A-200



A-201



A-202



A-203



A-204



A-205



A-206



A-207



A-208



A-209





A-211



A-212





A-214



A-216



# EXHIBIT 6

| | |
|---|---|
| **From:** | Rebecca Boon <Rebecca.Boon@blbglaw.com> |
| **Sent:** | Wednesday, July 30, 2025 2:27 PM |
| **To:** | Reed, Noelle M (HOU) |
| **Cc:** | Thomas Sperber; Hampton, Wallis M (HOU); Restey, Michael W (NYC); Davis, Abby (HOU); John Rizio-Hamilton; John Esmay; Caitlin Moyna; Lauren Salamon |
| **Subject:** | [Ext] RE: Exxon - Wright Deposition |

Noelle,

The record is clear that we have disclosed this expert to you repeatedly since July 24, 2024.  On July 24, consistent with the Court-ordered schedule, we said that "Plaintiffs designate Dr. Matthew D. Cain as a rebuttal expert. In addition, Plaintiffs may employ Paul Parsons of University of Texas and/or Randall Wright of Wright & Company as rebuttal experts if necessary to rebut evidence Defendants submit supporting their opposition to Plaintiffs' motion for class certification."

We have not misled the Court at any time. The schedule expressly allows for Lead Plaintiffs to submit "rebuttal evidence" with our reply brief, and for Defendants to depose "any rebuttal expert submitted with Lead Plaintiffs' Reply" during the period of August 6 through August 20, 2025.  We have already scheduled rebuttal expert Dr. Cain's deposition for August 15. We proactively reached out to you as a courtesy to try to secure a deposition date for Mr. Wright because scheduling during the summer months can be difficult.

As provided in the schedule, we will serve Mr. Wright's report on August 6. At that point, you will see the report and if you want to seek to strike/exclude it, we would be happy to discuss a briefing schedule and any necessary modification of the existing deposition schedule.

We do not believe that any motion on this issue at this point in time is necessary or appropriate.

Regards,
Rebecca


Rebecca Boon
**Bernstein Litowitz Berger & Grossmann LLP**
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1594
Fax: (212) 554-1444

---

**From:** Reed, Noelle M <Noelle.Reed@skadden.com>
**Sent:** Wednesday, July 30, 2025 2:31 PM
**To:** Rebecca Boon <Rebecca.Boon@blbglaw.com>
**Cc:** Thomas Sperber <Thomas.Sperber@blbglaw.com>; Hampton, Wallis M <Wallis.Hampton@skadden.com>; Restey, Michael W <Michael.Restey@skadden.com>; Davis, Abby <Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; John Esmay <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>
**Subject:** RE: Exxon - Wright Deposition

1

A-217

[This message is from an external sender]

Rebecca,

Your email, in which you continue to describe the "topic" of your new expert opinion only as some unspecified "new" arguments and evidence in our Opposition (putting aside the disingenuousness of calling responsive arguments in an Opposition brief "new"), confirms for the fourth time in this email chain that your plan is to present in your reply expert opinions (1) on issues **on which you bore the burden** in your opening Motion (but failed to carry that burden, and in many instances, failed to even try), and/or (2) on fact issues that have not been the subject of expert testimony and are not subject to rebuttal.  You first disclosed this plan to us on July 24, a full month after you reviewed our Opposition brief, in an email demanding that we depose this new expert on topics raised in your opening Motion on August 13, which will be just seven days after we receive your reply brief.  You also misleadingly failed to disclose this plan in your recently filed motion to extend the page limits in your reply.

We will ask the Court to compel you to disclose the actual topics in which you now plan to add expert testimony ("the new arguments and evidence in your brief" is not an expert topic, and you have refused to answer this simple question multiple times in this chain now and refused to confirm that you are not impermissibly attempting to present new evidence on topics on which you bore the burden), preclude you from supplementing your Motion now with new expert testimony on any issue on which you bore the burden, and extend the schedule for class cert briefing so this issue can be resolved before discovery closes and before we have to incur the unnecessary expense of taking the deposition of an impermissible expert.  As I have now said multiple times, the basis for expedition is the same as the basis you asserted for your recent motion to expedite.

I will attach this email chain to our motion and let the Court draw its own conclusions about your positions.

Regards,
NMR

**From:** Rebecca Boon <Rebecca.Boon@blbglaw.com>
**Sent:** Wednesday, July 30, 2025 9:49 AM
**To:** Reed, Noelle M (HOU) <Noelle.Reed@skadden.com>
**Cc:** Thomas Sperber <Thomas.Sperber@blbglaw.com>; Hampton, Wallis M (HOU) <Wallis.Hampton@skadden.com>; Restey, Michael W (NYC) <Michael.Restey@skadden.com>; Davis, Abby (HOU) <Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; John Esmay <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>
**Subject:** [Ext] RE: Exxon - Wright Deposition

Noelle,

We have repeatedly told you that our expert is rebutting the new (and incorrect) arguments and evidence you put in your opposition papers for the first time.  That of course includes a declaration that you submitted from an Exxon employee after the close of discovery, as well as Professor Ferrell's report, as part of your 1000-page submission.

You have still refused to tell us what motion you are purporting to file, or on what basis, or why you believe expedited briefing is necessary, or why any motion on a report you have not seen would not be premature. We reiterate our request that you provide this basic information so that we can consider it.  Your refusal to do so violates the ND Texas

2

A-218

rules requiring a conference. You certainly may not unilaterally declare or represent to the Court our position on any motions that you have not even identified.

Regards,
Rebecca


Rebecca Boon
**Bernstein Litowitz Berger & Grossmann LLP**
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1594
Fax: (212) 554-1444

**From:** Reed, Noelle M <Noelle.Reed@skadden.com>
**Sent:** Tuesday, July 29, 2025 9:52 PM
**To:** Rebecca Boon <Rebecca.Boon@blbglaw.com>
**Cc:** Thomas Sperber <Thomas.Sperber@blbglaw.com>; Hampton, Wallis M <Wallis.Hampton@skadden.com>; Restey, Michael W <Michael.Restey@skadden.com>; Davis, Abby <Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; John Esmay <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>
**Subject:** Re: Exxon - Wright Deposition

**[This message is from an external sender]**

Rebecca -

As you well know, we did not present any new argument in our opposition other than Dr Ferrell's price impact report.  The remainder of our brief addresses only the points on which you bore the burden.  You also know very well that you are not entitled to present a new expert opinion on matters for which you bore the burden (or if you don't, I strongly recommend you review NDTX case law on this point), nor can you file an expert report to rebut fact issues.  The schedule specifically does <u>not</u> allow this.  That we get a surreply on matters for which we bear the burden does not let you amend or supplement your motion in a reply.  And of course if it did, you would not be afraid to tell us precisely what topic your expert will address.

Because you've confirmed your new expert is not rebutting anything on which we bear the burden, but you have refused to say on what permissible topic your new expert will opine, we will bring this matter to the court and you can explain to the court why you refuse to make this disclosure.  We will of course have to file the motion and response as exhibits.

The basis for expediting is the same as your basis for expediting your motion on page limits, so I assume you do not oppose expedition.

NMR


> On Jul 29, 2025, at 8:34 PM, Rebecca Boon <Rebecca.Boon@blbglaw.com> wrote:

3

A-219

Hi Noelle,

We have told you that Mr. Wright is a rebuttal expert who will be responding to the new arguments you put in your opposition papers. The schedule expressly allows for this, as we recently briefed before the Court. You have known that we may be submitting a reply report from Mr. Wright for a year, and you will see his report when we serve it on August 6. Please help us understand why you think you are entitled to a preview of his report? We still don't have any clarity on what you are proposing to file at this time. Once we serve his report, you can make any motion you believe is appropriate, but we do not understand what you are proposing to file before you have seen his report.

Thanks so much,
Rebecca

---

**From:** Reed, Noelle M <Noelle.Reed@skadden.com>
**Sent:** Tuesday, July 29, 2025 7:06 PM
**To:** Rebecca Boon <Rebecca.Boon@blbglaw.com>
**Cc:** Thomas Sperber <Thomas.Sperber@blbglaw.com>; Hampton, Wallis M <Wallis.Hampton@skadden.com>; Restey, Michael W <Michael.Restey@skadden.com>; Davis, Abby <Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; John Esmay <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>
**Subject:** Re: Exxon - Wright Deposition

**[This message is from an external sender]**

Rebecca -

Please respond to my request from five days ago that you specify what opinions your new reply expert will provide.

> On Jul 29, 2025, at 6:04 PM, Rebecca Boon <Rebecca.Boon@blbglaw.com> wrote:
>
> Hi Noelle,
>
> I'm so sorry for the delay, I have been out of town preparing for and arguing a motion in another case. Can you please clarify what you are proposing to file and why you think expedited briefing is necessary so that we can consider your request and discuss with our clients?
>
> Thanks so much,
> Rebecca
>
> Rebecca Boon
> **Bernstein Litowitz Berger & Grossmann LLP**
> 1251 Avenue of the Americas
> New York, NY 10020
> Phone: (212) 554-1594

4

A-220

Fax: (212) 554-1444

---

**From:** Reed, Noelle M <Noelle.Reed@skadden.com>
**Sent:** Tuesday, July 29, 2025 4:25 PM
**To:** Rebecca Boon <Rebecca.Boon@blbglaw.com>; Thomas Sperber
<Thomas.Sperber@blbglaw.com>
**Cc:** Hampton, Wallis M <Wallis.Hampton@skadden.com>; Restey, Michael W
<Michael.Restey@skadden.com>; Davis, Abby <Abigail.Sheehan@skadden.com>; John
Rizio-Hamilton <Johnr@blbglaw.com>; John Esmay <John.Esmay@blbglaw.com>;
'Caitlin Moyna' <cmoyna@gelaw.com>; 'Lauren Salamon' <lsalamon@gelaw.com>
**Subject:** RE: Exxon - Wright Deposition

**[This message is from an external sender]**

---

Rebecca or one of the five other plaintiff's counsel on this email chain-

Please promptly and specify what issues precisely you intend to designate
Mr. Wright on in reply so we can address this with the Court.   We trust you do
not object to expedited briefing on the same ground that you sought
expedition of your page limit extension request.

Thank you
NMR

**Noelle M. Reed**
Partner
Skadden, Arps, Slate, Meagher & Flom LLP
1000 Louisiana, Suite 6800 | Houston | Texas | 77002-5026
**T: +1.713.655.5122** | **F: +1.713.483.9122**
**noelle.reed@skadden.com**

Skadden

---

**From:** Reed, Noelle M (HOU)
**Sent:** Friday, July 25, 2025 2:42 PM
**To:** 'Rebecca Boon' <Rebecca.Boon@blbglaw.com>; Thomas Sperber
<Thomas.Sperber@blbglaw.com>
**Cc:** Hampton, Wallis M (HOU) <Wallis.Hampton@skadden.com>; Restey, Michael W
(NYC) <Michael.Restey@skadden.com>; Davis, Abby (HOU)
<Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; John
Esmay <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren
Salamon <lsalamon@gelaw.com>
**Subject:** RE: [Ext] RE: Exxon - Wright Deposition

Rebecca –

As you know, you are not permitted in the NDTX to submit evidence or new
expert opinions in reply on issues for which you bear the burden.   The only

5

A-221

permissible rebuttal expert testimony would be rebutting Dr. Ferrell's price impact report.  Please specify what issues precisely you intend to designate Mr. Wright on in reply so we can address this with the Court.

Thanks so much –
NMR

---

**From:** Rebecca Boon <Rebecca.Boon@blbglaw.com>
**Sent:** Friday, July 25, 2025 2:22 PM
**To:** Reed, Noelle M (HOU) <Noelle.Reed@skadden.com>; Thomas Sperber <Thomas.Sperber@blbglaw.com>
**Cc:** Hampton, Wallis M (HOU) <Wallis.Hampton@skadden.com>; Restey, Michael W (NYC) <Michael.Restey@skadden.com>; Davis, Abby (HOU) <Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; John Esmay <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>
**Subject:** [Ext] RE: Exxon - Wright Deposition

Noelle,

Mr. Wright will be rebutting several incorrect assertions Defendants made in their opposition submission, addressing the full discovery record that closed after Plaintiffs served their papers. Dr. Cain will submit his own rebuttal report in which he will do the same.  On July 22, 2024, Plaintiffs disclosed that they may employ Mr. Wright as a rebuttal expert in addition to Dr. Cain.

Regards,
Rebecca

Rebecca Boon
**Bernstein Litowitz Berger & Grossmann LLP**
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1594
Fax: (212) 554-1444

---

**From:** Reed, Noelle M <Noelle.Reed@skadden.com>
**Sent:** Friday, July 25, 2025 2:15 PM
**To:** Thomas Sperber <Thomas.Sperber@blbglaw.com>
**Cc:** Hampton, Wallis M <Wallis.Hampton@skadden.com>; Restey, Michael W <Michael.Restey@skadden.com>; Davis, Abby <Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; Rebecca Boon <Rebecca.Boon@blbglaw.com>; John Esmay <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>
**Subject:** RE: Exxon - Wright Deposition

**[This message is from an external sender]**

Tom –

6

A-222

I have not seen a response to this.  Please confirm today that Mr. Wright's report will be a rebuttal on price impact and that you will not be relying on Cain on reply so that we can discuss depositions.

Thanks –
NMR

---

**From:** Reed, Noelle M (HOU) <Noelle.Reed@skadden.com>
**Sent:** Thursday, July 24, 2025 6:51 PM
**To:** Thomas Sperber <Thomas.Sperber@blbglaw.com>
**Cc:** Hampton, Wallis M (HOU) <Wallis.Hampton@skadden.com>; Restey, Michael W (NYC) <Michael.Restey@skadden.com>; Davis, Abby (HOU) <Abigail.Sheehan@skadden.com>; John Rizio-Hamilton <Johnr@blbglaw.com>; Rebecca Boon <Rebecca.Boon@blbglaw.com>; Esmay John <John.Esmay@blbglaw.com>; Caitlin Moyna <cmoyna@gelaw.com>; Lauren Salamon <lsalamon@gelaw.com>
**Subject:** Re: [Ext] Exxon - Wright Deposition

Tom -

I take it this is a rebuttal report and Wright will be your expert on price impact instead of Cain.   Please confirm.

Thanks
NMR

> On Jul 24, 2025, at 5:58 PM, Thomas Sperber <Thomas.Sperber@blbglaw.com> wrote:
>
> Counsel,
>
> We will be submitting an expert report from Randy Wright with our reply brief.  In the event that you want to depose Mr. Wright, he is available on August 13 in New York.  Given summer schedules, we would like to lock down a date.
>
> Thanks,
> Tom
>
> Tom Sperber
> **BLB&G**
> Bernstein Litowitz Berger & Grossmann LLP
> 1251 Avenue of the Americas
> New York, NY 10020
> (212) 554-1939

--------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

============================================================================

--------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

============================================================================

--------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

================================================================================

--------------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and

8

A-224

may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================

--------------------------------------------------------------------------------
This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

===============================================================================

9

# EXHIBIT 7





A-227





A-229

# EXHIBIT 8

A-230

A-231

A-232



# EXHIBIT 9

A-237



A-240



A-242

A-244

A-247

A-248